*************************************************************

**UNITED STATES COURT OF FEDERAL CLAIMS**

*************************************************************

**02-796C**
**(Judge Allegra)**

**INFORMATION SYSTEMS & NETWORKS CORPORATION,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

*************************************************************

# PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF INFORMATION SYSTEMS & NETWORKS CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT FOR BREACH OF CONTRACT

*************************************************************

**Norman H. Singer, Esquire**
**Benjamin M. Kahrl, Esquire (of counsel)**
**Singer & Associates, P.C.**
**10411 Motor City Drive**
**Suite 725**
**Bethesda, Maryland 20817**
**(301) 469-0400**

**Attorneys for Plaintiff**

# TABLE OF CONTENTS

TABLE OF CITATIONS .......... 3

QUESTION PRESENTED .......... 4

STATEMENT OF THE CASE .......... 5

A. Introduction .......... 5

B. Factual Background .......... 6

1. The Contract .......... 6

2. The Engineering Change Proposal .......... 8

3. Termination of Contract for Convenience .......... 10

4. Government Rescinds Settlement Agreement and Denies for That ECP is Enforceable .......... 14

5. Funding .......... 15

ARGUMENT .......... 16

A . Summary Judgment Standard .......... 16

B. There is No Genuine Dispute That the Government Contracted For ISN's Work Pursuant to the ECP .......... 17

1. Contractors may recover on a contract with the Government where the issuance of a final writing is a "mere formality" and the contract is "implied in fact." .......... 17

2. There is no genuine dispute that the parties had an enforceable contract implied-in-fact .......... 21

CONCLUSION .......... 23

# TABLE OF CITATIONS

CASE CITATIONS

Algonac Mfg. Co. v. United States, 192 Ct. Cl. 649, 428 F.2d 1241 (1970)………………………………………………………………………… 19

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ……...………………………. 17

Armco, Inc. v. Cyclops Corp., 791 F.2d 147 (Fed. Cir. 1986) ………………………. 16

Baltimore and Ohio R.R. Co. v. United States, 261 U.S. 592 (1923)………………. .. 19

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ……………………………………... 17

Cities Service Gas Co. v. United States, 205 Ct. Cl. 16, 500 F.2d 448 (1974) …...…19-20

Essex Electro Engineers, Inc., ASBCA 30118 *et al.*, 88-1 BCA 20,440 (1987) ……18-19

J.S. Alberici Construction Co., Inc. v. General Svcs. Admin., GSBCA No. 12,386, 94-2 BCA ¶26,776 (1994) ……………………..……………...18

Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987) ………....16

Narva Harris Constr. Corp. v. United States, 216 Ct. Cl. 238, 574 F.2d 508 (1978)……………………………………………………………………………20

PacOrd, Inc. v. United States, 139 F.3d 1320 (9th Cir.) ...………………………….20-21

Texas Instruments, Inc. v. United States, 922 F.2d 810 (Fed. Cir. 1990) ……………...18

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **INFORMATION SYSTEMS & NETWORKS CORPORATION** | : | |
| **Plaintiff** | : | |
| **v.** | : | **Case No. 02-796C** |
| | : | **(Judge Allegra)** |
| **UNITED STATES OF AMERICA** | : | |
| **Defendant** | : | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF INFORMATION SYSTEMS & NETWORKS CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT FOR BREACH OF CONTRACT**

Plaintiff Information Systems and Networks Corporation ("ISN"), by counsel, submits this Memorandum of Points and Authorities in Support of its Motion For Partial Summary Judgment on Count I of the Complaint for Breach of Contract.

## I. QUESTION PRESENTED

Is a government contractor entitled to summary judgment on the Government's liability for breach of a modification to a contract where: (a) the Government requested the modification; (b) the parties had a meeting of the minds as to the terms of the modification; (c) the Government indicated through the contracting officer's contract specialist and technical representative that the modification had been approved; (d) the Government issued additional funding for the work covered in the modification; and (e) the Government accepted work from the contractor pursuant to the terms of the modification?

## II. STATEMENT OF THE CASE

### A. Introduction

This Motion is based upon overwhelming evidence gleaned from discovery demonstrating the existence of a binding modification to the contract at issue in this litigation. The underlying facts demonstrate the existence of an implied-in-fact contract to modify the existing contract between the parties in order to include work requested from ISN by the Government and documented in the formal engineering change proposal ("ECP") submitted by ISN. Implied-in-fact contracts have been routinely enforced against the Government under circumstances similar to those present in this case: Where the parties have come to the meeting of the minds as to the scope and amount of work, and where the actions of the parties confirm the existence of that contract. In such instances, the issuance of a formal writing is considered a mere formality, the absence of which cannot be used by the Government to escape the terms of the contract modification.

In this case, ISN submitted the ECP at the Government's request. The Government's contracting specialist indicated that the ECP was approved. The Government's technical representatives approved the ECP, and indicated that the only remaining requirement was the Government's changes to its internal funding documents. The Government altered funding for the contract in order to fund the ECP. The Government was aware that ISN had commenced work on the ECP, supervised such work, and drafted a progress report regarding ISN's work on the ECP. In short, the parties had a binding agreement for the work contemplated in the ECP, and ISN is entitled to a judgment that the Government's decision to repudiate the ECP agreement constitutes a breach of its obligations to ISN under the ECP.

## B. Factual Background

### *1. The Contract*

The Navy awarded ISN a competitively bid contract (the "Contract") in 1994 to provide turnkey Automated Technical Control Systems ("ATCS") at designated Navy sites. (Crawford[1] Dep. Tr. at 23-24); (Bergdahl[2] Dep. Tr. at 13). The Contract was performed for the benefit of the Space and Naval Warfare Systems Command ("SPAWAR"). (Bergdahl Dep. Tr. at 115). SPAWAR is responsible for all Naval data communications at both ship and shore facilities, as well as the Navy's echelon command. (Bergdahl Dep. Tr. at 20). The firm fixed-price Contract required ISN to provide all material, labor and services necessary to engineer, install, test, and provide operational assistance and training and maintenance services for three ATCS turnkey facilities located at Naval Telecommunications Center ("NTCC") Hampton Roads, NTCC Camp H.M. Smith and NTCC Makalapa (Pearl Harbor). (Crawford Dep. Tr. at 24, 29). The Contract consisted of two lots: Lot I consisted of Hampton Roads, Camp Smith and Makalapa. Lot II consisted of Puerto Rico and Japan. (Crawford Dep. Tr. at 24). The Contract was separated into two lots to make Lot II an option to the Contract. (Crawford Dep. Tr. at 26-27). Funding for the ATC Contract from fiscal year 1994 through September 30, 1996 totaled $7.14 million. (Bergdahl Dep. Tr. at 95). Initial funding for Lot I of the Contract was $4,416,646. (Bergdahl Dep. Tr. at 91-92); (Crawford Dep. Tr. at 110). Attached as Exhibit 3 is a true and correct copy of the SPAWAR funding document allocating $4,416,646 to Lot I of the Contract. SPAWAR

---

[1] The deposition transcript of Roscoe W. Crawford taken on October 18, 1999. Excerpts from Mr. Crawford's deposition transcript are attached hereto as Exhibit 1.

[2] The deposition transcript of Jeffrey Bergdahl taken on October 29, 1999. Excerpts from Mr. Bergdahl's deposition transcript are attached as Exhibit 2.

also was appropriated another $7 million in the ANCC/ATC[3] procurement program for fiscal year 1996 ("FY '96"). (Bergdahl Dep. Tr. at 100, 101); (Exh. 3). As of October 1995, SPAWAR had received at least $2.5 million of the FY '96 ATC program appropriation. (Bergdahl Dep. Tr. at 101); (See Paragraph 4 of the SPAWAR funding document attached as Exhibit 4).

The Navy Contracting Officer ("CO") on the ISN ATCS Contract was Roscoe Crawford. (Bergdahl Dep. Tr. at 15). As a Navy CO, Mr. Crawford is responsible for negotiating contracts for supplies and services with full authority to bind the Government. (Crawford Dep. Tr. at 12). Mr. Crawford also provides administration services on the contracts he awards, i.e., taking care of any problems that may arise after a contract is awarded, implementing contract change orders, modifications, changes in delivery, and changes in the period of contract performance. (Crawford Dep. Tr. at 12).

The CO's technical representative ("COTR") on the ISN ATC Contract was Jeffrey Bergdahl. (Bergdahl Dep. Tr. at 14, 20). As a Navy COTR, Mr. Bergdahl was responsible for monitoring a contractor's performance, and any problems that the contractor encounters when performing a contract are reported by the COTR to the CO. (Crawford Dep. Tr. at 13). Mr. Bergdahl was selected as the COTR on the ISN ATC Contract because he was the SPAWAR employee that possessed the necessary technical background for the ATC Contract. (Bergdahl Dep. Tr. at 18-19).

Lisa Murtha was the contract specialist assigned to the ISN ATC Contract. (Crawford Dep. Tr. at 64-65.) A contract specialist reports to a CO, and a CO normally assigns only one contract specialist to a government contract. (Crawford Dep. Tr. at 17). The contract specialist negotiates and administers contracts. (Crawford Dep. Tr. at 9). Changes to the terms and

---

[3] "ANCC" refers to a related contract for three automated control network centers.

conditions of a contract came through the contract specialist and the CO. (Crawford Dep. Tr. at 13-14.) Ms. Murtha was the CO's representative to ISN "regarding any contractual matter that pertained to the case." (Crawford Dep. Tr. at 65).

### ***2. The Engineering Change Proposal***

Due to numerous revisions by the Government to the specification requirements and the ATCS site/facility and equipment configurations, the Navy requested that ISN submit an ECP to incorporate the directed changes into the Contract. (Bergdahl Dep. Tr. at 32, 35, 36, 47). The ECP principally involved equipment modifications at the Navy's Hampton Roads facility because the site configuration at Hampton Roads had changed. (Bergdahl Dep. Tr. at 47, 80). ISN submitted a final ECP in a letter to Bergdahl dated June 20, 1995. Attached to the ECP was (1) a cost breakdown differntiated by total cost, contract cost and ECP cost; (2) an equipment list for NTCC Hampton Roads; and (3) a revised schedule with a set of specific de livery dates for NTCC Hampton Roads. A true and correct copy of the ECP, with attachments, is attached as Exhibit 5.

The Navy subsequently approved the ECP submitted by ISN, both verbally and in writing. (Bergdahl Dep. Tr. at 32, 34, 45, 81, 82, 83). In a letter to ISN dated June 26, 1995, the Navy's contract specialist working with Roscoe Crawford indicated her receipt of the ECP and that "[a] modification to the contract will be issued for the combination of both the formal acceptance of an ECP of all sites in Lot I and the revised delivery schedule for all sites in Lot I." A true and correct copy of the June 26, 1995 letter is attached as Exhibit 6. Ms. Murtha further explained in her letter to ISN, "I am your first line point of contact within this activity" and that all questions regarding the contract should be directed to her. (Exh. 6).

SPAWAR confirmed its acceptance of ISN's ECP in writing by letter dated July 21, 1995. (Bergdahl Dep. Tr. at 81). A true and correct copy of a facsimile cover sheet from Jeffrey

Bergdahl to Roscoe Crawford dated July 21, 1995, with an attached letter from the SPAWAR Commander to the Office in Charge at the Navy Fleet Industrial Supply Center ("FISC") dated July 20, 1995 is attached as Exhibit 7. ISN was also verbally informed that the ECP had been approved on or around July 21, 1995. (Bergdahl Dep. Tr. at 82). On or about August 31, 1995, ISN was again informed in writing that the ECP had been approved, and that SPAWAR had submitted all of the documentation to FISC, i.e., the contracting office. (Bergdahl Dep. Tr. at 83). A true and correct copy of a memorandum from Jeffrey Bergdahl to Bill Robertson dated August 31, 1995 is attached as Exhibit 8.

SPAWAR further informed ISN that only the wording on the Contract funding document had to be changed, i.e., the funding document for the Lot II Puerto Rico ATC project would be changed to provide funding for ISN's ECP at Hampton Roads. (Bergdahl Dep. Tr. at 83-84). In August, 1995, the funding document for the Lot II Puerto Rico ATC project was amended to transfer the funds to the ISN ATC Contract to exercise the Hampton Roads ATC ECP. (Bergdahl Dep. Tr. at 87). The total funds transferred from the Lot II Puerto Rico ATC project to the Hampton Roads ATC project to fund the ECP was $789,319. (Bergdahl Dep. Tr. 88). A true and correct copy of the SPAWAR funding document received at NRCC on August 29, 1995 which transferred funds from the Puerto Rico project to the ISN ATC contract at Hampton Roads to exercise the ECP is attached as Exhibit 9.

Based upon SPAWAR's approval of the ECP, and the necessity of implementing the ECP configuration to perform the contractual requirements, ISN proceeded to perform the required and directed changes. (Bergdahl Dep. Tr. at 34-35, 36, 38, 58, 104). SPAWAR provided assistance to ISN with regard to ISN's ECP work. (Bergdahl Dep. Tr. at 58-60). Both SPAWAR and ISN assumed that the ECP would be formally approved by FISC. (Bergdahl Dep. Tr. at 105).

FISC never issued a "formal" approval of the ECP by way of a signed, Standard Form 30 ("SF-30"). (Bergdahl Dep. Tr. at 42-43); (Crawford Dep. Tr. at 43). It is undisputed that upon receiving agreement to the ECP, ISN could commence work on the ECP prior to the issuance of an SF-30. (Bergdahl Dep. Tr. at 46). ISN was never told that it should not commence work pursuant to the ECP until the SF-30 was issued. (Bergdahl Dep. Tr. at 46). The CO, Crawford, later explained at deposition that the only reason an SF-30 was not issued was that the ECP did not contain a revised schedule for the contract for Lot I. (Crawford Dep. Tr. at 66.) However, a revised schedule was clearly referenced in and attached to the ECP. (Exh. 5). Murtha, the CO's representative, acknowledged receipt of the ECP, and had communicated in writing to ISN that a modification of the contract woul be issued for "the formal acceptance of an ECP for implementation of all sites in Lot I <u>and the revised delivery schedule</u> for all sites in Lot I." (Exh. 6) (emphasis added). Crawford oversees over 50 government contracts at a time. (Crawford Dep. Tr. at 18).

On October 19, 1995, Mr. Bergdahl submitted a written evaluation regarding the ISN ATC project, and stated that "ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule." (Bergdahl Dep. Tr. at 102). A copy of Evaluation of Progress Payment No. 1319-03 submitted by Jeffrey Bergdahl on October 19, 1995 is attached as Exhibit 10. The total validated cost estimate for the ECP was $930,527.00. (Exh. 5).

***3. Termination of Contract for Convenience***

On or about December 6, 1995, SPAWAR and FISC held a meeting where the termination of SPAWAR's ATC Contract with ISN was discussed. (Bergdahl Dep. Tr. at 113, 114). SPAWAR did not want to terminate the Contract with ISN "that we worked so hard to get." (Bergdahl Dep. Tr. at 114, 116). During this meeting, it was discussed that SPAWAR

(Jeffrey Bergdahl, the COTR) could not continue to state that ISN was performing satisfactorily on ISN's progress payments paperwork so that progress payments could be withheld from ISN. (Bergdahl Dep. Tr. at 116). A true and correct copy of notes taken at the December 6, 1995 meeting that are contained in the FISC file regarding the ISN ATC Contract is attached as Exhibit 11.

The Navy terminated the Contract for the convenience of the Government effective March 15, 1996. (Compl. ¶ 11); (Answer ¶ 11). ISN submitted its certified, total cost basis, termination settlement proposal in the amount of $5,060,758 to the Government on June 6,1996 in accordance with FAR Part 49. (Compl. ¶ 11); (Answer ¶ 11). The settlement proposal costs included the costs incurred to perform the work described in the approved ECP, and, while the costs were segregated by item/job number in the accounting system, ISN did not identify the ECP costs as a separate claim within the termination settlement proposal. (Compl. ¶ 11); (Answer ¶ 11).

The Defense Contract Audit Agency ("DCAA") conducted a cost audit of ISN's termination settlement proposal and questioned the allowability of $1,011,047.00 of the proposed termination costs, the majority of which constituted costs in excess of the Contract price and profit. (Compl. ¶ 12); (Answer ¶ 12). Based upon the audit, ISN received total payments of $4,049,532 on the ATC Contract.

By letter dated August 8, 1997, Denise Jones, the termination contracting officer (TCO), then issued a unilateral determination which found that ISN was entitled to $4,049,532 under its termination settlement proposal. (Jones[4] Dep. Tr. at 54). A true and correct copy of the letter dated August 8, 1997 from Denise M. Jones to Bobby Melvin is attached as Exhibit 13. Since

[4] The deposition transcript of Denise Jones taken on October 22, 1999. Excerpts from Ms. Jones' deposition transcript are attached as Exhibit 12.

ISN had already been paid $4,049,532, the TCO stated that ISN was entitled to nothing. The TCO further informed ISN that it could submit additional information to the TCO that could impact her decision. (Jones Dep. Tr. at 55).

Thereafter, by letter dated September 5, 1997, ISN provided the TCO with supplemental information that supported ISN's entitlement to an additional $891,364 for work performed pursuant to the approved ECP.[5] (Jones Dep. Tr. at 60). A true and correct copy of the letter dated September 5, 1997 from Robert M. Cozzie, Esq. to Denise M. Jones is attached as Exhibit 14. Upon receipt of ISN's supplemental information, the TCO by certified letter dated October 9, 1997, requested confirmation of the information from the CO. (Jones Dep. Tr. at 63, 65). A true and correct copy of the letter dated October 9, 1997 from Denise M. Jones to Roscoe Crawford is attached as Exhibit 15. Specifically, Ms. Jones requested:

> It is asked of your office to review the enclosed information and provide to our office any documentation that would support that the ECP was never approved, that ISN was told not to perform the work related to the ECP, Why (sic) the modification was not issued to incorporate the ECP, if the mod was issued provide us a copy, or give us the actual cost that was agreed upon for the ECP.

Ms. Jones did not receive a response from CO Crawford to her October 9, 1997 letter. (Jones Dep. Tr. at 63, 66).

Due to no response from the CO, Ms. Jones sent another letter to CO Crawford dated November 5, 1997. (Jones Dep. Tr. 66-69). A true and correct copy of the letter dated November 5, 1997 from Denise M. Jones to Roscoe Crawford is attached as Exhibit 16. In that letter, Ms. Jones stated:

> Several attempts have been made to get your office to provide information on subject termination. A certified letter was sent to you on October 9, 1997 requesting you provided (sic) information on subject termination. After getting no response from you, I

[5] For the purposes of this Motion, ISN's damage entitlement under the ECP is not before the Court. However, the conduct of the defendant on the issue of settling the ECP demonstrates the parties' acceptance of the validity of the ECP agreement.

> phoned you on October 29, 1997 and we discussed the matter once again and at that time you informed me that you would setup a conference call for Friday October 31, 1997 with you, Jeff Bergdahl, and myself. Once again I did not hear from your office. On Monday, November 23, 1997, I phoned and got your voice mail. I left a message for you to call me, no response. I also left a message on Jeff Bergdahl's voice mail and there was no response from his office.
>
> This letter is to inform that based on the material provided to the TCO, The (sic) TCO is ready to make an offer to ISN for the settlement of the termination settlement proposal and the ECP in the amount of $4,940,725.00. This would require additional funding on the contract in the amount of $524,079.46. It is asked of your office to reply to this letter as to whether you agree or disagree. It is asked that you respond no later than COB November 7, 1997. If no response is received from your office by this date then TCO will proceed with settlement. (for emphasis)

The TCO established the settlement figure of $4,940,725 based on the audit report and supplemental information contained in the September 5, 1997 letter from ISN. (Jones Dep. Tr. at 71). The TCO: (1) acknowledged that ISN was paid $4,049,532 on the ATC Contract; (2) acknowledged that ISN had submitted information supporting a final settlement of an additional $891,364; (3) recognized available funding of $4,416,646; and (4) further recognized an additional $524,079.46 in funding was needed to pay ISN the full $891,364.

By letter dated November 13, 1997, the TCO offered ISN the sum of $891,364.00 in full and final settlement of ISN's claims under the terminated Contract.[6] (Jones Dep. Tr. at 77). A true and correct copy of the letter dated November 13, 1997 from Denise M. Jones to Robert M. Cozzie is attached as Exhibit 17. In that letter Ms. Jones in part stated:

> Contingent upon funding from The Department of the Navy, Fleet and Industrial Supply Center Norfolk, Washington, DC the TCO makes the following offer to ISN for the settlement on subject contract:

| | |
|---|---|
| Actual Costs and Profit | $4,909,211.00 |
| Total Previous Payment to ISN | (4,049,532.00) |
| Settlement Expenses | 31,685.00 |
| Net Settlement | 891,364.00 |

[6] The defendant has never disputed the authority of the TCO to settle the ECP agreement. Thus, the TC also had the authority to agree to it in the first place.

> Once again this is contingent on funding from the Department of the Navy. If your are in agreement with the settlement please sign at the bottom of this letter and return to this office. (for emphasis)
>
> * * *

ISN agreed with the Navy's settlement offer, and accepted the offer by signing the letter and returning it to the TCO on November 14, 1997. (Jones Dep. Tr. at 86-89). A true and correct copy of ISN's acceptance of the November 13, 1997 settlement offer is attached as Exhibit 18.

On November 18, 1997, the TCO sent another letter to CO Crawford advising him of the settlement offer and requesting additional funding in the amount of $524,079.46. (Jones Dep. Tr. 88-89). A true and correct copy of the letter dated November 18, 1997 from Denise M. Jones to Roscoe Crawford is attached as Exhibit 19.

### ***4. Government Rescinds Settlement Agreement And Denies For First Time That ECP Is Enforceable.***

On December 1, 1997, CO Crawford finally contacted the TCO regarding the ISN settlement. Mr. Crawford's reason for not contacting the TCO sooner was because he was on travel. (Crawford Dep. Tr. at 52). A true and correct copy of the December 1, 1997 letter from Roscoe Crawford to Denise M. Jones is attached as Exhibit 20. In that letter, CO Crawford stated:

> This office is in agreement with the original DCAA Audit Report No. 6311-97B17100001 and your August 8, 1997 letter determination that the net amount of $0 was due to ISN. ISN has provided your office with volumes of supposed justification for additional compensation based on supposed approval of an ECP. This ECP was not approved and no services/supplies were received as stated by ISN. The ISN request for payment is unwarranted and as a Contracting Officer, not approved by myself.
>
> * * *
>
> In summary, additional funding will not be provided. The ECP referred to by ISN was not approved. No further funding is approved.

It is CO Crawford's position that his December 1, 1997 letter to the TCO was simply to provide her with the information regarding ISN that she had previously requested. (Crawford Dep. Tr. at 132). Crawford further states:

> She (TCO Jones) entered into the agreement. I finally got back to her after she had entered into the agreement, and I provided her with the information that she had been requesting from us all along. Based on that information, I guess she rescinded her offer. (Crawford Dep. Tr. at 132).

Based on this information provided by CO Crawford, the TCO rescinded the written settlement offer accepted by ISN.[7] (Jones Dep. Tr. at 109-110, 113). By letter dated December 9, 1997, TCO Jones informed ISN:

> In our referenced letter to your office you were advised that the offer was contingent on funding from The Department of the Navy, Fleet and Industrial Supply Center Norfolk, Washington, DC.
>
> Our office has been advised by FISC that "additional funding will not be provided. The ECP referred to by ISN was not approved. No further funding is approved." FAR 49.114 requires I solicit the opinion of the Contracting Officer on all unadjusted changes. FISC's determination is that no amount is due and no funding will be provided. Accordingly, it is my determination that the Gross Settlement for this termination will be $4,049,532.00. The amount due ISN is $0. . .

A true and correct copy of the December 9, 1997 letter from Denise M. Jones to Robert Cozzie is attached as Exhibit 21.

***5. Funding***

At a minimum, it has never been disputed that the ISN ATC Contract was at least funded in the amount of $4,416,646. (Bergdahl Dep. Tr. at 91-92); (Crawford Dep. Tr. at 110); (Jones Dep. Tr. at 114). Therefore, at least $367,114 ($4,416,646 - $4,049,532) in ATC Contract funds exists to in part satisfy the $891,364 settlement. Funding for the ATC Contract from fiscal year 1994 through September 30, 1996 totaled $7.14 million. (Bergdahl Dep. Tr. at 95).

---

[7] To be clear, the settlement agreement was rescinded by the TCO because CO Crawford would not fund it. CO Crawford never claimed that TCO Jones had no authority to bind the defendant to the agreement, subject to funding.

Furthermore, SPAWAR was appropriated another $7 million in the ANCC/ATC procurement program for fiscal year 1996. (Bergdahl Dep. Tr. at 100, 101); (see also the true and correct copy of a SPAWAR e-mail dated April 12, 1995 which states that "[w]e have about $7M in the ANCC/ATC procurement program in FY 96 which is less than 6 months away" -- attached as Exhibit 22). As of October 1995, SPAWAR had received at least $2.5 million of the FY '96 ATC program appropriation. (Bergdahl Dep. Tr. at 101). Paragraph 4 of the SPAWAR fiscal year 1996 funding document signed on October 2, 1995 in the amount of $2,469,000 shows that the funds were appropriated for a three- year period, through September 30, 1998. (Exh. 4). In August, 1995, the funding document for the Puerto Rico ATC project was amended to transfer the funds to the ISN ATC Contract to exercise the Hampton Roads ATC ECP. (Bergdahl Dep. Tr. at 87); (Ex. 9). The total funds transferred from the Puerto Rico ATC project to the Hampton Roads ATC project to fund the ECP was $789,319. (Bergdahl Dep. Tr. 88). Accordingly, almost $15 million in funds existed in which to either satisfy ISN's $891,364 settlement or pay the costs incurred under the ECP agreement.

## III. ARGUMENT

### A. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The burden is on the moving party to establish the absence of any genuine issue of material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. Mere denials or conclusory statements are not sufficient to defeat a motion for summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-1391 (Fed. Cir. 1987); Armco, Inc. v. Cyclops Corp., 791 F.2d 147, 149 (Fed. Cir. 1986).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247-48 (1986). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." A dispute about a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Moreover, when a party moves for summary judgment on an issue for which the other party bears the burden of proof, the moving party may obtain summary judgment by pointing out that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). As the Court explained, summary judgment may be entered against a party who fails to make a showing sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Id. at 322-23.

### B. There Is No Genuine Dispute That The Government Contracted for ISN's Work Pursuant To The ECP.

#### ***1. Contractors may recover on a contract with the Government where the issuance of a final writing is a "mere formality" and the contract is implied-in-fact.***

ISN is entitled to judgment as a matter of law as to the Government's contractual liability for the costs associated with the ECP, as no formal writing was required by law. The Federal Circuit has observed in government contract disputes:

> "The law has long been that '[I]t makes no difference that the contract was not formally signed or the bond formally approved' for the Government to be bound by the terms of a contract. . . . '[F]ormal execution, as we have seen, [is] not essential to the consummation of contract.' . . . **The absence of an SF-30 therefore does not exclude the possibility that a final binding agreement was reached**."

*Texas Instruments, Inc. v. United States*, 922 F.2d 810 (Fed. Cir. 1990) (citations omitted) (emphasis added).

Several courts and administrative boards have upheld the enforceability of oral or written contracts or contract modifications in the absence of a signed SF-30. For example, the General Services Administration Board of Contract Appeals has ruled that where the standard form modification, SF-30, was only a "mere formality" and not a "condition precedent" to agreement, the failure to complete the written modification did not prevent the Board from finding that an enforceable modification had been created.

*See J.S. Alberici Construction Co., Inc. v. General Services Admin.*, GSBCA No. 12,386, 94-2 BCA ¶ 26,776 at 133,173 (1994). The GSBCA determined that

> the better view is that the completion of SF 30 was not a condition precedent to the appellant's entitlement to compensation. The parties agreed that the work was beyond that required by the contract. They agreed on a fair and reasonable price. Finally, they agreed on the number of extra sprinkler heads installed. Only the memorialization of their agreement remained to be completed.

*Id.*

As noted in the *Alberici* decision, a similar ruling was made in *Essex Electro Engineers, Inc.*, ASBCA 30118 *et al.*, 88-1 BCA 20,440 (1987). The parties in *Essex* had reached an oral agreement that had not been reduced to writing. *Id.* at 103,366. Price negotiation memoranda had been written which reflected "complete consideration of all issues and reflect[ed] the contractor's proposal, Government's negotiation objective" and the payment agreed upon. *Id.* at 103,364. Both parties at that point viewed the formal writing as a mere formality and not as a

contingency. *Id*. at 103,364-65. In upholding the contractor's claim, the board stated that "failure to reduce the agreement to writing on the SF 30 form [*sic*] is not *per se* fatal to the enforceability of the agreement." *Id*. at 103,368.

Federal courts interpreting the Contract Disputes Act have also enforced government contracts despite the absence of a signed writing from the CO. Such agreements are enforced if they satisfy the requirements of an implied-in-fact contract. It is well established that an implied-in-fact contract requires a meeting of the minds which is inferred from the conduct of the parties and, in light of surrounding circumstances, shows their tacit understanding and agreement. *Algonac Mfg. Co. v. United States*, 192 Ct. Cl. 649, 428 F.2d 1241, 1255 (1970). Such an implied contract requires the same elements as an express contract, i.e., an offer, acceptance and consideration. *Baltimore and Ohio R.R. Co. v. United States*, 261 U.S. 592, 597 (1923).

A contractor recovered on an implied-in-fact contract in *Cities Service Gas Co. v. United States*, 205 Ct. Cl. 16, 500 F.2d 448 (1974). In that case, the plaintiff sold and delivered gas to two Army locations pursuant to two written agreements from 1928 to 1971. The plaintiff thereafter terminated both contracts, but the parties negotiated for continued sales and purchases despite disagreements over price. The plaintiff sent letters indicating that it would continue to sell and deliver gas to the locations despite the absence of a written contract. The Army not only agreed to accept the deliveries of gas, but insisted upon such deliveries in a letter stating, "You are hereby informed that the Army has no intention whatsoever to permit or consent to any reduction or abandonment of service by your company." The Army continued to pay for the gas, although a dispute arose over the amount due for gas.

The court found that the facts established a "meeting of the minds" and "a clear case of a contract implied in fact." 205 Ct. Cl. at 24, 500 F.2d at 452. As a result, the court granted the

contractor's motion for partial judgment on the issue of liability, and held that the contractor was entitled to recover for the value of all of the gas provided on a *quantum meruit* basis. 205 Ct. Cl. at 32, 500 F.2d at 457.

A similar result is found in *Narva Harris Constr. Corp. v. United States*, 216 Ct. Cl. 238, 574 F.2d 508, 510-11 (1978). In *Narva Harris*, a government representative encouraged a contractor to submit an unrealistically low bid in order to get a project started. 574 F.2d at 509. The government representative assured the contractor that the cost figures would be adjusted later to reflect the actual cost. *Id.* Based upon these assurances, the contractor proceeded with the work. *Id.* After the contractor completed the work, the government failed to adjust the cost figures as promised. *Id.* at 510. The contractor sued the government, which defended on the basis that the contract to adjust the cost figures was not in writing. *Id.*

The Court of Claims held, "The failure, for whatever reason, of an attempt at an express contract be it written or oral, is not enough, in itself, to deprive a party of a recovery for breach where sufficient additional facts exist for the court to infer the 'meeting of the mind' necessary to separate an implied-in-fact from a pure implied-in-law contract." *Id.* at 511. The Court of Claims further concluded that the plaintiff could recover if it could "prove facts, in addition to the alleged express oral contract, from which a contract may be inferred . . . ." *Id.* at 512.

The decision in *Narva Harris* was recently relied upon in *PacOrd, Inc. v. United States*, 139 F.3d 1320 (9th Cir. 1998). In *PacOrd*, the plaintiff sued a government contractor ("A&E") and the Government for the costs of ship repair work it had done for the Navy as a subcontractor. *Id.* at 1321. After awarding a master contract to A&E, the Navy became concerned that A&E would have difficulty getting subcontractors because A&E had a past history of not paying them. *Id.* An authorized contracting officer from the Navy told the plaintiff that if it would subcontract with A&E on the project, the Navy would require A&E to establish an escrow account for the

payment of subcontractors in order to guarantee that the plaintiff would get paid. *Id.* After the plaintiff contracted with A&E and completed its work, A&E failed to pay plaintiff despite the payments A&E received from the Navy. *Id.* The plaintiff sued A&E and the government, alleging in part that the government had entered an oral guaranty contract in order to secure plaintiff's services as a subcontractor. *Id.* at 1322.

The Ninth Circuit held that an implied-in-fact contract is an exception to the requirement in FAR 2.101 (48 C.F.R. § 2.101) that contracts with the government be in writing. *Id.* Relying on the decision in *Narva Harris*, the Ninth Circuit noted that in both cases the government had made assurances in order to secure performance from the contractor, and that in both instances the contractor "proceeded and completed its work in reliance on the government's assurances." *Id.* at 1323. As a result, the Ninth Circuit determined that the plaintiff could recover if it proved an implied-in-fact contract at trial. *Id.*

### ***2. There is no genuine dispute that the parties had an enforceable contract implied-in-fact.***

There is no genuine issue of material fact that the Government approved the ECP, notwithstanding the lack of an executed SF-30. The Government communicated its acceptance of the ECP immediately through the CO's contract specialist, Lisa Murtha. The ECP was further accepted by Bergdahl, who told ISN that the ECP had been "technically approved" and that all that remained for completion of the ECP was the Governments own internal changes to funding documents. Crawford admitted that the Government intended to contract for the ECP, and that the only reason that the SF-30 was not issued was due to the lack of a revised schedule. But it isundisputed that a revised schedule was attached to the ECP, and that ISN was not told to submit a different schedule or to not commence work on the ECP.

ISN commenced work pursuant to the ECP in reliance on the communications from Bergadahl and Murhta, and Bergdahl monitored and approved such work. The scope of work was definitively laid out in the ECP, including the work to be completed and total costs associated with that work. The CO's first formal rejection of the ECP did not even take place until December 1, 1997 – almost 2 ½ years after the ECP was (1) requested, (2) approved orally and in writing by Government representatives of the CO, annd (3) worked on by ISN. Crawford was silent on the ECP despite many requests for a formal response from other officers of the Government. Crawford testified that ISN failed to provide a revised schedule for the ECP – an assertion contradicted by the ECP itself. Crawford also testified wrongfully testfied that SPAWAR never approved the ECP. (Crawford Dep. Tr. at 36-37). This assertion is plainly contradicted by the correspondence from SPAWAR indicating its complete approval of the ECP (Exhs. 7 and 8), as well as the testimony of Bergdahl, the COTR. Moreover, SPAWAR ameded its funding documents specifically to arrange for funding of the work cited in the ECP. (Exhx. 4 and 9).

There is no genuine issue of material fact that the Government reached an agreement with ISN for the work described in the ECP, and that ISN has not been fully-compensated for its work once the Government terminated the contract for convenience.. The parties treated the issuance of the SF-30 as a mere formality. The contracting parties had a meeting of the minds on the work to be done, and acted according to their mutual understanding. The case law governing this dispute simply does not allow the Government to deny a contract years after it was entered into on the basis of a technical formality due to the Government's own inaction.

## IV. CONCLUSION

Because there is no genuine issue of material fact regarding the existence of the Navy's contract with ISN for the work indicated in the ECP, and the Government's breach of that contract, ISN requests that this Court enter partial summary judgment in favor of ISN on the issue of the Government's liability for the ECP. ISN will then hereafter be required at trial to prove its damages resulting from the breach.

Respectfully submitted,

__s/ Norman H. Singer________________________
NORMAN H. SINGER, ESQ.
BENJAMIN M. KAHRL, ESQ. (of counsel)
Singer & Associates, P.C.
. 10411 Motor City Drive
Suite 725
Bethesda, Maryland 20817
(301) 469-0400

October 23, 2003 Counsel for Plaintiff

This document was created with Win2PDF available at http://www.daneprairie.com.
The unregistered version of Win2PDF is for evaluation or non-commercial use only.

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------:

INFORMATION SYSTEMS & :
NETWORKS CORPORATION :
Plaintiff :
vs. : Case No. 98-178C
THE UNITED STATES :
Defendant :

---------------------------:

Monday, October 18, 1999
Washington, D.C.

Deposition of

ROSCOE W. CRAWFORD

a witness, was called for examination by counsel for the plaintiff, at the offices of United States Department of Justice, 1100 L Street, N.W., 12th Floor Conference Room, Washington, D.C. 20530, commencing at 10:00 a.m. before Doris L. Gude, Shorthand Court Reporter and Notary Public for the District of Columbia, and were present on behalf of the respective parties:

MGB REPORTING, INC.
9805 Korman Court
Potomac, Maryland 20854
(301) 983-9315

PLAINTIFF'S EXHIBIT

A. Yes.
Q. After completing the contract specialist internship program, then what did you do with the Navy?
A. You became a journeyman once you graduated from the program. I just continued on to negotiate contracts and administer contracts.
Q. Is it called a journeyman or is it called a contract specialist?
A. It's a journeyman contract specialist.
Q. Do you recall what year you became a journeyman contract specialist?
A. '81, I believe.
Q. Were you a contract specialist intern out at the Navy Yard?
A. Yes.
Q. Let me ask you this. Have you always worked at the Navy Yard during your employment with the Navy?
A. No.
Q. We'll get into that one. How long

A. I'm responsible for negotiating contracts for supplies and services for the various customers that I have to service. I have full authority to bind the government in any contractual agreement regardless of the dollar value. I also provide contract administration services on the contracts that I award.

Q. Tell me about your work in contract administration. What is the scope of your work? What are your job duties when you administer a contract?

A. To take care of any problems that occur after the award of a contract, change orders, modifications of all sorts, changes in delivery, changes in period of performance. That sort of thing.

Q. After you negotiate a contract, generally do you then administer the same contract that you negotiated?

A. Yes.

Q. Are there supervisory positions in the

Navy for these contracts?

A. I am a supervisor.

Q. Would it be fair to say that you are the supervisor and everybody else that works on the contract on behalf of the Navy reports to you?

A. For a particular contract, yes.

Q. It's my understanding that for certain contracts that the Navy enters into there are positions called, "contracting officer representatives." Is that correct?

A. Yes, it's a COR.

Q. What is a COR?

A. Well, a COR is responsible for actually monitoring the contractor's performance when we award a contract. Any problems that the contractor encounters in performing that contract will be reported back to me through the COR. In certain instances, the CORs are authorized to give technical direction to the contractor, but the COR is not authorized to make any changes to the terms or

conditions of the contract. That comes through the designated contract specialist and myself as the contracting officer.

Q. Since we are on the subject, how are changes to a contract made? Tell me the process for modifying and/or amending a contract to add services?

A. To add services?

Q. Yes. Or to modify services just in general. We're not talking about any specific contract just in general. How does that work?

A. First of all, someone would have to initiate a request for a change. It could be the end user who determines that something needs to be changed. They might need an extension in the period of performance. It might be a change in the actual statement of work or the specification.

Anyway, they would make the request, and then, I would go out to -- with a letter to the contractor telling the contractor that I intend to modify the contract and specify the

it for?

A. It was for automating the tech control facilities. There was a location in Italy. There was another location in Virginia. Where was the third location? (Pause.)

Q. Puerto Rico?

A. No. Guam.

Q. An RFP was issue for this second ATCS program?

A. Yes.

Q. Do you recall the contractor who was awarded the contract for the second ATCS?

A. It was the same contractor. The same contractor received the award that had it the first time. I don't recall his name.

Q. The ATCS project in Virginia, did that deal with Hampton Roads?

A. No.

Q. Where was it?

A. NICTANSLANT (phonetic).

Q. Did there come a time when the ATCS program was further expanded?

A. After that contract, we went out for another RFP. That's the one that ISN won.

Q. We'll call that the third RFP.

A. Right.

Q. Just to wrap-up the first and second contracts, was the first contract successfully completed?

A. Yes.

Q. Was the second contract successfully completed?

A. Yes.

Q. That brings us back up to third RFP. What did the third RFP entail?

A. The third RFP was, again, automation of the tech control facilities at various sites throughout the world.

Q. What were the sites covering the third RFP?

A. In Lot I, there were three sites, Hampton Roads, Camp Smith in Hawaii, and Makalapa. In Lot II, on that particular contract, I think it was Puerto Rico, Japan --

Lots I and II?

A. No.

Q. We're talking about the first funding document issued around or about the time of the RFP. What was the scope of the first funding document?

A. The scope of the first funding document covered the three sites that were specified in Lot I, which were the two sites in Hawaii and Hampton Roads.

Q. Do you recall the approximate amount of funding for Lot I?

A. It was over $4 million.

Q. Do you know if it was over $4.4 million?

A. Yes. It was more than that. Maybe, I think, about $4.9, something like that.

Q. Why were Lots I and II separated under this third RFP?

A. Why were they separate --

Q. Why were they separate lots?

A. They were separate lots because we set

them up as options. Okay?

Q. Okay.

A. We didn't know for sure whether or not -- we knew the need existed, but we didn't know if we were going to be funded. That's why you set it up as an option lot.

Q. Lot II was as option lot?

A. Yes.

Q. The initial funding for Lot I only covered the Hampton Roads site and the two Hawaii sites. Correct?

A. Correct.

Q. If there was more funding made available in the future, then it would cover Lot II or Puerto Rico and Japan. Correct?

A. If we had chosen to exercise the option.

Q. If you had chosen to exercise the option for Lot II, where would the funding have come from?

A. SPAWAR.

Q. Once you received the funding from

funds from one lot or one option to another option?

A. No.

Q. Let's go back to Lot I. ISN was awarded the contract for the work under Lot I. Correct?

A. Correct.

Q. That work was to be done at three sites, one in Virginia and two in Hawaii. Correct?

A. Correct.

Q. Do you know when ISN entered into the contract to do that work?

A. I don't recall what the actual award date was.

Q. Early 1995. Would that sound right?

A. It's a '94 contract. I think it was sooner than that.

Q. Late '94?

A. Could have been.

Q. Do you recall how many other contractors bid on the Lot I option aside from

SPAWAR could tell me sometime in September, prior to 1 October, that they intended to exercise that option. I wouldn't receive the money probably until sometime in January. So if I exercised the option, it would have been exercised subject to availability of funds because I wouldn't have had the money.

Q. You don't recall approving the ECP, do you?

A. No, I didn't. It would have been a formal modification to the contract if it had been approved.

Q. What is a formal modification to the contract?

A. It's a written document.

Q. Is there a form document?

A. Yes. It's a standard Form 30.

Q. Was a standard Form 30 drafted for the ECP?

A. No.

Q. Do you know whether any of the work encompassed by the ECP was ever performed by

A. He would have, yes.

Q. That would have been reflected in some type of documentation including e-mail to you? Is that correct?

A. It would have been.

Q. Did there come a time when ISN was terminated for convenience?

A. Yes.

MR. AUSTIN: Can we take a break, please?

MR. CRAIG: Sure. Anytime.

(Brief Recess)

BY MR. CRAIG:

Q. Before I get into issue of termination for convenience, I just wanted to clarify something. Is it your understanding that SPAWAR has an annual appropriated budget?

A. Yes.

Q. With that annual budget they fund certain projects during the course of a year. Is that how it works?

A. Yes.

rescission letter?
A. That she was basically rescinding the offer, and that was based on new information that I had provided to her.
Q. Had ISN accepted the offer prior to Ms. Jones rescinding the offer?
A. Yes.
Q. After the offer was accepted and before the rescission letter was issued, what, as you put it, new information did you provide Ms. Jones?
A. Ms. Jones had been trying for sometime to have a conversation or a conference with me in regards to the termination and the settlement proposal, but I was on travel and I never really was able to have the conference. When I finally got back to the office and had reviewed all of her correspondence to me, that's when I was able to talk with her about my opinions on the settlement proposal.
Q. What did you tell Ms. Jones?
A. Basically, I told her we had agreed to

Q. Just identify it. No detail.
A. You mean the work that they had proposed in the ECP?
Q. Yes.
A. Yes, you could say that.
Q. I'm showing you what has been marked as Crawford Exhibit 4. Have you seen that document before?
A. Yes, I have seen this document.
(Documentation referred to above was marked as Crawford Exhibit Number 4 for identification, copy of which is attached.)
BY MR. CRAIG:
Q. When did you first see this document?
A. Right after Lisa had drafted and sent it to ISN.
Q. Did you review a draft of this document before Ms. Murtha sent the document to ISN?
A. No.
Q. Did you approve the contents of this

document with Ms. Murtha?

A. Not really. In other words, I didn't tell her to do this. How this letter occurred we had a meeting with my technical people from SPAWAR along with ISN. I believe I wasn't able to chair the meeting, so she chaired the meeting. As a result of the meeting, I guess she was just recanting what they had discussed and agreed to at the meeting which was the result of this letter.

Q. Let me draw your attention to the last paragraph which states, "I am your first line point of contact within this activity." What does that mean?

A. That she was my representative from the contract shop.

Q. With respect it the ECP?

A. With any contractual matter that pertained to the case.

Q. I want to draw you down to bullet number two, "A modification to the contract will be issued for the combination of both the

formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." What does that mean?

A. At the time, I guess, we had intention of issuing a modification, but that was predicated on ISN providing us with a revised installation and cutover schedule for the contract for Lot I which they never did.

Q. So ISN didn't provide a revised installation cutover schedule?

A. No, they never did.

Q. Did you keep a file on this ATCS project?

A. This case file folder that you looked through.

Q. Is that your file?

A. That's the file, yes.

Q. Do you recall whether Exhibits 3 and 4 were included in that file?

A. You're saying are they are still included in the file?

J. Lucey for Loretta Finamore.

A. That's common. (Reviewing.) Your question?

Q. Have you seen this document before?

A. Yes, I have seen this document before.

Q. What is this document Exhibit Number 21?

A. It's notifying me that there is no money left in the contract, and that it's going to cost $5,060,578 to settle.

(Documentation referred to above was marked as Crawford Exhibit Number 21 for identification, copy of which is attached.)

BY MR. CRAIG:

Q. Let's go to page 2. I want to go to line item number 10 and 11. It says, "Amount of contract including all supplements, $4,416,645.54." What is that?

A. That's the amount of the base lot.

Q. That's the amount of the contract that ISN had?

entered into the agreement. Correct?

A. Let me explain. She entered into the agreement. I finally got back to her after she had entered into the agreement, and I provided her with the information that she had been requesting from us all along. Based on that information, I guess she rescinded her offer.

Q. This is the information she requested in October?

A. No. This audit report is something that she had requested from DCAA. I didn't request the audit report.

Q. What I'm asking about is this information about the ECP and is this information she requested from you in October?

A. Yes. I had to gather documents, copies of letters where ISN fesses up that no formal ECP had been approved because the only way that it could be approved would be by issuing a formal modification to the contract to incorporate and that never occurred.

Q. I'm going to draw your attention down

# ORIGINAL

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INFORMATION SYSTEMS AND NETWORKS CORPORATION, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | Case No. 98-178C JUDGE JAMES TURNER |

Deposition of JEFFREY BERGDAHL, at 4301 Pacific Highway, San Diego, California, commencing at 10:01 A.M., Friday, October 29, 1999, before Sandra D. Warren, CSR No. 10831

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

SINGER & ASSOCIATES
BY: JOHN M. CRAIG, ESQ.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(301) 469-0400

FOR THE DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE
BY: MICHAEL D. AUSTIN, ESQ.
1100 L Street, N.W.
Suite 12144
Washington, D.C. 20530
(202) 307-0277

JEFFREY BERGDAHL,
having been first duly sworn, testified as follows:



PLAINTIFF'S EXHIBIT 2

-- ANCC project -- strike that.

Q. When did the ATC project first come about?

A. I became involved in it in the October of 1994 time frame. The contract was awarded in July of 1994, and obviously there was the RFP and source selection in the year prior to that.

Q. Did the contract that was awarded in 1994, was that to ISN?

A. Yes.

Q. And prior to the ISN award contract in July of 1994, there was a prototype ATC type project; is that correct?

A. There actually was a total of three contracts. The prototype ANCC was awarded in the early '90s to JACOR.

Q. Okay.

A. There was the follow up on a contract, which I was the COR on from the beginning, that was awarded to JACOR in November of 1993 for the three ANCC sites.

Q. Do you know why JACOR was not awarded

the ATC project that was awarded to ISN?

A. I was not involved in that source selection or evaluation. Obvious -- I wasn't involved in the source selection.

Q. Do you recall seeing any documents that may have stated the reason that JACOR didn't win that contract?

A. No.

Q. Mr. Bergdahl, I want to draw your attention to document Bergdahl Exhibit 1. Can you tell me what that document is.

A. The document was a contract modification, No. P00002. It was where I was -- the contract modification appointing me as the COTR on the ATC contract.

(Plaintiff's Exhibit No. 1 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. That was the ATC contact that was awarded to ISN, correct?

A. Yes.

000021

Q. Who is Percy Tolbert?
A. Percy Tolbert was a SPAWAR employee that also worked in PMW172.
Q. Do you know why you replaced Mr. Tolbert as a COTR?
A. I don't remember really.
Q. Let's turn to page 2. What is that document?
A. That is my appointment letter from the Contracting Officer appointing me as the Contracting Officer's Representative on the ATC contract with ISN.
Q. The Contracting Officer was Roscoe Crawford?
A. Yes, sir.
Q. Did Mr. Crawford go over this criteria set forth here?
A. Yes.
Q. Did you go over it on the phone with each other or did you meet with him?
A. I'm not sure. I believe I probably met with him.

the contract which is Designation of the COTR.

(Plaintiff's Exhibit No. 2 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. So this document, it's marked as page 84 and 85. It's actually two pages from the ATC -- strike that -- ISN/ATC contract.

A. Yes.

Q. Do you know who wrote -- crossed out Mr. Tolbert's name and placed your name here?

A. I don't know who crossed out and wrote my name in.

Q. Mr. Bergdahl, I want to direct your attention to a document that's been marked Bergdahl Exhibit 3. Can you tell me what that is?

A. That is my certificate of training certifying I completed the COTR training course on the 11th day of March, 1993.

(Plaintiff's Exhibit No. 3 was marked for identification and is annexed hereto.)

000023

BY MR. CRAIG:

Q. Is completion of the COTR training course a prerequisite to becoming a COTR?

A. Yes.

Q. Why did you become a COR on the ATC contract?

A. Well, both the ANCC and ATC contract were for a turnkey effort of a fairly complex and large communication system. And obviously, it was anticipated that there would be questions or technical clarifications that would be necessary during the contract performance time.

So he felt it was necessary that somebody be designated as a COTR on the contract to help resolve these technical things and make sure it was an official Navy technical representative.

Q. Were you approached to -- by someone in your department as to whether you would be interested in taking a COR position?

A. I don't remember.

Q. Were you assigned as a COR or was it voluntary?

A. It was voluntary. I was part of the ANCC technical evaluation board. So obviously, the person -- one of the persons that would be best qualified with being a COR on the ANCC contract was somebody that was familiar with the contract proposal and was familiar with the equipment and technology that was going to be used on the contract. And I was the SPAWAR member of the technical evaluation board.

Q. So you were the man for the job from SPAWAR that had the technical background and information with regards to this contract which made sense to appoint you as a COR, correct?

A. Yes.

Q. As a matter of background, we're speaking about SPAWAR today. What is that?

A. SPAWAR?

Q. What does SPAWAR stand for first?

A. SPAWAR stands for Space and Naval Warfare Systems Command.

Q. Okay. Prior to becoming known as SPAWAR, was it known as something else?

A. It was known as Naval Electronics Systems Command, NESC.

Q. Generally, what does SPAWAR do?

A. SPAWAR was the Navy's system command responsible for doing all the acquisition of C4I.

Q. What is C4I?

A. Communications, control, computer, intelligence, crypto. All that type of gear. All the data invoice communication stuff for the Navy, whether it's ship or shore facilities, or the Navy's echelon command.

Q. And currently, SPAWAR generally does that same type of work?

A. Yes.

Q. I want to begin talking about the ISN/ATC contract. When did you first become involved in that contract?

A. October of 1994.

Q. And that was as a COR on the contract, correct?

A. Yes.

Q. Tell me about the -- you know, when

approved by the contract?

A. Correct.

Q. Was there some ECP configuration changes that were informally approved?

A. Yes.

Q. Did ISN provide work on some of these informal ECP configuration changes?

A. Possibly, yes.

Q. Tell me about the work that ISN provided on the informal ECP configuration changes.

A. Based on the site survey that they made after contract award, I think they developed a matrix to which they tried to compare what equipment was identified in the RFP and what equipment they identified was at the site when they did the site survey.

Q. And these changes that were undertaken by ISN was informally approved by SPAWAR; is that correct?

A. We agreed with what the configuration was. The quantities of the equipment was what was in these surveys.

000027

MR. AUSTIN: Objection. It's ambiguous as to what "informally approved" means.

MR. CRAIG: I think he already answered this question. I'm trying to start again.

BY MR. CRAIG:

Q. Did you previously state that no ECP configuration changes were formally approved?

A. Yes.

Q. And did you previously tell me that some were -- some ECP configuration changes were informally approved?

A. They were informally, technically approved.

Q. What were the ECP configuration changes informally, technically approved?

A. I seem to believe they related to different amounts of DMSI hardware configurations, possibly like larger site -- user site licenses.

Q. We'll go over some of the specifics, but that -- that's in general.

You previously told me that ISN provided work on the informal ECP configuration

000028

changes, correct?

A. Yes.

Q. And was that -- how did ISN come about starting that work? Did SPAWAR tell them to do it?

MR. AUSTIN: Objection. Okay. Okay. I withdraw the objection.

BY MR. CRAIG:

Q. You can answer the question.

A. Restate it again.

Q. Sure. How did ISN begin performing the informal ECP configuration changes? What brought that about?

A. As a result of the site survey reports that we would have received back when we met, we would have been advised of what the site changes or differences were and we would have asked for a comparison of what DMSI equipment was bid or proposed versus what was needed to match the site configuration based on the site survey.

Q. And you meant SPAWAR?

A. SPAWAR, yes.

Q. After that information was obtained,

A000029

exchanged, then what happened?
A. We would have asked ISN to submit an ECP to Roscoe Crawford.
Q. Are you aware of whether an ECP was requested of ISN?
A. I don't remember.
Q. Do you know if ISN submitted an ECP?
A. Yes, they did.
Q. Do you know when ISN submitted an ECP?
A. They submitted several ECPs over the following months, I guess.
Q. And that would have been in, again, 1995 that they submitted these ECPs or was the first ECP submitted in late 1994, if you remember?
A. I don't remember. It probably was that early. Probably again in 1994.
Q. Do you recall at some point one of the -- at least one of the ECPs that ISN issued resulted from work performed pursuant to that ECP?
A. If your question means were they doing work to define what the configuration of the site was, yes.

000030

in ISN's ECPs, do you know if ISN took any action to acquire that modified equipment?

A. I'm not completely sure.

Q. Did the ECPs propose that, you know -- as you used deltas -- equipment be utilized at the Hampton Roads ATC?

A. Can you repeat the question?

Q. Sure. I'm not being clear for you. You know this very well. I'm trying to make it clear for you.

Tell me what work or what actions ISN took with respect to the ECPs at Hampton Roads.

A. Well, first, they would have obviously gone to the sites and identified what the different configurations were and that was part of their site survey. They obviously would have had to discuss this with their hardware subcontract DSMI. What would it change to change the configuration of the DSMI hardware which ISN was going to buy from them.

Q. Do you know if the configuration in the DSMI hardware were changed?

A. We proposed it to be changed versus

the proposal.

A. Uh-huh.

Q. Tell me again what you believe that meant.

A. Technical -- what I feel technical approval means is that we agreed with the technical content, the changes in the proposal were acceptable technically to us.

Q. Do you recall whether SPAWAR informed ISN that ISN's ECPs was technically approved?

A. I believe it's on at least one occasion or more we would have told them that it was technically approved.

Q. Did you tell them verbally?

A. We also would have told them also in writing, too.

Q. After SPAWAR technically approved ISN's ECP --

A. Uh-huh.

Q. -- did SPAWAR direct ISN to take -- to do certain work in compliance with the ECP pending formal approval?

A. Nope.

Q. Did you tell them not to do anything pending formal approval of the ECP?

A. No.

Q. What did SPAWAR tell ISN to do pending approval of the ECP? Formal approval of the ECP?

A. I don't really recall what was told to them, if anything.

Q. Could ISN do any work pending formal approval of the ECP?

A. Yes.

Q. What work could ISN perform pending formal approval of the ECP?

A. Again, there was still -- there was substantial amount of equipment that was in the RFP that was still remaining at ANCC Hampton Roads. But prior to that equipment being cut over, we needed all the various contract deliverables submitted and approved before they would start doing the cutover.

Q. And the contract deliverables weren't modified really at all pursuant to the ECP; is that right?

000033

A. The installation plan, I believe, would be the one document that would be modified.

Q. The ECP really dealt with equipment modifications at Hampton Roads, correct?

A. Yes.

Q. And that was because the site at Hampton Roads had changed; is that right?

A. Yes.

Q. And at the beginning and during, you know, let's say, at least the first half of the ECP contract, ISN was dealing with deliverable products that did not have to do with equipment; is that correct? Or did not have to do with the -- physically with the equipment? Wasn't it documentation basically?

A. Right.

Q. Did there come a point when ISN essentially completed the required documentation on the ATC contract?

A. Everything but maybe the cutover plan at Hampton Roads, and then some of the documentation that the two Hawaii sites were not completed.

A. There were probably several. Maybe three or four, maybe.

Q. Did all of these ECPs submitted by ISN in general set forth the same information that -- were they generally the same?

A. Probably the same. Similar, yeah.

Q. Do you know whether this ECP was ever accepted by the Navy?

A. Several ECPs were technically accepted. Possibly some of the ECPs were not accepted. I don't recall exactly which ones were accepted and which ones were not technically accepted.

Q. Do you know if ISN did any work on the ECP or were technically accepted? Or pursuant. Let me say pursuant to them being technically approved.

A. I believe they did some work.

Q. Did the Navy assist them with that work at all?

A. We assisted in helping determine what the configurations were necessary at the sites.

Q. The configurations would have been

to -- the configuration would have been part of the work to perform the ECP?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Tell me about that assistance provided by the Navy a little bit more.

A. The assistance was probably to verify that the correct DSMI hardware was matched to the Navy equipment.

Q. Any other assistance given by the Navy?

A. Not that I can recall.

Q. The technical instructions were provided by the Navy to assist ISN in its performance of the ECP?

A. We probably also advised them on the cabling pin outside for the 12-pair cable.

Q. Which the Navy would tell ISN to -- we suggest this.

A. This is the Navy's standard for 12 pairs.

Q. Okay. And ISN was performing the cabling work with consideration of the assistance or the information supplied by the Navy?

A. Yes.

Q. Do you know if that cabling work was done pursuant to the Navy's specifications?

A. I wasn't witnessing on site the day-to-day work they were doing. We obviously received monthly progress reports about what they were doing on the various sites.

Q. But to the best of your knowledge, ISN was complying with the Navy's directives regarding cabling?

A. Yes.

Q. Mr. Bergdahl, I want to draw your attention to the exhibit marked Bergdahl Exhibit 6. Do you know whose handwriting that is?

A. I don't immediately recognize whose handwriting this is.

(Plaintiff's Exhibit No. 6 was marked for identification and is annexed hereto.)

000037

A. I don't know.

Q. Did you discuss this letter at all with Lisa Murtha?

A. I believe I would have if the ECP was going to be reviewed by SPAWAR and comments provided back. I would have talked to her then.

Q. Do you recall speaking to her about that, though, as you sit here today?

A. I don't recall.

Q. Do you know if you were provided delivery schedules for all sites when Lot 1 was issued?

A. I don't recall, but I believe one was provided.

Q. Do you know why it was provided?

A. Probably because at the June 22 meeting referenced here, it was summarized of what was going to be done after the meeting.

Q. Was that in part due to the changed site configuration at Hampton Roads?

A. I believe so, yes.

Q. Let me draw your attention to an

exhibit marked Exhibit 12. What is that?

A. That is a fax from me to Roscoe Crawford and Lisa Murtha faxing the copy of tne original -- our approval letter on the ECP on July 21, 1995.

(Plaintiff's Exhibit No. 12 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Why did you fax this approval letter to Roscoe Crawford?

A. Because when an ECP would be submitted, Roscoe would request our technical approval on all the ECPs, so it appears this is what was discussed at this -- the meeting in June, and SPAWAR was to review and provide comments on the ECP to FISC. Again, FISC was our technical approval.

Q. Let me ask you. This is a formal approval of a contract. That can only be done by FISC; is that correct?

A. Yes.

Q. You all approve something, but you

000039

have to relay it on to FISC and they are the ones to do up the formal modification, right?

A. FISC was the contracting office for SPAWAR. SPAWAR was not the contracting office. We were the program office with the technical requirements. So FISC viewed us as the customer, and we went to them to do the contracting of our requirements for us.

Q. Okay. Do you recall in or around July 21, 1995, also informing ISN that the ECP was approved? That SPAWAR had approved the ECP?

A. I believe I would have informed them that we approved the ECP. I'm not sure exactly when, but we would have advised them that we completed our review of their ECP.

Q. And you did approve the ECP?

A. Yeah.

Q. Drawing your attention to the document marked Exhibit 13. What is that?

A. That looks like a memo I sent back to Bill Robertson responding to a voice mail he must have left me around that -- end of August.

000040

(Plaintiff's Exhibit No. 13 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. I want to draw --

A. Maybe reconfirming that we had approved the ECP and the schedule extension. I assume that he means that he might not have heard anything from FISC yet.

Q. The second sentence in paragraph one says, "I am not aware of any other administrative items we owe FISC."

What does that mean? You provided all the documentation in support of the approval?

A. Right.

Q. Other than changing the wording on the funding document at FISC, what other changes are there other than changing the wording on the funding document?

A. Well, at the bottom of the letter to FISC approving the ECP, in paragraph four, we said we would change the funding document for the ATC in

000041

Puerto Rico. That's what I think it's relating to.

Q. Do you know if the funding document for the ATC at Puerto Rico was changed?

A. I don't recall.

Q. Mr. Bergdahl, I want to draw your attention to a document marked Bergdahl Exhibit No. 13 (sic). What is that document?

A. That's a SPAWAR funding document from us to NRCC providing them funding for the procurement of the Puerto Rico ATC.

(Plaintiff's Exhibit No. 14 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. And that procurement was in the amount of the $789,319; is that correct?

A. Uh-huh.

Q. And that occurred sometime in October of 1994; is that correct?

A. Correct. Yes.

Q. I just referred to that funding document as Bergdahl Exhibit 13. I believe it

000014

A. Yes.

Q. So what you are talking about is some funds for fiscal year 1996?

A. Right.

Q. Those funds were for Puerto Rico and London's ATCs; is that correct?

A. That's what it looks like. I don't know what the document said, but that's what I believe it said.

MR. AUSTIN: Can we go off the record?

(Recess taken.)

MR. CRAIG: Let's go back on the record.

BY MR. CRAIG:

Q. Mr. Bergdahl, I want to draw your attention to Bergdahl Exhibit 16. What is that document?

A. That's a document from SPAWAR to FISC which did not change the dollar amount but amended the description to change it from exercising the Hampton Roads ATC ECP costs vice procurement of the Puerto Rico ATC.

(Plaintiff's Exhibit No. 16 was

000041

marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. So it took the funds from the Puerto Rico ATC and applied them to the Hampton Roads?

A. It was -- it was paragraph 4, that SPAWAR letter, where we would amend the document to change.

Q. This was supposed to cover the ISN's ECP costs; is that correct?

A. Yes.

Q. That was the $789,319?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. I'm showing you what's been marked as Exhibit 17. What is this document?

A. That is a funding document from SPAWAR to FISC sending them FY '96 ATC -- ATC funding for the procurement of the Puerto Rico ATC and London ATC, and then dial in technical support for the ANCC's ATCs fleet pots interfaces for the ANCC's

and I was providing funding for the procurement of the three ATC contractors; for Pearl Harbor and Camp Smith and Hampton Roads. Camp Smith would have funded the basic part of the ATC.

(Plaintiff's Exhibit No. 19 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. The ISN and ATC contract?

A. Right.

Q. It says, Funds expire on 30 September, '96. What does that mean?

A. That is the date that funds need to be obligated by. They were FY '94 funds, OPN funds, and they are good for three fiscal years.

Q. So you use it by then or lose it or redirect it?

A. If it's not obligated by then, you lose it and obviously our comp controller requires -- makes sure we use it before it is at risk of being obligated. But Congress appropriates OPN, and it's good for three fiscal years. But you don't

000045

want to get close to that before you can obligate it on a contract or expend it.

Q. So $4,416,646 was available to SPAWAR to pay for work performed on its ATC contract; is that correct?

A. Right.

Q. Now, it has this paragraph M and it says, "Cumulative Total." And it says "$6,975,319." What is that?

A. That is how much is currently on this funding document. The funding document, when it's sent out, it might have an initial amount of funds, and we can amend funding documents to either add additional money or delete money and the -- in paragraph 13, sections K and L of that, sometimes there would be multiple lines of accounting on a document and then L is the total of --

Q. The specific SPAWAR funding document?

A. Of this specific -- this specific amendment, whatever. The accumulative is the total after amendment two has been completed.

Q. That's paragraph M?

000046

A. Still Exhibit 19. But the basic document where we originally sent them $7.14 million, and it was for the procurement of one ANCC for NCTAMS MED and four ATCs for NTCC Hampton Roads, Japan, Makalapa, and Camp Smith.

Q. Okay.

A. So 2.5 million, approximately, of that was for Roscoe to exercise the option for the one ANCC at NCTAMS MED on the JACOR contract.

Q. Okay. So the pot for all this work was the -- a little over $7 million?

A. Right.

Q. And depending on what priorities or what work SPAWAR wanted to do and could move funds from one project to another, correct?

A. Uh-huh. Correct.

Q. So the total amount of funding for the ANCC/ATC project was $7.14 million, correct?

A. Right. For FY '94, correct.

Q. For FY '94 but the funds were good through September 30, 1996, correct?

A. Right.

page, the e-mail from Sandy Nalepa --

A. Yes.

Q. -- it says "We have about $7 million in the ANCC/ATC procurement program in FY '96 which is less than six months away."

The 7 million that is referred to, is that the 7 million that we had previously discussed in Exhibit 19?

A. No. It's not.

Q. It's not. What is that?

A. Exhibit 19 was referring to FY '94.

Q. Right. That went through September 30, 1996.

A. Right.

Q. Okay. And what is this 7 million in the ANCC/ATC procurement we are referring to in this e-mail?

A. It would have -- it appears it would be referring to Exhibit 15, the FY '96 funding document, which is also Exhibit 17. Exhibit 17 sends FY '96 funding to FISC. So approximately 2.4 million of that FY '96 funding was sent to FISC.

Q. Okay. So SPAWAR had available funds in the amount of approximately $7 million for FY '96, right?

A. Well, obviously, it was -- as of April of 1995, it was budgeted to be there.

Q. Do you know if it was?

A. I don't know how much, when FY '96 rolled around in October of 1995 -- how much money was actually -- how much SPAWAR received at the time. Obviously, it was at least 2 1/2 million based on that Exhibit 17.

Q. Okay. This was another 7 million in addition to the 7 million that we had looked at from the FY '94 document?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Let's switch gears. I'm going to go back to the ATC ECP. I want to draw your attention to an exhibit marked Bergdahl Exhibit 23. What is that document?

A. That's a request from the DCMDS from

Baltimore to SPAWAR requesting an evaluation of how much of the ATC's have been physically completed on a percentage basis. Obviously, it would be to support progress payments from DCMDS to ISN.

(Plaintiff's Exhibit No. 23 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. I want to refer you to the bottom of the page. Is that your handwriting?

A. Yes.

Q. And what were you -- let's take the information set forth in paragraph 3. It says, "See attachment for rationale on percentage of physical completion. ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule."

Are those true statements?

A. Yes.

Q. And in paragraph 1, you said, "Physical percentage of progress is estimated as 15 percent." Is that a correct statement?

turnkey ATC, it had training, had the -- the contract deliverables, the nonphysical work, the paper.

Q. The statement "ISN is slightly behind the proposed schedule in their ECP," what does that mean?

A. That was due to the fact that during the summer of 1995, they had obviously submitted a proposed schedule to FISC when they would complete each stage or complete all the contract deliverables, and I was comparing where they were at on 19 October versus whatever proposed schedule they had submitted in their ECP during the summer of 1995.

Q. Does this include work done -- that was proposed in the ECP?

A. Proposed? Yes.

Q. And you believe that ISN was performing satisfactorily as of October 1995?

A. As compared against the proposed schedule. They had an ECP, remember, as of October of 1995. There had been no contract modification

reached between ISN and FISC for a revised delivery schedule or completion of the turnkey site.

So if I had been forced to compare where they had been completedwise against what was originally in the original contract, at this point, all three sites should have been done, completed, several months prior to this.

Q. So this was taken in consideration that FISC would formally approve the ECP?

A. An issue which would be to revise the delivery schedules for both completing the sites and submitting all the documentation.

Q. And SPAWAR and ISN were going forward on the assumption that the ECP would be formally approved by FISC?

A. Yeah.

Q. This -- your comments here were reviewed and approved by Ron Zell; is that correct?

A. Correct.

Q. That's his signature, to the best of your knowledge?

A. Yes.

000052

sites in Lot I, knowing full well ISN won't meet the dates." Do you recall that discussion?

A. No.

Q. Do you recall any actions you took as a result of this meeting?

A. I would have had to inform my management of what happened at this meeting. I'm not -- I don't recall necessarily who was at the meeting with SPAWAR. I was likely one of the persons, and there might have been some other SPAWAR personnel there, but we would have wanted to make sure our -- our management was aware of what FISC was discussing with us.

Q. Okay. Did SPAWAR have a position as to whether it wanted T for C or T for D or --

A. I don't think SPAWAR necessarily wanted to terminate any contract that we worked so hard to get.

Q. Given a preference, was there a preference for SPAWAR of one of the -- whether T for C or T for D?

A. I don't recall what SPAWAR's

preference was at the time.

Q. Okay. Mr. Bergdahl, I want to show you what's been marked as Exhibit 30. Have you seen this document before?

A. No.

(Plaintiff's Exhibit No. 30 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. I want to draw your attention to the fifth page of the document. The top it says, "Not preferred by customer."

A. Uh-huh.

Q. So actually when you start from the previous page. "Or you could re-establish all delivery schedules and let them fail and T for D. This might be cheaper, because he can't submit an equitable adjustment."

Do you know what that means?

A. FISC viewed SPAWAR as their customer. FISC obviously wanted to try to do what the customer wanted them to do. If we were a FISC activity or

whatever, I think they would have recommended some kind of termination right then and -- but we were kind of a paying customer. We went to them to have them do our contracting stuff, so they really wanted to try to --

Q. Is it fair to say that SPAWAR wasn't in favor for TDSIN at that point?

A. Yes.

Q. Let's go down to the paragraph -- the third paragraph.

A. Uh-huh.

Q. "SPAWAR can't keep saying he's performing satisfactorily on Tish's progress payments paperwork." What does that mean?

A. That would probably be referring back to your Exhibit 23.

Q. Right.

A. If I put words down that say "they're performing satisfactorily," the DSMAO probably can't withhold progress payments to ISN.

Q. Okay. Were you instructed that you had to stop saying that ISN was performing

REQUEST FOR CONTRACTUAL PROCUREMENT-NAVCOMPT FORM 2276 (8 ...) (REV.8-81)

1. THIS REQUEST MUST BE ACCEPTED ON A DIRECT CITATION BASIS ONLY AND IS SUBJECT TO THE CONDITION LISTED ON THE REVERSE SIDE. ! 2. DOCUMENT NUMBER N0003994RCDL300

| 3. REFERENCE NO. | 4. FUNDS EXPIRE ON | 5. DMS RATING | 6. PRIORITY | 7. DATE REQUIRED | 8. AMEND. NO. |
|---|---|---|---|---|---|
| N0003994AFN52D6 | 30 SEP 96 | | | 30 SEP 94 | 002 |

9. FROM: SPACE AND NAVAL WARFARE SYSTEM COMMAND WASHINGTON, D.C. 20363-5100 ATTN: SPAWAR 01-4 ! 10. FOR DETAILS CONTACT: S. NALEPA, PD50P22, 602-3363/X145

11. TO: COMMANDING OFFICER
NAVAL REGIONAL CONTRACTING CENTER
WASHINGTON NAVY YARD
UIC N00600 WASHINGTON DC 20374-
ATTENTION: MR. ROSCOE CRAWFORD

12. MAIL BILLINGS TO: THE PAYING OFFICE CITED IN RESULTING CONTRACT

13. ACCOUNTING DATA TO BE CITED ON RESULTING CONTRACTS

| A. ACRN | B. APPROPRIATION | C. SUBHEAD | D. OBJ CLASS | E. BU. CONTROL | F. SA | G. AAA | H. TT | I. PAA | J. COST CODE | K. AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1741810 | 52D6 | 000 | EA152 | 0 | 068342 | 2D | 000000 | D60010000000 | 4,416,646.00 |

14. AMOUNTS WILL NOT BE EXCEEDED IN THE OBLIGATION DOCUMENT WITH OUT PRIOR WRITTEN APPROVAL FROM THE ISSUER. ! L. TOTAL THIS DOCUMENT ! 4,416,646.00 ! M. CUMULATIVE TOTAL ! 6,975,319.00

15. PROCUREMENT BY CONTRACT OF THE FOLLOWING ITEMS IS REQUESTED
THESE ITEMS !_! ARE !X! ARE NOT INCLUDED IN THE INTERSERVICE SUPPLY SUPPORT PROGRAM AND REQUIRED INTERSERVICE SCREENING ! ! HAS ! ! HAS NOT BEEN ACCOMPLISHED

| A. ACRN | B. ITEM NO | C. FSC | D. DESCRIPTION NAT.STOCK NO,SPEC AND/OR DRAW NO,ETC | E. QUANTITY | F. UNIT | G. ESTIMATED UNIT PRICE | H. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|
| | | | FUNDS PROVIDED FOR THE PROCUREMENT OF 3 ATC'S FOR HAMPTON RDS; PEARL HARBOR; AND CAMP SMITH. | | | | 4416646.00 |
| | | | PLEASE FAX BACK CONTRACTS FOR OBLIGATION: 703-602-7409 | | | | |

PLTFS Exhibit 19 for identification Sandra D Warren Oct 29, 1999 Wit. Jeffrey Bergdahl (4 pages)

NO CHANGES TO THIS DOCUMENT ARE AUTHORIZED WITHOUT PRIOR CONSENT OF AUTHORIZING OFFICIAL.

FORWARD ACCEPTANCE AND COPIES OF ALL OBLIGATING DOCUMENTS TO: COMMANDER, SPACE AND NAVAL WARFARE SYSTEM COMMAND, DEPARTMENT OF THE NAVY, WASHINGTON, D.C. 20363-5100, ATTN: SPAWAR 01-4 SEE ACCEPTANCE INSTRUCTIONS ON REVERSE

COPY TO: SPAWAR 01-4

TAC CODE: N880 NO CAAS IS AUTHORIZED WITHOUT SPECIFIC AMENDMENT TO THIS DOCUMENT

16. SEE ATTACH PAGES FOR DELIVERY SCHEDULES, PRESERVATION AND PACKAGING INSTRUCTIONS, SHIPPING INSTRUCTIONS AND INSTRUCTIONS FOR DISTRIBUTION OF CONTRACTS AND RELATED DOCUMENTS. ! GRAND TOTAL 4416646.00

17. TRANSPORTATION ALLOTMENT (USED IF FOB CONTRACTOR'S PLANT)

18. I CERTIFY THAT THE FUNDS CITED ARE PROPERLY CHARGEABLE FOR ITEMS REQUESTED. ! AUTHORIZING OFFICIAL (NAME, TITLE AND SIGNATURE) for RICHARD J. LUCEY, ACCOUNTING OFFICER Jeannie C Ch... ! DATE 15 JUL 1994

19. THIS REQUEST IS ACCEPTED AND THE ITEMS WILL BE PROVIDED IN ACCORDANCE HEREWITH. ! ACCEPTING OFFICIAL (NAME, TITLE A... ! DATE

PLAINTIFF'S EXHIBIT 3

000056

SEP-25-1995 14:22 FROM TO 992026850002 P.01

THIS REQUEST MUST BE ACCEPTED ON A DIRECT CITATION BASIS ONLY AND IS SUBJECT TO THE CONDITION LISTED ON THE REVERSE SIDE. !2. DOCUMENT NUMBER N0003996RCDL301

REFERENCE NO. N0003996AFN52D6 ! !4. FUNDS EXPIRE ON 30 SEP 98 !5. DMS RATING !6. PRIORITY !7. DATE REQUIRED 30 SEP 98 !8. AMEND. NO BASIC

FROM: SPACE AND NAVAL WARFARE SYSTEM COMMAND
LINGTON, VA. 22202, ATTN: SPAWAR 01-4

!10. FOR DETAILS CONTACT: SANDY SIMMS/72P4B/AV332-3364

TO: COMMANDING OFFICER
FLEET INDUSTRIAL SUPPLY CENTER
WASHINGTON NAVY YARD
C WASHINGTON DC 20374-
600
TTENTION: ROSCOE CRAWFORD

!12. MAIL BILLINGS TO:
THE PAYING OFFICE CITED IN RESULTING CONTRACT

202-433-5887
202-685-0002

ACCOUNTING DATA TO BE CITED ON RESULTING CONTRACTS

| N | B. APPROPRIATION | C. SUB HEAD | D. OBJ CLASS | E. BU. CONTROL | F. SA | G. AAA | H. TT | I. PAA | J. COST CODE | K. AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| A | 1761810 | 52D6 | 000 | EA172 | 0 | 068342 | 2D | 000000 | D60010000000 | 2,469,000.00 |

AMOUNTS WILL NOT BE EXCEEDED IN THE OBLIGATION DOCUMENT WITH OUT PRIOR WRITTEN APPROVAL FROM THE ISSUER.

!L. TOTAL THIS DOCUMENT! 2,469,000.00
!M. CUMULATIVE TOTAL! 2,469,000.00

PROCUREMENT BY CONTRACT OF THE FOLLOWING ITEMS IS REQUESTED

THESE ITEMS !_! ARE !X! ARE NOT INCLUDED IN THE INTERSERVICE SUPPLY SUPPORT PROGRAM AND REQUIRED INTERSERVICE SCREENING ! ! HAS ! ! HAS NOT BEEN ACCOMPLISHED

| B. ITEM NO. | C. FSC | D. NAT.STOCK NO,SPEC AND/OR DRAW NO,ETC DESCRIPTION | E. QUANTITY | F. UNIT | G. ESTIMATED UNIT PRICE | H. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|
| | | FUNDS PROVIDED FOR PROCUREMENT OF THE PUERTO RICO AND LONDON ATC'S, DIAL IN TECHNICAL SUPPORT FOR THE ANCC'S ATC'S, FLEET POTS INTERFACE INTERFACE FOR THE ANCC'S CONTRACT: N0060-94-C-0388/0389. PLEASE FAX CONTRACTS: 703-602-7409 | | | | 2469000.00 |

CHANGES TO THIS DOCUMENT ARE AUTHORIZED WITHOUT PRIOR CONSENT OF AUTHORIZING OFFICIAL

FORWARD ACCEPTANCE AND COPIES OF ALL OBLIGATING DOCUMENTS TO: COMMANDER, SPACE AND NAVAL WARFARE SYSTEM COMMAND, DEPARTMENT OF THE NAVY, ARLINGTON, VA. 22202, ATTN: SPAWAR 01-4 SEE ACCEPTANCE INSTRUCTIONS ON REVERSE

THIS ORDER IS ISSUED AS A DIRECT CITE MIPR IN ACCORDANCE WITH OASD(C) MEMO OF 1 MAR 1982 AS APPROVED BY THE DAR COUNCIL

COPY TO: SPAWAR 01-4

CODE: N880 NO CAAS IS AUTHORIZED WITHOUT SPECIFIC AMENDMENT TO THIS DOCUMENT

SEE ATTACH PAGES FOR DELIVERY SCHEDULES, PRESERVATION AND PACKAGING INSTRUCTIONS, SHIPPING INSTRUCTIONS AND INSTRUCTIONS FOR DISTRIBUTION OF CONTRACTS AND RELATED DOCUMENTS.
TRANSPORTATION ALLOTMENT (USED IF FOB CONTRACTOR'S PLANT)

!GRAND TOTAL 2469000.00

I CERTIFY THAT THE FUNDS CITED ARE PROPERLY CHARGEABLE FOR ITEMS REQUESTED.

!AUTHORIZING OFFICIAL (NAME, TITLE AND SIGNATURE) RICHARD J. LUCEY, ACCOUNTING OFFICER

! DATE 10/2/95

THIS REQUEST IS ACCEPTED AND THE ITEMS WILL BE PROVIDED IN ACCORDANCE HEREWITH.

!ACCEPTING OFFICIAL (NAME, TITLE ... ! DATE

000057

PLAINTIFF'S EXHIBIT 4

Exhibit 17 for identification Sandra D Warren 19 99 Date 8-23 Wit Jeffrey Bergdahl (1 page)

ISN®

June 20, 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

PLAINTIFF'S EXHIBIT 5

ATTENTION: Jeffrey Bergdahl, COR

REFERENCE: Contract Number N00600-94-C-0389
Letter Ser PMW 172-22C/037 dated 1 May 95

SUBJECT: Submittal of Engineering 12 Pair Cable Change Proposal (ECP)CDRL Item C003

ENCLOSURE: (1) HAMPTON ROADS ECP COST ANALYSIS

This letter ECP for ATC Contract N00600-94-C-0389 proposes the following ATC modifications for NTCC Hampton Roads, Virginia:

- Installing 12 pair cabling on digital interfaces specified in the referenced letter.
- Increasing the Novell Netware 3.11 SFT-III from 25 to 50 users.
- Government requested ATC site configuration change.
- Upgrade one of the RMSA 100(X) to an RMSA 200(X)
- The DIM 414E upgrade.

Guidance provided by the Government in the referenced letter during the development of this ECP has been incorporated. Total additional cost consideration of this ECP is $930,527. The Handbook of Electronics Industry Cost Estimating Data was used as a guide in validating the cost estimates for this ECP.

Supporting Enclosures:
1. Cost breakdown listed by categories, Total Cost, Contract Cost , and ECP Cost.
2. Equipment List for NTCC Hampton Roads, Virginia.
3. Revised Schedule.

Letter Ser PMW 172-22C/037 requested installation of 12 pair cable for certain equipment and provided additional guidelines. The Government will provide all of the 12 pair cable needed to perform the NTCC Hampton Roads, Virginia installation and cut

000058



Information Systems & Networks Corporation • 10411 Motor City Drive, Bethesda, Maryland 20817 • (301) 469-0400 Telex: 387814

over. The Government has provided 5000 ft of new 12 pair cable. For requirements in excess of 5000 feet ISN will attempt to use cable that has been reclaimed. In the event that reclaimed cables are inadequate in length or quality ISN will notify the Government The Government can authorize ISN to purchase the cable or the Government can provide the 12 pair cable needed. Although ISN will make every effort to adjust schedules to accommodate, this approach may result in delaying or rescheduling the cut over of some equipment. During research of MIL-SPEC 12-Pair Cable, it was discovered that the MIL-SPEC Cable did not meet Plenium requirements. Government guidance was to install the MIL-SPEC (Non-Plenium) cables. The use of Non-Plenium cable appears to be consistent with installation practices currently in use at NTCC Hampton Roads.

The Government has requested that ISN provide Novell Netware3.11 for 50 users. The requirement to increase Novell Netware 3.11 SFT-III from 25 to 50 users is to insure compliance with software licensing requirements and to allow future connection growth to the ATC LAN for additional workstations (local or remote).

The Government provided ATC equipment lists in meetings with the Contracting Officer in March 1995 and requested that ISN and DMS substitute the equipment for the proposed equipment at no cost. After some discussion and review ISN and DMS agreed to the change at no additional cost for equipment or installation as stipulated in the ECP that ISN submitted on 18 April 95. This ECP incorporates the equipment list for NTCC Hampton Roads, Virginia only.

ISN recommends that one of the RMSA 100 (X) switches be replaced with an RMSA 200 (X). This will provide the expansion needed at NTCC Hampton Roads, Virginia because of the rapid growth in high speed circuits at this site. The cost for installing the RMSA 200 (X) now instead of doing it as a field expansion is substantially lower and eliminates the need for subsequent removal and reinstallation. The differential cost is based on the difference in cost between the RMSA 100 (X) and the RMSA 200 (X) found in the GSA Schedule on page 1, appendix B of Subcontract. This cost has been verified via phone with DMS.

DMS has released a new version of the DIM-414-3 designated as the DIM-414-E. According to DMS the DIM-414-E design has resulted in a significant reduction in DC Current required to operate the module. DMS offers the DIM-414-E with an extended warranty of 15 years. This ECP incorporates the NTCC Hampton Roads, Virginia portion of the ECP that ISN submitted 20 October 94.

ISN requests conformation of approval for this ECP as soon as possible.

Sincerely,

William N.L. Robertson
ATC Program Manager
Information Systems and Networks Corp.

000059

| DESCRIPTION | TOTAL COST | COST in CONTRACT | COST of ECP |
|---|---|---|---|
| **LABOR** | | | |
| ECP Prep | 9,000 | 0 | 9,000 |
| Program Management & Engineering | 286,742 | 151,742 | 135,000 |
| Installation, Cut Over & 12 Pair Cable | 1,042,892 | 419,329 | 623,563 |
| **MATERIAL** | | | |
| Hardware & Software | 1,577,532 | 1,577,532 | 0 |
| Upgrade 1 RMSA 100 (X) to 1 RMSA 200 (x) | 18,537 | | 18,537 |
| Government Requested New Site Configuration | 0 | | n/c |
| NOVEL Fifty user | 3,226 | | 3,226 |
| Connectors (existing cable to be reused or new cable provided by the Government) | 23,000 | | * 23,000 |
| **ODC'S** | 13,581 | 3,581 | 10,000 |
| **TOTAL CLIN 0001AA** | 2,974,510 | 2,152,184 | 822,326 |
| **CDRL's CLIN 0003** | 388,457 | 338,457 | 50,000 |
| **TOTAL CLIN's 0001AA & 0003** | 3,362,967 | 2,490,641 | 872,326 |
| DIM 414 E upgrade | 58,201 | | 58,201 |
| | | | 930,527 |

20-Jun-95 03:28 PM

ENCLOSURE 1

## HAMPTON ROADS EQUIPMENT CONFIGURATION

| NOMENCLATURE | ECP QTY |
|---|---|
| RMSA 100 X | 2 |
| RMSA 200 X | 0 |
| RMSA 500 X | 0 |
| RMSA 4000 X | 1 |
| RMSA 8000 X | 1 |
| RIU 64 X | 81 |
| RIU 32 X | 5 |
| TFOU 8/16 | 1 |
| TATU 2/8 | 1 |
| DIM 414 E | 976 |
| DIX 202 | 0 |
| DIH 264 X | 0 |
| DIH 530 | 70 |
| DCI 402 | 4 |
| DTI 402 | 4 |
| AIM 800 | 152 |
| BTM 2048 | 0 |

| | | | |
|---|---|---|---|
| DIM 414 E Upgrade cost | 976 | 48 | 46,848 |
| G&A | | 12.94% | 6,062 |
| FEE | | 10.00% | 5,291 |
| TOTAL | | | 58,201 |

ENCLOSURE 2

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 1 | | | |
| 2 | CDRL DEVELOPMENT | 12/6/94 | 8/9/96 |
| 3 | CDRL E002 GOV CMNTS PASS DUE | 12/5/94 | 12/5/94 |
| 4 | CDRL D002 GOV CMNTS PASS DUE | 12/6/94 | 12/6/94 |
| 5 | MGT PLAN CDRL A001 GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 6 | REVIEW GOV CMNTS CDRL A001 | 5/1/95 | 5/26/95 |
| 7 | RE-SUBMIT CDRL A001 | 5/26/95 | 5/26/95 |
| 8 | GOV REVIEW CDRL A001 | 5/26/95 | 6/25/95 |
| 9 | TRAINING PLAN - CDRL F001 | 2/6/95 | 2/17/95 |
| 10 | SUBMIT CDRL F001 | 2/17/95 | 2/17/95 |
| 11 | GOV REVIEW CDRL F001 | 2/17/95 | 3/17/95 |
| 12 | GOV CMNTS CDRL F001 RCV'ED | 5/22/95 | 5/22/95 |
| 13 | REVIEW GOV CMNTS CDRL F001 | 5/22/95 | 5/31/95 |
| 14 | RE-SUBMIT CDRL F001 | 6/26/95 | 6/26/95 |
| 15 | CUTOVER PLAN - CDRL G001 | 6/9/95 | 7/14/95 |
| 16 | SUBMIT CDRL G001 | 7/14/95 | 7/14/95 |
| 17 | SYS TEST/VER PLN CDRL G002 | 2/6/95 | 2/28/95 |
| 18 | SUBMIT CDRL G002 | 2/28/95 | 2/28/95 |
| 19 | GOV REVIEW CDRL G002 | 2/28/95 | 3/28/95 |
| 20 | GOV CMNTS CDRL G002 RCV'ED | 5/22/95 | 5/22/95 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary | ISN task | GOV action | Milestone complete | Milestone pending

000062

000063

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 21 | REVIEW GOV CMNTS CDRLG002 | 6/15/95 | 7/9/95 |
| 22 | RE-SUBMIT CDRL G002 | 7/9/95 | 7/9/95 |
| 23 | LESSON PLAN - CDRL F002 | 5/1/95 | 7/7/95 |
| 24 | SUBMIT CDRL FOO2 | 7/9/95 | 7/9/95 |
| 25 | GOV REVIEW CDRL F002 | 7/10/95 | 8/10/95 |
| 26 | SS H.R. CDRL B001 GOV CMNTS REV'ED | 5/22/95 | 5/22/95 |
| 27 | REVIEW GOV CMNTS CDRL BOO1 | 5/22/95 | 6/27/95 |
| 28 | RE-SUBMIT CDRL B001 | 6/27/95 | 6/27/95 |
| 29 | GOV CMNT CDRL C001 RCV'ED | 6/5/95 | 6/5/95 |
| 30 | REVIEW GOV CMNTS CDRL C001 | 6/9/95 | 6/19/95 |
| 31 | RE-SUBMIT CDRL C001 | 6/19/95 | 6/19/95 |
| 32 | GOV CMNT CDRL C002 RCV'ED | 5/22/95 | 5/22/95 |
| 33 | REVIEW GOV CMNTS CDRL C002 | 5/31/95 | 6/30/95 |
| 34 | RE-SUBMIT CDRL C002 | 6/30/95 | 6/30/95 |
| 35 | TSIP H.R. CDRL B002 APPROVED | 6/2/95 | 6/2/95 |
| 36 | GOV CMNTS CDRL E001 ISP RCV'ED | 5/22/95 | 5/22/95 |
| 37 | COMMENTS REVIEW CDRL E001 | 6/9/95 | 7/8/95 |
| 38 | RE-SUBMIT CDRL E001 | 7/8/95 | 7/8/95 |
| 39 | TRAINEE GUIDE CDRL F003 | 7/3/95 | 8/3/95 |
| 40 | SUBMIT CDRL F003 | 8/3/95 | 8/3/95 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete

000064

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 41 | GOV REVIEW CDRL FOO3 | 8/3/95 | 8/31/95 |
| 42 | SPARE PARTS LIST CDRL E003 - ALL SITES | 4/5/95 | 4/17/95 |
| 43 | SUBMIT CDRL E003 | 4/17/95 | 4/17/95 |
| 44 | GOV REVIEW CDRL E003 | 4/14/95 | 5/15/95 |
| 45 | GOV CMNTS CDRL E003 RCV'ED | 6/13/95 | 6/13/95 |
| 46 | COMMENTS REVIEW CDRL E003 | 7/4/95 | 7/13/95 |
| 47 | RE-SUBMIT CDRL E003 | 7/13/95 | 7/13/95 |
| 48 | OJT HANDBOOK CDRL F004 | 7/25/95 | 8/16/95 |
| 49 | SUBMIT CDRL F004 | 8/17/95 | 8/17/95 |
| 50 | GOV REVIEW CDRL FOO4 | 8/17/95 | 9/15/95 |
| 51 | SOFTWARE USERS MANUAL CDRL D003 | 6/12/95 | 6/28/95 |
| 52 | SUBMIT CDRL D003 | 6/28/95 | 6/28/95 |
| 53 | GOV REVIEW CDRL D003 | 6/28/95 | 7/28/95 |
| 54 | TEST PROCEDURES CDRL G003 | 11/6/95 | 12/14/95 |
| 55 | SUBMIT CDRL G003 | 12/14/95 | 12/14/95 |
| 56 | GOV REVIEW CDRL G003 | 12/14/95 | 1/15/96 |
| 57 | JOB MANUAL - H.R. CDRL D006 | 12/4/95 | 1/31/96 |
| 58 | SUBMIT CDRL D006 | 1/31/96 | 1/31/96 |
| 59 | GOV REVIEW CDRL D006 | 1/31/96 | 3/1/96 |
| 60 | TEST REPORT CDRL G004 | 7/7/96 | 8/9/96 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

000065

## ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 61 | SUBMIT CDRL G004 | 8/9/96 | 8/9/96 |
| 62 | | | |
| 63 | **ENGINEERING/TECH SUPPORT** | 2/9/95 | 8/30/95 |
| 64 | SYSTEM ENGINEERING | 2/8/95 | 6/15/95 |
| 65 | ATC CONFIG ECP DEVELOPMENT | 2/8/95 | 6/20/95 |
| 66 | SUBMIT ATC CONFIG ECP | 6/20/95 | 6/20/95 |
| 67 | CORDINATE W/COR WRT EQIUP RELOCATION | 4/25/95 | 5/26/95 |
| 68 | GOV EQUIP CONFIG | 7/3/95 | 7/17/95 |
| 69 | MATERIAL PROCUREMENT | 2/10/95 | 8/31/95 |
| 70 | DMS FACTORY ACCEPTANCE | 2/8/95 | 2/8/95 |
| 71 | INVENTORY EQUIPMENT - DMS | 2/9/95 | 2/10/95 |
| 72 | SHIP EQUIPMENT FROM DMS TO ISN | 5/10/95 | 6/30/95 |
| 73 | RECEIVE DMS EQUIPMENT- ISN | 5/22/95 | 7/7/95 |
| 74 | SET-UP INTEGRATION SYSTEM | 5/15/95 | 6/2/95 |
| 75 | INTEGRATE SOFTWARE | 6/5/95 | 6/14/95 |
| 76 | SYSTEMS TRAINING - ISN | 6/19/95 | 6/23/95 |
| 77 | SHIP EQUIPMENT AT ISN TO HR | 6/23/95 | 6/23/95 |
| 78 | EQUIPMENT SHIPMENT ISN/HR | 6/26/95 | 8/15/95 |
| 79 | | | |
| 80 | **SITE - NTCC HAMPTON ROADS VA** | 3/3/95 | 7/7/96 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete

000066

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 81 | DEVELOP TSIP SUPPORT DOCUMENTATIOM | 3/1/95 | 3/27/95 |
| 82 | SITE MANAGEMENT/ PRE-INSTALLATION | 3/15/95 | 5/20/95 |
| 83 | RECEIVE/STORE EQUIPMENT - H.R. | 5/4/95 | 12/29/95 |
| 84 | COMMENCE INSTALLATION | 6/26/95 | 6/26/95 |
| 85 | RELOCATION OF GOV EQUIPMENT | 6/27/95 | 9/1/95 |
| 86 | SET-UP CLASSROOM | 8/11/95 | 8/14/95 |
| 87 | FORMAL TRAINING | 8/14/95 | 8/26/95 |
| 88 | CLEAN-UP | 6/26/95 | 6/12/96 |
| 89 | SWITCH/RIU INSTALLATION | 6/26/95 | 8/26/95 |
| 90 | ATC LAN INSTALLATION | 8/22/95 | 9/1/95 |
| 91 | ATC SYS CONFIG VERIFICATION | 9/5/95 | 9/8/95 |
| 92 | ATC SYSTEM TEST | 9/7/95 | 9/12/95 |
| 93 | GOV. APPROVAL FOR CUT-OVER | 9/12/95 | 9/12/95 |
| 94 | COMMENCE CUTOVER | 9/13/95 | 9/13/95 |
| 95 | RE-CONFIG OF GOV EQUIP INTERFACE | 9/13/95 | 6/5/96 |
| 96 | CUT-OVER | 9/13/95 | 6/5/96 |
| 97 | CUTOVER COMPLETE | 6/7/96 | 6/7/96 |
| 98 | GOVERNMENT ACCEPTANCE | 6/7/96 | 7/7/96 |
| 99 | ATC INSTALLATION ACCEPTED | 7/7/96 | 7/7/96 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary — ISN task — GOV action — Milestone complete — Milestone pending

DEPARTMENT OF THE NAVY
FLEET AND INDUSTRIAL SUPPLY CENTER NORFOLK
DETACHMENT WASHINGTON DC
WASHINGTON NAVY YARD BLDG 200
901 M STREET SE
WASHINGTON DC 20374-5014

PB2:LM:94C0389
26 June 1995

Information Systems & Networks Corporation
Attn: Mr. William Robertson
10411 Motor City Drive
Bethesda, MD 20817

Dear Mr. Robertson:

It was a pleasure to meet yourself and the other members of your team at our meeting on June 22nd. I would like to take this time to summarize some of the topics covered at the meeting. A copy of the attendance sheet was provided to you at the conclusion of the meeting by Ms. Held.

- An Engineering Change Proposal (ECP) for Hampton Roads (only) was provided to the Navy. The ECP was stated to include a "surcharge" cost for the 414 DIM Cards which are now upgraded.

- A modification to the contract will be issued for the combination of both the formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I.

- The ECP submitted (at the meeting) will be reviewed by SPAWAR with comments to be provided on Monday or Tuesday (June 26th or 27th).

- The delivery schedule for all sites in Lot I is to be provided by ISN to the Navy by by Monday, June 26th.

I am your first line point of contact within this activity. If there are any questions, please contact myself at (202) 433-5389 or by facsimile at (202) 685-0002. In my extended absence or in an emergency Mr. Roscoe Crawford, the Contracting Officer, is available to assist you at (202) 433-5387. Please notify your staff of my telephone and facsimile numbers. A message should be left on my voice mail if I am not immediately available. I will return call at the earliest time.

Lisa Murtha

LISA C. MURTHA
Contract Specialist

P.S. FAX # 685-0002 not working - use 433-9586

Cpy to:
DCMAO Baltimore, Attn: Ms. T. Proctor

000067

PLAINTIFF'S EXHIBIT 6

Jones Ex. 21

JUL-21-1995 15:34 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.01

PMW 172

WE KEEP THE FLEET COMMUNICATING

PLAINTIFF'S EXHIBIT 7

# FACSIMILE TRANSMISSION COVER SHEET

SPACE AND NAVAL WARFARE SYSTEMS COMMAND
SHIP/SHORE COMMUNICATIONS OFFICE
PMW 172
2451 CRYSTAL DRIVE
ARLINGTON, VA 22245-5200

FAX (703) 602-7252

Plfs' Exhibit 12 for identification Sandra D Warren Oct. 29 1999 Wit. Jeffrey Bergdahl (4 pages)

DATE: 7/21/95

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: 4

FROM: JEFF BERGDAHL CODE: PMW172-22C

PHONE #: (703)602-8332

TO:

AGENCY: FFSC DET WASH

NAME: ROSCOE CRAWFORD/LISA MURTHA CODE: PB2

FAX NUMBER: (202)685-0002

VOICE NUMBER: (202)433-5387/9

SUBJECT: ATC CONTRACT N00600-94-C-0389.

REMARKS: Roscoe/Lisa,
Enclosed is our approval letter on ECP-1.
I will be in Norfolk on Monday, but will be available after that to review the ISN contract.

Jeff Bergdahl

000068

12.1

JUL-21-1995 15:35 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.02

DEPARTMENT OF THE NAVY
SPACE AND NAVAL WARFARE SYSTEMS COMMAND
WASHINGTON, D.C. 20363-5100

IN REPLY REFER TO:

2300
Ser PMW 172-22C/049
20 July 1995

From: Commander, Space and Naval Warfare Systems Command
To: Officer in Charge, Fleet Industrial Supply Center Detachment, Washington, D.C. (Code PB2)

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

Ref: (a) ISN LETTER OF 20 Jun 95 REGARDING SUBMITTAL OF ENGINEERING 12 PAIR CABLE CHANGE PROPOSAL (ECP) CDRL ITEM C003

Encl: (1) ISN letter of 20 Jun 95

1. SPAWAR has reviewed reference (a) ECP and technically approves ISN's proposed engineering change. Recommend negotiate all terms and conditions listed in reference (a) with ISN. It is further recommended that ISN number all subsequent ECP submissions for accountability purposes commencing with ECP 0002 and submit in accordance with MIL-STD-973 Appendix D as required in Data Item Description (DID) DI-CMAN-80639A.

2. The following comments address ISN's cost analysis sheet for NTCC Hampton Roads in enclosure (1).

a. **ECP Item:** Installation of 12-pair cabling on digital interfaces specified in referenced letter.

**Comment:** Original contractual cost to install or reuse cable was $419,329. Recommend a cost breakdown of the additional charge of $623,563 to justify these additional costs.

b. **ECP Item:** Increase the Novell Netware 3.11 SFT III from 25 to 50 users.

**Comment:** ISN should indicate the cost for 25 users under the "Cost in Contract Column" of enclosure (1) to reference (a). The Government does require a 50 user LAN capacity.

c. **ECP Item:** Government requested ATC Configuration Change.

000069

12.2

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

Comment: Agree with No Cost (n/c) to the Government. The equipment which the Government requested was based on a review of Amendment 4 to the RFP N00600-93-R-2790 which ISN bid on. At no time did the Government request anything which was out of the scope of the contract proposal.

d. ECP Item: Upgrade one of the RMSA 100(X) to an RMSA 200(X).

Comment: Agree with this recommendation.

e. ECP Item: The DIM 414E upgrade.

Comment: ISN letter of April 18, 1995 provided an agreed upon ATC equipment list between the Government and ISN for all seven sites. This letter should be incorporated within the contract. ISN further agreed to make the changes at no cost to the Government. Charges cited in enclosure (1) of reference (a) is a surcharge between DIM 414-3 modules and the DIM 414-E modules. It should also be noted that the agreed upon DIM 414-E module figure of 976 between the Government and ISN is significantly lower than ISN's original contract proposal of 1,515 DIM 414-3 modules. Recommend surcharge differences be identified.

f. ECP Item: CLIN 0001AA costs.

Comment: Total CLIN 0001AA under Cost in Contract column Enclosure 1 to Reference (a) should read $2,341,219.73 vice $2,152,184 per the ATC Contract N00600-94-C-0389.

g. ECP Item: CDRL's CLIN 0003 cost of ECP of $50,000.

Comment: Agree with this recommendation.

3. SPAWAR agrees with ISNs new POA&M Engineering and Technical Support Plan for NTCC Hampton Roads in enclosure (1) to reference (a).

4. SPAWAR will change the funding document N0003995RCDL301 in the amount of $789,319 for the ATC at Puerto Rico currently at FISC DET, and will coordinate with NISE EAST DEt Norfolk to arrange additional funding to satisfy this ECP by separate correspondence.

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

5. Any questions concerning this correspondence should be addressed to Mr. Jeff Bergdahl at (703) 602-8332.

KEVIN MEYERS
Division Head
Ship and Shore Communication
By direction of
the Commander

Copy to:
COMNAVCOMTELCOM Washington, DC, N512B (G. Dinan)
DCAMO Baltimore, MD, S2102A (T. Proctor)

MEMORANDUM

31 August 1995

To: Bill Robertson

From: Jeff Bergdahl *Jeff Bergdahl*

Subj: ATC issues

1. IRT your voice mail, we have technically approved the ECP and proposed schedule extension via letter to FISC. I am not aware of any other administrative items we owe FISC, other than changing the wording on the funding document at FISC.

2. I would like to hear how the ATC training in Norfolk is proceeding and request copies of the student evaluations be provided. Also, are you still going to submit a no-cost ECP to use in negotiation of consideration with FISC.

3. At our meetings at NTCC Hampton Roads this month there was discussion of what testing would be required before start of cutover. This is discussed several times in CDRL G002, System Test and Verification Plan for NTCC Hampton Roads. Specifically:

a. Page 2 under 1.1 Scope
b. Page 9 under 1.5 Participation and Test Objectives
c. Page 10 under 1.9 Validation Signature Sheets
d. Page 11 under 1.9. Note "Validation Signature Sheets will be presented to the Government for review and comments 30 days prior to commencement of Phase VI."
e. Page 17 under 7.0 through 7.3. I would like to review the "(OEM) System Test Procedures" discussed in Paragraph 7.1 and the "test results documentation form" discussed in Paragraph 7.2 prior to the Phase VI testing. I would expect them to be delivered as part of CDRL G003, Test Procedures. At the start of the Phase VI testing I would like to see the test results from Phase IV and Phase V testing described on Pages 15 and 16.

Based on the documents you should be able to tell us how long you require to run through the tests.

PLAINTIFF'S EXHIBIT 8

Pl's' Exhibit 13
for identification
Sandra D Warren
Oct 29 19 99
Wit. Jeffrey Bergdahl
(1 page)

QUEST FOR CONTRACTUAL PROCUR T-NAVCOMPT FORM 2276 (8 PT) 8-81)
THIS REQUEST MUST BE ACCEP ON A DIRECT CITATION BASIS ON AND IS !2. DOCUMENT NUMBER
SUBJECT TO THE CONDITION LISTED ON THE REVERSE SIDE. ! N0003995RCDL301
EFERENCE NO. !4. FUNDS EXPIRE ON!5. DMS RATING!6. PRIORITY!7. DATE REQUIRED!8. AMEND. NO
N0003995AFN52D6! 30 SEP 97 ! ! ! 31 DEC 95 ! 001
FROM: SPACE AND NAVAL WARFARE SYSTEM COMMAND !10. FOR DETAILS CONTACT:
ARLINGTON, VA. 22202, ATTN: SPAWAR 01-4 ! S. SIMMS, PD72P4A, (703)602-3364
TO: COMMANDING OFFICER !12. MAIL BILLINGS TO:
FLEET INDUSTRIAL SUPPLY CENTER !
WASHINGTON NAVY YARD ! THE PAYING OFFICE CITED IN
WASHINGTON DC 20374- ! RESULTING CONTRACT
0600 !
ATTENTION: MR. ROSCOE CRAWFORD 95X3917 !

PLAINTIFF'S EXHIBIT 9

ACCOUNTING DATA TO BE CITED ON RESULTING CONTRACTS

| A. NO. | B. APPROPRIATION | C. SUB HEAD | D. OBJ CLASS | E. BU. CONTROL | F. SA | G. AAA | H. TT | I. PAA | J. COST CODE | K. AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1751810 | 52D6 | 000 | EA172 | 0 | 068342 | 2D | 000000 | D60010000000 | |
| | | | | | | | | | | .00 |

AMOUNTS WILL NOT BE EXCEEDED IN THE OBLIGATION DOCUMENT WITH OUT PRIOR WRITTEN APPROVAL FROM THE ISSUER. !L. TOTAL THIS DOCUMENT! .00
!M. CUMULATIVE TOTAL! 789,319.00

PROCUREMENT BY CONTRACT OF THE FOLLOWING ITEMS IS REQUESTED
THESE ITEMS !_! ARE !_! ARE NOT INCLUDED IN THE INTERSERVICE SUPPLY SUPPORT PROGRAM AND REQUIRED INTERSERVICE SCREENING ! ! HAS ! ! HAS NOT BEEN ACCOMPLISHED

| B. ITEM NO. | C. FSC | D. DESCRIPTION NAT. STOCK NO, SPEC AND/OR DRAW NO, ETC | E. QUANTITY | F. UNIT | G. ESTIMATED UNIT PRICE | H. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|
| | | DOCUMENT AMENDED TO EXERCISE HAMPTON ROADS ATC ECP COSTS VICE PROCUREMENT OF PUERTO RICO ATC. | | | | |

CONTRACT AWARD: $
AVAIL FOR RECOUPMENT: $
SIGNATURE CONTRACTING OFFICER

Def's Exhibit 16 for identification Sandra D. Warren Oct. 29, 1999 Wit. Jeffrey Bergdahl (1 page)

RECEIVED AT NRCC
ENTERED INTO PROSTATS
PALT COMMENCES AUG 29 1995

CHANGES TO THIS DOCUMENT ARE AUTHORIZED WITHOUT PRIOR CONSENT OF AUTHORIZING OFFICIAL.

FORWARD ACCEPTANCE AND COPIES OF ALL OBLIGATING DOCUMENTS TO: COMMANDER, SPACE AND NAVAL WARFARE SYSTEM COMMAND, DEPARTMENT OF THE NAVY, ARLINGTON, VA. 22202, ATTN: SPAWAR 01-4 SEE ACCEPTANCE INSTRUCTIONS ON REVERSE

000073

COPY TO: SPAWAR 01-4
CODE: N880 NO CAAS IS AUTHORIZED WITHOUT SPECIFIC AMENDMENT TO THIS DOCUMENT

SEE ATTACH PAGES FOR DELIVERY SCHEDULES, PRESERVATION AND PACKAGING INSTRUCTIONS, SHIPPING INSTRUCTIONS AND INSTRUCTIONS FOR DISTRIBUTION OF CONTRACTS AND RELATED DOCUMENTS. !GRAND TOTAL
TRANSPORTATION ALLOTMENT (USED IF FOB CONTRACTOR'S PLANT) ! .00

| | | |
|---|---|---|
| I CERTIFY THAT THE FUNDS CITED ARE PROPERLY CHARGEABLE FOR ITEMS REQUESTED. | AUTHORIZING OFFICIAL (NAME, TITLE AND SIGNATURE)<br>for RICHARD J. LUCEY, ACCOUNTING OFFICER<br>Loretta Iannamore | DATE<br>8/23/95 |
| THIS REQUEST IS ACCEPTED AND THE ITEMS WILL BE PROVIDED IN ACCORDANCE HEREWITH. | ACCEPTING OFFICIAL (NAME, TITLE AND SIGNATURE)<br>Roscoe W. Crawford Contracting Officer | DATE<br>8/29/95 |

Jones Ex. # 2

DEFENSE LOGISTICS AGENCY
DEFENSE CONTRACT MANAGEMENT COMMAND
DEFENSE CONTRACT MANAGEMENT DISTRICT, MID ATLANTIC
DEFENSE CONTRACT MANAGEMENT AREA OPERATIONS, BALTIMORE
200 TOWSONTOWN BLVD. WEST
TOWSON, MARYLAND 21204-5299

Date: 27 Sep 95
Case No. 202(A)-95-G-0183
Contract: N00600-94-C-0389
Address: 10411 Motor City Drive
Bethesda, Md 20817

aluation of Progress Payment No. 1319-03
ractor: Information Systems & Networks Corp.
OM: DCMDS-GMTC

SPAWAR-PMW 172-22C

Request evaluation of contract related to attached SF 1443 to determine entage of physical completion.

Furnish the following additional information:

a. Has the contractor's production pe... unsatisfactory?

Please furnish your report

Please acknowledge. The Pri
hone #(410) 339-4917.

PLAINTIFF'S EXHIBIT 10

uest Reply By: 18 Oct 95

THE COMMANDER:

...yst
...ial Pr... Area

---

DCMDS-GMTC FROM: PMW 172-22C Date: 19 OCT 95

1. Physical Percentage of Progress is estimated as 15 %.

2. Contractor's performance (Has)/Has Not been satisfactory.

3. Other Comments:
See attachment for rationale on percentage of physical completion. ISN is slightly behind the proposed schedule in their ECP, but ~~still~~ & still performing satisfactorily compared against that schedule.

Performed By: Jeff Bergdahl
Date: 19 Oct 95
Reviewed & Approved by: Ronald J. Zell
Date: 20 Oct 95

Lisa Murtha

Plfs' Exhibit 23
for identification
Sandra D Warren
Oct. 29 1999
Wit. Jeffrey Bergdahl
(2 pages)

000074

David Hahn 23 1

Physical percentage of completion of Lot I by CLIN:

0001AA- 15%
0001AB- 5%
0001AC- 5%

0002AA-100%
0002AB- 0%
0002AC- 0%

0003- 60%

Rationale:
For CLIN 0001 Turnkey ATC the work consists of three phases and an associated percentage of the physical effort:
(1) Installation-20%
(2) Cutover-70%
(3) Test and Acceptance-10%

ISN has ordered equipment for the three ATC sites. ISN is continuing to install the ATC at NTCC Hampton Roads and is expected to provide a delivery schedule this week for the remaining material to be installed. ISN has not provided a firm date for installation completion and start of cutover. ISN has not begun installation of the ATC at the two sites in Hawaii, NTCC Camp H M Smith and NTCC Pearl Harbor, and will not until cutover has begun at NTCC Hampton Roads and ISN demonstrates their ability to cutover complex circuits there. Based on their progress at NTCC Hampton Roads, installation will not commence at the two Hawaii sites until next year.

For CLIN 0002, ISN conducted the formal classroom for NTCC Hampton Roads(0002AA) at the end of August through the beginning of September. Formal classroom training for for the two remaining sites will not commence until the installations have begun there.

For CLIN 0003, ISN has submitted most of the general CDRLs and those site specific to NTCC Hampton Roads. The major outstanding items are the Telecommunication System Installation Plan(CDRL B002) and the other site specific deliverables for the two sites in Hawaii. These will not be submitted until after a joint SPAWAR/ISN site survey.

PLAINTIFF'S EXHIBIT 11

Plfs' Exhibit 30
for identification
Sandra D Warren
Oct. 29 1995
Wit. Jeffrey Bergdahl
(6 pages)

12/6/95

meeting w/ [redacted] SPAWAR
re: ISN

'94 Contract - Design, engineer, install + test FIP Systems
Differing site conditions alleged by the KR shortly after award
Changes in key Personnel prematurely by KR.
Misc. Perf. Problems + disputes
Gov't spent ~~$~~ over $2 million for HW under Prog. Payments for first 3 CLINs. 80% of equip. @ Hampton Rds site only has been delivered. Were in 1st Lot.
No other Equip. has been delivered.

KR has not complied w/ ~~[illegible]~~ contract established deliv. times
We never modified them to extend them; KR did not want to give us consideration

Did this Happen
Do a partial T for C of ~~all~~ all CLINs in Lot I except Hampton Rds. + Hampton Rds.

000076

30.1

adjustment w/ ISN.

No ~~Maybe try to do a no-cost T for C as consideration for their delays @ Hampton Rds.~~

~~Roscoe~~

Progress payments There is possible fraud involved w/ the progress payments they've rec'd. ACO is investigating. But it doesn't affect ~~the~~ our course of action on this KR, i.e. our plans to T for C.

ECP? There is an ~~[illegible]~~ eng. change needed for the equip to be ~~[illegible]~~ operated successfully @ Hampton Rds. Plan - let ISN install w/ KR as is writer

They can do cutover w/o the ECP 000077

New KR, maybe w/ an S&A can be done to provide for 30.2

ECP to be incorp. + work on installing the other sites.

Is this Done

We still need to mod the Hampton Roads CLIN to re-establish the deliv. schedule + set consideration. ★

There are a few perf. problems remaining on Hampton Roads. Gov't can't figure out what a good new deliv. time should be. Roscoe does need to do a mod to re-estab. the Hamp. Rds deliv. schedule (possibly w/o consideration if this is too hard to negot.) ASAP ** — if WAS Done

Then if KR doesn't deliver, Hampton Rds. can be T for D'd. — Are we?

000078

30.3

★ Lish wants Roscoe to T for D ... CLIN 1AB +

+ "fight the battle." But she acknow. ISN is very litigious + will fight it. Govt. has to invest consid. resources + take alot of risk to try to pursue a T for D.

SPAWAR est. 9 ~~mo~~ mo. Minimum until ~~SPAW~~ Hampt. Rds. can be successfully cut-over

(margin: cut over not complete)

Due to the problems @ Hampton Rds., one alternative is to ~~der~~ T for C the whole lot + just ~~tak~~ take title to Hamp. Rds. equip (both installed + uninstalled) as is

(margin: TfC ? option ?)

Maybe T for C Hampton + 2 for D the other & CLINS → Tish said she didn't think this would work. 000079

(margin: Roscoe needs to research illegal)

Or you could re-establish a ...

30.4

/ Not preferred by Customer

deliv. schedules + let them fail + T for D - this might be cheaper, because he can't submit an equitable adjustment.

Either way he'll probably litigate.

Progress Pay ✱

SPAWAR can't keep saying he's performing satisfactorily on Tish's Progress Payments paperwork, that way she won't have to approve progress payments.

T for D ✱✱

Really, ISN has no valid argument for not being T for D'd at Hampton (assuming a deliv. sked. is re-estab. + they don't meet it). Their only argument has been differing site condit. which (per SPAWAR) is not a valid basis for delay.

30.5

000030

When the deliv. skeds are re-estab they will all be indep. of each

Constructive change

but the Gov't has constructively changed this by directing them orally to "focus" on Hampton 1st.

~~12/19 Mtg. w/ Brian James~~



30.6

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

COPY

INFORMATION SYSTEMS AND NETWORKS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

CASE NO: 98-178C
JUDGE: James T. Turner

# DEPOSITION OF DENISE JONES

The deposition of **DENISE JONES**, taken at the instance of the Plaintiff, pursuant to stipulations contained herein; the reading and signing of the deposition reserved, before Certified Court Reporter, Allison Garrison, at 10:30 a.m., October 22, 1999, at 1201 West Peachtree Street, Suite 5050, Atlanta, Georgia.



000082

PLAINTIFF'S EXHIBIT 12

I sent to ISN.

Q You sent this document around August 8th 1997; is that correct?

A Yes.

Q Is that your signature on this document?

A Yes.

Q I want to refer your attention to the sentence that says (reading), This letter is to advise you that I have determined that the gross settlement for this termination will be four million, forty-nine thousand, five hundred and thirty-two dollars.

How did you come up with that figure?

A Based on the information that was provided to me.

Q What information was provided to you?

A Audit report.

Q And what did the audit report say?

A Evidently it misadvised me or somewhere pointed out this for me -- I'm mean, that's just one tool that we use to come up with the figure.

Q Do you know if that's the figure that ISN received under the contract?

A I'm not really sure.

Q Do you know how you came up with this figure of four million, forty-nine thousand, five hundred and thirty-two dollars?

A If I look back at my file I probably could tell you.

Q Do you have your file here?

A No.

Q Is it at your office?

A Yes.

Q Do you have a file on this ISN termination?

A Yes.

Q Do you know what documents that would help you in determining how this figure was set forth?

A Probably the settlement proposal, the audit, the MOCAS system.

Q The next paragraph says (reading), However, the issuance of this unilateral decision does not preclude the submittal of additional support which you feel that could impact this decision.

What does that mean?

A That means that if they have information that they want to provide at this

Q If it was after the settlement offer had been made, why would he get back with you?

A I don't know.

Q Did you have any conversations with Bobby Melvin with respect to ISN?

A I can't recall.

(Whereupon, Plaintiff's Exhibit Number 10 was marked for identification)

BY MR. CRAIG (resuming):

Q (Presenting) Ms. Jones, I want to draw your attention to a document marked Plaintiff's Exhibit Number 10. Have you seen that document before?

A Yes.

Q When do you recall first seeing this document?

A Sometime in September of '97.

Q Prior to receiving this letter identified as Exhibit Number 10, do you recall having any conversations with Robert M. Cozzie? He was identified on the last page of Exhibit Number 10.

A I spoke with someone from ISN, but I cannot be exact as to who.

Q Do you recall when you spoke with

Q This information that's set forth in the September 1997 letter, did you confirm the information at all?

A Meaning?

Q Did you look at documents to make sure that what is stated in this letter is correct?

A No.

Q What did you do? Did you ask somebody to confirm this information?

A Yes.

Q Who did you ask to confirm the information set forth in this letter?

A The PCO office.

Q You recall asking the PCO office to confirm this information for you that's set forth in the September 5th 1997 letter?

A It may not have said confirm, but I know I asked them to look at it for me.

Q The purpose of you having them look at it is to confirm the accuracy of the information?

A Yes.

Q Do you know whether they took a look at this information for you?

A I didn't get a response back.

Q Do you know why you didn't get a

Exhibit Number 11. Is this the request that you sent to the PCO with regard to ISN's settlement position?

A It was in regard to the letter.

Q The September 5th 1997 letter?

A Yes.

Q Describe this October 9, 1997 letter for me.

A It's a letter to Roscoe Crawford asking that he provide information on the attachment, which was the September 5th letter.

Q Did you send this letter to Mr. Crawford on or about October 9th 1997?

A Yes, if that's the date on here.

Q Did you sign this letter?

A Yes.

Q Did you review this letter with anyone prior to sending it to Mr. Crawford?

A No.

Q Did you receive any response to your October 9th 1997 letter to Mr. Crawford?

A I can't recall if he phoned me or not.

Q After you sent this October 9, 1997 letter, what happened next with respect to this ISN contract?

A I can't recall if I tried to contact him again or I issued -- I can't remember.

(Whereupon, Plaintiff's Exhibit Number 12 was marked for identification)

BY MR. CRAIG (resuming):

Q (Presenting) Ms. Jones, I want to draw your attention to the document marked Plaintiff's Exhibit 12. What is that document?

A Another letter to Mr. Roscoe Crawford.

Q Why did you send this letter to Roscoe Crawford?

A Because I had not gotten any information from his office.

Q He had not responded to your October 9, 1997 letter; is that correct?

A No.

Q Let me ask you another way just so we're clear on the record.

Is it true that he did not respond to your October 9, 1997 letter? Your no response, I think I know what it meant, but I just wanted to clarify it. I'll ask it again.

MR. CRAIG: It's ambiguous. I just want to make sure we're clear on this so down the road her no answer --

MR. AUSTIN: Ambiguous as to form in terms of --

MR. CRAIG: That's why I'm trying to clarify it.

MR. AUSTIN: Okay.

BY MR. CRAIG (resuming):

Q Is it correct that Mr. Crawford did not respond to your October 9, 1997 letter?

MR. AUSTIN: Objection as to form in terms of when.

BY MR. CRAIG (resuming):

Q After October 9, 1997, before November 5th 1997.

A I can't recall because he and I talked and I can't remember the date that we actually talked.

Q Your letter starts out (reading), Several attempts have been made to get your office to provide information on subject termination.

Were those attempts by telephone?

A Yes, more than likely, where I may have phoned.

Q And this October 9, 1997, do you consider that an attempt?

A Yes.

Q The next sentence states (reading), A certified letter was sent to you on October 9, 1997, requesting you provided information on subject termination.

That's Plaintiff's Exhibit 11, correct?

A Yes.

Q (Reading), After getting no response from you, I phoned you on October 29, 1997.

Is that correct?

A Yes.

Q (Reading), We discussed the matter once again, and at that time you informed me that you would set up a conference call for Friday, October 31, 1997, with you, Jeff Bergdahl and myself.

Is that correct?

A Yes.

Q (Reading), Once again, I did not hear from your office.

Is that correct?

A Yes.

Q (Reading), On Monday, November 23 -- Should that read October 23, 1997?

A It probably should. It probably

should.

Q -- I phoned and got your voice mail. I left a message for you to call me, no response.

Is that correct?

A Yes.

Q (Reading), I also left a message on Jeff Bergdahl's voice mail and there was no response from his office.

Is that correct?

A Yes.

Q Who is Jeff Bergdahl?

A Contracting office technical rep.

Q Why did you call Mr. Bergdahl?

A Because he was the technical rep on the contract.

Q Why would you contact a technical rep on the contract?

A Some of the information provided listed his name.

Q Do you know what agency or division within the Department of Navy that Mr. Bergdahl was assigned to?

A No.

Q Do you know whether Mr. Bergdahl was with Space and Naval Warfare Systems Command?

What material was provided to you that you're referring to?

A The audit report and the letter from ISN.

Q The September 5th 1997 letter we already went over?

A Yes.

Q The next sentence says (reading), The TCO is ready to make an offer to ISN for the settlement of the termination settlement proposal and the ECP in the amount of four million, nine hundred forty thousand, seven hundred twenty-five dollars.

My question is: How did you come up with that dollar figure?

A Basically, I relied heavily on the audit report.

Q Let's go quickly back to your -- let's go back to Plaintiff's Exhibit 9. It's an August 8th 1997 letter from you to Bobby Melvin.

I want you to look at that figure of four million, forty-nine thousand, five hundred and thirty-two dollars. And I want you to look at this figure of four million, nine hundred forty thousand, seven hundred twenty-five

if you made a settlement offer to ISN?
A Yes. At some point I did make a settlement offer.
Q And that point would have been after November 5th 1997?
A I'm not really sure when it was made.
Q This letter says (reading), If no response is received from your office by this date then TCO will proceed with settlement.
So I'm going to ask my question again: Did you proceed with settlement after November 5th 1997?
A Yes.
(Whereupon, Plaintiff's Exhibit Number 13 was marked for identification)
BY MR. CRAIG (resuming):
Q (Presenting) Ms. Jones, I want to draw your attention to a document marked Plaintiff's Exhibit Number 13. Can you tell me what that document is?
A This is the offer that I made to ISN.
Q You made this offer to ISN on or about November 13th 1997; is that correct?
A Yes.
Q Did you fax this offer to ISN?

A Correct.

Q And that review by the PCO with respect to ECP is in the context of funding for the settlement; is that correct?

A Repeat that.

Q This review of the ECP that we're talking about by the PCO -- strike that. I going to try to get this clear so we can just move on. That's okay. I'm going to just move on here.

A The next sentence says (reading), If you are not in agreement, you have fifteen days from the date of this letter to substantiate the cost proposed.

Do you know whether ISN agreed with this information or disagreed with this information?

A They agreed.

(Whereupon, Plaintiff's Exhibit Number 14 was marked for identification)

BY MR. CRAIG (resuming):

Q (Presenting) Ms. Jones, I'm showing you what's been marked as Plaintiff's Exhibit 14. What is that document?

A The letter that I sent to ISN making the offer.

Q I want to draw your attention to the lower left-hand corner of the document. What is that (indicating)?
A That's acceptance signed by the president of ISN.
Q Acceptance of what?
A The offer.
Q The offer you made in Exhibit Number 13?
A Yes.
Q I'm going to refer you to page two. It has a date of November 14th 1997. Do you know if you received this document on or about that date by fax from ISN?
A I'm not sure, but I probably have it in my file.
Q Sitting here today, do you have any reason to doubt that you didn't receive this acceptance by ISN on or about November 14th 1997?
A I know I received the letter.
Q Okay. Sitting here today, do you have any reason to doubt that you did not receive this acceptance on or about November 14th 1997?
A I don't have any doubt that I received the letter.

Q My question is: Sitting here today, do you have any reason that you know of right here today to doubt that you did not receive this letter on or about November 14th 1997?

A No.

Q After you received this acceptance by ISN, then what happened?

A I'm not really sure. This has been a long time.

Q Let me ask you this: Is that your signature?

A Yes.

Q After receiving this letter, did you request funding from the PCO?

A I'm not going to guess. I'm not really sure.

Q Okay.

(Whereupon, Plaintiff's Exhibit Number 15 was marked for identification)

BY MR. CRAIG (resuming):

Q (Presenting) Ms. Jones, I want to draw your attention to the document marked Plaintiff's Exhibit Number 15. What is that document?

A A letter to Mr. Roscoe Crawford advising that we did make ISN the offer and

requesting additional funding.

Q Is that your signature on this document?

A Yes.

Q Did you send this document to Mr. Crawford on or about November 18th 1997?

A Yes.

Q It says (reading), Reference our letter dated November 5, 1997 sent via facsimile.

Is that the document marked as Jones Exhibit Number 12 that you're referring to?

A Yes.

Q Do you know whether funding was provided?

A No.

Q How do you know that?

A I never received the modification for the funding.

Q You would have received that modification from Fleet and Industrial Supply Center Norfolk?

A From Mr. Roscoe Crawford.

Q The next sentence says (reading), If funding is not provided within a ninety day period, I will then issue my decision and return

authority back to your office for completion of the termination.

What does that mean?

A That basically I would write up my decision and send it back to him to issue the final settlement.

Q Did you write up a final decision, or issue a decision?

A I can't recall.

Q If Mr. Crawford's department didn't provide funding for this contract, are there other ways to fund the settlement you entered into?

A Not that I know of.

Q Do you know whether -- strike that.

You don't know what agency within the Department of the Navy would provide funding to Mr. Crawford do you?

A No.

Q You didn't ask Mr. Crawford what agency he would have received funding from did you?

A No.

Q Why not?

A Because basically we deal with the contracting officers, and what they do in their

16. Do you know what that document is?

A It looks like something from the PCO office.

Q Do you know what this document is though?

A It looks like a document where they're putting money on the contract.

Q Have you seen this document before?

A No.

Q In the course of your duties as a termination contracting officer, did you see documents like this?

A No.

Q Do you know whether this document is a funding document?

A It looks like where they try to put money on the contract. I'm not really sure because I've never seen it.

Q Have you ever heard of the term funding document?

A I've heard of the term.

Q Do you know what a funding document is?

A No.

Q So you don't know one way or the other whether this is a funding document; this being

A Based on what the DFAS has in the issuance of modifications.

Q DFAS. Tell me what that is?

A Defense Finance Accounting.

Q This signature down at the bottom of this document, Authorizing Official, Richard J. Lucey. Do you know who that is?

A No.

(Whereupon, Plaintiff's Exhibit Number 17 was marked for identification)

BY MR. CRAIG (resuming):

Q (Presenting) Ms. Jones, I want to draw your attention to a document marked Plaintiff's Exhibit Number 17. Have you seen that document before?

A No.

Q Again, I'm going to ask you: Do you know whether that document is a funding document?

A No.

Q Do you know what this document is?

A Well, from you telling me previously, I assume this is something --

Q But you don't know sitting here today what it is?

A No.

Do you know if that statement's correct or not?

A I don't know.

Q Do you recall speaking with anybody about funding for the ANCC/ATC program for fiscal year 1996?

A No, I did not.

Q Is it correct that you don't know how much money was in the ANCC/ATC procurement program for fiscal year 1996?

A No.

Q Do you know how much money was in the ANCC/ATC procurement program for fiscal year 1997?

A No.

(Whereupon, Plaintiff's Exhibit Number 26 was marked for identification)

BY MR. CRAIG (resuming):

Q (Presenting) Ms. Jones, I want to show you a document that's been marked Jones Exhibit Number 26. I'll preface my question by saying it reflects that eleven pages were sent to you, but there is only four pages that comprises this exhibit. We're just going to ask about these four pages in this exhibit, okay?

Q Did you send this document to ISN on or about December 9th 1997?

A Yes.

Q Why did you send this document to ISN?

A This was after I had received the information from Mr. Crawford, to advise them of the offer.

Q And what was that offer?

A You mean the offer now or?

Q That's a good point. Do you differentiate between different offers?

A Well, there's the offer previous and the offer that we're making now.

Q And the previous offer was set forth in your letter of November 13th 1997 to ISN; is that correct?

A Yes.

Q And that's the offer that ISN previously accepted, correct?

A Yes.

Q What's the second offer?

A The second offer was after the information was provided by Mr. Crawford's office.

Q And what is that second offer?

A Zero.
Q You base that amount of zero upon information you received from Mr. Crawford's office, correct?
A Yes.
Q Did you base that upon any other information aside from the information you received from Mr. Crawford's office?
A The information -- Well, basically, at this time, no.
Q You didn't receive any information from Jeff Bergdahl did you?
A No.
Q You didn't confirm what Mr. Crawford told you was true or not did you?
A No.
Q You assumed that what he told you was correct, right?
A Correct.
Q Aside from you dealing with Mr. Crawford on the funding issue, you didn't speak with anybody else with regard to funding, correct?
A No.
Q You didn't make any independent

A It supports both, but it asks for additional information.

Q How does it support the $4.9 million dollar claim?

A Because the auditor also needed more information on the ECP.

Q And you made the $4.9 million dollar offer based upon additional information that you had that the auditor didn't have?

A Yes.

Q When you made this four million dollar offer on December 9, 1997, you had the additional information that the auditor didn't have, correct?

A Yes.

Q Then why did you go from $4.9 million dollars to four million dollars?

A Because then I had additional information from Mr. Crawford.

Q Okay.

So your switch from $4.9 million to four million was based upon the information you received from Mr. Crawford, correct?

A Yes.

Q Assuming ISN received four million

dollars and the CPIT was $4.4 million -- strike that.

Assuming that ISN received this, let's call it four million, fifty thousand dollars, and the CPIT was $4.4 million dollars, that would have provided for an additional three hundred and fifty thousand dollars remaining on the contract, correct?

A Yes.

Q And you didn't award that three hundred and fifty thousand dollars to ISN based upon what Mr. Crawford told you, correct?

A And the audit report, correct.

Q Are you aware of any documentation that you gave to ISN at or around November 13th 1997, and informed ISN that they would not receive the funding based upon a future review of the ECP work?

A No, I don't recall.

Q Do you recall telling them orally that that review would occur, and that would make the funding issue contingent?

A I don't recall.

Q Did you review a draft of this document with anybody before you sent it to ISN?

CERTIFIED MAIL-RETURN RECEIPT REQUESTED

**DEFENSE LOGISTICS AGENCY**
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

IN REPLY
REFER TO: DCMDS-GATC

August 8, 1997

SUBJECT: Settlement by Unilateral Determination on Terminated Contract N00600-94-C0389

Bobby Melvin
ISN
10411 Motor City Dr.
Bethesda, MD 20817

Dear Mr. Melvin:

Reference our letter dated May 2, 1997.

In our referenced letter it was requested that you response to the DCAA audit report No. 6311-97B17100001. Our letter indicated that if no response was received in our office we would, inaccordance with FAR 52.249, issue a Unilateral Determination. This letter is to advise you that I have determined that the Gross Settlement for this termination will be $4,049,532.00. The net amount due ISN is $0.

However, the issuance of this unilateral decision does not preclude the submittal of additional support which you feel that could impact this decision. You have 15 days from the date of this letter to submit such information. You can also request a final decision be issued, which is appealable to the Board of Contract Appeals or the US Claims Court.

Should you have any question or desire further assistance please contact the undersign at (770)590-6389 or Fax (770)590-2081.

Sincerely

Denise M Jones
DENISE M. JONES
Termination Contracting Officer

cc:
Lisa Scott/Fleet Industrial Supply
DCMC Baltimore.

000106

PLAINTIFF'S EXHIBIT 13

ISN®

PLAINTIFF'S EXHIBIT 14

September 5, 1997

Denise M. Jones
Termination Contracting Officer
Defense Contract Management Command Atlanta
805 Walker Street
Marietta, GA 30060-2789

Pl'fs' Exhibit 34
for identification
Sandra D Warren
Oct. 29 1995
Jeffrey Bergdahl
(6 pages)

Dear Ms. Jones:

This letter responds to DCAA Audit Report No. 6311-97B17100001, and your August 8, 1997 letter wherein you determined that the gross settlement for terminated contract N00600-94-C-0389 will be $4,049,532.00. Your determination resulted in the net amount of $0 due to ISN. There are several issues which the DCAA audit report failed to address, and which were not considered in your unilateral determination. ISN submits this letter response to assist you in the final and expeditious resolution of the ATC contract termination settlement proposal, without either party having to resort to legal action.

ISN disputes that it incurred costs in excess of the contract limitations because the settlement proposal was submitted on a total cost basis. The total costs incurred included the costs for an engineering change proposal (ECP) which was approved and ratified by the contracting officer (CO), after technical approval from the contracting officer's representative (COR). At a minimum, the Government encouraged the performance of the tasks contained in the ECP; in fact, the Government directed ISN to perform the work knowing that it did not have the requisite funding to issue a formal modification to incorporate the approved ECP into the contract.

The DCAA questioned the entire amount of profit ($443,396) claimed by ISN because: (1) ISN did not provide an estimate to complete (ETC) or percentage of completion; (2) ISN [allegedly] underbid this contract by approximately $900,000[1]; and (3) DCAA audit report 6221-96G17500001 disclosed that ISN was in a loss position. The DCAA further reduced the termination settlement proposal costs claimed by ISN in the amount of $460,708 on the basis that these costs are in excess of the contract limitations.

It is our contention that the audit report is incomplete, inadequate and inconsistent with the actual events that transpired during the performance of Contract No. N00600-94-C-0389 ("ATC contract"). ISN further asserts that the Government had actual knowledge of the scope of work performed by ISN under the ATC contract and failed to disclose this information to the

[1] The DCAA auditor fails to disclose the source of this information, or from what documents this unsubstantiated assessment was derived.

000107

34.1

DCAA auditor during the preparation of the audit report. Accordingly, we will address each of these issues below, and we will show that ISN is entitled to recover the questioned costs for the reasons stated herein.

The crucial document that ISN relies upon in its claim for increased costs under the termination settlement proposal is the June 20, 1995 letter ECP submitted by ISN to Jeff Bergdahl, (COR, SPAWAR). Despite the Government's failure to incorporate the ECP by contract modification, the work described therein, and directed by the Government, was necessary and inherent to the continuing performance of the contractual work at NTCC Hampton Roads. Moreover, ISN proceeded with the installation and cut-over at NTCC Hampton Roads, including the installation of the 12-pair cabling and DIM-414-E upgrades, relying on the statements of the contract specialist, Lisa C. Murtha[2], and the COR (Mr. Bergdahl)[3], that the ECP was approved and would be incorporated into the ATC contract by modification.

As a TCO, you are fully aware that a contract specialist prepares correspondence, contract modifications, funding documents, etc., only at the direction and by the authority, or with the tacit approval, of the CO. In the present instance, Ms. Murtha's June 26, 1995 letter to ISN was evidently prepared at the direction of the CO, Mr. Roscoe Crawford, and with his full knowledge and approval. Ms. Murtha specifically identifies Mr. Crawford as the FISC Detachment CO, and the only point of contact if she is unavailable.[4] Moreover, Mr. Crawford attended every meeting wherein the ECP proposals (the subsequent revisions, the performance and status thereof) were regularly and repeatedly discussed, to include the June 21-22, 1995 meetings referenced in Ms. Murtha's letter.[5]

As noted in the June 20, 1995 letter ECP, the revised delivery schedule reflected a completion date of August 9, 1996 for the NTCC Hampton Roads site configuration. Accordingly, the Government is and has been aware of the estimated date of completion pursuant to the letter ECP. In addition, the Government was briefed on the progress of the ATC contract on or about February 2, 1996[6]. At that time, the projected completion date for the Hampton Roads NTCC site installation was July 7, 1996. The CO, Roscoe Crawford, thereafter issued a "Stop Work Order" on February 20, 1996. ISN was refused access to the site (and thus unable to assess the percentage of completion), and the Government took possession of all

---

[2] FISC letter dated 26 June 1995 wherein Ms. Murtha acknowledges that the DIM-414 cards have been upgraded. Ms. Murtha identifies herself as the "first line point of contact within this activity (FISC Detachment)." Ms. Murtha further states that "A modification will be issued for the combination of both the formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." Ms. Murtha also states that the ECP submitted [on or about June 20, 1995] will be reviewed by SPAWAR with comments to be provided on . . . June 26th or 27th."

[3] Memorandum dated 31 August 1995 from Jeff Bergdahl to Bill Robertson, which states, in part: "[SPAWAR has] technically approved the [June 20, 1995] ECP and proposed schedule extension via letter to FISC. I am not aware of any other administrative items we owe FISC other than changing the wording on the funding document at FISC."

[4] A copy of this letter was provided to the ACO, Ms. Letitia (Tish) Proctor, as well.

[5] See, ISN Progress, Status and Management Report (CDRL A0004) dated July 15, 1995; letter dated January 26, 1996, from Donald J. Tabasco (ISN Manager of Contracts) to Roscoe Crawford (CO).

[6] Briefing Charts: ATC Installation Status for Hampton Roads NTCC (as of January 31, 1996).

material and equipment at the Hampton Roads site and at ISN headquarters, Bethesda, Maryland.[7]

The DCAA audit report is qualified because the auditor never received an updated/current technical report with an estimate to complete/estimate at completion (ETC/EAC), nor did the Government provide the auditor with the inventory verification report (SF 1423). As demonstrated above, however, the Government was in possession of this information and unilaterally elected not to furnish this information to the DCAA auditor. ISN did not have access to the NTCC Hampton Roads location effective February 20, 1996, the date of the "Stop Work Order." Both the COR and the TCO are aware that ISN could not have commenced installation of the ATCS without performing the tasks enumerated in the June 20, 1995 letter ECP. Moreover, the Government advised the DCAA auditor that "ISN [is] due some form of equitable adjustment on this contract due to various changes to the statement of work."[8] Because ISN's termination settlement proposal was submitted on a total cost basis – and because the Government refused to provide the DCAA auditor with the requested information, which was and still is, in its possession – the auditor merely questioned the costs in excess of the stated contract price.

The next question to be addressed is the cost impact of the changed work. Based on the contract specialist's June 26, 1995 letter, and the COR's August 31, 1995 memorandum, the proposed costs for the June 20, 1995 letter ECP were acceptable and reasonable to the Government. The labor costs contained therein included the ECP preparation costs (**$9,000**) and the program management and engineering costs (**$135,000**). These costs should have been allowed in their entirety in the termination settlement proposal; however, the auditor's findings failed to include these costs as allowable contract labor costs.

The most significant portion of the ECP labor costs relate to the installation, cut-over and 12-pair cable. The total labor costs proposed for this work is $623,563. As of January 31, 1996, ISN had completed 98% of the installation of the ATC equipment at NTCC Hampton Roads. The cable fabrication and cut-over/demonstration was at 25% completion. At the time of the February 2, 1996 briefing, ISN anticipated completion of the NTCC Hampton Roads site by August 9, 1996, or 28 weeks after the status brief. By extrapolating the work completed prior to the "Stop Work Order" (3 weeks/28 weeks) from the percentage of work to be completed (75%), it is possible to derive a Percentage of Completion, <u>relative to the work required by the ECP</u>, as of February 20, 1996. The computation is as follows:

3 (weeks of work performed)/ (divided by) 28 (weeks of work to completion) = 10.7%
10.7% (% of work completed) * (multiplied by) 75% (% of work remaining) = 8%
8% (% of work performed from 2/1/96 – 2/20/96) + 25% (% of work completed as of 1/31/96) = **33%**

Accordingly, ISN is entitled to one-third of the ECP costs proposed for installation, cut-over and 12 pair cable. This sum is 33% x $623,563 = $205,776.

---

[7] ISN letter dated February 23, 1996; handwritten inventory schedules dated February 21, 22, and 23, 1996 (signed by Jeff Bergdahl and E. Basnight for the Government).

[8] These changes are discussed more fully in the related correspondence between SPAWAR and ISN, and specified in the site survey reports prepared by ISN. Of note is the facsimile transmission dated February 13, 1996, from Mr. Bergdahl to Mr. Robertson, wherein SPAWAR confirmed the new circuit count for NTCC Hampton Roads at 1129, versus the contractual specification of 672 circuits.

In addition, ISN incurred the additional material and equipment costs to effect the ECP and perform the installation under the Government specified site configuration changes:

DIM-414-E (digital interface module upgrades approved by Contract Specialist)
976 x $48 each = **$46,848**
Novell SFT-III upgrade (25 users to 50 users) = **$3,226**
Upgrade 1 RMSA 100 (X) to 1 RMSA 200 (X) = **$18,537**
12 pair cable connectors = **$23,000**

The total costs thus incurred by ISN in excess of the ATC contract price for the changed and additional work are as follows:

Labor costs: $9,000 + $135,000 + $205,776 = **$ 349,776** + **$47,884** (13.69% G&A per DCAA audit) = **$397,660** + $ 39,766 (10% profit) = **$ 437,426.00**.

Material/Equipment: $46,848 + $3,226 + $18,537 + $23,000 = **$ 91,611** + **$ 12,542** (G&A) = **$ 104,153** + **$10,415** (profit) = **$ 114,568.00**.[9]

**Labor + Material/Equipment** = **$ 437,426** + **$ 114,568** = **$ 541,994.00**.

The next item to be addressed is the questioned profit in the amount of $443,396. The DCAA auditor questioned this amount, in part, because ISN allegedly underbid the ATC contract by approximately $900,000. This information is incorrect and misleading.[10] ISN did not underbid the ATC contract nor did it have any intention to forego profit. Based on the statement of work contained in the RFP/Solicitation, ISN submitted a bid which included profit. The changed site conditions, and the numerous Government requested changes, resulted in increased costs for labor, travel, and ODCs which could not have been contemplated at the time ISN submitted its BAFO.

The DCAA auditor further questioned costs in the amount of $460,708 as costs in excess of the contract limitations. ISN disputes this calculation on the basis that the auditor used an incorrect and/or incomplete total contract price for purposes of the termination settlement proposal.

When computing the contract "ceiling price" for a termination settlement proposal, the TCO has the authority, and the obligation, to adjust the contract price upward or downward if there are outstanding claims by or against the Government, for changed, additional or deleted work, or for other equitable adjustments not previously incorporated into the contract by

[9] ISN notes that these material/equipment costs were included in the total cost settlement proposal and were approved by the TCO. These costs were previously submitted during the contract performance period as routine progress payment requests and were approved, confirming the CO's approval of the June 20, 1995 ECP.

[10] Based upon our investigation, the DCAA auditor is apparently referring to comments made by a former ISN employee, Mr. Robert Chapman. Mr. Chapman's statements related to the fact that ISN could not perform the ATC contract, given the changing conditions and circumstances at NTCC Hampton Roads, for the contract bid price. Mr. Chapman estimated that ISN would need another "$900,000 or so" to complete the job. This does not mean that ISN underbid the ATC contract, as it was described in the solicitation/RFP; what Mr. Chapman and Mr. William Robertson have repeatedly advised the Government, however, is that the requirements of the site, as determined by multiple site visits, constituted a dramatic change in the scope of work to perform the ATC contract.

modification. See, *Richerson Construction v. GSA*, GSBCA No. 11161, et al., 93-1 BCA ¶ 25,239; *Systems & Computer Information, Inc.*, ASBCA No. 18458, 78-1 BCA ¶ 12,946; *Valor Electronics, Inc.*, 67-1 BCA ¶ 6,320. Accordingly, the contract ceiling price should reflect the total of costs incurred (plus reasonable profit) up to the stated contract price, plus costs and profit for all changed/additional work, plus the incurred settlement expenses allowed under FAR 52.249-2.

As discussed supra, the contract price in this instance should have been adjusted upward to reflect the approved and ratified ECP. The Government directed, and the site conditions required, that ISN perform the tasks described in the June 20, 1995 letter ECP. The Government's subsequent determination to renege on modifying the contract to incorporate the ECP (instead, terminating the contract for the convenience of the government) does not change the fact that ISN performed the additional/changed work. The contract price of $4,416,646 therefore does not accurately reflect the contract "ceiling price" for determination of the settlement amount. Based on our calculations, and premised on the accepted ECP, the total cost settlement proposal and the specific audit findings, the new contract ceiling price should be calculated as follows:

| | | |
|---|---|---|
| a) ATC contract price: | | $4,416,646 |
| b) ECP cost proposal (equitable adjustment): | + | $ 930,527 |
| c) Stop Work Order costs (plus profit):[11] | + | $ 31,856 |
| Calculated Contract Ceiling Price: | | **$5,379,029** |

As you can see, the actual computed contract ceiling price ($5,379,029) exceeds the total proposed costs and profit ($4,877,355) submitted by ISN under the termination settlement proposal. Therefore, ISN did not propose costs and profit in excess of the contract limitations. ISN recognizes that it did not complete one hundred percent (100%) of the contract work and the ECP work prior to termination, and our total proposed costs reflect this.

The next step is to determine the final amount due to ISN based on the foregoing calculations. Just as the TCO must adjust the contract price upward for changed or additional work, reductions may be assessed for deleted or uncompleted work. We have computed the claimed contract costs to reflect the actual costs incurred, and for all previous payments.

[11] The DCAA auditor reclassified these costs from settlement expenses to direct labor, in the amount of $28,960, but did not adjust the contract price to reflect the additional/changed, work caused by the CO's "stop work" order. See, DCAA Audit Report No. 6311-97B17100001 at p. 6, ¶ 6.a.(1). In addition, the DCAA auditor did not allow profit on these costs. ISN claims profit in the amount of 10 percent ($2,896), for total stop work costs of $31,856.

| | |
|---|---|
| Actual Costs and Profit:[12] | $4,877,355 |
| Total Previous Payments to ISN: | - $4,049,532 |
| Settlement Expenses:[13] | + $ 31,685 |
| Stop Work Order Costs:[14] | + $ 31,856 |
| Net Balance/Amount Due to ISN: | **$ 891,364** |

As you are aware, the costs proposed by ISN, and identified herein, have been audited by the DCAA and deemed to be incurred. ISN therefore claims that it is entitled to payment under the termination settlement proposal in the supplemental amount of $891,364.00, plus applicable interest. If the Government does not intend to make payment to ISN in the claimed amount of $891,364.00 plus interest, ISN hereby requests that the TCO issue a final decision under the provisions of FAR 52.249-2. Any questions or comments may be directed to the undersigned at (301) 469-0400, ext. 301, or Mr. Bobby Melvin, ISN General Counsel, at (301) 469-0400, ext. 862.

Very truly yours,

Robert M. Cozzie

Robert M. Cozzie
Corporate Counsel
Information Systems & Networks
Corporation

[12] The DCAA has audited these costs and expenses and found that ISN incurred these costs, subject to the qualifications stated therein. This letter has addressed the cited qualifications and provided the factual basis for the claimed entitlement.

[13] For purposes of this letter response only, ISN accepts the DCAA auditor's determination of the unquestioned settlement expenses. However, ISN has incurred additional settlement costs subsequent to the final audit report. These expenses are estimated to be less than or equal to $15,000. We will provide the necessary documentation to support these claimed expenses, if the TCO should so request.

[14] The "stop work" order expenses were reclassified from the settlement expense category to the direct labor category. ISN did not include these costs in the original proposed costs and profit, so we are entitled to an upward equitable adjustment for these costs, plus reasonable profit at 10 percent ($28,960 + $2,896 = $31,856).

**CERTIFIED LETTER-RETURN RECEIPT REQUESTED**

**DEFENSE LOGISTICS AGENCY**
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

IN REPLY
REFER TO:
DCMDS-GATC

October 9, 1997

SUBJECT: Terminated Contract - N00600-94-C-0389 Docket N961443SA

Mr. Roscoe Crawford
Department of the Navy
Fleet and Industrial Supply Center Norfolk
Detachment Washington DC
Washington Navy Yard Bldg 200
901 M Street SE
Washington, DC 20374-5014

Dear Mr. Crawford:

Enclosed is information provided to our office from ISN on subject termination. As you review the information you will see that it all relates to the proposed ECP. It is asked of your office to review the enclosed information and provide to our office any documentation that would support that the ECP was never approved, that ISN was told not to perform the work related to the ECP, Why the modification was not issued to incorporate the ECP, if the mod was issued provide us a copy, or give us the actual cost that was agreed upon for the ECP.

This information is very vital for the settlement of this termination. It is asked that your prompt attention be given to this matter and a response from your office be issued by October 27, 1997.

Should you have any questions or desire any further information, please contact the undersigned at (404) 590-6389, or FAX (404) 590-2110.

Denise M. Jones
DENISE M. JONES
Termination Contracting Officer

cc:
Leslie Cook, Counsel DCMC-Atlanta
Benjamin Monastero-Senior Auditor DCAA

Pltfs' Exhibit 35
for identification
Sandra D Warren
Oct 29 1999
Jeffrey Bergdahl

PLAINTIFF'S EXHIBIT 15

000113

**DEFENSE LOGISTICS AGENCY**
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

IN REPLY REFER TO: DCMDS-GATC

November 5, 1997

SUBJECT: Terminated Contract - N00600-94-C-0389 Docket N961443SA

Mr. Roscoe Crawford
Department of the Navy
Fleet and Industrial Supply Center Norfolk
Detachment Washington DC
Washington Navy Yard Bldg 200
901 M Street SE
Washington, DC 20374-5014

Dear Mr. Crawford:

Several attempts have been made to get your office to provide information on subject termination. A certified letter was sent to you on October 9, 1997 requesting you provided information on subject termination. After getting no response from you, I phoned you on October 29, 1997 and we discussed the matter once again and at that time you informed me that you would setup a conference call for Friday October 31, 1997 with you, Jeff Berghdal, and myself. Once again I did not hear from your office. On Monday, November 23, 1997 I phoned and got your voice mail , I left a message for you to call me, no response. I also left a message on Jeff Berghddal's voice mail and there was no response from his office.

This letter is to inform that based on the material provided to the TCO, The TCO is ready to make an offer to ISN for the settlement of the termination settlement proposal and the ECP in the amount of $4,940,725.00. This would require additional funding on the contract in the amount of $524,079.40. It is asked of your office to reply to this letter as to whether you agree or disagree. It is asked that you respond no later than COB November 7, 1997. If no response is received from your office by this date then TCO will proceed with settlement.

Should you have any questions or desire any further information, please contact the undersigned at (404) 590-6389, or FAX (404) 590-2110.

PLS' Exhibit 36
for identification
Sandra D Warren
Oct 29 1999
Jeffrey Bergdahl
(1 page)

DENISE M. JONES
Termination Contracting Officer

000114

PLAINTIFF'S EXHIBIT 16

NOV. 13 '97 (THU) 15:59 DCMC-GAT TEL:770 590 2081 P. 002

# DEFENSE LOGISTICS AGENCY
## DEFENSE CONTRACT MANAGEMENT COMMAND ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

EXHIBIT Crawford #28 1/0-R49

REPLY REFER TO: DCMDS- GATC

November 13, 1997

SUBJECT: Terminated Contract N00600-94-C-0389
Docket N961443SA

Mr. Robert M. Cozzie
ISN
10411 Motor City Drive
Bethesda, MD

Dear Mr. Cozzie:

The cost principal in FAR Part 31, the DOD FAR Supplement (DFARS), and the cost or pricing data requirement contained in FAR Part 49 were used in reviewing your proposal.

Contingent upon funding from The Department of the Navy, Fleet and Industrial Supply Center Norfolk, Washington, DC the TCO makes the following offer to ISN for the settlement on subject contract:

| | |
|---|---|
| Actual Costs and Profit | $4,909,211.00 |
| Total Previous Payment to ISN | (4,049,532.00) |
| Settlement Expense | 31,685.00 |
| Net Settlement | 891,364.00 |

Once again this is contingent on funding from the Department of the Navy. If you are in agreement with the settlement please sign at the bottom of this letter and return to this office. If you are not in agreement you have 15 days from the date of this letter to substantiate the cost proposed. If no response is received from your office within 15 days I will in accordance with FAR 49 issue a unilateral determination of the amount due you on the subject termination.

Should you have any questions or desire any further information, please contact the undersigned at (404) 590-6389, FAX (404) 590-2081.

Sincerely,

Denise M. Jones
DENISE M. JONES
Termination Contracting Officer

PLAINTIFF'S EXHIBIT 17

000115

DEFENSE LOGISTICS AGENCY
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

PLAINTIFF'S EXHIBIT 18

IN REPLY REFER TO: DCMDS- GATC

November 13, 1997

SUBJECT: Terminated Contract N00600-94-C-0389
Docket N961443SA

Mr. Robert M. Cozzie
ISN
10411 Motor City Drive
Bethesda, MD

Dear Mr. Cozzie:

The cost principal in FAR Part 31, the DOD FAR Supplement (DFARS), and the cost or pricing data requirement contained in FAR Part 49 were used in reviewing your proposal.

Contingent upon funding from The Department of the Navy, Fleet and Industrial Supply Center Norfolk, Washington, DC the TCO makes the following offer to ISN for the settlement on subject contract:

| | |
|---|---|
| Actual Costs and Profit | $4,909,211.00 |
| Total Previous Payment to ISN | (4,049,532.00) |
| Settlement Expense | 31,685.00 |
| Net Settlement | 891,364.00 |

Once again this is contingent on funding from the Department of the Navy. If you are in agreement with the settlement please sign at the bottom of this letter and return to this office. If you are not in agreement you have 15 days from the date of this letter to substantiate the cost proposed. If no response is received from your office within 15 days I will in accordance with FAR 49 issue a unilateral determination of the amount due you on the subject termination.

Should you have any questions or desire any further information, please contact the undersigned at (404) 590-6389, FAX (404) 590-2081.

Accepted as to determination that ISN is due $891,364.00 on the subject termination.

[signature]
Roma Malkani, President

Sincerely,

[signature]
DENISE M. JONES
Termination Contracting Officer

Crawford Ex #29

FAX FAX **ISN** FAX FAX

# Telefax Cover Sheet

## Fax Shall NOT Be Used To Transmit Classified Material

Date: 11/14/97

Time: 4:45 AM

To: Denise Jones (Name)

Fax #: (770) 590-2081

TCO/DLA (Organization)

(770) 590-6389 (Phone & Extension)

From: Robert Cozzie (Name)

(301) 469-0400, ext. 301 (Phone & Extension)

Number of Pages (Excluding Cover Sheet): 1

Other Instructions: Denise,

Here is ISN's acceptance of termination settlement.

Person Sending: Robert Cozzie (Name) (Phone & Extension)

**If you have any problems receiving, please call the person sending immediately!**

### CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended only for the use of the individual(s) or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone at the number below to arrange for return of the original documents to us. Thank you.

Information Systems & Networks Corporation
10411 Motor City Drive • Bethesda Maryland 20817 • (301) 469-0400
Telex: 387814 • Fax (301) 469-7053

LAST TRANSACTION REPORT FOR HP FAX-700 SERIES VERSION: 01.03

NAME: ISN DATE: 13-DEC-97
NUMBER: 3014690767 TIME: 16:40

| TE | TIME | REMOTE FAX NAME AND NUMBER | DURATION | PG | RESULT | DIAGNOSTIC |
|---|---|---|---|---|---|---|
| DEC | 16:38 S | 770 590 2081 | 0:01:12 | 2 | OK | 663840100166 |

*************************************************************************************

S=FAX SENT
I=POLL IN(FAX RECEIVED)
O=POLLED OUT(FAX SENT)

RINT THIS REPORT AUTOMATICALLY, SELECT AUTOMATIC REPORTS IN THE SETTINGS MENU.
PRINT MANUALLY, PRESS THE REPORT/SPACE BUTTON. THEN PRESS ENTER.

**DEFENSE LOGISTICS AGENCY**
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

IN REPLY REFER TO: DCMDS-GATC

November 18, 1997

SUBJECT: Terminated Contract - N00600-94-C-0389 Docket N961443SA

Mr. Roscoe Crawford
Department of the Navy
Fleet and Industrial Supply Center Norfolk
Detachment Washington DC
Washington Navy Yard Bldg 200
901 M Street SE
Washington, DC 20374-5014

Dear Mr. Crawford:

Reference our letter dated November 5, 1997 sent via facsimile.

In our referenced letter we advised your office that we would be issuing an offer to ISN in the amount of $4,940,725.00 and that we need additional funding in the amount of $524,079.46. This letter is to request additional funding. It is requested that the funding be provided within 90 days. If funding is not provided within 90 day period, I will then issue my decision and return authority back to your office for completion of the termination.

Should you have any questions or desire any further information, please contact the undersigned at ~~(404)~~ 770 590-6389, or FAX ~~(404)~~ 770 590-2110.

Denise M. Jones
DENISE M. JONES
Termination Contracting Officer

000119

PLAINTIFF'S EXHIBIT 19

**DEPARTMENT OF THE NAVY**
FLEET AND INDUSTRIAL SUPPLY CENTER NORFOLK
DETACHMENT WASHINGTON
WASHINGTON NAVY YARD BLDG 200
901 M STREET SE
WASHINGTON DC 20374-5014

DEC 01 1997
4200
02W1.4A:CS:94C-0389

From: 02W1.4 (Mr. Roscoe Crawford)
To: Defense Contract Management Command, Atlanta
Attn: Ms. Denise M. Jones, Termination Contracting Officer
805 Walker Street
Marietta, GA 30060-2789

Subj: TERMINATED CONTRACT – N00600-94-C-0389 DOCKET N961443SA

Ref: (a) DCMDS-GATC ltr November 18, 1997
(b) DCMDS-GATC ltr November 5, 1997
(c) DCMDS-GATC ltr October 9, 1997

Encl: (1) ISN ltr January 26, 1996
(2) ISN ltr 25 May 1995

1. This office is in agreement with the original DCAA Audit Report No. 6311-97B17100001 and your August 8, 1997 letter determination that the net amount of $0 was due to ISN. ISN has provided your office with volumes of supposed justification for additional compensation based on supposed approval of an ECP. This ECP was not approved and no services/supplies were received as stated by ISN. The ISN request for payment is unwarranted and as a Contracting Officer, not approved by myself.

2. ISN was not issued this ECP because the costs associated with its implementation were exorbitant. ISN letter of January 26, 1996 (Encl. 1) states clearly that the approved ECP had not been received. ISN letter dated 25 May 1995 (Encl. 2) states "ISN will insure all changes are approved by contractually authorized Government Representatives and document." No matter what case ISN is trying to build, it is clear that ISN knew and knows the modification of the contract by myself as the Contracting Officer was the only way the ECP could be added to the contract and the only manner in which contracted reimbursable work could be performed.

3. In summary, additional funding will not be provided. The ECP referred to by ISN was not approved. No further funding is approved.

Roscoe W. Crawford

ROSCOE W. CRAWFORD
Contracting Officer

000120

PLAINTIFF'S EXHIBIT 20

# DEFENSE LOGISTICS AGENCY
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

EPLY
REFER TO: DCMDS-GATC

December 9, 1997

SUBJECT: Settlement on Terminated Contract N00600-94-C0389

Robert Cozzie
ISN
10411 Motor City Dr.
Bethesda, MD 20817

Dear Mr. Cozzie:

Reference DCMC-GATC letter dated November 13, 1997
Reference FAR 49.114 Unsettled Contract Changes

In our referenced letter to your office you were advised that the offer was contingent on funding from The Department of the Navy, Fleet and Industrial Supply Center Norfolk, Washington, DC.

Our office has been advised by FISC that "additional funding will not be provided. The ECP referred to by ISN was not approved. No further funding is approved." FAR 49.114 requires I solicit the opinion of the Contracting Officer on all unadjusted changes. FISC's determination is that no amount is due and no funding will be provided. Accordingly, it is my determination that the Gross Settlement for this termination will be $4,049,532.00. The net amount due ISN is $0. If ISN is not in agreement with this I will, within 15 days, in accordance with FAR 52.249-2, issue a Unilateral Determination. You may also request a final decision be issued by FISC, which is then appealable to the Board of Contract Appeals or the US Claims Court.

000121

PLAINTIFF'S EXHIBIT 21

Federal Recycling Program Printed on Recycled Paper

Should you have any question or desire further assistance please contact the undersign at (770)590-6389 or Fax (770)590-2081.

Sincerely

DENISE M. JONES
Termination Contracting Officer

cc:
Roscoe Crawford/Fleet Industrial Supply
DCMC Baltimore.

Jones Ex # 25

-12-1995 12:46 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.01

PMW 172

WE KEEP THE FLEET COMMUNICATING

# FACSIMILE TRANSMISSION COVER SHEET

**SPACE AND NAVAL WARFARE SYSTEMS COMMAND**
**SHIP/SHORE COMMUNICATIONS OFFICE**
**PMW 172**
**2451 CRYSTAL DRIVE**
**ARLINGTON, VA 22245-5200**

**FAX (703) 602-7252**

Plfs Exhibit 22 for identification
Sandra D Warren
Oct 29 1999
Wit. Jeffrey Bergdahl, (3 pages)

DATE: 4/12/95

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: 3

FROM: JEFF BERGDAHL CODE: PMW172-22C

PHONE #: (703) 602-8336

TO:

AGENCY: FISC DET WASHINGTON CODE: PB2

NAME: ROSCOE CRAWFORD/M. WELD

FAX NUMBER: (202) 685-0002

VOICE NUMBER: (202) 433-5387

SUBJECT: ATC FUNDING

REMARKS: Roscoe/Michelle,

Here is the E-mail Sandy put out along with Ron's desires. What is your opinion on ~~Ron's~~ paragraph C.4?

Jeff Bergdahl

PLAINTIFF'S EXHIBIT 22

22.1

Crawford

APR-12-1995 12:47 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.02

Author: Sandy Nalepa at SPAWAR-MC4
Date: 4/12/95 7:12 AM
Priority: Normal
Receipt Requested
TO: CAPT Peter Renfree
: Kevin Meyers
: Ronald Zell
CC: Jeffrey Bergdahl
CC: Buddy Heiman
: Dave Sivillo
Subject: FY 93 ATC $s

------------------------------ Message Contents ------------------------------

CAPT/Kevin,

On Monday we received a letter from N61 redirecting $2M from subject. This was no surprise. I had told both Ron and Jeff that the money was in question due to midyear review and we were at risk of losing it - both our comptroller and N6 have questioned status. After speaking to Jeff and Percy, as well as being told by others from PD 72F about current contract performance, I recommended that the money be reprogrammed.

We have about $7M in the ANCC/ATC procurement program in FY 96 which is less than 6 months away. With the difficulties we are experiencing with both fielded ANCCs and ATCs under contract I do not think it would hurt to get a grip on what's already started and use next year's money to buy the remaining ATCs (Japan, Sicily, London) if we are in a better position to do so. To my knowledge we have no other means of procurement for the balance of the ATCs.

I would appreciate it if one of you two would call Mr. Roscoe Crawford at FISC, (202)433-5387 and ask him to accept the funding document I faxed to him on Monday and return fax it to me immediately. He has all the info (my fax # and a copy of the CNO letter). I understand he is currently directed to sit on it and take no action.

Thank you,
Sandy

000124

22.2