ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------:

INFORMATION SYSTEMS & :
NETWORKS CORPORATION :
Plaintiff :
vs. : Case No. 98-178C
THE UNITED STATES :
Defendant :

---------------------------:

Monday, October 18, 1999
Washington, D.C.

Deposition of

ROSCOE W. CRAWFORD

a witness, was called for examination by counsel for the plaintiff, at the offices of United States Department of Justice, 1100 L Street, N.W., 12th Floor Conference Room, Washington, D.C. 20530, commencing at 10:00 a.m. before Doris L. Gude, Shorthand Court Reporter and Notary Public for the District of Columbia, and were present on behalf of the respective parties:



PLAINTIFF'S EXHIBIT 1

A. Yes.

Q. After completing the contract specialist internship program, then what did you do with the Navy?

A. You became a journeyman once you graduated from the program. I just continued on to negotiate contracts and administer contracts.

Q. Is it called a journeyman or is it called a contract specialist?

A. It's a journeyman contract specialist.

Q. Do you recall what year you became a journeyman contract specialist?

A. '81, I believe.

Q. Were you a contract specialist intern out at the Navy Yard?

A. Yes.

Q. Let me ask you this. Have you always worked at the Navy Yard during your employment with the Navy?

A. No.

Q. We'll get into that one. How long

A. I'm responsible for negotiating contracts for supplies and services for the various customers that I have to service. I have full authority to bind the government in any contractual agreement regardless of the dollar value. I also provide contract administration services on the contracts that I award.

Q. Tell me about your work in contract administration. What is the scope of your work? What are your job duties when you administer a contract?

A. To take care of any problems that occur after the award of a contract, change orders, modifications of all sorts, changes in delivery, changes in period of performance. That sort of thing.

Q. After you negotiate a contract, generally do you then administer the same contract that you negotiated?

A. Yes.

Q. Are there supervisory positions in the

Navy for these contracts?

A. I am a supervisor.

Q. Would it be fair to say that you are the supervisor and everybody else that works on the contract on behalf of the Navy reports to you?

A. For a particular contract, yes.

Q. It's my understanding that for certain contracts that the Navy enters into there are positions called, "contracting officer representatives." Is that correct?

A. Yes, it's a COR.

Q. What is a COR?

A. Well, a COR is responsible for actually monitoring the contractor's performance when we award a contract. Any problems that the contractor encounters in performing that contract will be reported back to me through the COR. In certain instances, the CORs are authorized to give technical direction to the contractor, but the COR is not authorized to make any changes to the terms or

conditions of the contract. That comes through the designated contract specialist and myself as the contracting officer.

Q. Since we are on the subject, how are changes to a contract made? Tell me the process for modifying and/or amending a contract to add services?

A. To add services?

Q. Yes. Or to modify services just in general. We're not talking about any specific contract just in general. How does that work?

A. First of all, someone would have to initiate a request for a change. It could be the end user who determines that something needs to be changed. They might need an extension in the period of performance. It might be a change in the actual statement of work or the specification.

Anyway, they would make the request, and then, I would go out to -- with a letter to the contractor telling the contractor that I intend to modify the contract and specify the

it for?

A. It was for automating the tech control facilities. There was a location in Italy. There was another location in Virginia. Where was the third location? (Pause.)

Q. Puerto Rico?

A. No. Guam.

Q. An RFP was issue for this second ATCS program?

A. Yes.

Q. Do you recall the contractor who was awarded the contract for the second ATCS?

A. It was the same contractor. The same contractor received the award that had it the first time. I don't recall his name.

Q. The ATCS project in Virginia, did that deal with Hampton Roads?

A. No.

Q. Where was it?

A. NICTANSLANT (phonetic).

Q. Did there come a time when the ATCS program was further expanded?

A. After that contract, we went out for another RFP. That's the one that ISN won.

Q. We'll call that the third RFP.

A. Right.

Q. Just to wrap-up the first and second contracts, was the first contract successfully completed?

A. Yes.

Q. Was the second contract successfully completed?

A. Yes.

Q. That brings us back up to third RFP. What did the third RFP entail?

A. The third RFP was, again, automation of the tech control facilities at various sites throughout the world.

Q. What were the sites covering the third RFP?

A. In Lot I, there were three sites, Hampton Roads, Camp Smith in Hawaii, and Makalapa. In Lot II, on that particular contract, I think it was Puerto Rico, Japan --

Lots I and II?

A. No.

Q. We're talking about the first funding document issued around or about the time of the RFP. What was the scope of the first funding document?

A. The scope of the first funding document covered the three sites that were specified in Lot I, which were the two sites in Hawaii and Hampton Roads.

Q. Do you recall the approximate amount of funding for Lot I?

A. It was over $4 million.

Q. Do you know if it was over $4.4 million?

A. Yes. It was more than that. Maybe, I think, about $4.9, something like that.

Q. Why were Lots I and II separated under this third RFP?

A. Why were they separate --

Q. Why were they separate lots?

A. They were separate lots because we set

them up as options. Okay?

Q. Okay.

A. We didn't know for sure whether or not -- we knew the need existed, but we didn't know if we were going to be funded. That's why you set it up as an option lot.

Q. Lot II was as option lot?

A. Yes.

Q. The initial funding for Lot I only covered the Hampton Roads site and the two Hawaii sites. Correct?

A. Correct.

Q. If there was more funding made available in the future, then it would cover Lot II or Puerto Rico and Japan. Correct?

A. If we had chosen to exercise the option.

Q. If you had chosen to exercise the option for Lot II, where would the funding have come from?

A. SPAWAR.

Q. Once you received the funding from

funds from one lot or one option to another option?

A. No.

Q. Let's go back to Lot I. ISN was awarded the contract for the work under Lot I. Correct?

A. Correct.

Q. That work was to be done at three sites, one in Virginia and two in Hawaii. Correct?

A. Correct.

Q. Do you know when ISN entered into the contract to do that work?

A. I don't recall what the actual award date was.

Q. Early 1995. Would that sound right?

A. It's a '94 contract. I think it was sooner than that.

Q. Late '94?

A. Could have been.

Q. Do you recall how many other contractors bid on the Lot I option aside from

SPAWAR could tell me sometime in September, prior to 1 October, that they intended to exercise that option. I wouldn't receive the money probably until sometime in January. So if I exercised the option, it would have been exercised subject to availability of funds because I wouldn't have had the money.

Q. You don't recall approving the ECP, do you?

A. No, I didn't. It would have been a formal modification to the contract if it had been approved.

Q. What is a formal modification to the contract?

A. It's a written document.

Q. Is there a form document?

A. Yes. It's a standard Form 30.

Q. Was a standard Form 30 drafted for the ECP?

A. No.

Q. Do you know whether any of the work encompassed by the ECP was ever performed by

A. He would have, yes.
Q. That would have been reflected in some type of documentation including e-mail to you? Is that correct?
A. It would have been.
Q. Did there come a time when ISN was terminated for convenience?
A. Yes.
MR. AUSTIN: Can we take a break, please?
MR. CRAIG: Sure. Anytime.
(Brief Recess)
BY MR. CRAIG:
Q. Before I get into issue of termination for convenience, I just wanted to clarify something. Is it your understanding that SPAWAR has an annual appropriated budget?
A. Yes.
Q. With that annual budget they fund certain projects during the course of a year. Is that how it works?
A. Yes.

rescission letter?

A. That she was basically rescinding the offer, and that was based on new information that I had provided to her.

Q. Had ISN accepted the offer prior to Ms. Jones rescinding the offer?

A. Yes.

Q. After the offer was accepted and before the rescission letter was issued, what, as you put it, new information did you provide Ms. Jones?

A. Ms. Jones had been trying for sometime to have a conversation or a conference with me in regards to the termination and the settlement proposal, but I was on travel and I never really was able to have the conference. When I finally got back to the office and had reviewed all of her correspondence to me, that's when I was able to talk with her about my opinions on the settlement proposal.

Q. What did you tell Ms. Jones?

A. Basically, I told her we had agreed to

Q. Just identify it. No detail.
A. You mean the work that they had proposed in the ECP?
Q. Yes.
A. Yes, you could say that.
Q. I'm showing you what has been marked as Crawford Exhibit 4. Have you seen that document before?
A. Yes, I have seen this document.

(Documentation referred to above was marked as Crawford Exhibit Number 4 for identification, copy of which is attached.)

BY MR. CRAIG:

Q. When did you first see this document?
A. Right after Lisa had drafted and sent it to ISN.
Q. Did you review a draft of this document before Ms. Murtha sent the document to ISN?
A. No.
Q. Did you approve the contents of this

document with Ms. Murtha?

A. Not really. In other words, I didn't tell her to do this. How this letter occurred we had a meeting with my technical people from SPAWAR along with ISN. I believe I wasn't able to chair the meeting, so she chaired the meeting. As a result of the meeting, I guess she was just recanting what they had discussed and agreed to at the meeting which was the result of this letter.

Q. Let me draw your attention to the last paragraph which states, "I am your first line point of contact within this activity." What does that mean?

A. That she was my representative from the contract shop.

Q. With respect it the ECP?

A. With any contractual matter that pertained to the case.

Q. I want to draw you down to bullet number two, "A modification to the contract will be issued for the combination of both the

formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." What does that mean?

A. At the time, I guess, we had intention of issuing a modification, but that was predicated on ISN providing us with a revised installation and cutover schedule for the contract for Lot I which they never did.

Q. So ISN didn't provide a revised installation cutover schedule?

A. No, they never did.

Q. Did you keep a file on this ATCS project?

A. This case file folder that you looked through.

Q. Is that your file?

A. That's the file, yes.

Q. Do you recall whether Exhibits 3 and 4 were included in that file?

A. You're saying are they are still included in the file?

J. Lucey for Loretta Finamore.

A. That's common. (Reviewing.) Your question?

Q. Have you seen this document before?

A. Yes, I have seen this document before.

Q. What is this document Exhibit Number 21?

A. It's notifying me that there is no money left in the contract, and that it's going to cost $5,060,578 to settle.

(Documentation referred to above was marked as Crawford Exhibit Number 21 for identification, copy of which is attached.)

BY MR. CRAIG:

Q. Let's go to page 2. I want to go to line item number 10 and 11. It says, "Amount of contract including all supplements, $4,416,645.54." What is that?

A. That's the amount of the base lot.

Q. That's the amount of the contract that ISN had?

entered into the agreement. Correct?

A. Let me explain. She entered into the agreement. I finally got back to her after she had entered into the agreement, and I provided her with the information that she had been requesting from us all along. Based on that information, I guess she rescinded her offer.

Q. This is the information she requested in October?

A. No. This audit report is something that she had requested from DCAA. I didn't request the audit report.

Q. What I'm asking about is this information about the ECP and is this information she requested from you in October?

A. Yes. I had to gather documents, copies of letters where ISN fesses up that no formal ECP had been approved because the only way that it could be approved would be by issuing a formal modification to the contract to incorporate and that never occurred.

Q. I'm going to draw your attention down