ORIGINAL

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS AND NETWORKS CORPORATION, Plaintiff, | ) | Case No. 98-178C |
| vs. | ) | JUDGE JAMES TURNER |
| UNITED STATES OF AMERICA, Defendant. | ) | |

Deposition of JEFFREY BERGDAHL, at 4301 Pacific Highway, San Diego, California, commencing at 10:01 A.M., Friday, October 29, 1999, before Sandra D. Warren, CSR No. 10831

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

SINGER & ASSOCIATES
BY: JOHN M. CRAIG, ESQ.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(301) 469-0400

FOR THE DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE
BY: MICHAEL D. AUSTIN, ESQ.
1100 L Street, N.W.
Suite 12144
Washington, D.C. 20530
(202) 307-0277

JEFFREY BERGDAHL,
having been first duly sworn, testified as follows:



PLAINTIFF'S EXHIBIT 2

-- ANCC project -- strike that.

Q. When did the ATC project first come about?

A. I became involved in it in the October of 1994 time frame. The contract was awarded in July of 1994, and obviously there was the RFP and source selection in the year prior to that.

Q. Did the contract that was awarded in 1994, was that to ISN?

A. Yes.

Q. And prior to the ISN award contract in July of 1994, there was a prototype ATC type project; is that correct?

A. There actually was a total of three contracts. The prototype ANCC was awarded in the early '90s to JACOR.

Q. Okay.

A. There was the follow up on a contract, which I was the COR on from the beginning, that was awarded to JACOR in November of 1993 for the three ANCC sites.

Q. Do you know why JACOR was not awarded

the ATC project that was awarded to ISN?

A. I was not involved in that source selection or evaluation. Obvious -- I wasn't involved in the source selection.

Q. Do you recall seeing any documents that may have stated the reason that JACOR didn't win that contract?

A. No.

Q. Mr. Bergdahl, I want to draw your attention to document Bergdahl Exhibit 1. Can you tell me what that document is.

A. The document was a contract modification, No. P00002. It was where I was -- the contract modification appointing me as the COTR on the ATC contract.

(Plaintiff's Exhibit No. 1 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. That was the ATC contact that was awarded to ISN, correct?

A. Yes.

000021

Q. Who is Percy Tolbert?
A. Percy Tolbert was a SPAWAR employee that also worked in PMW172.
Q. Do you know why you replaced Mr. Tolbert as a COTR?
A. I don't remember really.
Q. Let's turn to page 2. What is that document?
A. That is my appointment letter from the Contracting Officer appointing me as the Contracting Officer's Representative on the ATC contract with ISN.
Q. The Contracting Officer was Roscoe Crawford?
A. Yes, sir.
Q. Did Mr. Crawford go over this criteria set forth here?
A. Yes.
Q. Did you go over it on the phone with each other or did you meet with him?
A. I'm not sure. I believe I probably met with him.

the contract which is Designation of the COTR.

(Plaintiff's Exhibit No. 2 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. So this document, it's marked as page 84 and 85. It's actually two pages from the ATC -- strike that -- ISN/ATC contract.

A. Yes.

Q. Do you know who wrote -- crossed out Mr. Tolbert's name and placed your name here?

A. I don't know who crossed out and wrote my name in.

Q. Mr. Bergdahl, I want to direct your attention to a document that's been marked Bergdahl Exhibit 3. Can you tell me what that is?

A. That is my certificate of training certifying I completed the COTR training course on the 11th day of March, 1993.

(Plaintiff's Exhibit No. 3 was marked for identification and is annexed hereto.)

000023

BY MR. CRAIG:

Q. Is completion of the COTR training course a prerequisite to becoming a COTR?

A. Yes.

Q. Why did you become a COR on the ATC contract?

A. Well, both the ANCC and ATC contract were for a turnkey effort of a fairly complex and large communication system. And obviously, it was anticipated that there would be questions or technical clarifications that would be necessary during the contract performance time.

So he felt it was necessary that somebody be designated as a COTR on the contract to help resolve these technical things and make sure it was an official Navy technical representative.

Q. Were you approached to -- by someone in your department as to whether you would be interested in taking a COR position?

A. I don't remember.

Q. Were you assigned as a COR or was it voluntary?

A. It was voluntary. I was part of the ANCC technical evaluation board. So obviously, the person -- one of the persons that would be best qualified with being a COR on the ANCC contract was somebody that was familiar with the contract proposal and was familiar with the equipment and technology that was going to be used on the contract. And I was the SPAWAR member of the technical evaluation board.

Q. So you were the man for the job from SPAWAR that had the technical background and information with regards to this contract which made sense to appoint you as a COR, correct?

A. Yes.

Q. As a matter of background, we're speaking about SPAWAR today. What is that?

A. SPAWAR?

Q. What does SPAWAR stand for first?

A. SPAWAR stands for Space and Naval Warfare Systems Command.

Q. Okay. Prior to becoming known as SPAWAR, was it known as something else?

A. It was known as Naval Electronics Systems Command, NESC.

Q. Generally, what does SPAWAR do?

A. SPAWAR was the Navy's system command responsible for doing all the acquisition of C4I.

Q. What is C4I?

A. Communications, control, computer, intelligence, crypto. All that type of gear. All the data invoice communication stuff for the Navy, whether it's ship or shore facilities, or the Navy's echelon command.

Q. And currently, SPAWAR generally does that same type of work?

A. Yes.

Q. I want to begin talking about the ISN/ATC contract. When did you first become involved in that contract?

A. October of 1994.

Q. And that was as a COR on the contract, correct?

A. Yes.

Q. Tell me about the -- you know, when

approved by the contract?

A. Correct.

Q. Was there some ECP configuration changes that were informally approved?

A. Yes.

Q. Did ISN provide work on some of these informal ECP configuration changes?

A. Possibly, yes.

Q. Tell me about the work that ISN provided on the informal ECP configuration changes.

A. Based on the site survey that they made after contract award, I think they developed a matrix to which they tried to compare what equipment was identified in the RFP and what equipment they identified was at the site when they did the site survey.

Q. And these changes that were undertaken by ISN was informally approved by SPAWAR; is that correct?

A. We agreed with what the configuration was. The quantities of the equipment was what was in these surveys.

000027

MR. AUSTIN: Objection. It's ambiguous as to what "informally approved" means.

MR. CRAIG: I think he already answered this question. I'm trying to start again.

BY MR. CRAIG:

Q. Did you previously state that no ECP configuration changes were formally approved?

A. Yes.

Q. And did you previously tell me that some were -- some ECP configuration changes were informally approved?

A. They were informally, technically approved.

Q. What were the ECP configuration changes informally, technically approved?

A. I seem to believe they related to different amounts of DMSI hardware configurations, possibly like larger site -- user site licenses.

Q. We'll go over some of the specifics, but that -- that's in general.

You previously told me that ISN provided work on the informal ECP configuration

000023

changes, correct?

A. Yes.

Q. And was that -- how did ISN come about starting that work? Did SPAWAR tell them to do it?

MR. AUSTIN: Objection. Okay. Okay. I withdraw the objection.

BY MR. CRAIG:

Q. You can answer the question.

A. Restate it again.

Q. Sure. How did ISN begin performing the informal ECP configuration changes? What brought that about?

A. As a result of the site survey reports that we would have received back when we met, we would have been advised of what the site changes or differences were and we would have asked for a comparison of what DMSI equipment was bid or proposed versus what was needed to match the site configuration based on the site survey.

Q. And you meant SPAWAR?

A. SPAWAR, yes.

Q. After that information was obtained,

exchanged, then what happened?

A. We would have asked ISN to submit an ECP to Roscoe Crawford.

Q. Are you aware of whether an ECP was requested of ISN?

A. I don't remember.

Q. Do you know if ISN submitted an ECP?

A. Yes, they did.

Q. Do you know when ISN submitted an ECP?

A. They submitted several ECPs over the following months, I guess.

Q. And that would have been in, again, 1995 that they submitted these ECPs or was the first ECP submitted in late 1994, if you remember?

A. I don't remember. It probably was that early. Probably again in 1994.

Q. Do you recall at some point one of the -- at least one of the ECPs that ISN issued resulted from work performed pursuant to that ECP?

A. If your question means were they doing work to define what the configuration of the site was, yes.

000030

in ISN's ECPs, do you know if ISN took any action to acquire that modified equipment?

A. I'm not completely sure.

Q. Did the ECPs propose that, you know -- as you used deltas -- equipment be utilized at the Hampton Roads ATC?

A. Can you repeat the question?

Q. Sure. I'm not being clear for you. You know this very well. I'm trying to make it clear for you.

Tell me what work or what actions ISN took with respect to the ECPs at Hampton Roads.

A. Well, first, they would have obviously gone to the sites and identified what the different configurations were and that was part of their site survey. They obviously would have had to discuss this with their hardware subcontract DSMI. What would it change to change the configuration of the DSMI hardware which ISN was going to buy from them.

Q. Do you know if the configuration in the DSMI hardware were changed?

A. We proposed it to be changed versus

the proposal.

A. Uh-huh.

Q. Tell me again what you believe that meant.

A. Technical -- what I feel technical approval means is that we agreed with the technical content, the changes in the proposal were acceptable technically to us.

Q. Do you recall whether SPAWAR informed ISN that ISN's ECPs was technically approved?

A. I believe it's on at least one occasion or more we would have told them that it was technically approved.

Q. Did you tell them verbally?

A. We also would have told them also in writing, too.

Q. After SPAWAR technically approved ISN's ECP --

A. Uh-huh.

Q. -- did SPAWAR direct ISN to take -- to do certain work in compliance with the ECP pending formal approval?

000032

A. Nope.

Q. Did you tell them not to do anything pending formal approval of the ECP?

A. No.

Q. What did SPAWAR tell ISN to do pending approval of the ECP? Formal approval of the ECP?

A. I don't really recall what was told to them, if anything.

Q. Could ISN do any work pending formal approval of the ECP?

A. Yes.

Q. What work could ISN perform pending formal approval of the ECP?

A. Again, there was still -- there was substantial amount of equipment that was in the RFP that was still remaining at ANCC Hampton Roads. But prior to that equipment being cut over, we needed all the various contract deliverables submitted and approved before they would start doing the cutover.

Q. And the contract deliverables weren't modified really at all pursuant to the ECP; is that right?

A. The installation plan, I believe, would be the one document that would be modified.

Q. The ECP really dealt with equipment modifications at Hampton Roads, correct?

A. Yes.

Q. And that was because the site at Hampton Roads had changed; is that right?

A. Yes.

Q. And at the beginning and during, you know, let's say, at least the first half of the ECP contract, ISN was dealing with deliverable products that did not have to do with equipment; is that correct? Or did not have to do with the -- physically with the equipment? Wasn't it documentation basically?

A. Right.

Q. Did there come a point when ISN essentially completed the required documentation on the ATC contract?

A. Everything but maybe the cutover plan at Hampton Roads, and then some of the documentation that the two Hawaii sites were not completed.

A. There were probably several. Maybe three or four, maybe.

Q. Did all of these ECPs submitted by ISN in general set forth the same information that -- were they generally the same?

A. Probably the same. Similar, yeah.

Q. Do you know whether this ECP was ever accepted by the Navy?

A. Several ECPs were technically accepted. Possibly some of the ECPs were not accepted. I don't recall exactly which ones were accepted and which ones were not technically accepted.

Q. Do you know if ISN did any work on the ECP or were technically accepted? Or pursuant. Let me say pursuant to them being technically approved.

A. I believe they did some work.

Q. Did the Navy assist them with that work at all?

A. We assisted in helping determine what the configurations were necessary at the sites.

Q. The configurations would have been

to -- the configuration would have been part of the work to perform the ECP?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Tell me about that assistance provided by the Navy a little bit more.

A. The assistance was probably to verify that the correct DSMI hardware was matched to the Navy equipment.

Q. Any other assistance given by the Navy?

A. Not that I can recall.

Q. The technical instructions were provided by the Navy to assist ISN in its performance of the ECP?

A. We probably also advised them on the cabling pin outside for the 12-pair cable.

Q. Which the Navy would tell ISN to -- we suggest this.

A. This is the Navy's standard for 12 pairs.

000036

Q. Okay. And ISN was performing the cabling work with consideration of the assistance or the information supplied by the Navy?

A. Yes.

Q. Do you know if that cabling work was done pursuant to the Navy's specifications?

A. I wasn't witnessing on site the day-to-day work they were doing. We obviously received monthly progress reports about what they were doing on the various sites.

Q. But to the best of your knowledge, ISN was complying with the Navy's directives regarding cabling?

A. Yes.

Q. Mr. Bergdahl, I want to draw your attention to the exhibit marked Bergdahl Exhibit 6. Do you know whose handwriting that is?

A. I don't immediately recognize whose handwriting this is.

(Plaintiff's Exhibit No. 6 was marked for identification and is annexed hereto.)

000037

A. I don't know.

Q. Did you discuss this letter at all with Lisa Murtha?

A. I believe I would have if the ECP was going to be reviewed by SPAWAR and comments provided back. I would have talked to her then.

Q. Do you recall speaking to her about that, though, as you sit here today?

A. I don't recall.

Q. Do you know if you were provided delivery schedules for all sites when Lot 1 was issued?

A. I don't recall, but I believe one was provided.

Q. Do you know why it was provided?

A. Probably because at the June 22 meeting referenced here, it was summarized of what was going to be done after the meeting.

Q. Was that in part due to the changed site configuration at Hampton Roads?

A. I believe so, yes.

Q. Let me draw your attention to an

000038

exhibit marked Exhibit 12. What is that?

A. That is a fax from me to Roscoe Crawford and Lisa Murtha faxing the copy of tne original -- our approval letter on the ECP on July 21, 1995.

(Plaintiff's Exhibit No. 12 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Why did you fax this approval letter to Roscoe Crawford?

A. Because when an ECP would be submitted, Roscoe would request our technical approval on all the ECPs, so it appears this is what was discussed at this -- the meeting in June, and SPAWAR was to review and provide comments on the ECP to FISC. Again, FISC was our technical approval.

Q. Let me ask you. This is a formal approval of a contract. That can only be done by FISC; is that correct?

A. Yes.

Q. You all approve something, but you

000039

have to relay it on to FISC and they are the ones to do up the formal modification, right?

A. FISC was the contracting office for SPAWAR. SPAWAR was not the contracting office. We were the program office with the technical requirements. So FISC viewed us as the customer, and we went to them to do the contracting of our requirements for us.

Q. Okay. Do you recall in or around July 21, 1995, also informing ISN that the ECP was approved? That SPAWAR had approved the ECP?

A. I believe I would have informed them that we approved the ECP. I'm not sure exactly when, but we would have advised them that we completed our review of their ECP.

Q. And you did approve the ECP?

A. Yeah.

Q. Drawing your attention to the document marked Exhibit 13. What is that?

A. That looks like a memo I sent back to Bill Robertson responding to a voice mail he must have left me around that -- end of August.

000040

(Plaintiff's Exhibit No. 13 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. I want to draw --

A. Maybe reconfirming that we had approved the ECP and the schedule extension. I assume that he means that he might not have heard anything from FISC yet.

Q. The second sentence in paragraph one says, "I am not aware of any other administrative items we owe FISC."

What does that mean? You provided all the documentation in support of the approval?

A. Right.

Q. Other than changing the wording on the funding document at FISC, what other changes are there other than changing the wording on the funding document?

A. Well, at the bottom of the letter to FISC approving the ECP, in paragraph four, we said we would change the funding document for the ATC in

000041

Puerto Rico. That's what I think it's relating to.

Q. Do you know if the funding document for the ATC at Puerto Rico was changed?

A. I don't recall.

Q. Mr. Bergdahl, I want to draw your attention to a document marked Bergdahl Exhibit No. 13 (sic). What is that document?

A. That's a SPAWAR funding document from us to NRCC providing them funding for the procurement of the Puerto Rico ATC.

(Plaintiff's Exhibit No. 14 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. And that procurement was in the amount of the $789,319; is that correct?

A. Uh-huh.

Q. And that occurred sometime in October of 1994; is that correct?

A. Correct. Yes.

Q. I just referred to that funding document as Bergdahl Exhibit 13. I believe it

000014

A. Yes.
Q. So what you are talking about is some funds for fiscal year 1996?
A. Right.
Q. Those funds were for Puerto Rico and London's ATCs; is that correct?
A. That's what it looks like. I don't know what the document said, but that's what I believe it said.
MR. AUSTIN: Can we go off the record?
(Recess taken.)
MR. CRAIG: Let's go back on the record.
BY MR. CRAIG:
Q. Mr. Bergdahl, I want to draw your attention to Bergdahl Exhibit 16. What is that document?
A. That's a document from SPAWAR to FISC which did not change the dollar amount but amended the description to change it from exercising the Hampton Roads ATC ECP costs vice procurement of the Puerto Rico ATC.
(Plaintiff's Exhibit No. 16 was

000041

marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. So it took the funds from the Puerto Rico ATC and applied them to the Hampton Roads?

A. It was -- it was paragraph 4, that SPAWAR letter, where we would amend the document to change.

Q. This was supposed to cover the ISN's ECP costs; is that correct?

A. Yes.

Q. That was the $789,319?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. I'm showing you what's been marked as Exhibit 17. What is this document?

A. That is a funding document from SPAWAR to FISC sending them FY '96 ATC -- ATC funding for the procurement of the Puerto Rico ATC and London ATC, and then dial in technical support for the ANCC's ATCs fleet pots interfaces for the ANCC's

000044

and I was providing funding for the procurement of the three ATC contractors; for Pearl Harbor and Camp Smith and Hampton Roads. Camp Smith would have funded the basic part of the ATC.

(Plaintiff's Exhibit No. 19 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. The ISN and ATC contract?

A. Right.

Q. It says, Funds expire on 30 September, '96. What does that mean?

A. That is the date that funds need to be obligated by. They were FY '94 funds, OPN funds, and they are good for three fiscal years.

Q. So you use it by then or lose it or redirect it?

A. If it's not obligated by then, you lose it and obviously our comp controller requires -- makes sure we use it before it is at risk of being obligated. But Congress appropriates OPN, and it's good for three fiscal years. But you don't

000045

want to get close to that before you can obligate it on a contract or expend it.

Q. So $4,416,646 was available to SPAWAR to pay for work performed on its ATC contract; is that correct?

A. Right.

Q. Now, it has this paragraph M and it says, "Cumulative Total." And it says "$6,975,319." What is that?

A. That is how much is currently on this funding document. The funding document, when it's sent out, it might have an initial amount of funds, and we can amend funding documents to either add additional money or delete money and the -- in paragraph 13, sections K and L of that, sometimes there would be multiple lines of accounting on a document and then L is the total of --

Q. The specific SPAWAR funding document?

A. Of this specific -- this specific amendment, whatever. The accumulative is the total after amendment two has been completed.

Q. That's paragraph M?

000046

A. Still Exhibit 19. But the basic document where we originally sent them $7.14 million, and it was for the procurement of one ANCC for NCTAMS MED and four ATCs for NTCC Hampton Roads, Japan, Makalapa, and Camp Smith.

Q. Okay.

A. So 2.5 million, approximately, of that was for Roscoe to exercise the option for the one ANCC at NCTAMS MED on the JACOR contract.

Q. Okay. So the pot for all this work was the -- a little over $7 million?

A. Right.

Q. And depending on what priorities or what work SPAWAR wanted to do and could move funds from one project to another, correct?

A. Uh-huh. Correct.

Q. So the total amount of funding for the ANCC/ATC project was $7.14 million, correct?

A. Right. For FY '94, correct.

Q. For FY '94 but the funds were good through September 30, 1996, correct?

A. Right.

page, the e-mail from Sandy Nalepa --

A. Yes.

Q. -- it says "We have about $7 million in the ANCC/ATC procurement program in FY '96 which is less than six months away."

The 7 million that is referred to, is that the 7 million that we had previously discussed in Exhibit 19?

A. No. It's not.

Q. It's not. What is that?

A. Exhibit 19 was referring to FY '94.

Q. Right. That went through September 30, 1996.

A. Right.

Q. Okay. And what is this 7 million in the ANCC/ATC procurement we are referring to in this e-mail?

A. It would have -- it appears it would be referring to Exhibit 15, the FY '96 funding document, which is also Exhibit 17. Exhibit 17 sends FY '96 funding to FISC. So approximately 2.4 million of that FY '96 funding was sent to FISC.

Q. Okay. So SPAWAR had available funds in the amount of approximately $7 million for FY '96, right?

A. Well, obviously, it was -- as of April of 1995, it was budgeted to be there.

Q. Do you know if it was?

A. I don't know how much, when FY '96 rolled around in October of 1995 -- how much money was actually -- how much SPAWAR received at the time. Obviously, it was at least 2 1/2 million based on that Exhibit 17.

Q. Okay. This was another 7 million in addition to the 7 million that we had looked at from the FY '94 document?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Let's switch gears. I'm going to go back to the ATC ECP. I want to draw your attention to an exhibit marked Bergdahl Exhibit 23. What is that document?

A. That's a request from the DCMDS from

Baltimore to SPAWAR requesting an evaluation of how much of the ATC's have been physically completed on a percentage basis. Obviously, it would be to support progress payments from DCMDS to ISN.

(Plaintiff's Exhibit No. 23 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. I want to refer you to the bottom of the page. Is that your handwriting?

A. Yes.

Q. And what were you -- let's take the information set forth in paragraph 3. It says, "See attachment for rationale on percentage of physical completion. ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule."

Are those true statements?

A. Yes.

Q. And in paragraph 1, you said, "Physical percentage of progress is estimated as 15 percent." Is that a correct statement?

turnkey ATC, it had training, had the -- the contract deliverables, the nonphysical work, the paper.

Q. The statement "ISN is slightly behind the proposed schedule in their ECP," what does that mean?

A. That was due to the fact that during the summer of 1995, they had obviously submitted a proposed schedule to FISC when they would complete each stage or complete all the contract deliverables, and I was comparing where they were at on 19 October versus whatever proposed schedule they had submitted in their ECP during the summer of 1995.

Q. Does this include work done -- that was proposed in the ECP?

A. Proposed? Yes.

Q. And you believe that ISN was performing satisfactorily as of October 1995?

A. As compared against the proposed schedule. They had an ECP, remember, as of October of 1995. There had been no contract modification

000051

reached between ISN and FISC for a revised delivery schedule or completion of the turnkey site.

So if I had been forced to compare where they had been completedwise against what was originally in the original contract, at this point, all three sites should have been done, completed, several months prior to this.

Q. So this was taken in consideration that FISC would formally approve the ECP?

A. An issue which would be to revise the delivery schedules for both completing the sites and submitting all the documentation.

Q. And SPAWAR and ISN were going forward on the assumption that the ECP would be formally approved by FISC?

A. Yeah.

Q. This -- your comments here were reviewed and approved by Ron Zell; is that correct?

A. Correct.

Q. That's his signature, to the best of your knowledge?

A. Yes.

000052

sites in Lot I, knowing full well ISN won't meet the dates." Do you recall that discussion?

A. No.

Q. Do you recall any actions you took as a result of this meeting?

A. I would have had to inform my management of what happened at this meeting. I'm not -- I don't recall necessarily who was at the meeting with SPAWAR. I was likely one of the persons, and there might have been some other SPAWAR personnel there, but we would have wanted to make sure our -- our management was aware of what FISC was discussing with us.

Q. Okay. Did SPAWAR have a position as to whether it wanted T for C or T for D or --

A. I don't think SPAWAR necessarily wanted to terminate any contract that we worked so hard to get.

Q. Given a preference, was there a preference for SPAWAR of one of the -- whether T for C or T for D?

A. I don't recall what SPAWAR's

preference was at the time.

Q. Okay. Mr. Bergdahl, I want to show you what's been marked as Exhibit 30. Have you seen this document before?

A. No.

(Plaintiff's Exhibit No. 30 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. I want to draw your attention to the fifth page of the document. The top it says, "Not preferred by customer."

A. Uh-huh.

Q. So actually when you start from the previous page. "Or you could re-establish all delivery schedules and let them fail and T for D. This might be cheaper, because he can't submit an equitable adjustment."

Do you know what that means?

A. FISC viewed SPAWAR as their customer. FISC obviously wanted to try to do what the customer wanted them to do. If we were a FISC activity or

whatever, I think they would have recommended some kind of termination right then and -- but we were kind of a paying customer. We went to them to have them do our contracting stuff, so they really wanted to try to --

Q. Is it fair to say that SPAWAR wasn't in favor for TDSIN at that point?

A. Yes.

Q. Let's go down to the paragraph -- the third paragraph.

A. Uh-huh.

Q. "SPAWAR can't keep saying he's performing satisfactorily on Tish's progress payments paperwork." What does that mean?

A. That would probably be referring back to your Exhibit 23.

Q. Right.

A. If I put words down that say "they're performing satisfactorily," the DSMAO probably can't withhold progress payments to ISN.

Q. Okay. Were you instructed that you had to stop saying that ISN was performing