## INDEX TO APPENDIX - Con't.

**DEFENDANT'S EXHIBITS:** **PAGE**


17. Excerpts from Oral Argument and Status Conference, October 3, 2001. . . . . . . . 110-114
18. Order of Judgment, U.S. Ct. App. Federal Circuit, October 16, 2002 . . . . . . . . . . . . . . 115
19. Typed Meeting Notes, dated December 6, 1995 (compare Pl. Ex. 11) . . . . . . . . . . 116-117
20. Excerpts From Deposition of William Robertson, pp. 219-220 . . . . . . . . . . . . . . 118-120
21. Excerpts From Deposition of Roscoe Crawfrod, pp. 36, 66 . . . . . . . . . . . . . . . . . 121-123
22. Excerpts From Deposition of Jeffrey Bergdahl, pp. 46, 101-106 . . . . . . . . . . . . . 124-131

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORP., | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No. 98-178C |
| UNITED STATES, | ) | |
| Defendant. | ) | |

ORAL ARGUMENT AND STATUS CONFERENCE

Pages: 1 through 49

Place: Washington, D.C.

Date: October 3, 2001

**HERITAGE REPORTING CORPORATION**

*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

THE COURT: All right, sir.

MR. SINGER: And finally, Your Honor, on the issue of what the TCO would have done or could have done or what the parties could have done, none of that is going to help with respect to, you know, resolving the summary judgment.

It doesn't matter what the parties could have done or would have done. What matters is what is the record before this Court. And I think, if the Court looks at this record and looks at the documents that both the government and ISN has given the Court, and applies the fair inferences from those documents I think should be applied, I think the Court will determine, (a) there was a binding settlement; (b) there was funds available to fund the settlement; (c) the government did not have any right to breach the settlement. Thank you, Your Honor.

THE COURT: All right, sir. Well, gentlemen, thank you. I believe that I am in a position to go ahead and rule on the motions at this time. Before I do that, I want to assure everybody that this isn't any rush to judgment as I was reminded I have had this for some time. But the matter has been well briefed, and as Plaintiff's counsel stated this morning, all the documents appear to be here and they are not so voluminous that they couldn't all be studied.

Without keeping anybody in suspense, let me go

ahead and say in my view there was no settlement agreement, and consequently I will in due course enter an order that denies the Plaintiff's motion for summary judgment on Count 5, and grant the government's motion on Count 5, at least to the extent that it says there was a settlement agreement.

Now, just for the sake of completeness, I think it's plain from the colloquies this morning that the government isn't taking the position that there has been a waiver with respect to the other counts in the complaint. And so once the motions have been ruled on with respect to Count 5, we will be in a position to determine how we will get on a resolution track for the entire case, but it's incumbent upon me to state my rationale for denying the Plaintiff's motions and granting the government's motion, and I will state it alternatively.

I simply agree with the government's position that there never was a binding agreement with respect to that November 13, 1997 offer from termination contracting officer Denise Jones. She plainly stated that the matter was contingent on funding from the Department of the Navy, and that's stated in there twice, along with the figure that was proposed for settlement, and says that if you accept it, sign it and return it.

Now, it was signed but only under a paragraph that says accepted as to the determination that ISN is due a

certain amount. Now, that can be argued lots of ways, and the Plaintiff has argued it well. But to me, I think the plain meaning of that is, and I am the one called upon to interpret this thing. We accept part of it. We accepted the figure you have come up with, but we don't accept the contingency, and it makes no sense in belaboring that.

But as an alternative to that, even if it had just been signed on the bottom, or even if I agreed with the Plaintiff's position that that was an unconditional acceptance of the offer, the offer was, and consequently any such settlement would have been contingent "upon funding from the Department of the Navy."

Now, it seems to me that the reasonable way to interpret that is not whether there was money available somewhere in the Department of the Navy, or if $891,000 was somewhere left in the budget of SPARWAR. It seems to me this termination contracting officer was saying to the Plaintiff, I agree, or at least for the use of that proposal, I would agree to the extent of $891,000, you are entitled to more money, but I'm not going to just agree to this on my own authority. I want somebody else, somebody else in the Navy to say it's all right to spend this money on it.

And so, with a little repetition, even assuming that it was a mutual firm unconditioned meeting of the

minds, the contingency with that interpretation just never occurred. There never was, in my view, a funding from the Department of the Navy in the manner I would assume that letter meant.

Well, gentlemen, I could go on and on, but it doesn't seem to me a close case, at least on that last alternative point. And so that's the ruling at this level. But let us spend some profitable time together -- incidently, in due course or probably today an order will be entered memorializing that.

But while we are all here, let's talk about two things, and one about discovery specifically, whether that is complete; and then second, whether there is some reasonable prospect this case might be settled; and talk about some good reasons for that. And then even if it looks like that might happen, let's talk about how we will get it on a trial track or some resolution track to get the case wound up.

Let me ask about discovery. I had assumed from the state of the file and the papers that discovery has been completed from the Plaintiff's point of view?

MR. SINGER: It has.

THE COURT: From the government's point of view?

MR. AUSTIN: Depends on how we move forward, Your Honor, in the sense that --

NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition is not citable as precedent. It is a public record. This disposition will appear in tables published periodically.

*United States Court of Appeals for the Federal Circuit*

02-5041

INFORMATION SYSTEMS & NETWORKS CORPORATION,

Plaintiff- Appellant,

v.

UNITED STATES,

Defendant-Appellee.

FILED
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
OCT 16 2002
JAN HORBALY
CLERK

# *Judgment*

*ON APPEAL from the* UNITED STATES COURT OF FEDERAL CLAIMS

*in CASE NO(S).* 98-CV-178

*This CAUSE having been heard and considered, it is*

*ORDERED and ADJUDGED:*

Per Curiam (SCHALL, BRYSON, and LINN, Circuit Judges.)

AFFIRMED. See Fed. Cir. R. 36.

*ENTERED BY ORDER OF THE COURT*

*DATED* OCT 16 2002

Jan Horbaly
*Jan Horbaly, Clerk*

Brian — VISIT ROSCOE

SPAWAR vs ISN

Notes on Mtg. 12/6/95 with Roscoe and SPAWAR Re: ISN contract DEC 06 1995

Brian - I attached my handwritten notes. This contract was awarded in July '94 for FIP systems integration, delivery, installation, cutover and training. It is FFP services with numerous sites and lots. It is not IDIQ.

The contractor has had all kinds of performance problems from the beginning. We and SPAWAR have tried to work with them as much as possible but now realize that he will probably never perform satisfactorily. We are still in the first lot, made up of three sites. The contractor is at least five months late on delivery/installation completion on all three sites.

7 Mo

Roscoe never modified the contract to re-establish the deliv. schedule on any of the sites because he could never get a good idea of what a realistic new deliv. schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo.

The first site (Hampton Rds.) is 80% complete. ISN is having trouble completing it. We have paid over $2 million so far in progress payments towards all three sites in Lot I, which covers the cost of the equipment. We haven't taken title to any of it yet.

Progress Pay $2M

Roscoe wants to reestablish the deliv. schedule for all three sites in Lot I, knowing full well ISN won't meet the dates. If he can't negotiate consideration he will determine it unilaterally. When the contractor misses the dates, Roscoe wants to T for D them. The activity prefers to T for C them. This will have to be resolved and we discussed this at length. However, both Roscoe and the DCMAO ACO feel we have a good case for T for D ing them and it will be alot cheaper than T for C'ing. The downside is it will mean the contract will have to go on for about 6 more months (the soonest new realistic delivery date would be about 6 mo. from now).

T for C

Whether we T for C or T for D, ISN will probably litigate.

Also, the ACO is researching possible fraudulent progress payment submissions by ISN. However, this does not affect our course of action on the contract, she will handle this.

## Roscoe's Action Items

He needs to brief legal and get their input on his recommended course of action

(if activity agrees to T for D):

He needs to mod the contract and re-establish the delivery dates ASAP, for consideration if possible. If ISN will not agree to consideration, he should determine a reasonable amount unilaterally.

When contractor does not meet the delivery dates, Roscoe needs to T for D the contractor. If it turns out there is evidence of fraud by ISN re: the progress payments, this could also contribute to our basis for T for D ing.

(if we T for C):

If we T for C, we will only re-establish a delivery date for Hampton Roads, since this is 80% done. Or the activity may decide to T for C Hampton Rds. and finish that site themselves or with a different contractor.

We will T for C the other two sites in Lot I. Then we will have to negotiate the equitable adjustment.



Lisa

Roscoe could also research with legal the feasibility of T for C ing Hampton Roads and T for D'ing the other two sites. Probably not legally viable.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORK CORPORATION, | ) | |
| Plaintiff, | ) | No.: 98-178C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Deposition of:

WILLIAM ROBERTSON

a witness of lawful age, taken on behalf of the Defendant, pursuant to notice, in the offices of the Department of Justice, Room 12011, 1100 L Street, N.W., Washington, D.C. 20530, on Monday, October 25, 1999, at 10:15 a.m., before Sharon Bellamy, Notary Public in and for the District of Columbia, when were present:

APPEARANCES:

On behalf of Plaintiff:

JOHN M. CRAIG, Esquire
Singer & Associates, P.C.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(301) 469-0400

meetings reflected what the program management office wanted to tell the contracting officer, and in many instances they removed information that I had put in there which would not reflect well on them, okay?

Q Would you --

A Specifically, to your question, there was a tacit agreement and understanding with all parties involved that there was no way, as I have just been telling you, to proceed with work on this contract without implementing the ECP; that all of that documentation -- all of the documentation that had been reviewed and approved reflected the ECP and the changes necessitated it.

Q Now, when you say " a tacit," meaning that?

A It's like, yes, we understand that that's the real situation, but you understand that you can't start work until you get a formal mod.

Q So you were told not to start work?

A I was also told they recognized the reality of the situation and we couldn't make progress without doing it. That's the reason I made the point about boiler plate on the paragraph you pointed out, that, yes, that's the last paragraph in every letter from every contracting officer, okay, however.

Q And with regards to the ECP, and this is going back, you had a meeting some time in December time frame

with Ron Zell, and Ron Zell told you, if I remember correctly, told you that if ISN could make progress, then he could get the funding?

A He told me that consistently from the September time frame on, from the -- basically, when he -- I take that back. Yeah, September, September - October time frame when he was looking at next year's money. He originally thought he could get some end-of-year dollars to complete it, to complete the funding profile. He told me at the end of the fiscal year, within the last week or two of the fiscal year, that he wasn't going to be able to do that; that they had an emergency someplace else and that he wasn't going to be able to get end-of-year dollars, and that he was going to have to wait until the next fiscal year funding was allocated to him, and that he would complete funding at that point in time. So, as I said, it occurred over a series of meetings, a variety of meetings.

Q Now, January of '96 was also a busy month with this contract, if I understand --

A Mm-hmm.

Q -- in terms of meetings between the government and ISN. And those series of meetings culminated, if I understand correctly, with a request for a meeting with ISN to show progress to date and how they were going to meet the delivery schedule; is that correct?

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------:

INFORMATION SYSTEMS & :

NETWORKS CORPORATION :

Plaintiff :

vs. : Case No. 98-178C

THE UNITED STATES :

Defendant :

---------------------------:

Monday, October 18, 1999

Washington, D.C.

Deposition of

ROSCOE W. CRAWFORD

a witness, was called for examination by counsel for the plaintiff, at the offices of United States Department of Justice, 1100 L Street, N.W., 12th Floor Conference Room, Washington, D.C. 20530, commencing at 10:00 a.m. before Doris L. Gude, Shorthand Court Reporter and Notary Public for the District of Columbia, and were present on behalf of the respective parties:

MGB REPORTING, INC.
9805 Korman Court
Potomac, Maryland 20854
(301) 983-9315

the Navy that spurred ISN on to give you the ECP?

A. Probably discussions with the tech people and ISN.

Q. You don't recall any documents though?

A. No documents.

Q. Do you recall when ISN provided the ECP to the Navy?

A. It would be in the latter part of '95.

Q. After receiving the ECP from ISN, then what happened?

A. It was reviewed by my technical people over at SPAWAR, and we never could come to an -- well, they viewed it as being unreasonable, unreasonably priced.

Q. So was that the basis of the unreasonableness, the pricing?

A. Basically.

Q. Who were the technical people at SPAWAR?

A. At the time, it was McCore (phonetic), Jeff Bergdahl, and his boss, Ron Zell.

formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." What does that mean?

A. At the time, I guess, we had intention of issuing a modification, but that was predicated on ISN providing us with a revised installation and cutover schedule for the contract for Lot I which they never did.

Q. So ISN didn't provide a revised installation cutover schedule?

A. No, they never did.

Q. Did you keep a file on this ATCS project?

A. This case file folder that you looked through.

Q. Is that your file?

A. That's the file, yes.

Q. Do you recall whether Exhibits 3 and 4 were included in that file?

A. You're saying are they are still included in the file?

COPY

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INFORMATION SYSTEMS AND NETWORKS CORPORATION, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | Case No. 98-178C JUDGE JAMES TURNER |

Deposition of JEFFREY BERGDAHL, at 4301 Pacific Highway, San Diego, California, commencing at 10:01 A.M., Friday, October 29, 1999, before Sandra D. Warren, CSR No. 10831.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

SINGER & ASSOCIATES
BY: JOHN M. CRAIG, ESQ.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(301) 469-0400

FOR THE DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE
BY: MICHAEL D. AUSTIN, ESQ.
1100 L Street, N.W.
Suite 12144
Washington, D.C. 20530
(202) 307-0277

JEFFREY BERGDAHL,
having been first duly sworn, testified as follows:

**MGB REPORTING, INC.**
9805 Korman Court
Potomac, Maryland 20854
(301) 983-9315

A. Nope.

Q. Did you tell them not to do anything pending formal approval of the ECP?

A. No.

Q. What did SPAWAR tell ISN to do pending approval of the ECP? Formal approval of the ECP?

A. I don't really recall what was told to them, if anything.

Q. Could ISN do any work pending formal approval of the ECP?

A. Yes.

Q. What work could ISN perform pending formal approval of the ECP?

A. Again, there was still -- there was substantial amount of equipment that was in the RFP that was still remaining at ANCC Hampton Roads. But prior to that equipment being cut over, we needed all the various contract deliverables submitted and approved before they would start doing the cutover.

Q. And the contract deliverables weren't modified really at all pursuant to the ECP; is that right?

Q. Okay. So SPAWAR had available funds in the amount of approximately $7 million for FY '96, right?

A. Well, obviously, it was -- as of April of 1995, it was budgeted to be there.

Q. Do you know if it was?

A. I don't know how much, when FY '96 rolled around in October of 1995 -- how much money was actually -- how much SPAWAR received at the time. Obviously, it was at least 2 1/2 million based on that Exhibit 17.

Q. Okay. This was another 7 million in addition to the 7 million that we had looked at from the FY '94 document?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Let's switch gears. I'm going to go back to the ATC ECP. I want to draw your attention to an exhibit marked Bergdahl Exhibit 23. What is that document?

A. That's a request from the DCMDS from

Baltimore to SPAWAR requesting an evaluation of how much of the ATC's have been physically completed on a percentage basis. Obviously, it would be to support progress payments from DCMDS to ISN.

(Plaintiff's Exhibit No. 23 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. I want to refer you to the bottom of the page. Is that your handwriting?

A. Yes.

Q. And what were you -- let's take the information set forth in paragraph 3. It says, "See attachment for rationale on percentage of physical completion. ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule."

Are those true statements?

A. Yes.

Q. And in paragraph 1, you said, "Physical percentage of progress is estimated as 15 percent." Is that a correct statement?

A. Correct.

Q. And physical percentage of progress means the actual physical work that was being done at Hampton Roads; is that correct?

A. Yes.

Q. But there was other work that was being done by ISN that wasn't termed physical work; is that right? The documentation, that type of --

A. This is the overall for Lot 1.

Q. Why is it called physical percentage as opposed to total percentage or something like that?

A. It's not -- it wasn't my form. This was DSMI -- this was the Defense Contract Management Command's form that they sent to me.

Q. So is it correct that ISN had performed 15 percent of the work they proposed in their ECP as of October 19th, 1995?

A. This wasn't really related to necessarily just our ECP or anything. This was overall work on the contract, and the contract had several parts of it in Lot 1. It had the actual

turnkey ATC, it had training, had the -- the contract deliverables, the nonphysical work, the paper.

Q. The statement "ISN is slightly behind the proposed schedule in their ECP," what does that mean?

A. That was due to the fact that during the summer of 1995, they had obviously submitted a proposed schedule to FISC when they would complete each stage or complete all the contract deliverables, and I was comparing where they were at on 19 October versus whatever proposed schedule they had submitted in their ECP during the summer of 1995.

Q. Does this include work done -- that was proposed in the ECP?

A. Proposed? Yes.

Q. And you believe that ISN was performing satisfactorily as of October 1995?

A. As compared against the proposed schedule. They had an ECP, remember, as of October of 1995. There had been no contract modification

reached between ISN and FISC for a revised delivery schedule or completion of the turnkey site.

So if I had been forced to compare where they had been completedwise against what was originally in the original contract, at this point, all three sites should have been done, completed, several months prior to this.

Q. So this was taken in consideration that FISC would formally approve the ECP?

A. An issue which would be to revise the delivery schedules for both completing the sites and submitting all the documentation.

Q. And SPAWAR and ISN were going forward on the assumption that the ECP would be formally approved by FISC?

A. Yeah.

Q. This -- your comments here were reviewed and approved by Ron Zell; is that correct?

A. Correct.

Q. That's his signature, to the best of your knowledge?

A. Yes.

Q. Mr. Bergdahl, I want to draw your attention to a document marked Exhibit 24. What is that?

A. This was a fax I would have sent to FISC. Obviously, I included the -- the ECPs from April 1995 of what they submitted to us. This was trying to make sure FISC was aware of what had been submitted to us.

(Plaintiff's Exhibit No. 24 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. And it says -- you referred to "the agreed configuration." What -- does that mean that is the configuration that was proposed by ISN and agreed to by SPAWAR?

A. Yes.

Q. Do you know whether it was set forth in the contract or the ECP?

A. It obviously was never set forth in the contract. Very likely it was submitted in the ECP.