**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **INFORMATION SYSTEMS & NETWORKS CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 02-796C** **Judge Allegra** |
| **THE UNITED STATES,** | ) | |
| **Defendant,** | ) | |

PLAINTIFF'S MOTION PURSUANT TO RULES 30 AND 37 TO PRECLUDE DEFENDANT FROM TESTIFYING AT TRIAL ON THE SUBJECTS OF THE CORPORATE DESIGNEE DEPOSITION OR CONTRADICTING SUCH TESTIMONY AND OTHER SANCTIONS

Pursuant to the Rules 30 and 37 of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff, Information Systems & Networks Corporation ("plaintiff" or "ISN"), by its undersigned attorneys, hereby moves for an Order (i) precluding defendant from testifying at trial on the categories of corporate designee testimony for which the designated deponent was unprepared and unknowledgeable, (ii) precluding defendant from contradicting or modifying their responses on specified issues, from the deposition testimony offered, (iii) alternatively, requiring the production of a corporate designee with knowledge; and (iv) awarding plaintiff its costs and attorneys fees. Plaintiff's RCFC 37(a)(2)(A) certification is attached as Exhibit 1.

MEMORANDUM IN SUPPORT

ISN claims damages in this case of $460,708 of incurred costs and loss of profit.[1] These were the same damages claimed in ISN's Termination Settlement Proposal ("TSP"). The TSP was subjected to an audit by the Defense Contract Audit Agency ("DCAA")

[1] The contract is No. 00600-94-C0389. ISN attempted to clarify the two damage elements by an Amended Complaint, which was denied. The loss of profit claim in the original Complaint continues.

pursuant to the government's equivalent of GAAP, FAR and DFARS.[2] The results of the audit were set forth in a detailed Audit Report ("the Report"). In an effort to streamline the trial of this action, plaintiff issued four deposition notices in an effort to establish its damages before trial. The notices were issued primarily regarding the actions of the DCAA in verifying ISN's claimed damages as set forth in the Report. The deponents were Mark S. Moser, Branch Manager, DCAA Columbia Branch Office, who authorized the Report, Benjamin Monastero, the Senior Auditor who performed the audit and wrote the Report, William C. Erdman,[3] the Supervisory Auditor who worked with Monastero and a RCFC 30(b)(6) designate request regarding the Audit Report, the subject Contract, ISN's Complaint and claims.

Moser's testimony revealed that he had nothing to do with either the audit or the Report. He had no recollection of having seen the Report before his deposition and had no knowledge of its content or the audit. His signature, which appears on the Report, was signed by Mr. Erdman for him. Moser admitted that the Report disclosed that the TSP was supportable and accurate (Depo. T. at 68-71). Monastero actually performed the audit in the field (ie. at ISN). He also wrote the Report. He had no recollection of (i) writing the Report (Depo. T. at 21); (ii) performing the audit (Depo. T. at 10); (iii) the documents he reviewed regarding the audit (Depo.T at 24). But also confirmed that the audit disclosed that the TSP was supportable and accurate (Depo.T. at 44-45).[4] Unfortunately, he could not respond to any detailed questions regarding the Report's content, his conclusions, or even whether the audit took one hour or one year.

---

[2] Because DCAA considered ISN a "high risk" audit candidate, the audit testing procedures were applied as thoroughly as possible.
[3] Mr. Erdman is retired under a disability and cannot testify.
[4] This admission along with Moser's, are two of the bases for ISN's Motion In Limine filed concurrent with this motion.

The corporate designee was Ms. Ellen Erdelsky, an Auditor Technical Specialist, who had nothing to do with the audit, the Report, the contract or ISN's claims in this case. Why she was selected as the designee remained a mystery to her, so much so that she contacted her agency counsel to see if it was proper for her serve in such a capacity (Depo.T. at 11).

Erdelsky did not prepare for the deposition. Other than writing a sophomoric one-page chronology of basic case events (ie contract date, termination date), already set forth in the Complaint and thoroughly reviewed in this Court's Opinion of April 12, 2005, she did nothing else. Her lack of preparation was highlighted by the following: 1. She did not speak to Monastero who preformed the audit; 2. She did not review the audit files maintained by DCAA on the subject audit although they were available to her; 3. She did not review the Contract; 4. She did not review ISN's proposal for the Contract; 5. She did not review the TSP; 6. She did not review the Complaint; 7. She did not review the Report; 8. She did not speak to Moser; 9. She did not speak to Erdman. Thus, she undertook NO preparation whatsoever (Depo.T. at 12,15,19,22, 25,26,29,39). Interestingly, however, when she was asked to review the audit files in December, 2003 or January, 2004 by defendant's counsel, she read everything. Clearly defendant's counsel did not think it necessary for her to review them again for preparation for the designate deposition. Thurs her testimony was based only on her recollection of a review occurring about three years earlier. Despite defendant's counsels repeated objections that the Report "speaks for itself," when Erdelsky was asked whether the Report did speak for itself, she was instructed not to answer the question (Depo.T. at 75). In sum, she was a witness who had no knowledge at all on any of the subjects set forth in the designate notice, and apparently was asked to testify for that reason alone.

## ARGUMENT

A. Defendant has failed to produce a witness with the required knowledge.

Defendant has an obligation to provide a corporate 30(b)(6) witness with knowledge as to designated areas. Defendant has manifestly, and deliberately, failed to do so here. This is clearly improper. Wilson v. Lakner, 228 F.R.D. 524(D. Md. 2005).

In Wilson, defendant hospital designated three witnesses in response to plaintiff's 30(b)(6) notice; when their depositions were taken, it was evident that these witnesses were not prepared to testify regarding the noticed areas of testimony, had undertaken no inquiry to be able to testify, or were asserted by counsel at the deposition to be testifying only as to personal knowledge, and claimed to be a corporate designee only as to one area.

The District Court cogently articulated the duty of the party responding to the 30(b)(6) Notice:

> There can be no question that the rule imposes a "duty to prepare the designee…[that] goes beyond matters personally known to the designee or to matters in which that designee was personally involved."Poole v. Textron, Inc., 192 F.R.D. 494,504(D. Md.2000) citing United States v. Taylor, 166 F.R.D. 356,361(M.D.N.C. 1996). The designee must be prepared to the extent that matters are reasonably available, whether from documents, present or past employees, or other sources. Id. …[T]he organization is expected to create a witness or witnesses with responsive knowledge. Taylor, 166F.R.D. at 361. In no sense is a 30(b)(6) deposition limited to a witness or witnesses who can authenticate documents or identify other possible fact witnesses. 228 F.R.D. 528. (for emphasis)

Having articulated the responding party's duty, the Wilson court addressed the extent of the obligation:

> One widely cited standard suggests that the corporation "must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [the requesting party] and to prepare those persons in order that they can answer fully,

> completely, and unevasively, the questions posed...as to relevant subject matters." Mitsui & Co. v. Puerto Rico Water Res. Auth. 93 F.R.D. 62, 67(D.P.R. 1981). While the rule may not require absolute perfection in preparation-it speaks after all of matters known or "reasonably available to the organization"-it nevertheless certainly requires a good faith effort on the party of the designate to find out the relevant facts-to collect information, review documents, and interview employees with personal knowledge just as a corporate party is expected to do in answering interrogatories. See Fed. R. Civ. P. 33. [Plaintiff]...is not obligated to depose a string of [defendant's]...employees, none of whom is able to speak for the [defendant]...as to how the incident or incidents in the question occurred, nor indeed in a 30(b)(6) requesting party limited to conducting her factual inquiry via interrogatories. 228 F.R.D. 528-29(footnotes omitted).

Accord, Int'l Ass'n of Machinists and Aerospace Workers v. Werner-Masuda, 390 F.Supp.2d 479, 486-90(D.Md. 2005). The record clearly demonstrates that defendant failed to undertake ANY of the efforts, good faith or otherwise, required of it to prepare its 30(b)(6) designee for testimony on the designated areas. Defendant's counsel brushed this off by stating that the Audit Report speaks for itself, despite the admitted discrepancies and use of boilerplate as admitted in the depositions, and his instruction to the designee not to answer whether the Report speaks for itself.[5]

It is also unknown why the defendant would designate an auditor who had no involvement whatsoever with the audit, Contract, Report, or anything else remotely relevant to the issues being deposed.

At the designee deposition, Erdelsky's admitted lack of preparation, asserted lack of knowledge, insistence on her chimerical inability to speak on behalf of the DCAA on those subjects appear to be neither innocent, nor inadvertent, nor harmless. Nor do they in any way satisfy the requirements imposed by RCFC 30(b)(6), and caselaw articulating those requirements. As the Fifth Circuit observed:

[5] The designee testified that the Report was nothing more than an aid to the TCO in resolving the TSP. The other deponents, however, rightfully agreed that the audit complied with GAAP, FAR and DFARS in proving the support and accuracy of ISN's claim.

> When a corporation or association designates a person to testify on its behalf, the corporation appears vicariously through that agent. If that agent is not knowledgeable about the relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all.

Resolution Trust Corp. v. Southern Union Co., 985 F.2d 196,197(5th Cir. 1993).

For the reasons set forth above, Erdelsky's appearance as the 30(b)(6) corporate designee of the defendant was, with respect to all areas noticed, "for all practical purposes, no appearance at all." Consequences must flow from defendant's conduct.

This Court should preclude defendant and Erdelsky from testifying at trial with respect to the categories of corporate designee testimony for which the designated deponent was unprepared and unknowledgeable. They should be precluded from modifying or contradicting their responses, on specified issues, from the deposition testimony offered. Alternatively, the 30(b)(6) deposition should be reconvened, and the defendant compelled to produce an appropriate 30(b)(6) witness (es) with knowledge, prepared to testify on specified areas.

B. This Court Should Order Preclusion, Direct the Reconvening of the 30(b)(6) Deposition, or Further Relief.

The District Court in the Wilson case outlined certain remedies available where a party had failed to comply with its obligations under Fed. R. Civ. P. 30(b)(6). 228 F.R.D. at 529-30. The court started with the premise that "a designated witness or witnesses must still be prepared to respond to the 30(b)(6) notice" even if that involves undertaking an independent assessment of the facts. Assessing the effects of various responses to and at the 30(b)(6) deposition, the Wilson court noted "[c]ertainly to the extent that a designee is not responsive to a notice of deposition—claiming no or limited knowledge—the responding party may be subject to sanctions...particularly...where a more knowledgeable witness might have been produced." Id. (Citations omitted). Where the witness is

forthcoming, but the information is not, "the 30(b)(6) deposition may have to be reconvened, possibly with a new witness." Id. at 530(Citations omitted).

Lastly, the Wilson court enumerated further relief appropriate to such misconduct:

> Depending on the nature and extent of the obfuscation, the testimony given by the non-responsive deponent (e.g. "I don't know") may be deemed "binding on the corporation" so as to prohibit it from offering contrary evidence at trial. 228 F.R.D. at 530(Citations omitted).

The District Court in Int'l Ass'n of Machinists, prior to dismissing the case on jurisdictional grounds, upheld the Magistrate Judge's ruling that the responding party would be precluded from disputing any information provided in any 30(b)(6) deposition as regards certain issues, finding it appropriate that the responding party "be held to that level of response and not permitted to supplement or contradict later." 390F.Supp.2d at 491.

This Court has additional remedies available to it under RCFC 37(a). In light of the remedies outlined above, this Court has adequate grounds to afford ISN multi-faceted relief from defendant's obfuscation of discovery.

Given the nature and extent of defendant's failure to comply with the most central requirements of Rule 30(b)(6), the most substantial remedies are warranted, particularly where defendant's obfuscation was directed to an issue which ISN would bear the burden at trial.

Accordingly, it seems appropriate that this Court preclude defendant as well as Erdelsky, Moser and Monastero from testifying at trial with respect to the categories of corporate designee testimony for which the designated deponent was unprepared and unknowledgeable.

In the alternative, the defendant should be precluded from contradicting or modifying their deposition responses. It may also be appropriate to re-convene the 30(b)(6) deposition. In this way, where defendant bears the burden of proof with respect to

a specific issue, it would be held to its previous non-responsive answers.

In addition, under the circumstances where, as here, the defendant has engaged in a course of conduct to delay and frustrate the plaintiff's attempts to obtain necessary discovery, the Court may find that the award to plaintiff of costs and attorneys fees is warranted.

Accordingly, plaintiff ISN respectfully requests that this Court enter an Order:

(1) Precluding defendant from testifying at trial for the categories of corporate designee testimony for which the designated deponent as well as other deponents were unprepared and unknowledgeable; or in the alternative,

(2) Precluding defendant from contradicting or modifying their responses on specified issues, from the deposition testimony offered;

(3) Directing that the 30(b)(6) deposition of defendant be reconvened within 30 days of the date of the Order deciding this motion;;

(4) Awarding plaintiff costs and attorneys fees.[6]

Respectfully submitted,

December 13, 2006

SINGER & ASSOCIATES, P.C.

s/Norman H. Singer

NORMAN H. SINGER, ESQ
Singer & Associates, P.C.
10411 Motor City Drive
Suite 725
Bethesda, MD 20817
Phone: (301) 469-0400
Fax: (301) 469-0403

[6] Plaintiff has attached as exhibits the Rule 37 Certification including correspondence between counsel.

CERTIFICATE OF FILING

I hereby certify that on December 13, 2006, a copy of the foregoing Plaintiff's Motion Pursuant to Rules 30 and 37 to Preclude Defendant from Testifying at Trial on the Subjects of the Corporate Designee Deposition or Contradicting such Testimony and other Sanctions was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing systems. Parties may access this filing through the Court's system.

s/Norman H. Singer
NORMAN H. SINGER, ESQ

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **INFORMATION SYSTEMS & NETWORKS CORPORATION,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 02-796C** **Judge Allegra** |
| **THE UNITED STATES,** | ) | |
| **Defendant,** | ) | |

PLAINTIFF'S CERTIFICATE PURSUANT TO RULE 37

I, Norman H. Singer, Esq., under the penalty of perjury, states the following:

1. I am counsel of record for plaintiff, Information Systems & Networks Corporation ("plaintiff" or "ISN") in this case.

2. On November 29, 2006, I caused to be sent by Federal Express the attached letter dated November 29, 2006 to Anuj Vohra, Esq., counsel for the defendant in this case. The letter constitutes the good faith attempt by ISN to resolve a discovery dispute connected with depositions in this case held on October 30 and 31, 2006. The letter was not sent until November 29, 2006 because I was waiting for receipt of the deposition transcripts.

3. On December 7, 2006, Steven M. Maser, Esq. contacted plaintiff with the advice that he had replaced Mr. Vohra and was aware of the November 29, 2006 letter.

4. On December 13, 2006, Mr. Maser responded to ISN's November 29, 2006 letter refusing to agree to ISN's proposed resolution of the discovery dispute. A copy of the letter is attached.

s/Norman H. Singer
NORMAN H. SINGER, ESQ

SINGER & ASSOCIATES
*A Professional Corporation*

ATTORNEYS AT LAW
10411 MOTOR CITY DRIVE
SUITE 725
BETHESDA, MD 28017

TELEPHONE: (301) 469-0400
FASCIMILE: (301) 469-0403
EMAIL: NSINGER@ISNCORP.COM

VIRGINIA OFFICE
810A BULLS NECK ROAD
SUITE ONE
MCLEAN, VA 22102

November 29, 2006

*VIA FedEx*

Anuj Vohra, Esq.
Commercial Litigation Branch Civil Division
Department of Justice
1100 L Street, NW
Washington, DC 20530

Re: ISN v. US (Case No. 02-796C)

Dear Mr. Vohra:

I write concerning the deposition of defendant taken on October 31, 2006. Now that we have received the transcript of the deposition, and had an opportunity to analyze it, we can confirm that defendant has failed to discharge its discovery obligations, and offer defendant an opportunity to redress this without need for Court intervention.

Plaintiff served a notice pursuant to RCFC 30(b)(6) naming the DCAA as the deponent. The Notice designated various areas of inquiry on which a corporate representative would give deposition testimony. Also served along with the RCFC 30(b)(6) Notice were three additional notices for the depositions of Mark Moser, Benjamin Monastero, and William Erdman. You subsequently indicated that Mr. Erdman had retired and was under some form of unexplained disability, which rendered him unable to provide a deposition. This has never been confirmed in writing along with a detailed explanation regarding his whereabouts and disability. The day before the 30(b)(6) deposition, you informed me that Ellen Erdelsky would be the designee. No explanation was provided as to why someone totally unrelated to the subject contract, the subject audits and the case itself was being designated.

At the deposition of defendant, Erdelsky proved to be, inter alia, an unresponsive, non-cooperative and unprepared witness. Erdelsky testified about her concern being named the designee and that she raised the concern with agency counsel stating that she had nothing to do with the audits that are involved with this contract and had no direct involvement in connection with any aspect of the subject contract and that she was

merely the "custodian of the files." She said that she had not spoken to Monastero or Erdman and did not speak to Moser substantively (an email telling him she was being deposed). She did testify that she reviewed the audit files in either December, 2003 or January, 2004, at the request of defendant's counsel, but since that time she had not read them through as she had back then. Importantly, she did not review the audit reports for the deposition (not since January, 2004), she did not read the contract, she did not review the audit files and could only rely on her recollection from the review almost three years earlier.

In sum, Erdelsky testified that she was not prepared to testify on the details of the audit and the meaning of the audit results. Throughout the deposition (and others) you continually stated that the Report "speaks for itself" despite Monastero's admission that it contains boilerplate which was not applicable. When I asked Erdelsky if she agreed that the Report "speaks for itself", you instructed her not to answer.

Defendant has an obligation to provide a witness with knowledge as to the designated areas. Defendant has manifestly, and deliberately, failed to do so here. Either the fact discovery period should be re-opened with respect to the designate deposition and a witness with knowledge as to the specified categories produced, or defendant must be precluded from introducing evidence, or have facts determined adversely to it in light of this failure.

So as to avoid motions practice on this matter and the involvement of the Court, ISN proposes the following:

1. The defendant will stipulate that ISN's cost damages totaling $460,708 were audited and found to be supportable and accurate by DCAA and ISN is not required to offer any proof on such damages.
2. That this stipulation does apply to the obligation on ISN to prove entitlement.
3. That defendant will not offer at trial or by affidavit or otherwise any evidence on the categories of the corporate designee testimony for which the designated deponent was unprepared and unknowledgeable.
4. That Defendant will not contradict or modify the deposition testimony previously given.

Please let us know immediately whether the foregoing is acceptable or whether you have any alternative proposals to resolve these matters without resort to a Court determination of this dispute.

Very Sincerely Yours,

Norman H. Singer, Esq.

**U.S. Department of Justice**

Civil Division

*Washington, D.C. 20530*

December 12, 2006

Norman H. Singer, Esq.
Singer & Associates
10411 Motor City Drive
Suite 725
Bethesda, MD 28017

**Re: Information Systems & Networks Corp. v. United States, No. 02-796(C)**

Dear Mr. Singer:

I am writing in response to your letter dated November 29, 2006, addressed to Anuj Vohra, regarding the above-captioned matter. After a careful review of the case files and discussing the matter with Mr. Vohra, I do not believe that the Government has "failed to discharge its discovery obligations," and I see no need for any sort of redress in such regard. More specifically, your letter raises a number of concerns regarding the depositions conducted on October 30 and 31, 2006; I will address each in turn:

**The Deposition of William Erdman:** On or about October 18, 2006, Mr. Vohra notified you that William C. Erdman, a former employee of the Defense Contract Audit Agency ("DCAA") had retired due to a disability that rendered him unavailable to give a deposition in this matter. At no point subsequent to that disclosure, or at the October 31, 2006 deposition of Ellen Erdelsky, when you confirmed on the record Mr. Erdman's unavailability, did you request "a detailed explanation regarding his whereabouts and availability." Indeed, Mr. Vohra has informed you that Mr. Erdman has been diagnosed with Alzheimer's disease, and is not competent to testify. Accordingly, I see no need for any additional action on our part in this regard. Nevertheless, I have spoken with Mr. Erdman's wife (who possesses durable power of attorney for Mr. Erdman), and the Department of Justice has received her permission to represent Mr. Erdman in any dispute of his availability for deposition.

**The 30(b)(6) Deposition of Ellen Erdelsky**: Rule 30(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC") requires a noticed organization to present a witness to "testify as to matters known or reasonably available to the organization" provided that the requesting party "describe with reasonable particularity the matters on which the examination is requested." Rule 30(b)(6) does not, however, require that the designated deponent be "related" to any aspect of the litigation, as your letter suggests. Nor does the rule require that the party presenting the witness provide you an "explanation" as to why the deponent was designated.

Moreover, despite your characterization of her as "unresponsive, non-cooperative and unprepared," Ms. Erdelsky adequately testified "as to matters known or reasonably available to the [DCAA]." Your letter identifies a number of ways that Ms. Erdelsky allegedly failed to adequately prepare for her deposition, but does not identify a single line of questioning where she was unable to provide adequate responses or was in any way "non-cooperative." As to the fact that Ms. Erdelsky did not substantively speak to either Mr. Monastero or Mr. Moser prior to her deposition, given that you took the depositions of both those individuals one day before hers, I fail to understand what detrimental effect Ms. Erdelsky's failure to speak to them could have had upon your client. Finally, Mr. Vohra's only instruction to Ms. Erdelsky not to answer was in response to a question that essentially asked her if she agreed with a contention that counsel had previously made, which was improper and outside of the scope of her 30(b)(6) testimony.

As such we have met our obligation to produce a deponent in accordance with RCFC 30(b)(6). Your assertion that we have "manifestly and deliberately" failed to produce a proper witness is incorrect.

**ISN's Proposed Stipulations:** Defendant cannot agree to any of stipulations proposed in your November 29, 2006 letter. With regards to stipulations #1 and #2, regarding ISN's "cost damages," the Court has already stated that all of ISN's claims in its complaint (and therefore all of its damages) arise out of the alleged modification to the contract – a modification the Court held was never redeemed and over which it cannot award relief. Stipulations #3 and #4 address the usage of the October 31, 2006 deposition testimony. As we have complied with our requirements with regards to that deposition, such stipulations are unnecessary.

Very truly yours,

Steven M. Mager
Trial Attorney
Civil Division
U.S. Department of Justice

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - X

INFORMATION SYSTEMS & :
NETWORKS CORPORATION, :
Plaintiff, :
Vs. : Case No.:
THE UNITED STATES, : 1:02-cv-796
Defendant. :

- - - - - - - - - - - - - - x

Tuesday, October 31, 2006

Washington, D.C.

30(b)(6) Deposition of:

ELLEN E. ERDELSKY,

the Witness, called for examination by counsel for the Plaintiff, pursuant to notice, commencing at 10:05 a.m., at the offices of U.S. Department of Justice, 1100 L Street, N.W., Washington, D.C., before Curtis R. Cloward, CSR, a Notary Public in and for the District of Columbia when were present on behalf of the respective parties:

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
NORMAN H. SINGER, ESQ.
SINGER & ASSOCIATES
10411 Motor City Drive, Suite 725
Bethesda, Maryland 20817
(301) 469-0400
nsinger@isncorp.com

ON BEHALF OF THE DEFENDANT:
ANUJ VOHRA, ESQ.
U.S. DEPARTMENT OF JUSTICE
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0521
anuj.vohra@usdoj.gov

- oOo -



I N D E X
DEPOSITION OF ELLEN E. ERDELSKY
10/31/06


| EXAMINATION BY | PAGE |
| --- | --- |
| Mr. Singer ............................ | 4 |
| Mr. Vohra ............................ | 84 |


INDEX OF DEPOSITION EXHIBITS


| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Notice of Deposition ................ | 4 |
| 2 | Summary for Deposition ............. | 9 |


- oOo -



P R O C E E D I N G S

Whereupon,
ELLEN E. ERDELSKY,
was called as a witness and, after having been first duly sworn by the Notary Public, was examined and testified, as follows:
EXAMINATION ON BEHALF OF THE PLAINTIFF
BY MR. SINGER:
**Q. Would you state your full name for the record?**
A. Ellen Evelyn Erdelsky.
**Q. What is your business address?**
A. DCAA, Germantown Branch Office 20251 Century Boulevard, Germantown, Maryland.
What's the Zip? 20874 or 79, one or the other.
**Q. Okay.**
A. Notice the change in name from Silver Spring Branch Office to Germantown Branch Office? Just happened.
(Notice of Deposition, marked for



identification as Erdelsky Exhibit No. 1.)
BY MR. SINGER:
**Q. Before getting to that exhibit, have you had your deposition taken in the past?**
A. Once.
**Q. Okay, and in what matter was that, do you recall?**
A. Yes. That was a claim that had been tried before a board of contract appeals established by the GAO for the joint committee on the Library of Congress.
**Q. And who was the claimant, do you know?**
A. Clarke Construction.
**Q. Did you actually testify before the ASBCA in that matter?**
A. No, the ASBCA is the Armed Services Board of Contract Appeals, that is not the board of which I spoke.
**Q. Oh, I thought you did, okay.**
A. No, it was a very curious board of contract appeals.

**Q. You have testified in the United States Federal Claims Court?**
A. Yes.
**Q. On what occasion?**
A. On the occasion of trying the case of the subchapter S state tax issue for Information Systems & Networks Corporation.
**Q. Okay.**
A. And you were the attorney for Information Systems & Networks Corporation.
**Q. Okay, is that the only time you've testified in court?**
A. In the Court of Claims?
**Q. Yes.**
A. Yes.
**Q. Oh, have you testified in any other court other than what you've described?**
A. I testified before the Armed Services Board of Contract Appeals, entirely different case.
**Q. Okay, what case was that?**
A. That concerned a claim by Aepco



Incorporated, A-E-P-C-O, Incorporated.
**Q. Have you seen what has been marked Erdelsky Number 1, which is a notice, a 30(b)(6) notice of oral deposition?**
A. Yes, I was faxed a copy of this.
**Q. Okay, and you have consented to testify on behalf of DCAA regarding the subjects set forth in that notice?**
A. Yes.
**Q. The first one is ISN's contract number N00600 dash 94 dash C dash 0389.**
A. Yes.
**Q. And the audits of ISN regarding such contract?**
A. Yes.
**Q. And ISN's claims under such contract?**
A. Yes.
**Q. Okay, how did you prepare for this deposition this morning?**
A. I looked to our files to check over what it is that we had in them.
I looked to the -- looked to the



contract to see what it was about.
I looked to the people we had dealt with over the years.
And I prepared myself a short list of facts about these matters. That's what I did to prepare.
**Q. Okay, before we get to the document you prepared, when you say you looked at the -- you looked at your files, you're referring to the DCAA files --**
A. Yes.
**Q. -- correct?**
A. Yes.
**Q. And do you recall what you saw in those files?**
MR. VOHRA: Objection as to form. I believe it's a bit vague. I'd have to ask that you rephrase.
THE WITNESS: Yes, except that I did not read through all the files.
BY MR. SINGER:
**Q. Okay, let me begin by how many files**



**were there, first of all?**
A. Okay, there is a file for each of these audits (indicating) okay? Which is three files.
There is a file related to the termination settlement proposal file containing some items that came from the Navy at a later point in time.
Let's see, trying to think, that's one, two, three, four physical files. I think there may be a fifth physical file but I can't remember exactly how to divide up what may be in it.
MR. SINGER: Let me go ahead and have this marked as your Number 2.
(Summary for Deposition, marked for identification as Erdelsky Exhibit No. 2.)
MR. VOHRA: For the record, Erdelsky Number 2 is a document prepared by the Witness for today's deposition.

MR. SINGER: Yeah, I'll get into that.
(Whereupon, there was a discussion held off the record.)
BY MR. SINGER:
**Q. While that's being done let me just ask you, just to speed it along here, other than reviewing the files that you mentioned and which we will be going over shortly, did you speak to anybody in connection with the preparation for your deposition?**
A. I had contact with Anuj here who is the one who informed me about this.
**Q. Okay.**
A. I spoke briefly with Mark Moser, whom I learned was to be a -- was to be deposed.
**Q. Was that one conversation with him?**
A. Let me see, one. And I think we exchanged an E-mail, but it was just -- I'm going down there on whatever and, I mean, it wasn't long and -- neither conversation was long.
And I had a conversation with the DCAA General Counsel and a Deputy Counsel or Assistant



Counsel, whatever the title is.
**Q. Do you know their names?**
THE WITNESS: What's our Deputy Counsel's name?
MR. VOHRA: Is it David Hoffman.
THE WITNESS: Hoffman, that's it. David Hoffman.
Who is our counsel, Fairnish (ph.)? Is he still? I'm sure you know, Mr. Singer.
MR. SINGER: No, I can't say as I do, frankly?
THE WITNESS: I don't know who it is.
And anyway, I had a conversation with them because I was described as being a 30(b)(6) witness. And I said -- I went and I said am I an appropriate person to be such a kind, what kind of witness is this, I had nothing to do with the audits that are involved with this contract, I had nothing at all to do with them. I was merely the custodian of the files, as a matter of fact, of all the branch's ISN files.
And so, I had a conversation with them



about it and they said that they thought that I could be an appropriate witness.
**Q. Okay, other than Mr. Moser and Mr. Hoffman --**
A. Um-hum.
**Q. -- anyone else that you spoke to in connection with preparation for your deposition?**
A. I informed my administrative supervisory auditor, I informed the branch manager. Let's think, I don't remember anybody else specifically other than the other auditors hanging around.
**Q. You did not speak to Benjamin Monastero?**
A. No. As a matter of fact, I didn't. I knew he was going to be here but I did not speak with him.
**Q. Did you try to speak to him?**
A. No. I don't even know exactly where he is or what his phone number is or anything.
**Q. Do you know what his relationship has been in connection with this contract?**



A. Yes, he performed the audit of the termination proposal, termination settlement proposal.
**Q. Did you speak to Mr. William C. Erdman, E-R-D-M-A-N?**
A. About this matter? No. I do not have any way of contacting him either. I don't know where he is. I know he's retired.
**Q. Okay.**
MR. SINGER: And as counsel has represented to me, Mr. Erdman is retired but while living in the area is under some form of disability. Is that a fair statement?
MR. VOHRA: That is a fair statement, yes.
MR. SINGER: And such disability renders him unable to give a deposition?
MR. VOHRA: Are you asking me?
MR. SINGER: Yes.
MR. VOHRA: Yes.
MR. SINGER: Okay, very good. Thank you.

THE WITNESS: I was told that by Anuj.
BY MR. SINGER:
**Q. So other than informing various people at DCAA that you were being deposed, any other conversations in preparation for your deposition?**
A. Not that I can recall.
**Q. Okay.**
**Now I want to refer you, if I could, to what has been marked Erdelsky Number 2, which is, as you have described, a document prepared by you --**
A. Um-hum.
**Q. -- correct?**
**And it is a summary of the documents you prepared in preparation for this deposition?**
A. No, it's simply a summary of the information that are in these various files of certain key -- certain items that I thought might be relevant.
I had no idea what the questions would be, so I said okay, I better briefly write down the contract. I had no knowledge -- well, my



knowledge went back several years, you know? I hadn't even thought about this in quite a while, so I better look up -- Anuj, as a matter of fact, mentioned, you know, what the contract was about.
And I said whoops, I cannot remember exactly what the contract was about and so I went and wrote that down briefly. And I made a list of the audits there were done.
You know, that's all I did.
**Q. Now, you had no direct involvement in connection with any aspect of the subject contract, did you?**
A. No, I didn't. I didn't have any involvement.
**Q. Okay, and you had no direct involvement in any of the audits, correct, with that contract?**
A. That's true, yes, I did not.
**Q. Going first to the -- to your document that you prepared --**
A. Um-hum.
**Q. -- you first have some points**



**connected with the contract itself; correct?**
A. Yes.
**Q. Okay, do you know or have you reviewed any documents which can tell you whether ISN's proposal in connection with the award of this contract was audited by DCAA?**
A. As indicated there I found nothing to indicate that we audited the proposal. As a matter of fact, I looked specifically to see if I could find an audit that had been done of the proposal and there was nothing there.
**Q. Okay.**
A. There was nothing in the files I could find.
**Q. When are proposals audited and when are they not audited, to your experience?**
A. They were audited when we get a request from a procurement contracting officer.
**Q. I see.**
A. We do not initiate such audits.
**Q. Is it fair to conclude here that the procuring agency did not request an audit of this**



**proposal by ISN?**
A. I would infer that but, you know, I said I looked and could not find. That doesn't mean, you know -- how can I say that about a negative? I found nothing and so I am confident there was nothing.
But I suppose the possibility exists that more than a decade ago some request was made or some audit was done and the files have become misplaced, you know? That possibility always exists.
If I had found it then that's different. Then I could say definitely we did something.
**Q. Putting aside possibilities and just using some reasonable standard, are you aware of whether DCAA had a practice of destroying audit files?**
A. No.
**Q. It had no such practice?**
A. Right. Such files are, how can I say, there are rules about when to get rid of them,

Page 18

put it like that. I mean, you don't keep these things forever.
On the other hand, I am not aware of any ISN files in particular ever having been archived or whatever. I, as I mentioned, am custodian of the files for ISN that had been accumulating. And I have files -- I have some files dating back to 1982 maybe or '83, you know?
**Q. So it's reasonable to conclude that, first, DCAA has destroyed no files in connection with the subject contract?**
A. Right.
**Q. Okay.**
MR. VOHRA: Objection to the use of the word "reasonable" to the extent it's a legal conclusion.
BY MR. SINGER:
**Q. It is also reasonable to conclude that if an audit had been performed of the ISN proposal leading up to the contract that DCAA would have those audit materials?**
A. Yeah, I do believe they would have

Page 19

those audit materials.
**Q. And your review of the files and your locating documents connected with the contract revealed there were no such audit files connected with the --**
A. I found no such audit files, connected proposal audit files connected with this contract.
**Q. Okay.**
**Now, with respect the three audits that you reflect on in your memo --**
A. Yes.
**Q. -- did you review each of those?**
A. No, I did not. I just listed them on this piece of paper.
**Q. Have you ever reviewed these audit reports?**
A. Yes, I have looked at these audit reports.
**Q. And when was the last time?**
A. The time which I actually read them, so to speak, cover to cover was when I was called

Page 20

in December of 2003 by Mr. McBurney and Mr. Knoth, who are listed there. They were in the process of some talks with you, I believe, or with someone else at ISN. And they were asking questions about the audit and what was in the audit files and what things meant and that sort of thing.
And I was the only one around, left around to do anything about it, so I got out those files and at that point in time I read them.
Since that time, because I was called by other lawyers at other points in time, I have had reason to look at them. But I have never, again, read them through as I did back -- probably it was in January of 2004 that I -- I -- because they called me in December and made an appointment and came over in January.
**Q. And what was your position with DCAA in January of 2004?**
A. I'm an auditor, a technical specialist category, so to speak.

Page 21

**Q. Is that your position today?**
A. Yes, it is.
**Q. Okay, and how long have you been an auditor technical specialist for DCAA?**
A. Since the spring of 1998.
**Q. What did do you before 1998?**
A. I was I guess you'd call it a senior auditor.
**Q. For DCAA?**
A. For DCAA.
**Q. And for how long?**
A. Well, all the way back to the beginning. I wasn't a senior the whole time but I began with DCAA in 1979 as a trainee and have been an auditor ever since --
**Q. Okay.**
A. -- with DCAA.
**Q. And briefly, what is your educational background?**
A. I have a bachelor's degree in history, a master's degree in history, a master's degree in accounting.

**Q. And at what institution did you get the bachelor's degree?**
A. Wheeling College, which is now called Wheeling Jesuit University.
**Q. And how about the master's?**
A. Both of those are from Georgetown University.
**Q. And you're a licensed CPA?**
A. Yes, I'm a CPA in Maryland.
**Q. So, am I correct to say that you did not review the audit reports in connection with your deposition this morning?**
A. That's true, I did not.
**Q. Okay, and the last time you reviewed the audit reports certainly would have been January of 2004, and perhaps from time to time after that, when you were called upon to answer certain questions?**
A. Yeah.
**Q. Okay, how many times were you called upon since January of 2004 to answer certain questions?**



A. Okay, in January through March of 2004 is when I, so to speak, was answering questions for McBurney and Knoth, okay? And then I think maybe it was in April or May of 2004 was my last talk with them and then I didn't hear a word.
And in the spring of 2005, I contacted them and I said anything happening? And, as I recall, the answer was that they were making some sort of motion, et cetera, but that I was -- there was nothing to do.
I should add, the reason I contacted them was not because I had any specific interest in this matter, but rather one of my duties in my office is to maintain a database of all the active cases that involve our office for all the contractors in our office. And I am supposed to keep it as current as possible.
So, when I don't have contact for a long period of time I will go back and try to make contact and ask what's happening and whether there's any increment of information I should add to this database.



I have access to the database for my office to do this. It is, I believe, however, a DCAA-wide database I'm dealing with, okay?
So, in 2005 I called up and Knoth explained that they were making this motion and that's all, nothing else was happening.
MR. VOHRA: I'm just going to interject real quick.
Ellen, going forward you can refrain from disclosing what was actually said to you by the various attorneys you talked to.
THE WITNESS: okay.
Then in August of 2005 out of the blue I was called by Dorie Finnerman who I had never heard of before. And she explained she had taken over this matter and (laughter) I wrote it backwards (laughter) oh, well. Anyway, August of 2005.
And she asked me some questions in August, September, October of 2005. And then I didn't hear anything from her.
And so, July of 2006 I called her and



I said what's happening. And I forget exactly what she said, nothing. She didn't think I would be involved any further, I believe that was it.
But, at any rate, and then I didn't hear anything until September and I get called by the fourth lawyer (indicating)
BY MR. SINGER:
**Q. Did you, in preparation for this deposition, read the contract?**
A. No, I did not read the contract, the whole contract. I looked at the sections so that I could say what you see here (indicating). I put this little summary.
**Q. Okay.**
A. That's all.
**Q. Did you -- did you read ISN's proposal?**
A. Proposal in termination I did read.
**Q. The proposal leading up to the contract?**
A. No.
**Q. Okay.**

**Did you -- did the audit files, the three audit files which you referenced in your memorandum --**
A. Um-hum.
**Q. -- those files contained obviously the audit report --**
A. Um-hum.
**Q. -- correct?**
A. (Nodding head up and down, inaudible response.)
**Q. Did you see whether they also contained drafts of the audit report?**
A. When I looked at the files originally -- now we're talking the spring of 2004 -- I honestly can't remember if there were drafts in there. There probably were because that was the custom.
**Q. Okay, so it's correct to say that you did not look at those audit files in connection with this deposition this morning?**
A. True.
**Q. Okay, the last time you looked at them was this either January of 2004 or the spring of 2005?**



A. Actually, in the spring of 2005 I didn't look at them. I looked at certain aspects in August of 2005 with Dorie Finnerman. She asked some questions, so -- but I only looked at parts of them.
**Q. But you're looking at the files was actually January of 2004?**
A. Yeah, that's the time because I had never seen any of it before.
**Q. So relying on your recollection of that review --**
A. Okay.
**Q. -- you can't recall whether there were drafts?**
A. No. But I assume there were because it was the practice to do that sort of thing.
**Q. So the practice of DCAA was to retain drafts of audit reports by the auditor?**
A. Usually one draft, the final draft.
**Q. Okay, in addition to any draft or the final audit report were there working papers in those files?**



A. Yes.
**Q. Okay, is that another practice of DCAA --**
A. Yes.
**Q. -- to maintain working papers?**
A. Yes.
**Q. Okay, what else can you recall were in those files besides what we described? Anything else?**
A. There would be what we would call administrative working papers. For example, the requests to do the audit would be in there. The audit program would be in there.
Records of conversations with either the procurement authorities, if we're talking about a proposal -- well, it depends on what kind of audit it is, who you're dealing with. But, you know, other U.S. Government authorities, there would be their record of discussions with the contractor.



There would be, in this case, perhaps a brief of the contract.
So there are a lot of things besides the actual working -- what we refer to as the audit working papers, there would be these administrative papers, which are intimately connected. They are all intimately connected.
**Q. Did you review the request, the request to audit the termination settlement proposal?**
A. No, I didn't review it.
**Q. Okay, did you review any notes of the auditor in connection with this audit of the termination settlement proposal?**
A. Yes, I looked through the auditor's work papers.
**Q. Okay, and based on recollection --**
A. Um-hum.
**Q. -- does anything stand out in your mind about your review of those work papers?**
MR. VOHRA: I am going to object to the question as vague.

THE WITNESS: They were ordinary; they were what I expect to see. They were arranged in a way I more or less expected to see them. I thought they were good work papers. I don't always think that (laughter).
BY MR. SINGER:
**Q. Anything else?**
A. No, there was nothing unusual about the work papers.
**Q. Okay.**
**Were there any ISN documents that you reviewed in the DCAA audit file to the termination settlement proposal?**
A. There were any one of a number of documents which had been obtained from the contractor. I certainly can't remember them all.
**Q. Okay, and would this file, roughly speaking, be several inches thick?**
A. About that big (demonstrating).
**Q. Maybe four inches?**
A. Yeah.
And then, as I say, some things that



would have been in this file, had they arrived during the audit, are in another file. For example, the termination inventory we did, in fact, eventually get that type thing, so --
**Q. Do you know the timing between when DCAA got the termination inventory and when -- the audit report, I can tell you, was December of 1996.**
A. No, because, you know, I looked at it and I said oh, this is a termination inventory. I mean, that's it. I don't recall the -- the -- no, I can't.
There was probably a covering letter with a date on it, but I don't have a memory in mind of what that is.
**Q. Okay, anything else that subsequently came in?**
A. Let's see, along with that there was -- I think we asked them for something like a sequence of events and I think that came in from them.
**Q. Asked who for the sequence of events?**



A. Oh, when doing a termination, although I'm familiar more in the claim area with this, one of the things that you ask the contracting officer for is to provide a sequence of events in the circumstances. Which would be like here we have a stop work terminate (indicating) you know, events.
**Q. I'm sorry, that would be in connection with the audit of the termination settlement proposal.**
A. Yeah, we would have asked for it.
And I believe besides getting that inventory I think that was in there too subsequent.
**Q. To the completion of the audit report.**
A. Of the audit.
**Q. Okay.**
A. Also in those files I saw a letter, I think I said July but I believe it's September, from ISN to the terminating contracting officer. About four pages, I think, responding to the audit to the terminating that was in there.



**Q. Did you review that letter?**
A. Yes, I looked at that letter, again, at that time back in 2004.
**Q. Okay, is --**
A. And then over the years there's some other things in there. I don't remember exactly what they were. Well, yes, I am now adding to the files (indicating).
**Q. Okay.**
A. So....
**Q. Have you performed audits of ISN in the past, you yourself?**
A. Yes, I have.
**Q. Okay, and how many?**
A. How many? It's a little difficult to describe it by coming up with a number like that, so let me describe it a slightly different way.
I -- I did an audit of the incurred cost proposals for '88, '89, '90 and '91. That can be looked upon as four audits, although I did them simultaneously as one project, so to speak. So, I look upon that as one audit covering four

years.
I finished the audit of 1987, okay, and I provided subsequent reports concerning the audits of 1985 and '86.
**Q. These are, again, incurred cost audits?**
A. These are all incurred cost audits.
**Q. Okay.**
A. I then also rewrote the audit report on the incurred cost audits for the years 1992 to 1995, incurred cost audit.
I performed the incurred cost audit of the year 1996. And as one assignment covering two years, I did the incurred cost audit of '97 and '98.
I have done no other types -- I cannot remember doing a single other audit at -- well, yes, I did a floor check once. Once or twice I did floor checks. Other than that I did not do any termination audits, I did not do any claim audits, I did not do any forward pricing audits, I did not do -- there were lots of other types of



audits done at ISN and I did not do them.
**Q. Did anyone assist you with these incurred cost audits?**
A. No, I pretty much did them myself.
**Q. And was most -- I realize that's an ambiguous term -- was the majority of your time actually spent on-site at ISN doing these incurred cost audits?**
MR. VOHRA: I will object to the relevance of this line.
But go ahead and answer the question.
THE WITNESS: When I was doing the audits from '88 to '91, indeed, I spent roughly a year on-site.
BY MR. SINGER:
**Q. And who was the ISN CFO at that time; do you recall?**
A. I don't know that they had one.
**Q. Who was your point of contact at ISN?**
A. I'm trying to remember his name.
**Q. Okay.**
A. The year that I did this was '93, '94,



so you're taking more than a decade ago.
Come on, Ellen. Well, it's one of those tip-of-the-tongue type of things.
**Q. Okay.**
A. It's not going to come.
**Q. Since the 1998 incurred cost audit that you worked on --**
A. Um-hum.
**Q. -- again, you performed no other audit work in connection with ISN?**
A. That's right.
**Q. Have you, in the past at DCAA, audited termination settlement proposals?**
A. Yes, I have on occasion. Yes, on occasion I've done termination settlement proposals.
**Q. About how many such proposals have you audited?**
A. Maybe four, four or five.
**Q. And do you know approximately how long each of these audits took you? Did they vary or are they approximately -- it takes a couple of**



**weeks or three weeks or some approximation?**
MR. VOHRA: Objection.
THE WITNESS: They varied.
BY MR. SINGER:
**Q. From what to what?**
A. Quite a number of years ago I did a small one that may have taken a couple of weeks to do. And then I've done --
**Q. Is that --**
A. -- a couple of larger ones.
**Q. When you say "small" what are you referring to?**
A. I recall doing one that was a subcontract, actually it was a subcontract, not a prime contract, and it was small both in monetary size, in complexity, in whatever. And it was at a very small contractor, you know, who was about at that time maybe 2 million in revenues type, you know, was a small, it was small in every way.
**Q. Okay, and that took a couple of weeks?**
A. I'm thinking it took a couple. It doesn't mean I literally worked every hour of

those couple of weeks. You go in, you read it over, you go in, you ask for things, they have to get them together, you move -- you do something else, you go back, you know? That's the way it works.

**Q. Did you -- did you do an audit of a termination settlement proposal actually on-site at the contractor? Have you ever done that?**

A. I have never done one where the entire thing was done there, no. But in the cases that I have done I spent, you know, time there.

**Q. Okay.**

A. Gee, I recall one walking around and looking at the big thing, ha.

**Q. Let me show you what has been marked previously as Moser Deposition Exhibit Number 1.**

A. Okay.

**Q. And it's been identified as ISN's termination settlement proposal connected with this contract.**

A. Yes.

**Q. To be clear, that is a document that**



**you reviewed last back in January of 2004?**

A. Yes. This would have been in the audit work papers --

**Q. Okay.**

A. -- for the termination proposal.

**Q. Did you not review this document in preparation for your deposition this morning.**

A. No, I did not.

**Q. Okay.**

**Let me show you what has been marked as Moser Deposition Exhibit Number 2, which has been identified as the complaint in this current action.**

A. Um-hum.

**Q. Have you ever seen that document?**

A. Yes.

**Q. When is the last time you saw that document?**

A. In 2004, the spring of 2004 when I was contacted by McBurney and Knoth. One of the things I asked for and received was a copy of the complaint.



**Q. Okay, have you been contacted in the past, putting aside this case, in connection with other litigation where ISN is a party?**

A. Yes.

**Q. Okay, and what other case or cases?**

MR. VOHRA: I'm going to object to the relevance.

THE WITNESS: You --

MR. VOHRA: Just a second, Ellen.

I'm going to object that this line of questioning is outside of the scope of matters that have been identified in the notice of deposition pursuant to rule 30(b)(6), which has been identified as Erdelsky Exhibit Number 1.

You can go ahead and answer.

THE WITNESS: yes.

BY MR. SINGER:

**Q. Okay, and what case or cases?**

A. Every case? In the last, oh, eight years I have probably been contacted at some point on every one.

Or I have had reason to try to



contact. I explained about the database earlier. And, of course, all of ISN's cases would be in this database.

**Q. And the purpose in contacting you was for someone to get information from the database?**

A. No, no, not from the database but information from the files.

**Q. From the DCAA files?**

A. From DCAA files.

**Q. Okay.**

A. Yes.

**Q. Okay, fair enough.**

A. But I make contact and people contact -- I make contact if they don't contact me because of the database. So that's why I say every ISN case because every ISN case is in the database.

**Q. Well, how does an ISN case get into the database unless someone provides you that information?**

MR. VOHRA: Objection as to relevance.

THE WITNESS: Right, somebody will

Page 42

provide me with the information.
BY MR. SINGER:
**Q. And is that generally the government's counsel or the person who makes the request for DCAA material?**
A. I'm trying to think of the other contractors too, not just ISN because there are other contractors in there.
And the information can come to me from another -- a supervisory auditor. It can come to me from our region if they learn of some particular item. They can -- it can come to me, say, the Navy if it is one of their -- just many directions.
I can learn of the existence of something and then I will seek out what I need. This database doesn't contain a whole lot of information. I mean, it's a case number and, you know, a brief description and, you know, that kind of stuff.
**Q. Is it publicly available?**
A. No, it's for tracking internally.

Page 43

**Q. Let me show what you has been marked Moser Deposition Exhibit 3.**
A. Um-hum.
**Q. Which is the DCAA audit report of December of 19, 1996 regarding the termination settlement proposal.**
A. Yes. Yes.
**Q. Okay, and you last reviewed this again in January of 2004?**
A. Right.
**Q. And you did not review it in connection with your deposition this morning?**
A. That's right.
**Q. Let me just ask you some questions about this, recognizing you haven't reviewed it since January of 2004.**
A. Um-hum.
**Q. On page 93, which is the second page of the report under Significant Issues --**
A. Um-hum.
**Q. -- paragraph 1, it says that:**
**"The results are qualified**

Page 44

**because we have not yet received a copy of the current technical report regarding the estimate to complete/estimate of completion, and the inventory verification report."**
A. Yes.
**Q. Okay, do you know, sitting here today, what that term qualified the results are? Qualified, what the term "qualified" means?**
A. When we qualify a report what we are saying is that we did not receive a piece of information that might, in fact, have an impact on the opinion of a greater or lesser extent.
**Q. Is the obligation to provide the technical report an obligation of the government?**
A. I don't know about the word "obligation".
**Q. Is it provided by the government?**
A. It is. Yes, we make a request to the person who's asking for the audit when there is a termination for an estimate to complete, estimate

Page 45

at completion because we are usually not in a position to do it ourselves, we do not have the skills or --
**Q. Okay.**
A. -- or the knowledge or whatever to do it.
**Q. If there is a terminating contracting officer appointed in connection with the contract the request would be made to such officer?**
A. Yes.
**Q. Do you know if any request was made to the TCO in connection with this termination proposal?**
A. There must be such a request in the file or it would not have been expressed in the report as we have not yet received. So we had to ask for it.
**Q. Is it -- is it -- strike that.**
**From your experience have audit reports or the issuance of an audit report been delayed pending receipt of a technical report if, in fact, it was going to qualify the report?**

Page 46

A. Occasionally one would wait for it, but more often than not we would issue a report without such a technical having yet been received. And when it was received we'd evaluate it and then do a, you know, a -- revise the subsequent, you know, report incorporating it, provided it had any impact on -- on a conclusion.
If we got it afterwards and it didn't, we wouldn't bother doing, you know, a revised report. But if it did, we would.
**Q. There was no revised report done in --**
A. Right.
**Q. -- in this matter; correct?**
A. That's true.
**Q. In fact, you testified earlier that DCAA did receive the technical report?**
A. No, I did not, I said we got the inventory report.
**Q. So you never have received the technical report?**
A. As far as I know I found no evidence that we received any technical report regarding

Page 47

an estimate to complete or an estimate at completion as a result of the request.
The word is supplementary report, not revised report, pardon me. It's been bothering me; I knew that wasn't the right word. Supplementary.
**Q. On page 94, which is the next page --**
A. Um-hum.
**Q. -- under Scope of Audit?**
A. Yes.
**Q. Mr. Monastero assessed the control risk as high here.**
A. Um-hum.
**Q. Okay, and he testified yesterday that as a result he -- he undertook further or greater testing than he would if the control risk was something lower than high.**
A. Right.
**Q. Is that a standard practice of DCAA?**
A. Yes. Yes.
**Q. Okay.**
**On page 97, if you would --**

Page 48

A. Um-hum.
**Q. -- under the category Profit, the second paragraph?**
A. Um-hum.
**Q. If you would read that, please?**
MR. VOHRA: I am going to object, the audit report speaks for itself.
But you can go ahead and read it.
THE WITNESS: you want me to read it out loud?
MR. SINGER: No, just read it to yourself, if you would.
THE WITNESS: (Reading.) Okay, I've read it.
BY MR. SINGER:
**Q. Okay, under the Federal Acquisition Regulations, is it practice for DCAA to calculate a loss on a contract in connection with a termination settlement proposal?**
A. Yes, if it can be done.
**Q. Okay, and in this case, in reading this paragraph, despite counsel's objection that**

Page 49

**it speaks for itself, it says here that the loss calculation was not applied.**
A. Right.
**Q. And, in point of fact, is that a correct statement, is there one loss calculation?**
A. The loss calculation referred to was not applied.
**Q. Okay, and that was because the government acknowledged that ISN was due some form of equitable adjustment on this contract due to various changes to the statement of work?**
A. That is what the auditor thought at the time.
**Q. Okay.**
**And, in summary terms, how does the government's view that ISN is entitled to some form of equitable adjustment have anything to do with calculate -- making the loss calculation under the contract?**
A. You cannot determine the total value of the contract, and that's part of the loss calculation.

**Q. Well, you can determine the loss calculation on the contract through complete performance, can you not? Assuming -- putting aside the equitable adjustment portion.**

MR. VOHRA: Calls for speculation.

THE WITNESS: In order to do this calculation you have to know the total value of the contract. That's part of the calculation, okay?

If there's some aspect of the contract where it is uncertain, you know, at the point you're trying to do this then you can't do the calculation.

And it is apparent that the auditor at this point in time it was his understanding right or wrong, right? that -- that the total value of the contract was not determinable so you can't do the loss calculation.

BY MR. SINGER:

**Q. And the reason he said you can't determine the total value is because there's been no agreement on any adjustment?**



A. Yeah, that's what he said, what he said here. This is what his understanding of the situation was.

**Q. Okay.**

**Now let's go to the first paragraph under Summary of Conclusions on Profit.**

A. Um-hum.

**Q. Where the auditor says that he's questioning the entire claim of profit and he sets forth three reasons.**

A. Um-hum.

**Q. Okay, first, the estimate to complete or percentage of completion.**

A. Right.

**Q. Is it your understanding that that is a percentage of actually the work that was performed up to the stop work order?**

A. A percentage of completion is -- is something that would be estimated, yes, up until a stop work order if there was such a one on the contract, yes.

**Q. And there was a stop work order on**



**this contract --**

A. Yeah.

**Q. -- correct?**

A. So, yeah, if there was someone would make an estimate of a percentage. Although in a contract with line items, which this did, it has, I believe, several different line items, there would be an array of percentages. You know, this one was complete a hundred percent, this one was not, that kind of thing.

**Q. Is that something that the government could do?**

A. Both the government and the contractor usually do both of these things. They are both capable of --

**Q. Of coming up with their own percentage of completion.**

A. Yes, um-hum.

**Q. Which might not be agreeable.**

A. Yes, might not.

**Q. The percentage of completion, however, is different, is it not, to an estimate to**



**complete?**

A. Yes.

**Q. Okay.**

**So when he says that ISN did not provide us with any estimate to complete or percentage of completion --**

A. All he's saying is that ISN didn't provide either one of those items.

**Q. And both of those items could have been done by the government?**

A. The government is capable of doing those things too, yes.

**Q. Okay.**

**Now, the second point is a reference to ISN's significantly underbidding the contract.**

A. Um-hum.

**Q. Okay, and there's no reference to that conclusion by the auditor. In other words, you don't know what that statement is based on?**

A. No, he doesn't state in the audit report what it's based on.

**Q. Have you ever seen anything, any**

**document or been provided any information as to what that conclusion is based on?**

A. Yes. In the work papers, when I looked back in 2004, there were work papers directed exactly at that.

**Q. And what did the work papers contain?**

A. The work papers contained a couple of different things, as I recall. There was notes on a conversation with a Mr. Chapman -- is that the name? -- at ISN, project-manager-type of individual as I recall.

And there was also an ISN document, it might have been a copy of an E-mail or something like that, in -- in which there were statements about the contract being underbid but not about an amount, just about being underbid. It referenced -- the cedrals were referenced, but contracted data line item, those kinds of being underbid but not figured.

There were then a series of work papers that the contractor prepared, that the auditor prepared in which he took the BAFO, it



was a BAFO, information concerning the direct costs and then applied to them the indirect rates that were being used commonly at the time for other bidding purposes as opposed to those that had been used in this particular BAFO. And when he totted it all up he came to this figure.

**Q. Right.**

A. He rounded this figure, came to this figure. Yes, those were in the work papers.

**Q. If you go into the body of this audit report, and you can take as much time as you want, in fact, the auditor found that the proposal used approved provisional rates.**

MR. VOHRA: Objection foundation.

THE WITNESS: No, he didn't. This -- he was speaking of a termination proposal. I'm talking about the BAFO, which was done for the award of the contract which is a different thing entirely.

BY MR. SINGER:

**Q. Okay, so you're saying that the termination settlement proposal used different**



**rates than the contract?**

A. Than the BAFO used? Yes.

**Q. No, I'm talking about the contract. There's a --**

A. The contract was a firm fixed price, there were no -- once it's awarded there aren't any rates in the contract.

**Q. Well, there are rates to calculate the numbers in the contract, aren't there?**

A. In the BAFO.

**Q. Correct. And the government is aware of the rates that are used that get incorporated in the contract, aren't they?**

A. The rates themselves are not incorporated.

**Q. The rates are not incorporated in the BAFO?**

A. They are in the BAFO, they are not incorporated into the contract because that's --

**Q. Is the government not aware of what is incorporated in the BAFO?**

A. Yes.



**Q. And it is aware of what is incorporated before it signs the contract?**

A. Yes.

**Q. So, in this case the contract was signed with the government's knowledge of certain rates being used by ISN.**

MR. VOHRA: And I am going to --

THE WITNESS: Yes.

MR. VOHRA: I'm going to object --

BY MR. SINGER:

**Q. Now, are you saying --**

MR. VOHRA: Excuse me.

MR. SINGER: Go ahead.

MR. VOHRA: For the record, I would like to be clear, Ms. Erdelsky is not testifying on behalf of the government that signed the contract, she is testifying as a 30(b)(6) witness on behalf of the DCAA, the prepared audits --

MR. SINGER: Yeah.

MR. VOHRA: -- of the termination settlement proposal.

She is not qualified to testify as to

what the contract-- or what the government did prior to signing the contract or what it knew in terms of the rates that were incorporated into the contract.

MR. SINGER: Well, I thought she did say that the auditor concluded in auditing the termination settlement proposal that ISN had used different rates in connection with the proposal than it used in its BAFO in the contract.

BY MR. SINGER:

**Q. Isn't that what you said?**

A. The auditor looked at the rates that had been used in the BAFO. He also looked to the rate structure and the rates that were current at the time that the BAFO was done and being used by ISN on other, shall we say, proposals -- they were the forward pricing rates or whatever, I don't like to use that particular term -- and saw that the rate structure being used was different than that which ISN had been using and that the rates were different.

So he took the ones that were --



**Q. Had been using where?**

A. All other procurements that they were using at the time.

**Q. Okay.**

A. You know?

**Q. So --**

A. These are -- these are not the rates that are being specified in here, these are actual --

**Q. First of all --**

A. -- rates having to do with this.

**Q. -- let's establish that everything that you've just testified to does not appear in the audit report before you.**

A. That's true, it appears in the work papers.

**Q. It appears in the work papers.**

A. Right.

**Q. So, would it be fair to say that it's not of sufficient materiality to have been included in this report?**

A. No.



**Q. Do you think the auditor here made an error in not including this information in this report?**

A. No.

**Q. Why did he not include that information in this report?**

A. Did you ask him?

**Q. He didn't recall anything about the report.**

A. Well, you know, it's about ten years ago now so -- I actually looked at his work papers only three years ago or four years ago.

**Q. Other than looking at his work paper --**

A. Papers.

**Q. -- you don't know for a fact what the auditor did in this case.**

A. I -- I only know what shows in the work papers.

**Q. Okay.**

A. Okay?

**Q. Okay, and you never --**



A. And this is -- I'm telling you whether I saw -- and you asked me if I saw anything related to this 900,000, and I said yes, in the work papers and I'm describing in the work paper.

**Q. You are. You are.**

**And did you contact Mr. Monastero and ask him why he didn't include that information in the audit report.**

A. No. Besides that, I didn't know where he was.

**Q. Okay, well, your counsel did.**

A. Pardon?

**Q. Your counsel knew where he was.**

A. Back in 2004 is when I looked at this, right? And I don't know that any of the counsel or anybody at that particular time knew exactly where Ben was anyway.

**Q. Okay, so --**

A. He left the agency.

**Q. -- is it your testimony that -- I mean, as counsel said, this audit report speaks for itself.**

A. Yeah -- well, I don't know --
MR. VOHRA: Objection. That's -- objection.
THE WITNESS: I just --
MR. VOHRA: Ellen, Ellen, you don't have to testify as to what I said previously.
THE WITNESS: (Laughter.)
MR. VOHRA: I'm going to instruct you not to answer that question.
BY MR. SINGER:
**Q. Let me show you what has been marked Moser Number 6 for identification, which is the November 13, 1995 DCAA audit report.**
A. Right.
**Q. Is that another document you reviewed in January of 2004?**
A. Yes, I looked at this, yes, at this audit report, yes.
**Q. Did you actually review this audit report?**
A. Not as much because they were -- I looked more closely at the termination proposal



audit, that's what they were looking at. But I did look at this, it was one of the audits in the file.
**Q. Do you know, beginning on page 165 of that document, do you know where this estimated additional cost to complete was obtained?**
A. The footnote says:
"We reviewed the contractor's August 1995 EAC...took exception to the amounts computed."
Okay, computed, the contractor computed using indirect -- oh, they used the provisional billing rates, okay.
I presume in the work papers in the file you will find a copy of your, that is the contractor's, August 1995 EAC, as well as information about the rates used, both the actuals for the first seven months and the provisionals for 1995.
**Q. Do you know if ISN actually provided as estimate of its additional costs to complete in connection with this audit?**



A. They must have, otherwise he would not have written we reviewed the contractor's August 1995 EAC. He must have the EAC in that file amongst the audit work papers.
**Q. Did you --**
A. When you're doing a progress payment this is the customary way to prepare the audit.
**Q. Did you actually see the estimate to complete?**
A. I would say yes, but that's not because I can envision it in my mind, you know, the particular piece of paper, but because I looked at the audit file in 2004. And I think I would have picked up, shall we say, a gross error of that sort.
I suppose it's possible I might not and that it's not in the file.
**Q. Okay, let me call your attention back to the 1996 audit report (indicating).**
A. Um-hum, um-hum.
**Q. Under paragraph 7, Costs in Excess of Contract Limitations on page 98.**



A. Um-hum.
**Q. It says, quote: "We have questioned $460,708 which is the total proposed costs and profit of $4,877,354, less the contract price of $4,416,646, in accordance with FAR 49.207."**
**Do you agree that that's an incorrect statement?**
A. That it's a what?
**Q. Incorrect statement.**
MR. VOHRA: Objection, foundation.
THE WITNESS: Incorrect?
MR. SINGER: Yes.
THE WITNESS: Incorrect.
MR. VOHRA: Same objection, foundation.
MR. SINGER: Well, you're free to read the report.
THE WITNESS: I don't understand why you -- why -- I believe it is a correct statement.

BY MR. SINGER:
**Q. That the total proposed costs and profit total $460,708?**
A. That "We have questioned $460,708 which is the total proposed costs and profit...less the contract price..."
Yeah. Is there a mistake in subtraction here? Should I check this?
**Q. Well, in point of fact, the auditor questioned proposed costs and profit exceeding 460,708, didn't he?**
A. Yes, but we have other things here that have to do with things like stop work and settlement costs and other -- you know, there are other things happening here besides just the -- the work.
**Q. Well, is it correct to say, in reading this audit, that the auditor questioned more than $460,708 in total proposed costs and profit?**
MR. VOHRA: Objection, the audit report speaks for itself.



MR. SINGER: Well, apparently it doesn't.
BY MR. SINGER:
**Q. Do you want to turn to page 95 and we'll go through it?**
MR. VOHRA: Well, that would be foundational which will help her answer these questions.
MR. SINGER: Well, she's free to read the report.
THE WITNESS: Okay, I --
MR. SINGER: I don't really have to treat her like she's a 10th grader.
MR. VOHRA: Well, if you're going to ask her a question based on something you're looking at --
MR. SINGER: She's free to read the report.
MR. VOHRA: It will certainly make this go faster if you have something in mind to walk her through it.
MR. SINGER: Okay.



THE WITNESS: As you say, I'm an auditor.
BY MR. SINGER:
**Q. Okay, can you turn to page 95? This isn't nearly as hard is you're making it, but turn to page 95.**
A. I'm on page 95.
**Q. Did the auditor not, in fact, question costs in excess of the contract of $460,708?**
A. It says costs in excess of contract, 460,708. That's --
**Q. Right, questioned.**
A. Right.
**Q. Under the questioned column; correct?**
A. Yeah.
**Q. And did he also not question profit of 443,396?**
A. Yeah.
**Q. Okay.**
A. This results in a curiosity --
**Q. Now, if you go back --**
A. -- when you subtract it.



**Q. If you go back -- I'm just asking you if you go back to page 98, is it correct to say that the total proposed costs and profit questioned by the auditor exceeded $460,708?**
A. In this calculation you would not include, all right, items that are not directly related to the contract price, for example, stop work and that sort of thing.
Anyway, 443 and 443, comma 396, (calculating).
Okay, the figures that the auditor used in this case to come up with this number --
**Q. What is "this" number? What are you referring to?**
A. (Indicating.) Back here, 4,877,354.
**Q. No, I'm talking about the 460,708.**
A. Which is the difference between that and the contract price.
**Q. So the way --**
A. The contract price is four-four-one-six --
**Q. Okay, just to be clear, when you read**

**we have questioned 460,708, which is the total proposed cost and profit --**

A. Which is right over here, it's these numbers (indicating).

**Q. Right.**

A. It's these two numbers (indicating).

**Q. Correct. Well, the profit number is, in fact, 443,396; is it not?**

A. Well --

**Q. Don't you see that?**

A. Yeah.

**Q. Isn't what he's referring to the profit column and the costs in excess of contract column in that sentence?**

A. He is referring to these two, these two figures (indicating).

**Q. He's referring to, you're saying, the subtotal of ISN's proposal plus what else?**

A. The profit. It's this line and this line (indicating). These two lines (indicating).

**Q. That's how you read that, that sentence?**



A. Yeah, 4,877,355.

**Q. Okay, and that's how you read that?**

A. Yeah.

**Q. That's how you read that sentence?**

A. Yeah, where the number came from.

**Q. Okay, fair enough.**

A. Which is what is proposed here.

**Q. And on page 99, sub-paragraph b., Basis of Claimed Cost?**

A. Let's see, page 99 --

**Q. Where it says, quote:**

**"ISN did not indicate in its termination settlement proposal any costs claimed in excess of the contract limitations." End quote.**

A. Yeah.

**Q. Do you agree that that's an inaccurate statement or incorrect statement?**

A. As far as I know it's accurate.

**Q. Okay.**

A. In that the -- we can look, you have it, a copy somewhere here of the termination



settlement proposal, I believe, which is right here (indicating). And I don't know, I'd have to look through to see whether there was any indication in here about that fact, but I don't think there is. I'd have to read through all of it, you know, but this is the proposal.

**Q. And you'd read through the proposal with respect to what portion of that sentence that we just read? What's that going to help you with?**

A. I would -- the statement says:

"ISN did not indicate in its termination settlement proposal any costs claimed in excess of the contract limitations."

So I presume the auditor read through the proposal and saw there was no indication of this.

I must say, in general, the DCAA has a customary way of expressing these footnotes. They take a standard form and occasionally -- and this, I think, is one of them -- it becomes a



little awkward, the statements that you put in here. You have to put in something for basis of claimed costs, which is rather awkward in this instance and so you end up with a statement like this. But it's just awkward.

**Q. Awkward how so? I don't know what context in which you are using that word.**

A. It says basis of the claimed cost and there wasn't any.

**Q. Well --**

A. (Laughter.) It's -- it's awkward.

**Q. The termination settlement proposal asserts a claim, does it not, for settlement by ISN?**

A. Yes.

**Q. Okay, and the auditor, I take it, was aware of whether there were any contract limitations financially?**

A. Um-hum.

**Q. Correct? I mean, he would have been aware that it was a fixed price contract?**

A. Yes.

**Q. So, is it -- if you have your settlement proposal, which exceeds the amount of your fixed price contract, then is that not a claim in excess of contract limitations?**
A. Perhaps you could say that, yeah.
**Q. Okay.**
A. In which case you have a different awkward answer to the DCAA schema for setting up a footnote.
**Q. So you're treating --**
A. All I'm trying to say is that the scheme that the agency has defined for footnotes --
(Phone ringing.)
MR. SINGER: Let me just take this call. Can we break for a five minutes?
MR. VOHRA: Sure.
(Whereupon, there was a short pause in the proceedings.)
MR. SINGER: Back on the record.
BY MR. SINGER:
**Q. What is your understanding of the**



**purpose of this audit report that we we've been discussing, the December 1996 report?**
A. The purpose of the audit report is to do an evaluation on the contractor's termination settlement proposal, provide this information to the terminating contracting officer for his or her use in reaching a settlement.
**Q. Now, if that report is qualified does the purpose change?**
A. No.
**Q. Why not?**
A. I don't see how the purpose would change. The purpose is to provide information for the settlement to help the terminating contracting officer achieve a settlement.
**Q. So, are you saying that the qualification is irrelevant?**
A. No, it's just another fact for the terminating contracting officer. As well as information such a TCO will develop from other sources; an audit report is one source of information for the settlement.



**Q. Well, in this case this report disallowed all costs and profit in excess of the original contract amount; is that correct?**
A. Yes.
**Q. And that results -- those results or that result was qualified; was it not?**
A. Yes.
**Q. Okay, and it was qualified for the reasons set forth in the report.**
A. Yes.
**Q. Okay.**
**Given that, how is this report to be utilized by anyone?**
A. Ask the contracting officer how they utilize such reports. We issue qualified reports quite often.
**Q. Okay, well, we know there are different forms of the qualification in an audit report; correct?**
A. Um-hum, yeah, there are several.
**Q. Okay, in this case the qualifications, as we went over, dealt with the lack of certain**



**documentation --**
A. Um-hum.
**Q. -- connected with the contract; correct?**
A. Um-hum, yes, yes.
MR. VOHRA: Make sure you answer the questions yes or no.
BY MR. SINGER:
**Q. Okay, and if that documentation does not exist and if the DCAA has disallowed what we've been over as profit and cost in excess of contract, then how is this report to be utilized by anyone?**
A. The contracting officer can use all the information in this report. And some of these things that we mentioned may have come directly to the contracting officer.
**Q. Such as the technical report?**
A. Such as the technical report could go directly to the contracting officer. Or the inventory verification report, I'm sure went to the contracting officer. I feel confident about

that.
There's a lot of information in this report for the contracting officer.
**Q. Well, on those two issues, that is, again, the profit and costs in excess of contract amount, we'll call that one issue, what other information is there in this report on those two disallowances other than the qualification?**
A. I don't understand the intent of the question. I don't --
**Q. You said there's other information other than the disqualification, the reasons for the disqualification on these two issues.**
**What other information is there in this report?**
MR. VOHRA: I'm going to object to the question because it mischaracterizes her previous testimony.
MR. SINGER: Okay.
THE WITNESS: There is information about the classification of costs, there's information in the sense of the total costs



incurred. There is --
BY MR. SINGER:
**Q. Well, there's no dispute --**
A. You know, this -- this report is advisory to the contracting officer.
**Q. What does that mean?**
A. Meaning it is the contracting officer's obligation to make decisions in regard to this matter taking into consideration all information received. This is only -- this audit report is one item of information.
**Q. Is the fact that the auditor, in reference to the top of page 94 and the 10 percent profit factor, do you see that?**
A. Yes, I see the sentence. Yes, I see the statement there.
**Q. It says: "ISN could not support the proposed 10% profit factor with any Estimates to Complete."**
A. Yes, that's the statement.
**Q. Now, I can read that two ways and I**



**have read it two ways.**
A. Okay.
**Q. I've read it -- the first time I read it it said to me that the claim of 10 percent for profit could not be made without estimates to complete. That's the first way I read it.**
**And then I read it again to mean that the proposed 10 percent amount, the amount itself could not be supported without estimates to complete.**
**Do you see the two ways I read it?**
MR. VOHRA: I'm not sure I see the two ways that you read that.
THE WITNESS: I'm not sure I see it.
MR. VOHRA: Well --
THE WITNESS: I quite understand that when people read things they often see different possibilities within the statements.
MR. VOHRA: Well, why don't you ask her what she understand this to mean.
MR. SINGER: Well, because you would object on the fact that it speaks for itself.



MR. VOHRA: She can still answer though.
BY MR. SINGER:
**Q. ISN proposed or utilized a 10 percent profit factor in its termination settlement proposal; correct?**
A. Yes.
**Q. Okay, and the auditor is saying here that that was not supported with any estimates to complete; is that correct?**
A. Yes.
**Q. Okay, what is the relationship between the use of a proposed 10 percent profit factor and estimates to complete?**
A. When I read this what I walked away with was that if the contractor provided its actual costs, plus an estimate to complete the rest of the contract, okay, that that total cost now estimate at completion, less taken from the contract price, right, would show approximately that they anticipated making a 10-percent profit on the contract.

**Q. Okay.**
A. That's what I walked away with when I read the sentence.
**Q. So, just to be clear, you did not consider or this auditor didn't consider the profit factor in contract performance up to stop work.**
A. I have no idea.
**Q. So you don't know whether the termination settlement proposal claim for profit is a claim based upon both performance up to stop work and then completion performance?**
A. I have no idea.
**Q. Okay.**
**Let me show you what's been marked as Moser Number 7.**
A. Um-hum.
**Q. Have you seen that document before?**
A. Yes, I saw this document in the spring of 2004.
**Q. Okay.**
A. When I first looked in what was in the



files.
**Q. Did you review it?**
A. I read it then, yes. I have not read it -- I've looked at it; I haven't read it since. That's the time in which I read it.
**Q. And what about Moser Exhibit Number 8?**
A. No, I never saw this one. I don't believe there's a copy of this in the file. There are many. I have not gone through every single solitary piece of paper in these files, but I don't recall seeing it.
**Q. Okay, you never spoke to Denise Jones?**
A. No, I have no --
**Q. Or Roscoe Crawford?**
A. No, I don't even recognize that name, no.
**Q. Or Jeffery Bergdahl?**
A. No, I never spoke with anybody by that name.
MR. SINGER: Okay, I think I'm done, thank you very much.
MR. VOHRA: I have just a couple of



quick follow-up questions, Ellen.
EXAMINATION ON BEHALF OF THE DEFENDANT
BY MR. VOHRA:
**Q. Going back to what has been marked as Moser Exhibit Number 3, this was the December 1996 audit of ISN's termination settlement proposal.**
A. Um-hum.
**Q. You stated that the last time that you read this cover to cover was in January of 2004?**
A. That's correct.
**Q. Correct?**
A. Yes.
**Q. And, in fact, you have reviewed this more recently?**
A. Yes.
**Q. You and I have walked through this less than two months ago?**
A. Yes. Yes.
**Q. I just want to confirm a couple of things you said.**
**You had said that you didn't believe**



**there were any errors in the '96 audit report; is that correct?**
A. Right. As far as I know there are no significant errors in the report.
**Q. And you, in fact, said that Ben Monastero, the auditor who was in charge of this audit report, you had looked at his work papers and you thought that they were good?**
A. Yes, I did think they were good.
**Q. Now, Mr. Singer had pointed you to page 98 of the audit report, if you could go to that now?**
A. Um-hum.
**Q. Paragraph 7, where it says Cost in Excess of Contract Limitations. He asked you if you thought there was an error in the first question or the first sentence under Summary of Conclusions, which states:**
**"We have questioned $460,708 which is the total proposed costs and profit of $4,877,354 less the contract price..."**

A. Right.
**Q. In fact, he directed you to page 95. If you would go to that now?**
A. Um-hum.
**Q. He said that the audit report not only questioned the 460,708 identified in costs excess of contract, it also identified profit in the amount of 443,396.**
**Do you see that?**
A. Um-hum.
**Q. Okay, if you turn to page 97 of this audit report --**
A. Okay.
**Q. -- paragraph 5, entitled Profit under Summary of Conclusions, the first sentence states: "We have questioned the entire $443,396 of claimed profit..."**
A. Right.
**Q. I want to ask, is that 443,396 the same 443,396 identified on page 95 of the audit report under questioned cost to the right of profit?**



A. Not really. You are subtracting and doing two different things.
**Q. Okay.**
A. And if you will note the difference column, right?
**Q. Right.**
A. The 460, you know, you don't see the profit in that column.
**Q. Right. Let me --**
A. Okay? It's the way -- how can I say, it's the way DCAA expresses something.
**Q. Okay, I guess my question was more there are two identified questioned costs on page 95.**
A. Right.
**Q. There's the profit which is questioned at 443,396.**
A. Right.
**Q. And then there's cost in excess of the contract, which is 460,708.**
A. Right.
**Q. My question is if both of these are**



**identified later on in the audit report and my first part was at paragraph 5.**
A. Yes, they were both identified. Yes.
**Q. And paragraph 7 we have identified?**
A. Yes.
**Q. So both are identified?**
A. Yes, both of them are identified.
**Q. Okay.**
**Finally I wanted to ask you, you said there were no errors in this report. Mr. Singer had asked you the significance of the audit report being qualified.**
**Now, is it commonplace for DCAA to issue qualified audit reports?**
A. It is very common practice.
**Q. Okay, and, in fact, the purpose of these reports is to provide a recommendation to an agency or terminating contract officer; is that correct?**
A. Yes.
**Q. Okay, these audit reports are in no way mandatory.**



A. That's correct, they are advisory to them.
**Q. You're advisory?**
A. And they are the ones that make the decision and they don't always agree with us.
**Q. And a terminating contracting officer isn't limited to the information provided in an audit report in terms of negotiating a settlement with the contractor, is he?**
A. That's true, he is not limited.
**Q. There is other information that he can consider?**
A. Yes.
**Q. And he doesn't have to consider this at all if he chooses not to?**
A. Yes. They usually do not choose to ignore it entirely.
**Q. All right, but again, they can.**
A. Yes.
MR. VOHRA: Okay, I have nothing further.
MR. SINGER: Okay, good.

(Whereupon, the deposition was concluded at 11:55 a.m.)



INS -VS- THE UNITED STATES

ACKNOWLEDGMENT OF DEPONENT

I, ELLEN E. ERDELSKY, do hereby acknowledge that I have read and examined pages 1 through 90, inclusive, of the transcript of my deposition taken on Tuesday, October 31, 2006, and that:

(check appropriate box)

[ ] the same is a true, correct, and complete transcription of the answers given by me to the questions therein recorded.

[ ] except for the changes noted in the attached Errata Sheet, the same is a true, correct, and complete transcription of the answers given by me to the questions therein recorded.

_______________ _________________________

Date Signature



ERRATA SHEET

| AS WRITTEN: | CHANGE TO: | PAGE | LINE |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



CERTIFICATE OF NOTARY PUBLIC

I, Curtis R. Cloward, a Notary Public in and for the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

___________________________

Curtis R. Cloward, CSR
Notary Public in and for
the District of Columbia

My commission expires: September 30, 2007