No. 02-796C
(Judge Allegra)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

INFORMATION SYSTEMS & NETWORKS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, Room 12074
Washington, D.C. 20530
Tele: (202) 307-0277

March 16, 2007

Attorneys for Defendant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-796C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules for the United States Court of Federal Claims, defendant respectfully submits the following proposed findings of uncontroverted fact.

Contracts

1. On July 15, 1994, the Government, through the Department of the Navy, awarded Contract No. N00600-94-C-0389 ("contract 0389"), to plaintiff Information Systems And Networks Corporation ("ISN"). Def. App. 1.[1] The ultimate customer was the Navy's Space and Naval Warfare Systems Command ("SPAWAR"). Id. The contract required ISN to provide all material, labor, and services to engineer, install, and test an automated technical control system ("ATC") for three Naval turnkey facilities located at the switching centers at Hampton Roads, Virginia, Pearl Harbor, Hawaii, and Camp Smith, Hawaii. Def. App. 9. The contract was for a firm fixed price of $4,416,645.54. Def. App. 3. The contract also contained four options to provide the same system at several other installations around the world. Def. App. 3-7.

[1] Def. App. ___ refers to pages from the appendix attached to this filing.

2. Section G.2 of contract 0389 states, in relevant part:

> **G.2 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER, SUP 5252.243-9000 (JAN 1992)**
>
> (a) Except as specified in paragraph (b) herein, no order, statement, or conduct of Government personnel who visit the Contractor's facilities, or in any other manner communicate with Contractor personnel during the performance of this contract, shall constitute a change under the "Changes" clause of this contract.
>
> (b) The Contractor shall not comply with any order, direction, or request of Government personnel unless issued in writing and signed by the Contracting Officer, or pursuant to specific authority otherwise included in this contract.
>
> (c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and, notwithstanding provisions contained elsewhere in this contract, said authority remains solely with the Contracting Officer. In the event the Contractor effects any change (s) at the direction of any person other than the Contracting Officer, that change shall be considered to have been made without authority and no adjustment in price shall be made in the contract (or Delivery Order) to cover any increase in charges incurred as a result thereof.

Def. App. 24.

3. The contract identifies "Roscoe W. Crawford" as the principal contracting officer.

Def. App. 24.

4. Section G.4(a) of contract 0389 states, in relevant part:

> (3) When in the opinion of the contractor, the COTR requests effort outside the existing scope of the contract, the contractor will promptly notify the PCO in writing.
>
> (4) No action will be taken by the contractor under such technical instruction unless the PCO or ACO has issued a contractual change.

Def. App. 25.

5. Contract 0389 incorporates by reference FAR section 52.243-1 (Changes – Fixed Price).

Def. App. 39.

6. Section I.46 of contract 0389 states, in relevant part:

(a) After contract award, the Government may solicit, and the Contractor is encouraged to independently propose, changes to the equipment, software specifications, or other requirements of this contract. These changes may be proposed to save money, to improve performance, to save energy, or to satisfy increased data processing requirements. However, if the proposed changes relating to improved performance are necessary to meet increased data processing requirements of the user, those requirements shall not exceed the contract requirements by more than 25%. If the proposed changes are acceptable to both parties, the Contractor shall submit a price proposal to the Government for evaluation. Those proposed changes that are acceptable to the Government will be processed as modifications to the contract.

* * * *

(c) Change proposals submitted to the Contracting Officer shall be processed expeditiously. The Government shall not be liable for proposal preparation costs or any delay in acting upon any proposal submitted pursuant to this clause. The Contractor has the right to withdraw, in whole or in part, any change proposal not accepted by the Government within the period specified by the change proposal. The decision of the contracting officer as to the acceptance of any such proposal under this contract shall be final and shall not be subject to the "Disputes" clause of this contract.

(d) The Contracting Officer may accept any change proposal submitted pursuant to this clause by giving the Contractor written notice thereof. This written notice may be given by issuance of a modification to the contract. Unless or until a modification is executed to incorporate a change proposal under this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract

Def. App. 41-43.

7. On March 28, 1995, ISN formally executed a subcontract agreement with Datacomm Management Sciences ("Datacomm"). Def. App. 45. In accordance with the

agreement Datacomm was to provide ISN with the supplies and software ISN required for completion of the contract. Def. App. 46. ISN agreed to pay Datacomm a firm fixed price for each item ISN ordered. Id.

The Engineering Change Proposal

8. Almost from the beginning of contract performance, ISN was behind schedule. ISN was late in delivering contract data requirements lists ("CDRL"), as well as behind the overall installation for all three sites. Def. App. 59-63. While there were many reasons for ISN falling behind schedule, chief among them was the fact that ISN had initially understaffed the contract with temporary hires and that ISN did not understand the magnitude of the project. Id. Indeed, the problems required ISN to replace its program manager just a few months into the start of the project. Id.

9. The contract called for ISN to modernize the existing switching equipment in the turnkey facilities. The communications configuration at the Hampton Roads facility however, was continually changing. Complaint ¶ 6. On June 20, 1995 to address ISN's performance problems and the changing configuration, ISN submitted an Engineering Change Proposal ("ECP"). Complaint ¶ 7.

10. In a June 26, 1995 letter, The Navy contract specialist, Lisa Murtha, wrote to ISN that: "[a] formal modification to the contract will be issued for the combination of both the formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." Def. App. 64. That letter further indicated that the ECP "will be reviewed by SPAWAR with comments" to be provided. Id. In addition, the letter indicated that ISN was required to provide a delivery schedule for all sites in Lot I. Id.

11. On July 20, 1995, Jeff Bergdahl, the contracting officer's technical representative sent a facsimile to Roscoe Crawford, the contracting officer, that included a memorandum from SPAWAR to FISC. The memorandum indicated in paragraph 1 that SPAWAR reviewed the ECP and "technically approves ISN's proposed engineering changes," but recommended that all terms be negotiated. Def. App. 66. In paragraph 2, the memorandum addressed ISN's cost analysis, recommending, among other things, a further cost breakdown of the additional charges. Id.

12. Contracting officer Roscoe Crawford testified that discussions that he had with Mr. Bergdahl indicated that SPAWAR viewed the ECP's costs as unreasonably priced. Def. App. 136. In addition, Mr. Crawford testified that ISN never provided a revised installation cutover schedule as requested by Ms. Murtha's June 26, 1995 letter. Def. App. 137.

13. On August 23, 1995, an ISN employee, in an internal ISN memorandum, explained to Mr. Robertson that:

> PER FONCON WITH LISA MURTHA, 22 Aug 95:
>
> 1) She has not looked at the ECP, to date.
>
> 2) Due to end of year procurements(8a-2 each) She will not be able to work on our ECP until Mid-Sept 95.
>
> * * *
>
> 5) I talked with Don Tabasco about contract and FAR requirements for Timely ECP processing by the government. He recommends that we take a more forceful approach with the contracting officer. You might want to touch base with him personally.
>
> * * *
>
> If you decide to talk with Roscoe, please give me a heads up so I can do the same to Lisa?

Def. App. 69. Additionally, ISN included in its submitted progress reports for September through December 1995, that the June ECP had not been approved. Def. App. 70-84. On January 26, 1996, Mr. Don Tabasco, ISN's manager of contracts, wrote to the Government to complain about the fact that ISN had not received approval of the June 20, 1995 ECP. Def. App. 85-86.

Funding

14. On August, 31, 1995, Jeffery Bergdahl, the contracting officer's technical representative informed ISN that the ECP was "technically" approved. Def. App. 87. Further, Mr. Bergdahl acknowledged that additional funds would have to be added to the contract to accommodate the ECP. Id.

15. On August 23, 1995, just one week prior to the writing of the above memorandum, SPAWAR, had reprogrammed $789,319 from another contract to partially fund the ECP. Def. App. 88. On November 27, 1995, the reprogrammed funds were withdrawn from contract 0389 due to an emergent requirement. Def. App. 89. The reprogrammed funds represent the only monies added to contract 0389. As of November 27, 1995, there was no money added to contract 0389 to fund the ECP.

16. In addition, Mr. Bergdahl also specifically stated that the "agreed configuration" that had been proposed by ISN and technically approved by SPAWAR, "obviously was never set forth in the contract." Def. App. 145.

17. Meeting notes from a December 6, 1995 meeting between Roscoe Crawford and SPAWAR representatives indicate that Mr. Crawford "never modified the contract to re-establish the deliv. schedule on any of the sites because he could never get a good idea of what a realistic

new deliv. schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo." Def. App. 130.

18. ISN's program manager testified that ISN was aware that without a formal modification of the contract, ISN could not start work on the ECP. Def. App. 133. Mr. Robertson also testified that ISN was aware that the Government did not possess funding for the ECP, and that without such funding, the ECP could not be approved. Def. App. 134.

Termination

19. On February 20, 1996, the Government issued a stop work order to ISN. Def. App. 90. This was preliminary to the Government terminating ISN's contract for the convenience of the Government. On February 23, 1996, the Government took possession of all of the Government inventory retained by ISN. Id. The contract was formally terminated for the convenience of the Government on March 15, 1996. Def. App. 91. At the time of the termination, ISN had partially completed only the installation at the Hampton Roads Virginia site. ISN did not even start the installation at the two Hawaii sites. Id.

20. Pursuant to Part 49 of the Federal Acquisition Regulations ("FAR"), ISN, on June 6, 1996, submitted a termination settlement proposal ("proposal"). Def. App. 96-104. ISN sought payment of $5,060,578 on a $4,416,646 contract in which ISN had only performed work on a third of the contract requirements. The proposed amount included $443,396 in profit. Id. ISN also stated that it had spent $2,401,080 for materials. Id. There was no discussion about any outstanding payments due to ISN's subcontractor, Datacomm. In fact, according to a request letter from Datacomm, ISN still owes Datacomm $196,688.68 plus interest for materials Datacomm furnished to ISN pursuant to their subcontract agreement. Def. App. 105.

21. On December 19, 1996, the Defense Contract Audit Agency ("DCAA") issued audit Report No. 6311-97B17100001. Def. App. 106. At the request of the termination contracting officer, DCAA had conducted an audit of ISN's settlement proposal. Id. The auditor concluded that he could support a $4,049,532 settlement with ISN. Def. App. 109. The auditor questioned $1,011,047 of ISN's $5,060,578 proposal. In particular, all of the claimed profit was questioned. Def. App. 107. The disallowance was due in part to a previous audit of ISN's request for progress payments 3-5. Def. App. 116-123. The earlier audit had concluded that ISN was in loss position on contract 0389. Def. App. 117.

Previous Proceeding

22. On October 3, 2001, this Court, Judge James Turner presiding, issued a bench ruling to the effect that there was no settlement agreement between ISN and the Government. Def. App. 124-128. On March 29, 2002, ISN moved to dismiss its other counts without prejudice, pending a decision upon appeal. This Court granted ISN's motion on April 2, 2002.

23. This Court's October 3, 2001 ruling was subsequently affirmed by the United States Court of Appeals for the Federal Circuit on October 16, 2002. Def. App. 129.

24. In July 16, 2002, ISN refiled its complaint re-alleging counts for breach of contract, breach of the duty of good faith and fair dealing, constructive change, equitable adjustment, and attorney's fees. Compl.

25. On April 12, 2005, this Court dismissed ISN's breach of contract claim (Count I). Specifically, the Court held that the lack of a written modification demonstrated that there was no meeting of the minds with regard to the ECP, and that no agency official with authority had assented to the ECP, either in writing or by conduct. Def. App. 146-152.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, Room 12074
Washington, D.C. 20530
Tele: (202) 616-2377
Steven.Mager@usdoj.gov

March 16, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on this 16th day of March 2007, a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice

No. 02-796C
(Judge Allegra)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

INFORMATION SYSTEMS & NETWORKS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

APPENDIX OF EXHIBITS SUPPORTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, Room 12074
Washington, D.C. 20530
Tele: (202) 307-0277
Steven.mager@usdoj.gov

March 16, 2007

Attorneys for Defendant

# INDEX TO APPENDIX

**DEFENDANT'S EXHIBITS** **PAGE(S)**


1. Extract from Contract No. N00600-99-C-0389. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-44
2. Extract from Subcontract Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-58
3. Excerpts from Deposition of William Robertson, pp. 76-79 . . . . . . . . . . . . . . . . . . . 59-63
4. Letter from Lisa Murtha, to ISN, dated June 26, 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . 64
5. Facsimile from Jeff Bergdahl to Roscoe Crawford, dated July 21, 1995 . . . . . . . . . 65-68
6. Memorandum from Daniel Tobin, dated August 23, 1995 . . . . . . . . . . . . . . . . . . . . . . . 69
7. ISN Progress Reports for September through December 1995 . . . . . . . . . . . . . . . . 70-84
8. Letter from Donald Tabasco to Roscoe Crawford, dated January 26, 1996. . . . . . . . 85-86
9. Memorandum from Jeff Bergdahl to ISN, dated August 31, 1995 . . . . . . . . . . . . . . . . . 87
10. Funding Document, dated August 29, 1995 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
11. Funding Document, dated November 27, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
12. Letter from Roscoe Crawford to ISN, dated February 20, 1996 . . . . . . . . . . . . . . . . . . . 90
13. Notice of Termination, dated March 15, 1996. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91-95
14. Termination Settlement Proposal, dated June 6, 1996 . . . . . . . . . . . . . . . . . . . . . . . 96-104
15. Letter from Thomas Parnon to ISN, dated December 29, 1999 . . . . . . . . . . . . . . . . . . . 105
16. Defense Contract Audit Agency, Audit Report No. 6311-97B17100001, dated December 19, 1996. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106-115
17. Defense Contract Audit Agency, Audit Report No. 6221-96G17500001, dated November 13, 1995. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116-123

**INDEX TO APPENDIX (continued)**

**DEFENDANT'S EXHIBITS:** **PAGE(S)**


18. Excerpts from Oral Argument and Status Conference, Information Systems & Networks v. United States, Fed. Cl. No. 98-178, dated October 3, 2001. . . . . . . . . . 124-128

19. Order of Judgment, Information Systems & Networks v. United States, Fed. Cir. No. 98-178, dated October 16, 2002 . . . . . . . . . . 129

20. Typed Meeting Notes, dated December 6, 1995 . . . . . . . . . . 130-131

21. Excerpts From Deposition of William Robertson, pp. 219-220 . . . . . . . . . . 132-134

22. Excerpts From Deposition of Roscoe Crawfrod, pp. 36, 66 . . . . . . . . . . 135-137

23. Excerpts From Deposition of Jeffrey Bergdahl, pp. 46, 101-106 . . . . . . . . . . 138-145

24. Opinion, Information Systems & Networks v. United States, Fed. Cl. No. 02-796, dated April 12, 2005 . . . . . . . . . . 146-152

SOLICITATION, OFFER AND AWARD | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING DO-A7 | PAGE OF 1

2. CONTRACT NO. N00600-94-C-0389

3. SOLICITATION NO. N00600-93-R-2790

4. TYPE OF SOLICITATION: [ ] SEALED BID (IFB) [X] NEGOTIATED (RFP)

5. DATE ISSUED JUN 22, 1993

6. REQUISITION/PURCHASE NO. N00039-94-RC-

7. ISSUED BY CODE N00600
Naval Regional Contracting Center
Washington Navy Yard, Bldg 200, 901 M street SE,
Washington, D.C. 20374-5014

8. ADMINISTERED BY (If other than Item 7)
SEE BLOCK 24

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder"

SOLICITATION

9. Sealed offers in original and One (1) copies for furnishing the supplies or services in the schedule will be received at the place specified in item 8, or if handcarried, in the depository located in The Bid Room, Naval Regional Contracting Center Washington Navy Yard, Bldg 200, 901 M Street SE., Washington DC 20374-5014 until 2:00 PM EASTERN local time (Hour) AUGUST 31, 1993 (Date)

CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation

10. FOR INFORMATION CALL: A. NAME: WILLIAM THOREEN | B. TELEPHONE NO. (202) 433-5389 NO COLLECT CALLS

11. TABLE OF CONTENTS


| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE |
|---|---|---|---|---|---|---|---|
| | | PART I-THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 94 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III-LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 8 | X | J | LIST OF ATTACHMENTS | 11 |
| X | D | PACKAGING AND MARKING | 71 | | | PART IV-REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 73 | | K | REPRESENTATIONS, CERTIFICATES AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 78 | | | | |
| | G | CONTRACT ADMINISTRATION DATA | 83 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | 93 | | M | EVALUATION FACTORS FOR AWARD | |


OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within ______ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

13. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause 52.232-8) | 10 CALENDAR DAYS % | 20 CALENDAR DAYS % | 30 CALENDAR DAYS % | CALENDAR DAYS

14. ACKNOWLEDGEMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated:

| AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|
| 0001 | 8/19/93 | 0004 | 10/5/93 |
| 0002 | 9/13/93 | 0005 | 10/13/93 |
| 0003 | 10/1/93 | 0006 | 10/27/93 |

15A. NAME AND ADDRESS OF OFFEROR CODE 8U179 FACILITY
INFORMATION SYSTEMS & NETWORKS CORP.
10411 MOTOR CITY DRIVE, BETHESDA, MD 20817

16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN
ROMA MALKANI, PRESIDENT

15B. TELEPHONE NO. (INCLUDE AREA CODE) (301) 469-0400

15C. [ ] CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE - ENTER SUCH ADDRESS IN SCHEDULE

17. SIGNATURE [signature]

18. OFFER DATE 11/1/93

AWARD (To be completed by Government)

19. ACCEPTED AS TO ITEMS NUMBERED 0001 through 0003

20. AMOUNT $4416645.54

21. ACCOUNTING AND APPROPRIATION DATA SEE CLAUSE G.12

22. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION ( ) 10 U.S.C. 2304(c)( ) or ( ) 41 U.S.C. 253(c)( )

23. SUBMIT INVOICES TO ADDRESS SHOWN IN ITEM (4 copies unless otherwise specified) SEE CLAUSE G.20

24. ADMINISTERED BY (If other than Item 7) CODE S2102A
DCMAO Baltimore
200 Towsontown Blvd., West
Towson, MD 21204-5299

25. PAYMENT WILL BE MADE BY CODE S3910A
DFAS-Columbus Center.
DFAS-CO/Capitol Division, PO Box 182263
Columbus, OH 43218-2263

26. NAME OF CONTRACTING OFFICER (Type or print)
[illegible]

27. UNITED STATES OF AMERICA BY [signature] (Signature of Contracting Officer)

28. AWARD DATE 15 JUL 19

IMPORTANT - Award will be made on this form, or on Standard Form ... or other authorized official written notice

| DISTRIBUTION SHEET | DOCUMENT NUMBER: N00600-94-C-0389 | |
|---|---|---|
| CONTRACTOR (1 Copy):<br>Information Systems and Networks Corporation<br>10411 Motor City Drive<br>Bethesda, MD 20817 | | |
| [X][X] Copies To DCMAO<br><br>S2101A<br>DCMAO Baltimore<br>200 Towsontown Blvd., West<br>Towson, MD 21204-5299 | [X][1] To:<br><br>Naval Computer and Telecommunications Command<br>Code N622, Wes Rice<br>4401 Massachusetts Avenue, NW<br>Washington, DC 20394-5460 | [X][1] Copies To:<br><br>Space and Naval Warfare Systems Cmd, Code PMW-152-21F, P. Tolbert<br>2451 Crystal Drive, Arlington, VA 22245-5200 |
| [X][1] Copies To DFAS<br><br>SC3910A<br>DFAS-Columbus Center<br>DFAS-CO/Capital Division<br>P.O. Box 182263<br>Columbus, OH 43218-2263 | [ ][ ] Copies To: | [ ][ ] Copies To: |
| [X][1] Copies To Comptroller,<br><br>N68342<br><br>Navy Regional Finance Center Washington, DC | NEGOTIATOR:<br>[ ][ ] Copies To PD1R | [ ][ ]Copies To: |

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>2 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT I | | | | |
| 0001 | TURNKEY AUTOMATED TECHNICAL CONTROL SYSTEM (ATC) | | | | |
| 0001AA | TURNKEY ATC INSTALLED AND ACCEPTED AT NTCC HAMPTON ROADS | 1 | EA | $2,341,219.73 | $2,341,219.73 |
| 0001AB | TURNKEY ATC INSTALLED AND ACCEPTED AT NTCC CAMP SMITH | 1 | EA | $793,683.90 | $793,683.90 |
| 0001AC | TURNKEY ATC INSTALLED AND ACCEPTED AT NTCC MAKALAPA | 1 | EA | $933,860.16 | $933,860.16 |
| 0002 | FORMAL CLASSROOM TRAINING | | | | |
| 0002AA | FORMAL CLASSROOM TRAINING FOR NTCC HAMPTON ROADS | 1 | LOT | $3,141.49 | $3,141.49 |
| 0002AB | FORMAL CLASSROOM TRAINING FOR NTCC CAMP SMITH | 1 | LOT | $3,141.49 | $3,141.49 |
| 0002AC | FORMAL CLASSROOM TRAINING FOR NTCC MAKALAPA | 1 | LOT | $3,141.49 | $3,141.49 |
| 003 | CONTRACT DATA REQUIREMENTS FOR CLINS 0001 AND 0002.<br>SEE ATTACHMENT 6 (EXHIBITS A-R) | 1 | LOT | $338,457.28 | $338,457.28 |
| | TOTAL FOR LOT I | | | | $4,416,645.54 |
| | LOT II - OPTION I<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0004 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS JAPAN | 1 | EA | $866,886.23 | $866,886.23 |
| 0005 | FORMAL CLASSROOM TRAINING FOR NCTS JAPAN | 1 | LOT | $3,141.49 | $3,141.49 |
| 0006 | CONTRACT DATA REQUIREMENTS FOR CLINS 0004 AND 0005.<br>SEE ATTACHMENT 6 (EXHIBITS AI-AZ) | 1 | LOT | $78,984.26 | $78,984.26 |
| | TOTAL FOR LOT II | | | | $949,011.98 |

STANDARD FORM 36 (REV 10-83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600–94–C–0389 | PAGE<br>3 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT III – OPTION II<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0007 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS SICILY | 1 | EA | $876,957.68 | $876,957.68 |
| 0008 | FORMAL CLASSROOM TRAINING FOR NCTS SICILY | 1 | LOT | $3,141.49 | $3,141.49 |
| 0009 | CONTRACT DATA REQUIREMENTS FOR CLINS 0007 AND 0008<br>SEE ATTACHMENT 6 (EXHIBITS AI–AZ) | 1 | LOT | $78,984.26 | $78,984.26 |
| | TOTAL FOR LOT III | | | | $959,083.43 |
| | LOT IV – OPTION III<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0010 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS PUERTO RICO | 1 | EA | $724,477.20 | $724,477.20 |
| 0011 | FORMAL CLASSROOM TRAINING FOR NCTS PUERTO RICO | 1 | LOT | $3,141.49 | $3,141.49 |
| 0012 | CONTRACT DATA REQUIREMENTS FOR CLINS 0010 AND 0011<br>SEE ATTACHMENT 6 (EXHIBITS AI–AZ) | 1 | LOT | $61,700.78 | $61,700.78 |
| | TOTAL FOR LOT IV | | | | $789,319.47 |
| | LOT V – OPTION IV<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0013 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS LONDON | 1 | EA | $1,067,293.77 | $1,067,293.77 |
| 0014 | FORMAL CLASSROOM TRAINING FOR NCTS LONDON | 1 | LOT | $3,141.49 | $3,141.49 |
| 0015 | CONTRACT DATA REQUIREMENTS FOR CLINS 0013 AND 0014<br>SEE ATTACHMENT 6 (EXHIBITS AI–AZ) | 1 | LOT | $100,398.76 | $100,398.76 |
| | TOTAL FOR LOT V | | | | $1,170,834.02 |

STANDARD FORM 36 (REV 10–83) COMPUTER GENERATED

| CONTINUATION SHEET | [illegible] OF DOCUMENT BEING CONTINUED N00600-94-C-0389 | P[illegible]E 4 | OF PAGES |
|---|---|---|---|

'AME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ˈEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT VI – OPTION V<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0016 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0017 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0018 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0019 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0020 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.55 | $70,278.60 |
| 0021 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0022 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| ᵓ023 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0024 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0025 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0026 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0027 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0028 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0029 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0030 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT VI | | | | $605,930.98 |

STANDARD FORM 36 (REV 10–83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>5 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT VII – OPTION VI<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0031 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0032 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0033 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0034 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0035 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.56 | $70,278.72 |
| 0036 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0037 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| 0038 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0039 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0040 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0041 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0042 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0043 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0044 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0045 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT VII | | | | $605,931.10 |

STANDARD FORM 36 (REV 10-83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>7 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT IX – OPTION X<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0061 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0062 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0063 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0064 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0065 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.56 | $70,278.72 |
| 0066 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0067 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| 0068 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0069 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0070 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0071 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0072 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0073 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0074 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0075 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT IX | | | | $605,931.10 |

STANDARD FORM 36 (REV 10–83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>6 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT VIII – OPTION IX<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0046 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0047 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0048 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0049 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0050 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.56 | $70,278.72 |
| 0051 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0052 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| 0053 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0054 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0055 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0056 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0057 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0058 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0059 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0060 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT VIII | | | | $605,931.10 |

STANDARD FORM 36 (REV 10-83) COMPUTER GENERATED

SECTION C - DESCRIPTION/SPECIFICATION/WORK STATEMENT

STATEMENT OF WORK

SECTION 1 - SCOPE

1.1 INTRODUCTION

The United States Navy operates and maintains numerous multi-vendor Technical Control Facilities (TCFs) which provide tactical and strategic communications support for the fleet and other DOD components. Current technical control operations, such as network monitoring, patching, and testing of circuits and trunks for network reconfiguration require constant operator intervention with manually operated test equipment and patch cords.

The objective of this Statement of Work (SOW) is to seek a solution to this manpower intensive operation by upgrading all manual technical control facilities with Automated Technical Controls (ATCs). This SOW outlines the desired objectives of the project and associated technical, systems integration, and implementation requirements.

1.2 CONTRACTOR CONTACT WITH NAVY SITES

Prospective contractors shall not have direct contact with any Navy site with regards to this acquisition. All questions or Requests for Assistance will be directed to Naval Regional Contracting Center (NRCC) for resolution.

1.3 SCOPE OF WORK

This SOW defines communications service requirements and is not intended to be a design specification. This SOW, in conjunction with the ATC Functional Specification, establishes the requirements for the provision of an ATC to replace the manual technical control facilities in the Naval shore communications stations. The ATC shall automate the major functional areas in the technical control facilities of Naval Telecommunications Center (NTCC) Hampton Roads, Naval Computer and Telecommunications Station (NCTS) Sicily, NCTS Puerto Rico, NCTS Japan, NCTS London, NTCC Pearl Harbor and NTCC Camp Smith. These functional areas include service establishment and restoration, system performance assessment, fault isolation, coordination of operations, report generation and recordkeeping. The ATC contract shall be the primary vehicle for engineering, installation, training, operation, and maintenance services for these seven sites.

1.4 GEOGRAPHIC SCOPE

Automated Technical Control facilities, operational, and maintenance services shall be required for systems at each of the following Commander, Naval Computer and Telecommunications Command (COMNAVCOMTELCOM) facilities under the ATC contract:

a. NTCC Camp Smith

b. NTCC Hampton Roads

c. NCTS Sicily

d. NCTS Puerto Rico

e. NCTS Japan

f. NCTS London

g. NTCC Pearl Harbor

1.5 LIVE TEST DEMONSTRATION REQUIREMENTS

Each technically compliant offeror shall provide the Government a Live Test Demonstration (LTD) prior to contract award. This LTD shall be held in the continental United States (CONUS) in a fully functional and operational Automated Technical Control site. The offeror's LTD shall consist of the equipments proposed for the offeror's ATC solution and shall demonstrate that the system and its operation are compliant with Government's requirements as stated in the Functional Specification. Bidders will be asked to certify that they have a minimum of two (2) operational ATC sites in CONUS representing the design proposed. The LTD shall be conducted at one of these two operational sites.

SECTION 2 - APPLICABLE DOCUMENTS

2.1 MILITARY STANDARDS

MIL-STD-973 Configuration Management

2.2 OTHER

AUTOMATED TECHNICAL CONTROL (ATC), FUNCTIONAL CHARACTERISTIC SPECIFICATION dated 1 November 1992

## SECTION 3 - REQUIREMENTS

### 3.1 GENERAL

The Contractor shall provide all material, labor, and services to engineer, provide, install, test, provide operational assistance for seven ATC turnkey facilities at NTCC Camp Smith, NTCC Hampton Roads, NCTS Sicily, NCTS Puerto Rico, NCTS Japan, NCTS London, and NTCC Pearl Harbor. The Contractor shall identify and develop life-cycle maintenance on the ATC and its peripheral equipment in accordance with this SOW. The Contractor shall operate the ATC, 24 hours per day, during the 30-day Acceptance period and during this time, provide in-depth training to Government personnel. This training shall include a minimum of 50% hands-on training. Following the formal Acceptance by the Government, the Government will operate and maintain the ATC with support of one (1) on-site Contractor representative. Government maintenance includes replacement of defective modules down to the Lowest Replaceable Unit (LRU) for emergent requirements and routine preventive maintenance. The Contractor shall certify that he shall provide parts support, repair, maintenance, and replacement of defective modules for the fifteen (15) year life of the system to the extent and for so long as the Government contracts for such support. The Contractor shall provide one (1) maintenance person who will remain on-site for a period of one (1) year from time of formal acceptance. The responsibilities of the Contractor include, but are not limited to: further training of Government personnel, maintenance of the ATC equipment, and assisting in operating the ATC. The Contractor shall respond within a maximum 2 hour timeframe (after notification) to assist the Government with ATC system problems outside the Government's capabilities. The Contractor must have a Program Liaison Office within 2 hours of Washington, D.C.. The contract will have options to continue contractor operations and maintenance support beyond the one year after acceptance. The Government, without penalty, may cancel this on-site support with 30 days written notice to the Contractor. Throughout this SOW, "provide" refers to each ATC facility.

### 3.2 HARDWARE

The contractor shall develop, implement, operate, maintain, and support an Electronic Cross-connect Switch (ECS) and subsystems. Hardware elements of this system may include, but are not necessarily limited to, the following:

3.2.1 Switch Sizing

The ECS shall allow for easy expansion in modular increments to accommodate evolutionary growth anticipated to be 30% or more. The ECS Matrix must be sized to accommodate a 30% or more increase in port count above current communication baseline requirements. Circuits identified will be a combination of DC loop, analog, and digital. Requirements for specific sizing of each candidate technical control are contained in the Site Specific Appendices to this specification.

3.2.2 State of the Art

The Contractor shall provide commercially available, field-proven equipment, components, and parts. The equipment shall use state-of-the-art, solid state technology of currently designed communications systems and equipment. To be considered field-proven, the equipment shall have been operated successfully for a minimum of twelve (12) months as a fully integrated system carrying real (not simulated) traffic in either a commercial or military application. Equipment operated in a lab environment, or operated to further its design, or to validate or test its design, is not acceptable.

3.2.3 Work Stations

The Contractor shall provide Network Management System (NMS) work stations, each identical in function and capable of controlling all ECS and NMS functions, and any stand-alone administrative functions as identified in the Functional Specification.

3.2.4 Test Equipment (Automated)

The Contractor shall provide all test equipment, technical literature, and other items necessary to test, maintain, and repair the ATC system in accordance with the contractor proposed Logistics and Maintenance Plan.

3.2.5 Spare Parts

The Contractor shall be responsible for furnishing all spare parts and equipment required in performance of the contract. The term "spare parts" includes all assemblies, subassemblies, components, parts, repair kits, and raw materials required or anticipated to be required as replacements of like items during installation, maintenance, repair, or overhaul of the ATC or any other equipment identified as part of the contract. Such spare parts shall be obtained by acquisition of

off-the-shelf contractor, subcontractor, or vendor items. The Contractor will provide complete spare parts support for the life of the contract. Storage space will be furnished by the Government. The Contractor shall provide the cabinet for the storage of on-site spare parts and the means by which to secure it. The contractor will provide a list of "Recommended" spare parts within the Contractor's technical proposal.

3.2.6 Cabling

The Contractor shall conduct a site survey to determine cabling requirements for equipment that will interface to the ATC switch.

3.3 SOFTWARE

3.3.1 Network Management Software

The NMS software shall provide administrative and status monitoring functions via any, or all, of the required user consoles. All administrative functions shall be done in a non-disruptive manner so as not to interfere with normal switch operations. These functions include service establishment and restoration, performance assessment, coordination, fault isolation, and reporting and recordkeeping as identified and expanded on in the ATC specification.

3.3.1.1 Alarms

The ECS and/or NMS shall be capable of error identification between interface connections and provide both audible and visual hardware alarms.

3.3.1.2 Network Database

The database shall be accessible by all workstations of the NMS. Status and event data generated by the switch shall automatically update the database.

3.4 ENGINEERING SUPPORT

3.4.1 Configuration Management (CM)

The Contractor shall maintain the responsibilities and procedures of configuration management as specified herein. The Contractor shall identify a single authority with responsibility for configuration management. That authority shall serve as the focal point within the Contractor's organization for all communications between the Government and the Contractor on all

configuration management related matters. The Contractor shall maintain a configuration management program in accordance with MIL-STD-973 to include, but not be limited to:

- Review of hardware and software change proposals in accordance with the guidelines of the approved CM Plan.

- Provide Engineering Change Proposals (ECPs) and related documents with checklists to the members of the ATC Configuration Control Board (CCB) for review.

- Track implementing actions and provide periodic status reports as required to the Government ATC Program Manager (PM).

- Maintain a complete library of the most current version of all technical documentation and system software.

- Update Product Baseline and maintain updated site configurations.

- Monitor all warranties as new equipment is added to the system.

- Provide monthly CM reports - similar to current program reports - in content and format as required by the PM.

3.4.2 Configuration Identification

The Contractor shall select Configuration Items (CIs) in accordance with MIL-STD-973, as reviewed and approved by the Government.

3.4.3 Baseline Control

The Contractor shall identify the configuration of the ATC system baseline and, once approved by the Government, maintain currency of those baselines and assure consistency between all of the documentation, hardware, software, and firmware data associated with the baseline.

3.4.4 Configuration Change Control

Designated baseline documents and configuration items shall be changed only as a result of an approved ECP, Request for Deviation, or Request for Waiver. The Contractor shall prepare all such changes in accordance with MIL-STD-973.

3.4.5 Logistics Support

The Contractor shall establish and maintain a logistics support program. As a minimum, the support program shall provide an adequate range and level of spares and support equipment to achieve operational availability, as defined in the ATC Functional Specification. The Contractor shall be sensitive to the fact that no two sites are identical in composition, mission requirements, nor equipment inventory. Additionally, the Contractor shall incorporate the projected future growth factor of 30% or more in the logistics support program.

The Contractor shall prepare and submit for approval a Logistics and Maintenance Plan. The logistics and maintenance concept upon which this plan shall be developed is that of Contractor-provided maintenance for the life of the equipment. This concept is further detailed in this SOW.

3.4.6 Operational Site Installation

The site facilities provided by the Government shall include the building, heating, ventilation, air conditioning, electrical power (breakers within the power panels), and lighting. The Contractor shall be responsible for assisting the Government in insuring that the facility meets the requirements of the ATC system equipment to be installed.

3.4.7 Contractor Site Technical Support

The Contractor shall include in the Installation Plan, a Site Preparation Manual for the ATC installation. Site planning shall address all required facility support which must be available to operate the ATC. Examples of topics to be addressed are: power, air conditioning, grounding, equipment maintenance clearances, data cable length limitations between equipment components, equipment locations, etc.

3.4.8 Site Installation, System Assembly, and Check-out

Before activation of the operational ATC, the Contractor shall:

- Prepare the facility and provide all materials and equipment necessary for system assembly, installation, and on-site check-out;

- Provide all special cross-connection ground wiring and power stabilization equipment required for the ATC equipment;

- Provide all materials and labor required to connect the ATC power center to the power feeder specified by the

Government and to connect the ATC power center to the individual ATC equipment components;

- Open, protect, and close all means of access to the Government facility during the installation of ATC equipment and sub-systems;

- Provide protection of exposed Government property and equipment at all times during the ATC system assembly, installation, and check-out;

3.4.9 Site Survey

The Contractor shall perform site surveys in conjunction with the Government, to gather information about site conditions such as available electrical power, air conditioning, space, equipment placement, etc., which will enable the Contractor to determine the specific communication equipment to satisfy the contract requirements. The Contractor shall also make recommendations to the Government on actions required to successfully install the equipment. The report shall show all tasks associated with the installation of Contractor equipment. This shall include equipment locations, power interconnects, conduits, cable trays or underdeck cabling runs, signal cables, grounds, and other information necessary for the successful completion of the proposed system. Upon completion of required site surveys and network configuration design efforts, the Contractor shall provide a written report, to the Government, outlining the Contractor recommendations for site preparation, the type and quantities of communication equipment required and an explanation of the proposed network configuration design that will satisfy the functional and operational requirement of the ATC. The final site survey report in conjunction with the proposed ATC Installation Plan shall also include detailed drawings of the proposed network configuration, equipment placement, rack elevations, and cabling. The report shall describe in detail the proposed installation schedule and describe tasks to be accomplished in order to install the ATC system. This report shall be reviewed by the Government and approved before any communication equipment is installed. Critical points which require Navy assistance shall be highlighted.

The site surveys shall be conducted in a manner which will not disrupt any existing Government functions or system. The site surveys shall be conducted and completed by contract award plus 30 days. Site surveys for the optional ATC sites will be conducted and completed by date of option exercise plus 30 days (in accordance with the option provisions contained herein).

3.5 MAINTENANCE

3.5.1 Contractor Maintenance

The Contractor shall provide the necessary services and facilities to accomplish repair, modifications, overhaul, and acceptance testing as required for all ATC end items, spares, and equipment included as part of the contract. The term "maintenance" includes, but is not limited to that effort required to perform day-to-day maintenance and repair of unserviceable equipment and spares, retest, calibration, corrosion control, preventive maintenance, and refurbishment actions required to maintain the equipment and items comprising the ATC system in an operational condition.

The Contractor shall provide on-site maintenance support five (5) days per week, eight (8) hours per day during the peak period of system usage at each site. At all other times, the Contractor shall provide on-call support, responding to notice for assistance within two (2) hours of notification.

3.6 LABOR

3.6.1 Management Approach

The Contractor shall establish and maintain a program management function to plan and control the execution of tasks required by this contract. The Contractor shall be responsible for the selection and effective management of subcontractors required in the performance of work. In all cases, the contractor shall serve as the focal point for resolution of all problems or questions concerning the ATC network. Within 30 days of contract award, the Contractor shall hold a post-award conference with ATC program management. This conference shall identify key Government and Contractor personnel and their responsibilities, preliminary ATC technical, logistical, and management approach, and potential problem areas.

All engineering, installation, training, operation, and maintenance services under this contract shall be performed by competent personnel, fully trained to perform the required functions identified herein in accordance with the best commercial practices without unnecessary delays or interference with Government functions. Primary engineering (i.e. Program Manager and Site Managers), training, operation and maintenance

personnel and on-site installation supervisors shall have completed applicable installation and maintenance training courses specified by the Original Equipment Manufacturer (OEM) or certified equivalent, and one year of actual hands-on experience applicable for equipment similar to that being installed and/or maintained.

The Contractor shall provide written evidence of a proper level of resources to perform engineering, installation, training, operation, and maintenance tasks under this contract to include ownership or licensing of spare parts, diagnostic and repair tools, documentation, and employed personnel.

The Contractor shall have adequate resources (equipment, labor, and dollars) to support the requirements of this contract. The support infrastructure shall be such as to meet the response time requirements of this contract.

The Contractor shall provide references, in addition to the two operational ATC sites, in written form of similar engineering, installation, training, and maintenance services performed by the contractor in the last five years.

The Contractor shall ensure that there will be no interruption of contract services due to labor disruptions.

The Contractor shall keep the Government completely apprised of all facets of the ATC program through periodic meetings. These meetings shall be held frequently enough to ensure current and comprehensive knowledge of program status is resident with key Government personnel. The contractor shall include the planned schedule for meetings and reviews in the Management Plan. The meetings shall be held at a site recommended by the Contractor and approved by the Government.

3.6.2 Program Manager (PM)

The Contractor PM shall develop procedures and policies related to the overall management of project activities. The PM is responsible for formulating, disseminating and implementing project management standards, developing requirements and making written recommendations for solving management, technical, and business problems by use of sound management principles and practices. Qualified individual shall possess excellent verbal and written communications skills and must be capable of liaison with program specialists and cognizant officials within NRCC, CNCTC, and SPAWAR. Individual shall be capable of understanding and responding to their concerns in a timely and effect manner. The PM must possess a Bachelor of Science degree in Management,

Engineering or Applied Physical Sciences. The PM must also possess at least eight (8) years of commercial and/or government telecommunications management experience, three (3) years of which must be with large-scale telecommunications projects. As an alternative the PM may possess an Associates Degree in Management, Engineering or Applied Physical sciences with at least twelve (12) years of commercial and/or government telecommunications management experience, three (3) years of which must be with large scale telecommunications projects. He/she must show experience in the following areas:

- Management of engineers, communications, and installation specialists involved in implementation, installation, and maintenance of communications systems/networks.

- Previous experience in the implementation and installation of automated technical control facilities.

The PM shall be responsible for total system implementation. The PM shall be easily accessible to the Acquisition Engineer, Government Program Manager, and the Contracting Officer.

3.6.3 On-Site Maintenance Technician

The On-Site Maintenance Technician is responsible for maintaining the systems installed under this contract. This individual must have at least one year experience in maintaining systems similar to those proposed/installed under this contract. In addition, this individual must possess at least two years experience maintaining telecommunication systems in an operational environment.

3.7 TRAINING

3.7.1 Formal Training

Operator, maintenance, and System Administrator training shall produce graduates with skills and abilities necessary to perform their respective functions. System Administrator training is considered critical and will require a comprehensive curriculum, separate from operator and maintenance and tailored toward a limited number of individuals.

3.7.2 On-the-Job Training (OJT) During Acceptance Period

In addition to formal classroom instruction, the Contractor shall provide OJT with the emphasis on in-depth, "hands-on," interactive training provided for those Government

personnel who have completed the formal classroom course of instruction. The Acceptance Period is considered to be an opportune time to familiarize Government maintenance and operator personnel with the myriad potential problems that could be encountered after acceptance.

3.7.3 Continuing On-the-Job Training

The On-Site Maintenance Technician shall continue to provide OJT to on-site Government operator and maintenance personnel during the period that he/she remains on site following formal acceptance. This period is contingent on the continuing requirement and the exercising of contract option years, both contingencies at the sole discretion of the Government.

3.7.4 Training Materials

A Course Outline and required training materials will be included as part of the Training Plan.

3.7.5 Scheduling and Location of Classes

The starting dates and location of the classes for the formal training courses shall be proposed by the Contractor as part of the Training Plan and coordinated and agreed upon by the Government.

The Contractor shall be sensitive to the requirement to schedule in-depth OJT sufficiently close to the completion of formal training to maximize the benefits of both training evolutions.

3.8 DOCUMENTATION

3.8.1 Software

The Contractor shall develop system user, operator, and maintenance manuals to ensure complete and comprehensive documentation is available.

3.8.2 Hardware

At a minimum, the Contractor shall provide four (4) copies for each site of all Operator, Maintenance, and Fault Isolation Manuals. In addition, one copy each will be provided to the Acquisition Engineer and the Government PM.

3.9 TEST, EVALUATION, AND CUTOVER

3.9.1 Testing Methodology

The Contractor shall be responsible for the development of a Cutover Plan and a System Test Plan. The Contractor shall be responsible for ensuring all ATC associated equipment is tested in accordance with the Test Plan and demonstrates that the equipment satisfies the system requirements of the Functional Specification. The Contractor shall be familiar with the contents and requirements of the ATC Test and Evaluation Master Plan (TEMP) when formulating the System Test Plan. All testing shall be performed by the Contractor and monitored by the Government and/or its representative(s). At a minimum, the Contractor shall perform the testing described below.

3.9.1.1 Acceptance Testing

The Contractor shall perform acceptance testing of all equipment components which they provide as the ATC solution. The testing shall certify that all components shall remain operational without failure for 30 contiguous 24-hour periods. If any components fail during this time period, testing will restart after corrections have been made.

3.9.1.2 System Test Plan

The System Test Plan shall clearly define those tests and procedures which shall be utilized to test and demonstrate that system performance satisfies the system requirements as stated in the ATC Functional Specification, to verify the integrity of the installation, and to meet the test requirements of the Acceptance Testing. Failure to meet the requirements of any portion of the Test Plan shall be deemed a failure of the test and it must be rescheduled after appropriate corrections have been made to resolve the cause of the failure. If, after installation or prior to Government acceptance, the Contractor and/or Government tests show the ATC communication equipment is not functioning properly, then the Contractor shall be responsible for isolating and resolving the problem.

AUTOMATED TECHNICAL CONTROL

(ATC)

FUNCTIONAL SPECIFICATION

EXECUTIVE SUMMARY

The program consists of one overriding goal: to develop an acquisition strategy that insures industry will bring their experience, design expertise, implementation capabilities, maintenance, operation, and warranty skills for the development of an Automated Technical Control (ATC) for Navy Technical Control Facility automation, thereby minimizing the risk to the Government and providing a warranted, turnkey facility, life-time maintained by the contractor.

It is the Government's intention that the design of this system will reduce the technical control workload through the reduction of manual tasks, thereby reducing the manpower required.

With this procurement, the Government will select the best Non-Developmental Item (NDI) Commercial, Off-the-Shelf (COTS) design that is capable of being customized to satisfy the designated requirements in accordance with the Statement-of-Work (SOW) and this Functional Specification, meets the 99.998 percent (or greater) availability functional criteria, and is judged to achieve the best combination of stated goals at the lowest total life-cycle cost. Vendors shall propose their solution on how to meet the requirements outlined in the SOW and to provide the best combination (based on trade-offs) of requirements for meeting technical, performance, and scheduled goals at the most reasonable cost.

Only vendors who have at least two systems now in operation that meet the requirements stated in Section 3 need apply. Vendors must be able to demonstrate current ATCs in operation and be capable of delivering the ATC system hardware, firmware, and software within six (6) months of contract award.

Qualifications of potential vendors are listed below:

- Design and manufacture system(s) currently in operation which meet the 99.998% (or greater) reliability goal

## F.16 NO WAIVER OF DELIVERY SCHEDULE

None of the following shall be regarded as an extension, waiver, or abandonment of the delivery schedule or a waiver of the Government's right to terminate for default:

(a) Delay by the Government in terminating for default;

(b) Acceptance of delinquent deliveries; and

(c) Acceptance or approval of samples submitted either after default in delivery or in sufficient time for the contractor to meet the delivery schedule. Any assistance rendered to the contractor on this contract or acceptance by the Government of delinquent goods or services hereunder will be solely for the purpose of mitigating damages and is not to be construed as an intention on the part of the Government to condone any delinquency, nor as a waiver of any rights the Government may have under subject contract.

## SECTION G - CONTRACT ADMINISTRATION DATA

### G.1 POINT-OF-CONTACT

The point-of-contact regarding this document is William Thoreen, who can be reached at 202-433-5389.

### G.2 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER, SUP 5252.243-9000 (JAN 1992)

(a) Except as specified in paragraph (b) herein, no order, statement, or conduct of Government personnel who visit the Contractor's facilities, or in any other manner communicate with Contractor personnel during the performance of this contract, shall constitute a change under the "Changes" clause of this contract.

(b) The Contractor shall not comply with any order, direction, or request of Government personnel unless issued in writing and signed by the Contracting Officer, or pursuant to specific authority otherwise included in this contract.

(c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and, notwithstanding provisions contained elsewhere in this contract, said authority remains solely with the Contracting Officer. In the event the Contractor effects any change (s) at the direction of any person other than the Contracting Officer, that change shall be considered to have been made without authority and no adjustment in price shall be made in the contract (or Delivery Order) to cover any increase in charges incurred as a result thereof. The name and address of the Principle Contracting Officer (PCO) is:

ROSCOE W. CRAWFORD
NAVAL REGIONAL CONTRACTING CENTER
BLDG 200, 901 M ST
WASHINGTON NAVY YARD
WASHINGTON, DC 20374-5014

G.4 DESIGNATION OF COTR, (NRCC WASH)(OCT 1992)

(a) (1) The Contracting Officer's Technical Representative (COTR) for this contract is:

NAME: MR. PERCY TOLBERT
MAIL ADDRESS: Space and Naval Warfare Systems Command
Code PMW-152-21F
2451 Crystal Drive
Arlington, VA 22245-5200

TELEPHONE NUMBER: (703) 602-8332 Ext. 548

(2) The above-named individual is hereby delegated as the authorized COTR for this contract/order. As such, this individual is responsible for monitoring, progressing and overall technical surveillance of services to be performed under this contract/order and should be contacted regarding questions or problems of a technical nature. In no event will any understanding or agreement, modification, change order, or other matter deviating from the terms of the basic contract between the contractor and any person other than the Procuring Contracting Officer (PCO) or the Administering Contracting Officer (ACO) be effective or binding upon the Government.

(3) When, in the opinion of the contractor, the COTR requests effort outside the existing scope of the contract, the contractor will promptly notify the PCO in writing.

(4) No action will be taken by the contractor under such technical instruction unless the PCO or ACO has issued a contractual change.

(b) List of duties to be performed by COTR in the administration of Contract:

(1) Serve as the point-of-contact through which the contractor can relay questions or problems of a technical nature to the contracting Officer.

(2) Monitor services being performed to ensure the contractor uses personnel meeting the requisite qualifications cited in the contract/order and require contractor's justification when using categories of personnel that are not in proportion to approved estimates.

(3) Review and evaluate contractor's estimates to furnish comments and recommendations to the PCO or ACO as appropriate.

(4) Alert the ACO, as appropriate, to any potential problems which may affect cost or performance schedules. Determine if percentage of work performed reasonably corresponds to the percentage of funds expended.

(5) Ensure that a copy of trip reports of Government personnel visiting contractor's plant, and a copy of all pertinent Government technical correspondence is retained in the COTR contract file..

(6) Review and certify invoices in accordance with invoicing instructions of the contract. Maintain a file with copies of these documents.

(7) Determine causative factors for any slippage in the performance schedule and report to the PCO or ACO making recommendations for corrective action to eliminate the cause of the slippage. In addition, the contractor's performance should be monitored to ensure that corrective action is being taken.

(8) Furnish the PCO with any requests for change, deviation, or waiver (whether generated by Government personnel or contractor personnel), including all supporting paperwork in connection with such change, deviation, or waiver.

(9) Be responsible for the inspection and acceptance of the services performed. Ensure compliance with the clause at FAR 52.246-5 or -6 which provide the Government the right to require the contractor to perform the services again, in conformance with the contract requirements, without payment of additional profit/fee.

(10) Submit to the PCO (with a copy to the ACO), a written evaluation of

(A) the performance of the contractor and

(B) a statement as to the uses made of any deliverables furnished by the contractor.

This report shall be made within 60 days of contract completion or annually on the anniversary date for contracts which include options. The written performance should address the cost effectiveness, quality, and timeliness of contractor performance.

## G.6 SECURITY COGNIZANCE

The highest level of security required under this contract is Top Secret as designated on the DD Form 254, Attachment 8 to this contract. Responsibility for security requirements under this contract is assigned to Director Industrial Security, Defense Investigative Service, Capital Region.

## G.7 COST ACCOUNTING STANDARDS ADMINISTRATION

A copy of this contract has been furnished to the cognizant Contract Administration Office for administration of the Cost Accounting Standards provisions contained herein.

## G.8 AUTHORITY FOR DEOBLIGATION OF UNEXPENDED AND EXCESS DOLLAR BALANCES

The Administrative Contracting Officer (ACO) is authorized to execute contract modifications deobligating unexpended Navy dollar balances considered excess to known contract requirements.

## G.9 ADDITIONAL FUNCTIONS ASSIGNED

In addition to the Contract Administration functions authorized by FAR 42.302, the Administrative Contracting Officer (ACO) is authorized to perform the following administrative functions as checked below:

[X] Negotiate, or negotiate and execute, supplemental agreements issued under the Changes clause.

NOTE: Prior to completion of negotiations and issuance of the supplemental agreement, any delivery schedule change shall be coordinated with the Principle Contracting Officer (PCO).

[X] Negotiate, or negotiate and execute, supplemental agreements changing contract delivery schedules.

[X] Negotiate, or negotiate and execute, supplemental agreements providing for the deobligation of unexpended dollar balances excess to known contract requirements.

[ ] Negotiate changes to interim billing prices.

[X] Issue amended shipping instructions and, when necessary, negotiate and execute supplemental agreements incorporating contractor proposals resulting from the amended shipping instructions.

## G.10 NOTE TO PAYING OFFICE: ADDRESS OF PAYEE

The Contractor shall identify the address to which payments shall be made, if different from that identified on the SF26. Payments are to be mailed to the following address:

________________________________________

________________________________________

________________________________________

## G.12 APPROPRIATION DATA

Accounting and Appropriation Data for this contract is as follows:

| ACRN | ACCOUNTING AND APPROPRIATION DATA | DOLLARS OBLIGATED |
|---|---|---|
| AA | 1741810 52D6 000 EA152 0 068342 2D 000000 D60010000000 | $4,416,645.54 |

## G.14 EXTENDED MAINTENANCE FUNDING

(a) This contract specifies a not-to-exceed amount for per-call maintenance services (labor and travel) outside the Principal Period of Maintenance (OPPM). The Government may unilaterally modify the contract to increase the not-to-exceed amount for these services. However, the Contractor is not obligated to perform, and the Government is not obligated to pay for, services in excess of the dollars specified in Section B.

(b) However, the Contractor is not obligated to perform, and the Government is not obligated to pay, for services that will cause the total maximum value of the contract to be exceeded.

(c) Charges for per-call services shall be invoiced separately and on a calendar month basis

listing the date(s) performed, the service(s) performed, the number of hours, and the reasons for the services.

## G.15 GOVERNMENT DOWNTIME CREDIT

The amount of creditable hours (for failure to arrive within the response time designated in Clause C.21 ("On-Site Maintenance") shall be accumulated for the month and adjusted to the nearest hour. The amount of credit for each hour in excess of the specified response time shall be computed at the applicable OPPM rate specified in the Schedule. The total credit during any month shall not exceed the Total Monthly Maintenance Charge.

## G.16 CALCULATION OF DOWNTIME CREDIT

(a) Definition. System downtime is that period of time when the system is inoperative and no scheduled workload can be accomplished due to a malfunction in the Contractor-supplied/maintained equipment or operating software or the system is inoperative and no scheduled workload can be accomplished because the system is released to the Contractor for remedial services.

(b) Period of Downtime. Downtime shall commence at the time of the actual contact (or bona-fide attempt as defined in the glossary) with the Contractor's maintenance representative at the designated point of contact or with the Contractor's answering service or other continuous telephone coverage provided to permit the Government to make such contact. Downtime shall end when the system and/or machine is returned to the Government in operable condition, including operating software regeneration, if required, ready to perform the scheduled workload. The Contractor shall not be responsible for input of lost workload data.

(c) Maintenance Credit for System Downtime. If the system remains inoperative and cannot perform the scheduled workload due to an equipment or operating software malfunction through no fault or negligence of the Government for a period of 5 consecutive minutes, or more than 10 non-consecutive minutes during a twenty-four (24) hour period, the Contractor shall grant a credit to the Government for each minute of downtime in the amount of one-half (1/2) of one percent of the Total Monthly Charges due under this contract, as defined in Section J, Attachment 1, Glossary. However, no credit shall be due the Government for operating software malfunctions when

(1) the malfunction is not attributable solely to the Contractor-supplied/maintained software, and/or

(2) the Government has made any additions or alterations or otherwise modified the operating software.

The credit for system downtime shall be computed to the nearest half or whole minute. No credit shall accrue to the Government during those periods when the Contractor is denied access to the equipment and the amount of credit granted shall not exceed 1/30th of the Total Monthly Charges for any calendar day.

(d) Maintenance Credit for Equipment Downtime. If a machine remains unusable due to an equipment and/or operating software malfunction through no fault or negligence of the Government, for a period of _2_ consecutive hours or more than _4_ non-consecutive hours during a twenty four (24) hour period, the Contractor shall grant a credit to the Government for each hour of downtime in the amount of one-half (1/2) of one percent of Total Monthly Charges due under this contract, as defined in Section J, Attachment J.1, Glossary, plus similar credits for any other machine(s) supplied under this contract not usable as a result of the malfunction. No credit shall accrue to the Government during those periods when the Contractor is denied access to the equipment and the amount of credit granted under this paragraph for each machine shall not exceed 1/30th of the Total Monthly Charge for the machine for any calendar day. Credit for equipment or software malfunctions shall be computed to the nearest half or whole hour. However, no credit shall be due the Government for operating software or equipment malfunctions when

(1) the malfunction is not attributed solely to the Contractor supplied/maintained software or equipment and/or

(2) the Government has made any additions or alterations or otherwise modified the operating software or equipment.

During a period of downtime, the Government may use operable equipment when such action does not interfere with remedial maintenance. The credit provisions of this paragraph do not apply when paragraph (c) herein is invoked.

(e) Purchased System and/or Equipment. For purchased system/equipment, maintenance downtime credits apply only during the period in which the Contractor has maintenance responsibility.

G.18 SUBMISSION OF INVOICES IN CONTRACTS FOR ACQUISITION OF FEDERAL INFORMATION PROCESSING (FIP) RESOURCES INCLUDING LEASE, MAINTENANCE, RENTAL AND/OR SUPPORT SERVICES, SUP 5252.232-9003 (JUN 1992)

(a) The Contractor shall submit original DD-250s with 3 copies to the address identified on the solicitation/contract award form (SF33 - Block 23), for certification prior to payment.

(b) In addition to the information identified in the clause entitled "Prompt Payment" herein, in, DD-250s shall include the following information:

(1) Contract Line Item Number (CLIN):
(2) Contract Subline Item Number (SLIN), if applicable;
(3) Accounting Classification Reference Number (ACRN);
(4) Payment terms;
(5) Name and serial number of equipment provided or serviced;
(6) Total charges and, if applicable, the Prompt Payment discount.

(c) The Contractor shall submit DD-205s for basic monthly charges in the month following the month for which the charges accrue and not more than on a monthly basis. Payment for rental or services of less than one month's duration shall be prorated at 1/30th of the basic monthly charges for each calendar day.

(d) If maintenance credits apply, the procedures indicated below are applicable:

[ X ] The Government will request, in writing, that the applicable credits for the month be applied against other charges, The request will list the following information:

Type and model number(s) of machine(s);
Date of Occurrence;
Period of downtime; and Credit due.

Invoices for remedial (on-call) maintenance will be accompanied by copies of the applicable malfunction reports regarding the on-call maintenance furnished.

[ ] The government will deduct the credits from the monthly invoice and inform the contractor in writing of the reason.

## G.20 INVOICING ADDRESS

~~Invoices shall be sent to the following address(es):~~

NAME: MR. PERCY TOLBERT
MAIL ADDRESS: Space and Naval Warfare Systems Command
Code PMW-152-21F
2451 Crystal Drive
Arlington, VA 22245-5200

TELEPHONE NUMBER: (703) 602-8332 Ext. 548

## G.23 SERVICE CONTRACT GUIDELINES

All Naval personnel involved in inspection or surveillance of Contractor services or liaison with contractor personnel shall conform to the guidelines for using contractor services set forth in the latest version to SECNAVINST 4200.27A.

## G.24 SUBCONTRACTING PLAN

The Contractor's subcontracting plan number *__________, dated ____________ is determined to be acceptable and is hereby incorporated as Attachment ____. A copy of the plan shall be provided to the ACO.

*Not required.

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H.2 ADVERTISING OF AWARD

The Contractor agrees not to refer to awards in commercial advertising in such a manner as to state or imply that the product or service provided is endorsed or preferred by the Federal Government or is considered by the Government to be superior to other products or services.

### H.4 POST-AWARD CONFERENCE, (NAVSUP)(JAN 1992)

(a) A post-award conference shall be conducted within 30 days after contract award with representatives of the Contractor, the cognizant Contract Administration Office; and the Contracting Officer at ________to be determined__________. The Contracting Officer, or designated representative, initiating the conference will designate, or act as, the chairperson. At the request of the Procuring Contracting Officer, conference arrangements will be made by the Contract Administration Office, including notification to the Contractor and the Contracting Officer.

(b) The requirement for a post-award conference shall in no event constitute grounds for excusable delay by the Contractor in performance of any provisions in the contract.

## SECTION I - CONTRACT CLAUSES

### I.1 CLAUSES INCORPORATED BY REFERENCE

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER I) CLAUSES
II. DOD FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES

CAUTION TO OFFERORS: THE OFFEROR IS CAUTIONED NOT TO DELETE CLAUSES FROM NOR ADD CLAUSES TO THE FOLLOWING CONTRACT CLAUSE LIST. SUCH AN ACTION MAY CAUSE THE OFFER TO BE REJECTED. NOTE THE AVAILABILITY OF TEXT OF CLAUSES: THE COMPLETE TEXT OF SPECIFIC CLAUSES IS CONTAINED IN TITLES 48 AND 41 OF THE CODE OF FEDERAL REGULATIONS (CFR) AND IS AVAILABLE AT MOST COMPLETE LAW LIBRARIES.

| CLAUSE | TITLE | DATE |
|---|---|---|
| 252.201-7000 | CONTRACTING OFFICER'S REPRESENTATIVE | DEC 1991 |
| 52.202-1 | DEFINITIONS | APR 1984 |
| 52.203-1 | OFFICIALS NOT TO BENEFIT | APR 1984 |
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES | APR 1984 |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | JUL 1985 |
| 52.203-7 | ANTI-KICKBACK PROCEDURES | OCT 1988 |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | SEP 1990 |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | JAN 1990 |
| 252.203-7000 | STATUTORY PROHIBITIONS ON COMPENSATION TO FORMER DoD EMPLOYEES | DEC 1991 |
| 252.203-7001 | SPECIAL PROHIBITION ON EMPLOYMENT | DEC 1991 |
| 252.203-7002 | DISPLAY OF DoD HOTLINE POSTER | DEC 1991 |
| 52.204-2 | SECURITY REQUIREMENTS | APR 1984 |
| 252.204-7000 | DISCLOSURE OF INFORMATION | DEC 1991 |
| 252.204-7002 | PAYMENT FOR SUBLINE ITEMS NOT SEPARATELY PRICED | DEC 1991 |
| 252.205-7000 | PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS | DEC 1991 |

| | | |
|---|---|---|
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | NOV 1992 |
| 52.210-5 | NEW MATERIAL | APR 1984 |
| 52.210-7 | USED OR RECONDITIONED MATERIAL, RESIDUAL INVENTORY, AND FORMER GOVERNMENT SURPLUS PROPERTY | APR 1984 |
| 52.212-8 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS | SEP 1990 |
| 52.215-1 | EXAMINATION OF RECORDS BY COMPTROLLER GENERAL | APR 1984 |
| 52.215-2 | AUDIT-NEGOTIATION | DEC 1989 |
| 52.215-22 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA | DEC 1991 |
| 52.215-24 | SUBCONTRACTOR COST OR PRICING DATA | DEC 1991 |
| 52.215-25 | SUBCONTRACTOR COST OR PRICING DATA - MODIFICATIONS | DEC 1991 |
| 52.215-26 | INTEGRITY OF UNIT PRICES | APR 1991 |
| 52.215-27 | TERMINATION OF DEFINED BENEFIT PENSION PLANS | SEP 1989 |
| 52.215-33 | ORDER OF PRECEDENCE | JAN 1986 |
| 52.215-39 | REVERSION OR ADJUSTMENT OF PLANS FOR POST-RETIREMENT BENEFITS OTHER THAN PENSIONS (PRB) | JUL 1991 |
| 252.215-7000 | PRICING ADJUSTMENTS | DEC 1991 |
| 252.215-7002 | COST ESTIMATING SYSTEM REQUIREMENTS | DEC 1991 |
| 252.215-7003 | INDUSTRIAL MODERNIZATION INCENTIVE PROGRAM (IMIP) PRODUCTIVITY SAVINGS REWARDS | DEC 1991 |
| 52.219-8 | UTILIZATION OF SMALL-BUSINESS CONCERNS AND SMALL DISADVANTAGED BUSINESS CONCERNS | FEB 1990 |
| 52.219-9 | SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN | JAN 1991 |
| 52.219-13 | UTILIZATION OF WOMEN-OWNED SMALL BUSINESSES | AUG 1986 |
| 52.219-16 | LIQUIDATED DAMAGES-SMALL BUSINESS SUBCONTRACTING PLAN | AUG 1989 |

| | | |
|---|---|---|
| 252.219-7003 | SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN (DoD CONTRACTS) | DEC 1991 |
| 252.219-7005 | INCENTIVE FOR SUBCONTRACTING WITH SMALL BUSINESSES, SMALL DISADVANTAGED BUSINESSES, HISTORICALLY BLACK COLLEGES AND UNIVERSITIES, AND MINORITY INSTITUTIONS | DEC 1991 |
| 52.220-3 | UTILIZATION OF LABOR-SURPLUS AREA CONCERNS | APR 1984 |
| 52.220-4 | LABOR SURPLUS AREA SUBCONTRACTING PROGRAM | APR 1984 |
| 52.222-18 | NOTIFICATION OF EMPLOYEE RIGHTS CONCERNING PAYMENT OF UNION DUES OR FEES | MAY 1992 |
| 52.222-20 | WALSH-HEALEY PUBLIC CONTRACTS ACT | APR 1984 |
| 52.222-26 | EQUAL OPPORTUNITY | APR 1984 |
| 52.222-28 | EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS | APR 1984 |
| 52.222-35 | AFFIRMATIVE ACTION FOR SPECIAL DISABLED AND VIETNAM ERA VETERANS | APR 1984 |
| 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS | APR 1984 |
| 52.222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA | JAN 1988 |
| 252.222-7000 | RESTRICTIONS ON EMPLOYMENT OF PERSONNEL | DEC 1991 |
| 52.223-2 | CLEAN AIR AND WATER | APR 1984 |
| 52.223-6 | DRUG-FREE WORKPLACE | JUL 1990 |
| 252.223-7004 | DRUG-FREE WORK FORCE | SEP 1988 |
| 52.225-10 | DUTY-FREE ENTRY | APR 1984 |
| 52.225-11 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES | APR 1984 |
| 252.225-7001 | BUY-AMERICAN ACT AND BALANCE OF PAYMENTS PROGRAM | DEC 1991 |
| 252.225-7002 | QUALIFYING COUNTRY SOURCES AS SUBCONTRACTORS | DEC 1991 |
| 252.225-7007 | TRADE AGREEMENTS ACT | DEC 1991 |
| 252.225-7009 | DUTY-FREE ENTRY - QUALIFYING COUNTRY END-PRODUCTS AND SUPPLIES | DEC 1991 |

| | | |
|---|---|---|
| 252.225-7010 | DUTY-FREE ENTRY - ADDITIONAL PROVISIONS | DEC 1991 |
| 252.225-7012 | PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES | DEC 1991 |
| 252.225-7031 | SECONDARY ARAB BOYCOTT OF ISRAEL | JUN 1992 |
| 52.226-1 | UTILIZATION OF INDIAN ORGANIZATIONS AND INDIAN-OWNED ECONOMIC ENTERPRISES | AUG 1991 |
| 52.227-1 | AUTHORIZATION AND CONSENT | APR 1984 |
| 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT | APR 1984 |
| 52.227-3 | PATENT INDEMNITY | APR 1984 |
| 52.227-14 | RIGHTS IN DATA - GENERAL | JUN 1987 |
| 252.227-7000 | NON-ESTOPPEL | OCT 1966 |
| 252.227-7013 | RIGHTS IN TECHNICAL DATA AND COMPUTER SOFTWARE | OCT 1988 |
| 252.227-7018 | RESTRICTIVE MARKINGS ON TECHNICAL DATA | OCT 1988 |
| 252.227-7029 | IDENTIFICATION OF TECHNICAL DATA | APR 1988 |
| 252.227-7030 | TECHNICAL DATA - WITHHOLDING OF PAYMENTS | OCT 1988 |
| 252.227-7031 | DATA REQUIREMENTS | OCT 1988 |
| 252.227-7036 | CERTIFICATION OF TECHNICAL DATA CONFORMITY | MAY 1987 |
| 252.227-7037 | VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA | APR 1988 |
| 52.228-5 | INSURANCE - WORK ON A GOVERNMENT INSTALLATION | SEP 1989 |
| 52.229-3 | FEDERAL, STATE AND LOCAL TAXES | JAN 1991 |
| 52.229-5 | TAXES - CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO | APR 1984 |
| 52.230-2 | COST ACCOUNTING STANDARDS | AUG 1992 |
| 52.230-3 | DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES | AUG 1992 |
| 52.230-5 | ADMINISTRATION OF COST ACCOUNTING STANDARDS | AUG 1992 |
| 252.231-7000 | SUPPLEMENTAL COST PRINCIPLES | DEC 1991 |
| 52.232-1 | PAYMENTS | APR 1984 |
| 52.232-8 | DISCOUNTS FOR PROMPT PAYMENT | APR 1989 |
| 52.232-9 | LIMITATION ON WITHHOLDING OF PAYMENTS | APR 1984 |
| 52.232-11 | EXTRAS | APR 1984 |
| 52.232-16 | PROGRESS PAYMENTS | JUL 1991 |
| 52.232-17 | INTEREST | JAN 1991 |

| | | |
|---|---|---|
| 52.232-18 | AVAILABILITY OF FUNDS | APR 1984 |
| 52.232-23 | ASSIGNMENT OF CLAIMS | JAN 1986 |
| 52.232-25 | PROMPT PAYMENT | SEP 1992 |
| 252.232-7004 | DOD PROGRESS PAYMENT RATES | DEC 1991 |
| 252.232-7006 | REDUCTION OR SUSPENSION OF CONTRACT PAYMENTS UPON FINDING OF FRAUD | AUG 1992 |
| 52.233-1 | DISPUTES | DEC 1991 |
| | Alternate I | DEC 1991 |
| 52.233-3 | PROTEST AFTER AWARD | AUG 1989 |
| 252.233-7000 | CERTIFICATION OF CLAIMS AND REQUESTS FOR ADJUSTMENT OR RELIEF | DEC 1991 |
| 52.237-2 | PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT AND VEGETATION | APR 1984 |
| 252.239-7000 | PROTECTION AGAINST COMPROMISING EMANATIONS | DEC 1991 |
| 52.242-13 | BANKRUPTCY | APR 1991 |
| 252.242-7000 | POSTAWARD CONFERENCE | DEC 1991 |
| 252.242-7004 | MATERIAL MANAGEMENT AND ACCOUNTING SYSTEM | DEC 1991 |
| 52.243-1 | CHANGES - FIXED PRICE | AUG 1987 |
| 52.243-6 | CHANGE ORDER ACCOUNTING | APR 1984 |
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS | DEC 1991 |
| 52.244-1 | SUBCONTRACTS (FIXED-PRICE CONTRACTS) | APR 1991 |
| 52.245-2 | GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS) | DEC 1989 |
| 52.245-19 | SPECIAL TEST EQUIPMENT | AUG 1988 |
| 52.246-23 | LIMITATION OF LIABILITY | |
| 52.246-24 | LIMITATION OF LIABILITY - HIGH-VALUE ITEMS | APR 1984 |
| | Alternate I | APR 1984 |
| 52.246-25 | LIMITATION OF LIABILITY - SERVICES | APR 1984 |
| 252.246-7000 | MATERIAL INSPECTION AND RECEIVING REPORT | DEC 1991 |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA | DEC 1991 |
| 252.247-7024 | NOTIFICATION OF TRANSPORTATION OF SUPPLIES BY SEA | DEC 1991 |
| 52.248-1 | VALUE ENGINEERING | MAR 1989 |
| 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED PRICE) | APR 1984 |

| | | |
|---|---|---|
| 52.249-8 | DEFAULT (FIXED-PRICE SUPPLY AND SERVICE) | APR 1984 |
| 252.249-7001 | NOTICE OF SUBSTANTIAL IMPACT ON EMPLOYMENT | DEC 1991 |
| 52.253-1 | COMPUTER GENERATION OF FORMS BY THE PUBLIC | JAN 1991 |

(b) Risk of Loss or Damage - Purchased Equipment

(1) The Government is relieved of all risk of loss or damage to the equipment, up to and including the day prior to the first day of a successful performance period, except for

(i) loss or damage caused by nuclear reaction, nuclear radiation, radioactive contamination, war, insurrection, civil strife, rebellion, weapons of war; or

(ii) negligence on the part of the Government or its agents, provided, however, that the Government shall be relieved of the liability for such risks of loss-or damage due to negligence if any commercial customer of the Contractor is relieved of such liability under like circumstances.

(2) If the Government is liable for loss or damage of a machine, the Contractor shall have the option to restore the machine to its previous condition, in which event the Government shall pay the Contractor to perform such restoration at the Contractor's then-current prices, terms and conditions. If the Contractor elects not to restore the machine, the Government may, at its own expense, restore the machine to its previous condition. If, however, the machine is lost or damaged beyond repair, the Government shall pay the Contractor the same price for the machine as the Government would have paid if it had purchased the machine on the day prior to the loss or damage under the provisions of this contract. This clause shall govern risk of loss or damage, notwithstanding any other provisions of this contract relating to title, payment, or ownership.

## I.45 PREPARATION OF VALUE ENGINEERING CHANGE PROPOSALS, DFARS 252.248-7000 (DEC 1991)

Prepare Value Engineering change proposals, for submission pursuant to the value engineering clause of this contract, in the format prescribed by the version of MIL-STD-973 in effect on the date of contract award.

## I.46 CHANGE PROPOSALS

(a) After contract award, the Government may solicit, and the Contractor is encouraged to independently propose, changes to the equipment, software specifications, or other requirements of this contract. These changes may be proposed to save money, to improve performance, to save energy, or to satisfy increased data processing requirements. However, if proposed

changes relating to improved performance are necessary to meet increased data processing requirements of the user, those requirements shall not exceed the contract requirements by more than 25%. If the proposed changes are acceptable to both parties, the Contractor shall submit a price proposal to the Government for evaluation. Those proposed changes that are acceptable to the Government will be processed as modifications to the contract.

(b) This clause applies only to those proposed changes identified by the Contractor under a proposal submitted pursuant to the provisions of this clause. At a minimum, the following information shall be submitted by the Contractor with each proposal:

(1) A description of the difference(s) between the existing contract requirement and the proposed change(s), and the comparative advantages and disadvantages of each;

(2) Itemized requirements of the contract which must be changed if the proposal is adopted, and the proposed revision to the contract for each such change;

(3) An estimate of the changes in performance and cost, if any, that will result from adoption of the proposal;

(4) An evaluation of the effects the proposed change would have on collateral costs to the Government, such as Government-furnished property costs, costs of related items, and costs of maintenance and operation; and

(5) A statement of the time by which the change order adopting the proposal must be issued so as to obtain the maximum benefits of the changes during the remainder of this contract. Also, any effect on the contract completion time or delivery schedule shall be identified.

(c) Change proposals submitted to the Contracting Officer shall be processed expeditiously. The Government shall not be liable for proposal preparation costs or any delay in acting upon any proposal submitted pursuant to this clause. The Contractor has the right to withdraw, in whole or in part, any change proposal not accepted by the Government within the period specified in the change proposal. The decision of the Contracting Officer as to the acceptance of any such proposal under this contract shall be final and shall not be subject to the "Disputes" clause of this contract.

(d) The Contracting Officer may accept any change proposal submitted pursuant to this clause by giving the Contractor written notice thereof. This written notice may be given by issuance of a modification to this contract. Unless and until a modification is executed to incorporate a

change proposal under this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract.

(e) If a change proposal submitted pursuant to this clause is accepted and applied to this contract, an equitable adjustment in the contract price and in any other affected provisions of this contract shall be made in accordance with this clause and other applicable clauses of this contract.

(f) The Contractor is requested to identify specifically any information contained in the change proposal which the Contractor considers confidential and/or proprietary. Identification of information as confidential and/or proprietary is for information purposes only shall not be binding on the Government to prevent disclosure of such information. Offerors are advised that such information may be subject to release upon request pursuant to the Freedom of Information Act (5 U.S.C. 552).

(g) Nothing in this clause shall be construed to authorize change proposals which are properly changes under the "Changes" clause or new work which require justification and approval in accordance with FAR Part 6. All matters should be coordinated with the Contracting Officer.

**I.49 CLAUSES INCORPORATED BY REFERENCE, FAR 52.252-2 (JUN 1988)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

**I.50 ALTERATIONS IN CONTRACT,
FAR 52.252-4 (APR 1984)**

Portions of this contract are altered as follows:

| | | | | |
|---|---|---|---|---|
| G.4 | G.6 | | G.12 | G.20 |
| G.24 | H.4 | I.18 | I.26 | |

**I.51 AUTHORIZED DEVIATIONS IN CLAUSES,
FAR 52.252-6 (APR 1984)**

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR

Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation of any Defense Federal Acquisition Supplement (48 CFR Chapter 2) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

**SUBCONTRACT AGREEMENT**
**No. 13198**

**BETWEEN**

**INFORMATION SYSTEMS AND NETWORKS CORPORATION (Prime)**

**AND**

**DATACOMM MANAGEMENT SCIENCES**

This Agreement made as of this March 28, 1995 by and between Information Systems and Networks Corporation, a Maryland corporation, having its principal offices located at 10411 Motor City Drive, Bethesda, Maryland 20817 (hereinafter referred to as "ISN"), and Datacomm Management Sciences, a Delaware corporation (hereinafter referred to as "Subcontractor"), having its principal offices located at 25 Van Zant Street, East Norwalk, Connecticut.

WITNESSETH:

WHEREAS it is understood that (i) ISN has been awarded Contract No. N00600-94-C0389 as the prime contractor from NRCC, Washington Navy Yard, and (ii) ISN desires the Subcontractor to perform a certain portion of the contract and that the Subcontractor desires to so perform such work under the terms and conditions hereunder set forth; and (iii) this Subcontract is a firm-fixed-price type contract and that Subcontractor's prices for the supplies, software and services to be provided to ISN in the performance of this Subcontract are based on established catalog or market prices of its commercial off-the-shelf (COTS) items which are sold in substantial quantities to the general public.

NOW, THEREFORE, for and in consideration of the mutual covenants herein contained, the parties hereto mutually agree as follows:

1. <u>Statement of Requirements</u>

The Subcontractor shall complete the work when ordered and supply its NDI/COTS Electronic Cross-connect Switch (ECS) products, Network Management System Software (NMSS-8000) perpetual licenses, standard commercial installation, Maintenance, Operations and Database Administration manuals as specified in Appendix A, Statement of Work, which is incorporated and made a part of this Agreement and shall furnish all items when ordered as stated in paragraph 2, Supplies/Software, Services and Prices. Specific orders

will be issued by separate modification(s) to this subcontract agreement stating quantities and prices for each item.

2. Supplies/Software, Services and Prices

The prices for the supplies, software to be provided by the Subcontractor for Lots I through V in the prime contract are as specified in Appendix B-1 which is incorporated and made a part of this agreement.

The prices for supplies, software and services for additional items not presently shown in the prime contract are as specified in Appendix B-2, MTRX Itemized Price Schedule, which is incorporated and made part of this agreement.

3. Option(s)

ISN reserves the right to unilaterally exercise option(s) to purchase from the Subcontractor the items as shown in Appendix B-2 by written notice at any time within the period of performance at the prices specified.

4. Performance

The period of performance for this subcontract is from 1 February 1995 through to the duration of the prime contract. Specific delivery instructions will be included for each item ordered in subsequent modification(s) to this agreement. All items supplied by the Subcontractor in accordance with paragraph 1 of this Agreement are to be delivered F.O.B., East Norwalk, Connecticut to destination(s) specified by ISN or if not specified, to warehouse space at Subcontractor's premises, unless this Agreement is terminated sooner in accordance with paragraph 14. The Subcontractor agrees to provide such warehouse storage of any items "shipped in place" at no additional charge to ISN. Services, including training, supplied by the Subcontractor in accordance with paragraph 2 of this Agreement will be delivered F.O.B. at the place such services are performed and will be scheduled to meet dates mutually acceptable to ISN and the Subcontractor.

5. Consideration and Payment

ISN shall pay Subcontractor a firm fixed price for each item ordered for the supplies, software and services delivered in accordance with paragraphs 1 and 2 of this Agreement based on the prices as stated in Appendix B-1 or in Appendix B-2, MTRX Itemized Price Schedule, dated January 1, 1995 which is based on the authorized telecommunications schedule price



ISN
Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

list FSC or 58, Part VI, commercial telecommunications equipment, GSA Contract No. GS00K93AGS049 PS02 including any subsequent modifications. Processing of payment requests of subcontractor costs, only shall be based on the Department of the Navy, FISC Detachment, Washington Navy Yard, Washington, D.C. letter dated March 24, 1995, from the Contracting Officer, Mr. Roscoe Crawford. ISN shall submit separate invoice(s) for subcontractor's costs, for approval within (2) working days following receipt of subcontractor's invoice(s) for all items based upon acceptance by ISN and payment will be received by the subcontractor within five (5) calendar days after ISN receives payment from the Government.

Subcontractor's invoices shall be submitted in the format a specified in paragraph 9 of this Agreement and shall be dated no sooner than the date of delivery or provision of services. Delivery and invoicing of partial quantities of items supplied in accordance with paragraph 1 is allowed.

6. <u>Configuration Baseline</u>

The prices set forth in this agreement are based upon the production configuration baseline as stated in Appendix "A, Statement of Work. The Subcontractor shall maintain currency of those baselines and assure consistency between all of the documentation, hardware, software, and firmware data associated with the baseline.

Designated baseline documents and configuration items shall be changed only as a result of an approved ECP, Request for Deviation, or Request for Waiver.

7. <u>Inspection and Acceptance</u>

All supplies shall be subject to phase approvals and in-process inspection/test by ISN at the Subcontractor's facility to the extent practicable at all times during the period of performance and, in any event, prior to shipment.

Preliminary (conditional) acceptance of supplies and software shall be at the Subcontractor's facility upon satisfactory completion of quality assurance, test and inspection provisions of the Subcontractor, if same are not specified in the Subcontract, upon satisfactory completion of Subcontractor's standard final acceptance/test procedures.

Final inspection and acceptance by ISN of conforming supplies and software shall occur at the Subcontractor's plant in accordance with the inspection test and acceptance criteria of the Subcontractor.

Such inspection and acceptance shall be conducted within ten (10) business days following written or facsimile



Proprietary & Confidential Information

notification by Subcontractor that such supplies or software are available for ISN's inspection.

8. Quality Assurance

Subcontractor shall provide and maintain a documented quality assurance (QA) and inspection system, covering the supplies to be furnished hereunder, which satisfies the requirements of this Subcontract. Records of QA/inspection by the Subcontractor shall be kept complete and available to ISN during the performance of this Subcontract and for such longer period as may be specified elsewhere herein.

If requested by ISN, Subcontractor shall furnish copies of his latest quality assurance, inspection and test policies and procedures. ISN reserves the right to review such documentation/procedures to determine the adequacy of Subcontractor's quality assurance/test program. ISN's review and/or comments regarding Subcontractor's documentation shall in no way relieve Subcontractor of responsibility for full compliance with the Subcontract quality assurance requirements.

If ISN observes any failure(s) during final inspection and test of supplies manufactured or developed for ISN, Subcontractor shall correct or replace such failure(s) within ten (10) working days.

The supplies and software covered by this Subcontract may, at ISN's option, be subject to source inspection at final test for quality, identity, physical conformance, preservation, packaging, packing, and shipping container marking by ISN and/or the Government.

Each module furnished hereunder requires serialization. Subcontractor shall permanently identify each sub-system by part number, model number, serial number, revision level, etc. as necessary to insure positive identification of same. Inspection/test records shall list such identification, as necessary, of the item being inspected and/or tested. Subcontractor's serial number control system must insure that the same serial number is not used more than once.

Unless the requirements concerning quality assurance, inspection and test documentation to be supplied to ISN hereunder are specified elsewhere in this Subcontract, Subcontractor shall provide to ISN, with or prior to each shipment, a documentation package containing two (2) copies of each of the following:

a. Report of inspections, examinations and tests, as applicable or required, properly signed by authorized personnel of Subcontractor.



ISN
Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

b. Reports of any deviations, if applicable, from the Subcontract technical requirements, including quality assurance and inspection provisions, and copies of ISN's written approval for such deviations.

c. ISN reserves the right of its quality assurance personnel to visit Subcontractor's facilities, on a non-resident basis, for surveillance purposes, to assure/verify Subcontractor's conformance to the technical requirements for this Subcontract including quality assurance and test and inspection requirements. Such personnel shall be allowed full access to witness all operations/tests involved in the fulfillment of this Subcontract. Reasonable advance notice, in writing, shall be given to Subcontractor prior to any such visits.

d. Notwithstanding anything in this provision to the contrary, Subcontractor shall comply fully with the quality assurance, reliability and maintainability requirements of standard commercial practices.

9. <u>Subcontract Administration Data</u>

<u>Submissions of Invoices</u>

Subcontractor's invoices shall be submitted in triplicate addressed as follows:

ISN Corporation
10411 Motor City Drive
Bethesda, Maryland 20817

Attention: Accounts Payable
Reference: 1319
Additional copy: B. Robertson

Subcontractor's invoices shall contain the following information, as applicable: date of invoice, subcontract number (1319), subcontract line item numbers, description of supplies and software, sizes, quantities, unit prices, extended totals and payment terms.

10. <u>Preservation, Packaging and Packing/Marking and Shipping Information</u>

Preservation, Packaging and Packing

Unless otherwise specified herein, supplies shall be preserved, packaged and packed in accordance with best standard commercial practices for domestic shipment which shall be adequate to ensure against damage/deterioration during transit and storage pending usage.



Proprietary & Co[illegible]
Use, Publication or [illegible] Restricted
[illegible]

Marking and Shipping Information

The Subcontractor shall be responsible for the method of shipment and delivery in a safe, intact and functioning condition of the required supplies.

Shipping Address: F.O.B. Point: E. Norwalk, Conn.
TBD

Mark each crate, container or package as follows:

Contract No.: N00600-94-C-0389
Item No. (as applicable)
Quantity (as applicable)
Supplied by: ISN Corporation
Upon Arrival Notify: TBD
Telephone No.: TBD

The Subcontractor shall be responsible for marking each crate, container and package with appropriate CAUTIONARY NOTICES to warn of improper handling in loading, unloading,s shipment and storage.

Packing Lists:

The Subcontractor shall provide with each crate, container and package, appropriate packing lists for identification of contents.

Shipping Notices:

Prior to shipment, Subcontractor shall advise ISN by telephone and follow up to Facsimile communication, notice of each shipment, stating items to be shipped, quantities, method of shipment, carrier, time of departure and estimated time of arrival.

Equipment Weight and Size Lists:

Subcontractor shall provide equipment shipping weights and sizes of all supplies to be furnished at least (5) days prior to the first shipment and, in addition, if applicable, shall provide a list of ISN required handling tools/equipment for unloading and positioning the material when received.

Transportation Charges:

In all cases where transportation charges are the responsibility of ISN, the Subcontractor shall prepay and invoice ISN such charges. In such cases, if requested to



Proprietary & Confidential Information
Publication or ... Restricted
to Recipient ...

substantiate shipping charges, the following or equivalent documentation shall be supplied to ISN:

common carrier; the Subcontractor agrees to furnish in support of his invoice, a copy of the signed commercial bill of lading indicating the carrier's receipt of the supplies covered by the invoice for transportation to the destination specified in the Subcontract;

parcel post; the Subcontractor agrees to furnish a certificate of mailing; and,

other than common carrier or parcel post; the Subcontractor agrees to furnish a receipted copy of the appropriate delivery document showing receipt at the destination specified in the subcontract.

Transmittal of Classified Data

In the event it becomes necessary to transmit classified matter by mail, the transmittal shall be made in accordance with the requirements of the Industrial Security Manual (DOD ~~5220.22-M). Outer containers shall not disclose the classification or the name of classified matter contained~~ within the envelope or package, even though the name itself may not be classified. Internal markings or internal packaging will clearly indicate the classification.

Prohibited Packing Materials

The use of asbestos, excelsior, newspaper or shredded paper (all types, including waxed paper, computer paper and similar hydroscopic or non-neutral material) is prohibited.

11. Liaison

The ISN's representative responsible for the technical administration of the work shall be B. Robertson or other individuals who may be designated in writing by ISN from time to time. All contact with Government personnel on the subcontract shall be through ISN personnel. Any direct contact initiated by the Government on Contract No. N00600-94-C-0389 shall be documented and reported to ISN.

12. Continuing Support

ISN has the right to purchase any spare parts, maintenance services and out-of-warranty or voided warranty repair/replacement services of defective modules for ECS hardware for the fifteen (15) year life of the system. Such support is stated in Section 4.0 of Appendix A, Statement of Work.



Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

13. Warranty

The Subcontractor warrants MTRX equipment of its manufacture to be free from defects in material and workmanship for a period of five years from date of original shipment. The obligation under this warranty is limited to repair or replacement at factory (transportation prepaid) of defective articles or parts received within the warranty period. This warranty is exclusive of all other warranties; no claim other than a demand for repair or replacement shall be made by ISN. This warranty is void should equipment be exposed to electrical, mechanical or environmental hazards beyond its published specifications or intended use. Subcontractor warrants equipment not of its manufacture (i.e., personal computer systems, terminals, disk drives, printers, etc.) for a period of either 90 days or the original manufacturer's warranty, whichever is greater.

It is understood that ISN may request a transfer of all or any remaining warranty to the Government by providing written notice of such transfer to the Subcontractor. Such transfer of warranty will be approved by Subcontractor if received in writing stating all specific details.

14. Termination for Default

ISN may, by written notice, terminate the whole or any part of this subcontract for default in the following circumstances:

(A) If Subcontractor fails to deliver the products required by this subcontract within the time specified in paragraph 4 of the subcontract or any extension thereof granted by ISN in writing and Subcontractor does not cure such failure by the earlier of (i) ten (10) Business Days after receipt of notice from ISN or (ii) such date as the Government may specify to ISN in a notice given pursuant to the Prime Contract; or

(B) If Subcontractor materially breaches any of the covenants or terms and conditions set forth in this Contract or so fails to make progress as to endanger performance of this Contract in accordance with its terms, and in any of these circumstances, does not cure such breach or failure to ISN's reasonable satisfaction within a period of ten (10) business days after receipt of notice from ISN specifying such breach or failure, or within a longer period of time based upon the circumstances.

(C) In the event Subcontractor defaults on this subcontract, in whole or in part as stated above, ISN



ISN
Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

may procure, upon such terms and in such manner as ISN may deem appropriate, Products or Services similar to those so terminated; provided, however, that Subcontractor shall continue the performance of this Contract to the extent not terminated under the provisions of this clause.

(i) Except with respect to defaults of Subcontractor's vendors, Subcontractor shall not be liable for any excess costs if the failure to perform this Contract arises out of the causes beyond the control and without the fault or negligence of Subcontractor. Such causes may include, but are not restricted to, acts of God or the public enemy, acts of contractual capacity, fires, floods,epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; but in every case the failure to perform must be beyond the control and without the fault or negligence of default of a vendor to Subcontractor and if such default arises out of causes beyond the control of Subcontractor, Subcontractor shall not be liable for any excess costs or failure to perform, unless the supplies or services to be furnished by the vendor or subcontractor were obtainable from other sources in sufficient time to permit Subcontractor to meet the delivery requirements regardless of whether such supplies or services are only available to Subcontractor at a higher price to Subcontractor. No cause shall constitute a basis for excusable delay unless Subcontractor has notified ISN in writing, of the existence of such cause promptly as practicable, but in no event longer than ten (10) business days, from the beginning thereof. In any event, subcontractor shall take reasonable actions to mitigate the effects of any excusable delay.

(ii) If, after notice of termination of this contract as provided herein, it is determined for any reason that Subcontractor was not in default under the provisions of these paragraphs, then the rights and obligations of the parties shall be the same as if the notice of termination had not been issued.

(D) The rights and remedies of ISN provided in these paragraphs shall not be exclusive and are in addition to other rights and remedies provided by law or equity or otherwise provided under this Subcontract.



ISN
Proprietary & Confidential Information
Publication or Disclosure Restricted
to Receiving Party

15. Key Personnel

The individual cited below is considered to be essential to the work being performed hereunder. Prior to diverting any listed individual to another project, the Subcontractor shall notify ISN, in writing, reasonably in advance of such diversion, and shall submit justification (including the name and resumes of proposed substitutions) in sufficient detail to permit evaluation of the impact of such substitutions on the program. No diversions shall be made by the Subcontractor without prior written concurrence of ISN.

| NAME | TITLE |
|---|---|
| James Corless | President |
| ______________________ | ______________________ |

16. Insurance

Subcontractor agrees and shall submit evidence to ISN before ~~beginning work that it has procured and will maintain such insurance as will protect it from claims under Workmen's~~ Compensation Act, claims for damages because of bodily injury including personal injury, sickness or disease, or death of any of its employees or of any person other than its employees, and from claims for damages because of injury to or destruction of property including loss of use resulting therefrom. Such insurance shall include Workmen's Compensation, Employer's Liability, Comprehensive General Liability (bodily injury and property damage) insurance with respect to performance under this contract and such other insurance as the Government may from time to time require with respect to performance under this subcontract.

Subcontractor shall, at its own expense, procure and maintain during the entire performance of the Agreement, insurance of at least the kinds and minimum amounts as follows:

(1) Comprehensive General Liability with a limit of not less than $500,000 for bodily injury per person and $500,000 per accident and with a limit of not less than $100,000 for property damage. Coverage shall include the following: premises and operations, independent contractors, products including completed operation, and contractual. There shall be no exclusion for the following: explosion, collapses, underground piping and wiring.



Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

(2) Comprehensive Automobile Liability Insurance with a limit of not less than $500,000 for bodily injury per person and $500,000 per accident and with a limit of not less than $100,000 per accident for property damage. Coverage shall include the following: all owned, non-owned, hired and leased vehicles.

17. Indemnification

Subcontractor shall indemnify and hold harmless and defend ISN, its agents, servants, and employees from and against any claim, demand, or cause of action of every name or nature arising out of or through the acts or omissions of Subcontractor, its agent, servants, or employees in the performance of services under this Agreement.

ISN shall indemnify and hold harmless and defend Subcontractor, its agents, servants, and employees from and against any claim, demand, or cause of action of every name or nature arising out of or through the acts or omissions of ISN, its agent, servants, or employees in the performance of services under this Agreement.

18. Confidential Information

Confidential information shall mean all information disclosed to either party which relates to the other party's clients past, present, or future or to any research, development and business activities. Each party shall hold all such confidential information in trust and confidence and agrees that it will not, during or after the termination of this Agreement, disclose to any person, firm or corporation, nor use for its own business or benefit, any information obtained by it while in the execution of the terms and conditions of this Agreement and for (5) years, thereafter.

19. Records and Reports

The Subcontractor agrees to be bound by the Federal Acquisition Regulations regarding Examination of Records by Comptroller General, if applicable. These records must be maintained for a period of three (3) years from the completion of this subcontract.

20. Representation

Subcontractor represents that there is no conflict of interest with any other contractual relationship that would adversely impact its ability to perform the work required under this Agreement. In the event Subcontractor believes that there is presently any such conflict, or any such



Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

conflict arises during the Agreement or extension thereof, it will advise ISN immediately.

21. Successors and Assigns

ISN and Subcontractor each binds itself, successors, executors, administrators and assigns to the other party of this Agreement and to the partners, successors, executors, administrators and assigns of such other party in respect to all covenants of this Agreement. Except as noted above, neither ISN nor Subcontractor shall assign, sublet or transfer its interest in this Agreement without the written consent of the other. Nothing herein shall be construed as creating any personal liability on the part of any officer or agent of any public body which may be a part thereto, nor shall it be construed as giving any rights or benefits hereunder to anyone other than ISN and Subcontractor.

22. Delegation of Duties

Subcontractor shall not delegate its duties under this Agreement without the written consent of ISN.

23. Compliance with Laws and Regulations

Subcontractor agrees at all times to comply with all applicable Federal, State and Local laws, rules and regulations.

24. Prime Contract Flow-Down Clauses and Provisions

The flow-down clauses and provisions of Prime Contract #N00600-94-C-0389 which are attached to this Agreement as Appendix C, are hereby incorporated and made a part of said Agreement with the same force and effect as if they were set forth in full. The Subcontractor acknowledges that he has in his possession or is otherwise familiar with all the clauses and provisions incorporated herein by reference and agrees to perform this subcontract in accordance with the provisions of such referenced clauses and the other provisions of this subcontract.

25. GSA Pricing

Subcontractor certifies that the prices contained in Appendix B-1 and B-2 are accurate, current and complete as of January 1, 1995 and further represents that the prices are the lowest charged by said Subcontractor to others for performing work or supplying material to identical specifications, similar quantities, delivery intervals and having the same conditions of sale.



Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

Prices contained in Appendix B-2 will remain unchanged until September 30, 1995 and will be subject to possible increase thereafter but will not exceed prices listed on the most current GSA Schedule.

26. Disputes

If the Contracting Officer under the prime contract issues a decision affecting any decision, claim, or dispute with respect to this Subcontract, the decision shall be conclusive and binding on the Subcontractor. However, if the Contractor has the right of appeal from the Contracting Officer's decision, it will file an appeal under the Disputes clause of the prime contract upon receipt of the Subcontractor's written request in sufficient contract time to allow the timely filing of the appeal. The Contractor and Subcontractor shall cooperate reasonably with each other in connection with the appeal and shall pay their respective legal and other expenses.

The decision of the Board of Contract Appeals or court shall be final and conclusive on the Contractor and the ~~Subcontractor, and both parties agree to implement the decision provided, however, that the parties may invoke~~ available judicial remedies for review of the decision.

Pending determination of any dispute under this Subcontract, the Subcontractor agrees to perform the work in accordance with directives from the Contractor and shall not delay the progress or completion of the work.

27. Integration

This Agreement sets forth the entire and only Agreement between ISN and the Subcontractor relative to the subject matter hereof. Any representation, promise, or condition, whether oral or written, not incorporated herein shall not be binding upon either party. No waiver, modification, or amendment to the terms of this Agreement shall be effective unless made in writing and signed by the below signed individuals or their designated authorized representatives.

28. Conflict

If there is a conflict with the Subcontract Conditions, Statement of Work, and Prime Contract Clauses of Appendix C, the Prime Contract clauses shall govern. If there is a conflict with the Subcontract Conditions and the Statement of Work, the Statement of Work of Appendix A shall govern.

29. Employee Hiring



Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

Both ISN and the Subcontractor agree that during the term of this Agreement, neither party shall attempt to induce any employee to take employment with the other party.

30. Software License Agreement

Appendix D, Datacomm Management Sciences, Inc. End User Software License Agreement for Network Management System Software, NMSS 8000 is hereby made a part of this agreement.

This Agreement has been entered into and executed by officials duly authorized to bind their respective parties.

INFORMATION SYSTEMS AND NETWORKS CORPORATION

BY: [signature]

TITLE: President

DATE: Mar. 27, 1995

SUBCONTRACTOR:

BY: [signature]

TITLE: President

DATE: Mar. 28, 1995

ISN
Proprietary & Confidential Information
Use, Publication or Disclosure Restricted
to Receiving Party

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORK CORPORATION, Plaintiff, | ) | No.: 98-178C |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

Deposition of:

WILLIAM ROBERTSON

a witness of lawful age, taken on behalf of the Defendant, pursuant to notice, in the offices of the Department of Justice, Room 12011, 1100 L Street, N.W., Washington, D.C. 20530, on Monday, October 25, 1999, at 10:15 a.m., before Sharon Bellamy, Notary Public in and for the District of Columbia, when were present:

APPEARANCES:

On behalf of Plaintiff:

JOHN M. CRAIG, Esquire
Singer & Associates, P.C.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(301) 469-0400

question on the table about the problems that existed when you took over the program, and would you please continue with that?

A Where were we?

MR. CRAIG: I don't know what the question, do you have a specific question?

MR. AUSTIN: The question was, what types of problems existed when you came on board as a program -- as the program manager, replacing Mr. Chapman.

THE WITNESS: At that point in time the initial CDRL -- the very heavily front-loaded CDRL delivery requirements, most of the initial deliveries had been rejected by the government.

BY MR. AUSTIN:

Q Okay, now, what is -- when you mean CDRL delivery, give us an example.

A Program Management Plan.

Q Okay. Program Management Plan is how you as the program manager was going to handle the project?

A Yes.

Q And that was -- your predecessor plan was rejected?

A Mm-hmm. Among other things, yes.

Q Okay.

A I believe.

Q What other things?

A I don't recall exactly what they were. Basically, there would have been a support plan, integrated logistics support plan, training plans. I mean, there were a lot of documents of that sort that were front-loaded basically on the schedule.

Your documentation, I'm sure, has a list of those, but those that had been delivered prior to the time I came on board were essentially either all held or had been sent back for rework.

Q So we're at the point, late October, early November, where you come on board.

What were some of the first things, what was the first thing that you did or you recall doing?

A --I was introduced. Probably either the day or the day after I came on board, I was introduced at a program meeting with the government as the new program manager.

Q Okay. And then what happened? And then what?

A I sat down with Bob Chapman, talked to him about where we were, what had happened, what his problems were, et cetera, and basically I decided that I needed him as my deputy, my technical deputy, and proceeded from there to try to get back on schedule.

The first thing I did was replace the temporaries with direct hires with the kind of equipment -- the kind of

experience that I wanted in my staff, as quickly as possible.

Q Okay, now, getting back to the temps, why were the temps hired as opposed to direct hires?

A They were available and it was a matter of expeditiously getting somebody on board who could start the documents.

The documentation delivery schedule was extremely ambitious.

Q And that's from the RFP?

A Yes.

Q Okay, now, was ISN aware that it was ambitious at the time they bid on it?

A I don't know. I wasn't there. I would say they should have been. The schedule for delivery should have been in the RFP, but I won't swear to that. I really didn't review the RFP very well.

Q When you came on board, you were aware that, according to the contract, ISN was supposed to have a completed system within 12 months at Hampton Roads?

A Mm-hmm.

Q And when you came on approximately, you said, six months, I think, after contract award?

A Yes.

Q Okay. The contract was awarded in July of '94,

and you took over in October, later in '94?
A Yes.
Q All right.
A So it had been four months, five months instead of six; that range.
Q And so ISN was already behind schedule?
A Mm-hmm.
Q So what steps -- you hired direct hires. What other steps did you take to try to get it back on track?
A Basically, we started recycling the documentation that had been -- had been sent back to us, the CDRLs that had been sent back to us.
Q Okay.
A To identify the nature of the comments, to incorporate those comments, et cetera.
Q Okay. What other things did you do?
A Started -- at that point we were dramatically pursuing the design and trying to identify the changes, and still trying to get the government to drive a stake in the ground, if you will, as to what design we were really going to build to.
I discussed the fact that we submitted the site design four times. Each time the site had changed, and the program office wanted to incorporated -- wanted us to incorporate the changes that had occurred because you

DEPARTMENT OF THE NAVY
FLEET AND INDUSTRIAL SUPPLY CENTER NORFOLK
DETACHMENT WASHINGTON DC
WASHINGTON NAVY YARD BLDG 200
901 M STREET SE
WASHINGTON DC 20374-5014

PB2:LM:94C0389
26 June 1995

Information Systems & Networks Corporation
Attn: Mr. William Robertson
10411 Motor City Drive
Bethesda, MD 20817

Dear Mr. Robertson:

It was a pleasure to meet yourself and the other members of your team at our meeting on June 22nd. I would like to take this time to summarize some of the topics covered at the meeting. A copy of the attendance sheet was provided to you at the conclusion of the meeting by Ms. Held.

- An Engineering Change Proposal (ECP) for Hampton Roads (only) was provided to the Navy. The ECP was stated to include a "surcharge" cost for the 414 DIM Cards which are now upgraded.

- A modification to the contract will be issued for the combination of both the formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I.

- The ECP submitted (at the meeting) will be reviewed by SPAWAR with comments to be provided on Monday or Tuesday (June 26th or 27th).

- The delivery schedule for all sites in Lot I is to be provided by ISN to the Navy by by Monday, June 26th.

I am your first line point of contact within this activity. If there are any questions, please contact myself at (202) 433-5389 or by facsimile at (202) 685-0002. In my extended absence or in an emergency Mr. Roscoe Crawford, the Contracting Officer, is available to assist you at (202) 433-5387. Please notify your staff of my telephone and facsimile numbers. A message should be left on my voice mail if I am not immediately available. I will return call at the earliest time.

Lisa Murtha

LISA C. MURTHA
Contract Specialist

P.S. FAX # 685-0002 not working - use 433-9586

Cpy to:
DCMAO Baltimore, Attn: Ms. T. Proctor

Jones Ex. 21

JUL-21-1995 15:34 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.01

PMW 172

WE KEEP THE FLEET COMMUNICATING

PLAINTIFF'S EXHIBIT 7

# FACSIMILE TRANSMISSION COVER SHEET

SPACE AND NAVAL WARFARE SYSTEMS COMMAND
SHIP/SHORE COMMUNICATIONS OFFICE
PMW 172
2451 CRYSTAL DRIVE
ARLINGTON, VA 22245-5200

FAX (703) 602-7252

Plfs Exhibit 12
for identification
Sandra D Warren
Oct 29 19 99
Wit. Jeffrey Bergdahl
(4 pages)

DATE: 7/21/95

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: 4

FROM: JEFF BERGDAHL CODE: PMW172-22C

PHONE #: (703) 602-8332

TO:

AGENCY: FFSC DET WASH

NAME: ROSCOE CRAWFORD/LISA MURTHA CODE: PB2

FAX NUMBER: (202) 685-0002

VOICE NUMBER: (202) 433-5387/9

SUBJECT: ATC CONTRACT N00600-94-C-0389.

REMARKS: Roscoe/Lisa,
Enclosed is our approval letter on ECP-1.
I will be in Norfolk on Monday, but will be available after that to review the ISN contract.

Jeff Bergdahl

000068



12.1

DEPARTMENT OF THE NAVY
SPACE AND NAVAL WARFARE SYSTEMS COMMAND
WASHINGTON, D.C. 20363-5100

IN REPLY REFER TO:

2300
Ser PMW 172-22C/049
20 July 1995

From: Commander, Space and Naval Warfare Systems Command
To: Officer in Charge, Fleet Industrial Supply Center Detachment, Washington, D.C. (Code PB2)

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

Ref: (a) ISN LETTER OF 20 Jun 95 REGARDING SUBMITTAL OF ENGINEERING 12 PAIR CABLE CHANGE PROPOSAL (ECP) CDRL ITEM C003

Encl: (1) ISN letter of 20 Jun 95

1. SPAWAR has reviewed reference (a) ECP and technically approves ISN's proposed engineering change. Recommend negotiate all terms and conditions listed in reference (a) with ISN. It is further recommended that ISN number all subsequent ECP submissions for accountability purposes commencing with ECP 0002 and submit in accordance with MIL-STD-973 Appendix D as required in Data Item Description (DID) DI-CMAN-80639A.

2. The following comments address ISN's cost analysis sheet for NTCC Hampton Roads in enclosure (1).

a. **ECP Item:** Installation of 12-pair cabling on digital interfaces specified in referenced letter.

**Comment:** Original contractual cost to install or reuse cable was $419,329. Recommend a cost breakdown of the additional charge of $623,563 to justify these additional costs.

b. **ECP Item:** Increase the Novell Netware 3.11 SFT III from 25 to 50 users.

**Comment:** ISN should indicate the cost for 25 users under the "Cost in Contract Column" of enclosure (1) to reference (a). The Government does require a 50 user LAN capacity.

c. **ECP Item:** Government requested ATC Configuration Change.

000069

12.2

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

Comment: Agree with No Cost (n/c) to the Government. The equipment which the Government requested was based on a review of Amendment 4 to the RFP N00600-93-R-2790 which ISN bid on. At no time did the Government request anything which was out of the scope of the contract proposal.

d. ECP Item: Upgrade one of the RMSA 100(X) to an RMSA 200(X).

Comment: Agree with this recommendation.

e. ECP Item: The DIM 414E upgrade.

Comment: ISN letter of April 18, 1995 provided an agreed upon ATC equipment list between the Government and ISN for all seven sites. This letter should be incorporated within the contract. ISN further agreed to make the changes at no cost to the Government. Charges cited in enclosure (1) of reference (a) is a surcharge between DIM 414-3 modules and the DIM 414-E modules. It should also be noted that the agreed upon DIM 414-E module figure of 976 between the Government and ISN is significantly lower than ISN's original contract proposal of 1,515 DIM 414-3 modules. Recommend surcharge differences be identified.

f. ECP Item: CLIN 0001AA costs.

Comment: Total CLIN 0001AA under Cost in Contract column Enclosure 1 to Reference (a) should read $2,341,219.73 vice $2,152,184 per the ATC Contract N00600-94-C-0389.

g. ECP Item: CDRL's CLIN 0003 cost of ECP of $50,000.

Comment: Agree with this recommendation.

3. SPAWAR agrees with ISNs new POA&M Engineering and Technical Support Plan for NTCC Hampton Roads in enclosure (1) to reference (a).

4. SPAWAR will change the funding document N0003995RCDL301 in the amount of $789,319 for the ATC at Puerto Rico currently at FISC DET, and will coordinate with NISE EAST DEt Norfolk to arrange additional funding to satisfy this ECP by separate correspondence.

000070

12.3

JUL-21-1995 15:36 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.04

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

5. Any questions concerning this correspondence should be addressed to Mr. Jeff Bergdahl at (703) 602-8332.

KEVIN MEYERS
Division Head
Ship and Shore Communication
By direction of
the Commander

Copy to:
COMNAVCOMTELCOM Washington, DC, N512B (G. Dinan)
DCAMO Baltimore, MD, S2102A (T. Proctor)

000071



12.4

# Memorandum

**DATE:** August 23, 1995

**TO:** BILL ROBERTSON

**FROM:** DANIEL TOBIN

**RE:** STATUS REPORT: ATM ECP

BILL,

THE PURPOSE OF THIS MEMO IS TO UPDATE YOU ON THE STATUS OF OUR ECP AT FISC.

PER FONCON WITH LISA MURTHA, 22 AUG 95:

1) SHE HAS NOT LOOKED AT THE ECP, TO DATE.

2) DUE TO "END OF YEAR PROCUREMENTS" (8a-2 EACH) SHE WILL NOT BE ABLE TO WORK ON OUR ECP UNTIL MID-SEPT 95.

3) REASON—TOO MUCH "END OF YEAR" WORK AND TOO FEW PEOPLE TO ACCOMPLISH IT. SHE HAS INFORMED ROSCOE OF HER WORK LOAD.

4) I TOLD HER THAT I DID NOT THINK THAT ISN (MY VP) WOULD WAIT THAT LONG AND THAT I WOULD GIVE HER A 'HEADS UP' BEFORE MR. ROBERTSON TALKED TO ROSCOE, IF THAT IS THE COURSE HE CHOOSES. SHE SAID--THANKS!

5) I TALKED WITH DON TABASCO ABOUT CONTRACT AND FAR REQUIREMENTS FOR TIMELY ECP PROCESSING BY THE GOVERNMENT. HE RECOMMENDS THAT WE TAKE A MORE FORCEFUL APPROACH WITH THE CONTRACTING OFFICER. YOU MIGHT WANT TO TOUCH BASE WITH HIM PERSONALLY.

BOTTOM LINE—I HAVE LOOKED THROUGH THE "CONTRACT" AND CAN ONLY FIND A REQUIREMENT THAT THE "CONTRACTING OFFICER SHALL EXPEDITIOUSLY PROCESS CHANGE PROPOSALS." (PAGE 116, I-46 (c) 'CHANGE PROPOSALS').

NOTE: Para (g), Page 117: 'CHANGES' MAKES INTERESTING READING.

IF YOU DECIDE TO TALK WITH WITH ROSCOE, PLEASE GIVE ME A 'HEADS UP' SO I CAN DO THE SAME TO LISA?

 K-1 L Robertson #9

1/31/96

ISN

Louis H. Oliver
Group Vice President

January 15, 1995 96

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl

**REFERENCE:** Contract Number N00600-94-C0389

**SUBJECT:** A004 Contractor's Progress, Status and Management Report

In accordance with the terms and conditions of the referenced contract, attached is the December 1995 Contractor's Progress, Status and Management Report for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
ATC Program Manager

cc: FISC DET, Washington DC
R. Crawford

## PROGRESS FOR THE MONTH OF DECEMBER 95

The majority of ISN effort this month has been expended on ATC computer hardware and software integration, installation and CDRL development. Close coordination and multiple technical working meetings continued with Government Representatives of SPAWAR, NISE EAST DET Norfolk, VA and NTCC Hampton Roads, Virginia. These technical meetings were held to discuss and resolve issues on cutover Hampton Roads, Virginia. Received the RMSA 100 switch and associated hardware. Installed the tape back-up unit.

### Organizational Changes

### Schedule Changes

ISN provided a new ATC Program Schedule on 21 June 1995 for Government review and approval. Because the ECP has not been approved and work has not been allowed to proceed on the Hawaii sites, the schedule for Hawaii will need to be modified. The revised schedule for Hawaii will be done once ISN has been given a go-ahead for the Hawaii site.

### Cost Curves

To be provided.

### Costs Incurred For The Month of December 1995

| | |
|---|---|
| Hampton Roads | $254,295 |
| Camp Smith | 0 |
| Makalapa | 0 |
| CDRL | 22,487 |

### Hours Expended

During the month of December, ISN spent 2278.50 hour's effort on the ATC project.

### Trips

| Name | Period of Time | Location | Purpose of Trip |
|---|---|---|---|

No Trips

## Record of Significant Telephone Calls

None

## Status of Engineering Change Proposals

June 95 ECP for the following modifications: Waiting response from the Government

- Revised ATC Configuration at Hampton Roads
- Twelve pair cables
- Enhanced DIM 414E Module
- SFT III for fifty users

## Contract Schedule Status

Awaiting Government comments or approval on:

D002/003 - Computer System Operator's Manual/Software User Manual.

F002 - ATC Lesson Plan : 3 separate items

F003 - ATC Trainee Guide : 3 separate items

G003 - The draft ATC Test Procedure G003 was submitted to the Navy for review in September 95, a revised draft was reviewed and concurred by the Navy in October and November. It was formally submitted in early November and has been reviewed by the Navy.

The ATC Installation and cut over continues to be delayed as the result of the Government's not allowing ISN to proceed with the cut over until all of the hardware had been installed and by stopping all progress on Camp Smith and Makalapa until the cut over of significant equipment at Hampton Roads. As a result ISN has delayed additional staffing at Hampton Roads and has been required to plan work in a less than optimum sequence. Also ISN has deferred all staffing for Camp Smith and Makalapa.

F004 OJT Handbook in process to be submitted in January 1996.

## Activities Planned for January 96

Continue ATC installation at NTCC Hampton Roads, Virginia
Continue planning for NTCC Pearl Harbor and Camp H.W. Smith

Continue CDRL document development and review/incorporate appropriate Government comments received on previously submitted CDRL's

# List of Appendixes

None

Prepared by: William N.L. Robertson, (301) 469-0400

ISN.

Louis R. Oliver
Group Vice President

December 15, 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl

**REFERENCE:** Contract Number N00600-94-C0389

**SUBJECT:** A004 Contractor's Progress, Status and Management Report

In accordance with the terms and conditions of the referenced contract, attached is the November1995 Contractor's Progress, Status and Management Report for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
ATC Program Manager

cc: FISC DET, Washington DC
R. Crawford

# PROGRESS FOR THE MONTH OF NOVEMBER 95

The majority of ISN effort this month has been expended on ATC computer hardware and software integration, installation and CDRL development. Close coordination and multiple technical working meetings continued with Government Representatives of SPAWAR, NISE EAST DET Norfolk, VA and NTCC Hampton Roads, Virginia. These technical meetings were held to discuss and resolve issues on cutover Hampton Roads, Virginia. Received the RMSA 100 switch and associated hardware. Installed the tape back-up unit.

## Organizational Changes

## Schedule Changes

ISN provided a new ATC Program Schedule on 21 June 1995 for Government review and approval. Because the ECP has not been approved and work has not been allowed to proceed on the Hawaii sites, the schedule for Hawaii will need to be modified. The revised schedule for Hawaii will be done once ISN has been given a go-ahead for the Hawaii site.

## Cost Curves

To be provided.

## Costs Incurred For The Month of November 1995

| | |
|---|---|
| Hampton Roads | $50,953 |
| Camp Smith | 0 |
| Makalapa | 0 |
| CDRL | 24,981 |

## Hours Expended

During the month of November, ISN spent 2278.50 hour's effort on the ATC project.

## Trips

| Name | Period of Time | Location | Purpose of Trip |
|---|---|---|---|
| Bill Robertson | 11/6/95 - 11/7/95 | Hampton Roads | Mtg. at Hampton Roads with Navy Officials |
| Bill Robertson | 11/26/95 - 11/28/95 | Hampton Roads | Mtg. at Hampton Roads with Navy Officials |

## Record of Significant Telephone Calls

## Status of Engineering Change Proposals

June 95 ECP for the following modifications: Waiting response from the Government

- Revised ATC Configuration at Hampton Roads
- Twelve pair cables
- Enhanced DIM 414E Module
- SFT III for fifty users

## Contract Schedule Status

Delays caused by Government not allowing ISN to begin cutover and are impacting cost and schedule.

F004 OJT Handbook in process to be submitted in early January 1996.

## Activities Planned for November 95

Continue ATC installation at NTCC Hampton Roads, Virginia
Continue planning for NTCC Pearl Harbor and Camp H.W. Smith

Continue CDRL document development and review/incorporate appropriate Government comments received on previously submitted CDRL's

## List of Appendixes

None

**Prepared by:** William N.L. Robertson, (301) 469-0400

ISN

William N.L. Robertson
Vice President
Systems Integration Group

November 30, 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl

**REFERENCE:** Contract Number N00600-94-C0389

**SUBJECT:** A004 Contractor's Progress, Status and Management Report

In accordance with the terms and conditions of the referenced contract, attached is the October 1995 Contractor's Progress, Status and Management Report for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
ATC Program Manager

cc: FISC DET, Washington DC
R. Crawford

## PROGRESS FOR THE MONTH OF OCTOBER 95

The majority of ISN effort this month has been expended on ATC computer hardware and software integration, installation and CDRL development. Close coordination and multiple technical working meetings continued with Government Representatives of SPAWAR, NISE EAST DET Norfolk, VA and NTCC Hampton Roads, Virginia. These technical meetings were held to discuss and resolve issues on cutover Hampton Roads, Virginia.

### Organizational Changes

There were no new employees hired for October 1995.

### Schedule Changes

ISN provided a new ATC Program Schedule on 21 June 1995 for Government review and approval. Because the ECP has not been approved and work has not been allowed to proceed on the Hawaii sites, the schedule for Hawaii will need to be modified. The revised schedule for Hawaii will be done once ISN has been given a go-ahead for the Hawaii site.

### Cost Curves

To be provided.

### Costs Incurred For The Month of October 1995

| | |
|---|---|
| Hampton Roads | 139,539.66 |
| Camp Smith | 3,676.43 |
| Makalapa | 1,348.46 |
| CDRL | 26,792.67 |

### Hours Expended

During the month of October, ISN spent 2278.50 hour's effort on the ATC project.

### Trips

| Name | Period of Time | Location | Purpose of Trip |
|---|---|---|---|
| Bill Robertson | 10/09/95 - 10/10/95 | Hampton Roads | Meeting at Hampton Roads with Navy Officials |
| Bill Robertson | 10/22/95 - 10/24/95 | Hampton Roads | Meeting at Hampton Roads with Navy Officials |

| Name | Period of Time | Location | Purpose of Trip |
| --- | --- | --- | --- |
| Royce Priem | 10/03/95 - 10/10/95 | Hampton Roads | Engineering Support for Hampton Roads Installation |

## Record of Significant Telephone Calls

None.

## Status of Engineering Change Proposals

June 95 ECP for the following modifications: Waiting response from the Government

-- Revised ATC Configuration at Hampton Roads
-- Twelve pair cables
-- Enhanced DIM 414E Module
-- SFT III for fifty users

## Contract Schedule Status

Delays caused by Government not allowing ISN to begin cutover are impacting cost and schedule.

D002/003 COMPUTER SYSTEMS OPERATOR'S MANUAL SOFTWARE USER MANUAL
F004 OJT HANDBOOK

**Activities Planned for October 95**

Continue ATC installation at NTCC Hampton Roads, Virginia
Continue planning for NTCC Pearl Harbor and Camp H.W. Smith

Continue CDRL document development and review/incorporate appropriate Government comments received on previously submitted CDRL's

**List of Appendixes**

None

**Prepared by:** William N.L. Robertson, (301) 469-0400

NOV.11.1996 7:59AM NO.226 P.13/18

ISN

William N.L. Robertson
Vice President
Systems Integration Group

October 31, 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl

**REFERENCE:** Contract Number N00600-94-C0389

**SUBJECT:** A004 Contractor's Progress, Status and Management Report

In accordance with the terms and conditions of the referenced contract, attached is the September 1995 Contractor's Progress, Status and Management Report for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
ATC Program Manager

Received in mail room 12/1/95

cc: FISC DET, Washington DC
R. Crawford

## PROGRESS FOR THE MONTH OF SEPTEMBER 95

The majority of ISN effort this month has been expended on ATC computer hardware and software integration, installation and CDRL development. Close coordination and multiple technical working meetings continued with Government Representatives of SPAWAR, NISE EAST DET Norfolk, VA and NTCC Hampton Roads, Virginia. These technical meetings were held to discuss and resolve issues on cutover Hampton Roads, Virginia.

### Organizational Changes

During this reporting period, ISN has hired the following individuals to support the ATC Contract.

| Date Hired | Name | Position |
|---|---|---|
| 08/04/95 | Harry T. Watson | |

Epoch Engineering, Inc. is continuing to provide personnel support service to augment CDRL developments in the area of training (CDRL F003, and F004). This support service started in May 1995 and expected to continue until August 1995.

### Schedule Changes

ISN provided a new ATC Program Schedule on 21 June 1995 for Government review and approval. Because the ECP has not been approved and work has not been allowed to proceed on the Hawaii sites, the schedule for Hawaii may need to be modified. The revised schedule for Hawaii will be done once ISN has been given a go-ahead for the Hawaii site.

### Cost Curves

To be provided.

### Costs Incurred For The Month of September 1995

| | |
|---|---|
| Hampton Roads | $ 72,454.51 |
| Camp Smith | 7,129.56 |
| Makalapa | 638.50 |
| CDRL | 17,135.71 |

### Hours Expended

During the month of September, ISN spent 2242 hour's effort on the ATC project.

## Trips

| Name | Period of Time | Location | Purpose of Trip |
|---|---|---|---|
| Bill Robertson | 9/17-9/19/95 | Hampton Roads | Meeting with Navy Officials |
| | 9/24-9/26/95 | Hampton Roads | Meeting with Navy OfficialS |
| Royce Priem | 9/9-10/2\95 | Hampton Roads | Eng. Support for Hampton Roads Installation |
| Travis Ellis | 9/20-9/23/95 | Hampton Roads | Installation of ATC Switch |

## Record of Significant Telephone Calls

None.

## Status of Engineering Change Proposals

| | |
|---|---|
| June 95 ECP for the following modifications: | Waiting response from the Government |

- Revised ATC Configuration at Hampton Roads
- Twelve pair cables
- Enhanced DIM 414E Module
- SFT III for fifty users

## Contract Schedule Status

Awaiting Government comments or approval on:

D002/003 COMPUTER SYSTEMS OPERATOR'S MANUAL SOFTWARE USER MANUAL
F004 OJT HANDBOOK

## Activities Planned for September 95

Continue ATC installation at NTCC Hampton Roads, Virginia
Continue planning for NTCC Pearl Harbor and Camp H.W. Smith

Continue CDRL document development and review/incorporate appropriate Government comments received on previously submitted CDRL's

## List of Appendixes

None

Prepared by: William N.L. Robertson, (301) 469-0400

ISN

January 26, 1996

Department of the Navy
Naval Regional Contracting Center
Washington Navy Yard
Building 200
901 M Street, S.E.
Washington, D.C. 20374-5014

Attention: Roscoe W. Crawford
Contracting Officer

Subject: Contract No. N00600-94-C-0389

Dear Mr. Crawford:

The purpose of this letter is to review two very serious issues that are still open on the contract concerning lack of progress payments and approval of the ECP.

We have not received any progress payments since August 24, 1995, which included a payment in the amount of $443,565. The amount that is outstanding is $1,331,696.00 through December 21, 1995 as shown in the attached summary. We were told that Jeffery Bergdahl, COR, has recommended approval of additional payments based on his assessment of our progress to date. This being the case, ISN requests that your office contact the ACO, Tish Proctor, in order to expedite immediately payment for this excessively large amount.

Also, the approval of the latest ECP dated June 20, 1995 in the amount of $930,527 for Hampton Roads has not been received by ISN.

This latest version of the ECP includes changes to the site configuration, equipment configuration, use of 12 pair cable vice 6 pair cable, users changes and other changes. This ECP supersedes the ECP submitted on 6 March 1995 and confirms meetings held on March 28, 1995, April 30, 1995 and most recently June 22, 1995 where it was agreed that the ECP would be approved including a revised schedule in the form of a contract modification. The Navy provided direction to ISN to include all the changes in the ECP during several meetings with the Contracting Officer and COR. Subsequently, Ms. Lisa Murtha, Contract Specialist, issued a letter dated 26 June 1995 stating that a modification to the contract would be issued for the combination of the formal acceptance of an ECP for implementation

ENCL. 1

of all sites in Lot I and the revised delivery schedule for all sites in Lot I. Also a letter dated 31 August 1995 from Jeffrey Bergdahl indicated that the ECP was technically approved and that funding had been authorized and only required a wording change to the funding document.

We proceeded on the basis that the contract modification would be issued expeditiously in accordance with Clause I.46 of the contract implementing the ECP and that we wanted to continue with the progress on the contract to avoid default and receive progress payments. During discussions of the ECP and schedule changes, ISN advised the Navy that due to the magnitude of the site changes at Hampton Roads, it was not possible to implement the original proposed design solution. Therefore, in order to continue on the contract, it was necessary to implement the ECP configuration.

We are very concerned that approvals have not been received to date on this subject. We cannot continue to incur additional costs without the immediate approval of the ECP in a contract modification and authorization of progress payments. Without an expeditious resolution of these issues, our only recourse will be to submit a constructive change for equitable adjustment pursuant to the Changes Clause FAR 52.243-1.

Sincerely,
INFORMATION SYSTEMS AND NETWORKS CORPORATION

Donald P. Tabasco
Manager of Contracts

Attachments

MEMORANDUM

31 August 1995

To: Bill Robertson

From: Jeff Bergdahl *Jeff Bergdahl*

Subj: ATC issues

1. IRT your voice mail, we have technically approved the ECP and proposed schedule extension via letter to FISC. I am not aware of any other administrative items we owe FISC, other than changing the wording on the funding document at FISC.

2. I would like to hear how the ATC training in Norfolk is proceeding and request copies of the student evaluations be provided. Also, are you still going to submit a no-cost ECP to use in negotiation of consideration with FISC.

3. At our meetings at NTCC Hampton Roads this month there was discussion of what testing would be required before start of cutover. This is discussed several times in CDRL G002, System Test and Verification Plan for NTCC Hampton Roads. Specifically:

a. Page 2 under 1.1 Scope
b. Page 9 under 1.5 Participation and Test Objectives
c. Page 10 under 1.9 Validation Signature Sheets
d. Page 11 under 1.9. Note "Validation Signature Sheets will be presented to the Government for review and comments 30 days prior to commencement of Phase VI."
e. Page 17 under 7.0 through 7.3. I would like to review the "(OEM) System Test Procedures" discussed in Paragraph 7.1 and the "test results documentation form" discussed in Paragraph 7.2 prior to the Phase VI testing. I would expect them to be delivered as part of CDRL G003, Test Procedures. At the start of the Phase VI testing I would like to see the test results from Phase IV and Phase V testing described on Pages 15 and 16.

Based on the documents you should be able to tell us how long you require to run through the tests.

QUEST FOR CONTRACTUAL PROCUR T-NAVCOMPT FORM 2276 (8 PT) 8-81)

THIS REQUEST MUST BE ACCEP ON A DIRECT CITATION BASIS ON AND IS SUBJECT TO THE CONDITION LISTED ON THE REVERSE SIDE. | 2. DOCUMENT NUMBER N0003995RCDL301

REFERENCE NO. N0003995AFN52D6 | 4. FUNDS EXPIRE ON 30 SEP 97 | 5. DMS RATING | 6. PRIORITY | 7. DATE REQUIRED 31 DEC 95 | 8. AMEND. NO 001

FROM: SPACE AND NAVAL WARFARE SYSTEM COMMAND ARLINGTON, VA. 22202, ATTN: SPAWAR 01-4 | 10. FOR DETAILS CONTACT: S. SIMMS, PD72P4A, (703)602-3364

TO: COMMANDING OFFICER
FLEET INDUSTRIAL SUPPLY CENTER
WASHINGTON NAVY YARD
WASHINGTON DC 20374-0600
ATTENTION: MR. ROSCOE CRAWFORD 95X3917

12. MAIL BILLINGS TO: THE PAYING OFFICE CITED IN RESULTING CONTRACT

ACCOUNTING DATA TO BE CITED ON RESULTING CONTRACTS

| ACRN | B. APPROPRIATION | C. SUBHEAD | D. OBJ CLASS | E. BU. CONTROL | F. SA | G. AAA | H. TT | I. PAA | J. COST CODE | K. AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1751810 | 52D6 | 000 | EA172 | 0 | 068342 | 2D | 000000 | D60010000000 | .00 |

AMOUNTS WILL NOT BE EXCEEDED IN THE OBLIGATION DOCUMENT WITH OUT PRIOR WRITTEN APPROVAL FROM THE ISSUER.

L. TOTAL THIS DOCUMENT .00
M. CUMULATIVE TOTAL 789,319.00

PROCUREMENT BY CONTRACT OF THE FOLLOWING ITEMS IS REQUESTED

THESE ITEMS !_! ARE !_! ARE NOT INCLUDED IN THE INTERSERVICE SUPPLY SUPPORT PROGRAM AND REQUIRED INTERSERVICE SCREENING ! ! HAS ! ! HAS NOT BEEN ACCOMPLISHED

| B. ITEM NO. | C. FSC | D. DESCRIPTION NAT. STOCK NO, SPEC AND/OR DRAW NO, ETC | E. QUANTITY | F. UNIT | G. ESTIMATED UNIT PRICE | H. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|
| | | DOCUMENT AMENDED TO EXERCISE HAMPTON ROADS ATC ECP COSTS VICE PROCUREMENT OF PUERTO RICO ATC. | | | | |

Exhibit 16 for identification Sandra D. Warren 10-29-99 Wit. Jeffrey Bergdahl (1 page)

RECEIVED AT N R C C
ENTERED INTO PROSTATS
PALT COMMENCES AUG 29 1995

CONTRACT AWARD: $
AVAIL FOR RECOUPMENT: $
SIGNATURE CONTRACTING OFFICER

CHANGES TO THIS DOCUMENT ARE AUTHORIZED WITHOUT PRIOR CONSENT OF AUTHORIZING OFFICIAL.

FORWARD ACCEPTANCE AND COPIES OF ALL OBLIGATING DOCUMENTS TO: COMMANDER, SPACE AND NAVAL WARFARE SYSTEM COMMAND, DEPARTMENT OF THE NAVY, ARLINGTON, VA. 22202, ATTN: SPAWAR 01-4 SEE ACCEPTANCE INSTRUCTIONS ON REVERSE

COPY TO: SPAWAR 01-4
CODE: N880 NO CAAS IS AUTHORIZED WITHOUT SPECIFIC AMENDMENT TO THIS DOCUMENT

SEE ATTACH PAGES FOR DELIVERY SCHEDULES, PRESERVATION AND PACKAGING INSTRUCTIONS, SHIPPING INSTRUCTIONS AND INSTRUCTIONS FOR DISTRIBUTION OF CONTRACTS AND RELATED DOCUMENTS. | GRAND TOTAL .00

TRANSPORTATION ALLOTMENT (USED IF FOB CONTRACTOR'S PLANT)

| | | |
|---|---|---|
| I CERTIFY THAT THE FUNDS CITED ARE PROPERLY CHARGEABLE FOR ITEMS REQUESTED. | AUTHORIZING OFFICIAL (NAME, TITLE AND SIGNATURE) for RICHARD J. LUCEY, ACCOUNTING OFFICER Loretta Jukamore | DATE 8/23/95 |
| THIS REQUEST IS ACCEPTED AND THE ITEMS WILL BE PROVIDED IN ACCORDANCE HEREWITH. | ACCEPTING OFFICIAL (NAME, TITLE AND SIGNATURE) Roscoe W. Crawford Contracting Officer | DATE 8/29/95 |

REQUEST FOR CONTRACTUAL PROCUR ENT-NAVCOMPT FORM 2276 (8 PT) 7.8-81)

1. THIS REQUEST MUST BE ACCEPT. ON A DIRECT CITATION BASIS ONL. AND IS SUBJECT TO THE CONDITION LISTED ON THE REVERSE SIDE. !2. DOCUMENT NUMBER N0003995RCDL301

3. REFERENCE NO. N0003995AFN52D6 !4. FUNDS EXPIRE ON 30 SEP 97 !5. DMS RATING !6. PRIORITY !7. DATE REQUIRED 31 DEC 95 !8. AMEND. NO 002

9. FROM: SPACE AND NAVAL WARFARE SYSTEM COMMAND ARLINGTON, VA. 22202, ATTN: SPAWAR 01-4

!10. FOR DETAILS CONTACT: S. SIMMS, PD72P4A, (703)602-3364

11. TO: COMMANDING OFFICER
FLEET INDUSTRIAL SUPPLY CENTER
WASHINGTON NAVY YARD
UIC WASHINGTON DC 20374-
N00600
ATTENTION: MR. ROSCOE CRAWFORD

!12. MAIL BILLINGS TO:
THE PAYING OFFICE CITED IN RESULTING CONTRACT

13. ACCOUNTING DATA TO BE CITED ON RESULTING CONTRACTS

| A. ACRN | B. APPROPRIATION | C. SUB HEAD | D. OBJ CLASS | E. BU. CONTROL | F. SA | G. AAA | H. TT | I. PAA | J. COST CODE | K. AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|
| AA | 1751810 | 52D6 | 000 | EA172 | 0 | 068342 | 2D | 000000 | D60010000000 | 789,319.00- |

14. AMOUNTS WILL NOT BE EXCEEDED IN THE OBLIGATION DOCUMENT WITH OUT PRIOR WRITTEN APPROVAL FROM THE ISSUER.

!L. TOTAL THIS DOCUMENT! 789,319.00-
!M. CUMULATIVE TOTAL! .00

15. PROCUREMENT BY CONTRACT OF THE FOLLOWING ITEMS IS REQUESTED
THESE ITEMS !_! ARE !_! ARE NOT INCLUDED IN THE INTERSERVICE SUPPLY SUPPORT PROGRAM AND REQUIRED INTERSERVICE SCREENING ! ! HAS ! ! HAS NOT BEEN ACCOMPLISHED

| A. ACRN | B. ITEM NO. | C. FSC | D. DESCRIPTION NAT.STOCK NO,SPEC AND/OR DRAW NO,ETC | E. QUANTITY | F. UNIT | G. ESTIMATED UNIT PRICE | H. ESTIMATED AMOUNT |
|---|---|---|---|---|---|---|---|
| AA | | | FUNDS ARE WITHDRAWN TO COVER AN EMERGENT REQUIREMENT FOR THE ATC PROGRAM. | | | | 789319.00- |
| | | | PLEASE TELEFAX IMMEDIATE ACCEPTANCE TO: 703-602-7409 | | | | |
| | | | THANK YOU | | | | |

NO CHANGES TO THIS DOCUMENT ARE AUTHORIZED WITHOUT PRIOR CONSENT OF AUTHORIZING OFFICIAL.

FORWARD ACCEPTANCE AND COPIES OF ALL OBLIGATING DOCUMENTS TO: COMMANDER, SPACE AND NAVAL WARFARE SYSTEM COMMAND, DEPARTMENT OF THE NAVY, ARLINGTON, VA. 22202, ATTN: SPAWAR 01-4 SEE ACCEPTANCE INSTRUCTIONS ON REVERSE

COPY TO: SPAWAR 01-4

TAC CODE: N880 NO CAAS IS AUTHORIZED WITHOUT SPECIFIC AMENDMENT TO THIS DOCUMENT

16. SEE ATTACH PAGES FOR DELIVERY SCHEDULES, PRESERVATION AND PACKAGING INSTRUCTIONS, SHIPPING INSTRUCTIONS AND INSTRUCTIONS FOR DISTRIBUTION OF CONTRACTS AND RELATED DOCUMENTS. !GRAND TOTAL 789319.00-

17. TRANSPORTATION ALLOTMENT (USED IF FOB CONTRACTOR'S PLANT)

18. I CERTIFY THAT THE FUNDS CITED ARE PROPERLY CHARGEABLE FOR ITEMS REQUESTED.
!AUTHORIZING OFFICIAL (NAME, TITLE AND SIGNATURE) RICHARD J. LUCEY, ACCOUNTING OFFICER
CHARLES MCALLISTER OPERATING ACCOUNTANT
! DATE 11/27/95

19. THIS REQUEST IS ACCEPTED AND THE ITEMS WILL BE PROVIDED IN
!ACCEPTING OFFICIAL (NAME, TITLE AND SIGNATURE)
! DATE

DEPARTMENT OF THE NAVY
FLEET AND INDUSTRIAL SUPPLY CENTER DETACHMENT
WASHINGTON NAVY YARD BLDG 200
901 M STREET SE
WASHINGTON DC 20374-5014

FEB 2 0 1996

4200
PB2C:S-94C0389

CERTIFIED MAIL RECEIPT REQUESTED

Information Systems and Network Corporation
Attn: Mrs. Roma Malkani
10411 Motor City Drive
Bethesda, Maryland 20817

Dear Mrs. Roma Malkani:

This confirms in writing the verbal notification of the Stop-Work Order given to your staff today, 20 February 1996 at our meeting.

This letter constitutes a Stop-Work Order issued in accordance with FAR 52.242-15. Information Systems and Network Corporation is required to stop all, or any part of the work called for under subject contract. Your company shall take all reasonable steps to minimize the incurrence of costs allocable to the work covered by this order.

The Navy will make arrangements with your company to pick up the remaining equipment purchased for the three sites in Lot I of the contract. Enclosure (1) is the inventory of the items purchased for Lot I. All equipment for NTCC Camp Smith, NTCC Makalapa and the remaining equipment that was purchased for NTCC Hampton Roads shall be picked up by the Navy.

Should you have any questions concerning this matter, you may contact Ms. Lisas Scott, Code PB2C, at (202) 433-5391.

Sincerely,

Roscoe W. Crawford

ROSCOE W. CRAWFORD
Contracting Officer

Encl: (1) Equipment List

MAR.-26'96(TUE) 13:34

DEPARTMENT OF THE NAVY
FLEET AND INDUSTRIAL SUPPLY CENTER DETACHMENT
WASHINGTON NAVY YARD BLDG 200
901 M STREET SE
WASHINGTON DC 20374-5014

MAR 1 ' 1996

4200
201.4C:ls:94C0389

CERTIFIED MAIL RECEIPT REQUESTED

Information Systems and Network Corporation
Attn: Mrs. Roma Malkani
10411 Motor City Drive
Bethesda, Maryland 20817

Subj: NOTICE OF TERMINATION TO PRIME CONTRACTOR UNDER CONTRACT N00600-94-C-0389

Dear Mrs. Roma Malkani:

*(a) Effective date of termination.* You are notified that Contract No. N00600-94-C-0389 (referred to as "the contract") is terminated completely for the Government's convenience under the clause entitled "Termination for Convenience of the Government (Fixed Price) dated April 1984. This termination is effective 15 March 1996.

*(b) Cessation of work and notification to immediate subcontractors.* You shall take the following steps:

(1) Stop all work, make no further shipments, and place no further orders relating to the contract, except for –

(i) The continued portion of the contract, if any;

(ii) Work-in-process or other materials that you may wish to retain for your own account; or

(iii) Work-in-process that the Contracting Officer authorizes you to continue (A) for safety precautions, (B) to clear or avoid damage to equipment, (C) to avoid immediate complete spoilage of work-in-process having a definite commercial value, or (D) to prevent any other undue loss to the Government. (If you believe this authorization is necessary or advisable, immediately notify the Contracting Officer by telephone or personal conference and obtain instructions.)

(2) Keep adequate records of your compliance with subparagraph (1) above showing the–

(i) Date you received the Notice of Termination;

(ii) Effective date of the termination; and

(iii) Extent of completion of performance on the effective date.

(3) Furnish notice of termination to each immediate subcontractor and supplier that will be affected by this termination. In the notice

(i) Specify your Government contract number,

(ii) State whether the contract has been terminated completely or partially;

(iii) Provide instructions to stop all work, make no further shipments, place no further orders, and terminate all subcontracts under the contract, subject to the exceptions in subparagraph (I) above;

(iv) Provide instructions to submit any settlement proposal promptly; and

(v) Request that similar notices and instructions be given to its immediate subcontractors.

(4) Notify the Contracting Officer all pending legal proceedings that are based on subcontracts or purchase orders under the contract, or in which a lien has been or may be placed against termination inventory to be reported to the Government. Also, promptly notify the Contracting Officer of any such proceedings that are filed after receipt of this Notice.

(5) Take any action required by the Contractor or under the Termination clause in the contract.

*(c) Termination inventory.*

(1) As instructed by the Contracting Officer, transfer title and deliver to the Government all termination inventory of the following types or classes, including subcontractor termination inventory that you have the right to take: None

(2) To settle your proposal, it will be necessary to establish that all prime and subcontractor termination inventory has been properly accounted for. For detailed information, see Part 45.

(d) Settlements with subcontractors. You remain liable to your subcontractors and suppliers for proposals arising because of the termination of their subcontracts or orders. You are requested to settle these settlement proposals as promptly as possible. For purposes of reimbursement by the Government, settlements will be governed by the provisions of Part 49.

*(e) Completed end items.*

(I) Notify the Contracting Officer of the number of items completed under the contract and still on hand and arrange for their delivery or other disposal (see 49.205).

(2) Invoice acceptable completed end items under the contract in the usual way and do not include them in the settlement proposal.

*(f) Patents.* If required by the contract, promptly forward the following to the Contracting Officer;

(I) Disclosure of all inventions, discoveries, and patent applications made in the performance of the contract.

(2) Instruments of license or assignment on all inventions, discoveries, and patent applications made in the performance of the contract.

*(g) Employees affected.*

(1) If this termination, together with other outstanding terminations, will necessitate a significant reduction in your work force, you are urged to --

(i) Promptly inform the local State Employment Service of your reduction-in-force schedule in numbers and occupations, so that the Service can take timely action in assisting displaced workers;;

(ii) Give affected employees maximum practical advance notice of the employment reduction and inform them of the facilities and services available to them through the local State Employment Service offices;

(iii) Advise affected employees to file applications with the State Employment Services to qualify for unemployment insurance, if necessary;

(v) Inform the local Chamber of Commerce and other appropriate

organizations which are prepared to offer practical assistance in finding employment for displaced workers of the impending reduction-in-force.

(2) If practicable, urge subcontractors to take similar actions to those described in subparagraph (I) above.

*(h) Administrative.* The contract administration office name in the contract will identify the Contracting Officer who will be in charge of the settlement of this termination and who will, upon request, provide the necessary settlement forms. Matters not covered by this notice should be brought to the attention of the undersigned.

(i) Please acknowledge receipt of this notice as provided below.

Roscoe W. Crawford

ROSCOE W. CRAWFORD
Contracting Officer

Acknowledgement of Notice

The undersigned acknowledges receipt of a signed copy of this notice on ________, 19____. Two signed copies of this notice are returned.

______________________________
(Name of Contractor)

By ______________________________
(Name)

______________________________
(Title)

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONT ID CODE | PAGE OF PAGES 1 1 |
|---|---|---|---|
| 2. AMENDMENT/MODIFICATION NO. 00003 | 3. EFFECTIVE DATE MAR 1 1 1998 | 4. REQUISITION/PURCHASE REQ. NO. N0003998RCDL300 | 5. PROJECT NO. (If applicable) |
| 6. ISSUED BY CODE N00600 | | 7. ADMINISTERED BY (If other than Item 6) CODE | |

6. ISSUED BY
FLEET INDUSTRIAL SUPPLY CENTER
WASHINGTON DETACHMENT
WASHINGTON NAVY YARD BLDG 200-4th Floor
WASHINGTON DC 20374-5014
POC: LISA SCOTT, CODE P82C, A/C (202) 433-5391

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and ZIP Code)
INFORMATION SYSTEMS AND NETWORKS CORPORATION
6411 MOTOR CITY DRIVE
BETHESDA, MARYLAND 20817

CODE 8U179 FACILITY CODE

(✓) 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO. N00600-94-C-0389

10B. DATED (SEE ITEM 13) 15 JUL 1994

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
(a) By completing Items 8 and 15, and returning ___ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS,
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

(✓) A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NO. IN ITEM 10A.

B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b).

C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF:

X D. OTHER (Specify type of modification and authority)
PURSUANT TO FAR CLAUSE 52.249-1 "TERMINATION FOR THE CONVENIENCE OF THE GOVERNMENT"

E. IMPORTANT: Contractor X is not, is required to sign this document and return ___ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The purpose of this modification is to provide preliminary notice of the following:

1. Contract N00600-94-C-0389 is completely terminated pursuant to the authority of FAR 52.249-1 Termination For The Convenience of the Government.

2. This termination is effective 15 March 1996.

3. Refer all questions regarding this matter to Ms. Lisa Scott, Code 201.4C at (202) 433-5391.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or Print) ROSCOE W. CRAWFORD | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR (Signature of person authorized to sign) | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA BY Roscoe W. Crawford (Signature of Contracting Officer) | 16C. DATE SIGNED MAR 1 4 1998 |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE
Computer Generated

STANDARD FORM 30 (REV. 10-83)
Prescribed by GSA
FAR (48 CFR) 53.243

ISN

Roma Malkani
President

June 6, 1996

Defense Logistics Agency
Defense Contract Management Area
Operations - Atlanta
805 Walker Street
Marietta, GA 30060-2789

Attention: Ms. Denise M. Jones
Termination Contracting Officer

Subject: Contract No. N00600-94-C-0389
Settlement Proposal (Termination)

Dear Ms. Jones:

Enclosed is our settlement proposal consisting of the following documents (original and 3 copies):

(1) Standard Form 1436, Settlement Proposal (Total Cost Basis)
(2) Standard Form 1439, Schedule of Accounting Information.

Our proposal is based on a total cost basis in accordance with FAR 49.206-2(b) since an inventory basis is not practicable because the Government took most of the material on 21 February 1996 from ISN Corporate Headquarters in Bethesda, Maryland and the termination is a complete termination.

We request that partial payments be authorized for this proposal in accordance with FAR 49.112-1.

This contract was awarded on 15 July 1994, put on hold on February 20, 1996, pursuant to a Stop Work Order, FAR 52.212-13, and then subsequently Terminated for the Convenience of the Government on 15 March 1996.

If there are any questions, please do not hesitate to contact the undersigned.

Very truly yours,
INFORMATION SYSTEMS AND NETWORKS CORPORATION

Roma Malkani

Roma Malkani

# SETTLEMENT PROPOSAL
(TOTAL COST BASIS)

FORM APPROVED OMB NO. 3090-0115

FOR USE BY A FIXED-PRICE PRIME CONTRACTOR OR A FIXED-PRICE SUBCONTRACTOR

| | |
|---|---|
| This Proposal Applies to (check one)<br>[X] A Prime contract with the Government — A subcontract or Purchase Order | COMPANY<br>INFORMATION SYSTEMS and NETWORKS |
| SUBCONTRACT or PURCHASE ORDER NO.(S) | STREET ADDRESS<br>10411 MOTOR CITY DRIVE |
| CONTRACTOR WHO SENT NOTICE OF TERMINATION | CITY and STATE<br>BETHESDA, MD 20817 |
| NAME | NAME OF GOVERNMENT AGENCY<br>NAVY |
| ADDRESS | Government Prime Contract: N00600-94-C-0389 — Contractor's Reference No.: 01319 |
| If moneys payable under the contract have been assigned, given the following:<br>NAME OF ASSIGNEE | EFFECTIVE DATE of TERMINATION<br>15 MARCH 1996 |
| ADDRESS | PROPOSAL NO. — CHECK ONE: INTERIM X FINAL |

SF1439, SCHEDULE OF ACCOUNTING INFORMATION _X_ IS ___ IS NOT ATTACHED (if not, explain)

## SECTION I - STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT or PURCHASE ORDER (a) | | FINISHED: Previously Shipped and invoiced (b) | FINISHED ON HAND: PAYMENT To Be RECEIVED THROUGH INVOICING (c) | FINISHED ON HAND: PAYMENT NOT To Be RECEIVED THROUGH INVOICING (d) | UNFINISHED or NOT COMMENCED: SUBSEQUENTLY Completed AND INVOICED* (e) | UNFINISHED or NOT COMMENCED: NOT TO BE Completed (f) | TOTAL COVERED BY Contract OR ORDER (g) |
|---|---|---|---|---|---|---|---|
| | QUANTITY | | | | | | 1 LOT |
| CLINS 0001 through 0003 | $ | | | | | | $4,416,646 |
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |

## SECTION II - PROPOSED SETTLEMENT

| NO. | ITEM (a) | TOTAL previously proposed (b) (Use Columns (b) and (c) only where previous proposal has been filed) | Increase or Decrease by this Proposal (c) | TOTAL Proposed TO DATE (d) | for use of contracting Agency only (e) |
|---|---|---|---|---|---|
| 1 | DIRECT MATERIAL | | | 2,401,080 | |
| 2 | DIRECT LABOR | | | 604,657 | |
| 3 | INDIRECT FACTORY EXPENSE (from Schedule A) | | | 466,330 | |
| 4 | SPECIAL TOOLING and SPECIAL TEST EQUIPMENT (SF 1423) | | | 0 | |
| 5 | OTHER COSTS (from Schedule B) | | | 427,831 | |
| 6 | GENERAL and ADMINISTRATIVE EXPENSE | | | 534,061 | |
| 7 | TOTAL COSTS (ITEMS 1 through 4) | | | 4,433,958 | |
| 8 | PROFIT (Explain in Schedule D) | | | 443,396 | |
| 9 | TOTAL (ITEMS 7 and 8) | | | 4,877,354 | |
| 10 | DEDUCT FINISHED PRODUCT INVOICED or to be INVOICED | | | 0 | |
| 11 | TOTAL (ITEMS 9 less item 10) | | | 4,877,354 | |
| 12 | SETTLEMENT EXPENSES (from Schedule E) | | | 183,224 | |
| 13 | TOTAL (ITEMS 11 and 12) | | | 5,060,578 | |
| 14 | SETTLEMENTS with SUBCONTRACTORS (from Schedule F) | | | 0 | |
| 15 | GROSS PROPOSED SETTLEMENT (items 13 and 14) | | | 5,060,578 | |
| 16 | DISPOSAL and OTHER CREDITS (from Schedule G) | | | 0 | |
| 17 | NET PROPOSED SETTLEMENT (Item 15 less 16) | | | 5,060,578 | |
| 18 | ADVANCED, PROGRESS & PARTIAL PAYMENTS (from Schedule H) | | | 2,507,015 | |
| 19 | NET PAYMENT REQUESTED (Item 18 less 19) | | | 2,553,563 | |

*Column (e), Section I, should only be used in the event of a partial termination, in which the total cost reported in Section II should be accumulated to date of completion of the continued portion of the contract and the deduction for finished product (Item 10, Section II) should be contract price of finished product in Column (b), (c) and (e), Section I.

NOTE.—File inventory schedules (SF 1426, 1428, 1430 and 1432) for allocable inventories on hand at date of termination (see 49.2 06 and SF 1425)

Where the space provided for any information is insufficient, continue on a separate sheet.

NSN 7540-01-140-5521 1436-101 STANDARD FORM 1438 (10-83) Prescribed by GSA FAR (48 CFR) 53.249(a)(3)

SCHEDULE A - INDIRECT FACTORY EXPENSE (Item 2)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Fringe | DL * FRINGE | 179,482 | |
| Overhead | (DL+FRINGE)*OH | 286,848 | |
| TOTAL | | 466,330 | |

NOTE: - Individual items of small amounts may be grouped into a single entry in Schedules B, C, E, F and G.

SCHEDULE B - OTHER COSTS (Item 5)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| TRAVEL | Cost from Job Cost | 74,668 | |
| OTHER DIRECT COST | Cost from Job Cost | 353,162 | |
| TOTAL | | 427,831 | |

SCHEDULE C - GENERAL AND ADMINISTRATIVE EXPENSE (Item 3)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| LABOR | Calculated | 153,172 | |
| TRAVEL | Calculated | 10,109 | |
| ODC'S | Calculated | 47,410 | |
| MATERIAL | Calculated | 323,370 | |
| TOTAL | | 534,061 | |

SCHEDULE D - PROFIT (Item 8)

| EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| Profit was computed based on 10% of Costs | 443,396 | |
| TOTAL | 443,396 | |

Where the space provided for any information is insufficient, continue on a separate sheet.

STANDARD FORM 1436 (10-83)
PAGE 2

SCHEDULE E - SETTLEMENT EXPENSE (Item 12)

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| LABOR & ODC'S | BURDENED COSTS through 4/30/96 P<br>ESTIMATE TO COMPLETION | 125,000 | |
| PPA INTEREST | CALCULATED | 58,224 | |
| TOTAL | | 183,224 | |

Schedule F - SETTLEMENT with IMMEDIATE SUBCONTRACTORS and SUPPLIERS (Item 14)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| TOTAL | | 0 | |

SCHEDULE G - DISPOSAL and OTHER CREDITS (Item 16)

| DESCRIPTION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| Not Applicable | 0 | |
| TOTAL | 0 | |

(If practicable, show separately amounts of disposal credits applicable to acceptable finished product included on SF 1428.)

Where the space provided for any information is insufficient, continue on a separate sheet.

STANDARD FORM 1436 (10-83)
PAGE 3

SECTION H - ADVANCE, PROGRESS AND PARTIAL PAYMENTS

| DATE | .PE OF PAYMENT | ..MOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| 34729 | Progress payment | 2,063,450 | |
| 34754 | Progress payment | 443,565 | |
| | | 2,507,015 | |

Where the space provided for any information is insufficient, continue on a separate sheet.

CERTIFICATE

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this termination settlement proposal and that, to the best knowledge and belief of the undersigned.

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices. They include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of proposals filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate subcontractors' own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make if reimbursement by the Government were not involved; (3) The contractor has received from all its immediate subcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; and (4) the Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so received, to the extent that it has not previously done so. The term "subcontractors", as used above, includes suppliers.

NOTE: The Contractor shall, under conditions stated in FAR 15.8044-2, be required to submit a Certificate of Current Cost or Pricing Data (see FAR 15.804-2(a) and 15.804-6).

| NAME OF CONTRACTOR | BY (Signature of authorized official) | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORP. | [signature] | |
| | TITLE: President | DATE 6/4/96 |
| Name of Supervisory Accounting Official: Mr. Allieu Shaw | TITLE: Accounting Manager | |

U.S. GOVERNMENT PRINTING OFFICE STANDARD FORM 1436 PAGE 4

# SCHEDULE OF ACCOUNTING INFORMATION

FORM APPROVED OMB NO. 9000-0012

Public reporting burden for this collection of information is estimated to average 23 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition and Regulatory Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0012), Washington, D.C. 20503.

To be used by prime contractors submitting termination proposals under Part 49 of the Federal Acquisition Regulation. Also suitable for use by subcontractor in effecting subcontract settlements with prime contractor or immediate subcontractor.

THIS PROPOSAL APPLIES TO (Check one)
[X] A PRIME CONTRACT WITH THE GOVERNMENT
[ ] SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO.(S)

COMPANY (Prime or Subcontractor)
Information Systems & Networks (ISN)Co

STREET ADDRESS
10411 Motor City Drive

CITY AND STATE (Include ZIP Code)
Bethesda, MD 20817

CONTRACTOR WHO SENT NOTICE OF TERMINATION
NAME AND ADDRESS (Include ZIP Code)

NAME OF GOVERNMENT AGENCY
U.S. Navy

| GOVERNMENT PRIME CONTRACT NO. | CONTRACTOR'S REFERENCE NO. | EFFECTIVE DATE OF TERMINATION |
|---|---|---|
| N00600-94-C-0389 | 1319 | 15 Mar 1996 |

1. INDIVIDUAL IN YOUR ORGANIZATION FROM WHOM ADDITIONAL INFORMATION MAY BE REQUESTED ON QUESTIONS RELATING TO:

| | ACCOUNTING MATTERS | PROPERTY DISPOSAL |
|---|---|---|
| NAME | Mr. Allieu Shaw | Mr. Donald Tabasco |
| TITLE | Director of Accounting | Senior Contract Administrator |
| TELEPHONE NO. | 301/469-0400 | 301/469-0400 |
| ADDRESS (Include ZIP Code) | ISN<br>10411 Motor City Drive<br>Bethesda, MD 20817 | ISN<br>10411 Motor City Drive<br>Bethesda, MD 20817 |

2. ARE THE ACCOUNTS OF THE CONTRACTOR SUBJECT TO REGULAR PERIODIC EXAMINATION BY INDEPENDENT PUBLIC ACCOUNTANTS?
[X] YES [ ] NO (Name and address of accountants)

Arthur Andersen
1666 K Street, N.W.
Washington, D.C. 20006-2873

3. INDEPENDENT ACCOUNTANTS, IF ANY, WHO HAVE REVIEWED OR ASSISTED IN THE PREPARATION OF THE ATTACHED PROPOSAL

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| None | |

4. GOVERNMENTAL AGENCY(IES) WHICH HAVE REVIEWED YOUR ACCOUNTS IN CONNECTION WITH PRIOR SETTLEMENT PROPOSALS DURING THE CURRENT AND PRECEDING FISCAL YEAR

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| DCAA | Columbia Branch Office, One Mall North<br>10025 Governor<br>Warfield Pkwy., Suite 200<br>Columbia, MD 21004 |

5. HAVE THERE BEEN ANY SIGNIFICANT DEVIATIONS FROM YOUR REGULAR ACCOUNTING PROCEDURES AND POLICIES IN ARRIVING AT THE COSTS SET FORTH IN THE ATTACHED PROPOSAL? (If "Yes," explain briefly)
[ ] YES [X] NO

6. WERE THE DETAILED COST RECORDS USED IN PREPARING THE PROPOSAL CONTROLLED BY AND IN AGREEMENT WITH YOUR GENERAL BOOKS OF ACCOUNT?
[X] YES [ ] NO

7. STATE METHOD OF ACCOUNTING FOR TRADE AND CASH DISCOUNTS EARNED, REBATES, ALLOWANCES, AND VOLUME PRICE ADJUSTMENTS. ARE SUCH ITEMS EXCLUDED FROM COSTS PROPOSED?
[ ] YES [ ] NO

These items reduced the costs when recorded.

(Where the space provided for any information is insufficient, continue on a separate sheet.)

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable
EXPIRATION DATE 4-30-92
1439-102
STANDARD FORM 1439 (REV. 7-
Prescribed by GSA - FAR (48 CFR) 53.249(a)

8. STATE METHOD OF RECORDING AND ABSORBING (1) GENERAL ENGINEERING AND GENERAL DEVELOPMENT EXPENSE AND (2) ENGINEERING AND DEVELOPMENT EXPENSE DIRECTLY APPLICABLE TO THE TERMINATED CONTRACT.

Not applicable.

9. STATE TYPES AND SOURCE OF MISCELLANEOUS INCOME AND CREDITS AND MANNER OF RECORDING IN THE INCOME OR THE COST ACCOUNTS SUCH AS RENTAL OF YOUR FACILITIES TO OUTSIDE PARTIES, ETC.

ISN does not sublease facilities. Miscellaneous income is comprised primarily of interest or investment income. Refunds or rebates are credited to the original cost or cost pool where identifiable.

10. METHOD OF ALLOCATING GENERAL AND ADMINISTRATIVE EXPENSE.

General and Administrative expenses are allocated to direct cost objectives on a total cost basis.

11. ARE COSTS AND INCOME FROM CHANGE ORDERS SEGREGATED FROM OTHER CONTRACT COSTS AND INCOME? (If "Yes," by what method?)

☐ YES ☐ NO

Yes, if they result in a modification which requires separate accountability. No, if only a modification to an existing task where separate accountability is not required. The Contracting Officer makes this determination.

12. METHOD OF COMPUTING PROFIT SHOWN IN THE ATTACHED PROPOSAL AND REASON FOR SELECTING THE METHOD USED. FURNISH ESTIMATE OF AMOUNT OR RATE OF PROFIT IN DOLLARS OR PERCENT ANTICIPATED HAD THE CONTRACT BEEN COMPLETED.

A profit of 10% has been applied to all costs incurred. It is estimated that had the contract been completed, i.e., the planned change orders been implemented, ISN would have realized a 10% profit.

13. ARE SETTLEMENT EXPENSES APPLICABLE TO PREVIOUSLY TERMINATED CONTRACTS EXCLUDED FROM THE ATTACHED PROPOSALS? (If "NO," explain)

☒ YES ☐ NO

14. DOES THIS PROPOSAL INCLUDE CHARGES FOR MAJOR INVENTORY ITEMS AND PROPOSALS OF SUBCONTRACTORS COMMON TO THIS TERMINATED CONTRACT AND OTHER WORK OF THE CONTRACTOR? (If "Yes," explain the method used in allocating amounts to the terminated portion of this contract.)

☒ YES ☐ NO

All material and supplier costs are specific to this contract.

15. EXPLAIN BRIEFLY YOUR METHOD OF PRICING INVENTORIES, INDICATING WHETHER MATERIAL HANDLING COST HAS BEEN INCLUDED IN CHARGES FOR MATERIALS.

The equipment inventory has been priced at actual cost plus M&S costs.

16. ARE ANY PARTS, MATERIALS, OR FINISHED PRODUCT, KNOWN TO BE DEFECTIVE, INCLUDED IN THE INVENTORIES? (If "Yes," explain)

☐ YES ☐ NO

All material has been taken by the Government on 21 February 1996. To the best of ISN's knowledge and belief at the time the material was taken by the Government it was in serviceable condition.

(Where the space provided for any information is insufficient, continue on a separate sheet.)

STANDARD FORM 1439 REV. 7-89 PAGE 2

17. WERE INVENTORY QUANTITIES BASED ON A PHYSICAL COUNT AS OF THE DATE OF TERMINATION? (If "NO," explain exceptions.)

☐ YES ☐ NO

Not applicable since all material was taken by the Government on 21 February 1996.

18. DESCRIBE BRIEFLY THE NATURE OF INDIRECT EXPENSE ITEMS INCLUDED IN INVENTORY COSTS (See Schedule A, SF 1435) AND EXPLAIN YOUR METHOD OF ALLOCATION USED IN PREPARING THIS PROPOSAL, INCLUDING IF PRACTICABLE, THE RATES USED AND THE PERIOD OF TIME UPON WHICH THEY ARE BASED.

G&A costs are included in the cost of the material. This cost is allocated at the rate in use at the time costs were recorded.

19. STATE GENERAL POLICIES RELATING TO DEPRECIATION AND AMORTIZATION OF FIXED ASSETS, BASES, UNDERLYING POLICIES.

Fixed assets are depreciated over estimated useful lives. The costs of depreciation and amortization is included in the indirect cost pool of the business unit using the asset and spread to direct cost objectives in the same manner as the indirect pool. Overhead pools are spread based on total direct labor (Direct labor + fringe) benefiting from the pool. G&A costs are spread on a total cost basis.

20. DO THE COSTS SET FORTH IN THE ATTACHED PROPOSAL INCLUDE PROVISIONS FOR ANY RESERVES OTHER THAN DEPRECIATION RESERVES? (If "Yes," list such reserves)

☐ YES ☒ NO

21. STATE POLICY OR PROCEDURE FOR RECORDING AND WRITING OFF STARTING LOAD.

Not applicable.

22. STATE POLICIES FOR DISTINGUISHING BETWEEN CHARGES TO CAPITAL (FIXED) ASSET ACCOUNTS AND TO REPAIR AND MAINTENANCE ACCOUNTS.

Costs incurred which increase the value of the assets or materially extend the useful life of assets are capitalized and depreciated. Costs of maintenance and repairs which do not do the above are expensed.

23. ARE PERISHABLE TOOLS AND MANUFACTURING SUPPLIES CHARGED DIRECTLY TO CONTRACT COSTS OR INCLUDED IN INDIRECT EXPENSES?

Perishable items (small tools and consumables) purchased for use on a specific contract are charged to that contract. Items purchased for general corporate use are charged to indirect cost pools.

(Where the space provided for any information is insufficient, continue on a separate sheet.)

24. HAVE ANY CHARGES FOR SEVERANCE, DISMISSAL OR SEPARATION PAY BEEN INCLUDED IN THIS PSC and estimates of amounts included) — (If "Yes," furnish brief explanation)

☐ YES ☒ NO

25. STATE POLICIES RELATING TO RECORDING OF OVERTIME SHIFT PREMIUMS AND PRODUCTION BONUSES.

Overtime premium paid for non-exempt employees are charged to the cost objective on which employee is working. ISN does not provide for "production bonuses".

26. DOES CONTRACTOR HAVE A PENSION PLAN? (If "Yes," state method of funding and absorption of past and current pension service costs)

☒ YES ☐ NO

Yes, ISN maintains a defined contribution pension plan. As such, there are no past service costs. Required contributions are calculated annually by the Plan Administrator andpaid by the company.

27. IS THIS SETTLEMENT PROPOSAL BASED ON STANDARD COSTS?

☐ YES (If "Yes," has adjustment to actual cost or adjustment for any significant variations been made? ☐ YES ☐ NO (If "NO," explain)

☒ NO

This proposal is based on an actual costs basis.

28. DOES THIS PROPOSAL INCLUDE ANY ELEMENT OF PROFIT TO THE CONTRACTOR OR RELATED ORGANIZATION, OTHER THAN (a) PROFIT SET FORTH SEPARATELY IN THE PROPOSAL OR (b) PROFIT INCLUDED IN THE CONTRACT PRICE AT WHICH ACCEPTABLE FINISHED PRODUCT, IF ANY, IS INCLUDED IN THE PROPOSAL? (If "Yes," explain briefly)

☐ YES ☒ NO

29. WHAT IS LENGTH OF TIME (PRODUCTION CYCLE) REQUIRED TO PRODUCE ONE OF THE END ITEMS FROM THE TIME THE MATERIAL ENTERS THE PRODUCTION LINE TO THE COMPLETION AS THE FINISHED PRODUCT?

The normal lead time considering a fully staffed work force for a production system is 120 days.

30. STATE POLICY AND PROCEDURE FOR VERIFICATION AND NEGOTIATION OF SETTLEMENTS WITH SUBCONTRACTORS AND VENDORS.

Terms and conditions (Payment) of ISN's Purchase Orders are "....within 45 days after acceptance or 15 days after ISN is paid by the Government........ whichever is later."

CERTIFICATE

THIS CERTIFIES THAT, TO THE BEST KNOWLEDGE AND BELIEF OF THE UNDERSIGNED, THE ABOVE STATEMENTS ARE TRUE AND CORRECT.

| NAME OF CONTRACTOR | BY (Signature of supervisory accounting official) |
|---|---|
| ISN<br>10411 Motor City Drive<br>Bethesda, MD 20817 | [signature] |
| | TITLE President — DATE 6/4/96 |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

STANDARD FORM 1439 (REV. 7-89) PAGE 4

Datacomm Management Sciences Inc.

December 29, 1999

Ms. Roma Malkani
President
Information Systems & Networks Corporation
10411 Motor City Drive
Bethesda, MD 20817

Re: Prime Contract: N00600-94-C-0389, Sub-Contract 1319S
**Payment of Invoices #14769, 14775, 14785, 14845, 14853, and 14865**

Dear Ms. Malkani:

We seek your immediate attention to pay the above referenced Datacomm Management Sciences Inc. invoices which are now nearly three years past due.

The amount owed Datacomm Management Sciences by ISN is $275,870.66. This includes the total due for these invoices ($196,688.68) plus interest at a rate of 1% per month starting in March of 1997. We believe the U.S. Navy paid ISN for this equipment and service sometime on or before the end of February 1997 so we have calculated the interest due effective the end of March 1997. A summary of these outstanding invoices follows:

| DMSI Invoice #: | Date Invoiced: | What DMSI Provided: | $ Owed: |
|---|---|---|---|
| 14769 | 11-30-95 | Shipping charges | $ 187.20 |
| 14775 | 12-11-95 | Shipping charges | $ 58.39 |
| 14785 | 12-19-95 | 2 RMSA-100(X), 5 RIU-32 (X),70 DIH-530, 152 AIM-800 | $ 192,640.00 |
| 14845 | 2-20-96 | Telephone support | $ 198.00 |
| 14853 | 2-26-96 | Customer Service | $ 3,546.99 |
| 14865 | 3-11-96 | Telephone support | $ 58.10 |
| | | Total | $ 196,688.68 |

Our experience dealing with ISN has not been good thus far. We will not let this matter go unresolved and will refer this collection to our attorneys (as we were forced to do to successfully collect the money ISN owed us for Keflavik) if we do not receive a full payment from ISN on or before January 28, 2000.

We look forward to receiving your full payment on or before January 28, 2000.

Sincerely,

Tom Parnon

Thomas Parnon
President

cc: Mr. John Craig, ISN; Mr. Michael Austin, Dept. of Justice

*"The Responsive Ones"*

25 Van Zant Street • East Norwalk, Con (203) 838-7183 • Fax (203) 838-1751

# DEFENSE CONTRACT AUDIT AGENCY

## AUDIT REPORT

19 December 1996

**PREPARED FOR:** Termination Contracting Officer
ATTN: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

**PREPARED BY:** Columbia Branch Office
One Mall North, Suite 200
10025 Governor Warfield Parkway
Columbia, MD 21004
Telephone No. (410) 964-2060
FAX No. (410) 997-3237
e-Mail Address fao6311@rma.dcaa.mil

**SUBJECT:** Termination Settlement Proposal

**REFERENCES:** TCO: Contract No. N00600-94-C-0389
DCAA: Audit Report No. 6311-97B17100001

**CONTRACTOR:** Information Systems and Networks Corporation
10411 Motor City Drive
Bethesda, MD 20817

**REPORT RELEASE RESTRICTIONS:** See Page 9

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 3 |
| DCAA Personnel and Report Authorization | 8 |
| Audit Report Distribution and Restrictions | 9 |

## SUBJECT OF AUDIT

As requested by DCMC-Atlanta, we audited the 4 June 1996 termination settlement proposal submitted by Information Systems and Networks Corporation (ISN). Contract N00600-94-C-0389 was terminated for the convenience of the government with an effective termination date of 15 March 1996. Prior to the termination notice, a Stop-Work Order had been issued on 20 February 1996. The termination settlement proposal for $5,060,578 was submitted on the total cost basis.

The termination settlement proposal is the responsibility of ISN. Our responsibility is to express an opinion on the settlement proposal based on our audit.

## EXECUTIVE SUMMARY

Our audit of the $5.06 million proposal disclosed $1.01 million of questioned costs. The questioned costs are summarized below:

| | |
|---|---|
| Direct Labor | ($22,147) |
| Indirect Expenses | (17,079) |
| G&A Expense | (5,370) |
| Profit | 443,396 |
| Settlement Expenses | 151,539 |
| Cost in Excess of Contract | 460,708 |
| Total | $1,011,047 |

The termination settlement proposal is acceptable for arriving at a fair and reasonable price; however, the significant issues described below should be considered in establishing the government's position.

SIGNIFICANT ISSUES:

1. The results are qualified because we have not yet received a copy of the current technical report regarding the estimate to complete/estimate at completion, and the inventory verification report. We do not express an opinion regarding the contractor's legal entitlement.

2. ISN overstated settlement expenses by proposing settlement labor and ODCs which it did not incur and prompt payment act interest which is unallowable since ISN received progress payments.

3. ISN overstated the entire settlement proposal by proposing costs in excess of the contract limitations (FAR 49.207).

4. Profit is questioned in total. ISN could not support the proposed 10% profit factor with any Estimates to Complete (ETCs). Further, ISN acknowledged that they under bid this contract and were starting out in a loss from the beginning.

## SCOPE OF AUDIT

Except for the qualifications noted below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance that the proposal is free of material misstatement. An audit includes:

a. reviewing the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment:
b. examining, on a test basis, evidence supporting the amounts and disclosures in the termination settlement proposal:
c. assessing the accounting principles used and significant estimates made by the contractor:
d. evaluating the overall proposal presentation, and
e. determining the need for technical specialist assistance and (if applicable) quantifying the results of a government technical evaluation.

We evaluated the proposed costs using the applicable requirements contained in the:

a. Federal Acquisition Regulation (FAR), Part 49, and
b. DOD FAR Supplement (DFARS).

In CY 1996, ISN has brought three previous termination settlement proposals to the Armed Services Board of Contract Appeals (ASBCA) for settlement. Our prior audits have resulted in significant questioned costs. Based on our prior audits and current ASBCA experience with ISN's termination settlement proposals, we have assessed control risk as high. Our audit reflects this assessment and provides a reasonable basis for our opinion.

QUALIFICATIONS:

1. We were informed by Mr. Jeff Bergdahl, COTR that the updated technical reports will not be available for incorporation into our report. Therefore, the results of audit are qualified.

2. We made our recommendations without the benefit of the inventory verification report (SF 1423), which was not available as of the date of this report. Therefore, the audit report is qualified accordingly.

3. Our audit results do not consider the contractor's legal entitlement. We express no opinion regarding legal entitlement.

Audit Report No. 6311-97B17100001

## RESULTS OF AUDIT

### AUDITOR'S OPINION

In our opinion, the cost or pricing data submitted by the offeror are inadequate in some respects. The proposal was not prepared in all respects in accordance with appropriate provisions of FAR and DFARS (see Notes 5, 6 and 7, pages 5, 6 and 7 for a further discussion). However, the impact of the inadequacies and noncompliances described is considered to be relatively insignificant. Therefore, we consider the proposal to be acceptable as a basis for negotiating a fair and reasonable price. This statement should not be interpreted to mean that the data are necessarily accurate, complete and current in accordance with 10 U.S.C. 2306a, since a postaward review may disclose evidence not now discernible.

| Elements of ISN's Proposal | ISN's Proposal | Questioned Costs | Difference (Note 1) | Note | Page |
|---|---|---|---|---|---|
| Direct Materials | $ 2,401,080 | $ 0 | $ 2,401,080 | | |
| Direct Labor | 604,657 | (22,147) | 626,804 | 2 | 4 |
| Indirect Expenses | 466,330 | (17,079) | 483,409 | 3 | 4 |
| Other Direct Costs | 427,831 | 0 | 427,831 | | |
| G&A Expense | 534,061 | (5,370) | 539,431 | 4 | 5 |
| Subtotal | 4,433,959 | (44,596) | 4,478,555 | | |
| Profit | 443,396 | 443,396 | 0 | 5 | 5 |
| Settlement Expenses | 183,224 | 151,539 | 31,685 | 6 | 6 |
| Cost in Excess of Cont. | 0 | 460,708 | (460,708) | 7 | 6 |
| Total | 5,060,579 | $ 1,011,047 | $ 4,049,532 | | |
| Payments Received | (2,507,015) | | | 8 | 7 |
| Net Requested | $ 2,553,564 | | | | |

[handwritten: actuals profit; 4,049,532; 1,542,517.00; 2,507,015.00]

() Denotes upward adjustment

Explanatory Notes

1. The amounts in this column are presented solely for the convenience of the TCO in developing the government's negotiation objective. They represent only the arithmetic difference between the amounts proposed and the related questioned costs. You should not consider the amounts to be audit approved or recommended amounts. DCAA does not approve or recommend prospective costs because the amounts depend partly on factors outside the realm of accounting expertise, such as opinions on technical and production matters. Any portion of the questioned costs accepted by the TCO must have the appropriate indirect rates applied.

2. Direct Labor

a. Summary of Conclusions:

We have reclassified $22.332 of stop work labor from settlement costs to direct costs and questioned $185 due to a difference between the settlement proposal and its supporting documentation. The net effect of these adjustments is an upward adjustment to direct labor of $22,147.

b. Basis of Claimed Cost:

Direct labor is based on the actual incurred labor cost as recorded in the books and records.

c. Audit Evaluation:

We verified that the direct labor cost: (1) reconciled with ISN's Jamis job cost reports and employee timesheets; and (2) was incurred prior to the termination notice.

3. Indirect Expenses

a. Summary of Conclusions:

We have increased the indirect expenses by $17.079 due to the increase in Direct Labor shown above.

b. Basis of Claimed Cost:

The indirect expenses are based on a Fringe Benefits rate of 29.68% and an Overhead rate of 36.58%. ISN's overhead allocation base includes fringe benefits.

c. Audit Evaluation:

We verified the proposed Fringe Benefits and Overhead rates to the current provisional billing rates and prior termination audits. The upward adjustment applicable to Fringe Benefits is calculated by applying the proposed and accepted Fringe Benefits rate to the stop work labor reclassified from settlement expenses to direct labor. The resulting sum is then multiplied by the proposed and accepted Overhead rate to arrive at the upward adjustment applicable to overhead.

4. G&A Expense

a. Summary of Conclusions:

We have increased the G&A expenses by $5.370 due to the increases in Direct Labor, Fringe Benefits and associated Overhead expenses.

b. Basis of Proposed Cost:

The G&A expenses are based on a G&A rate of 13.69% applied to Direct labor, Indirect expenses, Direct materials and ODCs.

c. Audit Evaluation:

We verified the proposed G&A expense rate to the current provisional billing rate and prior termination audits. The upward adjustment is the result of applying the proposed and accepted G&A rate to the increase in Direct labor and related Fringe Benefits and Overhead expense

5. Profit

a. Summary of Conclusions:

We have questioned the entire $443.396 of claimed profit in accordance with FAR 49.203 due to the following: (1) ISN did not provide us with any Estimate to Complete (ETC) or Percentage of Completion; (2) ISN significantly under bid this contract by approximately $900,000; and (3) DCAA audit report No. 6221-96G17500001 disclosed that ISN was in a loss position on this contract.

A loss calculation was not applied since the Government acknowledged that ISN was due some form of equitable adjustment on this contract due to various changes to the statement of work. It is our understanding that the only hold-up in the equitable adjustment negotiations was a delivery schedule. Since the contract was terminated prior to the conclusion of the equitable adjustment negotiations, we are unable to determine the impact that the equitable adjustment would have on the anticipated loss.

b. Basis of Claimed Cost:

ISN has claimed a profit factor of 10% applied to all costs

c. Audit Evaluation:

We requested ISN to provide us with an ETC and a Percentage of Completion. We also requested technical specialist assistance regarding the ETC and Percentage of Completion.

Audit Report No. 6311-97B17100001

6. Settlement Expenses

a. Summary of Conclusions:

We have questioned $151,539 of the $183,224 proposed settlement expenses as shown below:

| Description | Questioned | Ref. |
|---|---|---|
| Reclassified to D/L | $28,960 | (1) |
| Cost Not Incurred | 64,355 | (2) |
| Prompt Pmt. Int. | 58,224 | (3) |
| Total | $151,539 | |

(1) We have reclassified the stop work period labor and associated fringe benefits to direct labor and indirect expenses respectively as discussed in notes 2. and 3. Stop work period labor is not a settlement cost but a direct expense.

(2) ISN is proposing settlement labor and ODCs which are estimates of possible future costs. Consequently, these costs have not been incurred and are questioned in total.

(3) We have questioned the entire $58,224 of proposed Prompt Payment Interest in accordance with FAR 32.907-2 which states "no interest penalty shall be paid to the contractor as a result of delayed contract financing payments". Since ISN received progress payments, and the interest is calculated on these progress payments, the interest is unallowable. Revise

b. Basis of Claimed Cost:

The claimed settlement costs are based on costs recorded in ISN's Jamis Job Cost and estimated future labor and ODCs. The claimed prompt payment interest is a mathematical calculation not recorded in the accounting records.

c. Audit Evaluation:

We verified that the claimed settlement expenses were recorded in the Jamis Job Cost and supported by vendor invoices and employee timesheets. We reviewed the supporting documentation for allowability and allocability to the terminated contract. We also verified that the costs were incurred after the Termination notice.

7. Cost in Excess of Contract Limitations

a. Summary of Conclusions:

We have questioned $460,708 which is the total proposed costs and profit of $4,877,354 less the contract price of $4,416,646 in accordance with FAR 49.207.

b. Basis of Claimed Cost

ISN did not indicate in its termination settlement proposal any costs claimed in excess of the contract limitations.

c. Audit Evaluation

We compared the proposed costs plus profit to the contract price.

8. Payments Received

a. Summary of Conclusions:

The $2,507,015 proposed by ISN agrees with their accounting records.

We discussed factual matters concerning audit findings with Mr. Daniel Dowling, Corporate Counsel. We did not disclose the dollar impact of our conclusions and recommendations to the contractor. Mr. Dowling reserved comment on our findings.

Audit Report No. 6311-97B17100001

## DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contact regarding this audit | |
| Benjamin Monastero, Senior Auditor | (410) 964-2060 |
| Other contacts regarding this audit: | |
| Mark S. Moser, Branch Manager | (410) 964-2060 |
| William C. Erdman, Supervisory Auditor | (410) 964-2060 |
| Office Administrative Personnel | |
| | FAX No. |
| | (410) 997-3237 |

AUDIT REPORT AUTHORIZED BY:

William C. Erdman
for Mark S. Moser
Branch Manager
DCAA Columbia Branch Office

FOR OFFICIAL USE ONLY

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

Termination Contracting Officer
ATTN.: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Proprietary determinations should be made in the event of an external request for access. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

2. Under the provisions of Title 32. Code of Federal Regulations. Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

3. The information contained in this audit report should not be used for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

Copy

DEFENSE CONTRACT AUDIT AGENCY

AUDIT REPORT

13 NOV 1995

*PREPARED FOR:* Contracting Officer
ATTN: DCMDS-GMTC (F. Soda)
Defense Contract Management Area, Baltimore
200 Towsontown Boulevard West
Towson, MD 21204-5299

*PREPARED BY:* Defense Contract Audit Agency
Silver Spring Branch Office
20251 Century Boulevard, Third Floor
Germantown, MD 20874
Telephone No. (301) 353-1506
FAX No. (301) 353-1518

*SUBJECT:* Audit of Progress Payment Nos. 3, 4, and 5
Contract No. N00600-94-C-0389

*REFERENCES:* ACO: Case No. 202 (A)95-G-0183
DCAA: Audit Report No. 6221-96G17500001
Chron No.

*CONTRACTOR:* Information Systems & Networks Corporation (ISN)
10411 Motor City Drive
Bethesda, MD 20817

*REPORT RELEASE RESTRICTIONS:* *See Page 8*

*CONTENTS:*


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 2 |
| DCAA Personnel and Report Authorization | 7 |
| Audit Report Distribution and Restrictions | 8 |
| Appendix 1 - Other Matters to be Reported | 9 |
| Appendix 2 - Technical Evaluation | 11 |


FOR OFFICIAL USE ONLY

*SUBJECT OF AUDIT*

In response to your 18 September 1995 request, reference DCMAO Case No. 202(A)-95-G-0183, and telephone conversation of 18 October 1995, we audited Information Systems & Networks Corporation's (ISN) progress payment request numbers 3, 4, and 5 under Contract No. N00600-94-C-0389. The purpose of the audit was to verify the amounts claimed through 30 June 1995, 31 July 1995, and 31 August 1995 to ISN's books and records as a basis for approving contract financing through progress payments in accordance with the provisions of the contract.

ISN's financial records and related supporting data are the responsibility of ISN. Our responsibility is to express an opinion on the progress payment request based on our audit.

*EXECUTIVE SUMMARY*

Our audit of progress payment Nos. 3, 4, and 5 disclosed the amounts claimed are unacceptable for payment. The contractor has understated the total costs incurred and the estimate at completion as explained in the results of audit. A summary of the claimed and eligible costs follows:

| | Claimed | Eligible |
|---|---|---|
| Progress Payment No. 3 | $103,327 | $(63,489) |
| Progress Payment No. 4 | 68,223 | 25,397 |
| Progress Payment No. 5 | 81,787 | 155,772 |

SIGNIFICANT ISSUES:

The contract is in a loss position. We applied the loss ratio factor to compute the maximum balances eligible for payment and the audit recommended progress payment amounts.

We have not finalized provisional billing rates with the contractor. In their progress payment request, indirect rates were applied based on actuals for the seven (7) months from the beginning of the fiscal year. The audit recommended amounts are based on the 1995 provisional billing rates. Additionally, we noted that the contractor is accumulating applied G&A costs differently than proposed. Additional information is provided in Appendix 1 - Other Matters.

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

*SCOPE OF AUDIT*

We conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the data and records reviewed are free of material misstatement. An audit includes:

a. reviewing the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on an assessment of control risk;
b. examining, on a test basis, evidence supporting the amounts and disclosures in the data and records reviewed;
c. assessing the accounting principles used and significant estimates made by the contractor; and
d. evaluating the overall data and records presentation.

We did not perform the customary auditing procedures to determine the allowability of costs under FAR part 31 and the DoD FAR Supplement since such procedures will be performed to establish the final contract price, if required.

ISN's billing system is considered adequate to ensure progress payment requests are prepared in accordance with FAR. Due to concerns over the lack of provisional billing rates, prior disputes over indirect allocations, and the concerns of the ACO; we assessed control risk as medium. Our audit reflects this assessment and provides a reasonable basis for our opinion.

Because the contractor is in a loss position, we included steps to determine if the contractor is financially capable of completing the audit.

*RESULTS OF AUDIT*

In our opinion, ISN has made errors in the computation of progress payments 3, 4 and 5. The contractor did not use the 1995 provisional billing rates resulting in the incurred costs and estimate at completion being understated. Our recommended adjustments to the progress payment amounts follow:

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

Progress Payment No. 3

SECTION I

| | | | Note |
|---|---|---|---|
| Item 5: | Contract Price | $4,416,645 | |

SECTION II

| | | | |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,299,365 | 1 |
| Item 12a: | Total Costs Incurred to Date | $3,299,365 | 1 |
| Item 12b: | Estimated Additional Costs to Complete (ETC) | +1,769,910 | 2 |
| | Total Estimated Cost at Completion (EAC) | $5,069,275 | 2 |

Loss Ratio Calculation:

$$\frac{\text{Contract Price}}{\text{EAC}} = \frac{\$4,416,645}{\$5,069,275} = 87.13\%$$ 3

SECTION II (Continued)

| | | | |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,299,365 | 1 |
| | Loss Ratio Factor | X 87.13% | |
| Adjusted Item 11: | Costs Eligible for Progress Payments | $2,874,737 | |
| Item 6a: | Progress Payment Rate | 85.00% | |
| Adjusted Item 13: | Recognized Eligible Costs | $2,443,526 | 3 |
| Item 18: | Previous Progress Payments Requested | -2,507,015 | 4 |
| Item 19: | Maximum Eligible for Progress Payment | $ (63,489) | |

Explanatory Notes:

1. Item 11: The contractor used the actual indirect rates for the first seven months of their fiscal year to compute total incurred costs. Additionally, the contractor included $2,076 of duplicated direct costs in their claimed costs. We computed the total incurred costs using the 1995 provisional billing rates. We also adjusted the total direct costs for the duplicated invoice.

2. Item 12b: We reviewed the contractor's August 1995 EAC and took exception to the amounts computed. The contractor computed the EAC using the actual indirect rates for the first seven months of their fiscal year. We recomputed the EAC using the 1995 provisional billing rates.

3. Item 13: We computed the loss ratio as shown above and applied the factor to the correct Item 11 amount. We multiplied the total by the authorized progress payment rate to determine the adjusted amount of $2,443,526 in Item 13.

FOR OFFICIAL USE ONLY

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

4. Item 18: The total progress payments requested amount is the total amounts paid under progress payment nos. 1 and 2.

Progress Payment No. 4

SECTION I

| | | | Note |
|---|---|---|---|
| Item 5: | Contract Price | $4,416,645 | |

SECTION II

| | | | Note |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,419,383 | 1 |
| Item 12a: | Total Costs Incurred to Date | $3,419,383 | 1 |
| Item 12b: | Estimated Additional Costs to Complete (ETC) | +1,649,892 | 2 |
| | Total Estimated Cost at Completion (EAC) | $5,069,275 | 2 |

Loss Ratio Calculation:

Contract Price / EAC = $4,416,645 / $5,069,275 = 87.13% (Note 3)

SECTION II (Continued)

| | | | Note |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,419,383 | 1 |
| | Loss Ratio Factor | X 87.13% | |
| Adjusted Item 11: | Costs Eligible for Progress Payments | $2,979,308 | |
| Item 6a: | Progress Payment Rate | 85.00% | |
| Adjusted Item 13: | Recognized Eligible Costs | $2,532,412 | 3 |
| Item 18: | Previous Progress Payments Requested | -2,507,015 | 4 |
| Item 19: | Maximum Eligible for Progress Payment | $ 25,397 | |

Explanatory Notes:

1. Item 11: The contractor used the actual indirect rates for the first seven months of their fiscal year to compute total incurred costs. We computed the total incurred costs using the 1995 provisional billing rates.

2. Item 12b: We reviewed the contractor's August 1995 EAC and took exception to the amounts computed. The contractor computed the EAC using the actual indirect rates for the first seven months of their fiscal year. We recomputed the EAC using the 1995 provisional billing rates.

FOR OFFICIAL USE ONLY

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

3. Item 13: We computed the loss ratio as shown above and applied the factor to the correct Item 11 amount. We multiplied the total by the authorized progress payment rate to determine the adjusted amount of $2,532,412 in Item 13.

4. Item 18: The total progress payments requested amount is the total amounts paid under progress payment nos. 1 and 2.

Progress Payment No. 5

SECTION I

| | | | Note |
|---|---|---|---|
| Item 5: | Contract Price | $4,416,645 | |

SECTION II

| | | | |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,629,713 | 1 |
| Item 12a: | Total Costs Incurred to Date | $3,629,713 | 1 |
| Item 12b: | Estimated Additional Costs to Complete (ETC) | +1,439,562 | 2 |
| | Total Estimated Cost at Completion (EAC) | $5,069,275 | 2 |
| | Loss Ratio Calculation: | | |
| | Contract Price / EAC = $4,416,645 / $5,069,275 = | 87.13% | 3 |

SECTION II (Continued)

| | | | |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,629,713 | 1 |
| | Loss Ratio Factor | X 87.13% | |
| Adjusted Item 11: | Costs Eligible for Progress Payments | $3,162,569 | |
| Item 6a: | Progress Payment Rate | 85.00% | |
| Adjusted Item 13: | Recognized Eligible Costs | $2,688,184 | 3 |
| Item 18: | Previous Progress Payments Requested | -2,532,412 | 4 |
| Item 19: | Maximum Eligible for Progress Payment | $ 155,772 | |

Explanatory Notes:

1. Item 11: The contractor used the actual indirect rates for the 2irst seven months of their fiscal year to compute total incurred costs. We computed the total incurred costs using the 1995 provisional billing rates.

2. Item 12b: We reviewed the contractor's August 1995 EAC and took exception to the amounts computed. The contractor computed the EAC using the actual indirect rates for the first seven months of their fiscal year. We recomputed the EAC using the 1995 provisional billing rates. We used the contractor's latest EAC, August 1995, to compute the EAC.

FOR OFFICIAL USE ONLY

3. Item 13: We computed the loss ratio as shown above and applied the factor to the correct Item 11 amount. We multiplied the total by the authorized progress payment rate to determine the adjusted amount of $2,688,184 in Item 13.

4. Item 18: The total progress payments requested amount is the total amounts paid under progress payment nos. 1 and 2 plus the amount eligible under progress payment no. 4.

We also determined the contractor's financial condition is adequate for the performance of the contract.

We discussed the results of audit with the contractor's representative, Mr. Allieu Shaw, Director of Finance, on 9 November 1995. The contractor disagrees with the results of audit in its entirety.

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contact regarding this audit: | |
| Jennifer L. Mosher, Senior Auditor | (301) 353-1506 |
| Other individuals having involvement with the audit report: | |
| Mark Moser, Branch Manager | (301) 353-1506 |
| Carol Bates, Supervisory Auditor | (301) 353-1506 |
| Class of persons having access to this report: | |
| Office Administrative Personnel | |
| DCAA Office FAX No. | (301) 353-1518 |

AUDIT REPORT AUTHORIZED BY:

Mark S. Moser
Branch Manager
DCAA Silver Spring Branch Office

FOR OFFICIAL USE ONLY

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORP., | ) | |
| Plaintiff, | ) | |
| v. | ) | Docket No. 98-178C |
| UNITED STATES, | ) | |
| Defendant. | ) | |

ORAL ARGUMENT AND STATUS CONFERENCE

Pages: 1 through 49

Place: Washington, D.C.

Date: October 3, 2001

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

THE COURT: All right, sir.

MR. SINGER: And finally, Your Honor, on the issue of what the TCO would have done or could have done or what the parties could have done, none of that is going to help with respect to, you know, resolving the summary judgment.

It doesn't matter what the parties could have done or would have done. What matters is what is the record before this Court. And I think, if the Court looks at this record and looks at the documents that both the government and ISN has given the Court, and applies the fair inferences from those documents I think should be applied, I think the Court will determine, (a) there was a binding settlement; (b) there was funds available to fund the settlement; (c) the government did not have any right to breach the settlement. Thank you, Your Honor.

THE COURT: All right, sir. Well, gentlemen, thank you. I believe that I am in a position to go ahead and rule on the motions at this time. Before I do that, I want to assure everybody that this isn't any rush to judgment as I was reminded I have had this for some time. But the matter has been well briefed, and as Plaintiff's counsel stated this morning, all the documents appear to be here and they are not so voluminous that they couldn't all be studied.

Without keeping anybody in suspense, let me go

ahead and say in my view there was no settlement agreement, and consequently I will in due course enter an order that denies the Plaintiff's motion for summary judgment on Count 5, and grant the government's motion on Count 5, at least to the extent that it says there was a settlement agreement.

Now, just for the sake of completeness, I think it's plain from the colloquies this morning that the government isn't taking the position that there has been a waiver with respect to the other counts in the complaint. And so once the motions have been ruled on with respect to Count 5, we will be in a position to determine how we will get on a resolution track for the entire case, but it's incumbent upon me to state my rationale for denying the Plaintiff's motions and granting the government's motion, and I will state it alternatively.

I simply agree with the government's position that there never was a binding agreement with respect to that November 13, 1997 offer from termination contracting officer Denise Jones. She plainly stated that the matter was contingent on funding from the Department of the Navy, and that's stated in there twice, along with the figure that was proposed for settlement, and says that if you accept it, sign it and return it.

Now, it was signed but only under a paragraph that says accepted as to the determination that ISN is due a

certain amount. Now, that can be argued lots of ways, and the Plaintiff has argued it well. But to me, I think the plain meaning of that is, and I am the one called upon to interpret this thing. We accept part of it. We accepted the figure you have come up with, but we don't accept the contingency, and it makes no sense in belaboring that.

But as an alternative to that, even if it had just been signed on the bottom, or even if I agreed with the Plaintiff's position that that was an unconditional acceptance of the offer, the offer was, and consequently any such settlement would have been contingent "upon funding from the Department of the Navy."

Now, it seems to me that the reasonable way to interpret that is not whether there was money available somewhere in the Department of the Navy, or if $891,000 was somewhere left in the budget of SPARWAR. It seems to me this termination contracting officer was saying to the Plaintiff, I agree, or at least for the use of that proposal, I would agree to the extent of $891,000, you are entitled to more money, but I'm not going to just agree to this on my own authority. I want somebody else, somebody else in the Navy to say it's all right to spend this money on it.

And so, with a little repetition, even assuming that it was a mutual firm unconditioned meeting of the

minds, the contingency with that interpretation just never occurred. There never was, in my view, a funding from the Department of the Navy in the manner I would assume that letter meant.

Well, gentlemen, I could go on and on, but it doesn't seem to me a close case, at least on that last alternative point. And so that's the ruling at this level. But let us spend some profitable time together -- incidently, in due course or probably today an order will be entered memorializing that.

But while we are all here, let's talk about two things, and one about discovery specifically, whether that is complete; and then second, whether there is some reasonable prospect this case might be settled; and talk about some good reasons for that. And then even if it looks like that might happen, let's talk about how we will get it on a trial track or some resolution track to get the case wound up.

Let me ask about discovery. I had assumed from the state of the file and the papers that discovery has been completed from the Plaintiff's point of view?

MR. SINGER: It has.

THE COURT: From the government's point of view?

MR. AUSTIN: Depends on how we move forward, Your Honor, in the sense that --

NOTE: Pursuant to Fed. Cir. R. 47.6, this disposition is not citable as precedent. It is a public record. This disposition will appear in tables published periodically.

# *United States Court of Appeals for the Federal Circuit*

02-5041

INFORMATION SYSTEMS & NETWORKS CORPORATION,

Plaintiff- Appellant,

v.

UNITED STATES,

Defendant-Appellee.

FILED
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

OCT 16 2002

JAN HORBALY
CLERK

# *Judgment*

*ON APPEAL from the* UNITED STATES COURT OF FEDERAL CLAIMS

*in CASE NO(S).* 98-CV-178

*This CAUSE having been heard and considered, it is*

*ORDERED and ADJUDGED:*

Per Curiam (SCHALL, BRYSON, and LINN, Circuit Judges.)

AFFIRMED. See Fed. Cir. R. 36.

*ENTERED BY ORDER OF THE COURT*

*DATED* OCT 16 2002

Jan Horbaly, Clerk

*Jan Horbaly, Clerk*

12/28 Brian — VISIT ROSCOE

SPAWAR vs ISN

Notes on Mtg. 12/6/95 with Roscoe and SPAWAR Re: ISN contract

DEC 06 1995

Brian - I attached my handwritten notes. This contract was awarded in July '94 for FIP systems integration, delivery, installation, cutover and training. It is FFP services with numerous sites and lots. It is not IDIQ.

The contractor has had all kinds of performance problems from the beginning. We and SPAWAR have tried to work with them as much as possible but now realize that he will probably never perform satisfactorily. We are still in the first lot, made up of three sites. The contractor is at least five months late on delivery/installation completion on all three sites.

7 Mo.

wut have ???

Roscoe never modified the contract to re-establish the deliv. schedule on any of the sites because he could never get a good idea of what a realistic new deliv. schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo.

The first site (Hampton Rds.) is 80% complete. ISN is having trouble completing it. We have paid over $2 million so far in progress payments towards all three sites in Lot I, which covers the cost of the equipment. We haven't taken title to any of it yet.

Progress Pay $2M

Roscoe wants to reestablish the deliv. schedule for all three sites in Lot I, knowing full well ISN won't meet the dates. If he can't negotiate consideration he will determine it unilaterally. When the contractor misses the dates, Roscoe wants to T for D them. The activity prefers to T for C them. This will have to be resolved and we discussed this at length. However, both Roscoe and the DCMAO ACO feel we have a good case for T for D ing them and it will be alot cheaper than T for C ing. The downside is it will mean the contract will have to go on for about 6 more months (the soonest new realistic delivery date would be about 6 mo. from now).

T for C

Whether we T for C or T for D, ISN will probably litigate.

Also, the ACO is researching possible fraudulent progress payment submissions by ISN. However, this does not affect our course of action on the contract, she will handle this.

## Roscoe's Action Items

He needs to brief legal and get their input on his recommended course of action

(if activity agrees to T for D):

He needs to mod the contract and re-establish the delivery dates ASAP, for consideration if possible. If ISN will not agree to consideration, he should determine a reasonable amount unilaterally.

When contractor does not meet the delivery dates, Roscoe needs to T for D the contractor. If it turns out there is evidence of fraud by ISN re: the progress payments, this could also contribute to our basis for T for D ing.

(if we T for C):

If we T for C, we will only re-establish a delivery date for Hampton Roads, since this is 80% done. Or the activity may decide to T for C Hampton Rds. and finish that site themselves or with a different contractor.

We will T for C the other two sites in Lot I. Then we will have to negotiate the equitable adjustment.

Lisa

Roscoe could also research with legal the feasibility of T for C ing Hampton Roads and T for D'ing the other two sites. Probably not legally viable.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORK CORPORATION, Plaintiff, | ) | No.: 98-178C |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

Deposition of:

WILLIAM ROBERTSON

a witness of lawful age, taken on behalf of the Defendant, pursuant to notice, in the offices of the Department of Justice, Room 12011, 1100 L Street, N.W., Washington, D.C. 20530, on Monday, October 25, 1999, at 10:15 a.m., before Sharon Bellamy, Notary Public in and for the District of Columbia, when were present:

APPEARANCES:

On behalf of Plaintiff:

JOHN M. CRAIG, Esquire
Singer & Associates, P.C.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(301) 469-0400

meetings reflected what the program management office wanted to tell the contracting officer, and in many instances they removed information that I had put in there which would not reflect well on them, okay?

Q Would you --

A Specifically, to your question, there was a tacit agreement and understanding with all parties involved that there was no way, as I have just been telling you, to proceed with work on this contract without implementing the ECP; that all of that documentation -- all of the documentation that had been reviewed and approved reflected the ECP and the changes necessitated it.

Q Now, when you say " a tacit," meaning that?

A It's like, yes, we understand that that's the real situation, but you understand that you can't start work until you get a formal mod.

Q So you were told not to start work?

A I was also told they recognized the reality of the situation and we couldn't make progress without doing it. That's the reason I made the point about boiler plate on the paragraph you pointed out, that, yes, that's the last paragraph in every letter from every contracting officer, okay, however.

Q And with regards to the ECP, and this is going back, you had a meeting some time in December time frame

with Ron Zell, and Ron Zell told you, if I remember correctly, told you that if ISN could make progress, then he could get the funding?

A He told me that consistently from the September time frame on, from the -- basically, when he -- I take that back. Yeah, September, September - October time frame when he was looking at next year's money. He originally thought he could get some end-of-year dollars to complete it, to complete the funding profile. He told me at the end of the fiscal year, within the last week or two of the fiscal year, that he wasn't going to be able to do that; that they had an emergency someplace else and that he wasn't going to be able to get end-of-year dollars, and that he was going to have to wait until the next fiscal year funding was allocated to him, and that he would complete funding at that point in time. So, as I said, it occurred over a series of meetings, a variety of meetings.

Q Now, January of '96 was also a busy month with this contract, if I understand --

A Mm-hmm.

Q -- in terms of meetings between the government and ISN. And those series of meetings culminated, if I understand correctly, with a request for a meeting with ISN to show progress to date and how they were going to meet the delivery schedule; is that correct?

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------:

INFORMATION SYSTEMS & :
NETWORKS CORPORATION :
Plaintiff :
vs. : Case No. 98-178C
THE UNITED STATES :
Defendant :

-----------------------------:

Monday, October 18, 1999
Washington, D.C.

Deposition of

ROSCOE W. CRAWFORD

a witness, was called for examination by counsel for the plaintiff, at the offices of United States Department of Justice, 1100 L Street, N.W., 12th Floor Conference Room, Washington, D.C. 20530, commencing at 10:00 a.m. before Doris L. Gude, Shorthand Court Reporter and Notary Public for the District of Columbia, and were present on behalf of the respective parties:

MGB REPORTING, INC.
9805 Korman Court
Potomac, Maryland 20854
(301) 983-9315

the Navy that spurred ISN on to give you the ECP?

A. Probably discussions with the tech people and ISN.

Q. You don't recall any documents though?

A. No documents.

Q. Do you recall when ISN provided the ECP to the Navy?

A. It would be in the latter part of '95.

Q. After receiving the ECP from ISN, then what happened?

A. It was reviewed by my technical people over at SPAWAR, and we never could come to an -- well, they viewed it as being unreasonable, unreasonably priced.

Q. So was that the basis of the unreasonableness, the pricing?

A. Basically.

Q. Who were the technical people at SPAWAR?

A. At the time, it was McCore (phonetic), Jeff Bergdahl, and his boss, Ron Zell.

formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." What does that mean?

A. At the time, I guess, we had intention of issuing a modification, but that was predicated on ISN providing us with a revised installation and cutover schedule for the contract for Lot I which they never did.

Q. So ISN didn't provide a revised installation cutover schedule?

A. No, they never did.

Q. Did you keep a file on this ATCS project?

A. This case file folder that you looked through.

Q. Is that your file?

A. That's the file, yes.

Q. Do you recall whether Exhibits 3 and 4 were included in that file?

A. You're saying are they are still included in the file?

COPY

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INFORMATION SYSTEMS AND NETWORKS CORPORATION, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | Case No. 98-178C JUDGE JAMES TURNER |

Deposition of JEFFREY BERGDAHL, at 4301 Pacific Highway, San Diego, California, commencing at 10:01 A.M., Friday, October 29, 1999, before Sandra D. Warren, CSR No. 10831.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

SINGER & ASSOCIATES
BY: JOHN M. CRAIG, ESQ.
1730 K Street, N.W.
Suite 304
Washington, D.C. 20006
(301) 469-0400

FOR THE DEFENDANT:

UNITED STATES DEPARTMENT OF JUSTICE
BY: MICHAEL D. AUSTIN, ESQ.
1100 L Street, N.W.
Suite 12144
Washington, D.C. 20530
(202) 307-0277

JEFFREY BERGDAHL, having been first duly sworn, testified as follows:

A. Nope.

Q. Did you tell them not to do anything pending formal approval of the ECP?

A. No.

Q. What did SPAWAR tell ISN to do pending approval of the ECP? Formal approval of the ECP?

A. I don't really recall what was told to them, if anything.

Q. Could ISN do any work pending formal approval of the ECP?

A. Yes.

Q. What work could ISN perform pending formal approval of the ECP?

A. Again, there was still -- there was substantial amount of equipment that was in the RFP that was still remaining at ANCC Hampton Roads. But prior to that equipment being cut over, we needed all the various contract deliverables submitted and approved before they would start doing the cutover.

Q. And the contract deliverables weren't modified really at all pursuant to the ECP; is that right?

Q. Okay. So SPAWAR had available funds in the amount of approximately $7 million for FY '96, right?

A. Well, obviously, it was -- as of April of 1995, it was budgeted to be there.

Q. Do you know if it was?

A. I don't know how much, when FY '96 rolled around in October of 1995 -- how much money was actually -- how much SPAWAR received at the time. Obviously, it was at least 2 1/2 million based on that Exhibit 17.

Q. Okay. This was another 7 million in addition to the 7 million that we had looked at from the FY '94 document?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Let's switch gears. I'm going to go back to the ATC ECP. I want to draw your attention to an exhibit marked Bergdahl Exhibit 23. What is that document?

A. That's a request from the DCMDS from

Baltimore to SPAWAR requesting an evaluation of how much of the ATC's have been physically completed on a percentage basis. Obviously, it would be to support progress payments from DCMDS to ISN.

(Plaintiff's Exhibit No. 23 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. I want to refer you to the bottom of the page. Is that your handwriting?

A. Yes.

Q. And what were you -- let's take the information set forth in paragraph 3. It says, "See attachment for rationale on percentage of physical completion. ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule."

Are those true statements?

A. Yes.

Q. And in paragraph 1, you said, "Physical percentage of progress is estimated as 15 percent." Is that a correct statement?

A. Correct.

Q. And physical percentage of progress means the actual physical work that was being done at Hampton Roads; is that correct?

A. Yes.

Q. But there was other work that was being done by ISN that wasn't termed physical work; is that right? The documentation, that type of --

A. This is the overall for Lot 1.

Q. Why is it called physical percentage as opposed to total percentage or something like that?

A. It's not -- it wasn't my form. This was DSMI -- this was the Defense Contract Management Command's form that they sent to me.

Q. So is it correct that ISN had performed 15 percent of the work they proposed in their ECP as of October 19th, 1995?

A. This wasn't really related to necessarily just our ECP or anything. This was overall work on the contract, and the contract had several parts of it in Lot 1. It had the actual

turnkey ATC, it had training, had the -- the
contract deliverables, the nonphysical work, the
paper.

Q. The statement "ISN is slightly behind
the proposed schedule in their ECP," what does that
mean?

A. That was due to the fact that during
the summer of 1995, they had obviously submitted a
proposed schedule to FISC when they would complete
each stage or complete all the contract
deliverables, and I was comparing where they were at
on 19 October versus whatever proposed schedule they
had submitted in their ECP during the summer of
1995.

Q. Does this include work done -- that
was proposed in the ECP?

A. Proposed? Yes.

Q. And you believe that ISN was
performing satisfactorily as of October 1995?

A. As compared against the proposed
schedule. They had an ECP, remember, as of October
of 1995. There had been no contract modification

reached between ISN and FISC for a revised delivery schedule or completion of the turnkey site.

So if I had been forced to compare where they had been completedwise against what was originally in the original contract, at this point, all three sites should have been done, completed, several months prior to this.

Q. So this was taken in consideration that FISC would formally approve the ECP?

A. An issue which would be to revise the delivery schedules for both completing the sites and submitting all the documentation.

Q. And SPAWAR and ISN were going forward on the assumption that the ECP would be formally approved by FISC?

A. Yeah.

Q. This -- your comments here were reviewed and approved by Ron Zell; is that correct?

A. Correct.

Q. That's his signature, to the best of your knowledge?

A. Yes.

Q. Mr. Bergdahl, I want to draw your attention to a document marked Exhibit 24. What is that?

A. This was a fax I would have sent to FISC. Obviously, I included the -- the ECPs from April 1995 of what they submitted to us. This was trying to make sure FISC was aware of what had been submitted to us.

(Plaintiff's Exhibit No. 24 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. And it says -- you referred to "the agreed configuration." What -- does that mean that is the configuration that was proposed by ISN and agreed to by SPAWAR?

A. Yes.

Q. Do you know whether it was set forth in the contract or the ECP?

A. It obviously was never set forth in the contract. Very likely it was submitted in the ECP.

# In The United States Court of Federal Claims

No. 02-796C

(Filed: April 12, 2005)

This Opinion Will Not Be Published in the U.S. Court of Federal Claims Reporter Because It Does Not Add Significantly to the Body of Law.

| | |
|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

**OPINION**

**ALLEGRA, Judge:**

This government contract action is before the court on the parties' partial cross-motions for summary judgment. For the reasons that follow, this court **DENIES** plaintiff's motion, but **GRANTS** defendant's cross-motion.

## I. BACKGROUND

On or about July 15, 1994, defendant, acting through the Department of the Navy's Fleet and Industrial Supply Center, Norfolk, Virginia (FISC), awarded plaintiff, Information Systems & Networks Corp (Information Systems), a contract (No. 00600-94-C0389) to provide various material, labor, and services for naval telecommunications centers at Hampton Roads, Camp H.M. Smith, and Pearl Harbor. The Space and Naval Warfare Systems Command (SPAWAR) was the agency beneficiary of the contract. As this case involves an alleged modification of this contract, it bears emphasis, from the outset, that several sections of the contract dealt, in varying ways, with how to effectuate such a modification. For example, a section on "Change Proposals" provided that "[t]he Contracting Officer may accept any change proposal submitted pursuant to this clause by giving the Contractor written notice thereof. This written notice may be given by issuance of a modification to this contract." Another section read that "[t]he Contractor shall not comply with any order, direction, or request of Government personnel unless issued in writing and signed by the

Contracting Officer, or pursuant to specific authority otherwise included in this contract." Yet a third section of the contract, which explained the duties of the contracting officer's technical representative, again specified that only the contracting officer could approve a modification to the contract. And, finally, the contract incorporated various FAR clauses, among them, 48 C.F.R. § 43.301, which provides that supplemental agreements must be in writing and, in particular, "shall" be on a Standard Form 30 (SF 30). Under the contract, Roscoe Crawford, Jeffery Berghdal and Lisa Murtha served, respectively, as the contracting officer, contracting officer's technical representative, and contract specialist.

Defendant asserts that almost from the beginning of contract performance, Information Systems began running behind schedule. In June of 1995, SPAWAR identified changes it felt needed to be made to the contract, particularly as to the Hampton Roads site, and requested that plaintiff submit an engineering change proposal (ECP) that would incorporate those changes. On June 20, 1995, plaintiff submitted an ECP with: (i) a cost breakdown differentiated by total cost, contract cost, and ECP cost; (ii) an equipment list for Hampton Roads; and (iii) a revised schedule with a set of specific delivery dates for Hampton Roads. On June 26, 1995, Ms. Murtha wrote plaintiff, indicating that "[a] modification to the contract will be issued for . . . the formal acceptance of an ECP," and that the "ECP submitted . . . will be reviewed by SPAWAR with comments to be provided" on June 26 or 27, 1995. The letter also requested Information System to provide a revised installation schedule.

On July 21, 1995, Mr. Berghdal sent Mr. Crawford and Ms. Murtha a copy of a July 20, 1995, memorandum from SPAWAR providing the latter's comments on the ECP. This memorandum began by stating –

> SPAWAR has reviewed reference (a) ECP and technically approves [Information System's] proposed engineering changes. Recommend negotiate all terms and conditions listed in reference (a) with ISN.

It went on to provide detailed comments on various aspects of Information System's cost analysis sheet. On August 23, 1995, SPAWAR, in a document signed by the contracting officer, reallocated $789,319 to the contract in question, allegedly to fund the ECP. (However, on November 27, 1995, these funds were reallocated to another purpose.)

Also on August 23, 1995, one of plaintiff's employees, Mr. Tobin, wrote Mr. Robertson, plaintiff's program manager, to "update him on the status of our ECP at FISC." This internal memorandum stated that Lisa Murtha "has not looked at the ECP, to date," and would be unable to do so until mid-September of 1995. The memorandum reflects that Mr. Tobin informed Ms. Murtha that he "did not think that ISN (my VP) would wait that long." Referring, by section number, to the "change proposals" clause in the contract, Mr. Tobin further stated –

> I talked with Don Tabasco about contract and FAR requirements for timely ECP processing by the government. He recommends that we take a more forceful

approach with the contracting officer. You might want to touch base with him personally.

On August 31, 1995, Mr. Berghdal sent a memorandum to plaintiff, indicating that "we have technically approved the ECP" and asking "are you still going to submit a no-cost ECP to use in negotiation of consideration with FISC."

Information Systems alleges that it orally was told to proceed with the work – or, at least, never told not to perform the work. Between September and December 1995, plaintiff submitted progress reports in which it repeatedly recognized that the ECP had not been approved. On September 27, 1995, Mr. Berghdal noted that "ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule." Notes from a December 6, 1995, meeting between Mr. Crawford and SPAWAR representatives reflect that Mr. Crawford –

> never modified the contract to re-establish the [delivery] schedule on any of the sites because he could never get a good idea of what a realistic new [delivery] schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo.

On January 26, 1996, Mr. Tabasco, plaintiff's manager of contracts, wrote the government complaining that "the approval of the latest ECP dated June 20, 1995, in the amount of $930,527 for Hampton Roads has not been received by ISN."

In February of 1996, after Information Systems had failed to meet its proposed delivery schedules, the Navy issued a stop work order. On March 15, 1996, defendant terminated the contract. From June of 1996 to November of 1997, plaintiff's representatives and Ms. Jones, the terminating contracting officer, attempted to settle on the proposed termination costs. As part of this process, on December 19, 1996, the Defense Contract Audit Agency audited plaintiff's termination proposal and concluded that a settlement of $4,049,532 was appropriate. By letter dated August 8, 1997, Ms. Jones issued a unilateral determination that found that Information Systems was entitled to $4,049,532; however, since plaintiff had already been paid this amount, Ms. Jones concluded that they were entitled to nothing further. In her letter, however, she left open the possibility that plaintiff could provide additional documentation to support its claim for compensation.

By letter dated September 5, 1997, Information Systems provided Ms. Jones with further information in support of its entitlement to an additional $891,364, for work performed pursuant to the ECP. Thereafter, Ms. Jones attempted to contact Mr. Crawford, the contracting officer on the original contract, to determine whether the ECP had been approved. After Mr. Crawford did not respond to Ms. Jones, by letter dated November 13, 1997, she offered Information System the sum of $891,364.00 in full and final settlement of its claims, "contingent on funding from the Department of Navy." On November 14, 1997, Information Systems accepted the offer by signing the November 13 letter and returning it to Ms. Jones.

On November 18, 1997, Ms. Jones wrote Mr. Crawford advising him of the "offer" to Information Systems and requesting that he provide the additional funding needed. On December 1, 1997, Mr. Crawford responded that his office agreed with the original audit findings, that is, that nothing further was due Information System. By way of explanation, his letter stated –

> ISN has provided your office with volumes of supposed justification for additional compensation based on supposed approval of an ECP. This ECP was not approved and no services/supplies were received as stated by ISN. The ISN request for payment is unwarranted and as a Contracting Officer, not approved by myself.

His letter continued –

> ISN was not issued this ECP because the costs associated with its implementation were exorbitant . . . No matter what case ISN is trying to build, it is clear that ISN knew and knows the modification of the contract by myself as the Contracting Officer was the only way the ECF could be added to the contract and the only way the ECP could be added to the contract and the only manner in which contracted reimbursable work could be performed.

This letter concluded, "[i]n summary, additional funding will not be provided." On December 9, 1997, Ms. Jones informed plaintiff that the funding for her prior offer had not been approved and that plaintiff was due nothing for the ECP.

Initially, Information Systems brought suit in this court seeking, *inter alia*, damages for the breach of a settlement agreement covering the ECP. This court held that the settlement had not been finalized and dismissed the relevant count of the complaint. Plaintiff then voluntarily dismissed its other counts, without prejudice, while pursuing an appeal; on October 16, 2002, the Federal Circuit affirmed. Then, on July 16, 2002, plaintiff filed a second complaint, this one containing five counts and seeking to recover in excess of $890,000, plus interest. At issue in the pending cross-motions for summary judgment is the first count of that complaint, in which plaintiff seeks damages for the costs incurred on the ECP as a result of the defendant's breach of the allegedly modified contract.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

In its motion, plaintiff asseverates that defendant breached an implied-in-fact contract based on the ECP. Plaintiff argues that a written modification to the contract was a "mere formality," and not required. In its response and cross-motion, defendant counters that the parties failed to execute a formal, written modification as required by the contract. It remonstrates that the parties never

formed an implied-in-fact contract because they never had a meeting of the minds and, at all events, no agency official with the authority to bind defendant expressed an intention to be bound in any form here.

All government contracts must be administered consistent with the applicable regulatory requirements and the contract language. *See Hercules, Inc. v. United States,* 516 U.S. 417, 428-29 (1996). Here, various contract provisions and incorporated FAR clauses, key among them, FAR § 43.301, required, first, that modifications of the contract be in writing and, second, that a Standard Form 30 (SF30) be used for this purpose. Plaintiff agrees that neither of these requirements were met. It is well-accepted that, where required by a contract, the failure to reduce a modification or amendment to writing renders the modification ineffective – even as against claims that the modification was somehow effectuated through an implied-in-fact or oral contract. *See e.g., Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1258 (Fed. Cir. 2002) (observing "an oral contract may not modify a written contract which is required by regulation to be in writing"); *Daly Constr., Inc. v. Garrett,* 5 F.3d 520, 521 (Fed. Cir. 1993) (writing requirement enforced and modification held not binding where contractor "knew the government was not bound in contract until a formal written modification was executed"); *Mil-Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed. Cir. 1987) ("Unless and until there was a binding modification to which both [the contractor] and the contracting officer had agreed in writing, there could not be a binding modification of the contract"); *SCM Corp. v. United States*, 595 F.2d 595, 598 (Ct. Cl. 1979) (no oral contract to modify agreement where regulations required such modifications to be in writing; "oral understandings which contemplate the finalization of the legal obligations in a written form are not contracts in themselves"). Summarizing these case, two leading commentators have stated that "it is now clearly established that bilateral contract modifications can only be made in writing," and that "alleged oral agreements to modify the terms of a contract are not valid." John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 410 (3d ed. 1995). Moreover, the cases noted above, as well as others, hold that the requirement that a written modification be on SF30 is also not met by an implied-in-fact or oral agreement. *See, e.g., Mils-Spec Contractors, Inc.*, 835 F.2d at 868 ("any bilateral modification of a contract is a 'supplemental agreement,' which requires the execution of a written standard form 30"); *Solar Turbines, Inc. v. United States*, 23 Cl. Ct. 142, 152 (1991); *Merrimac Mgmt. Inst., Inc.*, 94-3 B.C.A. ¶27,251, 1994 WL 590092 (1994).

Applying the law to the facts at hand, it is plain that a binding modification did not arise here, as the alleged modification was not reduced to a written agreement, let alone a SF30. In arguing to the contrary, plaintiff relies on several Federal Circuit cases that have upheld implied-in-fact contracts. *See, e.g., LDG Timber Enters., Inc. v. Glickman*, 114 F.3d 1140 (Fed. Cir. 1997), *cert. denied*, 522 U.S. 916 (1997); *Texas Instruments Inc. v. United States*, 922 F.2d 810 (Fed. Cir. 1991); *Narva Harris Constr. Corp. v. United States,* 574 F.2d 508 (Ct. Cl. 1978); *Cities Serv. Gas Co. v. United States*, 500 F.2d 448 (Fed. Cir. 1974). But, most of these cases did not involve true contract modifications, *see, e.g., Texas Instruments*, 922 F.2d at 814, and none involved regulations or contract provisions of the limiting sort at issue, *see, e.g., LDG Timber Enters.*, 114 F.3d at 1143 ("No statute, regulation, or rule was cited as violated by the contract extensions").

Indeed, the Federal Circuit in *Texas Instruments*, 922 F.2d at 814, distinguished its prior decision in *Mil-Spec*, *supra*, and *SCM*, *supra*, precisely on the latter basis. Accordingly, these cases are all inapposite and do not require a different result on the facts *sub judice*.

In a further attempt to sidestep the writing requirement, plaintiff relies on *J.S. Alberici Constr. Co., Inc. v. Gen. Servs. Admin.*, GSBCA No. 12,386, 94-2 BCA ¶ 26,776 at 133,173 (1994), where the Board found that the execution of the SF30, or any written document, was a "mere formality" that could be ignored where the parties had reached full agreement as to the terms of the contract. The ruling in *Alberici*, of course, is in tension with at least some of the decisions that have enforced the writing requirement – at least those in which an argument also might have been made that the requirement was a "mere formality." *See, e.g.*, *Daly Constr.*, 5 F.3d at 521. Perhaps for this reason, the Federal Circuit questioned the validity of *Alberici* in *Johnson,* 308 F.3d at 1258. Yet, the Federal Circuit ultimately was satisfied merely to distinguish that case because, unlike in *Johnson*, the contractor in *Alberici* had agreed to specific terms with the government, but simply had not reduced them to writing. *Id.* In the court's view, *Johnson* indicates, at the least, that the rule enunciated in *Alberici* is inapplicable where the signing of the SF30 was not a "mere formality." As in *Johnson*, the latter is the case here and the supposed salvific principles enunciated in *Alberici* (and arguably in other cases) thus have no factual footing in the case *sub judice*. *Cf. Robinson Contracting Co v. United States*, 16 Cl. Ct. 676, 688-89 (1989), *aff'd*, 895 F.2d 1420 (Fed. Cir. 1990) (signing of SF30 was a "mere formality" where the agreement was already fully reduced to writing).

Indeed, any notion that the signing here was a "mere formality" is belied by many of the same undisputed facts that demonstrate that an implied-in-fact modification did not arise here. For one thing, such a modification requires that there be a meeting of the minds, albeit one inferred from the conduct of the parties. *La Van v. United States*, 382 F.3d 1340, 1346 (Fed. Cir. 2004); *Maher v. United States*, 314 F.3d 600, 606 (Fed. Cir. 2002), *cert. denied*, 540 U.S. 821 (2003). However, it is improper to draw such an inference, where, as here, the evidence plainly indicates that the parties anticipated future negotiations, and particularly where it is anticipated that the final, fully-negotiated agreement will be reduced to writing. *See, e.g.*, *Kilmer Village Corp. v. United States*, 153 F. Supp. 393, 397 (Ct. Cl. 1957); *Edwards v. United States*, 22 Cl. Ct. 411, 421 (1991); *see also* Restatement (Second) Contracts § 26 (2004). That the parties had not agreed on critical terms (*e.g.*, the cost of the ECP) is evidenced by the entire course of conduct here – not only by correspondence between the parties, but even plaintiff's own internal documents, all of which acknowledge that the ECP had not been finally approved and that future negotiations were necessary. In light of these circumstances, plaintiff's alleged performance of the ECP could not give rise to an implied-in-fact contract with the government. *See Trauma Serv. Group v. United States*, 104 F.3d 1321, 1327 (Fed. Cir. 1997) (citing *Merritt v. United States*, 267 U.S. 338, 340-41 (1925)); *Atlas Corp. v. United States*, 895 F.2d 745, 754-56 (Fed. Cir. 1990), *cert. denied*, 498 U.S. 811 (1990); *EWG Assocs., Ltd. v. United States*, 231 Ct. Cl. 1028, 1030 (1982). While such performance might give rise to an implied-in-law contract, based on benefits received by the government, this court lacks jurisdiction to award relief on that basis. *See, e.g.*, *Hercules*, 516 U.S.

at 423; *Perri v. United States*, 340 F.3d 1337, 1343 (Fed. Cir. 2003); *Trauma Serv.*, 104 F.3d at 1327.

Further, no agency official with authority to bind the defendant assented to the ECP, either in writing or by conduct. In this regard, it is axiomatic that to show that either an implied-in-fact (or express) contract existed, a plaintiff must demonstrate "the Government representative 'whose conduct is relied upon [had] actual authority to bind the government in contract." *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (quoting *Juda v. United States*, 6 Cl. Ct. 441, 452 (1984)), *cert. denied*, 501 U .S. 1230 (1991); *see also Harbert/ Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed. Cir.1998), *cert. denied*, 525 U.S. 1177 (1999) ("It is well established that the government is not bound by the acts of its agents beyond the scope of their authority."); *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147, 1153 (Fed. Cir.1983) ("[T]he United States is not bound by its agents acting beyond their authority and contrary to regulation."). The only person with the authority to bind defendant here was Mr. Crawford, the contracting officer, who neither engaged in any conduct assenting to the amendment nor signed any written document to that effect. Although it appears that plaintiff knew that Mr. Crawford alone could authorize the ECP, it is charged with that knowledge at any rate, as "anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." *Federal Crop Ins Corp. v. Merrill*, 332 U.S. 380, 384 (1947). Morever, as plaintiff apparently knew all to well, mere silence or inaction by the contracting officer could not bind the United States. *See Harbert/Lummus Agrifuels Projects*, 142 F.3d at 1433-1434; *EWG Assocs.*, 231 Ct. Cl. at 1030. Indeed, the Federal Circuit has held that where, as here, agency procedures require a written approval by the contracting officer, any conduct short of that cannot demonstrate acceptance of a contract. *Harbert/Lummus*, 142 F.3d at 1433-1434.

## III. CONCLUSION

This court need go no further. The court has considered – and rejects – various other theories that plaintiff glancingly mentioned in its reply brief (*e.g.*, illegality, estoppel, and unilateral mistake). Based on the foregoing, the court **DENIES** plaintiff's motion for partial summary judgment, and **GRANTS** defendant's cross-motion for partial summary judgment. The Clerk is directed to dismiss count one of plaintiff's complaint.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge