Q. Okay. So SPAWAR had available funds in the amount of approximately $7 million for FY '96, right?

A. Well, obviously, it was -- as of April of 1995, it was budgeted to be there.

Q. Do you know if it was?

A. I don't know how much, when FY '96 rolled around in October of 1995 -- how much money was actually -- how much SPAWAR received at the time. Obviously, it was at least 2 1/2 million based on that Exhibit 17.

Q. Okay. This was another 7 million in addition to the 7 million that we had looked at from the FY '94 document?

A. Uh-huh.

Q. You have to say "yes" or "no."

A. Yes.

Q. Let's switch gears. I'm going to go back to the ATC ECP. I want to draw your attention to an exhibit marked Bergdahl Exhibit 23. What is that document?

A. That's a request from the DCMDS from

Baltimore to SPAWAR requesting an evaluation of how much of the ATC's have been physically completed on a percentage basis. Obviously, it would be to support progress payments from DCMDS to ISN.

(Plaintiff's Exhibit No. 23 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. I want to refer you to the bottom of the page. Is that your handwriting?

A. Yes.

Q. And what were you -- let's take the information set forth in paragraph 3. It says, "See attachment for rationale on percentage of physical completion. ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule."

Are those true statements?

A. Yes.

Q. And in paragraph 1, you said, "Physical percentage of progress is estimated as 15 percent." Is that a correct statement?

A. Correct.
Q. And physical percentage of progress means the actual physical work that was being done at Hampton Roads; is that correct?
A. Yes.
Q. But there was other work that was being done by ISN that wasn't termed physical work; is that right? The documentation, that type of --
A. This is the overall for Lot 1.
Q. Why is it called physical percentage as opposed to total percentage or something like that?
A. It's not -- it wasn't my form. This was DSMI -- this was the Defense Contract Management Command's form that they sent to me.
Q. So is it correct that ISN had performed 15 percent of the work they proposed in their ECP as of October 19th, 1995?
A. This wasn't really related to necessarily just our ECP or anything. This was overall work on the contract, and the contract had several parts of it in Lot 1. It had the actual

turnkey ATC, it had training, had the -- the contract deliverables, the nonphysical work, the paper.

Q. The statement "ISN is slightly behind the proposed schedule in their ECP," what does that mean?

A. That was due to the fact that during the summer of 1995, they had obviously submitted a proposed schedule to FISC when they would complete each stage or complete all the contract deliverables, and I was comparing where they were at on 19 October versus whatever proposed schedule they had submitted in their ECP during the summer of 1995.

Q. Does this include work done -- that was proposed in the ECP?

A. Proposed? Yes.

Q. And you believe that ISN was performing satisfactorily as of October 1995?

A. As compared against the proposed schedule. They had an ECP, remember, as of October of 1995. There had been no contract modification

reached between ISN and FISC for a revised delivery schedule or completion of the turnkey site.

So if I had been forced to compare where they had been completedwise against what was originally in the original contract, at this point, all three sites should have been done, completed, several months prior to this.

Q. So this was taken in consideration that FISC would formally approve the ECP?

A. An issue which would be to revise the delivery schedules for both completing the sites and submitting all the documentation.

Q. And SPAWAR and ISN were going forward on the assumption that the ECP would be formally approved by FISC?

A. Yeah.

Q. This -- your comments here were reviewed and approved by Ron Zell; is that correct?

A. Correct.

Q. That's his signature, to the best of your knowledge?

A. Yes.

Q. Mr. Bergdahl, I want to draw your attention to a document marked Exhibit 24. What is that?

A. This was a fax I would have sent to FISC. Obviously, I included the -- the ECPs from April 1995 of what they submitted to us. This was trying to make sure FISC was aware of what had been submitted to us.

(Plaintiff's Exhibit No. 24 was marked for identification and is annexed hereto.)

BY MR. CRAIG:

Q. Okay. And it says -- you referred to "the agreed configuration." What -- does that mean that is the configuration that was proposed by ISN and agreed to by SPAWAR?

A. Yes.

Q. Do you know whether it was set forth in the contract or the ECP?

A. It obviously was never set forth in the contract. Very likely it was submitted in the ECP.

# In The United States Court of Federal Claims

No. 02-796C

(Filed: April 12, 2005)

This Opinion Will Not Be Published in the U.S. Court of Federal Claims Reporter Because It Does Not Add Significantly to the Body of Law.

| | |
|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |

**OPINION**

**ALLEGRA, Judge:**

This government contract action is before the court on the parties' partial cross-motions for summary judgment. For the reasons that follow, this court **DENIES** plaintiff's motion, but **GRANTS** defendant's cross-motion.

## I. BACKGROUND

On or about July 15, 1994, defendant, acting through the Department of the Navy's Fleet and Industrial Supply Center, Norfolk, Virginia (FISC), awarded plaintiff, Information Systems & Networks Corp (Information Systems), a contract (No. 00600-94-C0389) to provide various material, labor, and services for naval telecommunications centers at Hampton Roads, Camp H.M. Smith, and Pearl Harbor. The Space and Naval Warfare Systems Command (SPAWAR) was the agency beneficiary of the contract. As this case involves an alleged modification of this contract, it bears emphasis, from the outset, that several sections of the contract dealt, in varying ways, with how to effectuate such a modification. For example, a section on "Change Proposals" provided that "[t]he Contracting Officer may accept any change proposal submitted pursuant to this clause by giving the Contractor written notice thereof. This written notice may be given by issuance of a modification to this contract." Another section read that "[t]he Contractor shall not comply with any order, direction, or request of Government personnel unless issued in writing and signed by the

Contracting Officer, or pursuant to specific authority otherwise included in this contract." Yet a third section of the contract, which explained the duties of the contracting officer's technical representative, again specified that only the contracting officer could approve a modification to the contract. And, finally, the contract incorporated various FAR clauses, among them, 48 C.F.R. § 43.301, which provides that supplemental agreements must be in writing and, in particular, "shall" be on a Standard Form 30 (SF 30). Under the contract, Roscoe Crawford, Jeffery Berghdal and Lisa Murtha served, respectively, as the contracting officer, contracting officer's technical representative, and contract specialist.

Defendant asserts that almost from the beginning of contract performance, Information Systems began running behind schedule. In June of 1995, SPAWAR identified changes it felt needed to be made to the contract, particularly as to the Hampton Roads site, and requested that plaintiff submit an engineering change proposal (ECP) that would incorporate those changes. On June 20, 1995, plaintiff submitted an ECP with: (i) a cost breakdown differentiated by total cost, contract cost, and ECP cost; (ii) an equipment list for Hampton Roads; and (iii) a revised schedule with a set of specific delivery dates for Hampton Roads. On June 26, 1995, Ms. Murtha wrote plaintiff, indicating that "[a] modification to the contract will be issued for . . . the formal acceptance of an ECP," and that the "ECP submitted . . . will be reviewed by SPAWAR with comments to be provided" on June 26 or 27, 1995. The letter also requested Information System to provide a revised installation schedule.

On July 21, 1995, Mr. Berghdal sent Mr. Crawford and Ms. Murtha a copy of a July 20, 1995, memorandum from SPAWAR providing the latter's comments on the ECP. This memorandum began by stating –

> SPAWAR has reviewed reference (a) ECP and technically approves [Information System's] proposed engineering changes. Recommend negotiate all terms and conditions listed in reference (a) with ISN.

It went on to provide detailed comments on various aspects of Information System's cost analysis sheet. On August 23, 1995, SPAWAR, in a document signed by the contracting officer, reallocated $789,319 to the contract in question, allegedly to fund the ECP. (However, on November 27, 1995, these funds were reallocated to another purpose.)

Also on August 23, 1995, one of plaintiff's employees, Mr. Tobin, wrote Mr. Robertson, plaintiff's program manager, to "update him on the status of our ECP at FISC." This internal memorandum stated that Lisa Murtha "has not looked at the ECP, to date," and would be unable to do so until mid-September of 1995. The memorandum reflects that Mr. Tobin informed Ms. Murtha that he "did not think that ISN (my VP) would wait that long." Referring, by section number, to the "change proposals" clause in the contract, Mr. Tobin further stated –

> I talked with Don Tabasco about contract and FAR requirements for timely ECP processing by the government. He recommends that we take a more forceful

approach with the contracting officer. You might want to touch base with him personally.

On August 31, 1995, Mr. Berghdal sent a memorandum to plaintiff, indicating that "we have technically approved the ECP" and asking "are you still going to submit a no-cost ECP to use in negotiation of consideration with FISC."

Information Systems alleges that it orally was told to proceed with the work – or, at least, never told not to perform the work. Between September and December 1995, plaintiff submitted progress reports in which it repeatedly recognized that the ECP had not been approved. On September 27, 1995, Mr. Berghdal noted that "ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule." Notes from a December 6, 1995, meeting between Mr. Crawford and SPAWAR representatives reflect that Mr. Crawford –

> never modified the contract to re-establish the [delivery] schedule on any of the sites because he could never get a good idea of what a realistic new [delivery] schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo.

On January 26, 1996, Mr. Tabasco, plaintiff's manager of contracts, wrote the government complaining that "the approval of the latest ECP dated June 20, 1995, in the amount of $930,527 for Hampton Roads has not been received by ISN."

In February of 1996, after Information Systems had failed to meet its proposed delivery schedules, the Navy issued a stop work order. On March 15, 1996, defendant terminated the contract. From June of 1996 to November of 1997, plaintiff's representatives and Ms. Jones, the terminating contracting officer, attempted to settle on the proposed termination costs. As part of this process, on December 19, 1996, the Defense Contract Audit Agency audited plaintiff's termination proposal and concluded that a settlement of $4,049,532 was appropriate. By letter dated August 8, 1997, Ms. Jones issued a unilateral determination that found that Information Systems was entitled to $4,049,532; however, since plaintiff had already been paid this amount, Ms. Jones concluded that they were entitled to nothing further. In her letter, however, she left open the possibility that plaintiff could provide additional documentation to support its claim for compensation.

By letter dated September 5, 1997, Information Systems provided Ms. Jones with further information in support of its entitlement to an additional $891,364, for work performed pursuant to the ECP. Thereafter, Ms. Jones attempted to contact Mr. Crawford, the contracting officer on the original contract, to determine whether the ECP had been approved. After Mr. Crawford did not respond to Ms. Jones, by letter dated November 13, 1997, she offered Information System the sum of $891,364.00 in full and final settlement of its claims, "contingent on funding from the Department of Navy." On November 14, 1997, Information Systems accepted the offer by signing the November 13 letter and returning it to Ms. Jones.

On November 18, 1997, Ms. Jones wrote Mr. Crawford advising him of the "offer" to Information Systems and requesting that he provide the additional funding needed. On December 1, 1997, Mr. Crawford responded that his office agreed with the original audit findings, that is, that nothing further was due Information System. By way of explanation, his letter stated –

> ISN has provided your office with volumes of supposed justification for additional compensation based on supposed approval of an ECP. This ECP was not approved and no services/supplies were received as stated by ISN. The ISN request for payment is unwarranted and as a Contracting Officer, not approved by myself.

His letter continued –

> ISN was not issued this ECP because the costs associated with its implementation were exorbitant . . . No matter what case ISN is trying to build, it is clear that ISN knew and knows the modification of the contract by myself as the Contracting Officer was the only way the ECF could be added to the contract and the only way the ECP could be added to the contract and the only manner in which contracted reimbursable work could be performed.

This letter concluded, "[i]n summary, additional funding will not be provided." On December 9, 1997, Ms. Jones informed plaintiff that the funding for her prior offer had not been approved and that plaintiff was due nothing for the ECP.

Initially, Information Systems brought suit in this court seeking, *inter alia*, damages for the breach of a settlement agreement covering the ECP. This court held that the settlement had not been finalized and dismissed the relevant count of the complaint. Plaintiff then voluntarily dismissed its other counts, without prejudice, while pursuing an appeal; on October 16, 2002, the Federal Circuit affirmed. Then, on July 16, 2002, plaintiff filed a second complaint, this one containing five counts and seeking to recover in excess of $890,000, plus interest. At issue in the pending cross-motions for summary judgment is the first count of that complaint, in which plaintiff seeks damages for the costs incurred on the ECP as a result of the defendant's breach of the allegedly modified contract.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

In its motion, plaintiff asseverates that defendant breached an implied-in-fact contract based on the ECP. Plaintiff argues that a written modification to the contract was a "mere formality," and not required. In its response and cross-motion, defendant counters that the parties failed to execute a formal, written modification as required by the contract. It remonstrates that the parties never