*****************************************************************

# UNITED STATES COURT OF FEDERAL CLAIMS

*****************************************************************

**02-796C**
**(Judge Allegra)**

**INFORMATION SYSTEMS & NETWORKS CORPORATION,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

*****************************************************************

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*****************************************************************

**Norman H. Singer, Esquire**
**Singer & Associates, P.C.**
**10411 Motor City Drive**
**Suite 725**
**Bethesda, Maryland 20817**
**(301) 469-0400**

**Attorneys for Plaintiff**

# TABLE OF CONTENTS


Page (s)

TABLE OF AUTHORITIES ..... ii

QUESTIONS PRESENTED ..... 1

STATEMENT OF THE CASE ..... 2

A. Summary of Case ..... 2

B. Summary of Argument ..... 5

LEGAL ARGUMENT ..... 8

A. The Applicable Summary Judgment Standard ..... 8

B. Whether Defendant has Presented Uncontroverted Facts in Support of its Motion ..... 9

C. Whether the Defendant Breached the Covenant of Good Faith and Fair Dealing in Contract Performance Presents Triable Issues of Fact Not Susceptible to Summary Judgment ..... 15

1. The Requested Changes ..... 17

2. The Termination of ISN ..... 21

3. The Failure to Participate in the Termination Process ..... 22

D. Whether ISN Was Ordered to Make Changes in Contract Specifications Thereby Creating Constructive Changes Presents Triable Issues of Fact Not Susceptible to Summary Judgment ..... 24

1. Authority for Changes ..... 26

2. Payment for Changes ..... 28

E. Whether the Defendant Has Made Admissions Against Interest That ISN is Entitled To An Equitable Adjustment ..... 29

CONCLUSION ..... 31

CERTIFICATE OF SERVICE ..... 32

# TABLE OF AUTHORIES

## CASES

Page (s)

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 ........ 8

Barseback Kraft AB v. U.S., 36 Fed. Cl. 69(1996) ........ 15

Beta Systems, Inc. v. U.S., 838 F.2d 1179(Fed. Cir. 1988) ........ 16

C. Sanchez and Son, Inc. v. U.S., 6 F.3d 1539(Fed. Cir. 1993) ........ 16

Godley v. U.S., 5 F.3d 1473 (Fed. Cir. 1993) ........ 16

Len Co. & Associates v. United States, 385 F.2d 438,493, 181 Ct. Cl.29 (1967) ........ 25

Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987) ........ 8

Orange Cove Dist. v. U.S., 28 Fed. Cl. 790(1993) ........ 15

Rangsburg Electro-Coating Corp. v. Landscape Finishers, Inc., 484 F.2d 1037(3rd 1973) ........ 8

Ralph Larsen & Son, Inc. v. United States, 17 Ct. Cl. 39, 42(1989) ........ 8

Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct. Cl.1 (1968) ........ 24

Rice v. United States, 317 U.S. 61, 63 S. Ct. 120, 87 L. Ed. 53 (1942) ........ 25

Solar Turbines, Inc. v. U.S., 23 Cl. Ct. 142(1991) ........ 15

Southwest Welding Manufacturing Company v. United States, 188 Ct. Cl. 295, 413 F.2d 1167(1969) ........ 24

State of Alabama v. U.S., Fed. Cl. 685(1986) ........ 15

United States v. Kattar, 840 F.2d 118,130-131(1st Cir. 1988) ........ 29

U.S. v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1968) ........ 29

United States v. Powers, 467 F.2d 1089, 1097 n. 1(7th Cir.) ........ 29

United States v. Spearin, 248 U.S. 132, 139, S.Ct. 59, 63 L.Ed. 166(1918) ........ 24

Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076(8th Cir. 1980) ........ 8

WRB Corp., et. al. v. United States, 183 Ct. Cl. 409(1968)........................................29

STATUTES & REGULATIONS

Contract Disputes Act of 1978, 41 U.S.C. 601,et. seq............................................30

28 U.S.C. 1746........................................................................App. A,B

FAR 52-243-1 ..........................................................................10

FAR 52-249-2 ..........................................................................22

MISCELLANEOUS

RCFC 5.2 (b)(3) (A) ....................................................................1

RCFC 56 (c)...............................................................................8

RCFC 56.....................................................................................8

RCFC 56 (f) ...............................................................................10

Calkins, Summary Judgment, Motions to Dismiss, and Other Examples of Equilibrating Tendencies in the Anti Trust System, Geo. L.J. 1065, 114-119 (1986) ..........................9

Restatement (Second) Contracts §205 .............................................15

FED. R. Evid. 801(d) (2) (D)......................................................... 29

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **INFORMATION SYSTEMS & NETWORKS CORPORATION** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Case No. 02-796C** |
| | : | **(Judge Allegra)** |
| **UNITED STATES OF AMERICA** | : | |
| **Defendant** | : | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[1]**

Plaintiff, Information Systems and Networks Corporation ("ISN"), by counsel, hereby submits this Opposition to the Motion for Summary Judgment ("the Motion") filed by defendant, the United States of America ("defendant" or "the Government"). This Opposition includes the following Legal Memorandum, the Response to Defendant's Proposed Findings of Uncontroverted Fact (which includes the objections and bases therefore to the Statement of Uncontroverted Facts of defendant), two supporting Affidavits, and Appendix.

**QUESTIONS PRESENTED**

1. Whether the appropriate summary judgment standard precludes summary judgment in this case because there are genuine issues of material fact on the issues raised by the Complaint.

2. Whether there has been a showing that there are material facts in dispute on whether defendant breached the covenant of good faith during the performance of the subject contract warranting trial.

---

[1] Pursuant to RCFC 5.2 (b) (3) (A), ISN relies on the Legal Argument section of its Motion in Limine to Establish As Admitted All Costs Incurred by Plaintiff As Verified in Defendant's Audit Report of Such Costs dated December 11, 2006, pps. 6-10. These excepted pages are attached in the ISN Appendix at 441-446. This reliance is in further support of the Argument herein on defendant's admissions. (See. E of Legal Argument at 29)

3. Whether there has been a showing that there are material facts in dispute on constructive changes in the subject contract based on orders and determinations by the Contracting Officer and his staff warranting a trial on an equitable adjustment.

4. Whether the defendant made admissions by persons in privity or jointly interested binding the defendant to admitting that ISN is entitled to an equitable adjustment.

## STATEMENT OF THE CASE

### A. Summary of the Case

The travels of this case (the second of two cases, one appeal and one motion granted for summary judgment), make any discussion of the background facts highly redundant and unnecessary. This Court has already addressed these overall facts in its summary judgment decision on Count I of the Complaint. However, for the purposes of addressing the Motion, it is important to review what this case is now about from a factual standpoint in that the defendant has neglected to present any of the germane facts on the issues raised by the remaining Counts of the Complaint.[2] Equally disturbing is that most of the facts presented by defendant (with only four exceptions) are identical to the presentation made in support of summary judgment on Count I of the Complaint. Defendant would have the Court believe that facts on the breach of contract Count are identical to those on the bad faith and constructive change Counts.[3] This tactic of utilizing the same facts rather than the facts raised by Counts II and III is not surprising- the defendant has never addressed its conduct during the performance of this Contract. It is now necessary for ISN to do so.

---

[2] There are four remaining Counts in the Complaint. Only Counts II and III require review and resolution. Count IV seeking Equitable Adjustment is part of Count III and should not be treated separately. Count V on Attorneys Fees is a claim under the Equal Access to Justice Act and is dependent on the outcome of the case. Such a claim is not filed until the merits of the case have been decided.

[3] Compare the April 29, 2004 Statement (ISN App. at 464-470) to the March 16, 2007 Statement. The only differences are the additions of paragraph (#2,3,5, and 6) citing Contract provisions. No new facts were added.

The Contract at issue[4] resulted from defendant's Solicitation in 1993 for the modernization of Technical Control Facilities in certain locations which provided tactical and strategic communications support for the Naval fleet and other DOD components. The overall task of the contractor was to change the manpower intensive operation to an equipment-driven solution by upgrading all manual technical control facilities with Automated Technical Controls (ATCs). The Statement of Work (SOW) provided the overall, general, and specific specifications for the project including the nature of the training for the one on-site contractor representative that was required. The type of hardware was provided including the switch sizing, type of workstations, spare parts, cable and software. Defendant's specifications for the upgraded ATC's were provided the bidders. With respect to how the equipment would be integrated, the contractor was to conduct a site survey as the first task after the Contract was entered into to determine all of the requirements for the equipment that would be interfaced to the ATC switch ("the Project").

Section 3.4.9 Site Survey in the Contract (ISN App. at 332) required ISN to gather information about the site conditions, which would then enable it to determine the specific communication equipment to satisfy the Contract requirements. The results of the site surveys were to be set forth in a report showing "all tasks associated with the installation of Contractor equipment." The report was required to outline the contractor recommendations for site preparation, the type and quantities of communication equipment required and an explanation of the proposed network configuration design that would satisfy the functional and operational requirements of the ATC. The report was also to include design drawings and an installation plan along with installation schedules. All of this was to be approved by the defendant.

---

[4] Contract No. 00600-94-C-0389 consists of 118 pages and 119 pages of attachments consisting of 11 separate documents. ISN's BAFO appears not to have been incorporated in the Contract, but the equipment and configurations specifications were incorporated in the Statement of Work and attachments.

Notwithstanding this process, however, ISN as a bidding contractor, was required to submit its BAFO (Best and Final Offer), i.e. all cost tables, equipment unit prices, quantity of equipment, before the site surveys ever took place (See ISN App. 189-317). Thus, the BAFO prices proposed and ultimately agreed upon by the defendant, by necessity, were based only on the specifications set forth in the Statement of Work ("SOW") (See ISN App. 190-206 Cost Tables). The equipment was anticipated to change as a result of the site surveys.[5] This meant that although the Project was contracted for on a fixed price basis, the necessity for changes in scope and price were reasonably known and contemplated from its onset.

The activity on the Contract was memorialized by the Minutes of the ATC Project Meetings held bi-monthly, and sometimes weekly.[6] The participants included ISN personnel, representatives of SPAWAR (the customer), the Contracting Officer ("CO"), the Technical Contracting Officer ("COTR"), the staff representatives from the actual ATC sites, representatives of ISN's subcontractor and representatives of the Fleet and Industrial Supply Center ("FISC) of the Navy. The number of participants in the meetings would vary-sometimes more than 30 and never less than 10.

As these minutes reflect, after the ISN site surveys, it was apparent that the defendant needed to make changes in its specifications. As a result, the defendant began making changes as early as the fall of 1994 (the Contract was signed on July 15, 1994) and continued until the late summer of 1995. ISN, at the requests of the COTR and the CO submitted FOUR Engineering Change Proposals (ECPs)[7] by late 1995. All of the ECPs concerned changes in

[5] The extent of the changes is reflected in the number of changes made to the Contract by defendant during its performance.
[6] These meetings are also described as "Project Meetings," "Conference Meetings" and "Memorandum of Meeting". The title of the meetings is irrelevant. The minutes were circulated and approved by all parties.
[7] As will be shown, defendant asked for the ECPs rather than a modification proposal.

original Contract specifications. The changed equipment was then ordered and paid for by ISN and regarding Hampton Roads, installed, with additional labor charges. For example, the 6-pair cabling set out in the Contract was first upgraded to 9-pair and than to 12-pair cabling at defendant's request; there were multiple re-locations of the matrix switches, the number of users were doubled from that in the Contract; there were further upgrades in card readers and implementing software. All of the changes increased the Contract costs. And, while defendant always indicated that formal modifications would be ultimately made to the Contract to include all of the changes and increased prices, the records tells us that the defendant never made the modifications, having decided without ISN's knowledge as early as April, 1995 that ISN would not be paid for any changes. As a result, ISN was strung along with the intent of the CO not to pay for any changes.[8]

**B. Summary of Argument**

The remaining Counts of the Complaint claim that the directives of both the COTR, approved by the CO, and the CO, all confirmed by ISN in writing, a recognized Contract process, caused ISN to order and pay for revised equipment and labor and other required changes. These instructions provided constructive changes to the Contract. As will be shown, one of the reasons the defendant immediately took possession of all ISN equipment on the Contract immediately after termination and without allowing ISN the opportunity to perform any inventory was because the defendant did not want to disclose what equipment had been purchased and delivered. In fact, this inventory report was not provided the Defense Contract Audit Agency ("DCAA") for purposes of its final audit of ISN's costs under the Contract and

[8] A discussion of the effect of not having a formal change order or modification is set forth in the Court's decision in Count I.

while DCAA states it was provided sometime later, a copy has never been provided ISN despite repeated requests.[9]

By December 1995, defendant had concluded that ISN had completed 80% of the Hampton Roads ATC work.[10] The defendant had been provided schedule revisions throughout the Spring of 1995. A new schedule revision caused by the significant changes to the Contract was submitted in June, 1995, discussed on July 10, 1995 and approved on July 24, 1995. However, despite these changes, defendant had decided secretly in April, 1995 that it would be cheaper to terminate ISN and replace it with a new contractor rather than pay for any increases in the Contract due to changes.[11]

Beginning with meetings held in early December, 1995, it was decided by the CO and SPAWAR to orchestrate ISN's removal from the Contract by creating a termination for default, which would provide the predicate for not having to pay ISN virtually any of the above Contract costs it had incurred as requested by defendant. The "plan" was for the CO to re-establish unilateral delivery schedules, different from those which had been mutually agreed upon in July, 1995, with the intent that ISN would not be able to meet the unilateral schedule. Then, ISN would be asked to pay "damages" for its tardiness (which had been demanded earlier) and if it refused (which was expected), the CO would issue a default termination notice. This "plan" was not ultimately implemented primarily because the defendant feared litigation resulting from it (not surprising). So, as an alternative, the CO stopped work on the Contract orally, confirmed by his letter of February 20, 1996, and then issued a termination for convenience letter on March 14,

[9] ISN was criticized in the Audit Report because it failed to have an inventory.
[10] Defendant has admitted in Answers to Interrogatories that is was 95% complete (See ISN App. 439).
[11] Why defendant then waited until December, 1995 to begin the behind the back termination process, as will be explained, when it decided to replace ISN in April is unknown. It would clearly be the subject of cross-examination at the trial.

1996. The reason for the termination, from the CO's standpoint, was that ISN never provided a cut-over schedule or date, despite the fact that such a date was provided in writing in a revised schedule submitted and agreed to by the defendant. Thus, in addition to the constructive changes ordered by the CO and ISN's performance of those changes without payment, the CO terminated ISN for a pretextual reason.

However, the bad faith of the defendant did not end there. As a result of the notice, ISN submitted its termination settlement proposal pursuant to the Contract, which then was audited by the DCAA. The audit resulted in the DCAA approving all of ISN's costs incurred on the Contract. This amount totaled $4,939,263. Of this amount, $522,617 was above the fixed Contract amount. At the time of the audit, ISN had been paid $2,507,015. ISN was requesting in the proposal an additional $2,553,564. After the audit, the defendant paid ISN an additional $1,542,517. The defendant has never provided a rationale for this payment or any explanation as to why ISN was not entitled to all the costs incurred and confirmed by DCAA. (See ISN App. 438 confirming the lack of rationale) In other words, there remained $367,114 under the fixed Contract amount, which did not require a modification, and had been verified by DCAA, but still was not paid along with the above Contract costs, verified by DCAA, of $522, 617.

Once again, the CO's lack of good faith as shown throughout the Contract, also permeated the attempted resolution of the settlement proposal, in violation of the spirit and intent of the Contract and the Federal Acquisition Regulations ("FAR"). First, the CO refused to respond to any requests for information from the Terminating Contract Officer ("TCO"). Second, after the issuance of certified communications and a pending settlement with ISN, which the DCAA and TCO thought was reasonable, the CO then claimed he would not authorize any additional funding on the Contract. He then claimed that ISN was potentially guilty of fraud in

its progress payments, although the payments had been audited and approved by DCAA as well. No further payments were made to ISN.

The foregoing, as later explained in detail with further record references, demonstrates that there are controverted facts in this case concerning the remaining Counts of the Complaint. Further, and as will be shown, the alleged uncontroverted facts, provided by the defendant do not address any of these issues. The summary judgment is meritless.

## LEGAL ARGUMENT

### A. The Applicable Summary Judgment Standard Precludes Relief for the Defendant.

The third sentence of RCFC 56 (c) provides for rendition of a judgment in the event that the matters considered by the Court on summary judgment disclose, "that there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56 (c); Anderson v. Liberty Lobby, Inc, 477 U.S.242, 250(1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390(Fed. Cir. 1987); Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42(1989). This provision, which is the very heart of the summary judgment procedure, demonstrates that the principal inquiry required by RCFC 56 is whether a genuine issue of material fact exists. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076(8th Cir. 1980); Ransburg Electro-Coating Corp. v. Lansdale Finishers, Inc, 484 F.2d 1037(3rd Cir. 1973)(In a summary judgment proceeding, the test is not the preponderance of the evidence but whether a genuine issue of material fact remains after an examination of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits.)

The first step for the Court is to determine whether the issues raised are truly factual issues, or are issues of law. The second step is to determine what subset of the truly factual issues are material to the decision of the case. The third step is to examine the evidence

presented by the parties to determine whether there is any genuine issue concerning any material factual issue. Ralph Larson & Son, 17 Cl. Ct. at 43(describing the three steps).

Defendant has set forth in 25 separate paragraphs (21 of which are the ones taken from defendant's April 29, 2004 Statement) its version of the uncontroverted material facts regarding Count II (Bad Faith) and Count III (Constructive Change). It is disingenuous to claim that these two Counts concern identical facts with the Breach of Contract Count. A brief review of the elements of each cause of action would disclose otherwise. Further, most of the "facts" are unsupported gratuitous conclusions and references to portions of Contract provisions. Some "facts" are totally irrelevant for what is now before the Court: (i.e. "Funding", paras. 14-18; "Previous Proceeding", paras. 22-25). To make matters worse, defendant's presentation is laced with gratuitous abuse of ISN and an intentional misstatement of its performance of the Contract. All of this shows the lack of merit of the Motion. Unfortunately, the defendant actually continues the same course of conduct before this Court as it did during the performance of the Contract.

**B. The Uncontroverted Facts Presented by the Defendant Are In Fact Highly Disputed Or Not Relevant on the Issues Presented by the Remaining Counts of the Complaint**

Defendant's legal argument on the two remaining Counts is simple: There was no bad faith by the defendant because it says so, and no constructive change because the CO never authorized any changes to the Contract in writing. In support of these two arguments, the defendant presents the old statement of material facts on the Breach of Contract Count which it claims are not in dispute. Before addressing these "facts", however, it is necessary to address one initial point: If the evidentiary material creates an issue of credibility, the case must go to trial. This is because doubts as to credibility should lead the Court to conclude that a genuine issue exists. "Nor is it (summary judgment) appropriate where a trial with its opportunity for cross-examination and testing the credibility of witnesses, might disclose a picture substantially

different from that given in the affidavits." U.S. v. Perry, 431 F.2d 1020,1022(9th Cir. 1968); See also Calkins, Summary Judgment, Motions to Dismiss, and Other Examples of Equilibrating Tendencies in the Antitrust System, Geo.L.J. 1065,1114-1119(1986) where the author argues that the most important contribution of the Supreme Court's summary judgment decisions is to refocus attention on Rule 56(f) to ameliorate the burden on the nonmovant.[12]

Contrary to following these mandates, the defendant presents the old disjointed and narrow presentation of the Proposed Findings of Uncontroverted Fact ("Defendant's Facts"). Defendant's Facts are more akin to a narrative disquisition of excerpted Contract provisions and a summary of how it thinks the provisions operate, rather than a presentation of the evidence, which it claims is uncontested on the remaining Counts. Moreover, many of the "facts" are conclusions or opinions, which are not evidence. Finally, it fails to present ANY evidence-whether contested or not-which applies to both bad faith and constructive change, preferring to view the case only as to whether the Contract provisions relating to Changes was complied with by the parties. ISN's case does not rest on whether the Contract provisions were complied with by the Parties. If the provisions had been correctly utilized, there would have been formal modifications or changes and no litigation. But that did not occur. Rather, the CO and COTR ordered ISN to provide the additional services and then intentionally failed to issue formal change orders. The defendant continues to use the same rationale it succeeded on with Count I as a defense to Count II and III. But the remaining case does NOT involve the issue whether there was a written agreement. Thus, it is easy to see why Defendant's Facts are of little use to meet its burden on the remaining two Counts. An analysis of Defendant's Facts now follows:

---

[12] RCFC 56(f) speaks to the availability of opposing affidavits. ISN does not claim inability to submit affidavits. However, the point is that the burden is on the defendant – not ISN – to show uncontested material facts.

1. Paras. 1-7 contain a general overview of the Contract (para. 1 which is not evidence anyhow), and in paras. 2-6 certain isolated provisions of the Contract. In para. 2 it cites Section G.2 on "Authorized Changes," in para. 3 includes the "Appointed CO," in para. 4. Section G.4 (a) on "Designation of COTR," para. 5 the incorporation of FAR § 52-243-1(Changes-Fixed Price) and para. 6 Section I.46 on "Change Proposals." All of the excerpts go to the issue of whether the changes to the Contract were made consistent with the Contract provisions. However, the remaining Counts assume there was no final written agreement or both services and price. What the defendant misses is that even if these Contract provisions were not met, ISN's entitlement to a constructive change is not impacted. In fact, the lack of a complete writing or change order is the fundamental basis for the constructive change claim. All ISN must show is that the CO and COTR directed changes to the Contract, which ISN undertook, and paid for, that the changes were within the overall scope of the Contract, and that no formal change order (i.e. writing) was ever issued. As for the Bad Faith Count, if changes were requested (which cannot be disputed) and yet the defendant never issued the change order or modification because of its intent not to pay ISN, how can good faith now be supported.

In para. 7, the defendant makes a reference to one of ISN's subcontractors, Datacom Management Services ("DMS"). In an apparent effort to abuse ISN, in para. 20, the defendant claims ISN still owes DMS $196,688.68 plus interest for materials furnished under the Contract, citing a letter to ISN's President dated December 29, 1999. What is neglected to be mentioned is that (i)$192,640 of materials were changes requested in the equipment by the defendant, (ii) that ISN fully paid DMS in 2001 even though it has not been paid by the defendant, and (iii) and that all of this was disclosed in discovery to the defendant. This is a further example of defendant's view of an "uncontested fact." (See Affidavit of Roma Malkani, ISN App. A).

2. Under the heading "Engineering Change Proposal" defendant lists six paragraphs (paras. 8-13), which are nothing more than a re-hash of the claimed facts set forth in support of the motion for summary judgment on Count I. Para. 8 addresses defendant's claim, vigorously disputed, that ISN had various problems with Contract performance. As reflected by the Project Meeting Minutes, however, any problems were the direct result of the defendant failing to understand that the site survey was to govern how the configuration of the ATCs were to be made and that changes and revisions were anticipated in the Contract. By stating these gratuitous conclusions (i.e. ISN was behind schedule, there were many reasons for ISN being behind schedule, ISN replaced its program manager because it was behind schedule), as uncontested facts, is wishful thinking. See, i.e. ISN App. at 6, where the parties agree that "Current manpower level is a little below needed level." (September 28, 1994)

In paragraph 9, the defendant glibly states that the configuration at Hampton Roads "was continually changing", but does not think explaining why it changed or who ordered the changes has anything to do with this case. Rather, it then makes the leap to the June 20, 1995 Engineering Change Proposal ("June ECP"), as if that was the first event in changing the configuration. As ISN shows in its Appendix, the Meeting Minutes reflect that the changes were being discussed, ordered and undertaken as early as late 1994 and well before the June, ECP. ISN submitted that ECP only after it had submitted three others: (Nov. 9, 1994 CO wants cost breakdown on 414R ECP but wants ISN to proceed; on March 21, 1995, CO approved 12-pair cabling and warranty ECP; on April 18, 1995, ECP on CDRL Item C003) submitted. See ISN App. at 12-16, 30-35, 33-50, 93-104).

Paras. 10-13 are nothing more than the same statements made about the June ECP and what happened after its submittal which demonstrate that there was no formal change order or

modification issued on it which while an undisputed fact, does nothing to address Counts II and III.

3. The five paragraphs under the heading "Funding" (paras. 14-18) are truly mystifying as uncontested facts regarding the Bad Faith and Constructive Change Counts. As previously pointed out, at the time the ECPs were submitted along with revised schedules, including cut-over dates, only a fraction of the fixed price Contract amount had been paid to ISN. Thus, whether or not the Contract required additional funding cannot be a defense by the defendant for not paying. And while most of the statements are accurate representations of correspondence submitted on the Count I summary judgment, they have nothing to do with the outstanding issues.[13]

4. Under the heading "Termination", the defendant lists three paragraphs attempting to set forth the uncontested facts regarding the termination of the Contract. Many of these facts are highly disputed. In paragraph 19, it is claimed that at the time of termination, ISN had "partially completed" the ATC installation at Hampton Roads. No mention is made that defendant admits ISN was 95% complete (obviously more than "partial") and that ISN was on schedule based on the revised and agreed cut-over schedule provided with the June ECP. (See ISN App. Ex. A, Affidavit of Roma Malkani). Further, there is loud silence regarding the CO's claim that ISN was terminated because it never provided a cut-over schedule, even though it had, and further silence on the CO's "plan" in early December, 1995 to orchestrate ISN's termination.

Paragraphs 20 and 21 address the Termination Settlement Proposal ("TSP") and again, intentionally mis-state facts-let alone set forth undisputed facts. The DCAA audited ISN's TSP

[13] The funding issue was first raised by ISN in an attempt to demonstrate that there was sufficient funding to pay the claimed settlement amount, which did not prevail in either this Court or the Federal Circuit Court of Appeals in Case No.98-178C. Also, that claim did not prevent the dismissal of Count I. However, funding is of interest here because it shows the defendant had no intention of paying ISN as early as April, 1995, unless ISN paid defendant $1.3 million for alleged late deliverables.

and confirmed that ISN incurred supportable costs prior to termination of $4,939,263. (See Erdelsky deposition excerpts, ISN App. at 441). In fact the ONLY costs not allowed were $151,539 of settlement expenses. Regarding Direct Labor and Indirect Expenses, DCAA increased the costs to which ISN was entitled. DCAA never concluded that it could only support $4,049,532 of the TSP costs (third sentence of para. 21). It questioned costs in excess of the Contract amount and profit, only because of the legal issues raised by these two categories. There is no mention of DCAA's confirmation that the defendant had told DCAA that ISN was entitled to an equitable adjustment or that the audit provided support for paying ISN at least the full amount of the fixed Contract.

5. The remaining four paragraphs under "Previous Proceeding" present the history of the litigation between the parties and do not constitute material facts. They warrant no response.

The problem with Defendant's Facts is that NO uncontested facts are presented on the two remaining Counts of the Complaint. Rather, defendant again presents as uncontested facts that (i) the CO did not authorize or approve the ECPs (which he did); (ii) that ISN must follow the Contract provisions to state any cause of action for constructive change (incorrect as a matter of law), and (iii) that ISN's claims arise from unapproved work outside of the scope of the original Contract (it was not unapproved and arises within the overall scope of work). The material facts on these factual issues are all contested. It is incumbent on the defendant to establish to the Court's satisfaction the absence of genuine issues of material fact. At the essence of defendant's Motion is the credibility of the CO and defendant's other witnesses. As will be shown, that credibility is highly suspect thus making summary judgment inappropriate.

**C. Count II Claiming Breach of the Covenant of Good Faith and Fair Dealing Raises Material Facts In Issue Which Cannot Be Resolved On Summary Judgment.**

The defendant's arguments on this Count are nothing more than convenient obsfrucation: (i) It is ISN's obligation to demonstrate bad faith and therefore the defendant has no obligation to show uncontested facts on this claim; (ii) the defendant must have acted with "specific intent" to injure the plaintiff and that is the legal standard which ISN must demonstrate to oppose summary judgment;[14] (iii) ISN's claim arises out of work outside the scope of the Contract and "new" obligations cannot give rise to a bad faith claim; and (iv.) insisting on a parties' compliance with contractual provisions cannot be the basis of a bad faith claim. None of these arguments are correct legally or factually and do not reflect the record in this case. As will shown, the defendant has the wrong legal standards and facts in support of this Count.

Every contract, whether the Government is a party or not, contains the implied covenant of good faith and fair dealing. Solar Turbines, Inc. v. U.S., 23 Cl. Ct. 142(1991). The obligation is implied into every contract that both parties will act in good faith and observe reasonable commercial standards of fair dealing in performance of the contract. Restatement (Second) Contracts §205; State of Alabama v. U.S. 35 Fed. Cl. 685(1996); see also, Orange Cove Dist. v. U.S., 28 Fed. Cl. 790(1993). The implied covenant of good faith and fair dealing implies the duty on all parties to perform a contract reasonably. The duty limits the manner in which a party who is vested with discretion under the contract may exercise it by requiring that party to exercise that discretion reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties. Barseback Kraft AB v. U.S., 36 Fed. Cl. 691 (1996). The duty even includes the protection of the reasonable expectation of the parties.

---

[14] "Scienter" is not an element of bad faith under a contract. It could be a factor for a fraud claim, but fraud is not being alleged.

This covenant is actually at the heart of every contract because it prevents the very conduct that occurred during the performance and termination of this Contract-heavy-handedness, misrepresentation, and the claim that the defendant is now insulated from liability because it did not comply with contractual provisions. Particularly on summary judgment, when genuine factual issues are raised by the non-moving party, its version of the underlying facts must be believed. C. Sanchez and Son, Inc. v. U.S., 6 F.3d 1539(Fed. Cir. 1993). In Sanchez, the Federal Circuit found that a genuine factual dispute, precluding summary judgment, existed as to how relevant provisions of the Army Corps of Engineers safety and health requirements manual could reasonably be read by engineers and experts in the field. Also, a material issue of fact was presented as to whether a United States Postal Service agent's illegal conduct tainted a contract, thereby voiding it, which precluded summary judgment. Godley v. U.S. 5 F.3d 1473 (Fed. Cir.1993).

Since the claim of breach of the covenant of good faith and fair dealing concerns the interpretation of a parties' conduct including the credibility of the party and its conduct, summary judgment cannot be used in disposing of the claim unless the facts are stipulated. Here, far from being stipulated, the defendant has not gone to the trouble to even set forth the salient facts on the claim. Rather, a broadbrush technique is utilized to avoid having to discuss the very facts that give rise to the claim. See also, Beta Systems, Inc. v U.S. 838 F.2d 1179(Fed. Cir. 1988) where genuine issues of material fact, concerning intent of the parties to a public contract regarding authorization of materials, precluded summary judgment on that issue.

ISN claims that the covenant of good faith in the Contract was violated in three separate respects:

A. By defendant requesting and demanding multiple ECP's and changes within the overall scope under the Contract, and then after such changes were made and paid for by ISN, refusing to follow the Contract provisions for memorializing the changes and paying for such changes.

B. By orchestrating ISN's termination so that the ECPs would not have to be paid for and defendant could then save money by replacing ISN.

C. By failing to participate in the termination settlement process as required by the Contract and FAR.

The material facts in support of these claims follow. However, and to repeat itself, it is not up to ISN to demonstrate the material issues of fact; it is the burden on the defendant to show there are no material facts in dispute. As the Court will see, the defendant has neglected this obligation.

**A. The Requested Changes**

The ATC Project under the Contract was directed by the parties through meetings held on a bi-monthly basis, and sometimes weekly. Between 15 and 30 persons participated; representatives of ISN, SPAWAR,[15] the CO, the COTR, and other Navy Representatives were all in attendance as reflected by the sign-in sheets which accompanied each meeting.[16] ISN was responsible for taking the minutes, which were transcribed in hand, typed and then distributed to all the participants for editing and agreement. The minutes were than approved. Those minutes now reflect the extent to which the defendant through the COTR and CO requested changes, insisted that ISN make them, insisted that ISN submit ECPs for the changes and how defendant

[15] "SPAWAR" is the Space and Naval Warfare System Command. It is responsible for all Naval data communications at both ship and shore facilities.

[16] The CO attended few of the meetings out of more than 30 that were held. The COTR attended all meetings. After the CO's appearance at the March 30, 1995 meeting, he became noticeably absent. The two meetings he did attend were those where he authorized the ECPs. However, all writings memorializing the changes were provided him.

managed the Project regarding the changes. The COTR attended all the Meetings. The CO attended approximately three meetings. As will be addressed, the COTR had the contractual right to direct changes so long as the CO was notified in writing (See ISN App. 401-402). A review of certain of the minutes discloses the following:

1. At the Kickoff Meeting held on July 25, 1994, the "Navy was to MOD the Contract to account for site Survey schedule."(ISN App. at 4-5);
2. At the September, 28, 1994 Meeting "SPAWAR to provide specifications for the 9 pair cable to be used."(ISN App. at 6);
3. At the October 20, 1994 Meeting, SPAWAR provided ISN with the 9 pair cable specifications and "ISN to propose workstation layout."(ISN App. at 8-11);
4. At the November 9, 1994 Meeting, SPAWAR requested re-establishment of the ISN schedule dates, an ECP to incorporate the two site surveys in Hawaii and a cost breakdown on the 414E ECP and "will expedite approval process."(ISN App. at 12-16);
5. At the November 16, 1994 Meeting, SPAWAR was interested in harmonizing the schedule with the CDRL deliveries and the ECPs. Defendant said it "had received the backup pricing information for the ECP addressing the 414E Cards. She [Representative of SPAWAR] considered the information adequate." Importantly,

> "There are a number of ECPs in process. Ron Zell (SPAWAR) asked that each ECP address the three sites on contract wherever possible. ISN agreed. Presently, ECPs in the making include: 12 pair cabling in lieu of 9 pair cabling; additional port counts; and remote sites at Camp Smith and Hampton Roads. All

> ECPs must be integrated into the official schedule, and there will be one. Acceptance Test for each site and that Test must include all ECPs." (ISN App. at 17-20);

6. At the November 30, 1994 Meeting "A technical meeting was scheduled to discuss port counts for the Hampton Roads ECP." The Navy "requested that the effective date for the 414E ECP be extended. ISN agreed."(ISN App. at 25-26)
7. At the March 21, 1995 Meeting, the CO stated the "the Government desired ISN to submit an ECP for the 12-pair cabling and an extended warranty for the DIM Cards." The CO wanted ISN to work concurrently on both the CDRL's and the ECP and acknowledged that the order for the new equipment would be at a higher rate/cost. ISN confirmed that the new equipment had been ordered. (For emphasis). (ISN App. at 30-36; App. Ex A)
8. At the July 10, 1995, a draft cut-over schedule was discussed. (ISN App. at 62-64);
9. At the July 20, 1995, ISN was told the ECP letter was in for Kevin (the Government's) signature. (ISN App. at 68-70);
10. At the July 24, 1995, the draft cut-over plan was approved. (ISN App. at 68-70);
11. As of the November 7, 1995 Meeting, no negative issues were raised by the defendant about the status of the Project. (ISN App. at 85-88)

These facts demonstrate that changes in the overall Contract were authorized[17] and that the CO was provided revised schedule and cut-over dates on more than one occasion and ultimately agreed to the final revised dates.

The defendant does not address or even mention any reason for not formally responding to ISN's ECPs. It had multiple opportunities to do so:[18]

1. On April 7, 1995, ISN submitted a written ECP to CDRL Item C003 with a new equipment configuration provided by the Navy. The changes were to be made at no cost to the Government. (ISN App. at 93-104)

2. On April 18, 1995, ISN submitted a second ECP for the 12 pair cables change as well as the Novell Netware 3.11 SFTIII from 25-50 users at Hampton Roads. The total cost of the ECP was $999,206. The rationale for the pricing was set forth. Also, a new schedule was provided with a cut-over of June, 1996. (ISN App. at 130-137).

3. On May 25, 1995, ISN submitted DMS DM-414E ---- card ECP. (See ISN App. 130-137, 93-104, 28-29)

4. On June 20, 1996, ISN submitted another ECP covering ECPs previously submitted with (i) a revised pricing, and (ii) a new cut-over date of August, 1996. (ISN App. at 52-61).

Despite the foregoing, the CO has testified that:

1. The Navy never requested an ECP.

2. The Navy was never provided a revised cut-over date.

[17] See Argument on Constructive Change discussing the authority issue in detail.
[18] The COTR and SPAWAR responded to all ECPs technically. The CO never responded to the ECP pricing.

3. He does not know if any work or equipment was performed or ordered under the ECPs. (See Defendant's App. at 235-137).

**B. The Termination of ISN.**

The CO was not shy, however, in attempting to orchestrate a default termination of ISN. As of early November 1995, the defendant had no complaints about ISN's performance. A revised cut-over date of August, 1996 had been provided in June, 1995, and agreed upon in July, 1995. ISN was 95% complete at Hampton Roads with NINE MONTHS remaining for performance on the other sites.

Given the representations, agreements and urgings by defendant, as set forth above, defendant never had the intention of paying for any changes. As early as April, 1995, defendant was discussing how to terminate ISN to save the costs of the Contract revisions.[19] The rationale was if ISN was defaulted for performance, the defendant would own the new equipment (even though it had not paid for it) and the balance of the Contract could be performed by a replacement contractor at less cost than ISN. But how do you accomplish that strategy? The defendant's memorandum of December 6, 1995 explains how.

On December 6, 1995, nine months before the accepted cut-over schedule, a meeting was held between the CO and SPAWAR regarding the termination of ISN. A memorandum was typed confirming the substance of the meeting. (ISN App. at 105 and 154-155) The following points were discussed: First, the CO wanted to re-establish a new delivery schedule, "knowing full well ISN won't meet the dates." If the CO could not negotiate consideration for the longer

[19] It is clear that as early as April, 1995, defendant knew that its inadequate specifications would cause Contract costs to increase and that the solution was to re-bid with a new Contractor rather than pay for the changes ISN had ordered.

period of performance, he would determine it unilaterally.[20] Then, when ISN fails to meet the dates, the CO would default them under the Contract. Second, ISN is 95% complete on Hampton Roads – not 80%: but the memorandum confirms that ISN has spent $2 million on equipment. Third, if ISN is terminated for convenience, an equitable adjustment will have to be negotiated.

This "plan to terminate" was established three months before ISN was ordered to stop work, during the same time ISN was working with the CO's office and SPAWAR to complete the changes to the Contract. Just how genuine could the CO and SPAWAR have been in their contractual efforts based on what was decided December 6th? The notion that there was actually an attempt to work with ISN to solve any problems is undercut by this "plan". At no time does the defendant reflect any causation between its imposed changes to the specifications and the schedule and its responsibility for any possible delay.

**3. Failing to Participate in the Termination Process.**

Finally, the failure of the CO to participate in the termination settlement process is also a measure of bad faith. When the defendant decided to terminate ISN for convenience, it knew that an equitable adjustment would have to be negotiated because it is required by FAR. So, after the DCAA audit of the proposal, which confirmed all of ISN's costs, the equitable settlement was left to the Terminating Contracting Officer ("TCO"). She immediately sought help from the CO. He failed to respond despite his knowledge that the termination process was underway. When he was contacted again, he continued his failure to respond. Assuming that the lack of CO input was credence to ISN's overall claim, the TCO accepted the claim (within her

[20] The consideration being contemplated was $3 million, first demanded from ISN on March 21, 1995, an astonishingly high number given the calculation, which is absurd at best. (ISN App. at 37). The demand on ISN claimed that there were 11 late deliverables, totaling in the aggregate 1,695 days and at $1,784.77 per day - based on a contract value of $10,708,619 – equaled $3,025,185 due to the Government from ISN. At that time, ISN had not been paid under the Contract.

authority) and requested funding. Only then did the CO enter the process and state that he would not authorize further funds on the Contract.[21] Given the fact that he seldom participated in Project Meetings from July, 1994 to March 1996, his knowledge of ISN's performance was based solely on the COTR. However, the meetings he did attend and ISN's written ECPs provided him direct knowledge of the changes in equipment and other specifications of the Project. Refusing to negotiate an equitable adjustment (i.e. he will not agree to fund any adjustment), without reason or basis, was not good faith. It was intended solely to penalize ISN for doing exactly what had been ordered.

The Contract incorporates FAR § 52.249-2 Termination for Convenience of the Government (Fixed-Price). Under that provision, ISN was obligated to submit a termination settlement proposal to the CO no later than one year from the effective date of the termination. ISN did that. Under subparagraph (g) if the CO and the ISN failed to agree on the amount to be paid because of the termination of work, the CO is required to pay ISN the amounts determined by the CO as follows:

> (1) The contract price for completed supplies or services accepted by the Government not previously paid for,
> (2) The total of (i) the costs incurred in the performance of the work terminated, (ii) the cost of settling and terminating subcontracts, and (iii) fair and reasonable profit.

Despite these clear requirements on the CO, the record demonstrates that he did nothing, other than tell the TCO that he would not fund any part of the amount that had been calculated by the TCO under this provision.

Each of these acts of bad faith when viewed collectively, demonstrate the nature of defendant's conduct. The foregoing analysis creates more than a prima facie case of bad faith.

[21] Pursuant to Section G.8 of the Contract, only the ACO is authorized to execute Contract Modifications de-obligating on unexpended Navy dollar balance considered excess to known contract requirements. Thus, since funds existed on the Contract, the CO had no authority to de-obligate in the first place.

Defendant has failed to provide any facts to address the foregoing. And, while complaining that ISN did not honor the provisions of the Contract, which is a mis-statement of ISN's argument, defendant's presentation is silent on facts because it is the classic wolf in sheep's clothing.

**D. ISN Is Entitled To A Constructive Change of the Contract For the Work And Equipment Ordered by Defendant and Paid For By ISN.**

In a rough way, a "constructive" change under a government contract amounts to nothing more than treating a transaction under the contract as if it were an order under the "Changes" clause, thus making available to the contractor the contractual remedy of an "equitable adjustment." The underlying assumption is that the parties have NOT complied with the particular provisions of the contract regarding Changes. The defendant claims ISN is not entitled to a constructive change on the Contract for two reasons: First, none of the changes were authorized by the CO, who it claims under the Contract was the only person authorized to make Changes. Second, since the parties agreed to pursue the changes pursuant to the ECPs which are somehow different than the documentation under the Changes provision, the CO had the right not to agree to the ECPs (i.e. not respond) which he would not have had if the process had involved the Changes provision. Both of these arguments are nothing more than a knee jerk reaction to ISN's claim intended not to address the facts in this case. They do not address the relevant provision of the Contract. In fact, the CO did authorize all of the changes to the Contract. Regarding the ECPs, this form of documentation is in fact exactly the documentation required by the Changes provisions. Thus, the arguments go nowhere.

This is a case where defendant clearly ordered work and modified the specifications originally approved above and beyond the requirements of the Contract. Southwest Welding Manufacturing Company v. United States, 188 Ct. Cl. 925, 413 F.2d 1167(1969). It is axiomatic that the Government warrants the sufficiency of its specifications. See, for example, United

States v. Spearin, 248 U.S. 132,39 S.Ct. 59, 63 L.Ed. 166(1918); Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct.Cl. 1 (1968); WRB Corp., et. al. v. United States, 183 Ct.Cl.409 (1968). The "constructive change" case is a remedial path and the cases are uniform that if the contractor incurred costs because of a change by the Government, then the contractor is entitled to an equitable adjustment.

Southwest Welding & Manufacturing Company v. United States, 188 Ct. Cl. 925, 413 F.2d 1167(1969), was a case in which the Government clearly ordered extra work above and beyond the requirements of the contract which it had drafted. The Claims Court held that it should reimburse the contractor therefor pursuant to the standard "Changes" clause contained in the contract. The order for the change came from the CO and the contractor provided notice that it would be considered extra work. No agreement was reached on the price for the change ordered by the CO. The Court stated that it was axiomatic that the Government warranted the sufficiency of its specifications. See, eg. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166(1918); Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct. Cl. 1 (1968); WRB Corp., et. al. v. United States, 183 Ct. Cl. 409 (1968). This principle is ordinarily cited to support a claim by a contractor that he was put to additional expense by reason of defective or inapplicable Government specifications. But the rule is a fortiori for application, when it is the Government, which is in effect questioning the sufficiency of its own specifications. In Southwest Welding, the unresolved issue of fact raised by the Government was whether its own specifications were sufficient to insure the integrity of the weld, but the Court found that there was sufficient doubt about the sufficiency of the specifications for the CO to order the additional work and to, in effect, upgrade the specifications, provided it paid for the upgrade. This is remarkably similar to what occurred on ISN's Contract.

Further, even if the CO misinterpretes the specifications and orders a change, a change is still effected under the Changes clause. Rice v. United States, 317 U.S. 61, 63 S. Ct. 120, 87 L. Ed. 53(1942). So long as the contractor acts on the decision and incurs costs, he is entitled to an equitable adjustment under the Changes article.

Under the constructive change theory, the clause may be invoked when the CO has ordered the contractor to render some service not required by but within the general scope of the contract, but has neglected to issue a formal change order. Len Co. & Associates v. United States, 385 F.2d 438, 443, 181 Ct. Cl. 29, 38(1967). This is the case here.

**A. Authority for Changes.**

Defendant cites Section G.2 of the Contract as requiring a writing signed by the CO or a change cannot be effected on the Contract. Since ISN cannot point to a writing signed by the CO, defendant claims ISN is out of luck in supporting a constructive change. This argument might have some basis if Section G.2 was read in harmony with the other provisions of the Contract, which were conveniently omitted. First, Section G.2 "Government personnel" is intended to prevent defendant's personnel from providing directions to the contractor unless in writing signed by either the CO "or pursuant to specific authority otherwise included in this contract. "SeeG.2 (b) (ISN App. at 400). ISN has not claimed that other "Government personnel" directed the changes leading to the ECPs. Rather, it claims that all the changes were requested by the COTR ("...specific authority...included in this contract") initially or the CO and that the CO was notified in writing about the changes. This process is consistent with the Contract.

Section G of the Contract is entitled "Contract Administration Data." G.4 addresses the "Designation of COTR." Under paragraph G.4 (a)(3) "When, in the opinion of the Contractor,

the COTR requests effort outside the existing scope of the contract, the contractor will promptly notify the PCO in writing."[22] In this case, the COTR attended all Project Meetings. All ECPs were requested by him and the CO. ISN then always followed-up with notification to the CO in writing of the ECP. (See COTR's memorandum of May 25, 1995 confirming that ISN had submitted two ECPs at defendant's request before the June 20, 1995 ECP, ISN App. at 138-139); ECP #1 submitted on April 7, 1995 addressing defendant's request that all digital circuits be cabled using 12-pair cabling, ISN App. at 130-137; ECP #2 submitted on April 18, 1995 to modify ATC configurations to conform to defendant's new requirements ISN App. 93-104; ECP #4 dated June 20, 1995 re-stating the prior ECP's with different pricing ISN App. 52-60 and attachments.) All of the ECPs arose out of Project Meetings attended by the COTR (and in some instances the CO as well) and clearly consisted of "effort outside the existing scope of the contract," The CO was then notified in writing and prices supplied for the requested changes.

There are also two other points regarding the COTR's involvement in the Project which shed light on what was transpiring: Under G.4- (b)(4) of the Contract, the COTR had the responsibility to alert the ACO as appropriate, to any potential problems which may affect cost or performance schedules, determine if percentage of work performed reasonably corresponds to the percentage of funds expended." While defendant complains about ISN's Performance, at no time did the COTR notify the ACO that there were ANY existing or potential problems on this Contract.

Second, defendant claims that ISN was terminated because it was late in its deliverables. Under G.4- (b)(7) it was the COTR's responsibility to "determine causative factors for any slippage in the performance schedule and report to the PCO or ACO making recommendations

---

[22] This provision makes sense because the COTR has the technical knowledge of the Contract and the CO does not. Further, arguably any new work or equipment is "effort outside the existing scope of the Contract…"

for corrective action to eliminate the cause of slippage." At no time did the COTR notify either the PCO or ACO regarding the subject of slippage in schedule. That was because ISN was submitting revised schedules based on the changes being ordered by the defendant to the Contract.

**B. "Payment" for Changes.**

Having authorized the changes to the scope and specifications, the CO clearly had no dispute with handling the changes via the ECP route. His problem came in paying for them. How different is that than if the Changes clause had been invoked which the defendant now claims is fatal to a constructive change? The Contract incorporates FAR § 52-243-1 on Changes to a Fixed-Price contract. Under that provision, the CO has the right to make changes within the general scope of a contract. The contractor can then ask for an adjustment either within 30 days of the written order or before final payment. Under I.46 Change Proposals in the Contract, defendant can solicit changes to the equipment or other requirements of the Contract and the proposal from the contractor "submitted to the Contracting Officer shall be processed expeditiously." Under both the FAR and the Contract provision, there is a written change along with a change in contract price. If made under FAR, if there is no agreement, the cost issue becomes a Dispute. If made under the Contract, the contractor is entitled to an equitable adjustment. Both provisions are therefore close in substance. Thus, defendant's argument that the ECP was a "Change Proposal" and not under FAR § 52-243-1 appears to be a distinction without a difference. If the defendant requested the changes to the Contract, ISN becomes entitled to compensation for the constructive change. Defendant cannot argue that the changes requested were then withdrawn because no action was taken when defendant knew ISN would

purchase the equipment and make the changes. Whether a change or proposal for a change, ISN is entitled to an equitable adjustment.

It is clear that defendant uniformly reserves the right to change the terms and conditions of an existing contract and that this originates in its desire to exclude contingencies in its initial pricing. That is why Government contracts include provisions for contract price adjustments resulting from Government-directed changes, acts, or omissions. As a result, the defendant has accepted the risk for potential future price increases. This risk is assumed in exchange for the elimination of pricing contingencies for these same actions in the initial contract value. Thus, changes to a contract, and the need for a resulting adjustment to the contract price are a normal part of contracting with the Government. It is for these reasons that a contractor's need to submit a request for an equitable adjustment is not an undesirable event. To the contrary, it is the result of recognition by both parties that the need for an equitable adjustment is a normal part of the contracting process. This case is an example.

**E. The Defendant's Conduct Constitutes Admissions Against Interest Regarding ISN's Entitlement to an Equitable Adjustment[23]**

A statement of an agent or servant concerning a matter within the scope of his employment, made during the existence of the relationship, is an admission of his employer. Fed. R. Evid. 801(d)(2)(D). Regarding the Government, if the statement is adopted by the Governmental agency and thus represents more than the mere statement of a government agent, United States v. Kattar, 840 F.2d 118, 130-31(1st Cir. 1988) it provides for the admissibility as an admission of a party opponent under Rule 801(d)(2)(B). So long as the agency has manifested an adoption or belief in the truth of the admission, the statements become the views of the

[23] ISN has previously field a Motion In Limine to Establish As Admitted All Costs Incurred Verified by Defendant's Audit Report of Such Costs dated December, 16, 1996.

agency or government. United States v. Powers, 467 F.2d 1089, 1097 n. 1(7th Cir. 1972)(Stevens, J. dissenting).

Here, the defendant has made at least two admissions regarding ISN's entitlement to an equitable adjustment of the Contract.[24] The first admission was by the DCAA in its Audit Report of the TSP on December 16, 1996:

> ...the Government acknowledged that ISN was due some form of equitable adjustment on this contract due to various changes to the statement of work. It is our understanding that the only hold-up in equitable adjustment negotiations was a delivery schedule. Since the contract was terminated prior to the conclusion of the equitable adjustment negotiations, we are unable to determine the impact that would have on the anticipated loss.

This Audit Report is a consolidation of all relevant facts regarding the ISN TSP and provides recommendations to the defendant. The acknowledgement by the defendant in the Report that ISN is due some form of equitable adjustment and the reason is binding as an admission which prevents the defendant from now arguing that ISN is NOT entitled to an equitable adjustment.

In addition to the DCAA admission of entitlement, a second admission was made by the Defense Logistics Agency ("DLA"). In a series of writings generated by Denise M. Jones, Termination Contracting Officer ("TCO"), defendant admits that ISN is entitled to $4,909,211, the amount claimed in the TSP. This admission prevents defendant from now arguing that that ISN is not entitled to an equitable adjustment.

These two admissions do not violate Fed. R. Evid. 408 prohibiting evidence of settlement offers and compromises. First, the admission sought here is not of an agreement with defendant on settlement, but of ISN's entitlement to some form of equitable adjustment to the Contract.

[24] The admission is ISN's entitlement to an equitable adjustment. The amount of the adjustment remains within the province of the Court.

Second, the admission of the defendant is not offered to show a settlement offer or amount-only that ISN was entitled to some amount.

Rule 408 only applies if the effort to compromise involves a "claim." The meaning of "claim" has both a qualitative and a quantitative dimension. The first refers to the kinds of disputes that are covered by the Rule. The quantitative dimension of "claim" arises from the fact that Rule 408 only applies to the use of evidence of compromise to prove validity or invalidity of the claim that was the subject of the compromise. Here, the TSP is not a claim-it is a termination settlement proposal. A "claim" would be asserted under the Contracts Disputes Act ("CDA"). Thus, if ISN had filed a CDA claim and that claim was responded to by defendant with an offer, that offer would probably be inadmissible. That is not the situation here.

The two admissions of the defendant are binding regarding ISN's entitlement to an equitable adjustment. The Court must now determine the amount of that adjustment.

## CONCLUSION

For reasons set forth herein, defendant's Motion for Summary Judgment should be denied.

Respectfully Submitted,

May 11, 2007

Singer & Associates, PC

s/Norman H. Singer

By: NORMAN H. SINGER, ESQ.
10411 Motor City Drive
Suite 725
Bethesda, MD 20783
(301) 469-0400
(301) 469-0403(f)

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that Plaintiff's Opposition to Defendant's Motion for Summary Judgment was filed electronically with the Court on this 11th day of May, 2007 pursuant to the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the system. The parties may access the filing through the system.

/s/Norman H. Singer
NORMAN H. SINGER, ESQ

****************************************************************

**UNITED STATES COURT OF FEDERAL CLAIMS**

****************************************************************

**02-796C**
**(Judge Allegra)**

**INFORMATION SYSTEMS & NETWORKS CORPORATION,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

****************************************************************

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

****************************************************************

**Norman H. Singer, Esquire**
**Singer & Associates, P.C.**
**10411 Motor City Drive**
**Suite 725**
**Bethesda, Maryland 20817**
**(301) 469-0400**

**Attorneys for Plaintiff**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **INFORMATION SYSTEMS & NETWORKS CORPORATION** | : |
| **Plaintiff** | : |
| **v.** | : **Case No. 04-385C** |
| | : **(Judge Block)** |
| **UNITED STATES OF AMERICA** | : |
| **Defendant** | : |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff Information Systems and Networks Corporation ("ISN" or "plaintiff") hereby respectfully submits its response to defendant's proposed findings of fact in support of its motion for summary judgment. This response references the numbered paragraphs in defendant's Proposed Findings of Uncontroverted Fact ("Defendant's Facts"). In response to Defendant's Facts, ISN states:

1. ISN agrees with the first two sentences of Para. 1. ISN denies the third sentence of Para. 1 in that the simplistic description of the Contract is not complete or completely accurate, and in fact the Contract required far more services and work as described in the Scope of Work. See, ISN App. 318-436 and on 436, the description of the 11 attachments to the Contract. ISN agrees with the fourth and fifth paragraphs of Para. 1.

2. ISN agrees that this paragraph sets forth an excerpt of Section G.2 .

3. ISN agrees with this paragraph.

4. ISN agrees that this paragraph sets forth an excerpt of Section G.4 (a).

5. ISN agrees that the Contract incorporates by reference FAR Sec. 52.243-1(Changes-Fixed Price).

6. ISN agrees that this paragraph sets forth excerpts of Section I.46 of the Contract.

7. ISN agrees it executed its subcontract with Datacomm Management Services ("DMS") on March 28, 1995. ISN disagrees with the second sentence of paragraph 7 in that the description of the subcontract is not complete or accurate. ISN disagrees with the third sentence of this paragraph because the subcontract speaks for itself on its financial terms, which are not completely stated in this paragraph.

8. ISN disagrees with the first sentence of this paragraph. See ISN App. 4-5 setting forth requirement of Contract modification for site surveys at defendant's request; ISN App. 6 stating as of September 28, 1994 the "Current manpower level is a little below needed level."; ISN App. A consisting of Affidavit of Roma Malkani. See ISN App. 158-162 setting forth CDRL status as of February 1, 1996. ISN disagrees with the second and third sentences of this paragraph. See ISN App 4-27; 31-36; 38-50; 61-70; 80-92; 52-60; 93-104; 130-137; Affidavit of Roma Malkani.

9. ISN disagrees with the first sentence of this paragraph. The Contract had multiple requirements. See ISN App. 318-436; 189-315. ISN agrees with the second sentence but affirmatively states that the changes were all at the request of the Technical Contracting Officer ("COTR") and Contracting Officer ("CO"). See ISN App. 12-16; 17-20; 21-24; 25-26; 31-36; 38-43; 71-79; 93-104; 105; 130-137; 138-139; 140; 141-143; 144. ISN disagrees with the third sentence of this paragraph. The June 20, 1995 ECP was the 4th ECP submitted to the CO and included additional requirements from the earlier three as well as re-stated the earlier three with different pricing.

10. ISN agrees with the first sentence of this paragraph. ISN agrees with the second and third sentences of this paragraph, although all sentences are to be read in conjunction with a complete reading of the letter.

11. ISN agrees with the three sentences of this paragraph to the extent they correctly summarize the letter of July 20, 1995.

12. ISN agrees with the summary of certain of Roscoe Crawford's testimony on these two pages of his deposition transcript are set forth in the transcript.

13. ISN agrees with the first sentence of this paragraph to the extent it properly sets forth the memorandum cited. ISN agrees that in the September-December, 1995 Progress Reports, ISN confirms that the ECP had not been formally approved. ISN agrees with the last sentence of this paragraph to the extent it correctly summarizes the letter of January 26, 1996.

14. ISN agrees with this paragraph as summarizing the August 31, 1995 letter.

15. ISN agrees with the first sentence of this paragraph. ISN denies the remaining two sentences of this paragraph because it does not understand "an emergent requirement for the ATC Program," does not have complete knowledge whether other monies were added or subtracted from the Contract and whether the ECP was ever funded at any time, and whether the provisions of the Contract regarding funding were complied with.

16. ISN agrees that the agreed configuration was not as originally set forth in the Contract.

17. ISN disagrees with this paragraph because it does not include all of the memorandum of the December 6, 1995 meeting. See ISN App. 154-155; 37; 105.

18. ISN disagrees with this paragraph as being a mis-characterization of the witnesses testimony. See Affidavit of Roma Malkani.

19. ISN agrees with the first sentence but also states that it was an oral stop work order. ISN agrees with the second, third and fourth sentences of the paragraph. ISN disagrees with the last two sentences of the paragraph. See, Affidavit of Roma Malkani; Inventory of Equipment in the possession of the defendant; invoices and bills to the defendant.

20. ISN agrees with the first sentence of this paragraph but also states that the Termination Settlement Proposal ("TSP") was issued pursuant to the Contract. ISN agrees that the TSP sought payment of $5,060,578 but does not agree with the argumentative portion of this sentence. ISN agrees with the third and fourth sentences. ISN disagrees with the fifth sentence in that any moneys due DMS were included in the TSP. ISN disagrees with the last sentence of this paragraph in that DMS has been paid in full. See Affidavit of Sonya Lyles and Roma Malkani.

21. ISN agrees with the first two sentences of this paragraph. ISN disagrees with the third sentence as being an incorrect conclusion from the Report. ISN agrees with the fourth sentence, but does not agree with the fifth or sixth sentences. See ISN App. 174-182; Affidavit of Sonya Lyles.

22. No response required.

23. No response required.

24. No response required.

25. No response required.

Respectfully submitted,

__s/ Norman H. Singer__________________

NORMAN H. SINGER, ESQ.
Singer & Associates, P.C.
10411 Motor City Drive
Suite 725
Bethesda, Maryland 20817
(301) 469-0400
Counsel for Plaintiff

May_11__, 2007

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact was filed electronically with the Court on this 11th day of May, 2007 pursuant to the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the system. The parties may access the filing through the system.

/s/Norman H. Singer
NORMAN H. SINGER, ESQ

************************************************************

# UNITED STATES COURT OF FEDERAL CLAIMS

************************************************************

02-796C
(Judge Allegra)

INFORMATION SYSTEMS & NETWORKS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

************************************************************

## APPENDIX OF EXHIBITS SUPPORTING PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

************************************************************

Norman H. Singer, Esquire
Singer & Associates, P.C.
10411 Motor City Drive
Suite 725
Bethesda, Maryland 20817
(301) 469-0400

Attorneys for Plaintiff

| Exh. # | Page |
|---|---|
| A. Affidavit of Roma Malkani | |
| B. Affidavit of Sonya Lyles | |
| 1. Project Kickoff Meeting Minutes dated August 1, 1994 | 4-5 |
| 2. Project Meeting Minutes dated September 28, 1994 | 6-7 |
| 3. Project Meeting Minutes dated October 20, 1994 | 8-11 |
| 4. Project Meeting Minutes dated November 2, 1994 | 12-16 |
| 5. Project Meeting Minutes dated November 15, 1994 | 17-20 |
| 6. Program Meeting Minutes dated November 16, 1994 | 21-24 |
| 7. Program Meeting Minutes dated November 30, 1994 | 25-26 |
| 8. Memorandum dated January 13, 1995 re DMS | 27 |
| 9. ECP-NTCC Hampton Roads, DMS Equipment | 28-29 |
| 10. Conference Meeting Minutes dated March 21, 1995 | 31-36 |
| 11. Government "Claim" for Late Submission of CDRLs as of 3/21/95 | 37 |
| 12. Conference Meeting Minutes dated March 30, 1995 | 38-43 |
| 13. 7-Page Attachment to Conference Meeting Minutes of 3/21/95 | 44-50 |
| 14. ECP CDRL Item 003 dated June 20, 1995 and attachments including revised schedule and cut-over | 52-60 |
| 15. Program Meeting Minutes of July 10, 1995 | 61-64 |
| 16. Memorandum dated July 20, 1995 from SPAWAR | 65 |
| 17. Conference Meeting Minutes dated July 24, 1995 | 66-70 |
| 18. Letter to SPAWAR (cc CO) dated August 16, 1995 and attachments | 71-79 |
| 19. Conference Meeting Minutes dated September 18, 1995 | 80-84 |
| 20. Project Meeting Minutes dated November 7, 1995 | 85-88 |

| | |
|---|---|
| 21. Project Meeting Minutes dated October 23, 1995 | 89-90 |
| 22. Project Meeting Minutes dated October 25, 1995 | 91 |
| 23. Conference Meeting Minutes dated October 23, 1995 | 92 |
| 24. ECP dated April 18, 1995 from ISN re Navy Equipment Configuration On All Sites and attachments | 93-104 |
| 25. Memorandum from Ron Zell (SPAWAR) dated April 12, 1995 | 105 |
| 26. Hampton Roads 12 pair cable ECP Cost | 106-113 |
| 27. Camp H M Smith 12 pair cable ECP | 114-122 |
| 28. Makalapa 12 pair cable ECP | 123-129 |
| 29. Letter ECP dated April 21, 1995 on 12 pair cable change including new Program Schedule | 130-137 |
| 30. Letter dated May 25, 1995 from ISN to SPAWAR on ECPs & Revised Schedule | 138-139 |
| 31. Letter dated June 26, 1995 from FISC (Navy) to ISN | 140 |
| 32. Letter dated July 20, 1995 from SPAWAR to ISN | 141-143 |
| 33. Letter dated July 21, 1995 from SPAWAR to ISN | 144 |
| 34. Memorandum dated August 31, 1995 from ISN to SPAWAR | 145 |
| 35. DCAA Audit Report dated November 13, 1995 on Progress Payments #'s 3, 4, and 5 | 146-153 |
| 36. Notes on Meeting between Contracting Officer and SPAWAR on December 6, 1995 | 154-155 |
| 37. Memorandum from SPAWAR to Contracting Officer dated December 8, 1995 and FISC Meeting Notes of 12/7/95 | 156-157 |
| 38. ISN CDRL Delivery Status As of February 1, 1996 | 158-162 |
| 39. Letter dated February 23, 1996 from ISN to Contracting Officer | 163-164 |
| 40. ISN's Termination Settlement Proposal dated June 6, 1996 | 165-173 |

EXHIBIT
A

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | No. 02-796C<br>(Judge Allegra) |

## AFFIDAVIT OF ROMA MALKANI

ROMA MALKANI, under penalty of perjury, submits the following declaration, in support of Information Systems & Network's ("ISN") Opposition to the Motion For Summary Judgment filed by the defendant, The United States of America("defendant"), and the state the following on personal knowledge:

1. I make this declaration upon personal knowledge, except as to matters stated to be upon information and belief, which I believe to be true. I have been the President and CEO of ISN since its inception in 1980 and continue in that capacity to date. In that capacity, I have been knowledgeable about all contracts entered into by ISN since only I have had contract signature authority. In addition to signing each contract, for contracts over $1 million in value, I participated internally in agreeing to the pricing of the contract.

2. In 1994, ISN bid on and won what generally has been referred to as the ATC Contract. In its BAFO, ISN was required to submit prices on all equipment, labor and costs. Even at the time of bidding, ISN understood that there was a high likelihood

that changes could be made in equipment, labor and other costs due to changes either requested by ISN or by the defendant, and because site surveys would not be undertaken until after the Contract was signed.

3. As soon as ISN completed its site surveys as required by the ATC Contract, the defendant began requesting changes in the Contract equipment and labor. These requests were made usually by the Technical Contracting Officer ("COTR") and Contracting Officer ("CO"). These changes would then be reduced to writing by: 1. The Project Meeting Minutes would set forth the changes the defendant was requesting and what was required of ISN; 2. An ISN letter or form of a proposal or memorandum confirming the changes to the CO. Both the Minutes of the meeting and the confirmatory documents were circulated to all participants including the CO. During the course of the Contract, ISN issued to the defendant at least four Engineering Change Proposals (ECPs), all at the request of the defendant through the COTR and CO. I understood that the COTR and CO requested these changes at Project Meetings, which were then confirmed by a proposal. I was aware that these proposals were being submitted at the time of submission. ISN understood that an Agreement had to be reached on the pricing of the change.

4. All of the equipment and additional labor required to be altered as a result of the changes, at the demand of the defendant, was ordered and paid for by ISN during Contract performance, despite the fact that ISN had not been paid for the changes.

5. On March 21, 1995, about eight months into the Contract, the defendant provided ISN with a claim or demand that because certain CDRL's were late primarily due to the defendant's changes, ISN owed defendant $3,025,185.15 as consideration for

the delays (See ISN Appendix p.37). At the time this claim was made, ISN had not been paid any amount under the Contract. While ISN disagreed with the claim and its calculation, ISN interpreted the claim as a threat so that ISN would not charge for any of the requested changes, i.e. the defendant would not be willing to pay for any changes regardless of how much more it would cost ISN. ISN did not agree to make the changes without compensation.

6. As of February 1, 1996, the Project was basically on-track and the CDRL deliverables had either been made and approved by defendant or were awaiting defendant's approval. (See ISN Appendix p. 158). Further, the defendant directed changes had been purchased and delivered and differences in configurations had been successfully worked on. I understood that Hampton Roads was virtually complete-the defendant states it was 80% complete as of early December, 1995, but its answer to interrogatory confirms 95%.

7. I was surprised to learn of the verbal stop-work order on February 24, 1996. Since more than half the cost of the Contract was in equipment, it was important for ISN to have an accurate inventory so it could be reimbursed. Further, I understood that under FAR, ISN had an obligation to deliver an inventory within 120-days of termination. It was prevented from preparing such an inventory under a strange set of circumstances. On February 21, 1996, less than 24 hours after the stop-work order, ISN was notified that the defendant would seize all equipment at 1pm that day. ISN requested a week to inventory, but defendant refused stating that it would use U.S. Marshalls to make the seizure. Once again, like the early demand for consideration of $3 million, defendant demonstrated unreasonable and heavy-handed tactics. (See ISN Appendix

163). To this date, ISN has never seen a copy of the inventory, which the defendant claims it took.

8. I understand that the defendant now claims that the CO did not authorize the changes to the Contract and the changes were not in writing. I have reviewed the Project Meeting Minutes and the various ECPs, and do not know the basis for defendant's position. ISN relied on the authority of the COTR and CO reduced to writing to make the changes and reduced all changes to writing and acted on the changes based on defendant's demand.

9. I have now reviewed certain documents, which disclose to me that defendant, as early as March, 1995, did not want to pay for any changes to the Contract (and never told this to ISN). I have also learned that despite the progress of the Project, in early December, 1995, defendant planned ISN's termination, hoping to establish a default basis for the termination.

10. I have been in the government contracting business for more than 25 years. I am familiar with the necessity for each party to follow the terms and conditions of the government contract. Here, at the defendant's written request through the CO, ISN submitted written proposals, which the defendant either approved or was in the process of approving. All orders and directions of the COTR and CO were memorialized in writing. However, ISN was instructed and ordered that if the changes were not effected before the formalities of documentation were accomplished, the defendant would assert a claim because of default. Having asserted such a monetary claim in March, 1995, ISN was left no alternative but to follow the CO instructions and undertake the changes.

11. One of ISN's subcontractors on the ATC Contract was Datacom Management Services ("DMS"). At the time of ISN's termination, DMS was owed $196,689 for equipment ordered at the defendant's request. ISN paid this amount in full in 2001.

12. I have reviewed the Memorandum in Opposition to the Motion for Summary Judgment and state that the facts set forth therein are correct to the best of my knowledge.

Further affiant saith not.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 1, 2007

Roma Malkani
ROMA MALKANI

EXHIBIT

B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | : | |
| Plaintiff, | : | |
| v. | : | No. 02-796C<br>(Judge Allegra) |
| THE UNITED STATES OF AMERICA, | : | |
| Defendant. | : | |

## AFFIDAVIT OF SONYA LYLES

SONYA LYLES, under penalty of perjury, submits the following declaration, in support of Information Systems & Network's ("ISN") Opposition to the Motion For Summary Judgment filed by the defendant, The United States of America ("defendant"), and the state the following on personal knowledge:

1. I make this declaration upon personal knowledge, except as to matters stated to be upon information and belief, which I believe to be true. I have been an Accountant in the Accounting Department of Information Systems & Networks Corporation ("ISN") since 1988. In that capacity, I have been responsible for working with ISN's accounting systems, including its JAMIS Cost Accounting System ("JAMIS"). JAMIS is a cost accounting system, which was approved by the Defense Contract Audit Agency ("DCAA"), as a proper accounting system for ISN to set forth its incurred costs on its government contracts. In 1994, at the time of the ATC Contract, I was responsible for imputing the incurred costs and working with DCAA on processing ISN's invoices for payment.

2. In 1994, ISN bid on and won what is generally has been referred to as the ATC Contract. In its BAFO, ISN was required to submit prices on all equipment, labor and costs.

3. As of the stop work order issued by the government in February, 1996, ISN had incurred total costs of $4,939,263, as reported in JAMIS. These costs were subsequently audited by DCAA and approved as having been incurred, supported and reasonable. ISN also incurred settlement expenses of $183,224 but DCAA allowed only $31,685 of this amount.

4. ISN was paid a total of $4,049,532, which was $889,731 less than the costs it had incurred and paid for under the ATC Contract. Of this amount, $367,113.50 remained on the original fixed price contract amount of $4,416,645.57. An additional $522,617.50 was incurred and paid for above the contract amount. Total costs incurred and paid for by ISN but not reimbursed are $889,731.00.

5. I have reviewed the Memorandum in Opposition to the Motion for Summary Judgment and state that the facts set therein to the extent they involve accounting matters for ISN are correct to the best of my knowledge.

Further affiant saith not.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 28, 2007

Sonya D. Lyles
SONYA LYLES

**ATC Project Kickoff Meeting** — **25 July, 1994**

R. E. C. \Data\ATC\Nkickoff.doc R1 9:53 PM 3-Aug-94 — page 1

Room 511 Crystal Park 5 — 1 Aug. 1994. 10:30 AM

**ATTENDEES**

| | | | | |
|---|---|---|---|---|
| NAVY | (703) 602-7252 FAX | | ISN (301) 469-0400<br>(301) 469-7726 FAX | DMS (203) 838-7183<br>(203) 838-1751 FAX |
| Ernie Flores | SPAWAR PMW 172-22E | (703) 602-4891 | Bob Chapman | |
| Shirley Hough, CWO3 | NCTC N6 | (202) 282-0288 | Don Miller | Ronald Thibodeau |
| Percy Tolbert | SPAWARSYSCOM | (703) 602-8337 | Don Tabasco | |
| Ron Zell | SPAWAR PMW 172-21 | (703) 602-8835 | | |
| Eugene Basnight | NISE EAST | (804) 396-0660 | | |
| Wes Miller | BAH | (703) 412-7782 | | |
| James L. Williams | SEMCOR | (703) 418-4400 | | |

**NEXT MEETING**

Monday 19 Aug. 94 Time and Place TBD

Main Subject will be the Site Survey and Options.

**GENERAL DISCUSSION**

Navy presented some of the details of the first three site surveys to be done and listed E. Basnight as the contact for Hampton Roads.

00004

00002

EXHIBIT 1

| NEW ACTION ITEMS | ACTION | DUE DATE |
|---|---|---|
| Navy to provide DD254 to ISN and ISN to provide flow down DD254 to DMS | | |
| Navy to contact sites to coordinate the site surveys | | |
| Navy to provide CAD drawings | | |
| Navy to MOD Contract to account for the site Survey schedule. | | |

| CURRENT ACTION ITEMS | ACTION | DUE DATE |
|---|---|---|
| ISN to provide names & Social Security Numbers of people doing the Site Surveys, needed by next meeting<br>ISN has provided all but one Social Security Number - Will provide in a couple of days. | R. Chapman | 1 Aug. 94 |
| Navy to state when ISN can expect the first option to be exercised<br>The decision of implementing the next option has been delayed and site survey will not be done at this time | P. Tolbert | |
| ISN to provide a schedule for the first three Site Survey's<br>Tentative schedule is to do the Site Survey on three consecutive weeks Starting 8 Aug. Ending 27 Aug.<br>ISN has provided the schedule for the first three site survey. | R. Chapman | |

| LATE ACTION ITEMS | ACTION | DUE DATE |
|---|---|---|
| none | | |

| COMPLETED ACTION ITEMS | DATE COMPLETED |
|---|---|

EXHIBIT
2

# DRAFT

ATC Project Meeting
Crystal City, VA
10:30, 28 September 1994

## ATTENDEES

| | | | |
|---|---|---|---|
| Ron Zell | SPAWAR | 172-22 | (703) 602-8835 |
| Michele Held | NRCC | | (202) 433-5391 |
| Jeff Bergdahl | SPAWAR | 172-22C | (703) 602-8332 |
| Percy Tolbert | SPAWAR | 172-22D | (703) 602-8337 |
| Ernie Flores | SPAWAR | 172-22E | (703) 602-4891 |
| Wesley E. Rice II | CNCTC | 6220 | (301) 202-0288 |
| Eugene Basnight | NISE | | (804) 558-6782 |
| Bob Chapman | ISN | | (301) 469-0400 |
| Don Tabasco | ISN | | (301) 469-0400 |
| Jim Corless | DMS | | (203) 838-7183 |
| Roland Thibodeau | DMS | | (203) 838-7183 |
| Frank Maher | DMS | | (203) 838-7183 |
| Wes Miller | BAH | (PMW 172-22C) | (703) 412-7782 |
| Jim Williams | Semcor | (PMW 172-22E) | (703) 418-4400 |

## GENERAL DISCUSSION

1. Bob Chapman presented the new ISN Schedule for the first three sites. NTCC Hampton Roads will be installed first. ISN anticipates no problem with the installation, However ISN is concerned with cut-over. DMS has indicated that the delivery of the hardware for the first three systems is not a problem. (Handout provided not all points discussed here).

2. The ISN Schedule showed that the installation plan to slip from the contract schedule this slip should not affect the installation schedule. Current manpower level is a little below needed level, however ISN has committed to a significant increase in the manpower level to catch-up with the documentation. This should put ISN back on schedule by beginning of next year.

3. The Issue of OJT and support during cut-over. ISN will provide OJT and will support the operations people during cut-over.

4. ISN brought discussed the need for technical meetings Navy concurred first meeting set for 1:30 PM same day.

5. Navy brought up the issue of minimal to no interruption in service of circuits. The ISN response was that limited interruptions will occur but ISN will schedule this with the site and attempt to schedule at such a time as to cause minimum interruption. This can be cone at night or weekends if necessary.

6. The issue of Tempest was addressed and was determined to not be within scope of this contract.

| **NEW ACTION ITEMS** | **ACTION** | **DUE DATE** |
|---|---|---|
| 1. Will the Red RIU's be installed at the NTCC or at user site? | Ernie Flores | |
| 2. Realign KG's to make space for RIU's at Camp Smith. | NISEWEST | 15 Jan 94 |
| 3. SPAWAR to provide specification of the 9 pair cable to be used. | Ernie Flores | |
| 4. NISEWEST to install new cabinets for expansion of RIU's. | NISEWEST | 15 Jan 94 |
| 5. ISN to provide schedule for the next three sites. | Bob Chapman | 19 Oct 94 |

**NEXT MEETING**

*Crystal Park 5 Room 1100; 1000, 19 October 94*

| **CURRENT ACTION ITEMS** | **ACTION** | **DUE DATE** |
|---|---|---|
| 1. What is to be the standard interface Neg Mark Bal or 530 | Ernie Florics | |
| 2. Provide location of the storage area during installation. | Ernie Florics | |

| **LATE ACTION ITEMS** | **ACTION** | **DUE DATE** |
|---|---|---|

| **COMPLETED ACTION ITEMS** | **ACTION** | **DATE** |
|---|---|---|
| SPAWAR specified fiber for entrance into the HEMP room. | Ernie Flories | |

EXHIBIT
3

ISN

LETTER OF MEMORANDUM

**REF: Minutes of ATC Working Group Meeting, 20 October, 1994**

The attendees of the ATC working group meeting were:

| | | |
|---|---|---|
| Eugene Basnight | NISE EAST | (804) 558-6782 |
| Jeffery Bergdahl | SPAWAR 172-22C | (703) 602-8332 |
| Ernie Flores | SPAWAR 172-22E | (703) 602-4891 |
| John Howard | Semcor | (703) 418-4400 |
| Steve Lord | Semcor | (703) 418-4400 |
| Aubrey Marion | ISN | (301) 469-0400 |
| Paul Nenninger | ISN | (301) 469-0400 |
| Frank Ostronic | ISN | (301) 469-0400 |
| Ralph Palmer | ISN | (301) 469-0400 |
| Royce Priem | ISN | (301) 469-0400 |
| Charles Rodgers | BAH | (703) 412-7855 |
| James Williams | Semcor | (703) 418-4400 |

## GENERAL DISCUSSION

Ernie Flores opened the meeting by reviewing the action items from the September 28, 1994, meeting. Regarding the placement of user RIUs, SPAWAR has determined that RIUs will be placed in user locations, not inside the TCFs. This is a blanket decision, covering all sites.

Mr. Flores provided ISN with the 9 pair cable specification that ISN requested including vendors and pricing.

Regarding the electrical specification, Mr. Flores stated that the final determination was to be negative mark, Mil STD-188, and said that the Rota documentation would assist us in cabling decisions.

Mr. Flores then discussed the issue of storage space for equipment to be installed at the sites. For Makalapa and Camp Smith, ISN will be provided with NISE WEST warehouse accommodations, with 24 entry access, as well as holiday access, if necessary. At present, for the Hampton Roads installation, the only accommodations that can be made are in warehouse space in Portsmouth, Virginia, which would require trucks to transport needed equipment on a weekly or daily basis. Alternatives were discussed, such as a trailer on site, however, due to limited parking space availability, the suggestion was discarded. Another alternative discussed was floor space on the second floor of building NH-95. Mr. Basnight stated that he would look into that possibility. The Portsmouth option would only allow 40 hour a week access. Other concerns noted were storage space inside the facility, because of limited space, and the need for storage of tools and test equipment. Dr. Nenninger asked whether it would be advantageous to send ISN personnel down to Hampton Roads to assist in this matter, and Mr. Flores and Mr. Basnight concurred.

Mr. Bergdahl then asked about a discrepancy between the schedule that was submitted by Bob Chapman and the schedule submitted with the Management Plan. Dr. Nenninger questioned if there was a need for an additional meeting to discuss the differences, however, after further discussion it was deemed unnecessary, and ISN need only compare the schedules and inform Mr. Bergdahl of the necessary corrections in writing.

Mr. Flores then entered into the discussion of the Camp H M Smith Site Survey Report. Mr. Flores provided ISN with a copy of comments regarding problem areas. Mr. Priem asked if the comments provided were those initially submitted with the first draft, and Mr. Flores affirmed the question, however, additional areas of concern were noted.

Mr. Flores began with APPENDIX A in the report, and stated that the proposed DMS Equipment layout had been omitted, and that rack elevations for those cabinets installed by ISN, housing the RED and BLACK switches should be provided in the report. He also stated that the drawing for the SCP-8000 system architecture had also been omitted, and the drawing indicated 3 printers, the listing in the survey indicated only 2.

Mr. Flores stated the floor layout for the Message Center did not indicate the proposed location of an RIU.

It was noted that paragraph **2.1.3 Power** did not address the needed power to those racks provided and installed by ISN.

Mr. Flores indicated that paragraph **2.1.9 Timing Reference** did not include sufficient detail concerning the requirements of the DMS switch, or the necessary connectivity to the switch.

Mr. Flores then discussed the issue of the IDNX installation, and the need to solidify the direction ISN will take in the DMS installation. Mr. Flores said he would review the issue and respond at the next meeting.

Mr. Bergdahl addressed the location of switch servers, and indicated that the switch servers and the BLACK switch should be centrally located.

Mr. Bergdahl stated that there seemed to be some confusion as to ISN's definition of a workstation and SPAWAR's definition of a workstation. ISN indicated in the survey that a workstation was nothing more than a PC, while SPAWAR expects a station with an operator console and various test and monitoring equipment collocated on the same platform. Mr. Bergdahl then provided ISN with photographs of workstation layouts from EastPac and indicated that Rota had a similar design.

**Summary of Decisions**

1. RIUs will be placed in user locations.

2. The electrical specification is to be negative mark.

**Summary of Actions**

1. ISN will update Camp H M Smith Site Survey Report incorporating SPAWAR's comments. Due: 26 October, 1994

2. SPAWAR will solidify the direction ISN will take with respect to the IDNX installation. Due: 26 October, 1994

3. ISN to evaluate SPAWAR's definition of workstation and propose a workstation layout. Will be submitted in Site Survey Report.

ISN

EXHIBIT
4

9 November, 1994

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, 2 November, 1994.

In accordance with the terms and conditions of the referenced contract, attached is the 2 November, 1994 Conference Minutes for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
Program Manager

cc: NRCC - R. Crawford

UC012

CDRL No: A003

ISN

# LETTER OF MEMORANDUM

**REF: Minutes of Program Meeting, 2 November, 1994**

Meeting attendees:

| | | |
|---|---|---|
| Eugene Basnight | NISE EAST | (804) 558-6782 |
| Jeffery Bergdahl | SPAWAR 172-22C | (703) 602-8332 |
| Roscoe Crawford | FISC Norf. Det. Washington | (202) 433-5387 |
| Jim Corless | DMS | (203) 838-7138 |
| Ernie Flores | SPAWAR 172-22E | (703) 602-4891 |
| Michele Held | FISC Washington | (202) 433-5391 |
| Paul Nenninger | ISN | (301) 469-0400 |
| Frank Ostronic | ISN | (301) 469-0400 |
| Bill Robertson | ISN | (301) 469-0400 |
| Roland Thibodeau | DMS | (203) 838-7183 |
| James Williams | Semcor | (703) 418-4400 |
| Ron Zell | SPAWAR | (703) 602-8423 |

*Next Scheduled Meeting*
*Date:* *16 November, 1994*
*Location:* *TBD*
*Time:* *10:00 AM*



00013

## GENERAL DISCUSSION

Dr. Nenninger opened the meeting at 10:12 AM by introducing Mr. William Robertson as the new ISN Program Manager for the ATC Program.

Mr. Robertson presented a brief biography of himself. He is experienced in Navy work, is a graduate of Naval Academy and Naval Post Graduate School and has considerable hands-on directly related technical and managerial experience. Beginning with the next meeting schedule for 16 November, Mr. Robertson will chair these meetings for ISN.

Dr. Nenninger presented the agenda for the meeting and mentioned that in the future, a draft agenda will be submitted to the Navy for their comments prior to the meeting.

The minutes of the 19 October, 1994 meeting were received and the following comments were offered:

1. Roscoe Crawford asked that a copy of the letter identifying Bill Robertson as the Program Manager be faxed to him today, 2 November, 1994.

2. It was also requested that ISN should submit a letter to Roscoe Crawford identifying all members of the ISN team including their title and assignments. This is to be completed by 4 November, 1994.

3. The re-establishment of ISN schedule dates including DMS delivery dates and CDRL dates should be forwarded by letter to Roscoe Crawford by 4 November, 1994.

4. The Progress Report, including clarifications of invoice discrepancies, will be provided to the Navy on 4 November, 1994.

5. Ron Zell commented that during the site surveys in Hawaii, ISN personnel had visited the two expansion sites for Camp H M Smith. He stated that he was expecting an ECP from ISN to incorporate those sites. He mentioned that if ISN did not have everything needed to develop the ECPs to let him know. He asked for a date for the ECP. ISN agreed to provide a promise date for the ECP by 4 November, 1994.

### New Business

1. The next meeting was scheduled for Wednesday, 16 November, 1994, subject to the availability of a conference room.

2. Mr. Crawford requested cost breakdowns of the 414E ECP. ISN agreed to provide this by 4 November, 1994. Mr. Zell said that he could not commit to an authorization date but will expedite the approval process. Jim Corless commented that DMS and ISN are discussing potential delivery of the 414E modules earlier than previously anticipated.

3. The delivery dates for the Telecommunications Systems Installation Plans were discussed. ISN will deliver all three plans by 11 November, 1994.

4. DMS stated that all DMS hardware deliverables would be available for shipment as follows:

a. Hawaii (both sites) by 6 January 1995.

b. Hampton Roads by 1 February 1995. Most of the hardware will be available for shipment by mid-December.

5. The date for the exercise of the optional site is not yet known. The ISN proposal schedule called for travel during Thanksgiving and Christmas holidays. Mr. Zell indicated that this was not acceptable. Mr. Bergdahl offered the Navy's concern of ISN's ability to staff six concurrent installations with qualified personnel. Mr. Robertson agreed in that such a schedule would be an inefficient use of personnel. Mr. Bergdahl reiterated his concern that we put the best personnel possible on the first three sites. These sites must be done right the first time and the schedule must be nailed down. Mr. Zell stated it is still the Navy's objective to exercise the options.

6. With respect to the DD254s for the DMS personnel, DMS stated it is their intention to enter into subcontract for services with ISN. This would allow ISN to process a DD254 for their clearances.

<u>Summary of Actions</u>

1. ISN will provide a copy of the letter identifying Mr. Robertson as the Program Manager by 2 November, 1994.

2. ISN will submit a letter identifying all personnel assigned to the ATC program, with assignments and titles, as well as resumes for each by 4 November, 1994.

3. ISN will submit schedule dates including DMS delivery dates and CDRL dates by 4 November, 1994.

4. ISN will provide the Progress Report to the Navy, including clarifications of invoice discrepancies, by 4 November, 1994.

5. ISN will provide a cost breakdown of the 414E ECP to the Navy by 4 November, 1994.

6. ISN will deliver all Installation Plans by 11 November, 1994.

EXHIBIT
5

# AGENDA

**Wednesday, 16 November 1994**

Welcome
- Attendance List

Minutes of last meeting

Old Business
- Action Items - Status
- CDRL Items - Status
- Schedule

New Business
- ECP's
- Issues/Action Items

Summary

ISN®

15 November 1994

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, VA 22245-5200

**ATTENTION:** Jeffrey Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, 15 November 1994

In accordance with the terms and conditions of the referenced contract, attached is the 15 November, 1994 Technical Meeting Minutes for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
Program Manager

cc: NRCC - R. Crawford

00018

November 1994

ISN®

# LETTER OF MEMORANDUM

**REF: Minutes of ATC Working Group Meeting, November 15, 1994**

The attendees of the ATC working group meeting were:

| | | |
|---|---|---|
| Eugene Basnight | NISE EAST | (804) 558-6782 |
| Jeffery Bergdahl | SPAWAR 172-22C | (703) 602-8332 |
| Ernie Flores | SPAWAR 172-22E | (703) 602-4891 |
| William Hunter | SPAWAR PD72F4A | (703) 602-8270 |
| Jim Williams | SEMCOR | (703) 418-4400 |
| William N.L. Robertson | ISN | (301) 469-0400 |
| Robert Chapman | ISN | (301) 469-0400 |
| Aubrey Marion | ISN | (301) 469-0400 |



Information Systems & Networks Corporation • 10411 Motor City Drive, Bethesda, Maryland 20817 • (301) 469-0400 Telex: 387814

## GENERAL DISCUSSION

Ernie Flores opened the meeting by referencing the status and option of T-1 circuits, for Hampton Roads site. After providing the **Circuit/Baud** rate update, that was completed October 18, 1994, Mr. Flores stated that they (SPAWAR and the Navy) would like to have up to T-1s included for the ATC project. He indicated that the 1994 circuit count be used as the basis for this program.

Mr. Flores also stated that they would like to have the Multiplexers wired to 100% of there configured capability.

He then began to discuss the minutes of the meeting of November 02, 1994. Mr. Flores first discussed the matter of storage for equipment to be installed at Hampton Roads. There were three possibilities discussed. One was rental of a commercial storage facility, which was ruled out. Two, storage in the basement of building NH-95. This was determined to be a fire hazard. Third was storage at Portsmouth Naval Facility, supported by transportation of equipment using a van. ISN personnel agreed on the idea of storage at Portsmouth Naval Station, because it was the most secure. A step van would be acquired to make trips to retrieve supplies from Portsmouth on a timely basis. The van when located at NTCC Hampton Roads would be parked adjacent to the fence of building NH-95, NTCC facility. As the Portsmouth storage facility does not operate 24 hours or weekends, arrangement would have to be made through Mr. Basnight for ISN to obtain access.

Mr. Flores brought up the point of a work space for INS personnel at the NTCC facility. The Task was given to Mr. Basnight to locate a work space and to supply the basic requirement needed , such as a desk, and a drawing table, etc.

The subject of remoting the RIUs to buildings NH-19, NH-139, and NH-141 was put to ISN. The question was asked where ISN was going to place RIUs and what were ISN plans. Mr. Robertson advised the group that an ECP would be developed.

Mr. Flores stated that WWMCC would need to be looked at for possible addition to the ATC as well. How many RIUs would be needed and how would the cables be brought in to the racks? Mr. Basnight made a phone call reference the cables and stated they enter the racks from the bottom.

Mr. Flores then asked about personnel for Hampton Roads. Mr. Chapman responded that personnel would more than likely begin to arrive at the site on December 17, according to the new **Installation Schedule**. Mr. Robertson passed the new schedule around to attendees to get the Navy's informal concurrence. All attendees agreed with the modifications made. Mr. Basnight stated the matter of clearance for ISN personnel working at NTCC Hampton Roads. It was decided that information required to get badges would be send to Mr. Flores by November 23.

Mr. Bergdahl then had question regarding the system operations. He asked if the packet received was all there was since it was only the information from DMS. Mr. Robertson stated that according to the contract ISN was only to supply commercially available documents.

**Summary of Decisions**

None

**Summary of Actions**

1. Mr. Basnight to define a work space for INS personnel and to supply the necessities for the work area.

EXHIBIT 6

ISN

16 November 1994

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, 16 November 1994

In accordance with the terms and conditions of the referenced contract, attached is the 16 November, 1994 Conference Minutes for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
Program Manager

cc: NRCC - R. Crawford

00021

ISN®

LETTER OF MEMORANDUM

**REF: Minutes of Program Meeting, 16 November 1994**

Meeting attendees:

| | | |
|---|---|---|
| Eugene Basnight | NISE E Norfolk | (804) 558-6782 |
| Jeff Bergdahl | SPAWAR PMW 172-22C | (703) 602-8332 |
| Jim Corless | DMS | (203) 838-7183 |
| Ernie Flores | SPAWAR PMW 172-22E | (703) 602-4891 |
| Michele Held | FISC. Washington | (703) 276-2726 |
| Wes Miller | BAH Support PMW 172-22C | (703) 412-7782 |
| Dr. Paul Nenninger | ISN | (301) 469-0400 |
| Frank Ostronic | ISN | (301) 469-0400 |
| Bill Robertson | ISN | (301) 469-0400 |
| Don Tabasco | ISN | (301) 469-0400 |
| Roland Thibodeau | DMS | (203) 838-7183 |
| James Williams | Semcor SPAWAR 172-22E | (703) 418-4400 |
| Ron Zell | SPAWAR 172-22 | (703) 602-8332 |

Next Scheduled Meeting

| | |
|---|---|
| Date: | 30 November 1994 |
| Location: | Room 1100 |
| Time: | 10:00 AM |

00022



Information Systems & Networks Corporation • 10411 Motor City Drive, Bethesda, Maryland 20817 • (301) 469-0400 Telex: 387814

**GENERAL DISCUSSION**

Mr. Robertson opened the meeting by asking those present to sign the attendance list. He also distributed copies of the agenda.

Mr. Robertson then provided copies of the minutes for the 2 November 1994 meeting and asked for comments or corrections. The minutes were approved as written in and distributed by ISN memorandum dated 9 November 1994.

Ron Zell pointed out that the review of the personnel qualifications was still in process. This review should be completed Thursday, 17 November 1994. ISN will than be notified of the Navy's findings. If there are problems ISN will be notified immediately.

Mr. Zell requested additional information concerning the schedule ISN had submitted to the Navy. The schedule had been presented and discussed at the technical meeting on 15 November 1994. Ron was interested in the underlying assumptions of the schedule and the integration of the schedule with the CDRL deliveries and the ECP's. It was agreed that a separate meeting would be scheduled for 9 a.m. Monday, 21 November 1994 at SPAWAR for further discussions. Ernie Flores will not be able to attend this meeting, though he did attend the meeting of 15 November 1994.

The delivery of CDRL's was addressed. Bill Robertson said the Site Installation Plans and the Baseline Description Documents were complete except for incorporation of the schedule and would be delivered late today or tomorrow, 17 November 1994. Michelle Held noted that she had received the backup pricing information for the ECP addressing the 414E cards. She considered the information adequate. However, ISN must send a letter extending the date for the terms of the ECP. Roland Thibodeau agreed this should not be a problem, as DMS could expedite the 414E's by 30 days. ISN will send the letter this week.

In the area of outstanding CDRL's, it was identified that the Training Plan was still overdue. Bill Robertson noted that the draft was complete. However, it was intentionally withheld pending evaluation of the Semcor interactive trainer. He had received a demonstration of the Semcor CBT and found it to be an excellent tool. However, he felt that some training in the ISN contract would still be needed. The Training Plan was promised for the middle of next week.

Ron Zell noted that there is only one official schedule and all milestones/deliverables are to be in accordance with that schedule. Although a revised schedule is being addressed it is not official until incorporated into the contract.

With respect to the schedule, Ron asked ISN about their comfort level at Hampton Roads with respect to technical information, relationships, etc. Bill Robertson said that during the past few weeks, ISN has had personnel on site and all was proceeding well. Bill also mentioned that site visits would resume in the near future.

There are a number of ECP's in process Ron Zell asked that each ECP address the three sites on contract wherever possible. ISN agreed. Presently ECP's in the making include: 12 pair cabling in lieu of 9 pair cabling; additional port counts; and remote sites at Camp Smith and Hampton Roads.

All ECP's must be integrated into the official schedule, and there will be one Acceptance Test for each site and that Test must include all ECPs.

The next meeting will be held Wednesday, 20 November 1994 at 10 a.m. Jeff Bergdahl will identify the room number to ISN within the next few days.

Action Items:

1. Navy will notify ISN of results of review personnel qualifications.
2. ISN committed to deliver Baseline Description Documents and Site Installation Plans, prior to 15 November 1994.
   17
3. ISN committed to provide formal letter extending terms for the 414E card ECP.
4. ISN committed to revise the draft training manual and provide it to the government during the week of 21 November 1994.

EXHIBIT 7

Memorandum

**REF: Minutes of Program Meeting, 30 November 1994**

Meeting Attendees

| | | |
|---|---|---|
| Frank Ostronic | ISN | (301) 469-0400 |
| John Howard | Semcor | (703) 418-4400 |
| Ron Zell | SPAWAR 172-22 | (703) 602-8330 |
| Eugene Basnight | NISE EAST | (804) 558-6782 |
| Ernie Flores | Spawar 172-22E | (703) 602-4891 |
| Jim Williams | Semcor | (703) 418-4400 |
| Michele Held | FISC Washington | (202) 433-5391 |
| Jeff Bergdahl | SPAWAR 172-22c | (703)-602-8332 |
| Wes Miller | BAH | (703) 412-7782 |
| Don Tobasco | ISN | (301) 469-0400 |
| Bill Robertson | ISN | (301) 469-0400 |

Next Scheduled Meeting

**GENERAL DISCUSSION**

Mr. Robertson opened the meeting by asking those present to sign the attendance list. He also distributed copies of the agenda.

Mr. Robertson then provided copies of the minutes for the 16 November meeting and asked for comments or corrections. The minutes were approved as written and distributed by ISN memorandum dated 16 November 1994.

Ron Zell stated a concern about the ISN management structure and the ability to actually accomplish the task. He asked that the installation supervisor and site maintenance personnel be named. It was agreed that this would be discussed in a separate meeting.

A technical meeting was scheduled for the following week to discuss port counts for the Hampton Roads ECP.

Ms. Held requested that the effective date for the "414 E" ECP be extended. Mr. Robertson replied that he would provide that extension.

The status of the option sites was discussed. Mr. Zell stated that he wanted to table exercise of the options until after the new year.

**Action Items**

A joint SPAWAR / ISN / DMS trip to Hampton Roads to discuss extension of RIU's to the users facilities was to be scheduled for early December.

EXHIBIT
8

13 JAN 95

**SPAWAR /SEMCOR ITEMS OF ACTION**

- HAWAII OS/2 DMS TRAINING TAPES (SEMCOR)

- COPY OF NCTAMS MED DET ROTA DTG 140815Z NOV 94 (SPAWAR)

**DMS ITEMS FOR DISCUSSION/ACTION**

- HOW ARE RIU'S REFERENCE NUMBERING DETERMINED IN DATABASE AND IS THERE ANY SOFTWARE LATITUDE TO ASSIGN RIU NUMBERS?

- CURRENT COMPUTER SPEC'S ARE ISA STANDARD 30 MHZ SERVERS WITH WORKSTATIONS AT 50MHZ. WITH POSSIBILITY OF LAN EXPANSION AND REMOTE LAN LOCATIONS, EISA STANDARD WOULD BE MORE APPLICABLE AND REDUCE POSSIBLE LAN PROBLEMS/CONFLICTS.

- RESOLUTION OF SOFTWARE VERSIONS AND IF SOFTWARE MODIFICATIONS ARE REQUIRED/ACCOMPLISHED BY DMS TO SUPPORT SWITCH HARDWARE

- REVIEW DMS ISSUES LISTED ON AFTER ACTION REPORT CONCERNING ROTA SPAIN.

- ADDRESS REPORT OF +/- 2DB OVER THE FREQ RANGE 300 - 3400HZ ON THE AIM-800 WE MAY BE REQUIRED TO HAVE THIS CORRECTED.

EXHIBIT
9

# ECP - NTCC HAMPTON ROADS, DMS EQUIPMENT

GENERAL OVERVIEW:

| SUBJECT | | PROPOSAL | ECP OPTION A | ECP OPTION B | MATERIAL DELTA A | MATERIAL DELTA B |
|---|---|---|---|---|---|---|
| TOTAL NUMBER OF PORTS | | 6591 | 6824 | 6824 | 233 | 233 |
| ECS TYPE/MODEL | RMSA 500 | 0 | 1 | 0 | 1 | 0 |
| | RMSA 4000 | 1 | 0 | 2 | -1 | 1 |
| | RMSA 8000 | 1 | 5 | 0 | 4 | -1 |
| | RMSA-100 | 2 | 0 | 0 | -2 | -2 |
| | RMSA-200 | 0 | 0 | 9 | 0 | 9 |
| PORT TYPE | DIM-414 | 6060 | 4077 | 4077 | -1983 | (1893) -1983 |
| | DIX-202 | 32 | 0 | 0 | -32 | -32 |
| | DIH-264 | 3 | 1674 | 0 | 1671 | -3 |
| | 530 | 0 | 0 | 1674 | 0 | 1674 |
| | AIM-800 | 496 | 1073 | 1073 | 577 | 577 |
| RIU NUMBER \TYPE | SSA-64 | 103 | 68 | 68 | -35 | -35 |
| | TRIPLE SSA | 0 | 187 | 0 | 187 | 0 |
| | SSA-32 | 2 | 0 | 53 | -2 | 51 |

DIM 414 (4 PORTS) (# ____ /MO)

# ECP - NTCC HAMPTON ROADS, DMS EQUIPMENT CONFIGU

**OPTION A:** **OPTION B:**

| OPTION A | NOMENCLATURE | QTY | OPTION B | NOMENCLATURE | QTY |
|---|---|---|---|---|---|
| **BLACK** | | | **BLACK** | | |
| | RMSA-8000 | 2 | | RMSA-4000 | 1 |
| | RIU-64 | 44 | | RMSA-200 | 4 |
| | TRIPLE SSA | 114 | | RIU-64 | 4 |
| | | | | RIU-32 | 22 |
| **RED** | | | **RED** | | |
| | RMSA-8000 | 3 | | RMSA-4000 | 1 |
| | RIU-64 | 24 | | RMSA-200 | 5 |
| | TRIPLE SSA | 165 | | RIU-64 | 24 |
| | | | | RIU-32 | 31 |

ISN®

EXHIBIT
10

March 28, 1995

Space and Naval Warfare Systems Command
2451 Crystal City Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, March 21, 1995.

In accordance with the terms ands conditions of the referenced contract, attached is the Conference Minutes of the March 21, 1995 meeting, for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
Acting Vice President Systems Integration Group

cc: NRCC - R. Crawford

00030

CDRL No: A003

# LETTER OF MEMORANDUM

**REF: Minutes of Program Meeting, March 21, 1995**

Meeting attendees:(Attachment 1)

| | | |
|---|---|---|
| Maria Bellizzi | FISC Washington | (202) 433-7172 |
| Roscoe W. Crawford | FISC Norf. Det. Washington | (202) 433-5387 |
| Ernie Flores | SPAWAR (PMW 172-22E) | (703) 602-4891 |
| Michele Held | FISC Washington | (202) 433-5391 |
| Steve Lord | SEMCOR | (703) 418-4400 |
| Wes Miller | BAH(Support 172-22C) | (703) 412-7782 |
| William Robertson | ISN | (301) 469-0400 |
| Don Tabasco | ISN | (301) 469-0400 |
| Roland Thibodeau | DMS | (203) 838-7183 |
| Daniel Tobin | ISN | (301) 469-0400 |
| Percy Tolbert | SPAWAR (PMW 172-22D) | (703) 602-8337 |
| Jim Williams | SEMCOR | (703) 418-4400 |

***Next Scheduled Meeting:***

| | |
|---|---|
| *Date:* | *March 30, 1995* |
| *Location:* | *Washington Navy Yard* |
| *Time:* | *10:00 AM* |

**AGENDA ITEMS:**

Mr. Crawford started the meeting at 10:08 am by presenting the agenda items to be discusssed:

1. Determine the proper equipment configuration per the origional RFP. Compare ISN bid equipment to this 'proper configuration' and determine ISN bid 'Shortages and Overages.'
2. Discuss CDRL delivery schedule.
3. Discuss ISN submitted ECP.
4. Discuss 'what Navy wants out of the ECP.'
5. Discuss Navy requirements for ISN to deliver--Installation and Cut Over CDRLs within 10 days.
6. Discuss cost of equipment.
7. Discuss Navy proposed 'Considerations' for late delivery of CDRL items and installation of equipment.
8. Discuss Navy requirement for ISN to prepare a 'Plan of Action' to bring ISN into contract compliance.

**Agenda Item # 1. DISCUSSION**

Mr. Crawford distributed attachment 2 to those present. Attachment 2 is a listing by site- containing columns of Equipment Nomenclature, quantity contained in the BAFO BID, the Actual Quantify Required (as determined by COR) and the difference (Overbid/Underbid) for each piece of equipment. Ms. Bellizzi, Mr. Crawford , and Mr. Flores, at different times, read the contents of the Attachment. Approximately 2/3rds of the way through the reading of the site requirements list, Mr. Tabasco asked Mr. Crawford "Are we discussing mistakes in the ISN's bid?" Mr. Crawford replied--"Yes." Mr. Tabasco asked--"Are these numbers clearly identified in the RFP? Mr. Crawford answered in the affirmative. Mr. Tabasco stated that it is the responsibility of the Government to promptly inform ISN of any mistakes. Further, to date, the Government has not (until today) informed ISN of any mistakes and ISN was awarded the contract. Ms. Bellizzi stated that ISN should have given the Government at least the middle column (Quantity Required) in the ISN bid.

Mr. Robertson stated that the equipment lists and required port counts were derived numbers that could not be accurately developed from the RFP

Mr. Robertson and Mr. Crawford discussed how these figures were arrived at. Both Mr. Crawford and Mr. Flores stated that ISN could/should have interpreted/deduced these same numbers from a reading of the RFP. Mr. Robertson stated that he disagreed.

Mr. Robertson asked Mr. Crawford if the "Quantity Required" numbers were based on the RFP Tables A1 & A2? Mr. Crawford and Mr. Flores answered--"Yes."

Later, Mr. Crawford stated that he doesn't see how ISN can complete the basic contract given the equipment's (numbers) that they bid. Ms. Bellizzi stated that she does not believe that ISN understood the architecture necessary to build the sites to the RFP requirements/ to build the solution per the RFP.

Later, Ms. Bellizzi stated that the purpose of this discussion was to form a baseline from which future ECPs could be discussed

The discussion ended with a reading of a summary sheet detailing the overall Overages/Shortages

CONCLUSIONS:

Mr. Robertson stated that ISN did not necessarily agree with the numbers presented and that they would review the Government presented/prepared figures and prepare a reply to the Contracting Officer. Mr. Robertson asked Mr. Crawford to affirm that the Quantity Required numbers were from the RFP. After consulting with Mr. Flores, Mr. Crawford affirmed that the numbers were from RFP Tables A1 & A2.

ACTION ITEM(S):

1. ISN will review the Government's numbers.

**Agenda Item # 2.** DISCUSSION:

Ms. Held started the discussion concerning CDRL delivery by distributing Attachment 3 (Late Submission of CDRLs as of 3/21/95) The general thrust of the discussion--ISN has not delivered the required CDRLs as per the contract. Further, given the number of days late (1,695) the Government produced a 'possible' Consideration Due in the amount of $3,025,185.15.

Mr. Robertson stated that the Government produced document was one sided, in that it did not reflect time lost to ISN due to the Government and circumstances beyond the control of the contractor. Mr. Robertson gave 4 examples of time lost, to ISN, due to the Government failing to return ISN input within the time specified within the contract.

Mr. Tabasco stated that the 'consideration due' figure was totally unrealistic and unreasonable. Further, the method used to calculate the consideration figure was incorrect.

Ms. Held stated that the document was, indeed, one sided and attachment 3 was produced for its shock value.

CONCLUSION(S):

The Government tasked ISN to answer their "Consideration" for Late Submission of CDRLS dated March 21, 199.

ACTION ITEM(S):

ISN will submit reply to the above Government request for Consideration not later than March 30, 1995 (Next meeting).

**Agenda Items # 3 & 4.** DISCUSSION:

Mr. Crawford stated that the Government desired ISN to submit an ECP for the following items--12 pair cable and an extended warranty for the DIM Card(s). Mr. Crawford did not discuss the ECP that ISN had previously submitted.

Mr. Robertson stated that when ISN walked into Hampton Roads to conduct the Site Survey, they found that it had significantly changed from the configuration given in the RFP. Mr. Robertson also stated that the Government had not informed ISN, at any time, of this drastic change. In Dec 94 ISN identified the full impact of this change to the Government. During the period Dec 94-Jan 95, the Government (Mr. Bergdahl-COR & Mr. Flores-TO) gave ISN new guidance, though none of it was in writing.

Mr. Robertson stated that during this same time period he worked with the ATC Program Office (SPAWAR) on at least 3 different versions of ECPs.

Mr. Crawford stated that the purpose of the Site Survey was to determine if there were any differences in the configurations--actual vice bid. Mr. Robertson stated that such work was not IAW nor authorized by the Statement of Work (SOW). He further stated that the only corrective action permitted was to submit an ECP. Mr. Tolbert stated that ISN, upon discovering the new configuration, should have prepared a new technical solution and presented it to SPAWAR in the form of an ECP.

Mr. Crawford stated that the Government wants ISN to put in the equipment that ISN bid to install.

Ms. Bellizzi stated that to date, ISN has not performed. She further stated that ISN's contract work ground to a halt while ISN worked on a future ECP. Her general theme--ISN should not have stopped CDRL development and delivery while they prepared the ECP. Rather, they should have worked concurrently on both the CDRLs and the ECP.

The discussion terminated with Mr. Crawford stating that he wants to work with ISN and complete, successfully, the contract.

**CONCLUSION(S):**

The Government did not desire to discuss the previously submitted ECP. At this date the Government was prepared only to accept and process an ECP for the 2 items mentioned above.

**ACTION ITEM(S):**

ISN will submit an ECP for the above 2 items ASAP.

**Agenda Item # 5. DISCUSSION:**

Mr. Crawford stated that he desired that ISN submit CDRL(s) B002 (Site Installation Plan-Hampton Roads) and G001 (Cutover Plan-Hampton Roads) within 10 days. Mr. Robertson stated that he disagreed with the submission of G001 concurrent with B002. Mr. Robertson continued--The basic contract CDRL delivery schedule recognizes that G001 cannot be developed and therefore delivered until the contractor has received a final Government approved B002. Mr. Crawford agreed with Mr. Robertson's comments concerning the delivery of G001. In conclusion, Mr. Crawford stated that ISN must deliver the documents required by the contract in a timely manner.

**CONCLUSION(S):**

The Government tasked ISN to submit CDRLs B002 (Site Installation Plan-Hampton Roads) within 10 days. CDRL G001 (Cutover Plan-Hampton Roads) will follow appropriately after ISN has received a final Government approved B002.

**ACTION ITEM(S):**

ISN will submit CDRL B002 (Hampton Roads) to the COR not later than March 30, 1995.

**Agenda Item # 6. DISCUSSION:**

Mr. Crawford stated that, to date, ISN has not provided the Government with proof that ISN has ordered any equipment from DMS. As such, if the configuration changes, ISN will not be out any funds. Mr. Crawford stated that the Government recognizes that an order placed today with DMS for equipment would be at a higher rate/cost. However, Mr. Crawford stated that due to changes in the configuration the actual cost to ISN would be a "wash". If there was any increase, he had no money to cover it.

Both Mr. Robertson and Mr. Thibodeau responded that ISN had placed an order for equipment and that the equipment had been built. Mr. Robertson further stated that the reason why an ISN-DMS Subcontract was not inplace was due to ongoing discussions with the Program Office concerning the pricing of the submitted ECP.

During this discussion Ms. Held stated that DCMAO-Baltimore (Ms. Tish Proctor, ACO) had informed her that they did not have an approved Subcontracting and Purchasing Plan. Mr. Tabasco stated that this was not true and that he would contact Ms. Proctor.

Mr. Tabasco stated that no progress payments have been made (to ISN) on the contract. Mr. Robertson added that ISN submitted invoice(s) with COR approval(s) have been with Ms. Proctor as early as Oct 94.

Mr. Crawford stated that he would look into this matter and assist ISN in receiving prompt payment.

Mr. Crawford stated that he still needs a copy of the ISN-DMS Subcontract ASAP.

**CONCLUSION(S):**

ISN tasked to clear up Subcontracting plan with Ms. Proctor. Mr. Crawford will ascertain why payments have not been made to ISN for previously submitted invoices. ISN tasked to submit a copy of ISN-DMS Subcontract, ASAP.

**ACTION ITEMS:**

1. Mr. Tabasco will coordinate with Ms. Proctor on the Subcontract Plan issue.

2. Mr. Crawford will look into the reasons why ISN has not received payment for invoices previously submitted.

3. ISN will provide COR with a copy of the signed ISN-DMS Subcontract ASAP.

**Agenda Item # 7. DISCUSSION:**

Discussion of this item was very brief and done near the conclusion of the meeting. Mr. Tabasco stated again, that he felt that the figure was unrealistic, unreasonable and that the method used to calculate it was incorrect. Mr. Crawford and Ms. Bellizzi both stated that this item was negotiable.

**CONCLUSION(S):**

ISN seriously questions both the methodology and appropriateness of the 'consideration' figure. ISN tasked to prepare a reply to Government "Consideration" document (attachment 3).

**ACTION ITEM:**

ISN will prepare reply to the "Consideration" document

**Agenda Item # 8. DISCUSSION:**

Mr. Crawford stated that he wants ISN to get the work done. ISN's work is a vital piece of the total program. Mr. Crawford stated that he wants ISN to prepare and deliver to him, within 10 days, a Plan of Action/Proposed solution--That will get ISN back onto track and in compliance with the original contract.

Mr. Robertson and Mr. Thibodeau asked Mr. Crawford what he expected to see at the next meeting? Was it an agreement between ISN and DMS to provide and install the equipment as shown in Attachment 2 (Quantity Required-Column). Mr. Crawford and Ms. Bellizzi answered in the affirmative.

At the end of the meeting Mr. Tobin requested that ISN be proved a copy of the SEMCOR produced ATC CDRL Status Report used by the Government participants during the meeting. Mr. Flores stated to Mr. Crawford that he would check into getting the document released by SPAWAR and provide the document.

**CONCLUSION(S):**

ISN tasked to prepare a Plan of Action that will:

1. Allow for delivery CDRLs in an expeditious manner.

2. Provide proof that the procurement of equipment and supplies has taken place and will allow for the installation of the equipment at the Hampton Roads Site to begin as soon as possible.

Mr. Flores tasked to check into the release of the SEMCOR produced document not later than March 22, 1995

**ACTION ITEM(S):**

1. ISN will prepare required Plan of Action/schedule and deliver to the COR not later than March 30, 1995.

2. Mr. Flores will inform Mr. Crawford and ISN as to the release of the SEMCOR produced ATC CDRL Status report that Mr. Tobin requested

Govt Provided To ...

EXHIBIT
11

LATE SUBMISSION OF CDRLS AS OF 3/21/95

| CDRL NO. | TITLE | DUE DATE | ISN DRFT DATE | NO. DAYS LATE |
|---|---|---|---|---|
| A001 | MGMT PLAN | 8/15/94 | 10/20/94 | 64 days |
| A004 | STATS RPTS | | | 90 days |
| C001 | CONFIG. MGT. PLAN | 10/15/94 | 10/18/94 | 3 days |
| D001 | COMM. AVAL | 1/15/95 | OVERDUE | 65 days |
| D003 | SFTWR MNL | 1/15/95 | OVERDUE | 65 days |
| D004 | SFWR PRGMR MNL | 1/15/95 | OVERDUE | 65 days |
| D005 | SFWR PRGMR MAIN MNL | 1/15/95 | OVERDUE | 65 days |
| E001 | INTGRTD SPRT PLAN | 10/15/94 | 10/18/94 | 3 days |
| E002 | MAIN PLAN | 12/15/94 | OVERDUE | 96 days |
| F001 | TRAIN PLN | 11/15/94 | 2/17/95 | 94 days |
| F002 | LSSN PLN | 10/21/94 | OVERDUE | 151 days |
| F003 | TRAIN GUID | 10/21/94 | OVERDUE | 151 days |
| F004 | OTJ TRAIN | 1/15/95 | OVERDUE | 65 days |
| E003 | SPR PRTS HAMP RDS | 1/15/95 | OVERDUE | 65 days |
| G001 | CUTOVR HAMP RDS | 11/15/94 | 3/1/95 | 106 days |
| E003 | SPR PRTS CMP SMTH | 1/15/95 | OVERDUE | 65 days |
| G001 | CUTOVR CMP SMTH | 11/15/94 | OVERDUE | 126 days |
| E003 | SPR PRTS PRL HRBR | 1/15/95 | OVERDUE | 65 days |
| G001 | CUTOVR PRL HRBR | 11/15/94 | OVERDUE | 126 days |
| | | | TOTAL DAYS LATE | 1,695 days |

Consideration = $10,708,618.72 (total contract value) x .005 = $53,543.09/30 days = $1,784.77

1,695 days x $1,784.77 = <u>$3,025,185.15 TOTAL CONSIDERATION DUE</u>

EXHIBIT 12

ISN®

April 12, 1995

Space and Naval Warfare Systems Command
2451 Crystal City Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, March 30, 1995.

In accordance with the terms ands conditions of the referenced contract, attached is the Conference Minutes of the March 30, 1995 meeting, for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
Acting Vice President Systems Integration Group

cc: NRCC--R. Crawford

00033

CDRL No: A003

# LETTER OF MEMORANDUM

**REF: Minutes of Program Meeting, March 30, 1995**

Meeting attendees:

| | | |
|---|---|---|
| Maria Bellizzi | FISC Washington | (202) 433-7172 |
| Jeff Bergdahl | SPAWARS (PMW 172-22C) | (703) 602-8332 |
| Robert Chapman | ISN | (301) 469-0400 |
| Roscoe W. Crawford | FISC Norf. Det. Washington | (202) 433-5387 |
| Michele Held | FISC Washington | (202) 433-5391 |
| Steve Lord | SEMCOR | (703) 418-4400 |
| Kevin Meyers | SPAWARS (PMW 172-2) | (703) 602-8420 |
| Wes Miller | BAH(Support 172-22C) | (703) 412-7782 |
| William Robertson | ISN | (301) 469-0400 |
| Don Tabasco | ISN | (301) 469-0400 |
| Roland Thibodeau | DMS | (203) 838-7183 |
| Daniel Tobin | ISN | (301) 469-0400 |

*__Next Scheduled Meeting:__*

*Date: To Be Determined*

**AGENDA ITEMS**

The meeting was called by the Government and ISN was not provided with a formal agenda. The purpose of the meeting was to discuss ATC Program issues.

Mr. Crawford started the meeting at 10:12 am.

**NEW BUSINESS**

1. Mr. Crawford asked Mr. Robertson if ISN was prepared to deliver the Installation Plan and Cut-Over Plan for Hampton Roads? Mr. Robertson replied that the Cut-Over Plan was delivered to the Government, by ISN, on December 1, 1994. A discussion followed and was culminated by Ms. Bellizzi's stating that if the Government cannot present an audit trail of receipt and return of documents to ISN, then the Government in coordination with ISN must re-establish a new date for ISN delivery and Government return for each document.

2. Mr. Robertson discussed with Mr. Crawford the delivery status of the of the Installation Plan. A significant portion of this discussion centered on the major changes in the Hampton Roads Site equipment configuration. Mr. Robertson stated that ISN has agreed to install the equipment, as discussed during the March 30 meeting. Mr. Robertson further stated that ISN would deliver the Installation Plan to the Government no later than April 4, 1995.

Mr. Robertson stated that many of the documents must be prepared in sequence rather than in parallel, as material changes from one document would effect the preparation of subsequent documents.

Mr. Meyers stated that the ATC Program Office would expedite (15 day turn around) their review of the Installation Plan for the Hampton Roads Site.

3. Mr. Crawford asked if ISN would have to wait for Government approval of the Cut-Over Plan before they could start substantial work? Mr. Robertson stated that ISN could initiate work, at the Hampton Roads Site, upon receipt (by ISN) of a Government approved Installation Plan (B002-HR).

4. Mr. Tabasco stated that ISN and DMS had signed the appropriate documentation for the delivery of the Lot 1 equipment. Mr. Tabasco provided Mr. Crawford with copies of the documentation.

5. Mr. Crawford requested that ISN provide him with a copy of the signed ISN-DMS Subcontract. Mr. Crawford stated that DCMAO had requested said copy. Mr. Tabasco stated that DCMAO had never requested this in the past and that the ISN-DMS Subcontract contained proprietary information and that he was concerned about the release of this information outside the Government if a FOIA request were received by the Government. Ms. Bellizzi stated that the information provided by ISN, as requested by Mr. Crawford for DCMAO, would not be releasable under FOIA and instructed Mr. Tabasco to stamp document pages--"PROPRIETARY INFORMATION." Ms. Bellizzi requested that Ms. Held put the request for the ISN-DMS Subcontract in writing and provide it to ISN.

6. Mr. Crawford initiated a general discussion of schedule recovery by ISN. Mr. Robertson submitted to Mr. Crawford a proposed schedule for the Hampton Roads Site and stated that the schedule for the two Hawaii sites would be faxed to Mr. Crawford, not later than close of business March 30. Mr. Crawford agreed.

7. Mr. Crawford stated that the Government was extending the 'Substitution of Personnel' Clause. It will now be in effect until 180 days after work has begun at the Hampton Roads Site. Mr. Robertson agreed.

8. Mr. Tabasco stated that 'to date' ISN has not received any progress payments on this contract. A general discussion followed. Mr. Crawford stated that he and his staff had conducted a conference call with Ms. Tish Proctor earlier this morning. Mr. Chapman stated that he had discussed this issue (lack of progress payments to ISN) with Mr. Crawford as far back as Oct 94. Mr. Meyers stated that the Government must come up with a reasonable dollar figure and initiate payment to ISN in a timely manner. Mr. Meyers stated that the ATC Program Office would look at the matter and get back with Mr. Crawford promptly.

9. Ms. Held requested that ISN establish appropriate Points of Contact between ISN and DCMAO.

10. Mr. Crawford, in response to a request by ISN during the last meeting, gave Mr. Robertson an ATC CDRL STATUS document. Mr. Tobin stated to Mr. Crawford that this document did not appear to be the one that he had requested during the March 30 meeting. Mr. Crawford assured him that it was.

11. Mr. Meyers asked Mr. Robertson when they could get together? Mr. Robertson suggested Tuesday, April 4, 1995.

12. No date was set by Mr. Crawford for the next meeting.

13. Mr. Crawford concluded the meeting at 10:58 am and thanked the participants for their attendance.

## SUMMARY OF ACTIONS

1. ISN will delivery CDRL B002 (Hampton Roads Installation Plan) not later than April 4, 1995.

2. The ATC Program Office will expedite the turn around time for their review of CDRL B002.

3. ISN will provide to the contracting office a copy of the ISN-DMS Subcontract marked "Proprietary" upon receipt of a request from Ms. Held.

4. ISN will fax the Hawaii Sites 'Schedule' to Mr. Crawford by close of business March 30, 1995.

5. Mr. Meyers will review the 'no progress payments' issue and get back to Mr. Crawford ASAP.

6. ISN will contact DCMAO and establish appropriate points of contact, for the ATC Contract, between their respective organizations.

7. Mr. Meyers and Mr. Robertson will tentatively meet on April 4, 1995 for a general discussion of the ATC Contract.

8. The date of the next meeting will be determined by Mr. Crawford.

# AGENDA (actual)

1. Delivery dates for Installation and Cut Over Plans.
2. Status of ISN-DMS Subcontract.
3. ISN Recovery Schedule.
4. Extension of ATC Contract 'Substitution of Personnel' Clause.
5. Lack of Government progress payments to ISN.
6. Proposed meeting between Mr. Meyers (SPAWARS) and Mr. Robertson (ISN).
7. Date for next meeting.

EXHIBIT
13

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 07:56:17 PM
**Subject:** HAMPTON ROADS RQMTS

HAMPTON ROADS

| NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 2 | 1 | OVERBID BY 1 |
| RMSA 200X | 0 | 1 | UNDERBID BY 1 |
| RMSA 500X | 0 | 0 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 1 | 1 | NONE |
| RIU 64X | 103 | 84 | OVERBID BY 19 |
| RIU 32X | 2 | 10 | UNDERBID BY 8 |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 1515 | 978 | OVERBID BY 537 |
| DIX 202 | 32 | 0 | OVERBID BY 32 |
| DIH 264X | 3 | 0 | OVERBID BY 3 |
| DIH 530 | 0 | 136 | UNDERBID BY 136 |
| DCI 402 | 0 | 4 | UNDERBID BY 4 |
| DTI 402 | 0 | 4 | UNDERBID BY 4 |
| AIM 800 | 62 | 153 | UNDERBID BY 91 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 |

To: Emie Flores
cc: Stephen Lord
From: Jim Williams
Date: 03/20/95 07:45:20 PM
Subject: CAMP SMITH RQMTS

| CAMP SMITH NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 0 | 0 | NONE |
| RMSA 200X | 0 | 0 | NONE |
| RMSA 500X | 1 | 1 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 0 | 0 | NONE |
| RIU 64X | 21 | 38 | UNDERBID BY 17 |
| RIU 32X | 0 | 0 | NONE |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 280 | 242 | OVERBID BY 38 |
| DIX 202 | 0 | 0 | NONE |
| DIH 264X | 0 | 39 | UNDERBID BY 39 |
| DIH 530 | 0 | 0 | NONE |
| DCI 402 | 0 | 0 | NONE |
| DTI 402 | 0 | 0 | NONE |
| AIM 800 | 20 | 33 | UNDERBID BY 13 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 |

**To:** Emie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 07:58:10 PM
**Subject:** LONDON RQMTS

| LONDON NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 2 | 1 | OVERBID BY 1 |
| RMSA 200X | 0 | 0 | NONE |
| RMSA 500X | 1 | 0 | OVERBID BY 1 |
| RMSA 4000X | 1 | 2 | UNDERBID BY 1 |
| RMSA 8000X | 0 | 0 | NONE |
| RIU 64X | 36 | 40 | UNDERBID BY 4 |
| RIU 32X | 2 | 2 | NONE |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 532 | 416 | OVERBID BY 116 |
| DIX 202 | 12 | 26 | UNDERBID BY 14 |
| DIH 264X | 1 | 22 | UNDERBID BY 21 |
| DIH 530 | 0 | 0 | NONE |
| DCI 402 | 0 | 0 | NONE |
| DTI 402 | 0 | 0 | NONE |
| AIM 800 | 27 | 34 | UNDERBID BY 7 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 |

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 08:05:55 PM
**Subject:** YOKOSUKA RQMTS

| YOKOSUKA NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 0 | 0 | NONE |
| RMSA 200X | 0 | 0 | NONE |
| RMSA 500X | 1 | 1 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 0 | 0 | NONE |
| RIU 64X | 30 | 23 | OVERBID BY 7 |
| RIU 32X | 0 | 0 | NONE |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 328 | 333 | UNDERBID BY 5 |
| DIX 202 | 0 | 0 | NONE |
| DIH 264X | 1 | 0 | OVERBID BY 1 |
| DIH 530 | 0 | 0 | NONE |
| DCI 402 | 0 | 0 | NONE |
| DTI 402 | 0 | 0 | NONE |
| AIM 800 | 47 | 28 | OVERBID BY 19 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 |

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 08:04:24 PM
**Subject:** SIGONELLA RQMTS

| SIGONELLA NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 0 | 0 | NONE |
| RMSA 200X | 0 | 0 | NONE |
| RMSA 500X | 1 | 1 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 0 | 0 | NONE |
| RIU 64X | 31 | 25 | OVERBID BY 6 |
| RIU 32X | 0 | 0 | NONE |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 394 | 317 | OVERBID BY 77 |
| DIX 202 | 0 | 0 | NONE |
| DIH 264X | 4 | 7 | UNDERBID BY 3 |
| DIH 530 | 0 | 0 | NONE |
| DCI 402 | 0 | 0 | NONE |
| DTI 402 | 0 | 0 | NONE |
| AIM 800 | 40 | 19 | OVERBID BY 21 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 |

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 08:01:22 PM
**Subject:** PUERTO RICO RQMTS

| PUERTO RICO NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 0 | 0 | NONE |
| RMSA 200X | 0 | 0 | NONE |
| RMSA 500X | 1 | 1 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 0 | 0 | NONE |
| RIU 64X | 23 | 25 | UNDERBID BY 2 |
| RIU 32X | 0 | 0 | NONE |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 283 | 315 | UNDERBID BY 32 |
| DIX 202 | 0 | 0 | NONE |
| DIH 264X | 0 | 7 | UNDERBID BY 7 |
| DIH 530 | 0 | 0 | NONE |
| DCI 402 | 0 | 0 | NONE |
| DTI 402 | 0 | 0 | NONE |
| AIM 800 | 33 | 8 | OVERBID BY 25 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 |

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 08:34:00 PM
**Subject:** TOTAL ISN OVER/UNDER BIDS BY EQPT QTY

ALL SITES COMBINED

| NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE | |
|---|---|---|---|---|
| RMSA 100X | 4 | 2 | OVERBID BY 2 | SAVE 30% of 1 100 |
| RMSA 200X | 0 | 1 | UNDERBID BY 1 | |
| RMSA 500X | 6 | 5 | OVERBID BY 1 | GOT TWO FREE 500 |
| RMSA 4000X | 7 | 8 | UNDERBID BY 1 | |
| RMSA 8000X | 1 | 1 | NONE | |
| RIU 64X | 273 | 272 | OVERBID BY 1 | GAVE 1 RIU 64 |
| RIU 32X | 4 | 12 | UNDERBID BY 8 | GOT 8 RIU 32 |
| TFOU 8/16 | 7 | 7 | NONE | |
| TATU 2/8 | 7 | 7 | NONE | |
| DIM 414E | 3696 | 2913 | OVERBID BY 783 | SAVE |
| DIX 202 | 44 | 26 | OVERBID BY 18 | |
| DIH 264X | 10 | 105 | UNDERBID BY 95 | |
| DIH 530 | 0 | 136 | UNDERBID BY 136 | |
| DCI 402 | 0 | 4 | UNDERBID BY 4 | |
| DTI 402 | 0 | 4 | UNDERBID BY 4 | |
| AIM 800 | 267 | 310 | UNDERBID BY 43 | |
| BTM 2048 | 0 | 14 | UNDERBID BY 14 | |

Govt Provided
21 MAR 95

LATE SUBMISSION OF CDRLS AS OF 3/21/95

| CDRL NO. | TITLE | DUE DATE | ISN DRFT DATE | NO. DAYS LATE |
|---|---|---|---|---|
| A001 | MGMT PLAN | 8/15/94 | 10/20/94 | 64 days |
| A004 | STATS RPTS | | | 90 days |
| C001 | CONFIG. MGT. PLAN | 10/15/94 | 10/18/94 | 3 days |
| D001 | COMM. AVAL | 1/15/95 | OVERDUE | 65 days |
| D003 | SFTWR MNL | 1/15/95 | OVERDUE | 65 days |
| D004 | SFWR PRGMR MNL | 1/15/95 | OVERDUE | 65 days |
| D005 | SFWR PRGMR MAIN MNL | 1/15/95 | OVERDUE | 65 days |
| E001 | INTGRTD SPRT PLAN | 10/15/94 | 10/18/94 | 3 days |
| E002 | MAIN PLAN | 12/15/94 | OVERDUE | 96 days |
| F001 | TRAIN PLN | 11/15/94 | 2/17/95 | 94 days |
| F002 | LSSN PLN | 10/21/94 | OVERDUE | 151 days |
| F003 | TRAIN GUID | 10/21/94 | OVERDUE | 151 days |
| F004 | OTJ TRAIN | 1/15/95 | OVERDUE | 65 days |
| E003 | SPR PRTS HAMP RDS | 1/15/95 | OVERDUE | 65 days |
| G001 | CUTOVR HAMP RDS | 11/15/94 | 3/1/95 | 106 days |
| E003 | SPR PRTS CMP SMTH | 1/15/95 | OVERDUE | 65 days |
| G001 | CUTOVR CMP SMTH | 11/15/94 | OVERDUE | 126 days |
| E003 | SPR PRTS PRL HRBR | 1/15/95 | OVERDUE | 65 days |
| G001 | CUTOVR PRL HRBR | 11/15/94 | OVERDUE | 126 days |
| | | | TOTAL DAYS LATE | 1,695 days |

Consideration = $10,708,618.72 (total contract value) x .005 = $53,543.09/30 days = $1,784.77

1,695 days x $1,784.77 = $3,025,185.15 TOTAL CONSIDERATION DUE

000051

Attachment #3

EXHIBIT 14

ISN®

June 20, 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

ATTENTION: Jeffrey Bergdahl, COR

REFERENCE: Contract Number N00600-94-C-0389
Letter Ser PMW 172-22C/037 dated 1 May 95

SUBJECT: Submittal of Engineering 12 Pair Cable Change Proposal (ECP)CDRL Item C003

ENCLOSURE: (1) HAMPTON ROADS ECP COST ANALYSIS

This letter ECP for ATC Contract N00600-94-C-0389 proposes the following ATC modifications for NTCC Hampton Roads, Virginia:

- Installing 12 pair cabling on digital interfaces specified in the referenced letter.
- Increasing the Novell Netware 3.11 SFT-III from 25 to 50 users.
- Government requested ATC site configuration change.
- Upgrade one of the RMSA 100(X) to an RMSA 200(X)
- The DIM 414E upgrade.

Guidance provided by the Government in the referenced letter during the development of this ECP has been incorporated. Total additional cost consideration of this ECP is $930,527. The Handbook of Electronics Industry Cost Estimating Data was used as a guide in validating the cost estimates for this ECP.

Supporting Enclosures:
1. Cost breakdown listed by categories, Total Cost, Contract Cost , and ECP Cost.
2. Equipment List for NTCC Hampton Roads, Virginia.
3. Revised Schedule.

Letter Ser PMW 172-22C/037 requested installation of 12 pair cable for certain equipment and provided additional guidelines. The Government will provide all of the 12 pair cable needed to perform the NTCC Hampton Roads, Virginia installation and cut

00052



Information Systems & Networks Corporation • 10411 Motor City Drive, Bethesda, Maryland 20817 • (301) 469-0400 Telex: 387814

over. The Government has provided 5000 ft of new 12 pair cable. For requirements in excess of 5000 feet ISN will attempt to use cable that has been reclaimed. In the event that reclaimed cables are inadequate in length or quality ISN will notify the Government The Government can authorize ISN to purchase the cable or the Government can provide the 12 pair cable needed. Although ISN will make every effort to adjust schedules to accommodate, this approach may result in delaying or rescheduling the cut over of some equipment. During research of MIL-SPEC 12-Pair Cable, it was discovered that the MIL-SPEC Cable did not meet Plenium requirements. Government guidance was to install the MIL-SPEC (Non-Plenium) cables. The use of Non-Plenium cable appears to be consistent with installation practices currently in use at NTCC Hampton Roads.

The Government has requested that ISN provide Novell Netware3.11 for 50 users. The requirement to increase Novell Netware 3.11 SFT-III from 25 to 50 users is to insure compliance with software licensing requirements and to allow future connection growth to the ATC LAN for additional workstations (local or remote).

The Government provided ATC equipment lists in meetings with the Contracting Officer in March 1995 and requested that ISN and DMS substitute the equipment for the proposed equipment at no cost. After some discussion and review ISN and DMS agreed to the change at no additional cost for equipment or installation as stipulated in the ECP that ISN submitted on 18 April 95. This ECP incorporates the equipment list for NTCC Hampton Roads, Virginia only.

ISN recommends that one of the RMSA 100 (X) switches be replaced with an RMSA 200 (X). This will provide the expansion needed at NTCC Hampton Roads, Virginia because of the rapid growth in high speed circuits at this site. The cost for installing the RMSA 200 (X) now instead of doing it as a field expansion is substantially lower and eliminates the need for subsequent removal and reinstallation. The differential cost is based on the difference in cost between the RMSA 100 (X) and the RMSA 200 (X) found in the GSA Schedule on page 1, appendix B of Subcontract. This cost has been verified via phone with DMS.

DMS has released a new version of the DIM-414-3 designated as the DIM-414-E. According to DMS the DIM-414-E design has resulted in a significant reduction in DC Current required to operate the module. DMS offers the DIM-414-E with an extended warranty of 15 years. This ECP incorporates the NTCC Hampton Roads, Virginia portion of the ECP that ISN submitted 20 October 94.

ISN requests conformation of approval for this ECP as soon as possible.

Sincerely,

William N.L. Robertson
ATC Program Manager
Information Systems and Networks Corp.

| DESCRIPTION | TOTAL COST | COST in CONTRACT | COST of ECP |
|---|---|---|---|
| **LABOR** | | | |
| ECP Prep | 9,000 | 0 | 9,000 |
| Program Management & Engineering | 286,742 | 151,742 | 135,000 |
| Installation, Cut Over & 12 Pair Cable | 1,042,892 | 419,329 | 623,563 |
| **MATERIAL** | | | |
| Hardware & Software | 1,577,532 | 1,577,532 | 0 |
| Upgrade 1 RMSA 100 (X) to 1 RMSA 200 (x) | 18,537 | | 18,537 |
| Government Requested New Site Configuration | 0 | | n/c |
| NOVEL Fifty user | 3,226 | | 3,226 |
| Connectors (existing cable to be reused or new cable provided by the Government) | 23,000 | | * 23,000 |
| **ODC'S** | 13,581 | 3,581 | 10,000 |
| **TOTAL CLIN 0001AA** | 2,974,510 | 2,152,184 | 822,326 |
| **CDRL's CLIN 0003** | 388,457 | 338,457 | 50,000 |
| **TOTAL CLIN's 0001AA & 0003** | 3,362,967 | 2,490,641 | 872,326 |
| DIM 414 E upgrade | 58,201 | | 58,201 |
| | | | 930,527 |

20-Jun-95 03:28 PM

ENCLOSURE 1

00054

## HAMPTON ROADS EQUIPMENT CONFIGURATION

| NOMENCLATURE | ECP QTY |
|---|---|
| RMSA 100 X | 2 |
| RMSA 200 X | 0 |
| RMSA 500 X | 0 |
| RMSA 4000 X | 1 |
| RMSA 8000 X | 1 |
| RIU 64 X | 81 |
| RIU 32 X | 5 |
| TFOU 8/16 | 1 |
| TATU 2/8 | 1 |
| DIM 414 E | 976 |
| DIX 202 | 0 |
| DIH 264 X | 0 |
| DIH 530 | 70 |
| DCI 402 | 4 |
| DTI 402 | 4 |
| AIM 800 | 152 |
| BTM 2048 | 0 |

| | | | |
|---|---|---|---|
| DIM 414 E Upgrade cost | 976 | 48 | 46,848 |
| G&A | | 12.94% | 6,062 |
| FEE | | 10.00% | 5,291 |
| TOTAL | | | 58,201 |

ENCLOSURE 2

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 1 | | | |
| 2 | **CDRL DEVELOPMENT** | 12/6/94 | 8/8/96 |
| 3 | CDRL E002 GOV CMNTS PASS DUE | 12/5/94 | 12/5/94 |
| 4 | CDRL D002 GOV CMNTS PASS DUE | 12/6/94 | 12/6/94 |
| 5 | *MGT PLAN CDRL A001 GOV CMNTS RCV'ED* | 2/27/95 | 2/27/95 |
| 6 | REVIEW GOV CMNTS CDRL A001 | 5/1/95 | 5/26/95 |
| 7 | RE-SUBMIT CDRL A001 | 5/26/95 | 5/26/95 |
| 8 | GOV REVIEW CDRL A001 | 5/26/95 | 6/25/95 |
| 9 | TRAINING PLAN - CDRL F001 | 2/6/95 | 2/17/95 |
| 10 | SUBMIT CDRL F001 | 2/17/95 | 2/17/95 |
| 11 | GOV REVIEW CDRL F001 | 2/17/95 | 3/17/95 |
| 12 | GOV CMNTS CDRL F001 RCV'ED | 5/22/95 | 5/22/95 |
| 13 | REVIEW GOV CMNTS CDRL F001 | 5/22/95 | 5/31/95 |
| 14 | RE-SUBMIT CDRL F001 | 6/26/95 | 6/26/95 |
| 15 | CUTOVER PLAN - CDRL G001 | 6/9/95 | 7/14/95 |
| 16 | SUBMIT CDRL G001 | 7/14/95 | 7/14/95 |
| 17 | SYS TEST/VER PLN CDRL G002 | 2/6/95 | 2/28/95 |
| 18 | SUBMIT CDRL G002 | 2/28/95 | 2/28/95 |
| 19 | GOV REVIEW CDRL G002 | 2/28/95 | 3/28/95 |
| 20 | GOV CMNTS CDRL G002 RCV'ED | 5/22/95 | 5/22/95 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary — GOV action — Milestone pending ◇
ISN task — Milestone complete ◆



00056

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 21 | REVIEW GOV CMNTS CDRLG002 | 6/15/95 | 7/9/95 |
| 22 | RE-SUBMIT CDRL G002 | 7/9/95 | 7/9/95 |
| 23 | LESSON PLAN - CDRL F002 | 5/1/95 | 7/7/95 |
| 24 | SUBMIT CDRL FOO2 | 7/9/95 | 7/9/95 |
| 25 | GOV REVIEW CDRL F002 | 7/10/95 | 8/10/95 |
| 26 | SS H.R. CDRL B001 GOV CMNTS REV'ED | 5/22/95 | 5/22/95 |
| 27 | REVIEW GOV CMNTS CDRL BOO1 | 5/22/95 | 6/27/95 |
| 28 | RE-SUBMIT CDRL B001 | 6/27/95 | 6/27/95 |
| 29 | *GOV CMNT CDRL C001 RCV'ED* | 6/5/95 | 6/5/95 |
| 30 | REVIEW GOV CMNTS CDRL C001 | 6/9/95 | 6/19/95 |
| 31 | RE-SUBMIT CDRL C001 | 6/19/95 | 6/19/95 |
| 32 | GOV CMNT CDRL C002 RCV'ED | 5/22/95 | 5/22/95 |
| 33 | REVIEW GOV CMNTS CDRL C002 | 5/31/95 | 6/30/95 |
| 34 | RE-SUBMIT CDRL C002 | 6/30/95 | 6/30/95 |
| 35 | TSIP H.R. CDRL B002 APPROVED | 6/2/95 | 6/2/95 |
| 36 | GOV CMNTS CDRL E001 ISP RCV'ED | 5/22/95 | 5/22/95 |
| 37 | COMMENTS REVIEW CDRL E001 | 6/9/95 | 7/8/95 |
| 38 | RE-SUBMIT CDRL E001 | 7/8/95 | 7/8/95 |
| 39 | TRAINEE GUIDE CDRL F003 | 7/3/95 | 8/3/95 |
| 40 | SUBMIT CDRL F003 | 8/3/95 | 8/3/95 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary — ISN task — GOV action — Milestone complete — Milestone pending



00057

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 41 | GOV REVIEW CDRL FOO3 | 8/3/95 | 8/31/95 |
| 42 | SPARE PARTS LIST CDRL E003 - ALL SITES | 4/5/95 | 4/17/95 |
| 43 | SUBMIT CDRL E003 | 4/17/95 | 4/17/95 |
| 44 | GOV REVIEW CDRL E003 | 4/14/95 | 5/15/95 |
| 45 | GOV CMNTS CDRL E003 RCV'ED | 6/13/95 | 6/13/95 |
| 46 | COMMENTS REVIEW CDRL E003 | 7/4/95 | 7/13/95 |
| 47 | RE-SUBMIT CDRL E003 | 7/13/95 | 7/13/95 |
| 48 | OJT HANDBOOK CDRL F004 | 7/25/95 | 8/16/95 |
| 49 | SUBMIT CDRL F004 | 8/17/95 | 8/17/95 |
| 50 | GOV REVIEW CDRL FOO4 | 8/17/95 | 9/15/95 |
| 51 | SOFTWARE USERS MANUAL CDRL D003 | 6/12/95 | 6/28/95 |
| 52 | SUBMIT CDRL D003 | 6/28/95 | 6/28/95 |
| 53 | GOV REVIEW CDRL D003 | 6/28/95 | 7/28/95 |
| 54 | TEST PROCEDURES CDRL G003 | 11/6/95 | 12/14/95 |
| 55 | SUBMIT CDRL G003 | 12/14/95 | 12/14/95 |
| 56 | GOV REVIEW CDRL GOO3 | 12/14/95 | 1/15/96 |
| 57 | JOB MANUAL - H.R. CDRL D006 | 12/4/95 | 1/31/96 |
| 58 | SUBMIT CDRL D006 | 1/31/96 | 1/31/96 |
| 59 | GOV REVIEW CDRL D006 | 1/31/96 | 3/1/96 |
| 60 | TEST REPORT CDRL G004 | 7/7/96 | 8/9/96 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary | ISN task | GOV action | Milestone complete ◆ | Milestone pending ◇



000058

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 61 | SUBMIT CDRL G004 | 8/9/96 | 8/9/96 |
| 62 | | | |
| 63 | **ENGINEERING/TECH SUPPORT** | 2/9/95 | 8/30/95 |
| 64 | SYSTEM ENGINEERING | 2/6/95 | 6/15/95 |
| 65 | ATC CONFIG ECP DEVELOPMENT | 2/6/95 | 6/20/95 |
| 66 | SUBMIT ATC CONFIG ECP | 6/20/95 | 6/20/95 |
| 67 | CORDINATE W/COR WRT EQIUP RELOCATION | 4/25/95 | 5/26/95 |
| 68 | GOV EQUIP CONFIG | 7/3/95 | 7/17/95 |
| 69 | MATERIAL PROCUREMENT | 2/10/95 | 8/31/95 |
| 70 | DMS FACTORY ACCEPTANCE | 2/8/95 | 2/8/95 |
| 71 | INVENTORY EQUIPMENT - DMS | 2/9/95 | 2/10/95 |
| 72 | *SHIP EQUIPMENT FROM DMS TO ISN* | 5/10/95 | 6/30/95 |
| 73 | RECEIVE DMS EQUIPMENT- ISN | 5/22/95 | 7/7/95 |
| 74 | SET-UP INTEGRATION SYSTEM | 5/15/95 | 6/2/95 |
| 75 | INTEGRATE SOFTWARE | 6/5/95 | 6/14/95 |
| 76 | SYSTEMS TRAINING - ISN | 6/19/95 | 6/23/95 |
| 77 | SHIP EQUIPMENT AT ISN TO HR | 6/23/95 | 6/23/95 |
| 78 | EQUIPMENT SHIPMENT ISN/HR | 6/25/95 | 8/15/95 |
| 79 | | | |
| 80 | **SITE - NTCC HAMPTON ROADS VA** | 3/3/95 | 7/7/96 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete



00059

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 81 | DEVELOP TSP SUPPORT DOCUMENTATIOM | 3/1/95 | 3/27/95 |
| 82 | SITE MANAGEMENT/ PRE-INSTALLATION | 3/15/95 | 5/20/95 |
| 83 | RECEIVE/STORE EQUIPMENT - H.R. | 5/4/95 | 12/29/95 |
| 84 | COMMENCE INSTALLATION | 6/26/95 | 6/26/95 |
| 85 | RELOCATION OF GOV EQUIPMENT | 6/27/95 | 9/1/95 |
| 86 | SET-UP CLASSROOM | 8/11/95 | 8/14/95 |
| 87 | FORMAL TRAINING | 8/14/95 | 8/26/95 |
| 88 | CLEAN-UP | 6/26/95 | 6/12/96 |
| 89 | SWITCH/RIU INSTALLATION | 6/26/95 | 8/26/95 |
| 90 | ATC LAN INSTALLATION | 8/22/95 | 9/1/95 |
| 91 | ATC SYS CONFIG VERIFICATION | 9/5/95 | 9/8/95 |
| 92 | ATC SYSTEM TEST | 9/7/95 | 9/12/95 |
| 93 | GOV. APPROVAL FOR CUT-OVER | 9/12/95 | 9/12/95 |
| 94 | COMMENCE CUTOVER | 9/13/95 | 9/13/95 |
| 95 | RE-CONFIG OF GOV EQUIP INTERFACE | 9/13/95 | 6/5/96 |
| 96 | CUT-OVER | 9/13/95 | 6/5/96 |
| 97 | CUTOVER COMPLETE | 6/7/96 | 6/7/96 |
| 98 | GOVERNMENT ACCEPTANCE | 6/7/96 | 7/7/96 |
| 99 | ATC INSTALLATION ACCEPTED | 7/7/96 | 7/7/96 |




Project: ATC - HAMPTON ROADS
Date: 6/20/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete



U0060

EXHIBIT
15

ISN

July 19, 1995

Space and Naval Warfare Systems Command
2451 Crystal City Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, March 30, 1995.

In accordance with the terms and conditions of the referenced contract, attached is the Conference Minutes of July 10, 1995 meeting for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400..

Sincerely,

William N.L. Robertson
Program Manager

cc: NRCC--R. Crawford

00061

CDRL No: A003

# LETTER OF MEMORANDUM

REF: Minutes of Program Meeting, July 10, 1995

Meeting Attendees:

| | | |
|---|---|---|
| Mr. Estes | NTCC | (804) 322-5979 |
| P.O. Palmer | NTCC | (804) 322-5979 |
| Chief Clark | NTCC | (804) 322-5979 |
| P.O. Claibaugh | NTCC | (804) 322-5979 |
| Mr. Mallon | NTCC | (804) 322-5979 |
| Mr. Sommes | NTCC | (804) 322-5979 |
| Mr. Zell | SPAWAR | (703) 602-8322 |
| Mr. Bergdahl | SPAWAR | (703) 602-8322 |
| Mr. Basnight | NISE EAST DET NORFOLK | (804) 558-6782 |
| Mr. Robertson | ISN | (301) 469-0400 |
| Mr. Reichart | ISN | (804) 421-7253 |
| Mr. Walters | ISN | (804) 421-7253 |

Next Scheduled Meeting
Date: July 24, 1995

4

**Agenda Items:**

Mr. Mallon started the meeting at 10:00 a.m.

**New Business:**

1. Mr. Mallon made reference to five items and repeated the ISN request that the circuits currently cross connected in the audio be moved so that a new bay could be established in position F6. He listed the CCSDS of eight circuits. After some discussion it was determined that they would be moved by 7/14.

2. The second item concerned the ISN request that the circuits on the KG 84's in the top position of the Bays scheduled for RIUS be relocated. The following discussion developed: That there were 9 KG 84S's assigned to circuits that user release to move the circuit was required. Also that the moves were currently planned for the next change of keying material and that they would be completed by August 3.

3. The third item discussed was concerning the duct and conduit route to be used to access the telephone frame room . NTCC would be happy to pull the cable provided by ISN if ISN would mark the path to be followed. Mr. Reichart stated that he wouuld accept that responsibility for ISN.

4. The fourth item discussed was announcing that the Rius to be placed in the telephone frame room were assigned to the row designated Y and that the ones placed in the LDMX room were assigned to row Z.

5. For the last item, Mr. Mallon stated that NTCC was attempting to remove the last of the circuits from Bay F1 and he anticipated completion by 7/14.

6. The next item discussed was regarding the test equipment list for the test bays. It was decided that the test bays would contain both the Phoenix and the Firebird devices and the rest of the equipment available to the station. Mr. Basnight, Mallon and Reichart were to determine the final configuration.

7. Mr. Robertson discussed the training to be provided to the site. Training would be conducted from 8/14 to 8/25 and fifteen students should attend each class. The courses would be: . Operator's Course, Maintenance Technicians Course and the System Administrator's Course. The recommended student for the Operator's Course should be E4 or above with a Nec of 2318/2319. The Maintenance Course students should be E4 or above in the RM or ET ratings. The System Administrator's Course should be attended by three or four people that are E6 and up or in a civilian billet. It was recomended that the students be familiar with a PC and windows, however, it is not a prerequisite.

Basnight was appointed the Government's local representative to arrange for the classroom space. The location of the classes will be at the Saint Julians Creek Annex at the Norfolk Shipyard. The building and room numbers will be announced.

**SUMMARY OF ACTIONS**:

ISN agreed that provision of a computer system free of viruses was a part of the contract.

The station is still discussing the request for access to the communication's security equipment room while restarts are in progress.

ISN will provide minutes of future meetings.

Copies of the current schedule will be provided to the site by ISN at the next regularly scheduled Wednesday status meeting.

The draft cut-over plan was presented for discussion and the main topic or agreement was to be conducted consistent with the previously agreed idea in that the procedure was important and the details would be worked out at the weekly status meetings. The next weekly status meeting will be to determine if the procedures are acceptable or if corrections are necessary, therefore, recommending any necessary changes.

The next progress meeting will be held at NTCC on 24 July at 10:00 A.M.

EXHIBIT
tabbies
16

Author: Jim Williams at AECLOTUSXCHGPO
Date: 7/20/95 10:00 AM
Priority: Normal
TO: Ernie Flores at SPAWAR-MC4
TO: Jeffrey Bergdahl at SPAWAR-MC4
TO: Ron Zell @ SEMCOR INC. at AECLOTUSXCHGPO
CC: John Howard @ SEMCOR INC. at AECLOTUSXCHGPO
CC: Stephen Lord @ SEMCOR INC. at AECLOTUSXCHGPO
Subject: ANCC/ATC GENERAL MEETING 7/20/95

------------------------------------ Message Contents ------------------------------------

A meeting was held to discuss ANCC/ATC related issues, results as folls:

1. Hampton Roads meeting for 24 Jul, agenda will be:
   a. ISN performance to date.
   b. Accomplishments to date.
   c. Cutover concept comments, Jeff to do followup meeting w/ISN.
   d. How ISN's direction to wiring crew to be accomplished, based on TSIP DWGS.
   e. Training deliverables.
   f. 14 Aug training start date doesn't look realistic, if documents received, can turn around quickly.
   g. Ron desires course of instruction to be audited by SEMCOR training, provided person has switch background due concern with ISN ability for training.
   h. Training class size, times, scheduling needs to be resolved.
   i. Training can be done at M51 if ISN able to setup over weekend, if not, St Juliens will be where done.
   j. Feedback from station regarding their OJT on test equipment.
   k. Station still needs to provide ISN with test bay requirements.

2. ISN ECP-1 letter is in for Kevin's signature, Jeff to followup to get it out.

3. ISN schedule letter, Jeff to forward FISC with SPAWAR letter concurrance/comments.

4. Go ahead and schedule Hawaii site survey, however, it will not be done if Hampton Roads installation not on track.

5. Meeting at LANT on 24 Jul for 1300:
   a. JAYCOR involved in research on automation matrice, reviewing for accuracy.
   b. Any LANT value added comments.
   c. JAYCOR to get verbal today regarding new software release.
   d. Possible to demo new VARCOM software RTM on 7 August at LANT, need to work out details of testing of FIREBIRD emulators, type info required to be provided by station, any impact to software operations, etc, etc,.
   e. Jeff is not to discuss specific items on automation matrices since list still being formulated.

6. Jeff has meeting with ISN scheduled for 1300 today.

VR/Jim

ISN®

EXHIBIT
17

July 31, 1995

Space and Naval Warfare Systems Command
2451 Crystal City Drive
Arlington, VA 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, July 24, 1995

In accordance with the terms and conditions of the referenced contract, attached are the Conference Minutes of the July 24, 1995 meeting for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
Program Manager

cc: FISC DET, Washington DC
R. Crawford

00066

**CDRL No: A003**

**Meeting Attendees:**

| NAME | REPRESENTING | TELEPHONE |
|---|---|---|
| J.A. Clark, RMC | NTCC Tech Control OPS | 804 322-5572 |
| C.S. Hanson | NTCC ADP Security | 804 455-4216 |
| Eugene Basnight | NISE EAST | 804 558-6782 |
| Steve Lord | SEMCOR | 703 418-4400 |
| Wes Miller | BAH | 703 412-7782 |
| Jeff Bergdahl | SPAWAR | 703 602-8332 |
| Bill Robertson | ISN | 301 469-0400 |
| Simon Martinez | ISN | 301 469-0400 |
| H. L. Williams, CW04 | NTCC EMO | 804 322-5368 |
| E. F. Palmer, RMI | NTCC TECH CONTROL OPS | 804 322-5511 |
| J. M. Buddenberg | NTCC PLANS | 804 322-5539 |
| Wayne Freeman | ISN | 804 421-7253 |
| Hal Reichart | ISN | 804 421-7253 |
| Ron Mallon | NTCC HAMPTON ROADS | 804 322-5979 |

**Next Scheduled Meeting**

**Monday, August 7, 1995**

**AGENDA ITEMS:**

The ATC Progress Meeting started at 10:00 AM

**OLD BUSINESS:**

1. At the request of the U.S. Navy(SPAWARS - NTCC Hampton Roads) ISN staffed and presented, for coordination and approval, a new and extended "training schedule to the participants of the meeting. Training was extended by one week, with the addition of 2 more Operator Courses, and 1 class day of the Database Administrator's course which will be conducted on a Saturday. SPAWARS, Jeff Bergdahl, accepted the new ISN schedule and also agreed to fund the Saturday training day for the Department of Navy Civilian students, if this was necessary and authorized. Chief Clark was designated the Action Officer to determine the necessary procedures. As a fall-back position, if weekend classes were not possible, administrator training will be completed on a Monday.

2. The metal dumpster was made available for cable, duct and other metal items. There is a sense of urgency that it be used so that it would not be removed.

3. The draft cut-over plan had been reviewed by the regularly scheduled status group as directed by the Progress Committee. The status group under the direction of the Progress Committee accepted the draft with minor corrections. Any additional corrections to the modified draft, presented at the meeting, are due at ISN not later than close of business on 7/26/95.

4. The test equipment for the operator positions was discussed briefly and Mr. Wayne Freeman was introduced to the group. It was pointed out that he had been assigned the responsibility for properly connecting the test equipment to the RIU.

5. Mr. Hanson discussed the responsibilities for the computer equipment associated with the ATC program. A message released by the Office of CNO N6 was introduced as the temporary document that spelled out the answers to most of the questions concerning the ATC system.

**NEW BUSINESS:**

1. A short status report on the installation was given by ISN.

2. The topic of approved interfaces for connecting devices to the ATC switch was discussed. Mr. Jeff Bergdahl accepted responsibility for providing any approved interfaces that were applicable to the ATC Hampton Roads.

3. Mr. Mallon indicated that the PADS and AMPS on the list of equipment to be connected would not be required. Mr. Mallon further indicated that the SACLANT voice frequency circuits would be consolidated in to high-speed digital circuits. These two actions would make additional VF ports available for reassignment.

4. A discussion of the voice circuitry ensued which led to the disclosure that parts of the telephone company's equipment exists in the Black Tech Control area. SPAWAR via NISE EAST DET Norfolk accepted responsibility to pay for any telephone company labor necessary to move loop back jacks and line conditioning equipment to Room 128.

**ACTION ITEMS:**

1. The next meeting will certainly expect to hear from:
   (A) Chief Clark regarding the procedures to authorize and fund civilian training on a weekend.

2. (B) Jeff Bergdahl on the approved interfaces applicable to Hampton Roads.

**SUMMARY OF ACTIONS:**

1. ISN presented a new training schedule, at the request of the Navy, that extended the training period by one week and added two Operator Training Courses. Also one day of the Administrator Course will be conducted on a Saturday.

2. The metal dumpster was made available for cable, duct, and other metal items.

3. The draft cut-over plan was reviewed and accepted with minor corrections. Any additional corrections to the modified draft are due at ISN not later than business on 7/26/95.

4. Jeff Bergdahl accepted responsibility for providing any approved interfaces that were applicable the Hampton Roads ATC.

5. Wayne Freeman was assigned the responsibility for properly connecting the test equipment to the RIU.

6. Mr. Hanson discussed the responsibilities for the Computer Equipment with the ATC Program.

7. Mr. Mallon indicated that the PADS and AMPS not needed and that the SACLANT voice frequency circuits would be consolidated to high-speed digital circuits.

8. Jeff Bergdahl accepted responsibility to pay for any telephone company labor necessary to move loop back jacks and line conditioning equipment from the Black Tech Control area to Room 128.

9. The next scheduled meeting will be August 7, 1995.

EXHIBIT 18

ISN®

August 16, 1995

Space and Naval Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffrey Bergdahl

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Hampton Roads Equipment

Attached is a list of equipment identified at the Hampton Roads site that may not meet the electrical interface criteria stipulated by the Government as MIL-STD-188-114, balanced, negative-mark, and documented in the Hampton Roads Site Survey Report. A majority of the equip-ment is RS-232, and may not be interfaced with DIM-414-E modules due to the potential disparity of voltage levels between RS-232, RS-422 and balanced MIL-188-114, which could possibly damage the modules. The full extent of this interface problem cannot be determined until the equipment is taken off line and each interface is evaluated. This will require close coordinatiion between ISN and the Government to insure that government equipment interfaces are compliant with the interface criteria. There may be additional equipment identified during the cutover phase that do not meet the criteria.

Sincerely,

William N.L. Robertson
Program Manager

cc: FISC DET Washington DC, R. Crawford

00071

| EQUIPMENT | LOCATION | INTFC |
|---|---|---|
| Codex Nest | G2 | RS-232 |
| Codex Nest | G2 | RS-232 |
| 3380 | H6 | RS-232 |
| 9600 | H6 | RS-232 |
| 9600 | H6 | RS-232 |
| 9600 | H6 | RS-232 |
| 2520 | H6 | RS-232 |
| 9600 | H6 | RS-232 |
| 9600 | H6 | RS-232 |
| 3380 | H6 | RS-232 |
| 3380 | H6 | RS-232 |
| 3380 | H6 | RS-232 |
| 3380 | H6 | RS-232 |
| 3380 | H6 | RS-232 |
| 3380 | H6 | RS-232 |
| 3380 | H6 | RS-232 |
| 9600 | H7 | RS-232 |
| 9600 | H7 | RS-232 |
| 3380 | H8 | RS-232 |
| 3380 | H8 | RS-232 |
| 3610 | H8 | RS-232 |
| 3610 | H8 | RS-232 |
| 2340 | H11 | RS-232 |
| 2640 | H11 | RS-232 |
| 4400 | H12 | RS-232 |
| 4400 | H12 | RS-232 |
| 4400 | H12 | RS-232 |
| 4400 | H12 | RS-232 |
| UDS V.3225 | H12 | RS-232 |
| 2202 | H12 | RS-232 |
| 2340 | H13 | RS-232 |
| 2510 | H13 | RS-232 |
| 1800 | H13 | RS-232 |
| 1800 | H13 | RS-232 |
| 1800B | H13 | RS-232 |
| 1800B | H13 | RS-232 |
| 2340 | H13 | RS-232 |
| 202T | H14 | RS-232 |
| 2200 | H14 | RS-232 |
| 202T | H14 | RS-232 |
| ICC24 | H14 | RS-232 |
| 1800S | H14 | RS-232 |
| ICC24 | H14 | RS-232 |
| GDC | H15 | RS-232 |
| CODEX NEST | H15 | RS-232 |
| CODEX NEST | H15 | RS-232 |
| 3380 | H15 | RS-232 |
| GDC | H15 | RS-232 |
| | | |
| FCC-100 | G10A | |

| EQUIPMENT | LOCATION | INTFC |
|---|---|---|
| PORT 2 | | ISOCH |
| 4 | | " |
| 5 | | " |
| 6 | | " |
| 8 | | " |
| 9 | | " |
| 10 | | " |
| 11 | | " |
| 12 | | " |
| 15 | | " |
| 16 | | " |
| | | |
| FCC-100 | G10B | |
| 1 | | ISOCH |
| 2 | | " |
| 3 | | " |
| 4 | | " |
| 5 | | " |
| 6 | | " |
| 7 | | " |
| 8 | | " |
| 10 | | " |
| 11 | | " |
| 12 | | " |
| | | |
| FCC-100 | G10C | |
| 1 | | ISOCH |
| 2 | | " |
| 3 | | " |
| 4 | | " |
| 7 | | " |
| 9 | | " |
| 10 | | " |
| 11 | | " |
| 12 | | " |
| 13 | | " |
| 15 | | " |
| | | |
| FCC-100 | G10D | |
| 8 | | ISOCH |
| | | |
| FCC-100 | G10E | |
| 1 | | ISOCH |
| 2 | | " |
| 4 | | " |
| 6 | | " |
| 7 | | " |
| 8 | | " |
| 10 | | " |
| 11 | | " |

| EQUIPMENT | LOCATION | INTFC |
|---|---|---|
| 13 | | * |
| 15 | | * |
| | | |
| FCC-100 | G11A | |
| 1 | | ISOCH |
| 2 | | * |
| 3 | | * |
| 4 | | * |
| 5 | | * |
| 6 | | * |
| 7 | | * |
| 8 | | * |
| 9 | | * |
| 10 | | * |
| 11 | | * |
| 12 | | * |
| 13 | | * |
| 14 | | * |
| 16 | | * |
| | | |
| FCC-100 | G11B | |
| 1 | | ISOCH |
| 2 | | * |
| 3 | | * |
| 4 | | * |
| 6 | | * |
| 7 | | * |
| 8 | | * |
| 9 | | * |
| 10 | | * |
| 11 | | * |
| 12 | | * |
| 13 | | * |
| 15 | | * |
| 16 | | * |
| | | |
| FCC-100 | G11C | |
| 1 | | ISOCH |
| 2 | | * |
| 4 | | * |
| 5 | | * |
| 6 | | * |
| 7 | | * |
| 8 | | * |
| 9 | | * |
| 12 | | * |
| 13 | | * |
| 14 | | * |
| 15 | | * |
| | | |

| EQUIPMENT | LOCATION | INTFC |
|---|---|---|
| FCC-100 | G12B | |
| 1 | | ISOCH |
| 2 | | " |
| 3 | | " |
| 4 | | " |
| 5 | | " |
| 6 | | " |
| 7 | | " |
| 8 | | " |
| 10 | | " |
| | | |
| FCC-100 | G12E | |
| 3 | | ISOCH |
| 4 | | " |

ISN®

August 22, 1995

Space and Naval Warfare Systems Command
2451 Crystal City Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List(CDRL) Item A003, Conference Minutes, August 7, 1995

In accordance with the terms and conditions of the referenced contract, attached are the Conference Minutes of the August 7, 1995 meeting for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
ATC Program Manager

00076

**CDRL A003**

**Meeting Attendees:**

| | | |
|---|---|---|
| Ron Mallon | NTCC | 804 322-5979 |
| Eugene Basnight | NISE EAST | 804 558-6782 |
| Hal Reichart | ISN | 804 421-7253 |
| Ron Zell | SPAWARS | 703 602-8248 |
| Jeff Bergdahl | SPAWARS | 703 602-4891 |
| Ernie Flores | SPAWARS | 703 602-4891 |
| ET3 Heather Hottle | NTCC | 804 322-5613 |
| Bill Robertson | ISN | 301 469-0400 |
| J.C. Laursen | NTCC | 804-322-5572 |
| Jim Williams | SEMCOR (PMW 172-225) | 703 418-4400 |
| CW04 Horace Williams | NTCC (EMO) | 804 322-5572 |
| Glenn Barnes | Lockheed Martin | 804 858-2539 |
| Steve Lord | SEMCOR | 703 418-4400 |
| RMC Joseph Clark | NTCC H/R TCF OPS CHIEF | 804 322-5328 |
| Jack Walters | ISN | 804 421-7253 |

**Next Scheduled Meeting**:

August 21, 1995

CDRL A003

## CONFERENCE MINUTES

**7 August 1995**

**AGENDA ITEMS**:

The purpose of the meeting was to discuss the necessity for a change in the numbering system currently in use at NTCC Hampton Roads and also the up-coming training on the ATC Switch System.

**NEW BUSINESS**:

It was stated that it was necessary to have a change in the numbering system as the old system caused problems. The new system that was introduced seemed to eliminate problems caused by the current system. The following elements were identified: The first element is the row and up to two letters that will be required. The second element is the bay number and up to two numbers which may be used. The third element is the vertical position in the bay. Each rack unit will be given a letter designation from AA to RR representing the 44 rack units in a standard C Y 597 cabinet. Equipment will be numbered according to the location of the upper left hand corner of the device. A piece of equipment with its upper left hand corner in the fourth rack unit from the top will be assigned a designation of AD for its vertical location. If two or more units are side by side up to two digits, they will be used to locate the device numbering from left to right. Additional characters will be used as follows: S and up to two numbers to identify a card slot and J with up to numbers to identify individual jacks., It was pointed out that this could lead to as many as 25 characters to locate the 7th jack on the 10th card in a Timeplex Link II in Row J Bay 13. Use of this system would allow cable numbers to approach 60 characters in length. ISN will attempt to determine if the fields in the MAPS 8000(N) will accommodate use of the system. All parties required time to evaluate the effect of implementing the proposed system.

2. The next subject was the up-coming training on the ATC Switch System. Training will start on the 16th of August in Room 204 of Building M51 at the Naval Base. Classes will start at 0700 each day and last until 1600 with an hour off for lunch. Parking is available in the parking lot near the Helo Pad. ISN will send clearances to NAVCAMSLANT and mark them Attention to Mr. Jim Knox. SPAWARS stated that each course would be audited and SEMCOR would video tape one session of each course.

3. The request for additional access to CSE is still being staffed.

4. Hal Reichart gave an update on the progress of the installation that indicated that things were on schedule and cutover will start as scheduled. ISN was encouraged to beat the schedule if possible.

5. The subject of the test equipment and the Test Bay arrangement was revisited. It was indicated that further work on the arrangement was delayed at the request ofd the site to allow for more study of the situation.

6. The Station advised all concerned that the K row including all cabinets, equipment and cables were being removed to make room for new cabinets and equipment to serve the Navy Exchange System. Fifteen 56 KGB circuits and a T3 link are currently planned.

7. ISN was informed that both the ROTA and EASTPAC IDP'd had already been provided as the guide for approved signal flows. It was also stated that it was the responsibility of ISN to recommend any signal flows that were required but not available

8. The cutover plan included a statement that it was the Government's responsibility to change any of the circuits that did not meet the mark space sense guidance provided at the Hawaii Site Survey. The SPAWARS representative requested that the Government be informed immediately of all circuits that are in that category and of any other interface problems that exist. Mr. Robertson of ISN agreed to take this item for action.

9. The subject of computer virus was discussed. The IBM Virus Check Program Version 2.0 is a part of the MTRX Switch Configuration. This program will be used to demonstrate that the switch system is free of computer virus prior to cutover.

10. SPAWARS stated that in the near future, Mr. Basnight would have two observers from Hawaii onboard for a period of about two weeks.

11. The next meeting is scheduled for 21 August 1995.

**SUMMARY OF ACTIONS**:

1. NTCC introduced the new numbering system that seems to eliminate problems caused by the current system.

2. ISN will attempt to determine if the fields in the MAPS 8000(n) will accommodate use of the systems.

3. Training on the ATC Switch System will start on the 165th of August in Room 204 of Building M51 at the Naval Base. Classes will start at 0700 each day and last until 1600 with an hour off for lunch.

4. The next scheduled meeting is for 21 August 1995.

ISN

EXHIBIT
19

William N.L. Robertson
Vice President
Systems Integration Group

September 20, 1995

Space and Naval Warfare Systems Command
2451 Crystal City Drive
Arlington, VA 22245-5200

**ATTENTION:** Jeffery Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirements List (CDRL) Item A003, Conference Minutes, September 18, 1995

In accordance with the terms and conditions of the referenced contract, attached are the Conference Minutes of the September 18, 1995 meeting for your review.

For additional information regarding this deliverable item, please contact the undersigned at (301) 469-0400.

Sincerely,

William N.L. Robertson
Program Manager

cc: FISC DET, Washington DC
R. Crawford

00080

**CDRL No: A003**

**Conference Minutes**
***18 September 1995***

**AGENDA:**

The purpose of this meeting was to discuss the station's comments on ATC training.

**DISCUSSION ITEMS:**

1. In the opinion of the station, the training provided for the ATC was inadequate. Further discussion indicated that the operator and administrator courses were acceptable. The maintenance people were unsure of the procedures necessary to accomplish effective trouble shooting. They suggested that the course should not be taught in generic terms but be taught around the specific site configuration. The site requested the MTRX Users Manual. A general comment was that during the maintenance training course the instructor lacked knowledge of the technical aspects of the switch. The technicians also suggested that the course would be much better if actual equipment and connections could be demonstrated. ISN was instructed to present a paper detailing how the site would be supported during cutover and how instruction would be augmented by on-the-job training.

2. The site requested that the Users Manual for the ATC be delivered to RM1 Palmer.

3. Mr. Flores stated that the ATC switch and all its ancillary devices be installed and fully configured prior to cutover. This includes the tape backup unit, the printers, the print server and all work stations. RIU's that could not be installed because of space considerations were excluded

4. ISN Suggested the possibility of providing a dial-in capability to support operation of the ATC during cutover. SPAWARS stated that the DMS software would be required. The site wanted to be specifically advised before the dial-in capability was used. and ISN is investigating this option.

5. SPAWARS requested that the site keep a log of all operator/maintainer/net-work administrator questions and problems to be used to enhance the ATC training.

6. SPAWARS requested comments on the usefulness of the ICW provided and asked that no reference to deleting "Rota" be provided in the comments.

7. *ISN asked if the guidance provided* on the AN/FCC-98 limiting connections to 12 digital and 18 voice channels be changed to include all 24 voice channels. Some of the AN/FCC 98's have voice channel assignments outside the 1 to 18 range. SPAWARS stated that the limits provided were guidance and that the guidance could

be changed by the mutual agreement of the local representatives to meet operational requirements. All changes must be documented on "as *builts*".

**ACTION ITEMS:**

ISN will provide a paper discussing ATC operation and maintenance support during cutover and to outline on-the-job training to be provided. The due date for this will be September 22, 1995.

**Next Meeting:**

The next regularly scheduled meeting will be September 25, 1995.

**LIST OF ATTENDEES:**

| NAME | REPRESENTING | TELEPHONE | |
|---|---|---|---|
| RM Palmer | NTCC Hampton Roads | 804 322-5572 | TCF OPS |
| ET3 Hottle | NTCC Hampton Roads | 804-322-5668 | PLANS |
| Ron Mallon | NTCC Hampton Roads | 804-322-5668 | PLANS |
| Jack Laursen | NTCC Hampton Roads | 804- 322-5572 | TCF OPS |
| Jeff Bergdahl | SPAWARS | 703-602-8332 | COR |
| Ernie Flores | SPAWARS | 703-602-4891 | ANC/ATC |
| Ron Zell | SPAWARS | 703--602-8248 | ANCC/ATC |
| Mike Loomis | SEMCOR | 703-418-4400 | SPAWARS |
| Eugene Basnight | NISE EAST | 804-558-6783 | ANCC/ATC |
| Bill Robertson | ISN | 301-469-0400 | PROG MGR. |
| Hal Reichart | ISN | 804-421-7253 | SITE MGR |
| Jack Walters | ISN | 804-421-7253 | SR. TECH |

ATTACHMENTS

## ATC OPERATION AND MAINTENANCE

During cutover of the Automated Technical Control(ATC) switch and its integration into the NTCC Hampton Roads facilities, there will be an extended period of time where both the station and ISN will share responsi-bility for operation and maintenance of the system. ISN fully recognizes the site's responsibility to maintain rapid, reliable and secure communication channels for its users. The installation of the ATC will allow this goal to be met.

ISN's goal is to accomplish the installation of the ATC in accordance with the contract and to cut over the existing communication links with as little disruption as possible to the site and the communications services the site provides to it's users as possible. In order to meet these goals it will be necessary to transition from a manual patch and test facility to an automated system. This goal is not achievable instantaneously.

The period after the installation of the switch and its peripherals and the connection of the last communication's link to the switch is the cutover period. Cutover of the first phase will continue for approximately ten months.

During cutover, ISN is responsible for switch maintenance while the site is responsible for circuit operation and maintenance. Note that the switch will automatically perform the monitoring and fault detection of equipment connected to it as well as the circuits passing through. The switch, through built-in test procedures will also detect failures in the switch system. These switch system failures can be corrected by replacing pluggable modules. *Site operators and maintenance* personnel must understand that the terms *outage* and *alarm* have specific definitions for the ATC. A reported outage at a work station implies the malfunction of a unit of the switch system and an automatic switch over to a redundant module, except in the case of Remote Interface Unit(RIU) interface cards. An interface card failure will affect from one to eight ports or links. The RIU interface card may be changed while the power is on and will not affect connections to other cards in the RIU. No connectors need to be removed to replace a faulty RIU interface card. A screwdriver is necessary to remove the RIU fromt cover to expose the cards.

An alarm reported on the workstation screen indicates that a function specified to be monitored is not within allowable tolerances. This is an indication that the equipment connected to the switch system is experiencing difficulty. This difficulty could be failure to receive the expected signal, a distant end or transmission media problem, or it could indicate a local equipment failure.

ISN is responsible for all switch outage conditions and is willing to help operators and maintainers with all switch related questions and problems. In order to meet our responsibilities, ISN expects to be notified of all outages immediately. This will be easily accomplished by dialing a pager number so that a responsible ISN employee can determine what action to take.

In order to assist with procedural questions and alarms, the pager may be used to contact the ISN representative. lif phone contact is insufficient to solve the problem, ISN intends to provide a dial-in capability using the DMS provided program. Until further investigation is completed we believe that the site will have to provide a dedicated line to support this service.

In order to provide in depth, site specific information to NTCC Personnel, an on-the job training program will commence with the start of cutover.

It is ISN's intention to take one watch stander per working day with the stations permission and provide on-the-job training. One maintenance technician or administrator is welcome to join each day.

Instruction will include a description of the system and how it operates, a walk around to point out the various parts of the system and an informal question and answer session. After that we anticipate that the operator will spend the rest of the day assisting in data entry for that day's cutovers. Some time will also be allowed for testing and sparing from the operators.

EXHIBIT 20

**SUBJ: MINUTES NTCC HAMPTON ROADS ATC STATUS MEETING 07 NOVEMBER 1995**

Ref: (a) ISN ltr dtd 3 November 1995
(b) SPAWAR ltr Ser PMW 172-22C/091 dtd 26 October 1995

1. Ron Zell opened the meeting requesting progress reports from ISN, followed by NTCC Hampton Roads. Hal Reichart reported for ISN, and Ron Mallon reported for NTCC Hampton Roads.

2. Bill Robertson provided Ron Zell with a copy of reference (a), the subject of which, requested corrections to the minutes of the 23 October 1995 meeting reported in reference (b). Reponse is provided herein keyed to reference (a):

a. Paragraph 1 of reference (a) keyed to paragraph 2 of reference (b): Concur and is modified as follows: "Hal Reichart reported receipt and installation of the Tape Back-up Unit. A set of blank tapes has been provided to be used in backing up the systems."

b. Paragraph 2 of reference (a) keyed to paragraph 4 of reference (b): Concur and is modified as follows: "Hal Recichart reported that ISN was procuring a cellular phone for timely contact of designated ISN personnel during off-duty hours.

c. Paragraph 3 of reference (a) keyed to paragraph 6 of reference (b): Do not concur. Remains as stated: "Ron Zell (in concert with Ron Mallon) advised Bill Robertson the Pre Test and Acceptance Checklist (as one document) will be accepterd once the MTRX-100 is included."

d. Paragraph 4 of reference (a) keyed to paragraph 10 of reference (b): Partially concur and is modified as follows: "Discussed ISN's submission of a "complex circuit" as previously agreed. ISN will propose a complex cutover using an existing NTCC Hampton Roads signal flow at the next meeting.

e. Paragraph 5 of reference (a) keyed to paragraph 14 of reference (b): Partially concur and is modified as follows: "Discussed scheduling start of cut-over. Ron Zell advised Bill Robertson decision would not be made in approving the start of cut-over until a firm delivery schedule of the MTRX-100, RIU-32s and 530 cards is provided. Bill Robertson indicated ISN's position that technically there is no reason to wait and that cut-over of the MTRX-100 could commence at a later date, at the time it is received/installed. Ron Zell indicated he would discuss further once ISN provides a firm delivery schedule. Ron Zell agreed with ISN that the switch was in fact modular, that additional modules have been and will continue to be added to active switches without loss of service.

f. Paragraph 6 of reference (a) keyed to paragraph 16: Concur and is modified as follows: "Bill Robertson advised there is no reason for having not submitted test procedures and cut-over sheets to date. He indicated they would be provided soon. Additionally, Hal Reichart stated that the VF cutover sheets were being held up by the need to change to VF cabling drawings due to the massive changes caused by the deletion of PADS and AMPS, the T324's and the addition of 6 more ports to each of 11 AN/FCC-98's. Bill Robertson addressed these procedures by stating that all test procedures had been submitted as promised but in two packages. He agreed that the MTRX 100 and RIU 32 procedures (2 pages) will be integrated into the basic document.

Enclosure (1)

**SUBJ: CONT; MINUTES NTCC HAMPTON ROADS ATC STATUS MEETING, 07 NOVEMBER 1995**

3. Ron Zell advised Bill Robertson that SPAWAR produced minutes, such as those provided in reference (b) are not contract binding, whereas those submitted by ISN as A003 are contract binding. Bill Robertson acknowledged, indicating concurrence to Ron Zell.

4. Hal Reichart reported difficulties with the Tape Backup Unit. Bill Robertson reported no prior knowledge of the difficulty. Hal Reichart advised that investigation into the problem was ongoing. Ron Zell recommended to Bill Robertson that he coordinate with DMS in determining whether or not ISN has the type of Unit DMS recommends.

5. Bill Robertson reported tentative delivery schedule of the MTRX-100s, RIU-32s, and 530 cards. Ron Zell requested the delivery schedule be submitted in writing and that ISN include a statement of impact if cut-over is not authorized until the aforementioned items are received/installed. Bill Robertson advised the requested information in writing would be provided NLT 8 November 1995.

6. RMC (SW) Clark asked status in clearing ISN personnel at the Top Secret level. Hal Reichart advised status remains unchanged. One person is cleared at the Top Secret level. Others have been processed and are pending adjudication.

7. Jeff Bergdahl asked Hal Reichart if ISN was attempting to standardize KG84 configurations. Hal Reichart responded "absolutely and that the focus was on 2 types of a standard configuration. Ron Zell made it clear that any circuit connected to the switch would be cut-over on the basis of a circuit "working" prior to cut-over and the circuit "still working" after cut-over. Ron Zell's expression of concern was to ensure ISN understanding that cut-over of circuits/equipments to the switch must take into consideration that a circuit is not changed in anyway and that its cut-over takes into consideration how it is connected as well as the operation of the circuit that includes the local user and the distant end.

8. Hal Reichart reported that the ATC contract does not include requirement for ISOC circuits. He reminded everyone that the DMS ATC switch provides for ASYNC/SYNC interfaces and that it does provide for ISOC interfaces. Hal Reichart went on to say that a "couple hundred" 75BPS ASYNC circuits derived of FCC-100 LSTDMs are operational at NTCC Hampton Roads using ISOC cards. Discussion revealed probability of FCC-100s being populated with ISOC cards (for 75BPS ASYNC circuits) in lieu of using ASYNC cards because the ISOC cards worked and they were held in inventory at the time. Resolution of this issue remains pending. All concern agreed that the solution may be simple through continued use of the FCC-100 ISOC cards for ASYNC circuits. Hal Reichart requested diagram examples if this situation exists at other sites where the DMS switch is operational. Ron Zell/Jeff Bergdahl advised SPAWAR would get back to ISN and the site after review of the contract and whether or not examples of diagrams might be available from similar installations at other DMS ATC sites.

9. Discussed positive/negative sensing as it applies to circuit configurations and the switch. It was stated that most circuits at NTCC Hampton Roads are configured as positive sensing. The DMS switch is negative sensed. Hal Reichart advised the information they have is that all circuits were to be configured for negative sensing. Ron Mallon requested COMSPAWARSYSCOM provide any authoritative documentation that standardizes sensing as negative mark.

10. Discussed the HEMP ROOM at NTCC Hampton Roads Technical Control Facility and that CINCLANTFLT says there is no longer a HEMP requirement. NTCC Hampton Roads has not allowed any penitration of the HEMP ROOM . Ron Mallon requested COMSPAWARSYSCOM provide any authoritative documentation that that decertifies the HEMP facility at NTCC Hampton Roads Tech Control Facility.

**SUBJ: MINUTES NTCC HAMPTON ROADS ATC STATUS MEETING, 07 NOVEMBER 1995**

11. Discussed high speed port assignments and need to identify and provide to ISN. Ron Mallon took for action to provide list.

12. Hal Reichart requested site permission to wire empty Fixed Plant Adapters (FPAs) to RIUs. Ron Mallon provided permission. Chief Clark made clear the requirement for ISN to coordinate in advance with PO Blueing (in charge of all crypto to include FPAs) or PO Palmer prior to moving and KG84s/FPAs (top of every 4th bay as per the TSIP (HRA) in making room for RIUs.

13. Next meeting is tentatively scheduled 27 November 1995 at NTCC Hampton Roads.

**SUBJ: ATTENDANCE LIST NTCC HAMPTON ROADS ATC STATUS MEETING, 07 NOVEMBER 1995**

| Name | Command/Agency |
|---|---|
| LCDR J. Denby | NTCC Hampton Roads (AOIC) |
| CWO4 H. Williams | NTCC Hampton Roads (EMO) |
| ET2 (SW) Clabaugh | NTCC Hampton Roads (Maintenance) |
| Ron Mallon | NTCC Hampton Roads (Plans) |
| RMC (SW) Clark | NTCC Hampton Roads (Tech Control) |
| RM1 Palmer | NTCC Hampton Roads (Tech Control) |
| Ron Zell | COMSPAWARSYSCOM (PMW 172-22) |
| Jeff Bergdahl | COMSPAWARSYSCOM (PMW 172-22C) |
| Gene Basnight | NISEEAST DET NORFOLK (Code 521EB) |
| Bill Robertson | Information Systems & Networks Corporation (ATC PM) |
| Hal Reichart | Information Systems & Networks Corporation (Site Manager) |
| Steve Lord | SEMCOR (COMSPAWARSYSCOM PMW 172-22C SUPPORT) |

Enclosure (2)

**Subj: ATTENDANCE LIST NTCC HAMPTON ROADS ATC STATUS MEETING, 23 OCTOBER 1995**

EXHIBIT 21

| Name | Command/Agency |
|---|---|
| LCDR J. Denby | NTCC Hampton Roads (AOIC) |
| CWO4 H. Williams | NTCC Hampton Roads (EMO) |
| ET2 (SW) Clabaugh | NTCC Hampton Roads (Maintenance) |
| Ron Mallon | NTCC Hampton Roads (Plans) |
| ET3 Hottle | NTCC Hampton Roads (Plans) |
| RMC (SW) Clark | NTCC Hampton Roads (Tech Control) |
| RM1 Palmer | NTCC Hampton Roads (Tech Control) |
| Ron Zell | COMSPAWARSYSCOM (PMW 172-22) |
| Jeff Bergdahl | COMSPAWARSYSCOM (PMW 172-22C) |
| Gene Basnight | NISEEAST DET NORFOLK (Code 521EB) |
| Bill Robertson | Integrated Systems Control (ATC PM) |
| Hal Reichart | Integrated Systems Control (Site Manager) |
| Steve Lord | SEMCOR (COMSPAWARSYSCOM PMW 172-22C Support) |

Enclosure (2)

Subj: CONT; MINUTES NTCC HAMPTON ROADS ATC STATUS MEETING, 23 OCTOBER 1995

c. In addition to circuits (by CCSD or other circuit name as mentioned above), equipments by type and location (row/bay) will be reported. Report same as circuits by indicating cut-over start date/end date and number of connections pending/required; e.g. Cutover started and ended 1 DEC 95, FCC-100(V)3, Row/Bay, 18 OF 18 connections completed.

14. Discussed scheduling start of cut-over. Ron Zell advised Bill Robertson decision would not be made in approving the start of cut-over until a firm delivery schedule of the MTRX-100, RIU-32s and 530 cards is provided. Bill Robertson indicated ISN's position that technically there is no reason to wait and that cut-over of the MTRX-100 could commence at a later date, at the time it is received/installed. Ron Zell indicated he would discuss further once ISN provides a firm delivery schedule.

15. Ron Zell asked Bill Robertson to estimate the date as to when his people at NTCC Hampton Roads would no longer have work to do. Bill Robertson was not able to provide a date. Hal Reichart indicated that he can keep people currently employed busy. This includes various cut-overs and other miscellaneous wiring in Tech Control (does not include cut-over and wiring to the ATC switch). Hal Reichart further commented that delaying cut-over only delays ISN's plans for hiring additional personnel required.

16. Bill Robertson advised there is no reason for having not submitted test procedures and cut-over sheets to date. He indicated they would be provided soon.

17. Tentative date for next meeting is 6 November 1995, 1000 at NTCC Hampton Roads. Alternate date is 7 November 1995.



Enclosure (1)

EXHIBIT
22

MINUTES OF THE STATUS GROUP MEETING

25 OCTOBER 1995

THE FOLLOWING IS A SUMMARY OF THE SUBJECTS DISCUSSED.

1. THERE WAS A BRIEF DISCUSSION OF SIGNALS TO BE CUTOVER TO THE SWITCH. AMONG THE TYPES OF SIGNAL EXISTING IN THE STATION BY BAUD RATE:
A. NO 45 BAUD CIRCUITS ( BEYOND THE LIMITS OF THE CONTRACT).
B. 2-50 BAUD CIRCUITS.
C. SOME 62.6 BAUD CIRCUITS.

2. ISOCHRONOUS CIRCUITS. THE STATION MAINTAINS THAT THE CONNECTION OF THESE CIRCUITS IS NOT REQUIRED AS THE ONLY CIRCUITS THAT HAD BEEN IDENTIFIED WERE ASYNC CIRCUITS THAT WERE CONNECTED TO ISOCHRONOUS CARDS ON THE AN/FCC100. ISN PROVIDED THE FOLLOWING EXPLANATION OF WHY THIS SUBJECT WAS IMPORTANT. (1) THE SWITCH INTERFACE THROUGH THE RIU IS A SYNCHRONOUS DEVICE. THE CONNECTION OF ASYNCHRONOUS SIGNALS TO SYNCHRONOUS DEVICES IS NOT A PROBLEM IF THE SYNCHRONOUS DEVICE CAN OPERATE AT LEAST TWICE THE ANTICIPATED SPEED OF THE ASYNCHRONOUS DEVICE. THE CONNECTION OF ISOCHRONOUS AND SYNCHRONOUS INTERFACES IS SOMETIMES POSSIBLE HOWEVER THERE IS NORMALLY A SLIPPAGE BETWEEN THE TWO SYSTEMS THAT CAUSE CIRCUIT OUTAGES. ALSO THE CONTRACT DOES NOT REQUIRE THE CONNECTION OF ISOCHRONOUS DEVICES TO THE SWITCH AND THAT THESE INTERFACES WERE BEYOND THE SCOPE OF THE CONTRACT. ISN WAS (2) REQUESTED TO TREAT THESE CIRCUITS AS ASYNCHRONOUS CIRCUITS.

3. ISN STATED THAT DUE THE MASSIVE CHANGES MADE TO THE VOICE FREQUENCY PORT ASSIGNMENTS THAT IT WAS NECESSARY TO REDO THE AUDIO CABLING DIAGRAM. HOWEVER, NO MORE SIGNIFICANT CHANGES COULD BE MADE TO THE PLAN AND THAT AS A PRACTICAL MATTER THIS WOULD SOMETIMES DICTATE THAT CABLE NUMBER ASSIGNMENTS WOULD NOT BE IN NUMERICAL ORDER. THE STATION ACCEPTED THIS CONDITION AS ONE THAT IT WAS LIVING WITH CURRENTLY AND WA NOT A SIGNIFICANT PROBLEM.

4. THE STATION STATED THAT THE REVISED QC SHEET THAT IT EXPECTS ALL CONTRACTORS TO FOLLOW WAS NOT READY YET.

5. THE STATION STATED THAT THEY DID NOT HAVE ANY FIREBERD TEST EQUIPMENT OF THEIR OWN TO USE IN THE OPERATORS POSITIONS. BUT TO LEAVE ROOM FOR THEM IN THE OPERATOR WORKSTATIONS.

6. THERE WAS A DISCUSSION OF THE POSSIBLE NEED FOR A DIGITAL PATCH PANEL IN THE OPERATORS POSITIONS. THIS WAS CONFIRMED SO THAT TEST EQUIPMENT COULD BE ASSIGNED TO BOTH THE HIGH AND LOW SPEED SWITCHES. IT WAS ALSO POINTED OUT THAT SOME TEST EQUIPMENT CONTAINED A PORT THAT WAS PROGRAMABLE AND THIS TYPE OF PORT WOULD NEED TO BE ASSIGNED TO A DTE OR DCE PORT ON THE SWITCH DEPENDING ON HOW THE PORT WAS PROGRAMMED.

EXHIBIT
23

CONFERENCE MINUTES
23 OCTOBER 1995

AGENDA

THE PURPOSE OF THE MEETING WS TO DISCUSS THE PROGRESS OF THE ATC INSTALLATION AT NTCC HAMPTON ROADS.

DISCUSSION ITEMS

MR. RON ZELL LEAD THE DISCUSSION BY ASKING FOR STATUS REPORTS OR COMMENTS ON THE FOLLOWING SUBJECTS:

A. THE TAPE BACK UP UNIT.
THE TAPE BACK UP UNIT WAS SENT TO NORFOLK LAST WEDNESDAY HOWEVER BECAUSE OF AN ERROR ON THE PART OF THE SHIPPING AGENT IT WENT TO WILLIAMSBURG. AFTER RECEIPT ON FRIDAY THE NECESSARY INSTALLATION MATERIALS WERE LOCATED OVER THE WEEKEND AND THE UNIT WAS INSTALLED, TESTED AND WORKING PRIOR TO THE MEETING.

B. THE MTRX 100 SWITCH AND THE RIU 32'S
MR. ROBERTSON STATED THAT THERE WAS NO NEW INFORMATION ON THE PROVISION OF THE MTRX 100 AND THE RIU 32'S SINCE THE STATUS PROVIDED ON THE 15TH OF SEPTEMBER AND THAT THE ANTICIPATED ARRIVAL WAS 15 NOVEMBER. THERE WAS SOME DISCUSSION CONCERNING THE IMPACT OF THIS INFORMATION ON THE START OF CUTOVER. ISN MAINTAINED THAT THE SWITCH SYSTEM WAS MODULAR IN DESIGN AND THE MTRX 100 AND THE RIU 32 WITH THE 530 CARDS COULD BE ADDED TO THE SYSTEM AT ANY TIME. SINCE THE SYSTEM WAS MODULAR THAT IT COULD BE TESTED AND ACCEPTED IN ITS CURRENT CONFIGURATION WITH FURTHER ACCEPTANCE TESTING BEING CONDUCTED WHEN THE MTRX 100 AND ITS SATELLITES WERE AVAILABLE. THE GOVERNMENT MAINTAINED THAT IT WAS A SYSTEM THAT COULD NOT BE ACCEPTED UNTIL ALL OF THE MODULES WERE AVAILABLE, ASSEMBLED, AND INSTALLED. MR. ZELL STATED THAT A NEW FORMAL SCHEDULE BASED ON THE ARRIVAL OF THE MTRX 100 WAS NECESSARY.

C. TRAINING
MR. REICHART STATED THAT IT WAS ISN'S INTENTION TO PROVIDE A CELLULAR TELEPHONE SO THAT ANY PROBLEMS THAT MIGHT ARISE AFTER CUTOVER STARTED COULD BE DISCUSSED BETWEEN THE WATCH AND THE DESIGNATED ISN REPRESENTATIVE. MR. ZELL ASK THE STATION IF THE WOULD BE WILLING TO START CUTOVER OF THE SWITCH AND ITS OPERATION WHEN ISN WAS NOT ON SITE IN LIGHT OF THE TRAINING, THE ICW, AND THE ANTICIPATED OJT. HE ALSO STATED THAT THE ICW WOULD BE UPDATED AND PROVIDED TO THE STATION BY THE END OF NOVEMBER. THE STATION RELUCTANTLY ACCEPTED THE START OPERATION OF THE SWITCH AND REQUESTED THAT ADDITIONAL TRAINING BE PROVIDED AS SOON AS POSSIBLE. MR. ZELL SAID THAT THE TRAINING COURSE WAS STILL BEING REVISED AND THAT IT WOULD BE OFFERED AGAIN AFTER THE FIRST OF THE CALENDAR YEAR UNLESS THERE WAS A FORMAL REQUEST FROM THE STATION THAT TRAINING BE PROVIDED EARLIER.

MR. ZELL SUGGESTED A MEETING LATER THIS WEEK OR NEXT WEEK BETWEEN ISN AND SPAWAR TO DISCUSS THE REQUIRED REVISIONS TO THE TRAINING MATERIALS. IT WAS DETERMINED THAT A POAM FOR ADDITIONAL TRAINING BE DEVELOPED.

EXHIBIT
24

18 April, 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffrey Bergdahl, COR

**REFERENCE:** Contract Number N00600-940C-0389

**SUBJECT:** Submittal of Engineering Change Proposal (ECP) CDRL Item C003

**ENCLOSURE:** (1) Navy provided Equipment configuration all sites.

This Letter ECP is submitted to reflect the proposed modification requested by the Navy to Contract N00600-940C-0389 at the contract meetings on 21 and 24 March 95. Enclosure (1) is the equipment configuration provided by the Navy for all seven sites. The Navy requested this confirmation to more closely match the current configuration. ISN has agreed to make these changes at no cost to the Government.

If you have any question or clarifications please contact the undersigned at (301) 469-0400.

Sincerely

William N.L. Robertson
VP Systems Integration Group
Information Systems and Networks

CC NRCC - R. Crowford

# LOT 1 Summary

| Description | Hampton Roads | Camp Smith | Pearl Harbor | Lot 1 TOTAL |
|---|---|---|---|---|
| RMSA 100X | 2 | | | 2 |
| RMSA 500X | | 1 | 1 | 2 |
| RMSA 4000X | 1 | 1 | 1 | 3 |
| RMSA 8000X | 1 | | | 1 |
| RIU 64X | 81 | 38 | 37 | 156 |
| RIU 32X | 5 | | | 5 |
| TFOU 8 / 16 | 1 | 1 | 1 | 3 |
| TATU 2 / 8 | 1 | 1 | 1 | 3 |
| DIM 414-E | 976 | 242 | 312 | 1530 |
| DIX 202 | | | | |
| DIH 264X | | 39 | 30 | 69 |
| DIH 530 | 70 | | | 70 |
| DCI 402 | 4 | | | 4 |
| DTI 402 | 4 | | | 4 |
| AIM 800 | 152 | 33 | 35 | 220 |
| BTM 2048 | | 2 | 2 | 4 |

| Description | Yokosuka | Sigonella | Puerto Rico | London | TOTAL |
|---|---|---|---|---|---|
| RMSA 100X | | | | 1 | 3 |
| RMSA 500X | 1 | 1 | 1 | | 5 |
| RMSA 4000X | 1 | 1 | 1 | 1 | 7 |
| RMSA 8000X | | | | | 1 |
| RIU 64X | 23 | 25 | 25 | 40 | 268 |
| RIU 32X | | | | 2 | 7 |
| TFOU 8 / 16 | 1 | 1 | 1 | 1 | 7 |
| TATU 2 / 8 | 1 | 1 | 1 | 1 | 7 |
| DIM 414-E | 333 | 317 | 315 | 416 | 2911 |
| DIX 202 | | | | 26 | 26 |
| DIH 264X | | 7 | 7 | 22 | 105 |
| DIH 530 | | | | | 70 |
| DCI 402 | | | | | 4 |
| DTI 402 | | | | | 4 |
| AIM 800 | 28 | 19 | 8 | 34 | 309 |
| BTM 2048 | 2 | 2 | 2 | 2 | 12 |

ATTACHMENT 1

## ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 1 | | | |
| 2 | **CDRL DEVELOPMENT** | 12/1/94 | 2/21/96 |
| 3 | CDRL G001 GOV CMNTS PASS DUE | 1/16/94 | 1/16/94 |
| 4 | CDRL E002 GOV CMNTS PASS DUE | 12/5/94 | 12/5/94 |
| 5 | MOT PLAN CDRL A001 GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 6 | REVIEW GOV CMNTS CDRL A001 | 3/23/95 | 4/6/95 |
| 7 | RE-SUBMIT CDRL A001 | 4/6/95 | 4/6/95 |
| 8 | TRAINING PLAN - CDRL F001 | 2/6/95 | 2/17/95 |
| 9 | SUBMIT CDRL F001 | 2/17/95 | 2/17/95 |
| 10 | GOV REVIEW CDRL F001 | 2/17/95 | 3/17/95 |
| 11 | GOV CMNTS CDRL F001 RCV'ED | 3/28/95 | 3/28/95 |
| 12 | REVIEW GOV CMNTS CDRL F001 | 4/4/95 | 4/13/95 |
| 13 | RE-SUBMIT CDRL F001 | 4/13/95 | 4/13/95 |
| 14 | SYS TEST/VER PLN CDRL G002 | 2/6/95 | 2/28/95 |
| 15 | SUBMIT CDRL G002 | 2/28/95 | 2/28/95 |
| 16 | GOV REVIEW CDRL G002 | 2/28/95 | 3/28/95 |
| 17 | LESSON PLAN - CDRL F002 | 3/27/95 | 4/15/95 |
| 18 | SUBMIT CDRL FOO2 | 4/15/95 | 4/15/95 |
| 19 | GOV REVIEW CDRL F002 | 4/15/95 | 5/15/95 |
| 20 | SS H.R. CDRL B001 GOV CMNTS REV'ED | 2/27/95 | 2/27/95 |




Project: ATC - HAMPTON ROADS
Date: 3/30/95

Summary — ISN task — GOV action — Milestone complete — Milestone pending



TABLE 1-1 ATC SCHEDULE - NTCC HAMPTON ROADS VA.

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 21 | REVIEW GOV CMNTS CDRL BOO1 | 3/3/95 | 3/20/95 |
| 22 | RE-SUBMIT CDRL B001 | 3/20/95 | 3/20/95 |
| 23 | GOV CMNT CDRL C001 RCV'ED | 2/27/95 | 2/27/95 |
| 24 | REVIEW GOV CMNTS CDRL C001 | 4/3/95 | 4/20/95 |
| 25 | RE-SUBMIT CDRL C001 | 4/20/95 | 4/20/95 |
| 26 | GOV CMNT CDRL C002 RCV'ED | 3/23/95 | 3/23/95 |
| 27 | REVIEW GOV CMNTS CDRL C002 | 4/10/95 | 4/27/95 |
| 28 | RE-SUBMIT CDRL C002 | 4/27/95 | 4/27/95 |
| 29 | TSP H.R. CDRL B002 GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 30 | COMMENTS REVIEW CDRL B002 | 3/1/95 | 4/4/95 |
| 31 | RE-SUBMIT CDRL BOO2 | 4/4/95 | 4/4/95 |
| 32 | GOV CMNTS CDRL E001 ISP RCV'ED | 2/27/95 | 2/27/95 |
| 33 | COMMENTS REVIEW CDRL E001 | 4/4/95 | 4/12/95 |
| 34 | RE-SUBMIT CDRL E001 | 4/12/95 | 4/12/95 |
| 35 | TRAINEE GUIDE CDRL F003 | 4/14/95 | 5/1/95 |
| 36 | SUBMIT CDRL F003 | 5/1/95 | 5/1/95 |
| 37 | GOV REVIEW CDRL FOO3 | 5/1/95 | 6/1/95 |
| 38 | SPARE PARTS LIST CDRL E003 - ALL SITES | 4/5/95 | 4/17/95 |
| 39 | SUBMIT CDRL E003 | 4/17/95 | 4/17/95 |
| 40 | GOV REVIEW CDRL E003 | 4/14/95 | 5/15/95 |




Project: ATC - HAMPTON ROADS
Date: 3/30/95

Summary — GOV action — Milestone pending
ISN task — Milestone complete



TABLE 1-1 ATC SCHEDULE - NTCC HAMPTON ROADS VA.

00096

ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 41 | OJT HANDBOOK CDRL F004 | 5/1/95 | 5/12/95 |
| 42 | SUBMIT CDRL F004 | 5/12/95 | 5/12/95 |
| 43 | GOV REVIEW CDRL FOO4 | 5/12/95 | 6/12/95 |
| 44 | TEST PROCEDURES CDRL G003 | 4/20/95 | 5/31/95 |
| 45 | SUBMIT CDRL G003 | 5/31/95 | 5/31/95 |
| 46 | GOV REVIEW CDRL GOO3 | 5/31/95 | 6/29/95 |
| 47 | JOB MANUAL - H.R. CDRL D008 | 10/2/95 | 11/3/95 |
| 48 | SUBMIT CDRL D008 | 11/3/95 | 11/3/95 |
| 49 | GOV REVIEW CDRL D008 | 11/3/95 | 12/1/95 |
| 50 | TEST REPORT CDRL G004 | 1/21/96 | 2/21/96 |
| 51 | SUBMIT CDRL G004 | 2/21/96 | 2/21/96 |
| 52 | | | |
| 53 | **ENGINEERING/TECH SUPPORT** | 2/7/95 | 8/30/95 |
| 54 | SYSTEM ENGINEERING | 2/8/95 | 6/15/95 |
| 55 | ATC CONFIG ECP DEVELOPMENT | 2/8/95 | 4/4/95 |
| 56 | SUBMIT ATC CONFIG ECP | 4/4/95 | 4/4/95 |
| 57 | CORDINATE W/COR WRT GOV EQUIP RELOCATION | 4/18/95 | 4/30/95 |
| 58 | COORDINATE W/COR GOV EQUIP INTERFACE CONFI | 5/1/95 | 5/15/95 |
| 59 | MATERIAL PROCUREMENT | 2/8/95 | 8/31/95 |
| 60 | DMS FACTORY ACCEPTANCE | 2/8/95 | 2/8/95 |




Project: ATC - HAMPTON ROADS
Date: 3/30/95

Summary | ISN task | GOV action | Milestone complete | Milestone pending



TABLE 1-1 ATC SCHEDULE - NTCC HAMPTON ROADS VA

00097

## ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 61 | INVENTORY EQUIPMENT - DMS | 2/9/95 | 2/10/95 |
| 62 | SHIP EQUIPMENT FROM DMS | 4/17/95 | 6/30/95 |
| 63 | RECEIVE DMS EQUIPMENT- ISN | 4/17/95 | 4/25/95 |
| 64 | SET-UP INTEGRATION SYSTEM | 4/26/95 | 4/27/95 |
| 65 | INTEGRATE SOFTWARE | 4/26/95 | 5/2/95 |
| 66 | SYSTEMS TRAINING - ISN | 5/3/95 | 5/17/95 |
| 67 | SHIP EQUIPMENT AT ISN TO HR | 5/18/95 | 5/18/95 |
| 68 | | | |
| 69 | **SITE - NTCC HAMPTON ROADS VA** | 3/1/95 | 1/21/96 |
| 70 | DEVELOP TSIP SUPPORT DOCUMENTATIOM | 3/1/95 | 3/27/95 |
| 71 | SITE MANAGEMENT/ PRE-INSTALLATION | 3/15/95 | 5/20/95 |
| 72 | RECEIVE/STORE EQUIPMENT - H.R. | 5/2/95 | 12/29/95 |
| 73 | COMMENCE INSTALLATION | 5/22/95 | 5/22/95 |
| 74 | RELOCATION OF GOV EQUIPMENT | 5/22/95 | 6/23/95 |
| 75 | SET-UP CLASSROOM | 6/8/95 | 6/9/95 |
| 76 | FORMAL TRAINING | 6/12/95 | 6/22/95 |
| 77 | CLEAN-UP | 6/2/95 | 1/15/96 |
| 78 | SWITCH/RIU INSTALLATION | 6/1/95 | 6/20/95 |
| 79 | ATC SYS CONFIG VERIFICATION | 6/22/95 | 6/22/95 |
| 80 | ATC SYSTEM TEST | 6/23/95 | 6/25/95 |




Project: ATC - HAMPTON ROADS
Date: 3/30/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete



TABLE 1-1 ATC SCHEDULE - NTCC HAMPTON ROADS VA.

00098

## ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 81 | GOV. APPROVAL FOR CUT-OVER | 6/25/95 | 6/25/95 |
| 82 | COMMENCE CUTOVER | 6/26/95 | 6/26/95 |
| 83 | RE-CONFIG OF GOV EQUIP INTERFACE | 6/26/95 | 12/21/95 |
| 84 | CUT-OVER | 6/26/95 | 12/21/95 |
| 85 | CUTOVER COMPLETE | 12/21/95 | 12/21/95 |
| 86 | GOVERNMENT ACCEPTANCE | 12/21/95 | 1/20/96 |
| 87 | ATC INSTALLATION ACCEPTED | 1/20/96 | 1/20/96 |




Project: ATC - HAMPTON ROADS
Date: 3/30/95






TABLE 1-1 ATC SCHEDULE - NTCC HAMPTON ROADS VA.

00093

# ATC SCHEDULE - NTCC PEARL HABOR AND CAMP H.M. SMITH

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 1 | | | |
| 2 | **CDRL DEVELOPMENT** | 12/1/94 | 12/14/95 |
| 3 | CDRL B001 (PEARL) GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 4 | CDRL B001 (CAMP SMITH) GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 5 | CDRL B002 (PEARL) GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 6 | CDRL B002 (CAMP SMITH) GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 7 | REVIEW GOV CMNTS CDRL B001(PEARL) | 4/20/95 | 5/9/95 |
| 8 | *RE-SUBMIT CDRL B001 (PEARL)* | 5/9/95 | 5/9/95 |
| 9 | REVIEW GOV CMNTS CDRL B001 (CAMP SMITH) | 4/25/95 | 5/15/95 |
| 10 | RE-SUBMIT CDRL B001 (CAMP SMITH) | 5/15/95 | 5/15/95 |
| 11 | REVIEW GOV CMNTS CDRL B002(PEARL) | 5/15/95 | 6/1/95 |
| 12 | RE-SUBMIT CDRL B002 (PEARL) | 6/1/95 | 6/1/95 |
| 13 | REVIEW GOV CMNTS CDRL B002 (CAMP SMITH) | 5/22/95 | 6/9/95 |
| 14 | RE-SUBMIT CDRL B002 (CAMP SMITH) | 6/9/95 | 6/9/95 |
| 15 | *CUT-OVER PLAN CDRL G001 (PEARL)* | 5/29/95 | 6/11/95 |
| 16 | SUBMIT CDRL G001 (PEARL) | 6/11/95 | 6/11/95 |
| 17 | GOV REVIEW CDRL G001 (PEARL) | 6/12/95 | 7/12/95 |
| 18 | CUT-OVER PLAN CDRL G001 (CAMP SMITH) | 5/29/95 | 6/11/95 |
| 19 | SUBMIT CDRL G001 (CAMP SMITH) | 6/11/95 | 6/11/95 |
| 20 | GOV REVIEW CDRL G001 (CAMP SMITH) | 6/12/95 | 7/12/95 |




Project: ATC - PEARL/CAMP SMITH
Date: 3/30/95

| | | | |
|---|---|---|---|
| Summary | | GOV action | |
| ISN task | | Milestone complete | Milestone pending |



00100

# ATC SCHEDULE - NTCC PEARL HABOR AND CAMP H.M. SMITH

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 21 | SYSTEMS TEST/VER PLN CDRL G002 (PEARL) | 5/1/95 | 5/5/95 |
| 22 | SUBMIT CDRL G002 (PEARL) | 5/5/95 | 5/5/95 |
| 23 | GOV REVIEW CDRL G002 (PEARL) | 5/5/95 | 6/5/95 |
| 24 | SYSTEMS TEST/VER PLN CDRL G002 (CAMP SMITH) | 5/3/95 | 5/8/95 |
| 25 | SUBMIT CDRL G002 (CAMP SMITH) | 5/8/95 | 5/8/95 |
| 26 | GOV REVIEW CDRL G002 (CAMP SMITH) | 5/8/95 | 6/8/95 |
| 27 | TEST PROCEDURES CDRL G003 (PEARL) | 5/15/95 | 6/5/95 |
| 28 | SUBMIT CDRL G003 (PEARL) | 6/5/95 | 6/5/95 |
| 29 | GOV REVIEW CDRL G003 (PEARL) | 6/5/95 | 7/5/95 |
| 30 | TEST PROCEDURES CDRL G003 (CAMP SMITH) | 5/10/95 | 6/10/95 |
| 31 | SUBMIT CDRL G003 (CAMP SMITH) | 6/10/95 | 6/10/95 |
| 32 | GOV REVIEW CDRL G003 (PEARL) | 6/12/95 | 7/12/95 |
| 33 | CDRL C002 (PEARL) GOV CMNTS RCV'ED | 3/23/95 | 3/23/95 |
| 34 | CDRL C002 (CAMP SMITH) GOV CMNTS RCV'ED | 3/23/95 | 3/23/95 |
| 35 | REVIEW GOV CMNTS CDRL C002 (PEARL) | 5/30/95 | 6/19/95 |
| 36 | RE-SUBMIT CDRL C002 (PEARL) | 6/19/95 | 6/19/95 |
| 37 | REVIEW GOV CMNTS CDRL C002 (CAMP SMITH) | 6/2/95 | 6/22/95 |
| 38 | RE-SUBMIT CDRL C002 (CAMP SMITH) | 6/22/95 | 6/22/95 |
| 39 | JOB MANUAL CDRL D006 (PEARL) | 9/4/95 | 9/29/95 |
| 40 | SUBMIT CDRL D006 (PEARL) | 9/29/95 | 9/29/95 |




Project: ATC - PEARL/CAMP SMITH
Date: 3/30/95

Summary | ISN task | GOV action | Milestone complete | Milestone pending



00101

## ATC SCHEDULE - NTCC PEARL HABOR AND CAMP H.M. SMITH

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 41 | GOV REVIEW CDRL D006 (PEARL) | 9/29/95 | 10/27/95 |
| 42 | JOB MANUAL CDRL D006 (CAMP SMITH) | 9/4/95 | 9/29/95 |
| 43 | SUBMIT CDRL D006 (CAMP SMITH) | 9/29/95 | 9/29/95 |
| 44 | GOV REVIEW CDRL D006 (CAMP SMITH) | 9/29/95 | 10/27/95 |
| 45 | TEST REPORT CDRL G004 (PEARL) | 12/25/95 | 1/25/96 |
| 46 | SUBMIT CDRL G004 (PEARL) | 1/25/96 | 1/25/96 |
| 47 | TEST REPORT CDRL G004 (CAMP SMITH) | 12/25/95 | 1/25/96 |
| 48 | SUBMIT CDRL G004 (CAMP SMITH) | 1/25/96 | 1/25/96 |
| 49 | | | |
| 50 | **ENGINEERING/TECH SUPPORT** | 4/1/95 | 8/30/95 |
| 51 | SYSTEM ENGINEERING | 4/1/95 | 7/14/95 |
| 52 | ATC CONFIG ECP DEVELOPMENT | 2/8/95 | 4/4/95 |
| 53 | SUBMIT ATC CNFIG ECP | 4/4/95 | 4/4/95 |
| 54 | CORDINATE W/COR WRT GOV EQUIP RELOCATION | 6/12/95 | 6/22/95 |
| 55 | COORDINATE W/COR GOV EQUIP INTERFACE CONFI | 6/19/95 | 6/30/95 |
| 56 | MATERIAL PROCUREMENT | 2/8/95 | 9/29/95 |
| 57 | DMS FACTORY ACCEPTANCE | 2/8/95 | 2/8/95 |
| 58 | INVENTORY EQUIPMENT - DMS | 2/9/95 | 2/10/95 |
| 59 | SET-UP INTEGRATION SYSTEM | 4/28/95 | 4/29/95 |
| 60 | INTEGRATE SOFTWARE | 5/1/95 | 5/4/95 |




Project: ATC - PEARL/CAMP SMITH
Date: 3/30/95

Summary | ISN task | GOV action | Milestone complete | Milestone pending



00102

# ATC SCHEDULE - NTCC PEARL HABOR AND CAMP H.M. SMITH

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 61 | SYSTEMS TRAINING - ISN | 5/3/95 | 5/17/95 |
| 62 | SHIP EQUIPMENT FROM DMS TO HAWAII | 6/12/95 | 6/15/95 |
| 63 | SHIP EQUIPMENT AT ISN TO HAWAII | 6/1/95 | 6/1/95 |
| 64 | | | |
| 65 | **SITE - NTCC PEARL AND CAMP SMITH** | 3/2/95 | 1/21/96 |
| 66 | DEVELOP TSIP SUPPORT DOCUMENTATIOM | 4/15/95 | 5/10/95 |
| 67 | SITE MANAGEMENT/ PRE-INSTALLATION | 5/5/95 | 6/19/95 |
| 68 | RECEIVE/STORE EQUIPMENT - HAWAII | 6/15/95 | 9/29/95 |
| 69 | COMMENCE INSTALLATION | 7/15/95 | 7/15/95 |
| 70 | RELOCATION OF GOV EQUIPMENT | 7/17/95 | 8/18/95 |
| 71 | SET-UP CLASSROOM | 7/3/95 | 7/4/95 |
| 72 | FORMAL TRAINING - PEARL | 7/5/95 | 7/17/95 |
| 73 | FORMAL TRAINING - CAMP SMITH | 7/18/95 | 7/28/95 |
| 74 | CLEAN-UP | 7/18/95 | 12/23/95 |
| 75 | SWITCH/RIU INSTALLATION | 8/1/95 | 8/18/95 |
| 76 | ATC SYS CONFIG VERIFICATION | 8/18/95 | 8/18/95 |
| 77 | ATC SYSTEM TEST | 8/21/95 | 8/22/95 |
| 78 | GOV. APPROVAL FOR CUT-OVER | 8/22/95 | 8/22/95 |
| 79 | COMMENCE CUTOVER | 8/23/95 | 8/23/95 |
| 80 | RE-CONFIG OF GOV EQUIP INTERFACE | 8/23/95 | 11/23/95 |




Project: ATC - PEARL/CAMP SMITH
Date: 3/30/95

Summary | ISN task | GOV action | Milestone complete | Milestone pending



00103

## ATC SCHEDULE - NTCC PEARL HABOR AND CAMP H.M. SMITH

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 81 | CUT-OVER | 8/23/95 | 11/23/95 |
| 82 | CUTOVER COMPLETE | 11/23/95 | 11/23/95 |
| 83 | GOVERNMENT ACCEPTANCE | 11/27/95 | 12/23/95 |
| 84 | ATC INSTALLATION ACCEPTED | 12/23/95 | 12/23/95 |




Project: ATC - PEARL/CAMP SMITH
Date: 3/30/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete

EXHIBIT 25

**Here is what RZ thinks is happening back at the ranch regarding the 1.9M fiasco**

A. Kevin will call CNO to arrange to have no action taken on the letter. Presumably, he will talk to Wiley Cress, or RMCS Eisenman.

B. Kevin will also go to Sandee and her chain (Tom Sutton ?) to have the funding document (that withdraws the 1.9) pulled back.

C. Jeff will:

1. Tell Percy to get the ADP approval ltr into Kevins hands for signature. If Kevin won't sign, he should then take it to Dr. McWilliams for signature. This letter authorizes two sites - Japan & Puerto Rico. We will address impact of this on what Francis is doing in P/R. If this letter is in SEMCOR hands, need to break it loose ASAP.

2. Tell C3 to reduce surveys to include only Japan & Puerto Rico.

3. Tell Roscoe not to sign acceptance on the funding document.

4. Find out what Roscoe's opinion is of doing the surveys in advance of the award to 8A company ??

5. Make sure the letter to be presented to ISN is a rejection letter (versus accepted subject to incorporation of changes). Reasons are deliverable is not in compliance with our last *letter of guidance*, and deliverable is not IAW the contract specifications. (Assume both of these reasons are valid). Note: Kevin will postpone the meeting until Thursday because he has a hard conflict on Wednesday.

6. Get with Ernie to categorize the LANT ANCC Status message contents as follows:

a. New requirement, we were not aware.
b. We were aware, and are correcting.
c. *Out of scope of the contract* - Needs ECP.

Once info is categorized, he should put in EMAIL to Kevin so he will be armed to answer PRR's comments on the message.

D. Regarding funding - Once recovered, the FY-93 1.9 will be used to fund the award of two sites to the 8A. If award is greater than 1.9, then we will use part of the FY-95 700K down at FISK. Remainder of the 700K to be used for production support of the 8A effort.

Thats it......

P.S. Since you told me Sandee has been bugging Roscoe for signature on the withdrawl document, we have to assume that "B" above didn't happen. I have no doubt Ron will call Kevin in the A.M. for an update. In the meantime, ZUJ to ZUJ........JLH

# HAMPTON ROADS

EXHIBIT
26

## TABLE of CONTENTS
## 12 pair cable ecp


| | | |
|---|---|---|
| **RATES** | 1 | Proposed and Provisonal Rates |
| **PROP** | 2 | Summary of the Cost Proposal |
| **ISN_Hrs** | 3 | ISN P M, Site Survey Hours & ECP Prep |
| **EQ_L** | 4 | Major Equipments to be installed |
| **I_Hrs** | 5 | Time required to do Install and cut over |
| **I_Cost** | 6 | Installation Labor Cost |
| **SUM** | 7 | ECP Cost Summary |

# HAMPTON ROADS PROPOSED COST

02-Apr-95 08:43 PM

| Description | COST PROP | total HRS | Prop Total AMT | unburdened | Burdened at ISN Prov Rates | prop-prov DELTA |
|---|---|---|---|---|---|---|
| **Cost Summary ISN** | | | | | | |
| Program Manager | | 627 | 48,761.79 | 21,855.83 | 47,406.46 | 1,355.33 |
| Sr. Systems Engineer | | 627 | 33,111.87 | 14,841.28 | 32,191.52 | 920.34 |
| Site Supervisor | | 160 | 8,692.80 | 3,896.26 | 8,451.19 | 241.62 |
| Systems Engineer | | 627 | 29,224.47 | 13,098.88 | 28,412.17 | 812.29 |
| Eng. Draft | | 227 | 7,302.59 | 3,273.14 | 7,099.62 | 202.98 |
| TOTAL | | 2,268 | 127,093.52 | 56,965.39 | 123,560.96 | 3,532.56 |
| | | G&A | 13,408.37 | | 17,965.76 | (4,557.40) |
| | | Sub total | 140,501.89 | | 141,526.72 | (1,024.83) |
| | | | 11,240.15 | | 14,152.67 | (2,912.52) |
| | Page 33 | Total | 151,742.04 | | 155,679.39 | (3,937.35) |
| **Cost Summary** | | | | | | |
| Site Supervisor | 1,520 | 1,520 | 58,261.60 | 37,010.28 | 65,610.76 | (7,349.17) |
| Senior Tech | 310 | 2,720 | 78,880.00 | 50,107.98 | 88,829.99 | (9,949.99) |
| System Engineer | 40 | 40 | 1,490.40 | 946.76 | 1,678.40 | (188.00) |
| Tech | 0 | 8,320 | 212,576.00 | 135,037.45 | 239,390.51 | (26,814.51) |
| | 1870 | 12,600 | 351,208.00 | 223,102.48 | 395,509.67 | (44,301.67) |
| | | G&A | 37,052.44 | | 57,507.11 | (20,454.66) |
| | | Sub total | 388,260.44 | | 453,016.77 | (64,756.33) |
| | | | 31,060.84 | | 45,301.68 | (14,240.84) |
| | Page 40 | Total | 419,321.28 | | 498,318.45 | (78,997.17) |
| | | **Labor** | 571,063.32 | 280,067.87 | 653,997.84 | (82,934.52) |
| | Page 2 | **Material Dms** | 1,577,532.22 | 1,524,775.00 | 1,921,125.01 | (343,592.80) |
| | | **Material Other** | 118,994.18 | 115,014.67 | 144,911.58 | (25,917.41) |
| | | **Software** | 10,425.66 | 10,077.00 | 12,696.42 | (2,270.75) |
| | | **Travel** | 42,997.24 | 36,012.90 | 45,374.09 | (2,376.85) |
| | | **DMS Subcontract** | 15,521.22 | 13,000.00 | 16,379.22 | (858.00) |
| | | **Shipping** | 1,104.39 | 925.00 | 1,165.44 | (61.05) |
| | | **Insurance** | 3,581.50 | 2,999.73 | 3,779.48 | (197.98) |
| | | **Total ODC's** | 1,770,156.41 | 1,702,804.30 | 2,145,431.25 | |
| | B TABLE | **TOTAL** | 2,341,219.73 | 1,982,872.17 | 2,799,429.09 | (458,209.36) |
| | | **AMT IN B TABLE** | 2,341,219.73 | | | |
| | | **AMT For DIM 414 E** | 91,622.84 | 72,720.00 | 91,622.84 | 0.00 |
| | | TOTAL | 2,432,842.57 | 2,055,592.17 | 2,891,051.93 | (458,209.36) |

* CAN NOT BE DONE IN HOURS ALLOTTED

| **Installation, Relocation & Te** | **QTY** | **HRS** | **TOTAL** | |
|---|---|---|---|---|
| MATRIX Switch | 4 | 4.00 | 16.0 | 294.76 |
| RIU's | 105 | 2.00 | 210.0 | 3,868.77 |
| Ports Cards | 1612 | 0.20 | 322.4 | 5,939.49 |
| Install Racks | 31 | 8.00 | 248.0 | 4,568.84 |
| Install Work Station | 1 | 80.00 | 80.0 | 1,473.82 |
| Install LAN CPU's | 1 | 1.00 | 1.0 | 18.42 |
| Sr. Tech total | | | 877.4 | |
| **Cut Over & Test** | | | | |
| Ports (Tech) | 6130 | 1.25 | 7,662.5 | 124,358.82 |
| Ports (Sr Tech) | 6130 | 0.25 | 1,532.5 | 28,232.83 |
| **6 Pair Cable & Clean Up** | | | | |
| (5% new cable) (Tech) | 307 | 2.15 | 658.98 | 10,694.86 |
| TOTAL | | | 10,731.38 | 179,450.62 |
| | | | 12,601.4 | |

00107

# ISN - PM & ENGINEERING LABOR COST ESTIMATE

**HAMPTON ROADS** 02-Apr-95 08:43 PM

| HAMPTON ROADS | CONTRACT total HRS | CONTRACT total AMT | ECP DELTA HRS | ECP total AMT | |
|---|---|---|---|---|---|
| **Cost Summary** | ATC RATES | | ISN RATES | | |
| Program Manager | 627 | 48,761.79 | 1080 | 81,657.05 | |
| Sr. Systems Engineer | 627 | 33,111.87 | 800 | 41,073.71 | |
| Site Supervisor | 160 | 8,692.80 | ↑ 240 | 12,676.78 | |
| Systems Engineer | 627 | 29,224.47 | ↑ 400 | 18,125.79 | |
| Eng. Draft | 227 | 7,302.59 | 0 ~~480~~ | 15,012.40 | |
| TOTAL | 2,268 | 127,093.52 | 3,000 | 168,545.74 | 77,704.75<br>25.9015827 |
| G & A | | 13,408.37 | | 24,506.55 | |
| Sub total | | 140,501.89 | | 193,052.29 | |
| FEE | | 11,240.15 | | 19,305.23 | |
| Total | | 151,742.04 | | 212,357.52 | |
| | | | | 212,500 | |
| | | | | -125000 | |

# ISN - ECP PREPARATION COST ESTIMATE

| Description | ECP HRS | ECP total AMT |
|---|---|---|
| **ECP PREP Cost Summary** | | |
| Program Manager | 40 | 3,024.34 |
| Sr. Systems Engineer | 80 | 4,107.37 |
| | TOTAL | 7,131.71 |
| | G & A | 1,036.95 |
| | Sub total | 8,168.66 |
| | FEE | 816.87 |
| | Total | 8,985.52 |
| | | 9,000 |

# HAMPTON ROADS EQUIPMENT CONFIGURATION

| PROP QTY | NOMENCLATURE | ECP QTY | PROP -ECP DELTA | |
|---|---|---|---|---|
| 2 | RMSA 100 X | 2 | 0 | |
| 0 | RMSA 200 X | 0 | 0 | |
| 0 | RMSA 500 X | 0 | 0 | |
| 1 | RMSA 4000 X | 1 | 0 | |
| 1 | RMSA 8000 X | 1 | 0 | |
| 103 | RIU 64 X | 81 | 22 | |
| 2 | RIU 32 X | 5 | (3) | |
| 1 | TFOU 8/16 | 1 | 0 | |
| 1 | TATU 2/8 | 1 | 0 | |
| 1515 | DIM 414 E | 976 | 539 | 58,560 |
| 32 | DIX 202 | 0 | 32 | |
| 3 | DIH 264 X | 0 | 3 | |
| 0 | DIH 530 | 70 | (70) | |
| 0 | DCI 402 | 4 | (4) | |
| 0 | DTI 402 | 4 | (4) | |
| 62 | AIM 800 | 152 | (90) | |
| 0 | BTM 2048 | 0 | 0 | |
| 6,690 | PORTS | 5,276 | 1,414 | |
| 1,612 | CARDS | 1,206 | 406 | |

158,280

| Description | | HRS/ QTY. | MIN HRS | total HRS | MAX HRS | total HRS |
|---|---|---|---|---|---|---|
| **Cost Summary** | | | | | | |
| Site Supervisor | A | | | 1,520 | | 1,600 |
| Senior Tech | B | | | 3,697 | | 4,424 |
| System Engineer | C | | | 40 | | 60 |
| Tech | D | | | 21,632 | | 26,380 |
| | | | Total Hrs | 26,889 | | 32,464 |
| **Site Management & 30 Day Acceptance** | | | | | | |
| Site Supervisor | A | 1,520 | | | 1600 | |
| Senior Tech | B | 0 | | | 0 | |
| System Engineer | C | 40 | | | 60 | |
| **Installation, Cabling, Power, GFE Relocation & Test** | | | | | | |
| MATRIX Switch 8/4 | B | 2 | *9.0* | 18.0 | *11.0* | 22.0 |
| MATRIX Switch 500 | B | | *8.0* | 0.0 | *10.0* | 0.0 |
| MATRIX Switch 100 | B | 2 | *7.5* | 15.0 | *9.0* | 18.0 |
| MATRIX Switch 200 | B | 0 | *10.0* | 0.0 | *12.0* | 0.0 |
| RIU 64 | B | 81 | *7.0* | 567.0 | *8.0* | 648.0 |
| RIU 32 | B | 5 | *9.0* | 45.0 | *10.0* | 50.0 |
| Triple Sat Shelf | B | | *10.0* | 0.0 | *12.0* | 0.0 |
| Ports Cards | B | 1,206 | *0.3* | 361.8 | *0.4* | 482.4 |
| Install Racks | B | 31 | *16.0* | 496.0 | *18.0* | 558.0 |
| Install GFE Test E.Q. | B | 2 | *16.0* | 32.0 | *18.0* | 36.0 |
| Install LAN CPU's | B | 1 | *36.0* | 36.0 | *40.0* | 40.0 |
| Install TFOU & TATU | B | 2 | *8.0* | 16.0 | *10.0* | 20.0 |
| **Cut Over & Test** | | | | | | |
| Ports | D | 5,276 | *1.6* | 8,441.6 | *2.0* | 10,552.0 |
| Ports | B | 5,276 | *0.4* | 2,110.4 | *0.5* | 2,638.0 |
| **Cable Removal & Clean Up** | | | | | | |
| Ports | D | 5,276 | *2.5* | 13,190.0 | *3.0* | 15,828.0 |

# HAMPTON ROADS INSTALLATION COST

07-Apr-95 09:39 AM

| Description | Contract HRS | MIN ECP HRS | MIN ECP AMT | MAX ECP HRS | MAX ECP AMT | |
|---|---|---|---|---|---|---|
| | C | E | | H | | |
| **Cost Summary** | | | | | | |
| Site Supervisor | 1,520 | 1,520 | 65,610.76 | 1,600 | 69,063.96 | 38,958.19 |
| Senior Tech | 2,720 | 3,697 | 120,747.91 | 4,424 | 144,497.75 | 81,509.53 |
| System Engineer | 40 | 40 | 1,678.40 | 60 | 2,517.59 | 1,420.15 |
| Tech | 8,320 | 21,632 | 622,368.29 | 26,380 | 758,985.73 | 428,135.17 |
| | | 26,889 | 810,405.37 | 32,464 | 975,065.03 | 550,023.04 |
| | | G&A | 117,832.94 | | 141,774.46 | |
| | | Sub total | 928,238.31 | | 1,116,839.48 | |
| | | Fee | 92,823.83 | | 111,683.95 | |
| | | Total | 1,021,062.14 | | 1,228,523.43 | |

| ECP MIN - Contract HRS | ECP MIN - Contract AMT | ECP MAX - Contract HRS | ECP MAX - Contract AMT |
|---|---|---|---|
| E - C | | H - C | |
| 0 | 0.00 | 80 | 3,453.20 |
| 977 | 31,917.92 | 1,704 | 55,667.75 |
| 0 | 0.00 | 20 | 839.20 |
| 13,311 | 382,977.78 | 18,060 | 519,595.21 |
| 14,288 | 414,895.70 | 19,864 | 579,555.36 |
| G&A | 60,325.83 | | 84,267.35 |
| Sub total | 475,221.54 | | 663,822.71 |
| Fee | 47,522.15 | | 66,382.27 |
| Total | 522,743.69 | | 730,204.98 |

| | |
|---|---|
| Min/Max Avg | 626,474 |
| round up | 730,000 |

# HAMPTON ROADS
## Equipment List
23-Mar-95

| NOMENCLATURE | QTY |
|---|---|
| RMSA 100X | 2 |
| RMSA 4000X | 1✓ |
| RMSA 8000X | 1✓ |
| RIU 64X | 81✓ |
| RIU 32X | 5✓ |
| TFOU 8/16 | 1✓ |
| TATU 2/8 | 1✓ |
| DIM 414 E | 976✓ |
| DIH 530 | 70 |
| DCI 402 | 4✓ |
| DTI 402 | 4✓ |
| AIM 800 | 152✓ |

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 07:56:17 PM
**Subject:** HAMPTON ROADS RQMTS

HAMPTON ROADS

| NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 2 | ~~2~~ 2 | ~~OVERBID BY 1~~ NONE |
| ~~RMSA 200X~~ | ~~0~~ | ~~1~~ | UNDERBID BY ~~1~~ 0 |
| RMSA 500X | 0 | 0 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 1 | 1 | NONE |
| RIU 64X | 103 | ~~84~~ 81 | OVERBID BY ~~19~~ 22 |
| RIU 32X | 2 | ~~10~~ 5 | UNDERBID BY ~~8~~ 3 |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 1515 | ~~978~~ 976 | OVERBID BY ~~537~~ 539 |
| DIX 202 | 32 | 0 | OVERBID BY 32 |
| DIH 264X | 3 | 0 | OVERBID BY 3 |
| DIH 530 | 0 | ~~136~~ 70 | UNDERBID BY ~~136~~ 70 |
| DCI 402 | 0 | 4 | UNDERBID BY 4 |
| DTI 402 | 0 | 4 | UNDERBID BY 4 |
| AIM 800 | 62 | ~~153~~ 152 | UNDERBID BY ~~91~~ 90 |
| ~~BTM 2048~~ | ~~0~~ | ~~2~~ | ~~UNDERBID BY 2~~ |

# CAMP H M SMITH

EXHIBIT 27

## TABLE of CONTENTS
## 12 pair cable ecp


| | | |
|---|---|---|
| **RATES** | 1 | Proposed and Provisonal Rates |
| **PROP** | 2 | Summary of the Cost Proposal |
| **ISN_Hrs** | 3 | ISN P M, Site Survey Hours & ECP Prep |
| **EQ_L** | 4 | Major Equipments to be installed |
| **I_Hrs** | 5 | Time required to do Install and cut over |
| **I_Cost** | 6 | Installation Labor Cost |
| **SUM** | 7 | ECP Cost Summary |

# ISN - PM & ENGINEERING LABOR COST ESTIMATE

**for CAMP SMITH** 07-Apr-95 08:58 AM

| ~~HAMPTON ROADS~~ | CONTRACT total HRS | CONTRACT total AMT | ECP DELTA HRS | ECP total AMT |
|---|---|---|---|---|
| **Cost Summary** | ATC RATES | | ISN RATES | |
| Program Manager | 627 | 48,761.79 | 80 | 6,048.67 |
| Sr. Systems Engineer | 627 | 33,111.87 | 120 | 6,161.06 |
| Site Supervisor | 160 | 8,692.80 | 0 ~~80~~ | 4,225.59 |
| Systems Engineer | 627 | 29,224.47 | 0 ~~80~~ | 3,625.16 |
| Eng. Draft | 227 | 7,302.59 | 0 ~~120~~ | 3,753.10 |
| TOTAL | 2,268 | 127,093.52 | 480 | 23,813.58 |
| G & A | | 13,408.37 | | 3,462.49 |
| Sub total | | 140,501.89 | | 27,276.07 |
| FEE | | 11,240.15 | | 2,727.61 |
| Total | | 151,742.04 | | 30,003.68 |
| | | | | 30,000 |

# ISN - ECP PREPARATION COST ESTIMATE

| Description | ECP HRS | ECP total AMT |
|---|---|---|
| **ECP PREP Cost Summary** | | |
| Program Manager | 20 | 1,512.17 |
| Sr. Systems Engineer | 40 | 2,053.69 |
| | TOTAL | 3,565.85 |
| | G & A | 518.48 |
| | Sub total | 4,084.33 |
| | FEE | 408.43 |
| | Total | 4,492.76 |
| | | 5,000 |

10,978.79
22.8724783

# CAMP SMITH EQUIPMENT CONFIGURATION

| PROP QTY | NOMENCLATURE | ECP QTY | PROP -ECP DELTA | |
|---|---|---|---|---|
| 0 | RMSA 100 X | 0 | 0 | |
| 0 | RMSA 200 X | 0 | 0 | |
| 1 | RMSA 500 X | 1 | 0 | |
| 1 | RMSA 4000 X | 1 | 0 | |
| 0 | RMSA 8000 X | 0 | 0 | |
| 21 | RIU 64 X | 38 | (17) | |
| 0 | RIU 32 X | 0 | 0 | |
| 1 | TFOU 8/16 | 1 | 0 | |
| 1 | TATU 2/8 | 1 | 0 | |
| 280 | DIM 414 E | 242 | 38 | 14,520 |
| 0 | DIX 202 | 0 | 0 | |
| 0 | DIH 264 X | 39 | (39) | |
| 0 | DIH 530 | 0 | 0 | |
| 0 | DCI 402 | 0 | 0 | |
| 0 | DTI 402 | 0 | 0 | |
| 20 | AIM 800 | 33 | (13) | |
| 0 | BTM 2048 | 2 | (2) | |
| 1280 | PORTS | 1,314 | (34) | |
| 300 | CARDS | 316 | (16) | |

39,420

# ECP COST ESTIMATE WORKSHEET

**CAMP H M SMITH** 07-Apr-95 09:52 AM

| Description | | HRS/ QTY. | MIN HRS | total HRS | MAX HRS | total HRS |
|---|---|---|---|---|---|---|
| **Cost Summary** | | | | | | |
| Site Supervisor | A | | | 1,520 | | 1,600 |
| Senior Tech | B | | | 1,219 | | 1,444 |
| System Engineer | C | | | 0 | | 60 |
| Tech | D | | | 5,387 | | 6,570 |
| | | | Total Hrs | 8,127 | | 9,674 |
| **Site Management & 30 Day Acceptance** | | | | | | |
| Site Supervisor | A | 1,520 | | | 1600 | |
| Senior Tech | B | 0 | | | 0 | |
| System Engineer | C | 0 | | | 60 | |
| **Installation, Cabling, Power, GFE Relocation & Test** | | | | | | |
| MATRIX Switch 8/4 | B | 1 | *9.0* | 9.0 | *11.0* | 11.0 |
| MATRIX Switch 500 | B | | *8.0* | 0.0 | *10.0* | 0.0 |
| MATRIX Switch 100 | B | 0 | *7.5* | 0.0 | *9.0* | 0.0 |
| MATRIX Switch 200 | B | 0 | *10.0* | 0.0 | *12.0* | 0.0 |
| RIU 64 | B | 38 | *7.0* | 266.0 | *8.0* | 304.0 |
| RIU 32 | B | 0 | *9.0* | 0.0 | *10.0* | 0.0 |
| Triple Sat Shelf | B | | *10.0* | 0.0 | *12.0* | 0.0 |
| Ports Cards | B | 316 | *0.3* | 94.8 | *0.4* | 126.4 |
| Install Racks | B | 15 | *16.0* | 240.0 | *18.0* | 270.0 |
| Install GFE Test E.Q | B | 2 | *16.0* | 32.0 | *18.0* | 36.0 |
| Install LAN CPU's | B | 1 | *36.0* | 36.0 | *40.0* | 40.0 |
| Install TFOU & TAT | B | 2 | *8.0* | 16.0 | *10.0* | 20.0 |
| **Cut Over & Test** | | | | | | |
| Ports | D | 1,314 | *1.6* | 2,102.4 | *2.0* | 2,628.0 |
| Ports | B | 1,314 | *0.4* | 525.6 | *0.5* | 657.0 |
| **Cable Removal & Clean Up** | | | | | | |
| Ports | D | 1,314 | *2.5* | 3,285.0 | *3.0* | 3,942.0 |

# CAMP H M SMITH INSTALLATION C0ST

07-Apr-95 09:54 AM

| Description | Contract HRS | MIN ECP HRS | MIN ECP AMT | MAX ECP HRS | MAX ECP AMT | |
|---|---|---|---|---|---|---|
| | C | E | | H | | |
| **Cost Summary** | | | | | | |
| Site Supervisor | 840 | 1,520 | 65,610.76 | 1,600 | 69,063.96 | 38,958.19 |
| Senior Tech | 1,000 | 1,219 | 39,824.73 | 1,444 | 47,173.07 | 26,609.79 |
| System Engineer | 0 | 0 | 0.00 | 60 | 2,517.59 | 1,420.15 |
| Tech | 1,600 | 5,387 | 155,002.26 | 6,570 | 189,027.15 | 106,628.05 |
| | | 8,127 | 260,437.76 | 9,674 | 307,781.78 | 173,616.18 |
| | | G&A | 37,867.65 | | 44,751.47 | |
| | | Sub total | 298,305.41 | | 352,533.25 | |
| | | Fee | 29,830.54 | | 35,253.33 | |
| | | Total | 328,135.95 | | 387,786.58 | |

| | ECP MIN - Contract HRS | ECP MIN - Contract AMT | ECP MAX - Contract HRS | ECP MAX - Contract AMT |
|---|---|---|---|---|
| | E - C | | H - C | |
| | 680 | 29,352.18 | 760 | 32,805.38 |
| | 219 | 7,165.45 | 444 | 14,513.79 |
| | 0 | 0.00 | 60 | 2,517.59 |
| | 3,787 | 108,966.82 | 4,970 | 142,991.70 |
| | 4,687 | 145,484.45 | 6,234 | 192,828.47 |
| | G&A | 21,153.44 | | 28,037.26 |
| | Sub total | 166,637.89 | | 220,865.72 |
| | Fee | 16,663.79 | | 22,086.57 |
| | Total | 183,301.67 | | 242,952.30 |
| Min/Max Avg | | | | 213,127 |
| round up | | | | 245,000 |

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 07:45:20 PM
**Subject:** CAMP SMITH RQMTS

CAMP SMITH

| NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 0 | 0 | NONE |
| RMSA 200X | 0 | 0 | NONE |
| RMSA 500X | 1 | 1 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 0 | 0 | NONE |
| RIU 64X | 21 | 38 | UNDERBID BY 17 |
| RIU 32X | 0 | 0 | NONE |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 280 | 242 – 38 | OVERBID BY 38 |
| DIX 202 | 0 | 0 | NONE |
| DIH 264X | 0 | 39 | UNDERBID BY 39 |
| DIH 530 | 0 | 0 | NONE |
| DCI 402 | 0 | 0 | NONE |
| DTI 402 | 0 | 0 | NONE |
| AIM 800 | 20 | 33 | UNDERBID BY 13 14 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 2 |

16 More Cards

# MAKALAPA

EXHIBIT
28

## TABLE of CONTENTS
## 12 pair cable ecp


| | | |
|---|---|---|
| **RATES** | 1 | Proposed and Provisonal Rates |
| **PROP** | 2 | Summary of the Cost Proposal |
| **ISN_Hrs** | 3 | ISN P M, Site Survey Hours & ECP Prep |
| **EQ_L** | 4 | Major Equipments to be installed |
| **I_Hrs** | 5 | Time required to do Install and cut over |
| **I_Cost** | 6 | Installation Labor Cost |
| **SUM** | 7 | ECP Cost Summary |

# MAKALAPA PROPOSED COST

02-Apr-95 08:43 PM

| Camp Smith Description | | COST PROP | total HRS | Prop Total AMT | unburdened | Burdened at ISN Prov Rates | prop-prov DELTA |
|---|---|---|---|---|---|---|---|
| **Cost Summary ISN** | | | | | | | |
| Program Manager | | | 627 | 48,761.79 | 21,855.83 | 47,406.46 | 1,355.33 |
| Sr. Systems Engineer | | | 627 | 33,111.87 | 14,841.28 | 32,191.52 | 920.34 |
| Site Supervisor | | | 160 | 8,692.80 | 3,896.26 | 8,451.19 | 241.62 |
| Systems Engineer | | | 627 | 29,224.47 | 13,098.88 | 28,412.17 | 812.29 |
| Eng. Draft | | | 227 | 7,302.59 | 3,273.14 | 7,099.62 | 202.98 |
| TOTAL | | | 2,268 | 127,093.52 | 56,965.39 | 123,560.96 | 3,532.56 |
| | | | G&A | 13,408.37 | | 17,965.76 | (4,557.40) |
| | | | Sub total | 140,501.89 | | 141,526.72 | (1,024.83) |
| | | | | 11,240.15 | | 14,152.67 | (2,912.52) |
| | Page 33 | | Total | 151,742.04 | | 155,679.39 | (3,937.35) |
| **Cost Summary Camp Smith** | | | | | | | |
| Site Supervisor | | 1,000 | 1,000 | 38,330.00 | 24,348.87 | 43,164.98 | (4,834.98) |
| Senior Tech | | 372 | 1,160 | 33,644.14 | 21,372.21 | 37,888.04 | (4,243.90) |
| System Engineer | | 0 | 0 | 0.00 | 0.00 | 0.00 | 0.00 |
| Tech | | (151) | 2,240 | 57,227.84 | 36,353.59 | 64,446.61 | (7,218.77) |
| | | 1221.1 | 4,400 | 129,201.98 | 82,074.67 | 145,499.62 | (16,297.64) |
| | | | G&A | 13,630.81 | | 21,155.64 | (7,524.84) |
| | | | Sub total | 142,832.78 | | 166,655.27 | (23,822.48) |
| | | | | 11,426.62 | | 16,665.53 | (5,238.90) |
| | Page 40 | | Total | 154,259.41 | | 183,320.79 | (29,061.38) |

| | | | Prop Total AMT | unburdened | Burdened at ISN Prov Rates | prop-prov DELTA |
|---|---|---|---|---|---|---|
| | | **Labor** | 306,001.45 | 139,040.06 | 339,000.18 | (32,998.74) |
| | Page 2 | **Material Dms** | 460,371.14 | 444,975.00 | 560,641.80 | (100,270.67) |
| | | **Material Other** | 71,818.75 | 69,416.92 | 87,461.15 | (15,642.41) |
| NMS 8000 software NOT included in Pro | | **Software** | 10,109.08 | 9,771.00 | 12,310.87 | (2,201.80) |
| | | **Travel** | 61,385.65 | 51,414.35 | 64,779.00 | (3,393.35) |
| | | **DMS Subcontract** | 15,521.22 | 13,000.00 | 16,379.22 | (858.00) |
| | | **Shipping** | 7,759.42 | 6,499.00 | 8,188.35 | (428.93) |
| | | **Insurance** | 893.46 | 748.33 | 942.85 | (49.39) |
| | | **Total ODC's** | 627,858.70 | 595,824.60 | 750,703.25 | |
| | B TABLE | **TOTAL** | 933,860.15 | 734,864.66 | 1,089,703.43 | (155,843.28) |
| | | **AMT IN B TABLE** | 933,860.16 | | | |
| | | **AMT For DIM 414 E** | 22,013.67 | 17,472.00 | 22,013.67 | 0.00 |
| | | TOTAL | 955,873.83 | 752,336.66 | 1,111,717.10 | (155,843.27) |

* CAN NOT BE DONE IN HOURS ALLOTTED

| **Installation & Test** | QTY | HRS | TOTAL | |
|---|---|---|---|---|
| MATRIX Switch | 2 | 4.00 | 8.0 | 147.38 |
| RIU's | 29 | 2.00 | 58.0 | 1,068.52 |
| Ports Cards | 403 | 0.20 | 80.6 | 1,484.87 |
| Install Racks | 15 | 8.00 | 120.0 | 2,210.73 |
| Install Work Station | 1 | 80.00 | 80.0 | 1,473.82 |
| Install LAN CPU's | 1 | 1.00 | 1.0 | 18.42 |
| Sr. Tech total | | | 347.6 | |
| **Cut Over & Test** | | | | |
| Ports (Tech) | 1762 | 1.25 | 2,202.5 | 35,745.55 |
| Ports (Sr Tech) | 1762 | 0.25 | 440.5 | 8,115.21 |
| **6 Pair Cable & Clean Up** | | | | |
| (5% new cable) (Tech) | 88 | 2.15 | 189.42 | 3,074.12 |
| TOTAL | | | 3,180.02 | 53,338.63 |
| | | | 4,401.1 | |

# ISN - PM & ENGINEERING LABOR COST ESTIMATE

07-Apr-95 09:22 AM

| M HAKALAPA | CONTRACT total HRS | CONTRACT total AMT | ECP DELTA HRS | ECP total AMT | |
|---|---|---|---|---|---|
| **Cost Summary** | ATC RATES | | ISN RATES | | |
| Program Manager | 627 | 48,761.79 | 80 | 6,048.67 | |
| Sr. Systems Engineer | 627 | 33,111.87 | 120 | 6,161.06 | |
| Site Supervisor | 160 | 8,692.80 | ~~80~~ | 4,225.59 | |
| Systems Engineer | 627 | 29,224.47 | ~~80~~ | 3,625.16 | |
| Eng. Draft | 227 | 7,302.59 | ~~120~~ | 3,753.10 | |
| TOTAL | 2,268 | 127,093.52 | 480 | 23,813.58 | 10,978.79<br>22.8724783 |
| G & A | | 13,408.37 | | 3,462.49 | |
| Sub total | | 140,501.89 | | 27,276.07 | |
| FEE | | 11,240.15 | | 2,727.61 | |
| Total | | 151,742.04 | | 30,003.68 | |
| | | | | 30,000 | |

# ISN - ECP PREPARATION COST ESTIMATE

**MAKALAPA**

| Description | ECP HRS | ECP total AMT |
|---|---|---|
| **ECP PREP Cost Summary** | | |
| Program Manager | 20 | 1,512.17 |
| Sr. Systems Engineer | 40 | 2,053.69 |
| TOTAL | | 3,565.85 |
| G & A | | 518.48 |
| Sub total | | 4,084.33 |
| FEE | | 408.43 |
| Total | | 4,492.76 |
| | | 5,000 |

# MAKALAPA EQUIPMENT CONFIGURATION

| PROP QTY | CAMP SMITH NOMENCLATURE | ECP QTY | PROP -ECP DELTA | |
|---|---|---|---|---|
| 0 ✓ | RMSA 100 X | 0 | 0 | |
| 0 X | RMSA 200 X | 0 | 0 | |
| 1 ✓ | RMSA 500 X | 1 | 0 | |
| 1 ✓ | RMSA 4000 X | 1 | 0 | |
| 0 ✓ | RMSA 8000 X | 0 | 0 | |
| 29 ✓ | RIU 64 X | 37 | (8) | |
| 0 ✓ | RIU 32 X | 0 | 0 | |
| 1 ✓ | TFOU 8/16 | 1 | 0 | |
| 1 ✓ | TATU 2/8 | 1 | 0 | |
| 364 ✓ | DIM 414 E | 312 | 52 | 18,720 |
| 0 | DIX 202 | 0 | 0 | |
| 1 ✓ | DIH 264 X | 30 | (29) | |
| 0 | DIH 530 | 0 | 0 | |
| 0 | DCI 402 | 0 | 0 | |
| 0 | DTI 402 | 0 | 0 | |
| 38 ✓ | AIM 800 | 35 | 3 | |
| 0 | BTM 2048 | 2 | (2) | |
| 1762 | PORTS | 1,592 | 170 | |
| 403 | CARDS | 379 | 24 | |

# ECP COST ESTIMATE WORKSHEET

**MAKALAPA** 07-Apr-95 09:22 AM

| Description | | HRS/ QTY. | MIN HRS | total HRS | MAX HRS | total HRS |
|---|---|---|---|---|---|---|
| **Cost Summary** | | | | | | |
| Site Supervisor | A | | | 1,520 | | 1,600 |
| Senior Tech | B | | | 1,351 | | 1,601 |
| System Engineer | C | | | 0 | | 60 |
| Tech | D | | | 6,527 | | 7,960 |
| | | | Total Hrs | 9,398 | | 11,221 |
| **Site Management & 30 Day Acceptance** | | | | | | |
| Site Supervisor | A | 1,520 | | | 1600 | |
| Senior Tech | B | 0 | | | 0 | |
| System Engineer | C | 0 | | | 60 | |
| **Installation, Cabling, Power, GFE Relocation & Test** | | | | | | |
| MATRIX Switch 8/4 | B | 1 | *9.0* | 9.0 | *11.0* | 11.0 |
| MATRIX Switch 500 | B | 1 | *8.0* | 8.0 | *10.0* | 10.0 |
| MATRIX Switch 100 | B | 0 | *7.5* | 0.0 | *9.0* | 0.0 |
| MATRIX Switch 200 | B | 0 | *10.0* | 0.0 | *12.0* | 0.0 |
| RIU 64 | B | 37 | *7.0* | 259.0 | *8.0* | 296.0 |
| RIU 32 | B | 0 | *9.0* | 0.0 | *10.0* | 0.0 |
| Ports Cards | B | 379 | *0.3* | 113.7 | *0.4* | 151.6 |
| Install Racks | B | 15 | *16.0* | 240.0 | *18.0* | 270.0 |
| Install GFE Test E.Q. | B | 2 | *16.0* | 32.0 | *18.0* | 36.0 |
| Install LAN CPU's | B | 1 | *36.0* | 36.0 | *40.0* | 40.0 |
| Install TFOU & TATU | B | 2 | *8.0* | 16.0 | *10.0* | 20.0 |
| **Cut Over & Test** | | | | | | |
| Ports | D | 1,592 | *1.6* | 2,547.2 | *2.0* | 3,184.0 |
| Ports | B | 1,592 | *0.4* | 636.8 | *0.5* | 796.0 |
| **Cable Removal & Clean Up** | | | | | | |
| Ports | D | 1,592 | *2.5* | 3,980.0 | *3.0* | 4,776.0 |

# MAKALAPA INSTALLATION COST ESTIMATE

07-Apr-95 09:57 AM

| Description | Contract HRS | MIN ECP HRS | MIN ECP AMT | MAX ECP HRS | MAX ECP AMT | |
|---|---|---|---|---|---|---|
| | C | E | | H | | |
| **Cost Summary** | | | | | | |
| Site Supervisor | 1,000 | 1,520 | 65,610.76 | 1,600 | 69,063.96 | 38,958.19 |
| Senior Tech | 1,160 | 1,351 | 44,106.37 | 1,601 | 52,274.45 | 29,487.42 |
| System Engineer | 0 | 0 | 0.00 | 60 | 2,517.59 | 1,420.15 |
| Tech | 2,240 | 6,527 | 187,795.74 | 7,960 | 229,019.20 | 129,187.11 |
| | | 9,398 | 297,512.87 | 11,221 | 352,875.21 | 199,052.87 |
| | | G&A | 43,258.37 | | 51,308.05 | |
| | | Sub total | 340,771.24 | | 404,183.26 | |
| | | Fee | 34,077.12 | | 40,418.33 | |
| | | Total | 374,848.37 | | 444,601.59 | |

| ECP MIN - Contract HRS | ECP MIN - Contract AMT | ECP MAX - Contract HRS | ECP MAX - Contract AMT |
|---|---|---|---|
| E - C | | H - C | |
| 520 | 22,445.79 | 600 | 25,898.99 |
| 190 | 6,218.33 | 441 | 14,386.42 |
| 0 | 0.00 | 60 | 2,517.59 |
| 4,287 | 123,349.13 | 5,720 | 164,572.59 |
| 4,998 | 152,013.25 | 6,821 | 207,375.59 |
| G&A | 22,102.73 | | 30,152.41 |
| Sub total | 174,115.98 | | 237,528.00 |
| Fee | 17,411.60 | | 23,752.80 |
| Total | 191,527.57 | | 261,280.79 |

| | |
|---|---|
| Min/Max Avg | 226,404 |
| round up | 260,000 |

# MAKALAPA INSTALLATION COST ESTIMATE

07-Apr-95 09:57 AM

| Description | Contract HRS | MIN ECP HRS | MIN ECP AMT | MAX ECP HRS | MAX ECP AMT |
|---|---|---|---|---|---|
| | C | E | | H | |
| **Cost Summary** | | | | | |
| Site Supervisor | 1,000 | 1,520 | 65,610.76 | 1,600 | 69,063.96 |
| Senior Tech | 1,160 | 1,351 | 44,106.37 | 1,601 | 52,274.45 |
| System Engineer | 0 | 0 | 0.00 | 60 | 2,517.59 |
| Tech | 2,240 | 6,527 | 187,795.74 | 7,960 | 229,019.20 |
| | | 9,398 | 297,512.87 | 11,221 | 352,875.21 |
| | | G&A | 43,258.37 | | 51,308.05 |
| | | Sub total | 340,771.24 | | 404,183.26 |
| | | Fee | 34,077.12 | | 40,418.33 |
| | | Total | 374,848.37 | | 444,601.59 |

| | ECP MIN - Contract HRS | ECP MIN - Contract AMT | ECP MAX - Contract HRS | ECP MAX - Contract AMT |
|---|---|---|---|---|
| | E - C | | H - C | |
| | 520 | 22,445.79 | 600 | 25,898.99 |
| | 190 | 6,218.33 | 441 | 14,386.42 |
| | 0 | 0.00 | 60 | 2,517.59 |
| | 4,287 | 123,349.13 | 5,720 | 164,572.59 |
| | 4,998 | 152,013.25 | 6,821 | 207,375.59 |
| | G&A | 22,102.73 | | 30,152.41 |
| | Sub total | 174,115.98 | | 237,528.00 |
| | Fee | 17,411.60 | | 23,752.80 |
| | Total | 191,527.57 | | 261,280.79 |

| | |
|---|---|
| Min/Max Avg | 226,404 |
| round up | 260,000 |

**To:** Ernie Flores
**cc:** Stephen Lord
**From:** Jim Williams
**Date:** 03/20/95 07:59:43 PM
**Subject:** PEARL HARBOR RQMTS

| PEARL HARBOR NOMENCLATURE | BAFO BID | QUANTITY REQUIRED | DIFFERENCE |
|---|---|---|---|
| RMSA 100X | 0 | 0 | NONE |
| RMSA 200X | 0 | 0 | NONE |
| RMSA 500X | 1 | 1 | NONE |
| RMSA 4000X | 1 | 1 | NONE |
| RMSA 8000X | 0 | 0 | NONE |
| RIU 64X | 29 | 37 | UNDERBID BY 8 |
| RIU 32X | 0 | 0 | NONE |
| TFOU 8/16 | 1 | 1 | NONE |
| TATU 2/8 | 1 | 1 | NONE |
| DIM 414E | 364 | 312 | OVERBID BY 52 |
| DIX 202 | 0 | 0 | NONE |
| DIH 264X | 1 | 30 | UNDERBID BY 29 |
| DIH 530 | 0 | 0 | NONE |
| DCI 402 | 0 | 0 | NONE |
| DTI 402 | 0 | 0 | NONE |
| AIM 800 | 38 | 35 | OVERBID BY 3 |
| BTM 2048 | 0 | 2 | UNDERBID BY 2 |

ISN®

EXHIBIT 29

21 April 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffrey Bergdahl, COR

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Engineering 12 Pair Cable Change Proposal (ECP) CDRL Item C003

**ENCLOSURE:** (1) HAMPTON ROADS ECP COST ANALYSIS

(2) PROGRAM SCHEDULE

This letter ECP for ATC Contract N00600-94-C-0389 proposes modifications for 12 pair cabling on all digital interfaces and increasing the Novell Netware 3.11 SFT-III from 25 to 50 users at NTCC Hampton Roads, Virginia.

Direction and guidance provided by the Government during the development of this ECP has been incorporated. Total additional cost consideration of this ECP is $999,206. The Handbook of Electronics Industry Cost Estimating Data was used as a guide in validating the cost estimates for this ECP.

Enclosure (1) provides an overall cost breakdown by description categories, total cost, cost in contract, and the cost of the ECP. Enclosure (2) contains revised CDRL Items delivery dates and a general implementation schedule for NTCC Hampton Roads. The major schedule impact is extension of the cut-over phase from six months to nine months to accommodate the added labor for installation of 12 Pair Cable.

The requirement for 12-pair cabling vice the original RFP requirement for 6-pair cabling for all digital interfaces presents the following considerations; ISN's proposal anticipated a 95% re-use of existing 6-pair cable and terminal equipment connectors, the cost to procure the 12-pair MIL-SPEC cable and additional terminal equipment connectors, and the increased labor costs to install and terminate 12-pair cabling including grounding not currently required to support wiring requirements. This ECP covers all costs associated with the 12-pair cable requirements with the exception of high cost Cannon connectors. ISN will attempt to re-use terminal equipment Cannon connectors were practical, and will submit an on-site installation ECP for high cost Cannon connectors that are determined to be non-usable. ISN anticipates very few, if any, new cannon connectors being required. During research of MIL-SPEC 12-pair cable, it was discovered that the MIL-SPEC Cable did not meet Plenum requirements and Plenum cable costs have not been considered under this ECP. Government guidance was to install the MIL-SPEC (Non-Plenum) cables. ISN will install all Non-Plenum cable unless otherwise directed. Use of Non-Plenum cable appears to be consistent with installation practices current in use at NTCC Hampton Roads.

00130

The requirement to increase Novell Netware 3.11 SFT-III from 25 to 50 users is to insure compliance with software licensing requirements and to allow future connection growth to the ATC LAN for additional workstations (locally or remotely).

Request this ECP and enclosures be reviewed and approved. This ECP meets all current contractual requirements but modifies the scope of the requirements. ISN recommends that the NAVY take advantage of the modifications contained in this ECP as a cost saving measure for the future. ISN requests conformation of approval for this ECP as soon as possible.

Sincerely,

William N.L. Robertson

ATC Program Manager
Information Systems and Networks Corp.

# HAMPTON ROADS ECP

| DESCRIPTION | TOTAL COST | COST in CONTRACT | COST of ECP |
|---|---|---|---|
| **LABOR** | | | |
| ECP Prep | 9,000 | 0 | 9,000 |
| Program Management & Engineerin | 239,242 | 151,742 | 87,500 |
| Installation, Cut Over & 12 Pair Cab | 1,108,321 | 419,321 | 689,000 |
| **MATERIAL** | | | |
| Hardware & Software | 1,577,532 | 1,577,532 | 0 |
| NOVEL Fifty user | 3,706 | | 3,706 |
| 12 Pair Cable & Conn | 150,000 | | 20K← 150,000 |
| **ODC'S** | 13,581 | 3,581 | 75K← 10,000 |
| **TOTAL CLIN 0001AA** | 3,101,383 | 2,152,177 | 949,206 |
| **CDRL's CLIN 0003** | 388,457 | 338,457 | 50,000 |
| **TOTAL CLIN's 0001AA & 0003** | 3,489,840 | 2,490,634 | 999,206 |

21-Apr-95 10:07 AM

999,206
785 206
214 000
130 000
184 000
2 500
81 500
37 500
44,000

ENCLOSURE 1

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 1 | | | |
| 2 | **CDRL DEVELOPMENT** | 12/1/94 | 7/11/96 |
| 3 | CDRL G001 GOV CMNTS PASS DUE | 1/16/94 | 1/16/94 |
| 4 | CDRL E002 GOV CMNTS PASS DUE | 12/5/94 | 12/5/94 |
| 5 | CDRL D002 GOV CMNTS PASS DUE | 12/6/94 | 12/6/94 |
| 6 | MGT PLAN CDRL A001 GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 7 | REVIEW GOV CMNTS CDRL A001 | 3/23/95 | 4/6/95 |
| 8 | RE-SUBMIT CDRL A001 | 4/6/95 | 4/6/95 |
| 9 | TRAINING PLAN - CDRL F001 | 2/6/95 | 2/17/95 |
| 10 | SUBMIT CDRL F001 | 2/17/95 | 2/17/95 |
| 11 | GOV REVIEW CDRL F001 | 2/17/95 | 3/17/95 |
| 12 | GOV CMNTS CDRL F001 RCV'ED | 3/28/95 | 3/28/95 |
| 13 | REVIEW GOV CMNTS CDRL F001 | 4/4/95 | 4/13/95 |
| 14 | RE-SUBMIT CDRL F001 | 4/13/95 | 4/13/95 |
| 15 | SYS TEST/VER PLN CDRL G002 | 2/6/95 | 2/28/95 |
| 16 | SUBMIT CDRL G002 | 2/28/95 | 2/28/95 |
| 17 | GOV REVIEW CDRL G002 | 2/28/95 | 3/28/95 |
| 18 | LESSON PLAN - CDRL F002 | 4/12/95 | 5/15/95 |
| 19 | SUBMIT CDRL FOO2 | 5/15/95 | 5/15/95 |
| 20 | GOV REVIEW CDRL F002 | 5/15/95 | 6/15/95 |




Project: ATC - HAMPTON ROADS
Date: 4/21/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete

Enclosure 2 1

00133

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 21 | SS H.R. CDRL B001 GOV CMNTS REV'ED | 2/27/95 | 2/27/95 |
| 22 | REVIEW GOV CMNTS CDRL B001 | 3/3/95 | 3/20/95 |
| 23 | RE-SUBMIT CDRL B001 | 3/20/95 | 3/20/95 |
| 24 | GOV CMNT CDRL C001 RCV'ED | 2/27/95 | 2/27/95 |
| 25 | REVIEW GOV CMNTS CDRL C001 | 4/3/95 | 4/20/95 |
| 26 | RE-SUBMIT CDRL C001 | 4/20/95 | 4/20/95 |
| 27 | GOV CMNT CDRL C002 RCV'ED | 3/23/95 | 3/23/95 |
| 28 | REVIEW GOV CMNTS CDRL C002 | 4/10/95 | 4/27/95 |
| 29 | RE-SUBMIT CDRL C002 | 4/27/95 | 4/27/95 |
| 30 | TSIP H.R. CDRL B002 GOV CMNTS RCV'ED | 2/27/95 | 2/27/95 |
| 31 | COMMENTS REVIEW CDRL B002 | 3/1/95 | 4/4/95 |
| 32 | RE-SUBMIT CDRL B002 | 4/4/95 | 4/4/95 |
| 33 | GOV CMNTS CDRL E001 ISP RCV'ED | 2/27/95 | 2/27/95 |
| 34 | COMMENTS REVIEW CDRL E001 | 4/4/95 | 4/12/95 |
| 35 | RE-SUBMIT CDRL E001 | 4/12/95 | 4/12/95 |
| 36 | TRAINEE GUIDE CDRL F003 | 5/16/95 | 6/16/95 |
| 37 | SUBMIT CDRL F003 | 6/16/95 | 6/16/95 |
| 38 | GOV REVIEW CDRL F003 | 6/16/95 | 7/18/95 |
| 39 | SPARE PARTS LIST CDRL E003 - ALL SITES | 4/5/95 | 4/17/95 |
| 40 | SUBMIT CDRL E003 | 4/17/95 | 4/17/95 |




Project: ATC - HAMPTON ROADS
Date: 4/21/95

Summary — GOV action — Milestone pending ◇

ISN task — Milestone complete ◆

Enclosure 2 2

U00134

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 41 | GOV REVIEW CDRL E003 | 4/14/95 | 5/15/95 |
| 42 | OJT HANDBOOK CDRL F004 | 6/19/95 | 7/6/95 |
| 43 | SUBMIT CDRL F004 | 7/6/95 | 7/6/95 |
| 44 | GOV REVIEW CDRL FOO4 | 7/5/95 | 8/3/95 |
| 45 | SOFTWARE USERS MANUAL CDRL D003 | 5/10/95 | 5/29/95 |
| 46 | SUBMIT CDRL D003 | 5/29/95 | 5/29/95 |
| 47 | GOV REVIEW CDRL D003 | 5/29/95 | 6/29/95 |
| 48 | TEST PROCEDURES CDRL G003 | 4/20/95 | 5/31/95 |
| 49 | SUBMIT CDRL G003 | 5/31/95 | 5/31/95 |
| 50 | GOV REVIEW CDRL GOO3 | 5/31/95 | 6/29/95 |
| 51 | JOB MANUAL - H.R. CDRL D006 | 3/4/96 | 5/3/96 |
| 52 | SUBMIT CDRL D006 | 5/3/96 | 5/3/96 |
| 53 | GOV REVIEW CDRL D006 | 11/30/95 | 12/29/95 |
| 54 | TEST REPORT CDRL G004 | 6/10/96 | 7/11/96 |
| 55 | SUBMIT CDRL G004 | 7/11/96 | 7/11/96 |
| 56 | | | |
| 57 | ENGINEERING/TECH SUPPORT | 2/7/95 | 8/30/95 |
| 58 | SYSTEM ENGINEERING | 2/6/95 | 6/15/95 |
| 59 | ATC CONFIG ECP DEVELOPMENT | 2/6/95 | 4/4/95 |
| 60 | SUBMIT ATC CONFIG ECP | 4/20/95 | 4/20/95 |




Project: ATC - HAMPTON ROADS
Date: 4/21/95

Summary | GOV action | Milestone pending
ISN task | Milestone complete

Enclosure 2 3

00135

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 61 | CORDINATE W/COR WRT EQUIP RELOCATION | 4/25/95 | 5/3/95 |
| 62 | COORDINATE W/COR EQUIP INTERFACE CONFIG | 5/1/95 | 5/15/95 |
| 63 | MATERIAL PROCUREMENT | 2/6/95 | 8/31/95 |
| 64 | DMS FACTORY ACCEPTANCE | 2/8/95 | 2/8/95 |
| 65 | INVENTORY EQUIPMENT - DMS | 2/9/95 | 2/10/95 |
| 66 | SHIP EQUIPMENT FROM DMS TO ISN | 4/17/95 | 6/30/95 |
| 67 | RECEIVE DMS EQUIPMENT- ISN | 4/17/95 | 4/25/95 |
| 68 | SET-UP INTEGRATION SYSTEM | 4/26/95 | 4/27/95 |
| 69 | INTEGRATE SOFTWARE | 4/28/95 | 5/2/95 |
| 70 | SYSTEMS TRAINING - ISN | 5/3/95 | 5/17/95 |
| 71 | SHIP EQUIPMENT AT ISN TO HR | 5/18/95 | 5/18/95 |
| 72 | | | |
| 73 | **SITE - NTCC HAMPTON ROADS VA** | 3/1/95 | 6/14/96 |
| 74 | DEVELOP TSIP SUPPORT DOCUMENTATIOM | 3/1/95 | 3/27/95 |
| 75 | SITE MANAGEMENT/ PRE-INSTALLATION | 3/15/95 | 5/20/95 |
| 76 | RECEIVE/STORE EQUIPMENT - H.R. | 5/2/95 | 12/29/95 |
| 77 | COMMENCE INSTALLATION | 6/2/95 | 6/2/95 |
| 78 | RELOCATION OF GOV EQUIPMENT | 6/2/95 | 8/2/95 |
| 79 | SET-UP CLASSROOM | 7/18/95 | 7/19/95 |
| 80 | FORMAL TRAINING | 7/20/95 | 8/1/95 |




Project: ATC - HAMPTON ROADS
Date: 4/21/95

Summary | ISN task | GOV action | Milestone complete | Milestone pending

Enclosure 2 4

00136

# ATC SCHEDULE - NTCC HAMPTON ROADS VA

| ID | Task Name | Start | Finish |
|---|---|---|---|
| 81 | CLEAN-UP | 6/15/95 | 6/14/96 |
| 82 | SWITCH/RIU INSTALLATION | 6/15/95 | 8/1/95 |
| 83 | ATC SYS CONFIG VERIFICATION | 8/2/95 | 8/2/95 |
| 84 | ATC SYSTEM TEST | 8/3/95 | 8/4/95 |
| 85 | GOV. APPROVAL FOR CUT-OVER | 8/4/95 | 8/4/95 |
| 86 | COMMENCE CUTOVER | 8/7/95 | 8/7/95 |
| 87 | RE-CONFIG OF GOV EQUIP INTERFACE | 8/7/95 | 5/7/96 |
| 88 | CUT-OVER | 8/7/95 | 5/7/96 |
| 89 | CUTOVER COMPLETE | 5/7/96 | 5/7/96 |
| 90 | GOVERNMENT ACCEPTANCE | 5/8/96 | 6/7/96 |
| 91 | ATC INSTALLATION ACCEPTED | 6/7/96 | 6/7/96 |




Project: ATC - HAMPTON ROADS
Date: 4/21/95

Summary — ISN task — GOV action — Milestone complete — Milestone pending

Enclosure 2 5

00137

EXHIBIT 30

ISN

Information Systems & Networks Corporation - 10411 Motor City Drive, Bethesda, Maryland 20817 - (301) 469-0400

25 May 1995

Space and Naval Warfare Systems Command
2451 Crystal Drive
Arlington, Virginia 22245-5200

**ATTENTION:** Jeffrey Bergdahl

**REFERENCE:** Contract Number N00600-94-C-0389

**SUBJECT:** Submittal of Contract Data Requirement List (CDRL) Item B002, Telecommunications System Installation Plan (TSIP), NTCC Hampton Roads, Virginia

In accordance with the approach agreed upon during the Technical meeting held on 22 May 1995, enclosed is the Telecommunications System Installation Plan (TSIP), NTCC Hampton Roads, Virginia and Appendix A, Section HRA for review and approval. Sections HRB and HRC of Appendix A will be modified and submitted subsequent to approval of CDRL B002 and Appendix A, Section HRA.

This document includes the DMS DM-414E interface card, Novell Netware for fifty Users, twelve pair cabling requirements and modification to the ATC configuration to more closely conform to the current Government equipment configuration at each site. An ECP was previously submitted concerning the DMS DM-414E interface card. This ECP is pending approval by the Government. ISN submitted an ECP on 7 April 1995 addressing the Government requirement for all digital circuits to be cabled using twelve pair cable and Novell Netware for fifty Users. The Government has since decreased the magnitude of requirement for use of 12 pair cable. ISN is currently reviewing and developing an ECP for submission to the government concerning the use of twelve pair cable for limited and specific equipment applications. ISN has not changed the drawings depicting twelve pair cable and will insure as built diagrams proper reflect the actual type of cabling installed. An ECP was submitted on 18 April 1995 to modify the ATC configuration to more closely conform to the Government equipment configuration at each of the contractual sites. The ECP resulted from Government direction provided by SPAWAR 2300, SER PMW-172-22C/042, dated 24 January 1995 and a subsequent Contract meeting held on 21 March 1995. This ECP is pending approval by the Government.

It is foreseeable that ATC configuration changes will occur during the installation. ISN will insure all changes are approved by contractually authorized Government Representatives and documented. Additionally, ISN recognizes that to produce an accurate final site document (as builts) for the ATC Installation will require ISN to perform a detailed configuration verification during the 30 day period of Government Acceptance Testing.

A Technical Working Group Meeting to discuss this document was held on the 22nd of May, 1995. Representatives from ISN, SPAWAR, NISE EAST DET NORFOLK, NTCC HA MPTON ROADS VA, and supporting Government Contractors attended. The following issues were resolved and corrective actions mutually agreed upon by ISN and the Government;

- Update the Existing and Future Floor Plan, HRA sheets 1 and 2 of B002, to incorporate recently received site alterations and requirement modifications from the Government
- Rotate the Test Bay/printer layout 90 degrees clockwise (HRA sheet 2)
- Not to use as originally agreed Bays J8 and J9 or the K Row for ATC equipment. ISN will research and propose new locations for affected subject ATC equipment.
- Relocate the Black RMSA switch units from J Row to F Row
- ISN will coordinate with the designated Technical Assistant (T/A) for NTCC Hampton Roads VA and incorporate the provided prioritization recommendation for 140 high speed ATC ports into the installation plan.

ISN will make the appropriate modifications to B002 as a RED line correction. The Government agreed to accept and approve B002 in this manner

Upon receipt of written Government direction, ISN will develop and submit ECP's to accommodate the following Government changes;

- Install three RIU-64(x)'s into the LDMX Room
- Install eight RIU-64(x)'s and QCP's for remote operation in the TELCO Room
- Provide planing to re-locate Telephone Company Coded line interface devices that produce that produce a return to zero signals to the TELCO room
- ISN will coordinate with the designated Technical Assistant (T/A) for NTCC Hampton Roads VA and develop ECP's to remotely install ATC RIU's into other Government designated locations

Therefore, B002 does not contain information or discussion concerning the above Government changes.

The type and model of GFE test equipment to support the RED and Black Test Bays has become an issue still requiring resolution. Therefore, ISN has not altered the original equipment listing or elevations. Once resolved, ISN will issue a Revision to this document reflecting associated test equipment changes and provide wiring interface diagrams.

*For additional information concerning this deliverable, please contact the undersigned at (301)-469-0400.*

Sincerely,

William N.L. Robertson
Program Manager

cc: FISC DET Washington DC, R. Crawford

EXHIBIT 31

**DEPARTMENT OF THE NAVY**
FLEET AND INDUSTRIAL SUPPLY CENTER NORFOLK
DETACHMENT WASHINGTON DC
WASHINGTON NAVY YARD BLDG 200
901 M STREET SE
WASHINGTON DC 20374-5014

PB2:LM:94C0389
26 June 1995

Information Systems & Networks Corporation
Attn Mr. William Robertson
10411 Motor City Drive
Bethesda, MD 20817

Dear Mr. Robertson:

It was a pleasure to meet yourself and the other members of your team at our meeting on June 22nd. I would like to take this time to summarize some of the topics covered at the meeting. A copy of the attendance sheet was provided to you at the conclusion of the meeting by Ms. Held.

- An Engineering Change Proposal (ECP) for Hampton Roads (only) was provided to the Navy. The ECP was stated to include a "surcharge" cost for the 414 DIM Cards which are now upgraded.

- A modification to the contract will be issued for the combination of both the formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I.

- The ECP submitted (at the meeting) will be reviewed by SPAWAR with comments to be provided on Monday or Tuesday (June 26th or 27th).

- The delivery schedule for all sites in Lot I is to be provided by ISN to the Navy by by Monday, June 26th.

I am your first line point of contact within this activity. If there are any questions, please contact myself at (202) 433-5389 or by facsimile at (202) 685-0002. In my extended absence or in an emergency Mr. Roscoe Crawford, the Contracting Officer, is available to assist you at (202) 433-5387. Please notify your staff of my telephone and facsimile numbers. A message should be left on my voice mail if I am not immediately available. I will return call at the earliest time.

Lisa Murtha

LISA C. MURTHA
Contract Specialist

P.S. FAX # 685-0002 not working - use 433-9586

Cpy to:
DCMAO Baltimore, Attn: Ms. T. Proctor

JUL-21-1995 15:35 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.02

DEPARTMENT OF THE NAVY
SPACE AND NAVAL WARFARE SYSTEMS COMMAND
WASHINGTON, D.C. 20363-5100

IN REPLY REFER TO:

2300
Ser PMW 172-22C/049
20 July 1995

EXHIBIT 32

From: Commander, Space and Naval Warfare Systems Command
To: Officer in Charge, Fleet Industrial Supply Center Detachment, Washington, D.C. (Code PB2)

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

Ref: (a) ISN LETTER OF 20 Jun 95 REGARDING SUBMITTAL OF ENGINEERING 12 PAIR CABLE CHANGE PROPOSAL (ECP) CDRL ITEM C003

Encl: (1) ISN letter of 20 Jun 95

1. SPAWAR has reviewed reference (a) ECP and technically approves ISN's proposed engineering change. Recommend negotiate all terms and conditions listed in reference (a) with ISN. It is further recommended that ISN number all subsequent ECP submissions for accountability purposes commencing with ECP 0002 and submit in accordance with MIL-STD-973 Appendix D as required in Data Item Description (DID) DI-CMAN-80639A.

2. The following comments address ISN's cost analysis sheet for NTCC Hampton Roads in enclosure (1).

a. **ECP Item:** Installation of 12-pair cabling on digital interfaces specified in referenced letter.

**Comment:** Original contractual cost to install or reuse cable was $419,329. Recommend a cost breakdown of the additional charge of $623,563 to justify these additional costs.

b. **ECP Item:** Increase the Novell Netware 3.11 SFT III from 25 to 50 users.

**Comment:** ISN should indicate the cost for 25 users under the "Cost in Contract Column" of enclosure (1) to reference (a). The Government does require a 50 user LAN capacity.

c. **ECP Item:** Government requested ATC Configuration Change.

00141

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

**Comment:** Agree with No Cost (n/c) to the Government. The equipment which the Government requested was based on a review of Amendment 4 to the RFP N00600-93-R-2790 which ISN bid on. At no time did the Government request anything which was out of the scope of the contract proposal.

d. **ECP Item:** Upgrade one of the RMSA 100(X) to an RMSA 200(X).

**Comment:** Agree with this recommendation.

e. **ECP Item:** The DIM 414E upgrade.

**Comment:** ISN letter of April 18, 1995 provided an agreed upon ATC equipment list between the Government and ISN for all seven sites. This letter should be incorporated within the contract. ISN further agreed to make the changes at no cost to the Government. Charges cited in enclosure (1) of reference (a) is a surcharge between DIM 414-3 modules and the DIM 414-E modules. It should also be noted that the agreed upon DIM 414-E module figure of 976 between the Government and ISN is significantly lower than ISN's original contract proposal of 1,515 DIM 414-3 modules. Recommend surcharge differences be identified.

f. **ECP Item:** CLIN 0001AA costs.

**Comment:** Total CLIN 0001AA under Cost in Contract column Enclosure 1 to Reference (a) should read $2,341,219.73 vice $2,152,184 per the ATC Contract N00600-94-C-0389.

g. **ECP Item:** CDRL's CLIN 0003 cost of ECP of $50,000.

**Comment:** Agree with this recommendation.

3. SPAWAR agrees with ISNs new POA&M Engineering and Technical Support Plan for NTCC Hampton Roads in enclosure (1) to reference (a).

4. SPAWAR will change the funding document N0003995RCDL301 in the amount of $789,319 for the ATC at Puerto Rico currently at FISC DET, and will coordinate with NISE EAST DEt Norfolk to arrange additional funding to satisfy this ECP by separate correspondence.

Subj: ENGINEERING CHANGE PROPOSAL (ECP) 0001

5. Any questions concerning this correspondence should be addressed to Mr. Jeff Bergdahl at (703) 602-8332.

KEVIN MEYERS
Division Head
Ship and Shore Communication
By direction of
the Commander

Copy to:
COMNAVCOMTELCOM Washington, DC, N512B (G. Dinan)
DCAMO Baltimore, MD, S2102A (T. Proctor)

JUL-21-1995 15:34 FROM SPAWAR PMW172 703602-7252 TO 992026850002 P.01

EXHIBIT 38

# FACSIMILE TRANSMISSION COVER SHEET

EXHIBIT Crawford #6 10-18-FA

**SPACE AND NAVAL WARFARE SYSTEMS COMMAND**
**SHIP/SHORE COMMUNICATIONS OFFICE**
**PMW 172**
**2451 CRYSTAL DRIVE**
**ARLINGTON, VA 22245-5200**

**FAX (703) 602-7252**

DATE: 7/21/95

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: 4

FROM: JEFF BERGDAHL CODE: PMW172-22C

PHONE #: (703) 602-8332

TO:

AGENCY: FISC DET WASH

NAME: ROSCOE CRAWFORD/LISA MURTHA CODE: PB2

FAX NUMBER: (202) 685-0002

VOICE NUMBER: (202) 433-5387/9

SUBJECT: ATC CONTRACT N00600-94-C-0389.

REMARKS: Roscoe/Lisa,

Enclosed is our approval letter on ECP-1. I will be in Norfolk on Monday, but will be available after that to review the ISN contract.

Jeff Bergdahl

00144

EXHIBIT 34

EXHIBIT Crawford #5 10-18-[illegible]

MEMORANDUM

31 August 1995

To: Bill Robertson

From: Jeff Bergdahl *Jeff Bergdahl*

Subj: ATC issues

1. IRT your voice mail, we have technically approved the ECP and proposed schedule extension via letter to FISC. I am not aware of any other administrative items we owe FISC, other than changing the wording on the funding document at FISC.

2. I would like to hear how the ATC training in Norfolk is proceeding and request copies of the student evaluations be provided. Also, are you still going to submit a no-cost ECP to use in negotiation of consideration with FISC.

3. At our meetings at NTCC Hampton Roads this month there was discussion of what testing would be required before start of cutover. This is discussed several times in CDRL G002, System Test and Verification Plan for NTCC Hampton Roads. Specifically:

a. Page 2 under 1.1 Scope
b. Page 9 under 1.5 Participation and Test Objectives
c. Page 10 under 1.9 Validation Signature Sheets
d. Page 11 under 1.9. Note "Validation Signature Sheets will be presented to the Government for review and comments 30 days prior to commencement of Phase VI."
e. Page 17 under 7.0 through 7.3. I would like to review the "(OEM) System Test Procedures" discussed in Paragraph 7.1 and the "test results documentation form" discussed in Paragraph 7.2 prior to the Phase VI testing. I would expect them to be delivered as part of CDRL G003, Test Procedures. At the start of the Phase VI testing I would like to see the test results from Phase IV and Phase V testing described on Pages 15 and 16.

Based on the documents you should be able to tell us how long you require to run through the tests.

EXHIBIT 35

# DEFENSE CONTRACT AUDIT AGENCY

## AUDIT REPORT

13 NOV 1995

*PREPARED FOR:* Contracting Officer
ATTN: DCMDS-GMTC (F. Soda)
Defense Contract Management Area, Baltimore
200 Towsontown Boulevard West
Towson, MD 21204-5299

*PREPARED BY:* Defense Contract Audit Agency
Silver Spring Branch Office
20251 Century Boulevard, Third Floor
Germantown, MD 20874
Telephone No. (301) 353-1506
FAX No. (301) 353-1518

*SUBJECT:* Audit of Progress Payment Nos. 3, 4, and 5
Contract No. N00600-94-C-0389

*REFERENCES:* ACO: Case No. 202 (A)95-G-0183
DCAA: Audit Report No. 6221-96G17500001
Chron No.

*CONTRACTOR:* Information Systems & Networks Corporation (ISN)
10411 Motor City Drive
Bethesda, MD 20817

*REPORT RELEASE RESTRICTIONS:* See Page 8

*CONTENTS:*


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 2 |
| DCAA Personnel and Report Authorization | 7 |
| Audit Report Distribution and Restrictions | 8 |
| Appendix 1 - Other Matters to be Reported | 9 |
| Appendix 2 - Technical Evaluation | 11 |


FOR OFFICIAL USE ONLY

## *SUBJECT OF AUDIT*

In response to your 18 September 1995 request, reference DCMAO Case No. 202(A)-95-G-0183, and telephone conversation of 18 October 1995, we audited Information Systems & Networks Corporation's (ISN) progress payment request numbers 3, 4, and 5 under Contract No. N00600-94-C-0389. The purpose of the audit was to verify the amounts claimed through 30 June 1995, 31 July 1995, and 31 August 1995 to ISN's books and records as a basis for approving contract financing through progress payments in accordance with the provisions of the contract.

ISN's financial records and related supporting data are the responsibility of ISN. Our responsibility is to express an opinion on the progress payment request based on our audit.

## *EXECUTIVE SUMMARY*

Our audit of progress payment Nos. 3, 4, and 5 disclosed the amounts claimed are unacceptable for payment. The contractor has understated the total costs incurred and the estimate at completion as explained in the results of audit. A summary of the claimed and eligible costs follows:

| | Claimed | Eligible |
|---|---|---|
| Progress Payment No. 3 | $103,327 | $(63,489) |
| Progress Payment No. 4 | 68,223 | 25,397 |
| Progress Payment No. 5 | 81,787 | 155,772 |

SIGNIFICANT ISSUES:

The contract is in a loss position. We applied the loss ratio factor to compute the maximum balances eligible for payment and the audit recommended progress payment amounts.

We have not finalized provisional billing rates with the contractor. In their progress payment request, indirect rates were applied based on actuals for the seven (7) months from the beginning of the fiscal year. The audit recommended amounts are based on the 1995 provisional billing rates. Additionally, we noted that the contractor is accumulating applied G&A costs differently than proposed. Additional information is provided in Appendix 1 - Other Matters.

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

*SCOPE OF AUDIT*

We conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the data and records reviewed are free of material misstatement. An audit includes:

a. reviewing the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on an assessment of control risk;
b. examining, on a test basis, evidence supporting the amounts and disclosures in the data and records reviewed;
c. assessing the accounting principles used and significant estimates made by the contractor; and
d. evaluating the overall data and records presentation.

We did not perform the customary auditing procedures to determine the allowability of costs under FAR part 31 and the DoD FAR Supplement since such procedures will be performed to establish the final contract price, if required.

ISN's billing system is considered adequate to ensure progress payment requests are prepared in accordance with FAR. Due to concerns over the lack of provisional billing rates, prior disputes over indirect allocations, and the concerns of the ACO; we assessed control risk as medium. Our audit reflects this assessment and provides a reasonable basis for our opinion.

Because the contractor is in a loss position, we included steps to determine if the contractor is financially capable of completing the audit.

*RESULTS OF AUDIT*

In our opinion, ISN has made errors in the computation of progress payments 3, 4 and 5. The contractor did not use the 1995 provisional billing rates resulting in the incurred costs and estimate at completion being understated. Our recommended adjustments to the progress payment amounts follow:

FOR OFFICIAL USE ONLY

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

Progress Payment No. 3

SECTION I

| | | | Note |
|---|---|---|---|
| Item 5: | Contract Price | $4,416,645 | |

SECTION II

| | | | Note |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,299,365 | 1 |
| Item 12a: | Total Costs Incurred to Date | $3,299,365 | 1 |
| Item 12b: | Estimated Additional Costs to Complete (ETC) | +1,769,910 | 2 |
| | Total Estimated Cost at Completion (EAC) | $5,069,275 | 2 |

#652,630 INCREASE

Loss Ratio Calculation:

Contract Price / EAC = $4,416,645 / $5,069,275 = 87.13% 3

SECTION II (Continued)

| | | | Note |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,299,365 | 1 |
| | Loss Ratio Factor | X 87.13% | |
| Adjusted Item 11: | Costs Eligible for Progress Payments | $2,874,737 | |
| Item 6a: | Progress Payment Rate | 85.00% | |
| Adjusted Item 13: | Recognized Eligible Costs | $2,443,526 | 3 |
| Item 18: | Previous Progress Payments Requested | -2,507,015 | 4 |
| Item 19: | Maximum Eligible for Progress Payment | $ (63,489) | |

Explanatory Notes:

1. Item 11: The contractor used the actual indirect rates for the first seven months of their fiscal year to compute total incurred costs. Additionally, the contractor included $2,076 of duplicated direct costs in their claimed costs. We computed the total incurred costs using the 1995 provisional billing rates. We also adjusted the total direct costs for the duplicated invoice.

2. Item 12b: We reviewed the contractor's August 1995 EAC and took exception to the amounts computed. The contractor computed the EAC using the actual indirect rates for the first seven months of their fiscal year. We recomputed the EAC using the 1995 provisional billing rates.

3. Item 13: We computed the loss ratio as shown above and applied the factor to the correct Item 11 amount. We multiplied the total by the authorized progress payment rate to determine the adjusted amount of $2,443,526 in Item 13.

FOR OFFICIAL USE ONLY

4. Item 18: The total progress payments requested amount is the total amounts paid under progress payment nos. 1 and 2.

Progress Payment No. 4

SECTION I

| | | | Note |
|---|---|---|---|
| Item 5: | Contract Price | $4,416,645 | |

SECTION II

| | | | Note |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,419,383 | 1 |
| Item 12a: | Total Costs Incurred to Date | $3,419,383 | 1 |
| Item 12b: | Estimated Additional Costs to Complete (ETC) | +1,649,892 | 2 |
| | Total Estimated Cost at Completion (EAC) | $5,069,275 | 2 |

Loss Ratio Calculation:

Contract Price / EAC = $4,416,645 / $5,069,275 = 87.13% (Note 3)

SECTION II (Continued)

| | | | Note |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,419,383 | 1 |
| | Loss Ratio Factor | X 87.13% | |
| Adjusted Item 11: | Costs Eligible for Progress Payments | $2,979,308 | |
| Item 6a: | Progress Payment Rate | 85.00% | |
| Adjusted Item 13: | Recognized Eligible Costs | $2,532,412 | 3 |
| Item 18: | Previous Progress Payments Requested | -2,507,015 | 4 |
| Item 19: | Maximum Eligible for Progress Payment | $ 25,397 | |

Explanatory Notes:

1. Item 11: The contractor used the actual indirect rates for the first seven months of their fiscal year to compute total incurred costs. We computed the total incurred costs using the 1995 provisional billing rates.

2. Item 12b: We reviewed the contractor's August 1995 EAC and took exception to the amounts computed. The contractor computed the EAC using the actual indirect rates for the first seven months of their fiscal year. We recomputed the EAC using the 1995 provisional billing rates.

FOR OFFICIAL USE ONLY

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

3. Item 13: We computed the loss ratio as shown above and applied the factor to the correct Item 11 amount. We multiplied the total by the authorized progress payment rate to determine the adjusted amount of $2,532,412 in Item 13.

4. Item 18: The total progress payments requested amount is the total amounts paid under progress payment nos. 1 and 2.

Progress Payment No. 5

SECTION I

| | | | Note |
|---|---|---|---|
| Item 5: | Contract Price | $4,416,645 | |

SECTION II

| | | | |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,629,713 | 1 |
| Item 12a: | Total Costs Incurred to Date | $3,629,713 | 1 |
| Item 12b: | Estimated Additional Costs to Complete (ETC) | +1,439,562 | 2 |
| | Total Estimated Cost at Completion (EAC) | $5,069,275 | 2 |
| | Loss Ratio Calculation: | | |
| | Contract Price / EAC = $4,416,645 / $5,069,275 = | 87.13% | 3 |

SECTION II (Continued)

| | | | |
|---|---|---|---|
| Item 11: | Total Costs Eligible for Progress Payments | $3,629,713 | 1 |
| | Loss Ratio Factor | X 87.13% | |
| Adjusted Item 11: | Costs Eligible for Progress Payments | $3,162,569 | |
| Item 6a: | Progress Payment Rate | 85.00% | |
| Adjusted Item 13: | Recognized Eligible Costs | $2,688,184 | 3 |
| Item 18: | Previous Progress Payments Requested | -2,532,412 | 4 |
| Item 19: | Maximum Eligible for Progress Payment | $ 155,772 | |

Explanatory Notes:

1. Item 11: The contractor used the actual indirect rates for the first seven months of their fiscal year to compute total incurred costs. We computed the total incurred costs using the 1995 provisional billing rates.

2. Item 12b: We reviewed the contractor's August 1995 EAC and took exception to the amounts computed. The contractor computed the EAC using the actual indirect rates for the first seven months of their fiscal year. We recomputed the EAC using the 1995 provisional billing rates. We used the contractor's latest EAC, August 1995, to compute the EAC.

FOR OFFICIAL USE ONLY

3. Item 13: We computed the loss ratio as shown above and applied the factor to the correct Item 11 amount. We multiplied the total by the authorized progress payment rate to determine the adjusted amount of $2,688,184 in Item 13.

4. Item 18: The total progress payments requested amount is the total amounts paid under progress payment nos. 1 and 2 plus the amount eligible under progress payment no. 4.

We also determined the contractor's financial condition is adequate for the performance of the contract.

We discussed the results of audit with the contractor's representative, Mr. Allieu Shaw, Director of Finance, on 9 November 1995. The contractor disagrees with the results of audit in its entirety.

Audit Report No. 6221-96G17500001
Information Systems & Networks Corporation

DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contact regarding this audit: | |
| Jennifer L. Mosher, Senior Auditor | (301) 353-1506 |
| Other individuals having involvement with the audit report: | |
| Mark Moser, Branch Manager | (301) 353-1506 |
| Carol Bates, Supervisory Auditor | (301) 353-1506 |
| Class of persons having access to this report: | |
| Office Administrative Personnel | |
| DCAA Office FAX No. | (301) 353-1518 |

AUDIT REPORT AUTHORIZED BY:

Mark S. Moser
Branch Manager
DCAA Silver Spring Branch Office

12/28

Brian — VISIT ROSCOE

SPAWAR vs ISN

Notes on Mtg. 12/6/95 with Roscoe and SPAWAR Re: ISN contract

DEC 06 1995

Brian - I attached my handwritten notes. This contract was awarded in July '94 for FIP systems integration, delivery, installation, cutover and training. It is FFP services with numerous sites and lots. It is not IDIQ.

The contractor has had all kinds of performance problems from the beginning. We and SPAWAR have tried to work with them as much as possible but now realize that he will probably never perform satisfactorily. We are still in the first lot, made up of three sites. The contractor is at least five months late on delivery/installation completion on all three sites.

7 Mo.

Roscoe never modified the contract to re-establish the deliv. schedule on any of the sites because he could never get a good idea of what a realistic new deliv. schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo.

The first site (Hampton Rds.) is 80% complete. ISN is having trouble completing it. We have paid over $2 million so far in progress payments towards all three sites in Lot I, which covers the cost of the equipment. We haven't taken title to any of it yet.

Progress Pay $2M

Roscoe wants to reestablish the deliv. schedule for all three sites in Lot I, knowing full well ISN won't meet the dates. If he can't negotiate consideration he will determine it unilaterally. When the contractor misses the dates, Roscoe wants to T for D them. The activity prefers to T for C them. This will have to be resolved and we discussed this at length. However, both Roscoe and the DCMAO ACO feel we have a good case for T for D ing them and it will be alot cheaper than T for C'ing. The downside is it will mean the contract will have to go on for about 6 more months (the soonest new realistic delivery date would be about 6 mo. from now).

T for C

Whether we T for C or T for D, ISN will probably litigate.

Also, the ACO is researching possible fraudulent progress payment submissions by ISN. However, this does not affect our course of action on the contract, she will handle this.

## Roscoe's Action Items

EXHIBIT 36

He needs to brief legal and get their input on his recommended course of action

(if activity agrees to T for D):

He needs to mod the contract and re-establish the delivery dates ASAP, for consideration if possible. If ISN will not agree to consideration, he should determine a reasonable amount unilaterally.

When contractor does not meet the delivery dates, Roscoe needs to T for D the contractor. If it turns out there is evidence of fraud by ISN re: the progress payments, this could also contribute to our basis for T for D ing.

(if we T for C):

If we T for C, we will only re-establish a delivery date for Hampton Roads, since this is 80% done. Or the activity may decide to T for C Hampton Rds. and finish that site themselves or with a different contractor.

We will T for C the other two sites in Lot I. Then we will have to negotiate the equitable adjustment.

00154

EXHIBIT Crawford # 8 10-18-99

Roscoe could also research with legal the feasibility of T for C ing Hampton Roads and T for D'ing the other two sites. Probably not legally viable.

EXHIBIT
Crawford
#9
10-18-04

EXHIBIT
37

Author: zellr@smtp-gw.spawar.navy.mil (Ronald Zell) at SMTPLink-Fmso
Date: 12/8/95 6:02 AM
Priority: Normal
TO: Roscoe Crawford at NRCC-DC
TO: meyersk@smtp-gw.spawar.navy.mil at SMTPLINK-Fmso
TO: zellr@smtp-gw.spawar.navy.mil at SMTPLINK-Fmso
CC: bergdahj@smtp-gw.spawar.navy.mil at SMTPLINK-Fmso
Subject: Re: FISC MEETING

------------------------------------------ Message Contents ------------------------------------------

Kevin/Roscoe/Jeff: I would think we could get outa this without either a TC or a TD in that we modify the contract bilaterally or unilaterally to accept Hampton Rds, Smith, and Makalapa hardware from ISN and provide them a DD250 reflecting completion of the sites. Although, I'd like to recoup some of the funds on each of those sites for the I&E -- if that process delays efforts at any of the sites or results in Navy having to pay more then it doesnt fit. I have no faith in ISN being able to perform on the cutover process based on their lack of demonstrated technical expertise to date. Thus, I want to get out of this quickly. Cut our losses and move on to doing our job. In this regard, we've got to move quickly such that we don't get in a bind at Hampton Rds where things are s l o w l y coming together towards start of cutover.
v/r Ron

______________________________ Reply Separator ______________________________

Subject: FISC MEETING
Author: Jeffrey Bergdahl at SPAWAR-MC4
Date: 12/7/95 4:03 PM

1. The attendees at the contract meeting on 6 DEC 95 at FISC:

| | |
|---|---|
| Lisa Diernisse | FISC PB |
| Roscoe Crawford | FISC PB2(PCO) |
| Lisa Murtha | FISC PB2 |
| Tish Proctor | DCMAO Baltimore(ACO) |
| Kevin Meyers | SPAWAR PMW 172-2 |
| Jeff Bergdahl | SPAWAR PMW 172-22C |

No one was present from FISC Legal Counsel.

2. The options discussed:

a. Option 1: Termination for Default immediately. FISC believes the Government would lose and it would become a termination for convenience. This alternative was possible a year ago, but now it is not because of forebearance by the Government.

b. Option 2: Termination for Convenience. Allows ISN to submit a settlement proposal and then we negotiate the costs. This could end up costing more than the value of the contract and SPAWAR would be required to provide additional funding.

c. Option 3: Partial Termination for Convenience of the two ATC sites in Hawaii and either:

(1) *Option 3(a): Proceed with the ATC at NTCC Hampton* Roads. Would be very difficult after disapproving the ECP.

(2) Option 3(b): FISC issue a Change Order to the Contract to redoce the scope of work to only require installation and test of the DMS switch. Cutover would be the responsibility of NISE East.

d. Option 4: Government reestablishing its rights under the existing contract by bilaterally agreeing(ISN/FISC/SPAWAR) on a revised delivery schedule. If bilateral agreement is not possible then it can still be accomplished unilaterally by FISC *without ISNs concurrence.* *There would be very little* consideration. FISC would only ask consideration for the cost of the delay versus the time of delay. We would have to tell FISC exactly the schedule/milestones we want for Hampton Roads and the

SOURCE SELECTION INFORMATION - SEE FAR 3.104

two Hawaii sites. Each site would [illegible] independent of each other. The intent is to start a process where ISN is tracked at every step along the way. Every time they fail to perform FISC would be consulted with the appropriate documentation. This is the only way we would be able to terminate them for default. We would expect completion of Hampton Roads and the 2 Hawaii sites exactly as per the contract. There would be no approval of any ECPs. Any new requirements would be completed after acceptance of the system.

3. There will be a follow-up meeting next week when FISC can have their legal personnel available. We should be ready to make a decision and tell FISC what we want, so we need to get approval from Gary/CAPT.

Jeff

**SOURCE SELECTION INFORMATION-SEE FAR 3.104**

EXHIBIT
38

# ISN-ATC PROJECT

## CDRL DELIVERY STATUS

| CDRL # | TITLE | STATUS |
|---|---|---|
| | | |
| | | |
| A 001 | MANAGEMENT PLAN | ACCEPTED BY GOVT. |
| | | |
| B 001 | SITE SURVEY REPORT | ACCEPTED BY GOVT. |
| B 002 | SITE INSTALLATION PLAN | ACCEPTED BY GOVT. |
| | | |
| C 001 | CONFIGURATION MGT. PLAN | ACCEPTED BY GOVT. |
| C 002 | BASELINE DESCRIPTION DOC. | COND. ACCEPTED BY GOVT. |
| C 003 | ECP | SUBMITTED TO GOVT. (APRIL 95) |
| | | |
| D 001 | DOC. OF COMM. AVAIL. SOFTWARE | N/A |
| D 002 | COMPUTER SY. OPERATOR'S MANUAL | AWAITING GOVT. COMMENTS |
| D 003 | SOFTWARE USER'S MANUAL | AWAITING GOVT. COMMENTS |
| D 004 | SOFTWARE PROGRAMMER'S MANUAL | N/A |
| D 005 | SOFTWARE PROGRAM MAINT. MANUAL | N/A |
| D 006 | JOB MANUAL | NOT DUE UNTIL COMPLETION OF INSTALLATION |
| | | |
| E 001 | INTEGRATED SUPPORT PLAN | ACCEPTED BY GOVT. |
| E 002 | MAINTENANCE PLAN | AWAITING GOVT. COMMENTS |
| E 003 | PROPOSED SPARE PARTS LIST | COND. ACCEPTED BY GOVT. |
| E 004 | SPARE PARTS USAGE REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| E 005 | FAILURE SUMMARY & ANAL. REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| | | |
| F 001 | TRAINING PLAN | ACCEPTED BY GOVT. |
| F 002 | LESSON PLAN | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 003 | TRAINEE GUIDE | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 004 | OJT HANDBOOK | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| | | |
| G 001 | CUTOVER PLAN | ACCEPTED BY GOVT. |
| G 002 | SYSTEM TEST & VERIFICATION PLAN | ACCEPTED BY GOVT. |
| G 003 | TEST PROCEDURE | COND. ACCEPTED. AWAITING FINAL GOVT ACCEPTANCE. |
| G 004 | TEST REPORT | NOT DUE UNTIL TESTING STARTS |
| | | |

AS OF FEB 1, 1996

# ISN-ATC PROJECT

## CDRL DELIVERY STATUS

| CDRL # | TITLE | STATUS |
|---|---|---|
| | | |
| | | |
| A 001 | MANAGEMENT PLAN | ACCEPTED BY GOVT. |
| | | |
| B 001 | SITE SURVEY REPORT | ACCEPTED BY GOVT. |
| B 002 | SITE INSTALLATION PLAN | ACCEPTED BY GOVT. |
| | | |
| C 001 | CONFIGURATION MGT. PLAN | ACCEPTED BY GOVT. |
| C 002 | BASELINE DESCRIPTION DOC. | COND. ACCEPTED BY GOVT. |
| C 003 | ECP | SUBMITTED TO GOVT. (APRIL 95) |
| | | |
| D 001 | DOC. OF COMM. AVAIL. SOFTWARE | N/A |
| D 002 | COMPUTER SY. OPERATOR'S MANUAL | AWAITING GOVT. COMMENTS |
| D 003 | SOFTWARE USER'S MANUAL | AWAITING GOVT. COMMENTS |
| D 004 | SOFTWARE PROGRAMMER'S MANUAL | N/A |
| D 005 | SOFTWARE PROGRAM MAINT. MANUAL | N/A |
| D 006 | JOB MANUAL | NOT DUE UNTIL COMPLETION OF INSTALLATION |
| | | |
| E 001 | INTEGRATED SUPPORT PLAN | ACCEPTED BY GOVT. |
| E 002 | MAINTENANCE PLAN | AWAITING GOVT. COMMENTS |
| E 003 | PROPOSED SPARE PARTS LIST | COND. ACCEPTED BY GOVT. |
| E 004 | SPARE PARTS USAGE REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| E 005 | FAILURE SUMMARY & ANAL. REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| | | |
| F 001 | TRAINING PLAN | ACCEPTED BY GOVT. |
| F 002 | LESSON PLAN | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 003 | TRAINEE GUIDE | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 004 | OJT HANDBOOK | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| | | |
| G 001 | CUTOVER PLAN | ACCEPTED BY GOVT. |
| G 002 | SYSTEM TEST & VERIFICATION PLAN | ACCEPTED BY GOVT. |
| G 003 | TEST PROCEDURE | COND. ACCEPTED. AWAITING FINAL GOVT ACCEPTANCE. |
| G 004 | TEST REPORT | NOT DUE UNTIL TESTING STARTS |
| | | |

AS OF FEB 1, 1996

# ISN-ATC PROJECT

## CDRL DELIVERY STATUS

| CDRL # | TITLE | STATUS |
|---|---|---|
| | | |
| | | |
| A 001 | MANAGEMENT PLAN | ACCEPTED BY GOVT. |
| | | |
| B 001 | SITE SURVEY REPORT | ACCEPTED BY GOVT. |
| B 002 | SITE INSTALLATION PLAN | ACCEPTED BY GOVT. |
| | | |
| C 001 | CONFIGURATION MGT. PLAN | ACCEPTED BY GOVT. |
| C 002 | BASELINE DESCRIPTION DOC. | COND. ACCEPTED BY GOVT. |
| C 003 | ECP | SUBMITTED TO GOVT. (APRIL 95) |
| | | |
| D 001 | DOC. OF COMM. AVAIL. SOFTWARE | N/A |
| D 002 | COMPUTER SY. OPERATOR'S MANUAL | AWAITING GOVT. COMMENTS |
| D 003 | SOFTWARE USER'S MANUAL | AWAITING GOVT. COMMENTS |
| D 004 | SOFTWARE PROGRAMMER'S MANUAL | N/A |
| D 005 | SOFTWARE PROGRAM MAINT. MANUAL | N/A |
| D 006 | JOB MANUAL | NOT DUE UNTIL COMPLETION OF INSTALLATION |
| | | |
| E 001 | INTEGRATED SUPPORT PLAN | ACCEPTED BY GOVT. |
| E 002 | MAINTENANCE PLAN | AWAITING GOVT. COMMENTS |
| E 003 | PROPOSED SPARE PARTS LIST | COND. ACCEPTED BY GOVT. |
| E 004 | SPARE PARTS USAGE REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| E 005 | FAILURE SUMMARY & ANAL. REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| | | |
| F 001 | TRAINING PLAN | ACCEPTED BY GOVT. |
| F 002 | LESSON PLAN | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 003 | TRAINEE GUIDE | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 004 | OJT HANDBOOK | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| | | |
| G 001 | CUTOVER PLAN | ACCEPTED BY GOVT. |
| G 002 | SYSTEM TEST & VERIFICATION PLAN | ACCEPTED BY GOVT. |
| G 003 | TEST PROCEDURE | COND. ACCEPTED. AWAITING FINAL GOVT ACCEPTANCE. |
| G 004 | TEST REPORT | NOT DUE UNTIL TESTING STARTS |
| | | |

AS OF FEB 1, 1996

# ISN-ATC PROJECT

## CDRL DELIVERY STATUS

| CDRL # | TITLE | STATUS |
|---|---|---|
| | | |
| | | |
| A 001 | MANAGEMENT PLAN | ACCEPTED BY GOVT. |
| | | |
| B 001 | SITE SURVEY REPORT | ACCEPTED BY GOVT. |
| B 002 | SITE INSTALLATION PLAN | ACCEPTED BY GOVT. |
| | | |
| C 001 | CONFIGURATION MGT. PLAN | ACCEPTED BY GOVT. |
| C 002 | BASELINE DESCRIPTION DOC. | COND. ACCEPTED BY GOVT. |
| C 003 | ECP | SUBMITTED TO GOVT. (APRIL 95) |
| | | |
| D 001 | DOC. OF COMM. AVAIL. SOFTWARE | N/A |
| D 002 | COMPUTER SY. OPERATOR'S MANUAL | AWAITING GOVT. COMMENTS |
| D 003 | SOFTWARE USER'S MANUAL | AWAITING GOVT. COMMENTS |
| D 004 | SOFTWARE PROGRAMMER'S MANUAL | N/A |
| D 005 | SOFTWARE PROGRAM MAINT. MANUAL | N/A |
| D 006 | JOB MANUAL | NOT DUE UNTIL COMPLETION OF INSTALLATION |
| | | |
| E 001 | INTEGRATED SUPPORT PLAN | ACCEPTED BY GOVT. |
| E 002 | MAINTENANCE PLAN | AWAITING GOVT. COMMENTS |
| E 003 | PROPOSED SPARE PARTS LIST | COND. ACCEPTED BY GOVT. |
| E 004 | SPARE PARTS USAGE REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| E 005 | FAILURE SUMMARY & ANAL. REPORT | NOT DUE UNTIL AFTER 1st QRT. OF OPERATIONAL STATUS |
| | | |
| F 001 | TRAINING PLAN | ACCEPTED BY GOVT. |
| F 002 | LESSON PLAN | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 003 | TRAINEE GUIDE | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| F 004 | OJT HANDBOOK | COND. ACCEPTED. AWAITING FINAL GOVT. ACCEPTANCE. |
| | | |
| G 001 | CUTOVER PLAN | ACCEPTED BY GOVT. |
| G 002 | SYSTEM TEST & VERIFICATION PLAN | ACCEPTED BY GOVT. |
| G 003 | TEST PROCEDURE | COND. ACCEPTED. AWAITING FINAL GOVT ACCEPTANCE. |
| G 004 | TEST REPORT | NOT DUE UNTIL TESTING STARTS |
| | | |

EXHIBIT 39

ISN

William N.L. Robertson
Vice President
Systems Integration Group

23 February, 1996

Department of the Navy
Naval Regional Contracting Center
Washington Navy Yard
Building 200
901 M Street, S.E.
Washington D.C. 20374-5014

**Attention:** Roscoe W. Crawford
Contracting Officer

**Contract:** N00600-94-C-0389

**Subject:** Seizure of LOT 1 ATC Hardware and Software by the U.S. Government.

Dear Mr. Crawford:

On 21 February 1996, at or about 10:15 AM, you notified ISN that the U.S. Government was to seize all subject contractual material at the ISN Corporate Headquarters, Bethesda, Maryland at or about 1:00 PM.

ISN insisted that the material not be taken on 21 February, but that one week be allotted to inventory the material so an orderly and professional turn over could be accomplished. This extension was denied by yourself after consultation with Ron Zell. Not only did the Government deny the extension, the Government threatened the use of U.S. Marshals if immediate access was not granted. ISN fully complied with the Government demands to seize the material even though adequate notice was not given.

The extremely limited time allotted (less than three hours) was not adequate to properly identify, segregate and inventory the ATC material putting ISN at considerable risk by not allowing ISN to properly document and turn over the material in an orderly and professional manner. The Laboratory/work area where the ATC hardware and software was set up for test also contained hardware and software from other projects. The equipment that was seized by the Government most likely contained some material that was not part of or purchased for the ATC contract. There may be some material that ISN purchased for ATC that was not included in the material seized. Much of the material taken by the Government had not been paid for by the Government and was still ISN property.

Since the software licenses and hardware warranty are currently in ISN's name, it will require ISN to make the necessary arrangements to transfer the licenses to the Government. The terms and agreements on some of the software preclude use by the Government without prior specific permission. The Government did not provide ISN with adequate notice to properly effect this transfer before the Navy removed the material. This has caused ISN to be in violation of license provisions which could have serious implications.

00163

ISN has retained two RMSA-500(X), some interface modules, workstations and appropriate software (with licenses) which ISN currently requires for test and training purposes. ISN will deduct the applicable cost for these items from the cost incurred to date. ISN will make these items available to the Navy as "used" at a discounted price when our need of them ceases.

In conclusion, ISN cannot attest to the accuracy of the material taken for this contract and we are in the process of reviewing our legal rights on this subject to be submitted at a later date.

Sincerely,
Information Systems & Networks Corporation

William N.L. Robertson
ATC Program Manager

cc: Jeffrey Bergdahl, COR

EXHIBIT
40

ISN

Roma Malkani
President

June 6, 1996

Defense Logistics Agency
Defense Contract Management Area
Operations - Atlanta
805 Walker Street
Marietta, GA 30060-2789

Attention: Ms. Denise M. Jones
Termination Contracting Officer

Subject: Contract No. N00600-94-C-0389
Settlement Proposal (Termination)

Dear Ms. Jones:

Enclosed is our settlement proposal consisting of the following documents (original and 3 copies):

(1) Standard Form 1436, Settlement Proposal (Total Cost Basis)
(2) Standard Form 1439, Schedule of Accounting Information.

Our proposal is based on a total cost basis in accordance with FAR 49.206-2(b) since an inventory basis is not practicable because the Government took most of the material on 21 February 1996 from ISN Corporate Headquarters in Bethesda, Maryland and the termination is a complete termination.

We request that partial payments be authorized for this proposal in accordance with FAR 49.112-1.

This contract was awarded on 15 July 1994, put on hold on February 20, 1996, pursuant to a Stop Work Order, FAR 52.212-13, and then subsequently Terminated for the Convenience of the Government on 15 March 1996.

If there are any questions, please do not hesitate to contact the undersigned.

Very truly yours,
INFORMATION SYSTEMS AND NETWORKS CORPORATION

Roma Malkani

Roma Malkani

# SETTLEMENT PROPOSAL (TOTAL COST BASIS)

FORM APPROVED OMB NO. 3090-0115

FOR USE BY A FIXED-PRICE PRIME CONTRACTOR OR A FIXED-PRICE SUBCONTRACTOR

| | |
|---|---|
| This Proposal Applies to (check one) [X] A Prime contract with the Government [ ] A subcontract or Purchase Order | COMPANY: INFORMATION SYSTEMS and NETWORKS |
| SUBCONTRACT or PURCHASE ORDER NO.(S) | STREET ADDRESS: 10411 MOTOR CITY DRIVE |
| CONTRACTOR WHO SENT NOTICE OF TERMINATION NAME | CITY and STATE: BETHESDA, MD 20817 |
| ADDRESS | NAME OF GOVERNMENT AGENCY: NAVY |
| If moneys payable under the contract have been assigned, given the following: | Government Prime Contract: N00600-94-C-0389 / Contractor's Reference No.: 01319 |
| NAME OF ASSIGNEE | EFFECTIVE DATE of TERMINATION: 15 MARCH 1996 |
| ADDRESS | PROPOSAL NO. / CHECK ONE: INTERIM X FINAL |

SF1439, SCHEDULE OF ACCOUNTING INFORMATION _X_ IS ___ IS NOT ATTACHED (if not, explain)

## SECTION I - STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT or PURCHASE ORDER (a) | | FINISHED: Previously Shipped and invoiced (b) | FINISHED ON HAND: PAYMENT To Be RECEIVED THROUGH INVOICING (c) | FINISHED ON HAND: PAYMENT NOT To Be RECEIVED THROUGH INVOICING (d) | UNFINISHED or NOT COMMENCED: SUBSEQUENTLY Completed AND INVOICED* (e) | UNFINISHED or NOT COMMENCED: NOT TO BE Completed (f) | TOTAL COVERED BY Contract OR ORDER (g) |
|---|---|---|---|---|---|---|---|
| CLINS 0001 through 0003 | QUANTITY | | | | | | 1 LOT |
| | $ | | | | | | $4,416,646 |
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |

## SECTION II - PROPOSED SETTLEMENT

| NO. | ITEM (a) | TOTAL previously proposed (b) (Use Columns (b) and (c) only where previous proposal has been filed) | Increase or Decrease by this Proposal (c) | TOTAL Proposed TO DATE (d) | for use of contracting Agency only (e) |
|---|---|---|---|---|---|
| 1 | DIRECT MATERIAL | | | 2,401,080 | |
| 2 | DIRECT LABOR | | | 604,657 | |
| 3 | INDIRECT FACTORY EXPENSE (from Schedule A) | | | 466,330 | |
| 4 | SPECIAL TOOLING and SPECIAL TEST EQUIPMENT (SF 1423) | | | 0 | |
| 5 | OTHER COSTS (from Schedule B) | | | 427,831 | |
| 6 | GENERAL and ADMINISTRATIVE EXPENSE | | | 534,061 | |
| 7 | TOTAL COSTS (ITEMS 1 through 4) | | | 4,433,958 | |
| 8 | PROFIT (Explain in Schedule D) | | | 443,396 | |
| 9 | TOTAL (ITEMS 7 and 8) | | | 4,877,354 | |
| 10 | DEDUCT FINISHED PRODUCT INVOICED or to be INVOICED | | | 0 | |
| 11 | TOTAL (ITEMS 9 less item 10) | | | 4,877,354 | |
| 12 | SETTLEMENT EXPENSES (from Schedule E) | | | 183,224 | |
| 13 | TOTAL (ITEMS 11 and 12) | | | 5,060,578 | 5,067,275 |
| 14 | SETTLEMENTS with SUBCONTRACTORS (from Schedule F) | | | 0 | |
| 15 | GROSS PROPOSED SETTLEMENT (items 13 and 14) | | | 5,060,578 | |
| 16 | DISPOSAL and OTHER CREDITS (from Schedule G) | | | 0 | |
| 17 | NET PROPOSED SETTLEMENT (item 15 less 16) | | | 5,060,578 | |
| 18 | ADVANCED, PROGRESS & PARTIAL PAYMENTS (from Schedule H) | | | 2,507,015 | |
| 19 | NET PAYMENT REQUESTED (Item 18 less 19) | | | 2,553,563 | |

*Column (e), Section I, should only be used in the event of a partial termination, in which the total cost reported in Section II should be accumulated to date of completion of the continued portion of the contract and the deduction for finished product (Item 10, Section II) should be contract price of finished product in Column (b), (c) and (e), Section I.

NOTE --File inventory schedules (SF 1426, 1428, 1430 and 1432) for allocable inventories on hand at date of termination (see 49.2 06 and SF 1425)

Where the space provided for any information is insufficient, continue on a separate sheet.

NSN 7540-01-140-5521 1436-101 STANDARD FORM 1436 (10-83) Prescribed by GSA FAR (48 CFR) 53.249(a)(3)



00166

SCHEDULE A - INDIRECT FACTORY EXPENSE (Item 7)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| Fringe | DL * FRINGE | 179,482 | |
| Overhead | (DL+FRINGE)*OH | 286,848 | |
| TOTAL | | 466,330 | |

NOTE: - Individual items of small amounts may be grouped into a single entry in Schedules B, C, E, E and G.

SCHEDULE B - OTHER COSTS (Item 5)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| TRAVEL | Cost from Job Cost | 74,668 | |
| OTHER DIRECT COST | Cost from Job Cost | 353,162 | |
| TOTAL | | 427,831 | |

SCHEDULE C - GENERAL AND ADMINISTRATIVE EXPENSE (Item 3)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| LABOR | Calculated | 153,172 | |
| TRAVEL | Calculated | 10,109 | |
| ODC'S | Calculated | 47,410 | |
| MATERIAL | Calculated | 323,370 | |
| TOTAL | | 534,061 | |

SCHEDULE D - PROFIT (Item 8)

| EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| Profit was computed based on 10% of Costs | 443,396 | |
| TOTAL | 443,396 | |

Where the space provided for any information is insufficient, continue on a separate sheet.

STANDARD FORM 1436 (10-83)
PAGE 2

SCHEDULE E - SETTLEMENT EXPENSE (Item 12)

| ITEM | EXPLANATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| LABOR & ODC'S | BURDENED COSTS through 4/30/96 P<br>ESTIMATE TO COMPLETION | 125,000 | |
| PPA INTEREST | CALCULATED | 58,224 | |
| TOTAL | | 183,224 | |

Schedule F - SETTLEMENT with IMMEDIATE SUBCONTRACTORS and SUPPLIERS (Item 14)

| DETAIL OF EXPENSE | METHOD OF ALLOCATION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| TOTAL | | 0 | |

SCHEDULE G - DISPOSAL and OTHER CREDITS (Item 16)

| DESCRIPTION | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|
| Not Applicable | 0 | |
| TOTAL | 0 | |

(If practicable, show separately amounts of disposal credits applicable to acceptable finished product included on SF 1428.)

Where the space provided for any information is insufficient, continue on a separate sheet.

STANDARD FORM 1436 (10-83)
PAGE 3

SECTION N - ADVANCE, PROGRESS AND PARTIAL PAYMENTS

| DATE | TYPE OF PAYMENT | AMOUNT | FOR USE OF CONTRACTING AGENCY ONLY |
|---|---|---|---|
| 34729 | Progress payment | 2,083,450 | |
| 34754 | Progress payment | 443,565 | |
| | | 2,507,015 | |

Where the space provided for any information is insufficient, continue on a separate sheet.

## CERTIFICATE

This is to certify that the undersigned, individually, and as an authorized representative of the Contractor, has examined this termination settlement proposal and that, to the best knowledge and belief of the undersigned.

(a) AS TO THE CONTRACTOR'S OWN CHARGES. The proposed settlement (exclusive of charges set forth in Item 14) and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices. They include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will, or may, be used directly or indirectly as the basis of settlement of a termination settlement proposal or claim against an agency of the United States; and the charges as stated are fair and reasonable.

(b) AS TO THE SUBCONTRACTORS' CHARGES. (1) The Contractor has examined, or caused to be examined, to an extent it considered adequate in the circumstances, the termination settlement proposals of its immediate subcontractors (exclusive of proposals filed against these immediate subcontractors by their subcontractors); (2) The settlements on account of immediate subcontractors' own charges are fair and reasonable, the charges are allocable to the terminated portion of this contract, and the settlements were negotiated in good faith and are not more favorable to its immediate subcontractors than those that the Contractor would make if reimbursement by the Government were not involved; (3) The contractor has received from all its immediate subcontractors appropriate certificates with respect to their termination settlement proposals, which certificates are substantially in the form of this certificate; and (4) the Contractor has no information leading it to doubt (i) the reasonableness of the settlements with more remote subcontractors or (ii) that the charges for them are allocable to this contract. Upon receipt by the Contractor of amounts covering settlements with its immediate subcontractors, the Contractor will pay or credit them promptly with the amounts so received, to the extent that it has not previously done so. The term "subcontractors", as used above, includes suppliers.

NOTE: The Contractor shall, under conditions stated in FAR 15.8044-2, be required to submit a Certificate of Current Cost or Pricing Data (see FAR 15.804-2(a) and 15.804-6).

| NAME OF CONTRACTOR | BY (Signature of authorized official) | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORP. | Donna Walton | |
| | TITLE President | DATE 6/4/96 |
| Name of Supervisory Accounting Official Mr. Allieu Shaw | TITLE Accounting Manager | |

U.S. GOVERNMENT PRINTING OFFICE STANDARD FORM 1436 PAGE 4

# SCHEDULE OF ACCOUNTING INFORMATION

FORM APPROVED OMB NO. 9000-0012

Public reporting burden for this collection of information is estimated to average 25 hours per response, including the time for reviewing [illegible] searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition and Regulatory Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0012), Washington, D.C. 20503.

To be used by prime contractors submitting termination proposals under Part 49 of the Federal Acquisition Regulation. Also suitable for use by subcontractor in effecting subcontract settlements with prime contractor or immediate subcontractor.

THIS PROPOSAL APPLIES TO (Check one)

[X] A PRIME CONTRACT WITH THE GOVERNMENT [ ] SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NO(S).

COMPANY (Prime or Subcontractor): Information Systems & Networks (ISN)Co

STREET ADDRESS: 10411 Motor City Drive

CITY AND STATE (Include ZIP Code): Bethesda, MD 20817

CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME AND ADDRESS (Include ZIP Code)

NAME OF GOVERNMENT AGENCY: U.S. Navy

| GOVERNMENT PRIME CONTRACT NO. | CONTRACTOR'S REFERENCE NO. | EFFECTIVE DATE OF TERMINATION |
|---|---|---|
| N00600-94-C-0389 | 1319 | 15 Mar 1996 |

1. INDIVIDUAL IN YOUR ORGANIZATION FROM WHOM ADDITIONAL INFORMATION MAY BE REQUESTED ON QUESTIONS RELATING TO

| | ACCOUNTING MATTERS | | PROPERTY DISPOSAL |
|---|---|---|---|
| NAME | Mr. Allieu Shaw | NAME | Mr. Donald Tabasco |
| TITLE | Director of Accounting | TITLE | Senior Contract Administrator |
| TELEPHONE NO. | 301/469-0400 | TELEPHONE NO. | 301/469-0400 |
| ADDRESS (Include ZIP Code) | ISN<br>10411 Motor City Drive<br>Bethesda, MD 20817 | ADDRESS (Include ZIP Code) | ISN<br>10411 Motor City Drive<br>Bethesda, MD 20817 |

2. ARE THE ACCOUNTS OF THE CONTRACTOR SUBJECT TO REGULAR PERIODIC EXAMINATION BY INDEPENDENT PUBLIC ACCOUNTANTS?

[X] YES [ ] NO (Name and address of accountants)

Arthur Andersen
1666 K Street, N.W.
Washington, D.C. 20006-2873

3. INDEPENDENT ACCOUNTANTS, IF ANY, WHO HAVE REVIEWED OR ASSISTED IN THE PREPARATION OF THE ATTACHED PROPOSAL

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| None | |

4. GOVERNMENTAL AGENCY(IES) WHICH HAVE REVIEWED YOUR ACCOUNTS IN CONNECTION WITH PRIOR SETTLEMENT PROPOSALS DURING THE CURRENT AND PRECEDING FISCAL YEAR

| NAME | ADDRESS (Include ZIP Code) |
|---|---|
| DCAA | Columbia Branch Office, One Mall North<br>10025 Governor<br>Warfield Pkwy., Suite 200<br>Columbia, MD 21004 |

5. HAVE THERE BEEN ANY SIGNIFICANT DEVIATIONS FROM YOUR REGULAR ACCOUNTING PROCEDURES AND POLICIES IN ARRIVING AT THE COSTS SET FORTH IN THE ATTACHED PROPOSAL? (If "Yes," explain briefly)

[ ] YES [X] NO

6. WERE THE DETAILED COST RECORDS USED IN PREPARING THE PROPOSAL CONTROLLED BY AND IN AGREEMENT WITH YOUR GENERAL BOOKS OF ACCOUNT?

[X] YES [ ] NO

7. STATE METHOD OF ACCOUNTING FOR TRADE AND CASH DISCOUNTS EARNED, REBATES, ALLOWANCES, AND VOLUME PRICE ADJUSTMENTS. ARE SUCH ITEMS EXCLUDED FROM COSTS PROPOSED?

[ ] YES [ ] NO

These items reduced the costs when recorded.

(Where the space provided for any information is insufficient, continue on a separate sheet.)

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable

EXPIRATION [illegible]

STANDARD FORM 1439 REV. 7
Prescribed by GSA - FAR (48 CFR 53.249)

8. STATE METHOD OF RECORDING AND ABSORBING GENERAL ENGINEERING AND GENERAL DEVELOPMENT EXPENSE AND ID ENGINEERING AND DEVELOPMENT EXPENSE DIRECTLY APPLICABLE TO THE TERMINATED CONTRACT.

Not applicable.

9. STATE TYPES AND SOURCE OF MISCELLANEOUS INCOME AND CREDITS AND MANNER OF RECORDING IN THE INCOME OR THE COST ACCOUNTS SUCH AS RENTAL OF YOUR FACILITIES TO OUTSIDE PARTIES, ETC.

ISN does not sublease facilities. Miscellaneous income is comprised primarily of interest or investment income. Refunds or rebates are credited to the original cost or cost pool where identifiable.

10. METHOD OF ALLOCATING GENERAL AND ADMINISTRATIVE EXPENSE.

General and Administrative expenses are allocated to direct cost objectives on a total cost basis.

11. ARE COSTS AND INCOME FROM CHANGE ORDERS SEGREGATED FROM OTHER CONTRACT COSTS AND INCOME? (If "Yes," by what method?)

☐ YES ☐ NO

Yes, if they result in a modification which requires separate accountability. No, if only a modification to an existing task where separate accountability is not required. The Contracting Officer makes this determination.

12. METHOD OF COMPUTING PROFIT SHOWN IN THE ATTACHED PROPOSAL AND REASON FOR SELECTING THE METHOD USED. FURNISH ESTIMATE OF AMOUNT OR RATE OF PROFIT IN DOLLARS OR PERCENT ANTICIPATED HAD THE CONTRACT BEEN COMPLETED.

A profit of 10% has been applied to all costs incurred. It is estimated that had the contract been completed, i.e., the planned change orders been implemented, ISN would have realized a 10% profit.

13. ARE SETTLEMENT EXPENSES APPLICABLE TO PREVIOUSLY TERMINATED CONTRACTS EXCLUDED FROM THE ATTACHED PROPOSAL? (If "No," explain)

☒ YES ☐ NO

14. DOES THIS PROPOSAL INCLUDE CHARGES FOR MAJOR INVENTORY ITEMS AND PROPOSALS OF SUBCONTRACTORS COMMON TO THIS TERMINATED CONTRACT AND OTHER WORK OF THE CONTRACTOR? (If "Yes," explain the method used in allocating amounts to the terminated portion of this contract.)

☒ YES ☐ NO

All material and supplier costs are specific to this contract.

15. EXPLAIN BRIEFLY YOUR METHOD OF PRICING INVENTORIES, INDICATING WHETHER MATERIAL HANDLING COST HAS BEEN INCLUDED IN CHARGES FOR MATERIALS.

The equipment inventory has been priced at actual cost plus M&S costs.

16. ARE ANY PARTS, MATERIALS, OR FINISHED PRODUCT, KNOWN TO BE DEFECTIVE, INCLUDED IN THE INVENTORIES? (If "Yes," explain)

☐ YES ☐ NO

All material has been taken by the Government on 21 February 1996. To the best of ISN's knowledge and belief at the time the material was taken by the Government it was in serviceable condition.

(Where the space provided for any information is insufficient, continue on a separate sheet.)

17. WERE INVENTORY QUANTITIES BASED ON A PHYSICAL COUNT AS OF THE DATE OF TERMINATION? (IF "NO," explain exceptions.)

☐ YES ☐ NO

Not applicable since all material was taken by the Government on 21 February 1996.

18. DESCRIBE BRIEFLY THE NATURE OF INDIRECT EXPENSE ITEMS INCLUDED IN INVENTORY COSTS (See Schedule A, SF 1435) AND EXPLAIN YOUR METHOD OF ALLOCATION USED IN PREPARING THIS PROPOSAL, INCLUDING IF PRACTICABLE, THE RATES USED AND THE PERIOD OF TIME UPON WHICH THEY ARE BASED.

G&A costs are included in the cost of the material, This cost is allocated at the rate in use at the time costs were recorded.

19. STATE GENERAL POLICIES RELATING TO DEPRECIATION AND AMORTIZATION OF FIXED ASSETS, BASES, UNDERLYING POLICIES.

Fixed assets are depreciated over estimated useful lives, The costs of depreciation and amortization is included in the indirect cost pool of the business unit using the asset and spread to direct cost objectives in the same manner as the indirect pool, Overhead pools are spread based on total direct labor (Direct labor + fringe) benefiting from the pool. G&A costs are spread on a total cost basis.

20. DO THE COSTS SET FORTH IN THE ATTACHED PROPOSAL INCLUDE PROVISIONS FOR ANY RESERVES OTHER THAN DEPRECIATION RESERVES? (If "Yes," list such reserves)

☐ YES ☒ NO

21. STATE POLICY OR PROCEDURE FOR RECORDING AND WRITING OFF STARTING LOAD.

Not applicable.

22. STATE POLICIES FOR DISTINGUISHING BETWEEN CHARGES TO CAPITAL (FIXED) ASSET ACCOUNTS AND TO REPAIR AND MAINTENANCE ACCOUNTS.

Costs incurred which increase the value of the assets or materially extend the useful life of assets are capitalized and depreciated, Costs of maintenance and repairs which do not do the above are expensed,

23. ARE PERISHABLE TOOLS AND MANUFACTURING SUPPLIES CHARGED DIRECTLY TO CONTRACT COSTS OR INCLUDED IN INDIRECT EXPENSES?

Perishable items (small tools and consumables) purchased for use on a specific contract are charged to that contract, Items purchased for general corporate use are charged to indirect cost pools,

(Where the space provided for any information is insufficient, continue on a separate sheet.)

STANDARD FORM 1439 REV. 1-48 PAGE

HAVE ANY CHARGES FOR ... OR SEPARATION PAY BEEN INCLUDED IN THIS PROPOSAL? (If "Yes," furnish brief explanation)

☐ YES ☒ NO

STATE POLICIES RELATING TO RECORDING OF OVERTIME SHIFT PREMIUMS AND PRODUCTION BONUSES

Overtime premium paid for non-exempt employees are charged to the cost objective on which employee is working. ISN does not provide for "production bonuses".

DOES CONTRACTOR HAVE A PENSION PLAN? (If "Yes," state method of funding and absorption of past and current pension service costs)

☒ YES ☐ NO

Yes, ISN maintains a defined contribution pension plan. As such, there are no past service costs. Required contributions are calculated annually by the Plan Administrator andpaid by the company.

IS THIS SETTLEMENT PROPOSAL BASED ON STANDARD COSTS?

☐ YES (If "Yes," has adjustment to actual cost or adjustment for any significant variations been made? ☐ YES ☐ NO (If "NO," explain))

☒ NO

This proposal is based on an actual costs basis.

DOES THIS PROPOSAL INCLUDE ANY ELEMENT OF PROFIT TO THE CONTRACTOR OR RELATED ORGANIZATION, OTHER THAN (a) PROFIT SET FORTH SEPARATELY IN THE PROPOSAL OR (b) PROFIT INCLUDED IN THE CONTRACT PRICE AT WHICH ACCEPTABLE FINISHED PRODUCT, IF ANY, IS INCLUDED IN THE PROPOSAL? (If "Yes," explain briefly)

☐ YES ☒ NO

WHAT IS LENGTH OF TIME (PRODUCTION CYCLE) REQUIRED TO PRODUCE ONE OF THE END ITEMS FROM THE TIME THE MATERIAL ENTERS THE PRODUCTION LINE TO THE COMPLETION AS THE FINISHED PRODUCT?

The normal lead time considering a fully staffed work force for a production system is 120 days.

STATE POLICY AND PROCEDURE FOR VERIFICATION AND NEGOTIATION OF SETTLEMENTS WITH SUBCONTRACTORS AND VENDORS.

Terms and conditions (Payment) of ISN's Purchase Orders are "....within 45 days after acceptance or 15 days after ISN is paid by the Government........ whichever is later."

**CERTIFICATE**

THIS CERTIFIES THAT, TO THE BEST KNOWLEDGE AND BELIEF OF THE UNDERSIGNED, THE ABOVE STATEMENTS ARE TRUE AND CORRECT.

| NAME OF CONTRACTOR | BY (Signature of supervisory accounting official) | |
|---|---|---|
| ISN<br>10411 Motor City Drive<br>Bethesda, MD 20817 | [signature] | |
| | TITLE<br>President | DATE<br>6/4/96 |

(Where the space provided for any information is insufficient, continue on a separate sheet.)

STANDARD FORM 1436 (REV. 7-89) PAGE 4

151



U0173

EXHIBIT
41

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT

19 December 1996

**PREPARED FOR:** Termination Contracting Officer
ATTN: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

**PREPARED BY:** Columbia Branch Office
One Mall North, Suite 200
10025 Governor Warfield Parkway
Columbia, MD 21004

| | |
|---|---|
| Telephone No. | (410) 964-2060 |
| FAX No. | (410) 997-3237 |
| e-Mail Address | fao6311@rma.dcaa.mil |

**SUBJECT:** Termination Settlement Proposal

**REFERENCES:** TCO: Contract No. N00600-94-C-0389
DCAA: Audit Report No. 6311-97B17100001

**CONTRACTOR:** Information Systems and Networks Corporation
10411 Motor City Drive
Bethesda, MD 20817

**REPORT RELEASE RESTRICTIONS:** See Page 9

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 3 |
| DCAA Personnel and Report Authorization | 8 |
| Audit Report Distribution and Restrictions | 9 |

## SUBJECT OF AUDIT

As requested by DCMC-Atlanta, we audited the 4 June 1996 termination settlement proposal submitted by Information Systems and Networks Corporation (ISN). Contract N00600-94-C-0389 was terminated for the convenience of the government with an effective termination date of 15 March 1996. Prior to the termination notice, a Stop-Work Order had been issued on 20 February 1996. The termination settlement proposal for $5,060,578 was submitted on the total cost basis.

The termination settlement proposal is the responsibility of ISN. Our responsibility is to express an opinion on the settlement proposal based on our audit.

## EXECUTIVE SUMMARY

Our audit of the $5.06 million proposal disclosed $1.01 million of questioned costs. The questioned costs are summarized below:

| | |
|---|---|
| Direct Labor | ($22,147) |
| Indirect Expenses | (17,079) |
| G&A Expense | (5,370) |
| Profit | 443,396 |
| Settlement Expenses | 151,539 |
| Cost in Excess of Contract | 460,708 |
| Total | $1,011,047 |

The termination settlement proposal is acceptable for arriving at a fair and reasonable price; however, the significant issues described below should be considered in establishing the government's position.

SIGNIFICANT ISSUES:

1. The results are qualified because we have not yet received a copy of the current technical report regarding the estimate to complete/estimate at completion, and the inventory verification report. We do not express an opinion regarding the contractor's legal entitlement.

2. ISN overstated settlement expenses by proposing settlement labor and ODCs which it did not incur and prompt payment act interest which is unallowable since ISN received progress payments.

3. ISN overstated the entire settlement proposal by proposing costs in excess of the contract limitations (FAR 49.207).

4. Profit is questioned in total. ISN could not support the proposed 10% profit factor with any Estimates to Complete (ETCs). Further. ISN acknowledged that they under bid this contract and were starting out in a loss from the beginning.

## SCOPE OF AUDIT

Except for the qualifications noted below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance that the proposal is free of material misstatement. An audit includes:

a. reviewing the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment:
b. examining, on a test basis, evidence supporting the amounts and disclosures in the termination settlement proposal:
c. assessing the accounting principles used and significant estimates made by the contractor:
d. evaluating the overall proposal presentation, and
e. determining the need for technical specialist assistance and (if applicable) quantifying the results of a government technical evaluation.

We evaluated the proposed costs using the applicable requirements contained in the:

a. Federal Acquisition Regulation (FAR), Part 49, and
b. DOD FAR Supplement (DFARS).

In CY 1996, ISN has brought three previous termination settlement proposals to the Armed Services Board of Contract Appeals (ASBCA) for settlement. Our prior audits have resulted in significant questioned costs. Based on our prior audits and current ASBCA experience with ISN's termination settlement proposals, we have assessed control risk as high. Our audit reflects this assessment and provides a reasonable basis for our opinion.

QUALIFICATIONS:

1. We were informed by Mr. Jeff Bergdahl. COTR that the updated technical reports will not be available for incorporation into our report. Therefore, the results of audit are qualified.

2. We made our recommendations without the benefit of the inventory verification report (SF 1423), which was not available as of the date of this report. Therefore, the audit report is qualified accordingly.

3. Our audit results do not consider the contractor's legal entitlement. We express no opinion regarding legal entitlement.

## RESULTS OF AUDIT

### AUDITOR'S OPINION

In our opinion, the cost or pricing data submitted by the offeror are inadequate in some respects. The proposal was not prepared in all respects in accordance with appropriate provisions of FAR and DFARS (see Notes 5, 6 and 7, pages 5, 6 and 7 for a further discussion). However, the impact of the inadequacies and noncompliances described is considered to be relatively insignificant. Therefore, we consider the proposal to be acceptable as a basis for negotiating a fair and reasonable price. This statement should not be interpreted to mean that the data are necessarily accurate, complete and current in accordance with 10 U.S.C. 2306a, since a postaward review may disclose evidence not now discernible.

| Elements of ISN's Proposal | ISN's Proposal | Questioned Costs | Difference (Note 1) | Note | Page |
|---|---|---|---|---|---|
| Direct Materials | $ 2,401,080 | $ 0 | $ 2,401,080 | | |
| Direct Labor | 604,657 | (22,147) | 626,804 | 2 | 4 |
| Indirect Expenses | 466,330 | (17,079) | 483,409 | 3 | 4 |
| Other Direct Costs | 427,831 | 0 | 427,831 | | |
| G&A Expense | 534,061 | (5,370) | 539,431 | 4 | 5 |
| Subtotal | 4,433,959 | (44,596) | 4,478,555 | | |
| Profit | 443,396 | 443,396 | 0 | 5 | 5 |
| Settlement Expenses | 183,224 | 151,539 | 31,685 | 6 | 6 |
| Cost in Excess of Cont. | 0 | 460,708 | (460,708) | 7 | 6 |
| Total | 5,060,579 | $ 1,011,047 | $ 4,049,532 | | |
| Payments Received | (2,507,015) | | | 8 | 7 |
| Net Requested | $ 2,553,564 | | | | |

actual profit

4,049,532

() Denotes upward adjustment

1,542,517.00
2,507,015.00

4,416,645.50
PD. 2,507,015
1,909,630.50
367,113.50
1,542,517 PD. AS A RESULT of the AUDIT

### Explanatory Notes

1. The amounts in this column are presented solely for the convenience of the TCO in developing the government's negotiation objective. They represent only the arithmetic difference between the amounts proposed and the related questioned costs. You should not consider the amounts to be audit approved or recommended amounts. DCAA does not approve or recommend prospective costs because the amounts depend partly on factors outside the realm of accounting expertise, such as opinions on technical and production matters. Any portion of the questioned costs accepted by the TCO must have the appropriate indirect rates applied.

2. Direct Labor

a. Summary of Conclusions:

We have reclassified $22,332 of stop work labor from settlement costs to direct costs and questioned $185 due to a difference between the settlement proposal and its supporting documentation. The net effect of these adjustments is an upward adjustment to direct labor of $22,147.

b. Basis of Claimed Cost:

Direct labor is based on the actual incurred labor cost as recorded in the books and records.

c. Audit Evaluation:

We verified that the direct labor cost: (1) reconciled with ISN's Jamis job cost reports and employee timesheets; and (2) was incurred prior to the termination notice.

3. Indirect Expenses

a. Summary of Conclusions:

We have increased the indirect expenses by $17,079 due to the increase in Direct Labor shown above.

b. Basis of Claimed Cost:

The indirect expenses are based on a Fringe Benefits rate of 29.68% and an Overhead rate of 36.58%. ISN's overhead allocation base includes fringe benefits.

c. Audit Evaluation:

We verified the proposed Fringe Benefits and Overhead rates to the current provisional billing rates and prior termination audits. The upward adjustment applicable to Fringe Benefits is calculated by applying the proposed and accepted Fringe Benefits rate to the stop work labor reclassified from settlement expenses to direct labor. The resulting sum is then multiplied by the proposed and accepted Overhead rate to arrive at the upward adjustment applicable to overhead.

4. <u>G&A Expense</u>

a. Summary of Conclusions:

We have increased the G&A expenses by $5,370 due to the increases in Direct Labor, Fringe Benefits and associated Overhead expenses.

b. Basis of Proposed Cost:

The G&A expenses are based on a G&A rate of 13.69% applied to Direct labor, Indirect expenses, Direct materials and ODCs.

c. Audit Evaluation:

We verified the proposed G&A expense rate to the current provisional billing rate and prior termination audits. The upward adjustment is the result of applying the proposed and accepted G&A rate to the increase in Direct labor and related Fringe Benefits and Overhead expense

5. <u>Profit</u>

a. Summary of Conclusions:

We have questioned the entire $443,396 of claimed profit in accordance with FAR 49.203 due to the following: (1) ISN did not provide us with any Estimate to Complete (ETC) or Percentage of Completion; (2) ISN significantly under bid this contract by approximately $900,000; and (3) DCAA audit report No. 6221-96G17500001 disclosed that ISN was in a loss position on this contract.

<u>A loss calculation was not applied since the Government [Navy] acknowledged that ISN was due some form of equitable adjustment on this contract due to various changes to the statement of work. It is our understanding that the only hold-up in the equitable adjustment negotiations was a delivery schedule. Since the contract was terminated prior to the conclusion of the equitable adjustment negotiations, we are unable to determine the impact that the equitable adjustment would have on the anticipated loss.</u>

b. Basis of Claimed Cost:

ISN has claimed a profit factor of 10% applied to all costs

c. Audit Evaluation:

We requested ISN to provide us with an ETC and a Percentage of Completion. We also requested technical specialist assistance regarding the ETC and Percentage of Completion.

6. Settlement Expenses

a. Summary of Conclusions:

We have questioned $151,539 of the $183,224 proposed settlement expenses as shown below:

| Description | Questioned | Ref. |
|---|---|---|
| Reclassified to D/L | $28,960 | (1) |
| Cost Not Incurred | 64,355 | (2) |
| Prompt Pmt. Int. | 58,224 | (3) |
| Total | $151,539 | |

(1) We have reclassified the stop work period labor and associated fringe benefits to direct labor and indirect expenses respectively as discussed in notes 2. and 3. Stop work period labor is not a settlement cost but a direct expense.

(2) ISN is proposing settlement labor and ODCs which are estimates of possible future costs. Consequently, these costs have not been incurred and are questioned in total.

(3) We have questioned the entire $58,224 of proposed Prompt Payment Interest in accordance with FAR 32.907-2 which states "no interest penalty shall be paid to the contractor as a result of delayed contract financing payments". Since ISN received progress payments, and the interest is calculated on these progress payments, the interest is unallowable.

b. Basis of Claimed Cost:

The claimed settlement costs are based on costs recorded in ISN's Jamis Job Cost and estimated future labor and ODCs. The claimed prompt payment interest is a mathematical calculation not recorded in the accounting records.

c. Audit Evaluation:

We verified that the claimed settlement expenses were recorded in the Jamis Job Cost and supported by vendor invoices and employee timesheets. We reviewed the supporting documentation for allowability and allocability to the terminated contract. We also verified that the costs were incurred after the Termination notice.

7. Cost in Excess of Contract Limitations

a. Summary of Conclusions:

We have questioned $460,708 which is the total proposed costs and profit of $4,877,354 less the contract price of $4,416,646 in accordance with FAR 49.207.

b. Basis of Claimed Cost

ISN did not indicate in its termination settlement proposal any costs claimed in excess of the contract limitations.

c. Audit Evaluation

We compared the proposed costs plus profit to the contract price.

8. Payments Received

a. Summary of Conclusions:

The $2,507,015 proposed by ISN agrees with their accounting records.

We discussed factual matters concerning audit findings with Mr. Daniel Dowling, Corporate Counsel. We did not disclose the dollar impact of our conclusions and recommendations to the contractor. Mr. Dowling reserved comment on our findings.

## DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contact regarding this audit | |
| Benjamin Monastero, Senior Auditor | (410) 964-2060 |
| Other contacts regarding this audit: | |
| Mark S. Moser, Branch Manager | (410) 964-2060 |
| William C. Erdman. Supervisory Auditor | (410) 964-2060 |
| Office Administrative Personnel | |
| | FAX No. |
| | (410) 997-3237 |

AUDIT REPORT AUTHORIZED BY:

William C. Erdman for

Mark S. Moser
Branch Manager
DCAA Columbia Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

Termination Contracting Officer
ATTN.: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Proprietary determinations should be made in the event of an external request for access. The *restrictions of 18 U.S.C. 1905 should be considered before this information is released to the* public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

3. The information contained in this audit report should not be used for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

ISN

EXHIBIT
42

Roma Malkani
President

February 6, 1997

Mr. Paul E. Slemons
Termination Contracting Officer
Defense Logistics Agency
Defense Contract Management Area
Command- Atlanta
805 Walker Street, Suite 1
Marietta, Georgia 30060-2789

Subject: Request for partial payment for terminated
contract number N00600-94-C-0389

Dear Mr. Slemons:

We have received the DCAA audit of the above referenced contract from your office in a letter dated January 27, 1997. We do not accept the findings of the auditor as they relate to total cost, as they do not include the impact of changed site conditions and other problems for which the company is entitled to compensation from the government. These matters will be set out in a detailed response to the audit findings.

Pursuant to our telephone conference of today, we are sending the enclosed request for partial payment. As you know, the costs associated with this contract have been outstanding for over a year. ISN is a small company; going without payment for this period imposes quite a severe burden on the company.

The DCAA audit report found that, at a minimum, ISN would be eligible for a total payment of $4,049,532. While we disagree with this finding, ISN requests a partial payment based on the difference between the DCAA's total eligible amount of $4,049,532 and the amount already paid of $2,507,015, as stated in the settlement proposal, in the amount of $1,542,517. This request is made on the Form 1440 attached. Any assistance your office can render in expediting ISN's partial payment request would be greatly appreciated.

00183

Information Systems & Networks Corporation • 10411 Motor City Drive, Bethesda, Maryland 20817 • (301) 469-0400 • Fax: (301) 469-0767

Thank you for your cooperation. Should you need further information on this matter please call Daniel Dowling of Jerry Binker at 301-469-0400.

Sincerely,

Roma Malkani

encl: Form 1440

# APPLICATION FOR PARTIAL PAYMENT

FORM APPROVED OMB NO. 9000-0012

Public reporting burden for this collection of information is estimated to average 2.5 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (VRS), Office of Federal Acquisition and Regulatory Policy, GSA, Washington, D.C. 20405; and to the Office of Management and Budget, Paperwork Reduction Project (9000-0012), Washington, D.C. 20503.

For use by Prime Contractor or Subcontractor under contracts terminated for the convenience of the Government.

THIS APPLICATION APPLIES TO (Check one)
☐ A PRIME CONTRACT WITH THE GOVERNMENT ☐ SUBCONTRACT OR PURCHASE ORDER

SUBCONTRACT OR PURCHASE ORDER NUMBER(S)

APPLICANT: Information Systems & Networks Corporation

STREET ADDRESS: 10411 Motor City Drive

CITY AND STATE (Include ZIP Code): Bethesda, MD 20817

CONTRACTOR WHO SENT NOTICE OF TERMINATION

NAME

ADDRESS (Include ZIP Code)

NAME OF GOVERNMENT AGENCY: Navy

GOVERNMENT PRIME CONTRACT NUMBER: N00600-94-C-0389

IF CONTRACTOR HAS GUARANTEED LOANS OR HAS ASSIGNED MONEYS DUE UNDER THE CONTRACT, GIVE THE FOLLOWING:

NAME AND ADDRESS OF FINANCING INSTITUTION (Include ZIP Code)

CONTRACTOR'S REFERENCE NUMBER: 01319

NAME AND ADDRESS OF GUARANTOR (Include ZIP Code)

EFFECTIVE DATE OF TERMINATION: 15 March 1996

DATE OF THIS APPLICATION: 7 February 1997

NAME AND ADDRESS OF ASSIGNEE (Include ZIP Code)

AMOUNT REQUESTED: $ 1,542,517

APPLICATION NUMBER UNDER THIS TERMINATION: 1

## SECTION I – STATUS OF CONTRACT OR ORDER AT EFFECTIVE DATE OF TERMINATION

| PRODUCTS COVERED BY TERMINATED CONTRACT OR PURCHASE ORDER (a) | | FINISHED: PREVIOUSLY SHIPPED AND INVOICED (b) | FINISHED, ON HAND: PAYMENT TO BE RECEIVED THROUGH INVOICING (c) | FINISHED, ON HAND: INCLUDED IN THIS APPLICATION (d) | UNFINISHED OR NOT COMMENCED: TO BE COMPLETED (e) | UNFINISHED OR NOT COMMENCED: NOT TO BE COMPLETED (f) | TOTAL COVERED BY CONTRACT OR ORDER (g) |
|---|---|---|---|---|---|---|---|
| CLINS 0001 through 0003 | QUANTITY | | | | | | 1 Lot |
| | $ | | | | | | $4,416,646 |
| | QUANTITY | | | | | | |
| | $ | | | | | | |
| | QUANTITY | | | | | | |
| | $ | | | | | | |

## SECTION II – APPLICANT'S OWN TERMINATION CHARGES (Exclusive of its Subcontractors' Charges)

SETTLEMENT PROPOSAL ☐ ATTACHED ☒ PREVIOUSLY SUBMITTED

| NO. | ITEM | CHARGES AS LISTED IN SETTLEMENT PROPOSAL |
|---|---|---|
| 1 | ACCEPTABLE FINISHED PRODUCT (at contract price) | $ |
| 2 | WORK-IN-PROGRESS ** (includes profit of $443,396) | 1,514,383 |
| 3 | RAW MATERIALS, PURCHASED PARTS, AND SUPPLIES | 2,401,080 |
| 4 | GENERAL AND ADMINISTRATIVE EXPENSE | 534,061 |
| 5 | TOTAL (Sum of lines 1, 2, 3, and 4) | $ 4,449,524 |
| 6 | SPECIAL TOOLING AND SPECIAL TEST EQUIPMENT | |
| 7 | OTHER COSTS | 427,831 |
| 8 | SETTLEMENT EXPENSES | 183,224 |
| 9 | TOTAL (Sum of lines 5, 6, 7, and 8) (from settlement proposal) | $ 5,060,578 |
| 10 | SUBCONTRACTOR SETTLEMENTS APPROVED BY CONTRACTING OFFICER OR SETTLED UNDER A DELEGATION OF AUTHORITY AND PAID BY APPLICANT | $ |
| | **11. AMOUNTS RECEIVED** | |
| a | UNLIQUIDATED PARTIAL, PROGRESS, AND ADVANCE PAYMENTS RECEIVED | $ 2,507,015 |
| b | DISPOSAL AND OTHER CREDITS | |
| c | TOTAL (Sum of lines a and b) | 2,507,015 |
| d | AMOUNT OF PARTIAL PAYMENT REQUESTED | 1,542,517 |
| e | TOTAL (Sum of lines c and d) | $ 4,049,532 |

## SECTION III – AGREEMENT OF APPLICANT

IN CONSIDERATION OF PARTIAL PAYMENT THAT MAY BE MADE, THE APPLICANT AGREES AS FOLLOWS:

(a) Repayment of Excess. If any partial payment made to the Contractor is in excess of the amount finally determined to be due on its termination settlement proposal or claim, the Contractor shall repay the excess to the Government upon demand together with interest at the rate established by the Secretary of the Treasury under 50 U.S.C. (App.) 1215(b)(2). Interest shall be computed for the period from the date of the excess payment to the date the excess is repaid. Interest shall not be charged however, for any (1) excess payment due to a reduction in the Contractor's proposal or claim because of retention or other disposition of termination inventory, until 10 days after the date of the retention or disposition, or any later date determined by the Contracting Officer because of the circumstances, or for (2) overpayment under cost-reimbursement research and development contracts (without profit or fee to the Contractor) if the overpayments are repaid to the Government within *30 days after demand.*

(b) Prompt Settlement of Proposal. The applicant will make every effort to expedite final settlement of the termination settlement proposal and any proposals of its subcontractors.

(c) Disposal and Retention of Inventory. The applicant shall, within 10 days, notify the Contracting Officer whenever the proceeds received from the disposal of termination inventory, when added to the cost or agreed value of inventory retained by the applicant, exceeds the amount of its charges (Section II, Line 9) and the amount of such credits has not been included on Section II, Line b (Disposal and Other Credits).

## SECTION IV – CERTIFICATE OF APPLICANT

I certify that the amount of charges *(exclusive of subcontractors' charges)* due as of the date of this application and allocable to the terminated portion of contract number N00600-94-C-0389 dated 15 July 1994 with U.S. Navy, is not less than $ 5,060,578 *(From Section II, Line 9)*, that, to the best of my knowledge, the amounts received are as set forth above, and that I have not assigned any moneys payable under this contract, except as set forth above.

| NAME OF APPLICANT | BY *(Signature of authorized official)* | |
|---|---|---|
| Information Systems & Networks Corp. | [signature] | |
| | TITLE: Roma Malkani, President | DATE: |

## SECTION V – RECOMMENDATION OF FIRST REVIEWING CONTRACTOR

The undersigned states that it has examined this application and has considered the applicant's general reputation. It has no reason to doubt the accuracy of the information contained in this application or that the amount certified by the applicant as due will constitute a proper charge to be included in the undersigned's termination settlement proposal against
It recommends that the requested partial payment be made.

The undersigned agrees that it will promptly pay over to the applicant or credit against amounts owing from the applicant any amount received for the benefit of the applicant under this application, and that it will repay to the Government on demand any amount not so paid or credited.

| NAME OF CONTRACTOR | BY *(Signature of authorized official)* | |
|---|---|---|
| | | |
| | TITLE | DATE |

## SECTION VI – RECOMMENDATIONS OF OTHER REVIEWING CONTRACTORS

Each of the undersigned states that it has no reason to doubt that the amount of the partial payment requested, and recommended above is due the applicant and will constitute a proper charge in the termination settlement proposal of the undersigned.

Each of the undersigned agrees that it will promptly pay over to its immediate subcontractor or credit against amounts owing from such subcontractor any amount received for the benefit of the applicant under this application, and that it will repay to the Government on demand any amount not so paid or credited.

| | CONTRACTOR | DATE | IDENTIFICATION OF YOUR CONTRACT | SIGNATURE OF OFFICER, PARTNER, OR OWNER |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |

*Where the space provided for any information is insufficient, continue on a separate sheet.*

EXHIBIT
Crawford
#27
8/10/1999 9

EXHIBIT
43

**DEFENSE LOGISTICS AGENCY**
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

IN REPLY
REFER TO: DCMDS-GATC

November 5, 1997

SUBJECT: Terminated Contract - N00600-94-C-0389 Docket N961443SA

Mr. Roscoe Crawford
Department of the Navy
Fleet and Industrial Supply Center Norfolk
Detachment Washington DC
Washington Navy Yard Bldg 200
901 M Street SE
Washington, DC 20374-5014

Dear Mr. Crawford:

Several attempts have been made to get your office to provide information on subject termination. A certified letter was sent to you on October 9, 1997 requesting you provided information on subject termination. After getting no response from you, I phoned you on October 29, 1997 and we discussed the matter once again and at that time you informed me that you would setup a conference call for Friday October 31, 1997 with you, Jeff Berghdal, and myself. Once again I did not hear from your office. On Monday, November 23, 1997 I phoned and got your voice mail , I left a message for you to call me, no response. I also left a message on Jeff Berghddal's voice mail and there was no response from his office.

This letter is to inform that based on the material provided to the TCO, The TCO is ready to make an offer to ISN for the settlement of the termination settlement proposal and the ECP in the amount of $4,940,725.00. This would require additional funding on the contract in the amount of $524,079.46. It is asked of your office to reply to this letter as to whether you agree or disagree. It is asked that you respond no later than COB November 7, 1997. If no response is received from your office by this date then TCO will proceed with settlement.

Should you have any questions or desire any further information, please contact the undersigned at (404) 590-6389, or FAX (404) 590-2110.

Denise M. Jones
DENISE M. JONES
Termination Contracting Officer

EXHIBIT 44

**DEFENSE LOGISTICS AGENCY**
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

IN REPLY REFER TO: DCMDS-GATC

November 18, 1997

SUBJECT: Terminated Contract - N00600-94-C-0389 Docket N961443SA

Mr. Roscoe Crawford
Department of the Navy
Fleet and Industrial Supply Center Norfolk
Detachment Washington DC
Washington Navy Yard Bldg 200
901 M Street SE
Washington, DC 20374-5014

Dear Mr. Crawford:

Reference our letter dated November 5, 1997 sent via facsimile.

In our referenced letter we advised your office that we would be issuing an offer to ISN in the amount of $4,940,725.00 and that we need additional funding in the amount of $524,079.46. This letter is to request additional funding. It is requested that the funding be provided within 90 days. If funding is not provided within 90 day period, I will then issue my decision and return authority back to your office for completion of the termination.

Should you have any questions or desire any further information, please contact the undersigned at ~~(404)~~ 770 590-6389, or FAX ~~(404)~~ 770 590-2110.

DENISE M. JONES
Termination Contracting Officer

EXHIBIT Crawford #30

00188

EXHIBIT
45

# Volume II – Cost Proposal
# Proposal Revisions
# Best and Final Offer (BAFO)

# AUTOMATED TECHNICAL CONTROL SYSTEMS

Solicitation #: N00600-93-R-2790
May 18, 1994

**Presented to:**
Naval Regional Contracting Center
Washington Navy Yard, Bldg 200, 4th Floor
901 M Street, S.E.
Washington, D.C. 20374-5014

**Prepared by:**
Information Systems & Networks Corp.
10411 Motor City Drive
Bethesda, Maryland 20817
Phone: (301) 469-0400

**Use or Disclosure Restriction**
This proposal or quotation includes data that shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed–in whole or in part–for any purpose other than to evaluate this proposal or quotation. If, however, a contract is awarded to this offeror or quoter as a result of–or in connection with–the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the Government's right to use information contained in this data if it is obtained from another source without restriction. The data subject to this restriction are contained in sheets so marked in this proposal document.

# 1.0 Cost Tables

# 1.1 Unit Price Tables (Tables B-1, B-2, and B-3)

# 1.1.1 Table B-1

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NTCC HAMPTON ROADS - YEAR 1**
Prices are valid from month 1 through month 6 (months after contract award)

| Item No. | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Qty. | 5. Months of Use From | To | 6. FIP Schedule Prices Purchase Price | Monthly Maint. | Monthly Rental | 7. Extended Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1001 | 80486 DX2-66 AUSTIN FILE SERVER | $2,958.00 | NA | NA | NA | 2 | NA | NA | $2,958.00 | NA | NA | $5,916.00 |
| 1002 | 80486 DX2-50 AUSTIN WORKSTATION | $2,133.00 | NA | NA | NA | 6 | NA | NA | $2,133.00 | NA | NA | $12,798.00 |
| 1003 | EXB-4200 DAT TAPE BACKUP | $753.00 | NA | NA | NA | 1 | NA | NA | $753.00 | NA | NA | $753.00 |
| 1004 | MI 1015 LOGITECH TRACKBALL MOUSE | $55.00 | NA | NA | NA | 2 | NA | NA | $55.00 | NA | NA | $110.00 |
| 1005 | NSPK1 SPARE PARTS KIT | $2,663.59 | NA | NA | NA | 1 | NA | NA | $2,663.59 | NA | NA | $2,663.59 |
| 1006 | 104015 HP 4+ LASER JET PRINTER | $1,399.00 | NA | NA | NA | 1 | NA | NA | $1,399.00 | NA | NA | $1,399.00 |
| 1007 | 104323 HP JET DIRECT CARD | $359.00 | NA | NA | NA | 1 | NA | NA | $359.00 | NA | NA | $359.00 |
| 1008 | LQ 1070 EPSON 24-PIN WIDE CARRIAGE PRINTER | $359.00 | NA | NA | NA | 1 | NA | NA | $359.00 | NA | NA | $359.00 |
| 1009 | SYNOPTICS LATTISHUB #2814 116-PORT ENET UTP HUB | $1,419.00 | NA | NA | NA | 1 | NA | NA | $1,419.00 | NA | NA | $1,419.00 |
| 1010 | ATL TELEC # K0124415 LEV 5 PATCH CORD (100 ft.) | $14.00 | NA | NA | NA | 13 | NA | NA | $14.00 | NA | NA | $182.00 |
| 1011 | ALLIED AT-MX25F FIBER OPTIC MICRO TRANSCEIVER | $156.00 | NA | NA | NA | 2 | NA | NA | $156.00 | NA | NA | $312.00 |
| 1012 | RK-MX880A FIBER OPTIC MULTIPLEXER | $869.25 | NA | NA | NA | 2 | NA | NA | $869.25 | NA | NA | $1,738.50 |
| 1013 | SMC #LANET16/24PK ETHERCARD + ELITE ADAPTER | $101.48 | NA | NA | NA | 8 | NA | NA | $101.48 | NA | NA | $811.84 |
| 1014 | NF3000 ISA FDDI ADAPTER FOR UTP (RJ-45), SINGLE | $789.00 | NA | NA | NA | 2 | NA | NA | $789.00 | NA | NA | $1,578.00 |
| 1015 | RK-WP263 NYLON WALL PLATE | $1.10 | NA | NA | NA | 2 | NA | NA | $1.10 | NA | NA | $2.20 |
| 1016 | RK-WP260 OUTLET JACK FRAME | $3.01 | NA | NA | NA | 2 | NA | NA | $3.01 | NA | NA | $6.02 |
| 1017 | DMS MTRX CONFIGURATION DQ-9405-2256C - consists of foll. | $1,493,180.00 | NA | NA | NA | 1 | NA | NA | $1,493,180.00 | NA | NA | $1,493,180.00 |
| | TFOU-8/16 Tandem Fanout Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | TATU 2/8Tandem Automatic Transfer Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-100(X) Ext. Timed Redund. Mtrx Switch Assly. - 256 ports | NSP | NA | NA | NA | 2 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-500(X) Ext. Timed Redund. Mtrx Switch Assly.-512 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | *RMSA-4000(X) Ext. Timed Redund. Mtrx Switch Assly.-4096 ports* | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-8000(X) Ext. Timed Redund. Mtrx Switch Assly.-8192 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-64/RIU (X) Satellite Shelf Assembly | NSP | NA | NA | NA | 103 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-32/RIU(X) Satellite Shelf Assembly | NSP | NA | NA | NA | 2 | NA | NA | NSP | NA | NA | $0.00 |
| | DIM-414-3 Data Interface Module | NSP | NA | NA | NA | 1515 | NA | NA | NSP | NA | NA | $0.00 |
| | DIX-202 Universal Data Information Exchange Module | NSP | NA | NA | NA | 32 | NA | NA | NSP | NA | NA | $0.00 |
| | DIH-264X Data Interface Module, High Speed | NSP | NA | NA | NA | 3 | NA | NA | NSP | NA | NA | $0.00 |
| | AIM-800 Analog Interface Module | NSP | NA | NA | NA | 62 | NA | NA | NSP | NA | NA | $0.00 |
| 1018 | ESPK1 MTRX SPARE PARTS KIT | $31,595.00 | NA | NA | NA | 1 | NA | NA | $31,595.00 | NA | NA | $31,595.00 |
| 1019 | 990-0959-0400 3-BAY CONSOLE CABINETS | $2,889.14 | NA | NA | NA | 4 | NA | NA | $2,889.14 | NA | NA | $11,556.56 |
| 1020 | 990-0949-0600 3-BAY EQUIPMENT CABINETS | $2,069.30 | NA | NA | NA | 1 | NA | NA | $2,069.30 | NA | NA | $2,069.30 |
| 1021 | 990-0949-0500 STANDALONE EQUIPMENT CABINETS | $904.26 | NA | NA | NA | 0 | NA | NA | $904.26 | NA | NA | $0.00 |
| 1022 | 990-0949-0500 STANDALONE CABINET | $904.26 | NA | NA | NA | 16 | NA | NA | $904.26 | NA | NA | $14,468.16 |
| 1023 | EDSAL DOUBLE DOOR STORAGE CABINET | $297.00 | NA | NA | NA | 1 | NA | NA | $297.00 | NA | NA | $297.00 |
| 1024 | CM-00222BAG-2 2/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $22.00 | NA | NA | NA | 5 | NA | NA | $22.00 | NA | NA | $110.00 |
| 1025 | CM-00622BAG-2 6/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $59.00 | NA | NA | NA | 2 | NA | NA | $59.00 | NA | NA | $118.00 |
| 1026 | BELDEN #8106 6-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $668.00 | NA | NA | NA | 16 | NA | NA | $668.00 | NA | NA | $10,688.00 |
| 1027 | BELDEN #9682, 5-PAIR OR EQUAL, 24 AWG DATA CABLE (10 | $190.00 | NA | NA | NA | 49 | NA | NA | $190.00 | NA | NA | $9,310.00 |
| 1028 | BELDEN #9681 4-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $140.00 | NA | NA | NA | 24 | NA | NA | $140.00 | NA | NA | $3,360.00 |
| 1029 | BELDEN #8162 2-PAIR OR EQUAL, 24 AWG DATA CABLE (500 | $45.00 | NA | NA | NA | 1 | NA | NA | $45.00 | NA | NA | $45.00 |
| 1030 | COMP CRAFT FIBER OPTIC JUMPER - 62.5 MICRONS (100 ft.) | $162.00 | NA | NA | NA | 3 | NA | NA | $162.00 | NA | NA | $486.00 |
| 1031 | AIW #ES13244002000 12 AWG ROMAX POWER CABLE (500 ft | $85.00 | NA | NA | NA | 4 | NA | NA | $85.00 | NA | NA | $340.00 |
| 1032 | BULK CONDUIT (Liquid Tight, EMT, Square D) | $10,000.00 | NA | NA | NA | 2 | NA | NA | $10,000.00 | NA | NA | $20,000.00 |
| 1033 | AIW #ES13244008001 8 AWG GROUND WIRE CABLE (500 ft.) | $210.00 | NA | NA | NA | 2 | NA | NA | $210.00 | NA | NA | $420.00 |
| 1034 | SIEMON #S66M1-25 BLOCK CONNECTING CLIPS | $5.50 | NA | NA | NA | 10 | NA | NA | $5.50 | NA | NA | $55.00 |
| 1035 | FIBER OPTIC PLATE - SEICOR | $45.00 | NA | NA | NA | 2 | NA | NA | $45.00 | NA | NA | $90.00 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00193

IBM

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NTCC HAMPTON ROADS - YEAR 1**

Prices are valid from month 1 through month 6 (months after contract award)

| Item No. | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Qty. | 5. Months of Use From | To | 6. FIP Schedule Prices Purchase Price | Monthly Maint. | Monthly Rental | 7. Extended Cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1036 | NEMA BOXES | $1.75 | NA | NA | NA | 48 | NA | NA | $1.75 | NA | NA | $84.00 |
| 1037 | NEMA DUPLEX RECEPTACLES | $4.00 | NA | NA | NA | 46 | NA | NA | $4.00 | NA | NA | $184.00 |
| 1038 | AMP #749808-3 DB 25 CONNECTORS | $1.79 | NA | NA | NA | 3150 | NA | NA | $1.79 | NA | NA | $5,638.50 |
| 1039 | AMP #749805-2 DB 15 CONNECTORS | $1.65 | NA | NA | NA | 197 | NA | NA | $1.65 | NA | NA | $325.05 |
| 1040 | STEWART #940-SP3088RA133 RJ-45 CONNECTORS | $0.24 | NA | NA | NA | 196 | NA | NA | $0.24 | NA | NA | $47.04 |
| 1041 | ATC INSTALLATION TOOL KIT | $4,533.00 | NA | NA | NA | 1 | NA | NA | $4,533.00 | NA | NA | $4,533.00 |
| 1042 | RG-FT 850 IDC TOOL KIT | $363.55 | NA | NA | NA | 1 | NA | NA | $363.55 | NA | NA | $363.55 |
| 1043 | RG-FT 023 IDC INSERTION/REMOVAL KIT | $11.33 | NA | NA | NA | 1 | NA | NA | $11.33 | NA | NA | $11.33 |
| 1044 | RG-FT 022 HAND TERMINATION TOOL | $8.03 | NA | NA | NA | 1 | NA | NA | $8.03 | NA | NA | $8.03 |
| 1045 | FIREBIRD 6000 BERT TESTER (Used) | $6,000.00 | NA | NA | NA | 0 | NA | NA | $6,000.00 | NA | NA | $0.00 |
| 1046 | HP 54501A 100 Mhz OSCILLOSCOPE | $4,725.00 | NA | NA | NA | 0 | NA | NA | $4,725.00 | NA | NA | $0.00 |
| | LAST EQUIPMENT ITEM | | | | | | | | | | | |
| | OPTIONS: | | | | | | | | | | | |
| | SONY (KT1079) INTERNAL CD-ROM (Not included in costs) | $156.00 | NA | NA | NA | 1 | NA | NA | $156.00 | NA | NA | -------- |
| | GHD 525S 525 MB SCSI HARD DRIVE (Not included in costs) | $395.00 | NA | NA | NA | 1 | NA | NA | $395.00 | NA | NA | -------- |
| | Total Costs | | | | | | | | | | | $1,639,789.67 |
| | G&A | 3.46% | | | | | | | | | | $56,736.72 |
| | Fees | 0.00% | | | | | | | | | | $0.00 |
| | Total Price | | | | | | | | | | | $1,696,526.39 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00194

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS JAPAN - YEAR 2**

Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item No. | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Qty. | 5. Months of Use From | To | 6. FIP Schedule Prices Purchase Price | Monthly Maint. | Monthly Rental | 7. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1001 | 80486 DX2-66 AUSTIN FILE SERVER | $2,662.20 | NA | NA | NA | 2 | NA | NA | $2,662.20 | NA | NA | $5,324.40 |
| 1002 | 80486 DX2-50 AUSTIN WORKSTATION | $1,919.70 | NA | NA | NA | 5 | NA | NA | $1,919.70 | NA | NA | $9,598.50 |
| 1003 | EXB-4200 DAT TAPE BACKUP | $677.70 | NA | NA | NA | 1 | NA | NA | $677.70 | NA | NA | $677.70 |
| 1004 | MI 1015 LOGITECH TRACKBALL MOUSE | $49.50 | NA | NA | NA | 2 | NA | NA | $49.50 | NA | NA | $99.00 |
| 1005 | NSPK1 SPARE PARTS KIT | $2,397.23 | NA | NA | NA | 1 | NA | NA | $2,397.23 | NA | NA | $2,397.23 |
| 1006 | 104015 HP 4+ LASER JET PRINTER | $1,259.10 | NA | NA | NA | 1 | NA | NA | $1,259.10 | NA | NA | $1,259.10 |
| 1007 | 104323 HP JET DIRECT CARD | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1008 | LQ 1070 EPSON 24-PIN WIDE CARRIAGE PRINTER | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1009 | SYNOPTICS LATTISHUB #2814 116-PORT ENET UTP HUB | $1,277.10 | NA | NA | NA | 1 | NA | NA | $1,277.10 | NA | NA | $1,277.10 |
| 1010 | ATL TELEC # K0124415 LEV 5 PATCH CORD (100 ft.) | $12.60 | NA | NA | NA | 12 | NA | NA | $12.60 | NA | NA | $151.20 |
| 1011 | ALLIED AT-MX25F FIBER OPTIC MICRO TRANSCEIVER | $140.40 | NA | NA | NA | 2 | NA | NA | $140.40 | NA | NA | $280.80 |
| 1012 | RK-MX880A FIBER OPTIC MULTIPLEXER | $782.33 | NA | NA | NA | 2 | NA | NA | $782.33 | NA | NA | $1,564.66 |
| 1013 | SMC #LANET16/24PK ETHERCARD + ELITE ADAPTER | $91.33 | NA | NA | NA | 7 | NA | NA | $91.33 | NA | NA | $639.31 |
| 1014 | NF3000 ISA FDDI ADAPTER FOR UTP (RJ-45), SINGLE | $710.10 | NA | NA | NA | 2 | NA | NA | $710.10 | NA | NA | $1,420.20 |
| 1015 | RK-WP263 NYLON WALL PLATE | $0.99 | NA | NA | NA | 2 | NA | NA | $0.99 | NA | NA | $1.98 |
| 1016 | RK-WP260 OUTLET JACK FRAME | $2.71 | NA | NA | NA | 2 | NA | NA | $2.71 | NA | NA | $5.42 |
| 1017 | DMS MTRX CONFIGURATION DQ-9405-2257B - consists of foll. | $357,453.00 | NA | NA | NA | 1 | NA | NA | $357,453.00 | NA | NA | $357,453.00 |
| | TFOU-8/16 Tandem Fanout Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | TATU 2/8Tandem Automatic Transfer Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-100(X) Ext. Timed Redund. Mtrx Switch Assly. - 256 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-500(X) Ext. Timed Redund. Mtrx Switch Assly.-512 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-4000(X) Ext. Timed Redund. Mtrx Switch Assly.-4096 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-8000(X) Ext. Timed Redund. Mtrx Switch Assly.-8192 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-64/RIU (X) Satellite Shelf Assembly | NSP | NA | NA | NA | 30 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-32/RIU(X) Satellite Shelf Assembly | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIM-414-3 Data Interface Module | NSP | NA | NA | NA | 328 | NA | NA | NSP | NA | NA | $0.00 |
| | DIX-202 Universal Data Information Exchange Module | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIH-264 Data Interface Module, High Speed | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | AIM-800 Analog Interface Module | NSP | NA | NA | NA | 47 | NA | NA | NSP | NA | NA | $0.00 |
| 1018 | ESPK1 MTRX SPARE PARTS KIT | $20,997.00 | NA | NA | NA | 1 | NA | NA | $20,997.00 | NA | NA | $20,997.00 |
| 1019 | 990-0959-0400 3-BAY CONSOLE CABINETS | $2,600.23 | NA | NA | NA | 3 | NA | NA | $2,600.23 | NA | NA | $7,800.69 |
| 1020 | 990-0949-0600 3-BAY EQUIPMENT CABINETS | $1,862.37 | NA | NA | NA | 0 | NA | NA | $1,862.37 | NA | NA | $0.00 |
| 1021 | 990-0949-0500 STANDALONE EQUIPMENT CABINETS | $813.83 | NA | NA | NA | 1 | NA | NA | $813.83 | NA | NA | $813.83 |
| 1022 | 990-0949-0500 STANDALONE CABINET | $813.83 | NA | NA | NA | 4 | NA | NA | $813.83 | NA | NA | $3,255.32 |
| 1023 | EDSAL DOUBLE DOOR STORAGE CABINET | $267.30 | NA | NA | NA | 1 | NA | NA | $267.30 | NA | NA | $267.30 |
| 1024 | CM-00222BAG-2 2/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $19.80 | NA | NA | NA | 5 | NA | NA | $19.80 | NA | NA | $99.00 |
| 1025 | CM-00622BAG-2 6/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $53.10 | NA | NA | NA | 1 | NA | NA | $53.10 | NA | NA | $53.10 |
| 1026 | BELDEN #8106 6-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $601.20 | NA | NA | NA | 5 | NA | NA | $601.20 | NA | NA | $3,006.00 |
| 1027 | BELDEN #9682, 6-PAIR OR EQUAL, 24 AWG DATA CABLE (10 | $171.00 | NA | NA | NA | 12 | NA | NA | $171.00 | NA | NA | $2,052.00 |
| 1028 | BELDEN #9681 4-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $126.00 | NA | NA | NA | 7 | NA | NA | $126.00 | NA | NA | $882.00 |
| 1029 | BELDEN #8162 2-PAIR OR EQUAL, 24 AWG DATA CABLE (500 | $40.50 | NA | NA | NA | 1 | NA | NA | $40.50 | NA | NA | $40.50 |
| 1030 | COMP CRAFT FIBER OPTIC JUMPER - 62.5 MICRONS (100 ft.) | $145.80 | NA | NA | NA | 3 | NA | NA | $145.80 | NA | NA | $437.40 |
| 1031 | AIW #ES13244002000 12 AWG ROMAX POWER CABLE (500 ft | $76.50 | NA | NA | NA | 2 | NA | NA | $76.50 | NA | NA | $153.00 |
| 1032 | BULK CONDUIT (Liquid Tight, EMT, Square D) | $9,000.00 | NA | NA | NA | 1 | NA | NA | $9,000.00 | NA | NA | $9,000.00 |
| 1033 | AIW #ES13244008001 8 AWG GROUND WIRE CABLE (500 ft.) | $189.00 | NA | NA | NA | 1 | NA | NA | $189.00 | NA | NA | $189.00 |
| 1034 | SIEMON #S66M1-25 BLOCK CONNECTING CLIPS | $4.95 | NA | NA | NA | 7 | NA | NA | $4.95 | NA | NA | $34.65 |
| 1035 | FIBER OPTIC PLATE - SEICOR | $40.50 | NA | NA | NA | 2 | NA | NA | $40.50 | NA | NA | $81.00 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS JAPAN - YEAR 2**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | 5. Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1036 | NEMA BOXES | $1.58 | NA | NA | NA | 23 | NA | NA | $1.58 | NA | NA | $36.34 |
| 1037 | NEMA DUPLEX RECEPTACLES | $3.60 | NA | NA | NA | 21 | NA | NA | $3.60 | NA | NA | $75.60 |
| 1038 | AMP #749808-3 DB 25 CONNECTORS | $1.61 | NA | NA | NA | 864 | NA | NA | $1.61 | NA | NA | $1,391.04 |
| 1039 | AMP #749805-2 DB 15 CONNECTORS | $1.49 | NA | NA | NA | 54 | NA | NA | $1.49 | NA | NA | $80.46 |
| 1040 | STEWART #940-SP3088RA133 RJ-45 CONNECTORS | $0.22 | NA | NA | NA | 158 | NA | NA | $0.22 | NA | NA | $34.76 |
| 1041 | ATC INSTALLATION TOOL KIT | $2,999.70 | NA | NA | NA | 1 | NA | NA | $2,999.70 | NA | NA | $2,999.70 |
| 1042 | RG-FT 850 IDC TOOL KIT | $327.20 | NA | NA | NA | 1 | NA | NA | $327.20 | NA | NA | $327.20 |
| 1043 | RG-FT 023 IDC INSERTION/REMOVAL KIT | $10.20 | NA | NA | NA | 1 | NA | NA | $10.20 | NA | NA | $10.20 |
| 1044 | RG-FT 022 HAND TERMINATION TOOL | $7.23 | NA | NA | NA | 1 | NA | NA | $7.23 | NA | NA | $7.23 |
| 1045 | FIREBIRD 6000 BERT TESTER (Used) | $5,400.00 | NA | NA | NA | 0 | NA | NA | $5,400.00 | NA | NA | $0.00 |
| 1046 | HP 54501A 100 Mhz OSCILLOSCOPE | $4,252.50 | NA | NA | NA | 0 | NA | NA | $4,252.50 | NA | NA | $0.00 |
| | LAST EQUIPMENT ITEM | | | | | | | | | | | |
| | **OPTIONS:** | | | | | | | | | | | |
| | SONY (KT1079) INTERNAL CD-ROM (Not included in costs) | $140.40 | NA | NA | NA | 1 | NA | NA | $140.40 | NA | NA | ——— |
| | GHD 525S 525 MB SCSI HARD DRIVE (Not included in costs) | $355.50 | NA | NA | NA | 1 | NA | NA | $355.50 | NA | NA | -------- |
| | Total Costs | | | | | | | | | | | $436,920.12 |
| | G&A | 3.46% | | | | | | | | | | $15,117.44 |
| | Fees | 0.00% | | | | | | | | | | $0.00 |
| | Total Price | | | | | | | | | | | $452,037.56 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NTCC MAKALAPA - YEAR 1**

Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1001 | 80486 DX2-66 AUSTIN FILE SERVER | $2,958.00 | NA | NA | NA | 2 | NA | NA | $2,958.00 | NA | NA | $5,916.00 |
| 1002 | 80486 DX2-50 AUSTIN WORKSTATION | $2,133.00 | NA | NA | NA | 5 | NA | NA | $2,133.00 | NA | NA | $10,665.00 |
| 1003 | EXB-4200 DAT TAPE BACKUP | $753.00 | NA | NA | NA | 1 | NA | NA | $753.00 | NA | NA | $753.00 |
| 1004 | MI 1015 LOGITECH TRACKBALL MOUSE | $55.00 | NA | NA | NA | 2 | NA | NA | $55.00 | NA | NA | $110.00 |
| 1005 | NSPK1 SPARE PARTS KIT | $2,663.59 | NA | NA | NA | 1 | NA | NA | $2,663.59 | NA | NA | $2,663.59 |
| 1006 | 104015 HP 4+ LASER JET PRINTER | $1,399.00 | NA | NA | NA | 1 | NA | NA | $1,399.00 | NA | NA | $1,399.00 |
| 1007 | 104323 HP JET DIRECT CARD | $359.00 | NA | NA | NA | 1 | NA | NA | $359.00 | NA | NA | $359.00 |
| 1008 | LQ 1070 EPSON 24-PIN WIDE CARRIAGE PRINTER | $359.00 | NA | NA | NA | 1 | NA | NA | $359.00 | NA | NA | $359.00 |
| 1009 | SYNOPTICS LATTISHUB #2814 116-PORT ENET UTP HUB | $1,419.00 | NA | NA | NA | 1 | NA | NA | $1,419.00 | NA | NA | $1,419.00 |
| 1010 | ATL TELEC # K0124415 LEV 5 PATCH CORD (100 ft.) | $14.00 | NA | NA | NA | 12 | NA | NA | $14.00 | NA | NA | $168.00 |
| 1011 | ALLIED AT-MX25F FIBER OPTIC MICRO TRANSCEIVER | $156.00 | NA | NA | NA | 2 | NA | NA | $156.00 | NA | NA | $312.00 |
| 1012 | RK-MX880A FIBER OPTIC MULTIPLEXER | $869.25 | NA | NA | NA | 2 | NA | NA | $869.25 | NA | NA | $1,738.50 |
| 1013 | SMC #LANET16/24PK ETHERCARD + ELITE ADAPTER | $101.48 | NA | NA | NA | 7 | NA | NA | $101.48 | NA | NA | $710.36 |
| 1014 | NF3000 ISA FDDI ADAPTER FOR UTP (RJ-45), SINGLE | $789.00 | NA | NA | NA | 2 | NA | NA | $789.00 | NA | NA | $1,578.00 |
| 1015 | RK-WP263 NYLON WALL PLATE | $1.10 | NA | NA | NA | 2 | NA | NA | $1.10 | NA | NA | $2.20 |
| 1016 | RK-WP260 OUTLET JACK FRAME | $3.01 | NA | NA | NA | 2 | NA | NA | $3.01 | NA | NA | $6.02 |
| 1017 | DMS MTRX CONFIGURATION DQ-9405-2256C - consists of foll. | $421,645.00 | NA | NA | NA | 1 | NA | NA | $421,645.00 | NA | NA | $421,645.00 |
| | TFOU-8/16 Tandem Fanout Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | TATU 2/8Tandem Automatic Transfer Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-100(X) Ext. Timed Redund. Mtrx Switch Assly. - 256 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-500(X) Ext. Timed Redund. Mtrx Switch Assly.-512 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-4000(X) Ext. Timed Redund. Mtrx Switch Assly.-4096 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-8000(X) Ext. Timed Redund. Mtrx Switch Assly.-8192 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-64/RIU (X) Satellite Shelf Assembly | NSP | NA | NA | NA | 29 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-32/RIU(X) Satellite Shelf Assembly | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIM-414-3 Data Interface Module | NSP | NA | NA | NA | 364 | NA | NA | NSP | NA | NA | $0.00 |
| | DIX-202 Universal Data Information Exchange Module | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIH-264 Data Interface Module, High Speed | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | AIM-800 Analog Interface Module | NSP | NA | NA | NA | 38 | NA | NA | NSP | NA | NA | $0.00 |
| 1018 | ESPK1 MTRX SPARE PARTS KIT | $23,330.00 | NA | NA | NA | 1 | NA | NA | $23,330.00 | NA | NA | $23,330.00 |
| 1019 | 990-0959-0400 3-BAY CONSOLE CABINETS | $2,889.14 | NA | NA | NA | 3 | NA | NA | $2,889.14 | NA | NA | $8,667.42 |
| 1020 | 990-0949-0600 3-BAY EQUIPMENT CABINETS | $2,069.30 | NA | NA | NA | 0 | NA | NA | $2,069.30 | NA | NA | $0.00 |
| 1021 | 990-0949-0500 STANDALONE EQUIPMENT CABINETS | $904.26 | NA | NA | NA | 1 | NA | NA | $904.26 | NA | NA | $904.26 |
| 1022 | 990-0949-0500 STANDALONE CABINET | $904.26 | NA | NA | NA | 5 | NA | NA | $904.26 | NA | NA | $4,521.30 |
| 1023 | EDSAL DOUBLE DOOR STORAGE CABINET | $297.00 | NA | NA | NA | 1 | NA | NA | $297.00 | NA | NA | $297.00 |
| 1024 | CM-00222BAG-2 2/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $22.00 | NA | NA | NA | 4 | NA | NA | $22.00 | NA | NA | $88.00 |
| 1025 | CM-00622BAG-2 6/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $59.00 | NA | NA | NA | 1 | NA | NA | $59.00 | NA | NA | $59.00 |
| 1026 | BELDEN #8106 6-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $668.00 | NA | NA | NA | 8 | NA | NA | $668.00 | NA | NA | $5,344.00 |
| 1027 | BELDEN #9682, 6-PAIR OR EQUAL, 24 AWG DATA CABLE (10 | $190.00 | NA | NA | NA | 13 | NA | NA | $190.00 | NA | NA | $2,470.00 |
| 1028 | BELDEN #9681 4-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $140.00 | NA | NA | NA | 7 | NA | NA | $140.00 | NA | NA | $980.00 |
| 1029 | BELDEN #8162 2-PAIR OR EQUAL, 24 AWG DATA CABLE (500 | $45.00 | NA | NA | NA | 3 | NA | NA | $45.00 | NA | NA | $135.00 |
| 1030 | COMP CRAFT FIBER OPTIC JUMPER - 62.5 MICRONS (100 ft.) | $162.00 | NA | NA | NA | 3 | NA | NA | $162.00 | NA | NA | $486.00 |
| 1031 | AIW #ES13244002000 12 AWG ROMAX POWER CABLE (500 ft | $85.00 | NA | NA | NA | 3 | NA | NA | $85.00 | NA | NA | $255.00 |
| 1032 | BULK CONDUIT (Liquid Tight, EMT, Square D) | $10,000.00 | NA | NA | NA | 1 | NA | NA | $10,000.00 | NA | NA | $10,000.00 |
| 1033 | AIW #ES13244008001 8 AWG GROUND WIRE CABLE (500 ft.) | $210.00 | NA | NA | NA | 1 | NA | NA | $210.00 | NA | NA | $210.00 |
| 1034 | SIEMON #S66M1-25 BLOCK CONNECTING CLIPS | $5.50 | NA | NA | NA | 6 | NA | NA | $5.50 | NA | NA | $33.00 |
| 1035 | FIBER OPTIC PLATE - SEICOR | $45.00 | NA | NA | NA | 2 | NA | NA | $45.00 | NA | NA | $90.00 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NTCC MAKALAPA - YEAR 1**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1036 | NEMA BOXES | $1.75 | NA | NA | NA | 27 | NA | NA | $1.75 | NA | NA | $47.25 |
| 1037 | NEMA DUPLEX RECEPTACLES | $4.00 | NA | NA | NA | 25 | NA | NA | $4.00 | NA | NA | $100.00 |
| 1038 | AMP #749808-3 DB 25 CONNECTORS | $1.79 | NA | NA | NA | 1490 | NA | NA | $1.79 | NA | NA | $2,667.10 |
| 1039 | AMP #749805-2 DB 15 CONNECTORS | $1.65 | NA | NA | NA | 93 | NA | NA | $1.65 | NA | NA | $153.45 |
| 1040 | STEWART #940-SP3088RA133 RJ-45 CONNECTORS | $0.24 | NA | NA | NA | 144 | NA | NA | $0.24 | NA | NA | $34.56 |
| 1041 | ATC INSTALLATION TOOL KIT | $3,333.00 | NA | NA | NA | 1 | NA | NA | $3,333.00 | NA | NA | $3,333.00 |
| 1042 | RG-FT 850 IDC TOOL KIT | $363.55 | NA | NA | NA | 1 | NA | NA | $363.55 | NA | NA | $363.55 |
| 1043 | RG-FT 023 IDC INSERTION/REMOVAL KIT | $11.33 | NA | NA | NA | 1 | NA | NA | $11.33 | NA | NA | $11.33 |
| 1044 | RG-FT 022 HAND TERMINATION TOOL | $8.03 | NA | NA | NA | 1 | NA | NA | $8.03 | NA | NA | $8.03 |
| 1045 | FIREBIRD 6000 BERT TESTER (Used) | $6,000.00 | NA | NA | NA | 0 | NA | NA | $6,000.00 | NA | NA | $0.00 |
| 1046 | HP 54501A 100 Mhz OSCILLOSCOPE | $4,725.00 | NA | NA | NA | 0 | NA | NA | $4,725.00 | NA | NA | $0.00 |
| | LAST EQUIPMENT ITEM | | | | | | | | | | | |
| | **OPTIONS:** | | | | | | | | | | | |
| | SONY (KT1079) INTERNAL CD-ROM (Not included in costs) | $156.00 | NA | NA | NA | 1 | NA | NA | $156.00 | NA | NA | ——— |
| | GHD 525S 525 MB SCSI HARD DRIVE (Not included in costs) | $395.00 | NA | NA | NA | 1 | NA | NA | $395.00 | NA | NA | ——— |
| | Total Costs | | | | | | | | | | | $514,391.92 |
| | G&A | 3.46% | | | | | | | | | | $17,797.96 |
| | Fees | 0.00% | | | | | | | | | | $0.00 |
| | Total Price | | | | | | | | | | | $532,189.88 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NTCC CAMP SMITH - YEAR 1**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item No. | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Qty. | Months of Use From | To | 6. FIP Schedule Prices Purchase Price | Monthly Maint. | Monthly Rental | 7. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1001 | 80486 DX2-66 AUSTIN FILE SERVER | $2,958.00 | NA | NA | NA | 2 | NA | NA | $2,958.00 | NA | NA | $5,916.00 |
| 1002 | 80486 DX2-50 AUSTIN WORKSTATION | $2,133.00 | NA | NA | NA | 5 | NA | NA | $2,133.00 | NA | NA | $10,665.00 |
| 1003 | EXB-4200 DAT TAPE BACKUP | $753.00 | NA | NA | NA | 1 | NA | NA | $753.00 | NA | NA | $753.00 |
| 1004 | MI 1015 LOGITECH TRACKBALL MOUSE | $55.00 | NA | NA | NA | 2 | NA | NA | $55.00 | NA | NA | $110.00 |
| 1005 | NSPK1 SPARE PARTS KIT | $2,663.59 | NA | NA | NA | 1 | NA | NA | $2,663.59 | NA | NA | $2,663.59 |
| 1006 | 104015 HP 4+ LASER JET PRINTER | $1,399.00 | NA | NA | NA | 1 | NA | NA | $1,399.00 | NA | NA | $1,399.00 |
| 1007 | 104323 HP JET DIRECT CARD | $359.00 | NA | NA | NA | 1 | NA | NA | $359.00 | NA | NA | $359.00 |
| 1008 | LQ 1070 EPSON 24-PIN WIDE CARRIAGE PRINTER | $359.00 | NA | NA | NA | 1 | NA | NA | $359.00 | NA | NA | $359.00 |
| 1009 | SYNOPTICS LATTISHUB #2814 116-PORT ENET UTP HUB | $1,419.00 | NA | NA | NA | 1 | NA | NA | $1,419.00 | NA | NA | $1,419.00 |
| 1010 | ATL TELEC # K0124415 LEV 5 PATCH CORD (100 ft.) | $14.00 | NA | NA | NA | 12 | NA | NA | $14.00 | NA | NA | $168.00 |
| 1011 | ALLIED AT-MX25F FIBER OPTIC MICRO TRANSCEIVER | $156.00 | NA | NA | NA | 2 | NA | NA | $156.00 | NA | NA | $312.00 |
| 1012 | RK-MX880A FIBER OPTIC MULTIPLEXER | $869.25 | NA | NA | NA | 2 | NA | NA | $869.25 | NA | NA | $1,738.50 |
| 1013 | SMC #LANET16/24PK ETHERCARD + ELITE ADAPTER | $101.48 | NA | NA | NA | 7 | NA | NA | $101.48 | NA | NA | $710.36 |
| 1014 | NF3000 ISA FDDI ADAPTER FOR UTP (RJ-45), SINGLE | $789.00 | NA | NA | NA | 2 | NA | NA | $789.00 | NA | NA | $1,578.00 |
| 1015 | RK-WP263 NYLON WALL PLATE | $1.10 | NA | NA | NA | 2 | NA | NA | $1.10 | NA | NA | $2.20 |
| 1016 | RK-WP260 OUTLET JACK FRAME | $3.01 | NA | NA | NA | 2 | NA | NA | $3.01 | NA | NA | $6.02 |
| 1017 | DMS MTRX CONFIGURATION DQ-9405-2256C - consists of foll. | $328,155.00 | NA | NA | NA | 1 | NA | NA | $328,155.00 | NA | NA | $328,155.00 |
| | TFOU-8/16 Tandem Fanout Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | TATU 2/8Tandem Automatic Transfer Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-100(X) Ext. Timed Redund. Mtrx Switch Assly. - 256 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-500(X) Ext. Timed Redund. Mtrx Switch Assly.-512 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-4000(X) Ext. Timed Redund. Mtrx Switch Assly.-4096 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-8000(X) Ext. Timed Redund. Mtrx Switch Assly.-8192 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-64/RIU (X) Satellite Shelf Assembly | NSP | NA | NA | NA | 21 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-32/RIU(X) Satellite Shelf Assembly | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIM-414-3 Data Interface Module | NSP | NA | NA | NA | 280 | NA | NA | NSP | NA | NA | $0.00 |
| | DIX-202 Universal Data Information Exchange Module | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIH-264 Data Interface Module, High Speed | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | AIM-800 Analog Interface Module | NSP | NA | NA | NA | 20 | NA | NA | NSP | NA | NA | $0.00 |
| 1018 | ESPK1 MTRX SPARE PARTS KIT | $20,395.00 | NA | NA | NA | 1 | NA | NA | $20,395.00 | NA | NA | $20,395.00 |
| 1019 | 990-0959-0400 3-BAY CONSOLE CABINETS | $2,889.14 | NA | NA | NA | 3 | NA | NA | $2,889.14 | NA | NA | $8,667.42 |
| 1020 | 990-0949-0600 3-BAY EQUIPMENT CABINETS | $2,069.30 | NA | NA | NA | 0 | NA | NA | $2,069.30 | NA | NA | $0.00 |
| 1021 | 990-0949-0500 STANDALONE EQUIPMENT CABINETS | $904.26 | NA | NA | NA | 1 | NA | NA | $904.26 | NA | NA | $904.26 |
| 1022 | 990-0949-0500 STANDALONE CABINET | $904.26 | NA | NA | NA | 4 | NA | NA | $904.26 | NA | NA | $3,617.04 |
| 1023 | EDSAL DOUBLE DOOR STORAGE CABINET | $297.00 | NA | NA | NA | 1 | NA | NA | $297.00 | NA | NA | $297.00 |
| 1024 | CM-00222BAG-2 2/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $22.00 | NA | NA | NA | 3 | NA | NA | $22.00 | NA | NA | $66.00 |
| 1025 | CM-00622BAG-2 6/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $59.00 | NA | NA | NA | 1 | NA | NA | $59.00 | NA | NA | $59.00 |
| 1026 | BELDEN #8106 6-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $668.00 | NA | NA | NA | 6 | NA | NA | $668.00 | NA | NA | $4,008.00 |
| 1027 | BELDEN #9682, 6-PAIR OR EQUAL, 24 AWG DATA CABLE (10 | $190.00 | NA | NA | NA | 19 | NA | NA | $190.00 | NA | NA | $3,610.00 |
| 1028 | BELDEN #9681 4-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $140.00 | NA | NA | NA | 10 | NA | NA | $140.00 | NA | NA | $1,400.00 |
| 1029 | BELDEN #8162 2-PAIR OR EQUAL, 24 AWG DATA CABLE (500 | $45.00 | NA | NA | NA | 2 | NA | NA | $45.00 | NA | NA | $90.00 |
| 1030 | COMP CRAFT FIBER OPTIC JUMPER - 62.5 MICRONS (100 ft.) | $162.00 | NA | NA | NA | 3 | NA | NA | $162.00 | NA | NA | $486.00 |
| 1031 | AIW #ES13244002000 12 AWG ROMAX POWER CABLE (500 ft | $85.00 | NA | NA | NA | 2 | NA | NA | $85.00 | NA | NA | $170.00 |
| 1032 | BULK CONDUIT (Liquid Tight, EMT, Square D) | $10,000.00 | NA | NA | NA | 1 | NA | NA | $10,000.00 | NA | NA | $10,000.00 |
| 1033 | AIW #ES13244008001 8 AWG GROUND WIRE CABLE (500 ft.) | $210.00 | NA | NA | NA | 1 | NA | NA | $210.00 | NA | NA | $210.00 |
| 1034 | SIEMON #S66M1-25 BLOCK CONNECTING CLIPS | $5.50 | NA | NA | NA | 4 | NA | NA | $5.50 | NA | NA | $22.00 |
| 1035 | FIBER OPTIC PLATE - SEICOR | $45.00 | NA | NA | NA | 2 | NA | NA | $45.00 | NA | NA | $90.00 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NTCC CAMP SMITH - YEAR 1**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1036 | NEMA BOXES | $1.75 | NA | NA | NA | 24 | NA | NA | $1.75 | NA | NA | $42.00 |
| 1037 | NEMA DUPLEX RECEPTACLES | $4.00 | NA | NA | NA | 22 | NA | NA | $4.00 | NA | NA | $88.00 |
| 1038 | AMP #749808-3 DB 25 CONNECTORS | $1.79 | NA | NA | NA | 1064 | NA | NA | $1.79 | NA | NA | $1,904.56 |
| 1039 | AMP #749805-2 DB 15 CONNECTORS | $1.65 | NA | NA | NA | 67 | NA | NA | $1.65 | NA | NA | $110.55 |
| 1040 | STEWART #940-SP3088RA133 RJ-45 CONNECTORS | $0.24 | NA | NA | NA | 73 | NA | NA | $0.24 | NA | NA | $17.52 |
| 1041 | ATC INSTALLATION TOOL KIT | $3,333.00 | NA | NA | NA | 1 | NA | NA | $3,333.00 | NA | NA | $3,333.00 |
| 1042 | RG-FT 850 IDC TOOL KIT | $363.55 | NA | NA | NA | 1 | NA | NA | $363.55 | NA | NA | $363.55 |
| 1043 | RG-FT 023 IDC INSERTION/REMOVAL KIT | $11.33 | NA | NA | NA | 1 | NA | NA | $11.33 | NA | NA | $11.33 |
| 1044 | RG-FT 022 HAND TERMINATION TOOL | $8.03 | NA | NA | NA | 1 | NA | NA | $8.03 | NA | NA | $8.03 |
| 1045 | FIREBIRD 6000 BERT TESTER (Used) | $6,000.00 | NA | NA | NA | 0 | NA | NA | $6,000.00 | NA | NA | $0.00 |
| 1046 | HP 54501A 100 Mhz OSCILLOSCOPE | $4,725.00 | NA | NA | NA | 0 | NA | NA | $4,725.00 | NA | NA | $0.00 |
| | LAST EQUIPMENT ITEM | | | | | | | | | | | |
| | OPTIONS: | | | | | | | | | | | |
| | SONY (KT1079) INTERNAL CD-ROM (Not included in costs) | $156.00 | NA | NA | NA | 1 | NA | NA | $156.00 | NA | NA | -------- |
| | GHD 525S 525 MB SCSI HARD DRIVE (Not included in costs) | $395.00 | NA | NA | NA | 1 | NA | NA | $395.00 | NA | NA | -------- |
| | Total Costs | | | | | | | | | | | $416,283.93 |
| | G&A | 3.46% | | | | | | | | | | $14,403.42 |
| | Fees | 0.00% | | | | | | | | | | $0.00 |
| | Total Price | | | | | | | | | | | $430,687.35 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS SICILY - YEAR 2**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item No. | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Qty. | Months of Use From | To | 6. FIP Schedule Prices Purchase Price | Monthly Maint. | Monthly Rental | 7. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1001 | 80486 DX2-66 AUSTIN FILE SERVER | $2,662.20 | NA | NA | NA | 2 | NA | NA | $2,662.20 | NA | NA | $5,324.40 |
| 1002 | 80486 DX2-50 AUSTIN WORKSTATION | $1,919.70 | NA | NA | NA | 5 | NA | NA | $1,919.70 | NA | NA | $9,598.50 |
| 1003 | EXB-4200 DAT TAPE BACKUP | $677.70 | NA | NA | NA | 1 | NA | NA | $677.70 | NA | NA | $677.70 |
| 1004 | MI 1015 LOGITECH TRACKBALL MOUSE | $49.50 | NA | NA | NA | 2 | NA | NA | $49.50 | NA | NA | $99.00 |
| 1005 | NSPK1 SPARE PARTS KIT | $2,397.23 | NA | NA | NA | 1 | NA | NA | $2,397.23 | NA | NA | $2,397.23 |
| 1006 | 104015 HP 4+ LASER JET PRINTER | $1,259.10 | NA | NA | NA | 1 | NA | NA | $1,259.10 | NA | NA | $1,259.10 |
| 1007 | 104323 HP JET DIRECT CARD | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1008 | LQ 1070 EPSON 24-PIN WIDE CARRIAGE PRINTER | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1009 | SYNOPTICS LATTISHUB #2814 116-PORT ENET UTP HUB | $1,277.10 | NA | NA | NA | 1 | NA | NA | $1,277.10 | NA | NA | $1,277.10 |
| 1010 | ATL TELEC # K0124415 LEV 5 PATCH CORD (100 ft.) | $12.60 | NA | NA | NA | 12 | NA | NA | $12.60 | NA | NA | $151.20 |
| 1011 | ALLIED AT-MX25F FIBER OPTIC MICRO TRANSCEIVER | $140.40 | NA | NA | NA | 2 | NA | NA | $140.40 | NA | NA | $280.80 |
| 1012 | RK-MX880A FIBER OPTIC MULTIPLEXER | $782.33 | NA | NA | NA | 2 | NA | NA | $782.33 | NA | NA | $1,564.66 |
| 1013 | SMC #LANET16/24PK ETHERCARD + ELITE ADAPTER | $91.33 | NA | NA | NA | 7 | NA | NA | $91.33 | NA | NA | $639.31 |
| 1014 | NF3000 ISA FDDI ADAPTER FOR UTP (RJ-45), SINGLE | $710.10 | NA | NA | NA | 2 | NA | NA | $710.10 | NA | NA | $1,420.20 |
| 1015 | RK-WP263 NYLON WALL PLATE | $0.99 | NA | NA | NA | 2 | NA | NA | $0.99 | NA | NA | $1.98 |
| 1016 | RK-WP260 OUTLET JACK FRAME | $2.71 | NA | NA | NA | 2 | NA | NA | $2.71 | NA | NA | $5.42 |
| 1017 | DMS MTRX CONFIGURATION DQ-9405-2258B - consists of foll. | $404,860.50 | NA | NA | NA | 1 | NA | NA | $404,860.50 | NA | NA | $404,860.50 |
| | TFOU-8/16 Tandem Fanout Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | TATU 2/8Tandem Automatic Transfer Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-100(X) Ext. Timed Redund. Mtrx Switch Assly. - 256 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-500(X) Ext. Timed Redund. Mtrx Switch Assly.-512 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-4000(X) Ext. Timed Redund. Mtrx Switch Assly.-4096 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-8000(X) Ext. Timed Redund. Mtrx Switch Assly.-8192 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-64/RIU (X) Satellite Shelf Assembly | NSP | NA | NA | NA | 31 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-32/RIU(X) Satellite Shelf Assembly | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIM-414-3 Data Interface Module | NSP | NA | NA | NA | 394 | NA | NA | NSP | NA | NA | $0.00 |
| | DIX-202 Universal Data Information Exchange Module | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIH-264 Data Interface Module, High Speed | NSP | NA | NA | NA | 4 | NA | NA | NSP | NA | NA | $0.00 |
| | AIM-800 Analog Interface Module | NSP | NA | NA | NA | 40 | NA | NA | NSP | NA | NA | $0.00 |
| 1018 | ESPK1 MTRX SPARE PARTS KIT | $20,997.00 | NA | NA | NA | 1 | NA | NA | $20,997.00 | NA | NA | $20,997.00 |
| 1019 | 990-0959-0400 3-BAY CONSOLE CABINETS | $2,600.23 | NA | NA | NA | 3 | NA | NA | $2,600.23 | NA | NA | $7,800.69 |
| 1020 | 990-0949-0600 3-BAY EQUIPMENT CABINETS | $1,862.37 | NA | NA | NA | 0 | NA | NA | $1,862.37 | NA | NA | $0.00 |
| 1021 | 990-0949-0500 STANDALONE EQUIPMENT CABINETS | $813.83 | NA | NA | NA | 1 | NA | NA | $813.83 | NA | NA | $813.83 |
| 1022 | 990-0949-0500 STANDALONE CABINET | $813.83 | NA | NA | NA | 5 | NA | NA | $813.83 | NA | NA | $4,069.15 |
| 1023 | EDSAL DOUBLE DOOR STORAGE CABINET | $267.30 | NA | NA | NA | 1 | NA | NA | $267.30 | NA | NA | $267.30 |
| 1024 | CM-00222BAG-2 2/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $19.80 | NA | NA | NA | 6 | NA | NA | $19.80 | NA | NA | $118.80 |
| 1025 | CM-00622BAG-2 6/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $53.10 | NA | NA | NA | 1 | NA | NA | $53.10 | NA | NA | $53.10 |
| 1026 | BELDEN #8106 6-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $601.20 | NA | NA | NA | 6 | NA | NA | $601.20 | NA | NA | $3,607.20 |
| 1027 | BELDEN #9682, 6-PAIR OR EQUAL, 24 AWG DATA CABLE (10 | $171.00 | NA | NA | NA | 13 | NA | NA | $171.00 | NA | NA | $2,223.00 |
| 1028 | BELDEN #9681 4-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $126.00 | NA | NA | NA | 7 | NA | NA | $126.00 | NA | NA | $882.00 |
| 1029 | BELDEN #8162 2-PAIR OR EQUAL, 24 AWG DATA CABLE (500 | $40.50 | NA | NA | NA | 1 | NA | NA | $40.50 | NA | NA | $40.50 |
| 1030 | COMP CRAFT FIBER OPTIC JUMPER - 62.5 MICRONS (100 ft.) | $145.80 | NA | NA | NA | 3 | NA | NA | $145.80 | NA | NA | $437.40 |
| 1031 | AIW #ES13244002000 12 AWG ROMAX POWER CABLE (500 ft | $76.50 | NA | NA | NA | 2 | NA | NA | $76.50 | NA | NA | $153.00 |
| 1032 | BULK CONDUIT (Liquid Tight, EMT, Square D) | $9,000.00 | NA | NA | NA | 1 | NA | NA | $9,000.00 | NA | NA | $9,000.00 |
| 1033 | AIW #ES13244008001 8 AWG GROUND WIRE CABLE (500 ft.) | $189.00 | NA | NA | NA | 1 | NA | NA | $189.00 | NA | NA | $189.00 |
| 1034 | SIEMON #S66M1-25 BLOCK CONNECTING CLIPS | $4.95 | NA | NA | NA | 6 | NA | NA | $4.95 | NA | NA | $29.70 |
| 1035 | FIBER OPTIC PLATE - SEICOR | $40.50 | NA | NA | NA | 2 | NA | NA | $40.50 | NA | NA | $81.00 |



USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL

00201

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS SICILY - YEAR 2**

Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1036 | NEMA BOXES | $1.58 | NA | NA | NA | 25 | NA | NA | $1.58 | NA | NA | $39.50 |
| 1037 | NEMA DUPLEX RECEPTACLES | $3.60 | NA | NA | NA | 23 | NA | NA | $3.60 | NA | NA | $82.80 |
| 1038 | AMP #749808-3 DB 25 CONNECTORS | $1.61 | NA | NA | NA | 1065 | NA | NA | $1.61 | NA | NA | $1,714.65 |
| 1039 | AMP #749805-2 DB 15 CONNECTORS | $1.49 | NA | NA | NA | 67 | NA | NA | $1.49 | NA | NA | $99.83 |
| 1040 | STEWART #940-SP3088RA133 RJ-45 CONNECTORS | $0.22 | NA | NA | NA | 136 | NA | NA | $0.22 | NA | NA | $29.92 |
| 1041 | ATC INSTALLATION TOOL KIT | $2,999.70 | NA | NA | NA | 1 | NA | NA | $2,999.70 | NA | NA | $2,999.70 |
| 1042 | RG-FT 850 IDC TOOL KIT | $327.20 | NA | NA | NA | 1 | NA | NA | $327.20 | NA | NA | $327.20 |
| 1043 | RG-FT 023 IDC INSERTION/REMOVAL KIT | $10.20 | NA | NA | NA | 1 | NA | NA | $10.20 | NA | NA | $10.20 |
| 1044 | RG-FT 022 HAND TERMINATION TOOL | $7.23 | NA | NA | NA | 1 | NA | NA | $7.23 | NA | NA | $7.23 |
| 1045 | FIREBIRD 6000 BERT TESTER (Used) | $5,400.00 | NA | NA | NA | 0 | NA | NA | $5,400.00 | NA | NA | $0.00 |
| 1046 | HP 54501A 100 Mhz OSCILLOSCOPE | $4,252.50 | NA | NA | NA | 0 | NA | NA | $4,252.50 | NA | NA | $0.00 |
| | LAST EQUIPMENT ITEM | | | | | | | | | | | |
| | OPTIONS: | | | | | | | | | | | |
| | SONY (KT1079) INTERNAL CD-ROM (Not included in costs) | $140.40 | NA | NA | NA | 1 | NA | NA | $140.40 | NA | NA | —— |
| | GHD 525S 525 MB SCSI HARD DRIVE (Not included in costs) | $355.50 | NA | NA | NA | 1 | NA | NA | $355.50 | NA | NA | —— |
| | Total Costs | | | | | | | | | | | $486,277.00 |
| | G&A | 3.46% | | | | | | | | | | $16,825.18 |
| | Fees | 0.00% | | | | | | | | | | $0.00 |
| | Total Price | | | | | | | | | | | $503,102.18 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS PUERTO RICO - YEAR 2**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1001 | 80486 DX2-66 AUSTIN FILE SERVER | $2,662.20 | NA | NA | NA | 2 | NA | NA | $2,662.20 | NA | NA | $5,324.40 |
| 1002 | 80486 DX2-50 AUSTIN WORKSTATION | $1,919.70 | NA | NA | NA | 5 | NA | NA | $1,919.70 | NA | NA | $9,598.50 |
| 1003 | EXB-4200 DAT TAPE BACKUP | $677.70 | NA | NA | NA | 1 | NA | NA | $677.70 | NA | NA | $677.70 |
| 1004 | MI 1015 LOGITECH TRACKBALL MOUSE | $49.50 | NA | NA | NA | 2 | NA | NA | $49.50 | NA | NA | $99.00 |
| 1005 | NSPK1 SPARE PARTS KIT | $2,397.23 | NA | NA | NA | 1 | NA | NA | $2,397.23 | NA | NA | $2,397.23 |
| 1006 | 104015 HP 4+ LASER JET PRINTER | $1,259.10 | NA | NA | NA | 1 | NA | NA | $1,259.10 | NA | NA | $1,259.10 |
| 1007 | 104323 HP JET DIRECT CARD | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1008 | LQ 1070 EPSON 24-PIN WIDE CARRIAGE PRINTER | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1009 | SYNOPTICS LATTISHUB #2814 116-PORT ENET UTP HUB | $1,277.10 | NA | NA | NA | 1 | NA | NA | $1,277.10 | NA | NA | $1,277.10 |
| 1010 | ATL TELEC # K0124415 LEV 5 PATCH CORD (100 ft.) | $12.60 | NA | NA | NA | 12 | NA | NA | $12.60 | NA | NA | $151.20 |
| 1011 | ALLIED AT-MX25F FIBER OPTIC MICRO TRANSCEIVER | $140.40 | NA | NA | NA | 2 | NA | NA | $140.40 | NA | NA | $280.80 |
| 1012 | RK-MX880A FIBER OPTIC MULTIPLEXER | $782.33 | NA | NA | NA | 2 | NA | NA | $782.33 | NA | NA | $1,564.66 |
| 1013 | SMC #LANET16/24PK ETHERCARD + ELITE ADAPTER | $91.33 | NA | NA | NA | 7 | NA | NA | $91.33 | NA | NA | $639.31 |
| 1014 | NF3000 ISA FDDI ADAPTER FOR UTP (RJ-45), SINGLE | $710.10 | NA | NA | NA | 2 | NA | NA | $710.10 | NA | NA | $1,420.20 |
| 1015 | RK-WP263 NYLON WALL PLATE | $0.99 | NA | NA | NA | 2 | NA | NA | $0.99 | NA | NA | $1.98 |
| 1016 | RK-WP260 OUTLET JACK FRAME | $2.71 | NA | NA | NA | 2 | NA | NA | $2.71 | NA | NA | $5.42 |
| 1017 | DMS MTRX CONFIGURATION DQ-9405-2259B - consists of foll. | $310,810.50 | NA | NA | NA | 1 | NA | NA | $310,810.50 | NA | NA | $310,810.50 |
| | TFOU-8/16 Tandem Fanout Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | TATU 2/8Tandem Automatic Transfer Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-100(X) Ext. Timed Redund. Mtrx Switch Assly. - 256 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-500(X) Ext. Timed Redund. Mtrx Switch Assly.-512 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-4000(X) Ext. Timed Redund. Mtrx Switch Assly.-4096 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-8000(X) Ext. Timed Redund. Mtrx Switch Assly.-8192 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-64/RIU (X) Satellite Shelf Assembly | NSP | NA | NA | NA | 23 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-32/RIU(X) Satellite Shelf Assembly | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIM-414-3 Data Interface Module | NSP | NA | NA | NA | 283 | NA | NA | NSP | NA | NA | $0.00 |
| | DIX-202 Universal Data Information Exchange Module | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | DIH-264 Data Interface Module, High Speed | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | AIM-800 Analog Interface Module | NSP | NA | NA | NA | 33 | NA | NA | NSP | NA | NA | $0.00 |
| 1018 | ESPK1 MTRX SPARE PARTS KIT | $18,828.00 | NA | NA | NA | 1 | NA | NA | $18,828.00 | NA | NA | $18,828.00 |
| 1019 | 990-0959-0400 3-BAY CONSOLE CABINETS | $2,600.23 | NA | NA | NA | 3 | NA | NA | $2,600.23 | NA | NA | $7,800.69 |
| 1020 | 990-0949-0600 3-BAY EQUIPMENT CABINETS | $1,862.37 | NA | NA | NA | 0 | NA | NA | $1,862.37 | NA | NA | $0.00 |
| 1021 | 990-0949-0500 STANDALONE EQUIPMENT CABINETS | $813.83 | NA | NA | NA | 1 | NA | NA | $813.83 | NA | NA | $813.83 |
| 1022 | 990-0949-0500 STANDALONE CABINET | $813.83 | NA | NA | NA | 4 | NA | NA | $813.83 | NA | NA | $3,255.32 |
| 1023 | EDSAL DOUBLE DOOR STORAGE CABINET | $267.30 | NA | NA | NA | 1 | NA | NA | $267.30 | NA | NA | $267.30 |
| 1024 | CM-00222BAG-2 2/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $19.80 | NA | NA | NA | 3 | NA | NA | $19.80 | NA | NA | $59.40 |
| 1025 | CM-00622BAG-2 6/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $53.10 | NA | NA | NA | 1 | NA | NA | $53.10 | NA | NA | $53.10 |
| 1026 | BELDEN #8106 6-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $601.20 | NA | NA | NA | 5 | NA | NA | $601.20 | NA | NA | $3,006.00 |
| 1027 | BELDEN #9682, 6-PAIR OR EQUAL, 24 AWG DATA CABLE (10 | $171.00 | NA | NA | NA | 8 | NA | NA | $171.00 | NA | NA | $1,368.00 |
| 1028 | BELDEN #9681 4-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $126.00 | NA | NA | NA | 5 | NA | NA | $126.00 | NA | NA | $630.00 |
| 1029 | BELDEN #8162 2-PAIR OR EQUAL, 24 AWG DATA CABLE (500 | $40.50 | NA | NA | NA | 1 | NA | NA | $40.50 | NA | NA | $40.50 |
| 1030 | COMP CRAFT FIBER OPTIC JUMPER - 62.5 MICRONS (100 ft.) | $145.80 | NA | NA | NA | 3 | NA | NA | $145.80 | NA | NA | $437.40 |
| 1031 | AW #ES13244002000 12 AWG ROMAX POWER CABLE (500 ft | $76.50 | NA | NA | NA | 3 | NA | NA | $76.50 | NA | NA | $229.50 |
| 1032 | BULK CONDUIT (Liquid Tight, EMT, Square D) | $9,000.00 | NA | NA | NA | 1 | NA | NA | $9,000.00 | NA | NA | $9,000.00 |
| 1033 | AW #ES13244008001 8 AWG GROUND WIRE CABLE (500 ft.) | $189.00 | NA | NA | NA | 2 | NA | NA | $189.00 | NA | NA | $378.00 |
| 1034 | SIEMON #S66M1-25 BLOCK CONNECTING CLIPS | $4.95 | NA | NA | NA | 5 | NA | NA | $4.95 | NA | NA | $24.75 |
| 1035 | FIBER OPTIC PLATE - SEICOR | $40.50 | NA | NA | NA | 2 | NA | NA | $40.50 | NA | NA | $81.00 |



USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSA

IBM

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS PUERTO RICO - YEAR 2**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1036 | NEMA BOXES | $1.58 | NA | NA | NA | 33 | NA | NA | $1.58 | NA | NA | $52.14 |
| 1037 | NEMA DUPLEX RECEPTACLES | $3.60 | NA | NA | NA | 31 | NA | NA | $3.60 | NA | NA | $111.60 |
| 1038 | AMP #749808-3 DB 25 CONNECTORS | $1.61 | NA | NA | NA | 882 | NA | NA | $1.61 | NA | NA | $1,420.02 |
| 1039 | AMP #749805-2 DB 15 CONNECTORS | $1.49 | NA | NA | NA | 55 | NA | NA | $1.49 | NA | NA | $81.95 |
| 1040 | STEWART #940-SP3088RA133 RJ-45 CONNECTORS | $0.22 | NA | NA | NA | 115 | NA | NA | $0.22 | NA | NA | $25.30 |
| 1041 | ATC INSTALLATION TOOL KIT | $2,999.70 | NA | NA | NA | 1 | NA | NA | $2,999.70 | NA | NA | $2,999.70 |
| 1042 | RG-FT 850 IDC TOOL KIT | $327.20 | NA | NA | NA | 1 | NA | NA | $327.20 | NA | NA | $327.20 |
| 1043 | RG-FT 023 IDC INSERTION/REMOVAL KIT | $10.20 | NA | NA | NA | 1 | NA | NA | $10.20 | NA | NA | $10.20 |
| 1044 | RG-FT 022 HAND TERMINATION TOOL | $7.23 | NA | NA | NA | 1 | NA | NA | $7.23 | NA | NA | $7.23 |
| 1045 | FIREBIRD 6000 BERT TESTER (Used) | $5,400.00 | NA | NA | NA | 0 | NA | NA | $5,400.00 | NA | NA | $0.00 |
| 1046 | HP 54501A 100 Mhz OSCILLOSCOPE | $4,252.50 | NA | NA | NA | 0 | NA | NA | $4,252.50 | NA | NA | $0.00 |
| | LAST EQUIPMENT ITEM | | | | | | | | | | | |
| | OPTIONS: | | | | | | | | | | | |
| | SONY (KT1079) INTERNAL CD-ROM (Not Included in costs) | $140.40 | NA | NA | NA | 1 | NA | NA | $140.40 | NA | NA | -------- |
| | GHD 525S 525 MB SCSI HARD DRIVE (Not included in costs) | $355.50 | NA | NA | NA | 1 | NA | NA | $355.50 | NA | NA | -------- |
| | Total Costs | | | | | | | | | | | $387,461.43 |
| | G&A | 3.46% | | | | | | | | | | $13,406.17 |
| | Fees | 0.00% | | | | | | | | | | $0.00 |
| | Total Price | | | | | | | | | | | $400,867.60 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

TABLE B-1

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS LONDON - YEAR 2**

Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item No. | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Qty. | Months of Use From | To | 6. FIP Schedule Prices Purchase Price | Monthly Maint. | Monthly Rental | 7. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1001 | 80486 DX2-66 AUSTIN FILE SERVER | $2,662.20 | NA | NA | NA | 2 | NA | NA | $2,662.20 | NA | NA | $5,324.40 |
| 1002 | 80486 DX2-50 AUSTIN WORKSTATION | $1,919.70 | NA | NA | NA | 5 | NA | NA | $1,919.70 | NA | NA | $9,598.50 |
| 1003 | EXB-4200 DAT TAPE BACKUP | $677.70 | NA | NA | NA | 1 | NA | NA | $677.70 | NA | NA | $677.70 |
| 1004 | MI 1015 LOGITECH TRACKBALL MOUSE | $49.50 | NA | NA | NA | 2 | NA | NA | $49.50 | NA | NA | $99.00 |
| 1005 | NSPK1 SPARE PARTS KIT | $2,397.23 | NA | NA | NA | 1 | NA | NA | $2,397.23 | NA | NA | $2,397.23 |
| 1006 | 104015 HP 4+ LASER JET PRINTER | $1,259.10 | NA | NA | NA | 1 | NA | NA | $1,259.10 | NA | NA | $1,259.10 |
| 1007 | 104323 HP JET DIRECT CARD | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1008 | LQ 1070 EPSON 24-PIN WIDE CARRIAGE PRINTER | $323.10 | NA | NA | NA | 1 | NA | NA | $323.10 | NA | NA | $323.10 |
| 1009 | SYNOPTICS LATTISHUB #2814 116-PORT ENET UTP HUB | $1,277.10 | NA | NA | NA | 1 | NA | NA | $1,277.10 | NA | NA | $1,277.10 |
| 1010 | ATL TELEC # K0124415 LEV 5 PATCH CORD (100 ft.) | $12.60 | NA | NA | NA | 12 | NA | NA | $12.60 | NA | NA | $151.20 |
| 1011 | ALLIED AT-MX25F FIBER OPTIC MICRO TRANSCEIVER | $140.40 | NA | NA | NA | 2 | NA | NA | $140.40 | NA | NA | $280.80 |
| 1012 | RK-MX880A FIBER OPTIC MULTIPLEXER | $782.33 | NA | NA | NA | 2 | NA | NA | $782.33 | NA | NA | $1,564.66 |
| 1013 | SMC #LANET16/24PK ETHERCARD + ELITE ADAPTER | $91.33 | NA | NA | NA | 7 | NA | NA | $91.33 | NA | NA | $639.31 |
| 1014 | NF3000 ISA FDDI ADAPTER FOR UTP (RJ-45), SINGLE | $710.10 | NA | NA | NA | 2 | NA | NA | $710.10 | NA | NA | $1,420.20 |
| 1015 | RK-WP263 NYLON WALL PLATE | $0.99 | NA | NA | NA | 2 | NA | NA | $0.99 | NA | NA | $1.98 |
| 1016 | RK-WP260 OUTLET JACK FRAME | $2.71 | NA | NA | NA | 2 | NA | NA | $2.71 | NA | NA | $5.42 |
| 1017 | DMS MTRX CONFIGURATION DQ-9405-2260B - consists of foll. | $517,635.00 | NA | NA | NA | 1 | NA | NA | $517,635.00 | NA | NA | $517,635.00 |
| | TFOU-8/16 Tandem Fanout Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | TATU 2/8Tandem Automatic Transfer Unit | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-100(X) Ext. Timed Redund. Mtrx Switch Assly. - 256 ports | NSP | NA | NA | NA | 2 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-500(X) Ext. Timed Redund. Mtrx Switch Assly.-512 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-4000(X) Ext. Timed Redund. Mtrx Switch Assly.-4096 ports | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | RMSA-8000(X) Ext. Timed Redund. Mtrx Switch Assly.-8192 ports | NSP | NA | NA | NA | 0 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-64/RIU (X) Satellite Shelf Assembly | NSP | NA | NA | NA | 36 | NA | NA | NSP | NA | NA | $0.00 |
| | SSA-32/RIU(X) Satellite Shelf Assembly | NSP | NA | NA | NA | 2 | NA | NA | NSP | NA | NA | $0.00 |
| | DIM-414-3 Data Interface Module | NSP | NA | NA | NA | 500 | NA | NA | NSP | NA | NA | $0.00 |
| | DIX-202 Universal Data Information Exchange Module | NSP | NA | NA | NA | 12 | NA | NA | NSP | NA | NA | $0.00 |
| | DIH-264 Data Interface Module, High Speed | NSP | NA | NA | NA | 1 | NA | NA | NSP | NA | NA | $0.00 |
| | AIM-800 Analog Interface Module | NSP | NA | NA | NA | 27 | NA | NA | NSP | NA | NA | $0.00 |
| 1018 | ESPK1 MTRX SPARE PARTS KIT | $32,458.50 | NA | NA | NA | 1 | NA | NA | $32,458.50 | NA | NA | $32,458.50 |
| 1019 | 990-0959-0400 3-BAY CONSOLE CABINETS | $2,600.23 | NA | NA | NA | 3 | NA | NA | $2,600.23 | NA | NA | $7,800.69 |
| 1020 | 990-0949-0600 3-BAY EQUIPMENT CABINETS | $1,862.37 | NA | NA | NA | 0 | NA | NA | $1,862.37 | NA | NA | $0.00 |
| 1021 | 990-0949-0500 STANDALONE EQUIPMENT CABINETS | $813.83 | NA | NA | NA | 1 | NA | NA | $813.83 | NA | NA | $813.83 |
| 1022 | 990-0949-0500 STANDALONE CABINET | $813.83 | NA | NA | NA | 5 | NA | NA | $813.83 | NA | NA | $4,069.15 |
| 1023 | EDSAL DOUBLE DOOR STORAGE CABINET | $267.30 | NA | NA | NA | 1 | NA | NA | $267.30 | NA | NA | $267.30 |
| 1024 | CM-00222BAG-2 2/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $19.80 | NA | NA | NA | 3 | NA | NA | $19.80 | NA | NA | $59.40 |
| 1025 | CM-00622BAG-2 6/P LEV 2 SOL PVC UTP CABLE (1000 ft.) | $53.10 | NA | NA | NA | 1 | NA | NA | $53.10 | NA | NA | $53.10 |
| 1026 | BELDEN #8106 6-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $601.20 | NA | NA | NA | 6 | NA | NA | $601.20 | NA | NA | $3,607.20 |
| 1027 | BELDEN #9682, 6-PAIR OR EQUAL, 24 AWG DATA CABLE (10 | $171.00 | NA | NA | NA | 16 | NA | NA | $171.00 | NA | NA | $2,736.00 |
| 1028 | BELDEN #9681 4-PAIR OR EQUAL, 24 AWG DATA CABLE (100 | $126.00 | NA | NA | NA | 9 | NA | NA | $126.00 | NA | NA | $1,134.00 |
| 1029 | BELDEN #8162 2-PAIR OR EQUAL, 24 AWG DATA CABLE (500 | $40.50 | NA | NA | NA | 1 | NA | NA | $40.50 | NA | NA | $40.50 |
| 1030 | COMP CRAFT FIBER OPTIC JUMPER - 62.5 MICRONS (100 ft.) | $145.80 | NA | NA | NA | 3 | NA | NA | $145.80 | NA | NA | $437.40 |
| 1031 | AIW #ES13244002000 12 AWG ROMAX POWER CABLE (500 ft | $76.50 | NA | NA | NA | 3 | NA | NA | $76.50 | NA | NA | $229.50 |
| 1032 | BULK CONDUIT (Liquid Tight, EMT, Square D) | $9,000.00 | NA | NA | NA | 1 | NA | NA | $9,000.00 | NA | NA | $9,000.00 |
| 1033 | AIW #ES13244008001 8 AWG GROUND WIRE CABLE (500 ft.) | $189.00 | NA | NA | NA | 1 | NA | NA | $189.00 | NA | NA | $189.00 |
| 1034 | SIEMON #S66M1-25 BLOCK CONNECTING CLIPS | $4.95 | NA | NA | NA | 5 | NA | NA | $4.95 | NA | NA | $24.75 |
| 1035 | FIBER OPTIC PLATE - SEICOR | $40.50 | NA | NA | NA | 2 | NA | NA | $40.50 | NA | NA | $81.00 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

**TABLE B-1**

**EQUIPMENT UNIT PRICE SCHEDULE**
**NCTS LONDON - YEAR 2**
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line | 2. Item Description | 3. Unit Prices Offered | | | | 4. Qty. | Months of Use | | 6. FIP Schedule Prices | | | 7. Extended |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Item No. | Equipment | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | | From | To | Purchase Price | Monthly Maint. | Monthly Rental | Costs |
| 1036 | NEMA BOXES | $1.58 | NA | NA | NA | 27 | NA | NA | $1.58 | NA | NA | $42.66 |
| 1037 | NEMA DUPLEX RECEPTACLES | $3.60 | NA | NA | NA | 25 | NA | NA | $3.60 | NA | NA | $90.00 |
| 1038 | AMP #749808-3 DB 25 CONNECTORS | $1.61 | NA | NA | NA | 1224 | NA | NA | $1.61 | NA | NA | $1,970.64 |
| 1039 | AMP #749805-2 DB 15 CONNECTORS | $1.49 | NA | NA | NA | 77 | NA | NA | $1.49 | NA | NA | $114.73 |
| 1040 | STEWART #940-SP3088RA133 RJ-45 CONNECTORS | $0.22 | NA | NA | NA | 90 | NA | NA | $0.22 | NA | NA | $19.80 |
| 1041 | ATC INSTALLATION TOOL KIT | $2,999.70 | NA | NA | NA | 1 | NA | NA | $2,999.70 | NA | NA | $2,999.70 |
| 1042 | RG-FT 850 IDC TOOL KIT | $327.20 | NA | NA | NA | 1 | NA | NA | $327.20 | NA | NA | $327.20 |
| 1043 | RG-FT 023 IDC INSERTION/REMOVAL KIT | $10.20 | NA | NA | NA | 1 | NA | NA | $10.20 | NA | NA | $10.20 |
| 1044 | RG-FT 022 *HAND TERMINATION TOOL* | $7.23 | NA | NA | NA | 1 | NA | NA | $7.23 | NA | NA | $7.23 |
| 1045 | FIREBIRD 6000 BERT TESTER (Used) | $5,400.00 | NA | NA | NA | 0 | NA | NA | $5,400.00 | NA | NA | $0.00 |
| 1046 | HP 54501A 100 Mhz OSCILLOSCOPE | $4,252.50 | NA | NA | NA | 0 | NA | NA | $4,252.50 | NA | NA | $0.00 |
| | LAST EQUIPMENT ITEM | | | | | | | | | | | |
| | **OPTIONS:** | | | | | | | | | | | |
| | SONY (KT1079) INTERNAL CD-ROM (Not included in costs) | $140.40 | NA | $199.00 | NA | 1 | NA | NA | $140.40 | NA | NA | ------- |
| | GHD 525S 525 MB SCSI HARD DRIVE (Not included in costs) | $355.50 | NA | $600.00 | NA | 1 | NA | NA | $355.50 | NA | NA | ------- |
| | Total Costs | | | | | | | | | | | $611,561.28 |
| | G&A | 3.46% | | | | | | | | | | $21,160.02 |
| | Fees | 0.00% | | | | | | | | | | $0.00 |
| | Total Price | | | | | | | | | | | $632,721.30 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 1.1.2 Table B-2

TABLE B-2

**SOFTWARE UNIT PRICE SCHEDULE**
NTCC HAMPTON ROADS - YEAR 1
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item Number | 2. Item Description Equipment | 3. Unit Prices Offered: Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Months of Use: From | To | 5.Quantity | 6.Extended Costs |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | IBM OS/2 V2.1 OPERATING SYSTEM | $79.00 | NA | NA | NA | NA | NA | 4 | $316.00 |
| 2002 | NOVELL NETWARE 3.12 NOS | $1,995.00 | NA | NA | NA | NA | NA | 2 | $3,990.00 |
| 2003 | NOVELL NETWARE SFT III (20 users) | $2,525.00 | NA | NA | NA | NA | NA | 1 | $2,525.00 |
| 2004 | DBASE IV - SERVER (10 users) | $478.00 | NA | NA | NA | NA | NA | 2 | $956.00 |
| 2005 | DBASE IV - CLIENT NODE | $255.00 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2006 | WORD PERFECT V. 6.0 FOR WINDOWS (Server) | $265.00 | NA | NA | NA | NA | NA | 2 | $530.00 |
| 2007 | WORD PERFECT V.6.0 FOR WINDOWS ( Addl Licence) | $178.00 | NA | NA | NA | NA | NA | 4 | $712.00 |
| 2008 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Server - 5 Users | $285.00 | NA | NA | NA | NA | NA | 2 | $570.00 |
| 2009 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Addl Lic) | $49.00 | NA | NA | NA | NA | NA | 1 | $49.00 |
| 2010 | NMSS-8000(N) NETWORK MNGMT. SYS. SOFTWARE- consists of | N/C ← | NA | NA | NA | NA | NA | 1 | $0.00 |
| | MAPS-8000(N), Multi-User MTRX Application Program Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | IMUP-8000(N), Initialization & Maintenance Utility Program | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | *DBES-8000(N), Database Entry Software* | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| 2011 | LEGATO NETWORKER 2326 V.3.0 TAPE BACKUP | $429.00 | NA | NA | NA | NA | NA | 1 | $429.00 |
| | Last software item | | | | | | | | |
| | Total Costs | | | | | | | | $10,077.00 |
| | G&A | 3.46% | | | | | | | $348.66 |
| | Fees | 0.00% | | | | | | | $0.00 |
| | Total Price | | | | | | | | $10,425.66 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00208

**TABLE B-2**

**SOFTWARE UNIT PRICE SCHEDULE**
NCTS JAPAN - YEAR 2
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item Number | 2. Item Description Equipment | 3. Unit Prices Offered | | | | 4. Months of Use | | 5. Quantity | 6. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|
| | | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | From | To | | |
| 2001 | IBM OS/2 V2.1 OPERATING SYSTEM | $71.10 | NA | NA | NA | NA | NA | 3 | $213.30 |
| 2002 | NOVELL NETWARE 3.12 NOS | $1,795.50 | NA | NA | NA | NA | NA | 2 | $3,591.00 |
| 2003 | NOVELL NETWARE SFT III (20 users) | $2,272.50 | NA | NA | NA | NA | NA | 1 | $2,272.50 |
| 2004 | DBASE IV - SERVER (10 users) | $430.20 | NA | NA | NA | NA | NA | 2 | $860.40 |
| 2005 | DBASE IV - CLIENT NODE | $229.50 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2006 | WORD PERFECT V. 6.0 FOR WINDOWS (Server) | $238.50 | NA | NA | NA | NA | NA | 2 | $477.00 |
| 2007 | WORD PERFECT V.6.0 FOR WINDOWS ( Addl Licence) | $160.20 | NA | NA | NA | NA | NA | 3 | $480.60 |
| 2008 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Server - 5 Users | $256.50 | NA | NA | NA | NA | NA | 2 | $513.00 |
| 2009 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Addl Lic) | $44.10 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2010 | NMSS-8000(N) NETWORK MNGMT. SYS. SOFTWARE- consists of | $0.00 | NA | NA | NA | NA | NA | 1 | $0.00 |
| | MAPS-8000(N), Multi-User MTRX Application Program Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | IMUP-8000(N), Initialization & Maintenance Utility Program | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | DBES-8000(N), Database Entry Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| 2011 | LEGATO NETWORKER 2326 V.3.0 TAPE BACKUP | $386.10 | NA | NA | NA | NA | NA | 1 | $386.10 |
| | Last software item | | | | | | | | |
| | Total Costs | | | | | | | | $8,793.90 |
| | G&A | 3.46% | | | | | | | $304.27 |
| | Fees | 0.00% | | | | | | | $0.00 |
| | Total Price | | | | | | | | $9,098.17 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00209

**TABLE B-2**

**SOFTWARE UNIT PRICE SCHEDULE**
NTCC MAKALAPA - YEAR 1
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item Number | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Months of Use From | To | 5. Quantity | 6. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | IBM OS/2 V2.1 OPERATING SYSTEM | $79.00 | NA | NA | NA | NA | NA | 3 | $237.00 |
| 2002 | NOVELL NETWARE 3.12 NOS | $1,995.00 | NA | NA | NA | NA | NA | 2 | $3,990.00 |
| 2003 | NOVELL NETWARE SFT III (20 users) | $2,525.00 | NA | NA | NA | NA | NA | 1 | $2,525.00 |
| 2004 | DBASE IV - SERVER (10 users) | $478.00 | NA | NA | NA | NA | NA | 2 | $956.00 |
| 2005 | DBASE IV - CLIENT NODE | $255.00 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2006 | WORD PERFECT V. 6.0 FOR WINDOWS (Server) | $265.00 | NA | NA | NA | NA | NA | 2 | $530.00 |
| 2007 | WORD PERFECT V.6.0 FOR WINDOWS ( Addl Licence) | $178.00 | NA | NA | NA | NA | NA | 3 | $534.00 |
| 2008 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Server - 5 Users | $285.00 | NA | NA | NA | NA | NA | 2 | $570.00 |
| 2009 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Addl Lic) | $49.00 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2010 | NMSS-8000(N) NETWORK MNGMT. SYS. SOFTWARE- consists of | $0.00 | NA | NA | NA | NA | NA | 1 | $0.00 |
| | MAPS-8000(N), Multi-User MTRX Application Program Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | IMUP-8000(N), Initialization & Maintenance Utility Program | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | DBES-8000(N), Database Entry Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| 2011 | LEGATO NETWORKER 2326 V.3.0 TAPE BACKUP | $429.00 | NA | NA | NA | NA | NA | 1 | $429.00 |
| | Last software item | | | | | | | | |
| | Total Costs | | | | | | | | $9,771.00 |
| | G&A | 3.46% | | | | | | | $338.08 |
| | Fees | 0.00% | | | | | | | $0.00 |
| | Total Price | | | | | | | | $10,109.08 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00210

**TABLE B-2**

**SOFTWARE UNIT PRICE SCHEDULE**
NTCC CAMP SMITH - YEAR 1
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item Number | 2. Item Description Equipment | 3. Unit Prices Offered | | | | 4. Months of Use | | 5. Quantity | 6. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|
| | | Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | From | To | | |
| 2001 | IBM OS/2 V2.1 OPERATING SYSTEM | $79.00 | NA | NA | NA | NA | NA | 3 | $237.00 |
| 2002 | NOVELL NETWARE 3.12 NOS | $1,995.00 | NA | NA | NA | NA | NA | 2 | $3,990.00 |
| 2003 | NOVELL NETWARE SFT III (20 users) | $2,525.00 | NA | NA | NA | NA | NA | 1 | $2,525.00 |
| 2004 | DBASE IV - SERVER (10 users) | $478.00 | NA | NA | NA | NA | NA | 2 | $956.00 |
| 2005 | DBASE IV - CLIENT NODE | $255.00 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2006 | WORD PERFECT V. 6.0 FOR WINDOWS (Server) | $265.00 | NA | NA | NA | NA | NA | 2 | $530.00 |
| 2007 | WORD PERFECT V.6.0 FOR WINDOWS ( Addl Licence) | $178.00 | NA | NA | NA | NA | NA | 3 | $534.00 |
| 2008 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Server - 5 Users | $285.00 | NA | NA | NA | NA | NA | 2 | $570.00 |
| 2009 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Addl Lic) | $49.00 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2010 | NMSS-8000(N) NETWORK MNGMT. SYS. SOFTWARE- consists of | $0.00 | NA | NA | NA | NA | NA | 1 | $0.00 |
| | MAPS-8000(N), Multi-User MTRX Application Program Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | IMUP-8000(N), Initialization & Maintenance Utility Program | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | DBES-8000(N), Database Entry Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| 2011 | LEGATO NETWORKER 2326 V.3.0 TAPE BACKUP | $429.00 | NA | NA | NA | NA | NA | 1 | $429.00 |
| | Last software item | | | | | | | | |
| | Total Costs | | | | | | | | $9,771.00 |
| | G&A | 3.46% | | | | | | | $338.08 |
| | Fees | 0.00% | | | | | | | $0.00 |
| | Total Price | | | | | | | | $10,109.08 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00211

**TABLE B-2**

**SOFTWARE UNIT PRICE SCHEDULE**
NCTS SICILY - YEAR 2
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item Number | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Months of Use From | To | 5. Quantity | 6. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | IBM OS/2 V2.1 OPERATING SYSTEM | $71.10 | NA | NA | NA | NA | NA | 3 | $213.30 |
| 2002 | NOVELL NETWARE 3.12 NOS | $1,795.50 | NA | NA | NA | NA | NA | 2 | $3,591.00 |
| 2003 | NOVELL NETWARE SFT III (20 users) | $2,272.50 | NA | NA | NA | NA | NA | 1 | $2,272.50 |
| 2004 | DBASE IV - SERVER (10 users) | $430.20 | NA | NA | NA | NA | NA | 2 | $860.40 |
| 2005 | DBASE IV - CLIENT NODE | $229.50 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2006 | WORD PERFECT V. 6.0 FOR WINDOWS (Server) | $238.50 | NA | NA | NA | NA | NA | 2 | $477.00 |
| 2007 | WORD PERFECT V.6.0 FOR WINDOWS ( Addl Licence) | $160.20 | NA | NA | NA | NA | NA | 3 | $480.60 |
| 2008 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Server - 5 Users | $256.50 | NA | NA | NA | NA | NA | 2 | $513.00 |
| 2009 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Addl Lic) | $44.10 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2010 | NMSS-8000(N) NETWORK MNGMT. SYS. SOFTWARE- consists of | $0.00 | NA | NA | NA | NA | NA | 1 | $0.00 |
| | MAPS-8000(N), Multi-User MTRX Application Program Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | IMUP-8000(N), Initialization & Maintenance *Utility Program* | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | DBES-8000(N), Database Entry Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| 2011 | LEGATO NETWORKER 2326 V.3.0 TAPE BACKUP | $386.10 | NA | NA | NA | NA | NA | 1 | $386.10 |
| | Last software item | | | | | | | | |
| | Total Costs | | | | | | | | $8,793.90 |
| | G&A | 3.46% | | | | | | | $304.27 |
| | Fees | 0.00% | | | | | | | $0.00 |
| | Total Price | | | | | | | | $9,098.17 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00212

**TABLE B-2**

**SOFTWARE UNIT PRICE SCHEDULE**
NCTS PUERTO RICO - YEAR 2
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item Number | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Months of Use From | To | 5. Quantity | 6. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | IBM OS/2 V2.1 OPERATING SYSTEM | $71.10 | NA | NA | NA | NA | NA | 3 | $213.30 |
| 2002 | NOVELL NETWARE 3.12 NOS | $1,795.50 | NA | NA | NA | NA | NA | 2 | $3,591.00 |
| 2003 | NOVELL NETWARE SFT III (20 users) | $2,272.50 | NA | NA | NA | NA | NA | 1 | $2,272.50 |
| 2004 | DBASE IV - SERVER (10 users) | $430.20 | NA | NA | NA | NA | NA | 2 | $860.40 |
| 2005 | DBASE IV - CLIENT NODE | $229.50 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2006 | WORD PERFECT V. 6.0 FOR WINDOWS (Server) | $238.50 | NA | NA | NA | NA | NA | 2 | $477.00 |
| 2007 | WORD PERFECT V.6.0 FOR WINDOWS ( Addl Licence) | $160.20 | NA | NA | NA | NA | NA | 3 | $480.60 |
| 2008 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Server - 5 Users | $256.50 | NA | NA | NA | NA | NA | 2 | $513.00 |
| 2009 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Addl Lic) | $44.10 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2010 | NMSS-8000(N) NETWORK MNGMT. SYS. SOFTWARE- consists of | $0.00 | NA | NA | NA | NA | NA | 1 | $0.00 |
| | MAPS-8000(N), Multi-User MTRX Application Program Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | IMUP-8000(N), Initialization & Maintenance Utility Program | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | DBES-8000(N), Database Entry Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| 2011 | LEGATO NETWORKER 2326 V.3.0 TAPE BACKUP | $386.10 | NA | NA | NA | NA | NA | 1 | $386.10 |
| | Last software item | | | | | | | | |
| | Total Costs | | | | | | | | $8,793.90 |
| | G&A | 3.46% | | | | | | | $304.27 |
| | Fees | 0.00% | | | | | | | $0.00 |
| | Total Price | | | | | | | | $9,098.17 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00213

**TABLE B-2**

**SOFTWARE UNIT PRICE SCHEDULE**
NCTS LONDON - YEAR 2
Prices are valid from month 1 through month 6 (months after contract award)

| 1. Line Item Number | 2. Item Description Equipment | 3. Unit Prices Offered Purchase Price | Monthly Maint. | Monthly Rental | Special Plans | 4. Months of Use From | To | 5. Quantity | 6. Extended Costs |
|---|---|---|---|---|---|---|---|---|---|
| 2001 | IBM OS/2 V2.1 OPERATING SYSTEM | $71.10 | NA | NA | NA | NA | NA | 3 | $213.30 |
| 2002 | NOVELL NETWARE 3.12 NOS | $1,795.50 | NA | NA | NA | NA | NA | 2 | $3,591.00 |
| 2003 | NOVELL NETWARE SFT III (20 users) | $2,272.50 | NA | NA | NA | NA | NA | 1 | $2,272.50 |
| 2004 | DBASE IV - SERVER (10 users) | $430.20 | NA | NA | NA | NA | NA | 2 | $860.40 |
| 2005 | DBASE IV - CLIENT NODE | $229.50 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2006 | WORD PERFECT V. 6.0 FOR WINDOWS (Server) | $238.50 | NA | NA | NA | NA | NA | 2 | $477.00 |
| 2007 | WORD PERFECT V.6.0 FOR WINDOWS ( Addl Licence) | $160.20 | NA | NA | NA | NA | NA | 3 | $480.60 |
| 2008 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Server - 5 Users | $256.50 | NA | NA | NA | NA | NA | 2 | $513.00 |
| 2009 | WORD PERFECT OFFICE V.4.0 FOR WINDOWS (Addl Lic) | $44.10 | NA | NA | NA | NA | NA | 0 | $0.00 |
| 2010 | NMSS-8000(N) NETWORK MNGMT. SYS. SOFTWARE- consists of | $0.00 | NA | NA | NA | NA | NA | 1 | $0.00 |
| | MAPS-8000(N), Multi-User MTRX Application Program Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | IMUP-8000(N), Initialization & Maintenance Utility Program | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| | DBES-8000(N), Database Entry Software | N/C | NA | NA | NA | NA | NA | 1 | $0.00 |
| 2011 | LEGATO NETWORKER 2326 V.3.0 TAPE BACKUP | $386.10 | NA | NA | NA | NA | NA | 1 | $386.10 |
| | Last software item | | | | | | | | |
| | Total Costs | | | | | | | | $8,793.90 |
| | G&A | 3.46% | | | | | | | $304.27 |
| | Fees | 0.00% | | | | | | | $0.00 |
| | Total Price | | | | | | | | $9,098.17 |



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 1.1.3 Table B-3

**TABLE B-3**

**MAINTENANCE UNIT PRICE SCHEDULE**

**NTCC HAMPTON ROADS**

| | YEAR TWO | | | YEAR THREE | | | YEAR FOUR | | | FINAL YEAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Description* | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost |
| Maintenance costs for equipment and software are not separately priced. The purchase prices include the cost of the extended warranty. | | | | | | | | | | | | |

***There are no maintenance costs in year one.***



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00216

TABLE B-3

**MAINTENANCE UNIT PRICE SCHEDULE**
NCTS JAPAN

| | YEAR TWO | | | YEAR THREE | | | YEAR FOUR | | | FINAL YEAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost |
| Maintenance costs for equipment and software are not separately priced. The purchase prices include the cost of the extended warranty. | | | | | | | | | | | | |

**There are no maintenance costs in year one.**



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00217

**TABLE B-3**

**MAINTENANCE UNIT PRICE SCHEDULE**
NTCC MAKALAPA

| | YEAR TWO | | | YEAR THREE | | | YEAR FOUR | | | FINAL YEAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost |
| Maintenance costs for equipment and software are not separately priced. The purchase prices include the cost of the extended warranty. | | | | | | | | | | | | |

**There are no maintenance costs in year one.**



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00218

**TABLE B-3**

**MAINTENANCE UNIT PRICE SCHEDULE**
NTCC CAMP SMITH

| | YEAR TWO | | | YEAR THREE | | | YEAR FOUR | | | FINAL YEAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost |
| Maintenance costs for equipment and software are not separately priced. The purchase prices include the cost of the extended warranty. | | | | | | | | | | | | |

**There are no maintenance costs *in year one.***



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00210

TABLE B-3

**MAINTENANCE UNIT PRICE SCHEDULE**
NCTS SICILY

| | YEAR TWO | | | YEAR THREE | | | YEAR FOUR | | | FINAL YEAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost |
| Maintenance costs for equipment and software are not separately priced. The purchase prices include the cost of the extended warranty. | | | | | | | | | | | | |

**There are no maintenance costs in year one.**



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

**TABLE B-3**

**MAINTENANCE UNIT PRICE SCHEDULE**
**NCTS PUERTO RICO**

| | YEAR TWO | | | YEAR THREE | | | YEAR FOUR | | | FINAL YEAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost |
| Maintenance costs for equipment and software are not separately priced. The purchase prices include the cost of the extended warranty. | | | | | | | | | | | | |

**There are no maintenance costs in year one.**



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

**TABLE B-3**

**MAINTENANCE UNIT PRICE SCHEDULE**
NCTS LONDON

| | YEAR TWO | | | YEAR THREE | | | YEAR FOUR | | | FINAL YEAR | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost | Quantity | Unit Monthly Maint. Cost | Total Annual Maint. Cost |
| Maintenance costs for equipment and software are not separately priced. The purchase prices include the cost of the extended warranty. | | | | | | | | | | | | |

**There are no maintenance costs in year one.**



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 1.2 Summary Price Table (Table B-4)

ISN

TABLE B-4 INSTALLATION SUMMARY PRICE SCHEDULE MATRIX

OFFEROR : ISN

| OFFEROR PRICES | | LOT I | LOT II-VI | LOT VII | LOT VIII | LOT IX | |
|---|---|---|---|---|---|---|---|
| COST ELEMENTS | | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
| HARDWARE | | $2,570,465.52 | $1,922,219.83 | $0.00 | $0.00 | $0.00 | $4,492,685.35 |
| SOFTWARE | | $29,619.00 | $35,175.60 | $0.00 | $0.00 | $0.00 | $64,794.60 |
| TOTAL MATERIALS | | $2,600,084.52 | $1,957,395.43 | $0.00 | $0.00 | $0.00 | $4,557,479.95 |
| PERSONNEL SUPPORT: | | | | | | | |
| OFF-SITE (AT ISN) | | $661,103.36 | $596,943.60 | $0.00 | $0.00 | $0.00 | $1,258,046.96 |
| ON-SITE (AT NAVY SITES) | | $582,487.20 | $514,817.21 | $0.00 | $0.00 | $0.00 | $1,097,304.41 |
| FORMAL CLASSROOM TRAINING | | $7,893.60 | $10,524.80 | $0.00 | $0.00 | $0.00 | $18,418.40 |
| ADDITIONAL TRAINING CLASSES | | $0.00 | $31,780.00 | $31,780.00 | $31,780.00 | $31,780.00 | $127,120.00 |
| TOTAL PERSONNEL SUPPORT | | $1,251,484.16 | $1,154,065.61 | $31,780.00 | $31,780.00 | $31,780.00 | $2,500,889.77 |
| OTHER DIRECT COSTS: | | | | | | | |
| TRAVEL | | $133,770.92 | $421,916.77 | $51,959.60 | $51,959.60 | $51,959.60 | $711,566.49 |
| SHIPPING | | $12,008.00 | $0.00 | $0.00 | $0.00 | $0.00 | $12,008.00 |
| U.S. INLAND | | $1,915.00 | $3,700.00 | $0.00 | $0.00 | $0.00 | $5,615.00 |
| INSURANCE | | $4,300.17 | $2,714.79 | $0.00 | $0.00 | $0.00 | $7,014.96 |
| SUBCONTRACTS | | $39,000.00 | $40,000.00 | $0.00 | $0.00 | $0.00 | $79,000.00 |
| REPRODUCTION | | $3,656.50 | $5,078.00 | $0.00 | $0.00 | $0.00 | $8,734.50 |
| TOTAL ODC | | $194,650.59 | $473,409.56 | $51,959.60 | $51,959.60 | $51,959.60 | $823,938.95 |
| ANNUAL MAINTENANCE : | | | | | | | |
| EQUIPMENT & SOFTWARE | | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| LABOR | | $0.00 | $412,039.60 | $412,039.60 | $412,039.60 | $412,039.60 | $1,648,158.40 |
| TOTAL ANNUAL MAINTENANCE | | $0.00 | $412,039.60 | $412,039.60 | $412,039.60 | $412,039.60 | $1,648,158.40 |
| PER CALL MAINTENANCE * | | $0.00 | $14,000.00 | $14,000.00 | $14,000.00 | $14,000.00 | $56,000.00 |
| SUB TOTAL COSTS | | $4,046,219.27 | $4,010,910.20 | $509,779.20 | $509,779.20 | $509,779.20 | $9,586,467.07 |
| MATERIALS: | | | | | | | |
| SUB TOTAL | | $2,600,084.52 | $1,957,395.43 | $0.00 | $0.00 | $0.00 | $4,557,479.95 |
| G&A | 3.46% | $89,962.92 | $67,725.88 | $0.00 | $0.00 | $0.00 | $157,688.80 |
| TOTAL COST | | $2,690,047.44 | $2,025,121.31 | $0.00 | $0.00 | $0.00 | $4,715,168.75 |
| FEES | 0.00% | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL PRICE | | $2,690,047.44 | $2,025,121.31 | $0.00 | $0.00 | $0.00 | $4,715,168.75 |
| OTHER ODCS (Excld. Travel): | | | | | | | |
| SUBTOTAL | | $60,879.67 | $51,492.79 | $0.00 | $0.00 | $0.00 | $112,372.46 |
| G&A | 10.55% | $6,422.81 | $5,432.49 | $0.00 | $0.00 | $0.00 | $11,855.30 |
| TOTAL COST | | $67,302.48 | $56,925.28 | $0.00 | $0.00 | $0.00 | $124,227.76 |
| FEES | 8.00% | $5,384.20 | $4,554.02 | $0.00 | $0.00 | $0.00 | $9,938.22 |
| TOTAL PRICE | | $72,686.68 | $61,479.30 | $0.00 | $0.00 | $0.00 | $134,165.98 |
| TRAVEL: | | | | | | | |
| SUBTOTAL | | $133,770.92 | $421,916.77 | $51,959.60 | $51,959.60 | $51,959.60 | $711,566.49 |
| G&A | 10.55% | $14,112.83 | $44,512.22 | $5,481.74 | $5,481.74 | $5,481.74 | $75,070.27 |
| TOTAL COST | | $147,883.75 | $466,428.99 | $57,441.34 | $57,441.34 | $57,441.34 | $786,636.76 |
| FEES | 8.00% | $11,830.70 | $37,314.32 | $4,595.31 | $4,595.31 | $4,595.31 | $62,930.95 |
| TOTAL PRICE | | $159,714.45 | $503,743.31 | $62,036.65 | $62,036.65 | $62,036.65 | $849,567.71 |
| PERSONNEL SUPPORT : | | | | | | | |
| SUB TOTAL | | $1,251,484.16 | $1,566,105.21 | $443,819.60 | $443,819.60 | $443,819.60 | $4,149,048.17 |
| G&A | 10.55% | $132,031.58 | $165,224.10 | $46,822.97 | $46,822.97 | $46,822.97 | $437,724.59 |
| TOTAL COST | | $1,383,515.74 | $1,731,329.31 | $490,642.57 | $490,642.57 | $490,642.57 | $4,586,772.76 |
| FEES | 8.00% | $110,681.26 | $138,506.34 | $39,251.41 | $39,251.41 | $39,251.41 | $366,941.83 |
| TOTAL PRICE (LABOR) | | $1,494,197.00 | $1,869,835.65 | $529,893.98 | $529,893.98 | $529,893.98 | $4,953,714.59 |
| ANNUAL AGGREGATE OFFERROR TOTAL | | $4,416,645.57 | $4,474,179.57 | $605,930.63 | $605,930.63 | $605,930.63 | $10,708,617.03 |
| ADJUSTMENT FACTOR ** | | 0.909090 | 0.826446 | 0.751315 | 0.683013 | 0.620921 | |
| ADJUSTED ANNUAL OFFEROR TOTALS | | $4,015,128.32 | $3,697,667.81 | $455,244.77 | $413,858.50 | $376,235.05 | $8,958,134.45 |

* This amount is based on the OPPM total given in Section C (NTE amount is $2,000.00 per site). There are no loadings on the OPPM amounts.

** Based on applicable PVDF found in Table B-5.



*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

# 1.3 Present Value Discount Factors (Table B-5)

TABLE B-5 PRESENT VALUE DISCOUNT FACTORS

The following table reflects the Present Value Discount Factors for years 1 through 5 from date of contract award.

| YEAR | FACTOR |
|---|---|
| 1 | 0.909090 |
| 2 | 0.826446 |
| 3 | 0.751315 |
| 4 | 0.683013 |
| 5 | 0.620921 |

# 1.4 Optional Extended Maintenance Service & Per Call Hourly Rates (Table B-6)

TABLE B-6 OPTIONAL EXTENDED MAINTENANCE SERVICE AND PER-CALL HOURLY RATES

(a) The Basic Monthly Maintenance charges set forth in the Unit Price Schedules cover the Principal Period of Maintenance as set forth in Section C. As reflected in the table below, the charge for any optional Period of Maintenance Services Availability is based on the Basic Monthly Maintenance Charge plus a percentage of the Basic Monthly Maintenance Charge. The percentage depends on the optional period selected.

| Up to ___ Consecutive Hours a Day | 9 | 12 | 16 | 20 | 24 |
|---|---|---|---|---|---|
| Monday through Friday * | 0 % | 50 % | 50 % | 100% | 100% |
| Saturday | 50 % | 50 % | 50 % | 100% | 100% |
| Sunday | 100 % | 100 % | 100 % | 200% | 200% |
| Holidays | 100 % | 100 % | 100 % | 200% | 200% |

(b) Per-Call Hourly Rates. Should the government request maintenance service outside the designated Principal Period of Maintenance, or any extensions thereof, on a per-call basis, charges for such additional service shall be as follows:

$ 56.07 per hour on Saturdays
$ 74.76 per hour on Sundays and Holidays

A minimum of

$ 56.07 per call workdays
$ 74.76 per call Saturday
$ 74.76 per call Sundays and Holidays

will be charged for each service call. Charges shall be computed to the nearest one-half hour, which shall include travel to an from the site, not to exceed one hour per service call, or mileage (whichever is the lesser charge). The maximum for any one occurrence shall be $ 150 .

* The percentages indicated under 9 hours Monday through Friday refers to nine consecutive hours, any part of which is outside the hours of 7 a.m. through 6 p.m.

# 2.0 Completed Cost Information Questionnaire

## 2.0 COSTING INFORMATION QUESTIONNAIRE

1. Supplemental Price Tables. Please see attached supporting tables in Section 3.0.

2. Extended Maintenance Service. Completed Table B-6 is provided in Section 1.4.

3. Prompt Payment Discounts. ISN does not offer any prompt payment discounts.

4. Hardware and/or Software Monitors. There are no charges for assistance in identifying and locating device connections for hardware and/or software monitors when requested by the Government.



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 3.0 Supplemental Price Tables

# 3.1 Off-Site Labor Costs

## LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - OFF SITE (ISN) RATES

## CLIN 0001AA : TURNKEY ATCS INSTALLED & ACCEPTED AT NTCC HAMPTON

**YEAR 1** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $77.77 | 627 | $48,761.79 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | | $52.81 | 627 | $33,111.87 |
| SITE SUPERVISOR | | $54.33 | 160 | $8,692.80 |
| SENIOR TECHNICIAN | | $41.10 | 0 | $0.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $46.61 | 627 | $29,224.47 |
| SR SYSTEMS ANALYST ← ? | | $47.05 | 0 | $0.00 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 227 | $7,302.59 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $127,093.52 |
| G&A | 10.55% | | | $13,408.37 |
| TOTAL COST | | | | $140,501.89 |
| FEE | 8.00% | | | $11,240.15 |
| TOTAL PRICE | | | 2268 | $151,742.04 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



00233

"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - OFF SITE (ISN) RATES

## CLIN 0001AB : TURNKEY ATCS INSTALLED & ACCEPTED AT NTCC CAMP SMITH

**YEAR 1** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $77.77 | 627 | $48,761.79 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | | $52.81 | 627 | $33,111.87 |
| SITE SUPERVISOR | | $54.33 | 160 | $8,692.80 |
| SENIOR TECHNICIAN | | $41.10 | 0 | $0.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $46.61 | 627 | $29,224.47 |
| SR SYSTEMS ANALYST | | $47.05 | 0 | $0.00 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 227 | $7,302.59 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $127,093.52 |
| G&A | 10.55% | | | $13,408.37 |
| TOTAL COST | | | | $140,501.89 |
| FEE | 8.00% | | | $11,240.15 |
| TOTAL PRICE | | | 2268 | $151,742.04 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - OFF SITE (ISN) RATES

## CLIN 0001AC : TURNKEY ATCS INSTALLED & ACCEPTED AT NTCC MAKALAPA

**YEAR 1** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $77.77 | 627 | $48,761.79 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | | $52.81 | 627 | $33,111.87 |
| SITE SUPERVISOR | | $54.33 | 160 | $8,692.80 |
| SENIOR TECHNICIAN | | $41.10 | 0 | $0.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ENGINEER ← | | $46.61 | 627 | $29,224.47 |
| SR SYSTEMS ANALYST | | $47.05 | 0 | $0.00 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 227 | $7,302.59 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $127,093.52 |
| G&A | 10.55% | | | $13,408.37 |
| TOTAL COST | | | | $140,501.89 |
| FEE | 8.00% | | | $11,240.15 |
| TOTAL PRICE | | | 2268 | $151,742.04 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS





"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790

ISN

S/B 0004

**LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - OFF SITE (ISN) RATES**

**CLIN 0005: TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS JAPAN**

**YEAR 2**

ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $77.77 | 470 | $36,551.90 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | | $52.81 | 470 | $24,820.70 |
| SITE SUPERVISOR | | $54.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $41.10 | 0 | $0.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST ← | | $46.61 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $47.05 | 470 | $22,113.50 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $83,486.10 |
| G&A | 10.55% | | | $8,807.78 |
| TOTAL COST | | | | $92,293.88 |
| FEE | 8.00% | | | $7,383.51 |
| TOTAL PRICE | | | 1410 | $99,677.39 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - OFF SITE (ISN) RATES

## CLIN 0007 : TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS SICILY

**YEAR 2** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $77.77 | 470 | $36,551.90 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | | $52.81 | 470 | $24,820.70 |
| SITE SUPERVISOR | | $54.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $41.10 | 0 | $0.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST | | $46.61 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $47.05 | 470 | $22,113.50 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $83,486.10 |
| G&A | 10.55% | | | $8,807.78 |
| TOTAL COST | | | | $92,293.88 |
| FEE | 8.00% | | | $7,383.51 |
| TOTAL PRICE | | | 1410 | $99,677.39 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS





"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - OFF SITE (ISN) RATES

### CLIN 0010 : TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS PUERTO RICO

**YEAR 2** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $77.77 | 470 | $36,551.90 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | | $52.81 | 470 | $24,820.70 |
| SITE SUPERVISOR | | $54.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $41.10 | 0 | $0.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST | | $46.61 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $47.05 | 470 | $22,113.50 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $83,486.10 |
| G&A | 10.55% | | | $8,807.78 |
| TOTAL COST | | | | $92,293.88 |
| FEE | 8.00% | | | $7,383.51 |
| TOTAL PRICE | | | 1410 | $99,677.39 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



00238
"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790 ISN

S/B :0013

**LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - OFF SITE (ISN) RATES**

**CLIN 0011 : TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS LONDON**

**YEAR 2** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $77.77 | 470 | $36,551.90 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | | $52.81 | 470 | $24,820.70 |
| SITE SUPERVISOR | | $54.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $41.10 | 0 | $0.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST | | $46.61 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $47.05 | 470 | $22,113.50 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $83,486.10 |
| G&A | 10.55% | | | $8,807.78 |
| TOTAL COST | | | | $92,293.88 |
| FEE | 8.00% | | | $7,383.51 |
| TOTAL PRICE | | | 1410 | $99,677.39 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00239



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 3.2 On-site Labor Costs

## LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - ON SITE RATES

1.57

## CLIN 0001AA : TURNKEY ATCS INSTALLED & ACCEPTED AT NTCC HAMPTON

**YEAR 1**

ESCALATION RATE: 0

| LABOR CATEGORIES | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | |
|---|---|---|---|---|
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | |
| SYSTEMS ENGINEER | $37.26 | 40 | $1,490.40 | |
| SITE SUPERVISOR | $38.33 | 1520 | $58,261.60 | 50,773 |
| SENIOR TECHNICIAN | $29.00 | 2720 | $78,880.00 | 38,418 |
| TECHNICIAN | $25.55 | 8320 | $212,576.00 | 33,842 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | |
| QA ENGINEER | $38.32 | 0 | $0.00 | |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | |
| ENGR DRAFT | $22.70 | 0 | $0.00 | |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 | |
| SUB TOTAL | | | $351,208.00 | |
| G&A 10.55% | | | $37,052.44 | |
| TOTAL COST | | | $388,260.44 | |
| FEE 8.00% | | | $31,060.84 | |
| TOTAL PRICE | | 12600 | $419,321.28 | |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION ON THE TITLE PAGE OF THIS PROPOSAL" 241

**LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - ON SITE RATES**

**CLIN 0001AB: TURNKEY ATCS INSTALLED & ACCEPTED AT NTCC CAMP SMITH**

**YEAR 1** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | | $38.33 | 840 | $32,197.20 |
| SENIOR TECHNICIAN | | $29.00 | 1000 | $29,000.00 |
| TECHNICIAN | | $25.55 | 1600 | $40,880.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | | $102,077.20 |
| G&A | 10.55% | | | $10,769.14 |
| TOTAL COST | | | | $112,846.34 |
| FEE | 8.00% | | | $9,027.71 |
| TOTAL PRICE | | | 3440 | $121,874.05 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00242



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

**LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - ON SITE RATES**

**CLIN 0001AC : TURNKEY ATCS INSTALLED & ACCEPTED AT NTCC MAKALAPA**

**YEAR 1** ESCALATION RATE: 0

| LABOR CATEGORIES | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|
| PROGRAM MANAGER | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 1000 | $38,330.00 |
| SENIOR TECHNICIAN | $29.00 | 1160 | $33,640.00 |
| TECHNICIAN | $25.55 | 2240 | $57,232.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | $129,202.00 |
| G&A 10.55% | | | $13,630.81 |
| TOTAL COST | | | $142,832.81 |
| FEE 8.00% | | | $11,426.62 |
| TOTAL PRICE | | 4400 | $154,259.43 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00243



*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790 ISN

SB 0004?

**LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - ON SITE RATES**

**CLIN 0005: TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS JAPAN**

**YEAR 2**

ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | | $38.33 | 920 | $35,263.60 |
| SENIOR TECHNICIAN | | $29.00 | 1120 | $32,480.00 |
| TECHNICIAN | | $25.55 | 2120 | $54,166.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | | $121,909.60 |
| G&A | 10.55% | | | $12,861.46 |
| TOTAL COST | | | | $134,771.06 |
| FEE | 8.00% | | | $10,781.68 |
| TOTAL PRICE | | | 4160 | $145,552.74 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



00244

"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790

ISN

**LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - ON SITE RATES**

**CLIN 0007 : TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS SICILY**

**YEAR 2** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | | $38.33 | 1000 | $38,330.00 |
| SENIOR TECHNICIAN | | $29.00 | 1200 | $34,800.00 |
| TECHNICIAN | | $25.55 | 2440 | $62,342.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $22.70 |
| ON-SITE MAINTENANCE TECHNICIAN | | $31.31 | 0 | $31.31 |
| SUB TOTAL | | | | $135,526.01 |
| G&A | 10.55% | | | $14,297.99 |
| TOTAL COST | | | | $149,824.00 |
| FEE | 8.00% | | | $11,985.92 |
| TOTAL PRICE | | | 4640 | $161,809.92 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00245



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - ON SITE RATES

## CLIN 0010 : TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS PUERTO RICO

**YEAR 2** ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | | $38.33 | 840 | $32,197.20 |
| SENIOR TECHNICIAN | | $29.00 | 1040 | $30,160.00 |
| TECHNICIAN | | $25.55 | 1800 | $45,990.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | | $108,347.20 |
| G&A | 10.55% | | | $11,430.63 |
| TOTAL COST | | | | $119,777.83 |
| FEE | 8.00% | | | $9,582.23 |
| TOTAL PRICE | | | 3680 | $129,360.06 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS





"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

S/B 13

**LABOR COSTS FOR INSTALLATION OF ATCS AT SITES - ON SITE RATES**

**CLIN 0011 : TURNKEY ATCS INSTALLED & ACCEPTED AT NCTS LONDON**

**YEAR 2**

ESCALATION RATE: 0

| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
|---|---|---|---|---|
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | | $38.33 | 1080 | $41,396.40 |
| SENIOR TECHNICIAN | | $29.00 | 1280 | $37,120.00 |
| TECHNICIAN | | $25.55 | 2760 | $70,518.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | | $149,034.40 |
| G&A | 10.55% | | | $15,723.13 |
| TOTAL COST | | | | $164,757.53 |
| FEE | 8.00% | | | $13,180.60 |
| TOTAL PRICE | | | 5120 | $177,938.13 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS





*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

# 3.3 Formal Classroom Training Costs

## FORMAL CLASSROOM TRAINING COSTS

### CLIN 0002AA - NTCC HAMPTON ROADS

| YEAR 1 | | ESCALATION RATE: | 0 |
|---|---|---|---|
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST/ENGR. | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR (Subcontract to DMS) | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 |
| OTHER DIRECT COSTS : | | | |
| SUB TOTAL | | | $2,631.20 |
| G&A 10.55% | | | $277.59 |
| TOTAL COST | | | $2,908.79 |
| FEE 8.00% | | | $232.70 |
| TOTAL PRICE | | 80 | $3,141.49 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00249



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## FORMAL CLASSROOM TRAINING COSTS

### CLIN 0002AB - NTCC CAMP SMITH

| YEAR 1 | ESCALATION RATE: | | 0 |
|---|---|---|---|
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST/ENGR. | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR (Subcontract to DMS) | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 |
| OTHER DIRECT COSTS : | | | |
| SUB TOTAL | | | $2,631.20 |
| G&A 10.55% | | | $277.59 |
| TOTAL COST | | | $2,908.79 |
| FEE 8.00% | | | $232.70 |
| TOTAL PRICE | | 80 | $3,141.49 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00250



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

ISN

## FORMAL CLASSROOM TRAINING COSTS

### CLIN 0002AC - NTCC MAKALAPA

| YEAR 1 | | ESCALATION RATE: | | 0 |
|---|---|---|---|---|
| LABOR CATEGORIES | | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 |
| SITE MANAGER | | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $29.00 | 0 | $0.00 |
| TECHNICIAN | | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST/ENGR. | | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR (Subcontract to DMS) | | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | | $31.31 | 0 | $0.00 |
| OTHER DIRECT COSTS : | | | | |
| SUB TOTAL | | | | $2,631.20 |
| G&A | 10.55% | | | $277.59 |
| TOTAL COST | | | | $2,908.79 |
| FEE | 8.00% | | | $232.70 |
| TOTAL PRICE | | | 80 | $3,141.49 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00251



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS NETWORK CORP. - N00600-93-R-2790

S/B 0005!

**FORMAL CLASSROOM TRAINING COSTS**

**CLIN 0006 - NCTS JAPAN**

| YEAR 2 | ESCALATION RATE: | | 0 |
|---|---|---|---|
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST/ENGR. | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR (Subcontract to DMS) | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 |
| OTHER DIRECT COSTS : | | | |
| SUB TOTAL | | | $2,631.20 |
| G&A 10.55% | | | $277.59 |
| TOTAL COST | | | $2,908.79 |
| FEE 8.00% | | | $232.70 |
| TOTAL PRICE | | 80 | $3,141.49 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00252



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## FORMAL CLASSROOM TRAINING COSTS

### CLIN 0008 - NCTS SICILY

| YEAR 2 | ESCALATION RATE: | | 0 |
|---|---|---|---|
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST/ENGR. | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR (Subcontract to DMS) | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 |
| OTHER DIRECT COSTS : | | | |
| SUB TOTAL | | | $2,631.20 |
| G&A 10.55% | | | $277.59 |
| TOTAL COST | | | $2,908.79 |
| FEE 8.00% | | | $232.70 |
| TOTAL PRICE | | 80 | $3,141.49 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS





*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

INFORMATION SYSTEMS NETWORK CORP. - N00600-93-R-2790

ISN

## FORMAL CLASSROOM TRAINING COSTS

## CLIN 0011 - NCTS PUERTO RICO

| YEAR 2 | | ESCALATION RATE: | 0 |
|---|---|---|---|
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST/ENGR. | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR (Subcontract to DMS) | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 |
| OTHER DIRECT COSTS : | | | |
| SUB TOTAL | | | $2,631.20 |
| G&A 10.55% | | | $277.59 |
| TOTAL COST | | | $2,908.79 |
| FEE 8.00% | | | $232.70 |
| TOTAL PRICE | | 80 | $3,141.49 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00254



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

ISN

**FORMAL CLASSROOM TRAINING COSTS**

**CLIN 0014 - NCTS LONDON**

| YEAR 2 | ESCALATION RATE: | | 0 |
|---|---|---|---|
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST/ENGR. | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR (Subcontract to DMS) | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECHNICIAN | $31.31 | 0 | $0.00 |
| OTHER DIRECT COSTS : | | | |
| SUB TOTAL | | | $2,631.20 |
| G&A 10.55% | | | $277.59 |
| TOTAL COST | | | $2,908.79 |
| FEE 8.00% | | | $232.70 |
| TOTAL PRICE | | 80 | $3,141.49 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00255



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 3.4 Contract Data Requirements List Costs

## COST OF CDRLS

### CLIN 0003 - CONTRACT DATA REQUIREMENTS FOR CLINS 0001 AND 0002

| YEAR 1 | | ESCALATION RATE: | 0 |
|---|---|---|---|
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $77.77 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $43.33 | 0 | $0.00 |
| SR. SYSTEMS ENGINEER | $52.81 | 0 | $0.00 |
| SITE SUPERVISOR | $54.33 | 1280 | $69,542.40 |
| SENIOR TECHNICIAN | $41.10 | 1360 | $55,896.00 |
| TECHNICIAN | $36.21 | 160 | $5,793.60 |
| SYSTEMS ANALYST | $46.61 | 960 | $44,745.60 |
| SR SYSTEMS ANALYST | $47.05 | 320 | $15,056.00 |
| QA ENGINEER | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $26.51 | 0 | $0.00 |
| ENGR DRAFT | $32.17 | 2760 | $88,789.20 |
| ON-SITE MAINTENANCE TECHNICIAN | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | $279,822.80 |
| G&A 10.55% | | | $29,521.31 |
| TOTAL COST | | | $309,344.11 |
| FEE 8.00% | | | $24,747.53 |
| PRICE | | | $334,091.64 |
| OTHER DIRECT COSTS: | | | |
| REPRODUCTION | | | $3,656.50 |
| SUB TOTAL | | | $3,656.50 |
| G&A 10.55% | | | $385.76 |
| TOTAL COST | | | $4,042.26 |
| FEE 8.00% | | | $323.38 |
| PRICE | | | $4,365.64 |
| TOTAL PRICE | | 6840 | $338,457.28 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## COST OF CDRLS

### CLIN 0006 - CONTRACT DATA REQUIREMENTS FOR CLINS 0004 AND 0005

| YEAR 2 | | ESCALATION RATE: | | 0 |
|---|---|---|---|---|
| LABOR CATEGORIES | | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $77.77 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $52.81 | 280 | $14,786.80 |
| SITE SUPERVISOR | | $54.33 | 280 | $15,212.40 |
| SENIOR TECHNICIAN | | $41.10 | 160 | $6,576.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST | | $46.61 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $47.05 | 0 | $0.00 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 880 | $28,309.60 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $64,884.80 |
| G&A | 10.55% | | | $6,845.35 |
| TOTAL COST | | | | $71,730.15 |
| FEE | 8.00% | | | $5,738.41 |
| PRICE | | | | $77,468.56 |
| OTHER DIRECT COSTS: | | | | |
| REPRODUCTION | | | | $1,269.50 |
| SUB TOTAL | | | | $1,269.50 |
| G&A | 10.55% | | | $133.93 |
| TOTAL COST | | | | $1,403.43 |
| FEE | 8.00% | | | $112.27 |
| PRICE | | | | $1,515.70 |
| TOTAL PRICE | | | 1600 | $78,984.26 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00258



*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

**COST OF CDRLS**

**CLIN 0009 - CONTRACT DATA REQUIREMENTS FOR CLINS 0007 AND 0008**

| YEAR 2 | | ESCALATION RATE: | | 0 |
|---|---|---|---|---|
| LABOR CATEGORIES | | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $77.77 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $52.81 | 280 | $14,786.80 |
| SITE SUPERVISOR | | $54.33 | 280 | $15,212.40 |
| SENIOR TECHNICIAN | | $41.10 | 160 | $6,576.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST | | $46.61 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $47.05 | 0 | $0.00 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 880 | $28,309.60 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $64,884.80 |
| G&A | 10.55% | | | $6,845.35 |
| TOTAL COST | | | | $71,730.15 |
| FEE | 8.00% | | | $5,738.41 |
| PRICE | | | | $77,468.56 |
| OTHER DIRECT COSTS: | | | | |
| REPRODUCTION | | | | $1,269.50 |
| SUB TOTAL | | | | $1,269.50 |
| G&A | 10.55% | | | $133.93 |
| TOTAL COST | | | | $1,403.43 |
| FEE | 8.00% | | | $112.27 |
| PRICE | | | | $1,515.70 |
| TOTAL PRICE | | | 1600 | $78,984.26 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

00259



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## COST OF CDRLS

### CLIN 0012 - CONTRACT DATA REQUIREMENTS FOR CLINS 0010 AND 0011

| YEAR 2 | | ESCALATION RATE: | | 0 |
|---|---|---|---|---|
| LABOR CATEGORIES | | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $77.77 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $52.81 | 200 | $10,562.00 |
| SITE SUPERVISOR | | $54.33 | 240 | $13,039.20 |
| SENIOR TECHNICIAN | | $41.10 | 120 | $4,932.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST | | $46.61 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $47.05 | 0 | $0.00 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 680 | $21,875.60 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $50,408.80 |
| G&A | 10.55% | | | $5,318.13 |
| TOTAL COST | | | | $55,726.93 |
| FEE | 8.00% | | | $4,458.15 |
| PRICE | | | | $60,185.08 |
| OTHER DIRECT COSTS: | | | | |
| REPRODUCTION | | | | $1,269.50 |
| SUB TOTAL | | | | $1,269.50 |
| G&A | 10.55% | | | $133.93 |
| TOTAL COST | | | | $1,403.43 |
| FEE | 8.00% | | | $112.27 |
| PRICE | | | | $1,515.70 |
| TOTAL PRICE | | | 1240 | $61,700.78 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS



00260
"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## COST OF CDRLS

### CLIN 0015 - CONTRACT DATA REQUIREMENTS FOR CLINS 0013 AND 0014

| YEAR 2 | | ESCALATION RATE: | | 0 |
|---|---|---|---|---|
| LABOR CATEGORIES | | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $77.77 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $43.33 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $52.81 | 360 | $19,011.60 |
| SITE SUPERVISOR | | $54.33 | 360 | $19,558.80 |
| SENIOR TECHNICIAN | | $41.10 | 200 | $8,220.00 |
| TECHNICIAN | | $36.21 | 0 | $0.00 |
| SYSTEMS ANALYST | | $46.61 | 0 | $0.00 |
| SR SYSTEMS ANALYST | | $47.05 | 0 | $0.00 |
| QA ENGINEER | | $54.30 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $33.82 | 0 | $0.00 |
| ADMINISTRATIVE ASST | | $26.51 | 0 | $0.00 |
| ENGR DRAFT | | $32.17 | 1120 | $36,030.40 |
| ON-SITE MAINTENANCE TECHNICIAN | | $44.38 | 0 | $0.00 |
| SUB TOTAL | | | | $82,820.80 |
| G&A | 10.55% | | | $8,737.59 |
| TOTAL COST | | | | $91,558.39 |
| FEE | 8.00% | | | $7,324.67 |
| PRICE | | | | $98,883.06 |
| OTHER DIRECT COSTS: | | | | |
| REPRODUCTION | | | | $1,269.50 |
| SUB TOTAL | | | | $1,269.50 |
| G&A | 10.55% | | | $133.93 |
| TOTAL COST | | | | $1,403.43 |
| FEE | 8.00% | | | $112.27 |
| PRICE | | | | $1,515.70 |
| TOTAL PRICE | | | 2040 | $100,398.76 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS





"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 3.4.1 CDRL Lot I

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: A
C. CATEGORY: TDP TM OTHER MANAGEMENMT
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: A001
2. TITLE OF DATA ITEM: Management Plan
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-MGMT-80004 of 3 May 85
5. CONTRACT REFERENCE: S.O.W. 3.6.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 30 DAC
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC
16. REMARKS:

Government will review NLT 30 DAR.

Contractor shall include a program schedule showing the planned execution as part of the Management Plan.

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

17. PRICE: 7,566.00
18. ESTIMATED TOTAL: 7,566.00

1. DATA ITEM NO.: A002
2. TITLE OF DATA ITEM: Conference Agenda
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-A-7088 of 18 Feb 81
5. CONTRACT REFERENCE: S.O.W. 3.6.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: As required
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 15 DP MTG
13. DATE OF SUBSEQUENT SUBMISSION: At Meeting
16. REMARKS:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 2 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL → | | 3 | |

17. PRICE: 181.00
18. ESTIMATED TOTAL: TBD

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
(2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: C
C. CATEGORY: TDP TM OTHER INSTALL. ENGINEERING
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

---

1. DATA ITEM NO.: B001
2. TITLE OF DATA ITEM: Site Survey Report
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-S-30601 of 1 Jul 77
5. CONTRACT REFERENCE: S.O.W. PARA 3.4.9
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: SEE BLK 16
13. DATE OF SUBSEQUENT SUBMISSION: 15 DARC

16. REMARKS
Block 12: Draft report due 15 days after site visit. Government will review and comment 30 DAR.
*Block 2: Deliver separate reports for each site.

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 4 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 5 | 5 | |

17. PRICE: 31,517.00
18. ESTIMATED TOTAL: 31,517.00

---

1. DATA ITEM NO.: B002
2. TITLE OF DATA ITEM: Telecommunication System Installation Plan
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-MGMT-81118 of 19 Dec 90
5. CONTRACT REFERENCE: S.O.W. 3.4.7
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC

16. REMARKS
Block 12: Draft due 6 months after contract award. Government will review and comment or approve NLT 30 DAR.
Block 2: Deliver separate reports for each site.

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 4 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 5 | 5 | |

17. PRICE: 213,523.00
18. ESTIMATED TOTAL: 213,523.00

---

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
(2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: E
C. CATEGORY: TDP TM OTHER CONFIGURATION MGMT
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: C003
2. TITLE OF DATA ITEM: Engineering Change Proposal
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-CMAN-80639A of 17 Apr 92
5. CONTRACT REFERENCE: S.O.W. 3.4.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: As required
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: As required
13. DATE OF SUBSEQUENT SUBMISSION: As required
16. REMARKS:

17. PRICE: 192.00
18. ESTIMATED TOTAL: TBD

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 2 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL ——→ | | 3 | |

1. DATA ITEM NO.: C004
2. TITLE OF DATA ITEM: Request for Deviation
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-CMAN-80640A of 17 Apr 92
5. CONTRACT REFERENCE: S.O.W. 3.4.4
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: As required
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: As required
13. DATE OF SUBSEQUENT SUBMISSION: As required
16. REMARKS:

17. PRICE: 96.00
18. ESTIMATED TOTAL: TBD

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 2 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL ——→ | | 3 | |

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE



1059/183
Attachment 6

00265

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: G
C. CATEGORY: TDP TM OTHER SOFTWARE
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: D001
2. TITLE OF DATA ITEM: Doc. of Commercially Available or Priv. Dev.
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-E-7141 of 18 Jan 85 .
5. CONTRACT REFERENCE: S.O.W. 3.3.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. DIST STATEMENT REQUIRED:
9. APP CODE:
10. FREQUENCY: 0 Time
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 180 DAC
13. DATE OF SUBSEQUENT SUBMISSION:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 2 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL → | | 3 | |

16. REMARKS
Block 4: Tailor DI-E-7141 as follows:
a. Change block 3.2 all after satisfactory to read "for its intended use. If approved..."
b. Delete block 7.1 in its entirety.
c. Delete from block 7.2 "as defined in DoD-STD-1467 (AR)."

Block 12: Government will review and comment NLT 30 DAR.

17. PRICE: 67.00
18. ESTIMATED TOTAL: 67.00

1. DATA ITEM NO.: D002
2. TITLE OF DATA ITEM: Computer System Operator's Manual
3. SUBTITLE: NMS Operator's Manual
4. AUTHORITY (Data Acquisition Document No.): DI-MCCR-80018A of 29 Feb 88
5. CONTRACT REFERENCE: S.O.W. 3.8.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: DD
8. DIST STATEMENT REQUIRED:
9. APP CODE:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 5 | |

16. REMARKS
Block 12: Due 9 months after contract award.
Block 13: Government will review and comment or approve NLT 30 DAR.

17. PRICE: 15,582.0
18. ESTIMATED TOTAL: 15,582.C

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
(2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: I
C. CATEGORY: TDP ___ TM ___ OTHER SOFTWARE
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

**Data Item 1**

1. DATA ITEM NO.: D005
2. TITLE OF DATA ITEM: Software Program Maintenance Manual
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-MCCR-80317 of 12 Feb 87
5. CONTRACT REFERENCE: S.O.W. 3.8.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: AS REQ
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC
16. REMARKS: Block 12: Due 9 Months after contract. Government will review and comment or approve NLT 30 DAR

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL ⟶ | 4 | 5 | |

17. PRICE: 13,356.0
18. ESTIMATED TOTAL: 13,356.0

**Data Item 2**

1. DATA ITEM NO.: D006
2. TITLE OF DATA ITEM: Job Manual
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-ILSS-80559 of 7 Apr 88
5. CONTRACT REFERENCE: S.O.W. 3.8
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: 0 Time
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC
16. REMARKS: Block 12: Due upon completion of installation. Government will review and comment or approve NLT 45 DAR.
Tailor DI-ILSS-80559 as follows:
a. Add block 7.3: This DID is for the identification and procurement of the Technical Manual(s) required for CFE installed as part of this procurement. This information may be contained in one or several binders but shall include all information necessary to perform, but not limited to, the operational, maintenance and fault isolation functions of the system.

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL ⟶ | 4 | 5 | |

17. PRICE: 20,154.0
18. ESTIMATED TOTAL: 20,154.0

| G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE |
|---|---|---|---|
| | | | |

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
(2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: K
C. CATEGORY: TDP TM OTHER LOGISTICS
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

---

1. DATA ITEM NO.: E003
2. TITLE OF DATA ITEM: Proposed Spare Parts List
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-ILSS-80134A of 6 Nov 90
5. CONTRACT REFERENCE: S.O.W. 3.2.5
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: 0 Time
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 12 MOS ADC
13. DATE OF SUBSEQUENT SUBMISSION:
16. REMARKS:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 0 | 0 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 1 | 1 | |

17. PRICE: 2,725.00
18. ESTIMATED TOTAL: 2,725.00

---

1. DATA ITEM NO.: E004
2. TITLE OF DATA ITEM: Spare Parts Usage Report
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-ILSS-80483 of 30 Oct 87
5. CONTRACT REFERENCE: S.O.W. 3.2.5
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: Quarterly
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: See Block 16
16. REMARKS:

Block 12: Submit 15 days after end of first quarter of operational status.
Block 13: Submit 15 days after end of each quarterly reporting period.
Block 2: Submit separate report for each site.

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 2 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL → | | 3 | |

17. PRICE: 89.00
18. ESTIMATED TOTAL: 89.00

---

G. PREPARED BY:
H. DATE:
I. APPROVED BY:
J. DATE:



1059/183
Attachment 6

00268

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
(2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: M
C. CATEGORY: TDP ___ TM ___ OTHER TRAINING
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

| | |
|---|---|
| 1. DATA ITEM NO. | F001 |
| 2. TITLE OF DATA ITEM | Training Plan |
| 3. SUBTITLE | |
| 4. AUTHORITY (Data Acquisition Document No.) | DI-ILSS-80143 of 7 Apr 86 8768 |
| 5. CONTRACT REFERENCE | S.O.W. 3.7.1 - 3.7.5 |
| 6. REQUIRING OFFICE | PMW 152 |
| 7. DD 250 REQ | LT |
| 8. APP CODE | AN |
| 9. DIST STATEMENT REQUIRED | |
| 10. FREQUENCY | ONE/R |
| 11. AS OF DATE | |
| 12. DATE OF FIRST SUBMISSION | 12 Mos ADC |
| 13. DATE OF SUBSEQUENT SUBMISSION | 30 DARC |
| 17. PRICE | 17,977.00 |
| 18. ESTIMATED TOTAL | 17,977.00 |

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

16. REMARKS
Block 13: Government will review and comment or approve NLT 30 DAR.

| | |
|---|---|
| 1. DATA ITEM NO. | F002 |
| 2. TITLE OF DATA ITEM | Lesson Plan |
| 3. SUBTITLE | |
| 4. AUTHORITY (Data Acquisition Document No.) | DI-ILSS-81095 of 5 Dec 91 |
| 5. CONTRACT REFERENCE | S.O.W. 3.7.1 - 3.7.5 |
| 6. REQUIRING OFFICE | PMW 152 |
| 7. DD 250 REQ | LT |
| 8. APP CODE | AN |
| 9. DIST STATEMENT REQUIRED | |
| 10. FREQUENCY | ONE/R |
| 11. AS OF DATE | |
| 12. DATE OF FIRST SUBMISSION | See Block 16 |
| 13. DATE OF SUBSEQUENT SUBMISSION | See Block 16 |
| 17. PRICE | 11,130.00 |
| 18. ESTIMATED TOTAL | 11,130.00 |

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

16. REMARKS
Block 12: Submit 90 days prior to start of first scheduled course.
Block 13: Government will review and comment or approve NLT 30 DAR. Revisions due NLT 30 DARC.

| G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE |
|---|---|---|---|
| | | | |

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

| A. CONTRACT LINE ITEM NO. | B. EXHIBIT | C. CATEGORY: |
|---|---|---|
| 0003 | O | TDP  TM  OTHER TESTING |

| D. SYSTEM/ITEM | E. CONTRACT/PR NO. | F. CONTRACTOR |
|---|---|---|
| AUTOMATED TECHNICAL CONTROL | N00600-93-R-2790 | |

| 1. DATA ITEM NO. | 2. TITLE OF DATA ITEM | 3. SUBTITLE | 17. PRICE |
|---|---|---|---|
| G001 | Cutover Plan | | $5,106.00 |

| 4. AUTHORITY (Data Acquisition Document No.) | 5. CONTRACT REFERENCE | 6. REQUIRING OFFICE | 18. TOTAL |
|---|---|---|---|
| DI-MGMT-80355 of 7 May 87 | S.O.W. 3.9.1 | PMW 152 | $5,106.00 |

| 7. DD 250 REQ | 9. DIST STATEMENT REQUIRED | 10. FREQUENCY | 12. DATE OF FIRST SUBMISSION |
|---|---|---|---|
| LT | | | See Block 16 |
| **8. APP CODE** | | **11. AS OF DATE** | **13. DATE OF SUBSEQUENT SUBMISSION** |
| A | | | See Block 16 |

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 4 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 5 | 5 | |

16. REMARKS

Block 12: Draft due 4 months after contract. Government will review and comment within 30 days. Tailor DI-MGMT-80355 as follows:

a. Delete block 10 in its entirety.

b. Add the following:

10.1 The Cutover Plan will take into acccount all facets of the program and will consist of the following parts:

a. Concept
b. Schedule
c. Management
d. Site cutover operation sheets
e. Removal of replaced equipment and materials

| 1. DATA ITEM NO. | 2. TITLE OF DATA ITEM | 3. SUBTITLE | 17. PRICE |
|---|---|---|---|
| G001 | Cutover Plan (cont.) | | $5,106.00 |

| 4. AUTHORITY (Data Acquisition Document No.) | 5. CONTRACT REFERENCE | 6. REQUIRING OFFICE | 18. TOTAL |
|---|---|---|---|
| | | | $5,106.00 |

| 7. DD 250 REQ | 9. DIST STATEMENT REQUIRED | 10. FREQUENCY | 12. DATE OF FIRST SUBMISSION |
|---|---|---|---|
| | | | |
| **8. APP CODE** | | **11. AS OF DATE** | **13. DATE OF SUBSEQUENT SUBMISSION** |
| | | | |

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| 15. TOTAL → | | | |

16. REMARKS (Tailoring of DI-MGMT-80355 cont.)

f. Government participation requirements

Block 2: Submit separate plan for each site.

10.2 Part 1 Concepts: This part shall contain details of the cutover plan concept. It shall include information explaining the cutover impact on parts of the system and impact of subsequent cutover in other parts of the system on this particular site. The concept should recognize a phased sequence of the cutover expresseing the contractor's intent and general method of maintaining the system through a gradual series of transitions from the existing to the final configuration.

10.3 Part II Schedule: This part shall identify and describe link and circuit cutopver schedule. This schedule shall be divided into four general (1) contractor installation phase

| G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE |
|---|---|---|---|
| | | | |

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST (2 Data Items)

*Form Approved OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0003
B. EXHIBIT: Q
C. CATEGORY: TDP TM OTHER TESTING
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: G001
2. TITLE OF DATA ITEM: Cutover Plan (cont.)
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.):
5. CONTRACT REFERENCE:
6. REQUIRING OFFICE:
7. DD 250 REQ:
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY:
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION:
13. DATE OF SUBSEQUENT SUBMISSION:
14. DISTRIBUTION: a. ADDRESSEE / b. COPIES (Draft, Final Reg, Repr)
15. TOTAL →
16. REMARKS

(Tailoring of DI-MGMT-80355 continued)
10.6 Part V Removal of Replaced Equipment and Materials: This part shall be included in the cutover plan only for those sites at which the contractor proposes to remove existing equipment. As such, this segment of the shall clearly specify the specific items of equipment to be removed, location, reasons for removal, and equipment disposition.
10.7 Part VII Government Participation: The cutover plan shall clearly delineate the extent and the schedule of the Government participation required durint the cutover phase. The cutover of items for which the the Government has responsibility must be displayed in detail and the schedule for each activity specified.

17. PRICE: 14,266.0
18. TOTAL: 14,266.0

1. DATA ITEM NO.: G002
2. TITLE OF DATA ITEM: System Test and Verification Plan
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-T-5422 of 21 Jul 77
5. CONTRACT REFERENCE: S.O.W. 3.9.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: AN
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

16. REMARKS

Block 4: Delete DID para 10.13
Block 12: Submit NLT 180 days prior to scheduled start.
Government will review and comment or approve NLT 30 DAR.
Block 2: Submit separate plan for each site.

17. PRICE:
18. TOTAL:

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE



1059/183
Attachment 6

00271

*Pages 19 through 34 of Attachment 6 are deleted and replaced with this new Page 19

Exhibits S through AH are deleted.

# 3.4.2 CDRL Lot II - V

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AJ
C. CATEGORY: TDP TM OTHER MANAGEMENMT
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: A003
2. TITLE OF DATA ITEM: Conference Minutes
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-A-7089 of 18 Feb 81
5. CONTRACT REFERENCE: S.O.W. 3.6.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: As required
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 15 DA MTG
13. DATE OF SUBSEQUENT SUBMISSION:
16. REMARKS:
17. PRICE:
18. ESTIMATED TOTAL:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 2 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL ⟶ | | 3 | |

1. DATA ITEM NO.: A004
2. TITLE OF DATA ITEM: Contractors Progress, Status, and Mgmt. Report
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-MGMT-80227 of 5 Sep 86
5. CONTRACT REFERENCE: S.O.W. 3.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: Monthly
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: See Block 16
16. REMARKS:
Block 12: Submit 15 days after first full month after contract award.
Block 13: Submit 15 days after the end of each reporting period.
17. PRICE:
18. ESTIMATED TOTAL:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 3 | |
| NRCC | | 1 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL ⟶ | | 5 | |

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE



1044/183
Attachment 6

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
(2 Data Items)

Form Approved
OMB No. 0704-0188

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AL
C. CATEGORY: TDP TM OTHER CONFIGURATION MGMT.
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: C001
2. TITLE OF DATA ITEM: Configuration Management Plan
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-CMAN-80858 of 20 Jun 89
5. CONTRACT REFERENCE: S.O.W. 3.4.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: AN
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 90 DAC
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC
16. REMARKS: Government will review and comment or approve NLT 60 DAR.
17. PRICE:
18. ESTIMATED TOTAL:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

1. DATA ITEM NO.: C002
2. TITLE OF DATA ITEM: Baseline Description Document
3. SUBTITLE: Product Baseline Description
4. AUTHORITY (Data Acquisition Document No.): DI-CMAN-81121 of 1 Feb 91
5. CONTRACT REFERENCE: S.O.W. 3.4.3
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: DD
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC
16. REMARKS:
Block 3: Contractor shall provide unique deliverable for each site.
Block 12: Submit 4 months after contract award. Government will review and provide any comments if required, NLT 30 DAR.
17. PRICE: 7,874.0
18. ESTIMATED TOTAL: 7,874.0

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

G. PREPARED BY
H. DATE
I. APPROVED BY
J. DATE

DD Form 1423-2, JUN 90 Previous editions are obsolete Page 38 of 68 Pages

1058/183
Attachment 6

00275

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AN
C. CATEGORY: TDP TM OTHER CONFIGURATION MGMT
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: C005
2. TITLE OF DATA ITEM: Request for Waiver
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-CMAN-80641A of 17 Apr 92
5. CONTRACT REFERENCE: S.O.W. 3.4.4
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: As required
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: As required
13. DATE OF SUBSEQUENT SUBMISSION: As required
16. REMARKS:
17. PRICE:
18. ESTIMATED TOTAL:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 2 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL → | | 3 | |

1. DATA ITEM NO.:
2. TITLE OF DATA ITEM:
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.):
5. CONTRACT REFERENCE:
6. REQUIRING OFFICE:
7. DD 250 REQ:
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY:
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION:
13. DATE OF SUBSEQUENT SUBMISSION:
16. REMARKS:

Intentionally left blank.

17. PRICE:
18. ESTIMATED TOTAL:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| 15. TOTAL → | | | |

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AP
C. CATEGORY: TDP TM OTHER SOFTWARE
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: D003
2. TITLE OF DATA ITEM: Software User's Manual
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-MCCR-80019A of 29 Feb 88
5. CONTRACT REFERENCE: S.O.W. 3.8.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: DD
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: AS REQ
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC
16. REMARKS:
Block 12: Due 9 Months after contract.
Block 13: Government will review and comment or approve NLT 30 DAR

17. PRICE: 176.00
18. ESTIMATED TOTAL: 176.00

| 14. DISTRIBUTION a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 5 | |

1. DATA ITEM NO.: D004
2. TITLE OF DATA ITEM: Software Programmer's Manual
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-MCCR-80021A of 29 Feb 88
5. CONTRACT REFERENCE: S.O.W. 3.8.1
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: AS REQ
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC
16. REMARKS:
Block 12: Due 9 months after contract. Government will review and comment or approve NLT 30 DAR.

17. PRICE: 151.00
18. ESTIMATED TOTAL: 151.00

| 14. DISTRIBUTION a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 4 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 5 | |

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AR
C. CATEGORY: TDP TM OTHER LOGISTICS
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTRO..
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

## Data Item E001

| Field | Value |
|---|---|
| 1. DATA ITEM NO. | E001 |
| 2. TITLE OF DATA ITEM | Integrated Support Plan |
| 3. SUBTITLE | |
| 4. AUTHORITY (Data Acquisition Document No.) | DI-ILSS-80395 c Aug 87 8768 |
| 5. CONTRACT REFERENCE | S.O.W. 3.4.5 |
| 6. REQUIRING OFFICE | PMW 152 |
| 7. DD 250 REQ | LT |
| 8. APP CODE | AN |
| 9. DIST STATEMENT REQUIRED | |
| 10. FREQUENCY | ONE/R |
| 11. AS OF DATE | |
| 12. DATE OF FIRST SUBMISSION | 90 DAC |
| 13. DATE OF SUBSEQUENT SUBMISSION | 30 DARC |
| 16. REMARKS | Government will review and comment or approve NLT 30 DAR. |
| 17. PRICE | 1,936.00 |
| 18. ESTIMATED TOTAL | 1,936.00 |

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 6 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 7 | |

## Data Item E002

| Field | Value |
|---|---|
| 1. DATA ITEM NO. | E002 |
| 2. TITLE OF DATA ITEM | Maintenance Plan |
| 3. SUBTITLE | |
| 4. AUTHORITY (Data Acquisition Document No.) | DI-ILSS-8081 24 May 89 |
| 5. CONTRACT REFERENCE | S.O.W. 3.4.5 |
| 6. REQUIRING OFFICE | PMW 152 |
| 7. DD 250 REQ | LT |
| 8. APP CODE | AN |
| 9. DIST STATEMENT REQUIRED | |
| 10. FREQUENCY | ONE/R |
| 11. AS OF DATE | |
| 12. DATE OF FIRST SUBMISSION | 150 DAC |
| 13. DATE OF SUBSEQUENT SUBMISSION | 30 DARC |
| 16. REMARKS | ..vernment will review and comment or approve NLT 30 DAR. |
| 17. PRICE | 237.00 |
| 18. ESTIMATED TOTAL | 237.00 |

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 6 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 7 | |

| G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE |
|---|---|---|---|
| | | | |

00278

*DD Form 1423-2: Contract Data Requiren nts Li Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and review collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Dav Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AT
C. CATEGORY: TDP TM OTHER LOGISTICS
D. SYSTEM/ITEM: AUTOMATED TE HNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

| Field | Value |
|---|---|
| 1. DATA ITEM NO. | E005 |
| 2. TITLE OF DATA ITEM | Failure Summary and Analysis Report |
| 3. SUBTITLE | |
| 4. AUTHORITY (Data Acquisition Document No.) | DI-RELI-80255 of 17 Oct 86 8768 |
| 5. CONTRACT REFERENCE | S.O.W. 3.4.5 |
| 6. REQUIRING OFFICE | PMW 152 |
| 7. DD 250 REQ | LT |
| 8. APP CODE | |
| 9. DIST STATEMENT REQUIRED | |
| 10. FREQUENCY | Monthly |
| 11. AS OF DATE | |
| 12. DATE OF FIRST SUBMISSION | See Block 16 |
| 13. DATE OF SUBSEQUENT SUBMISSION | See Block 16 |
| 17. PRICE | |
| 18. ESTIMATED TOTAL | |

16. REMARKS
Block 12: Submit 10 days after the first full quarter system operation.
Block 13: Submit the 10th of every quarter.
Block 2: Submit separate report for each site.

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 3 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL ⟶ | | 4 | |

| Field | Value |
|---|---|
| 1. DATA ITEM NO. | |
| 2. TITLE OF DATA ITEM | |
| 3. SUBTITLE | |
| 4. AUTHORITY (Data Acquisition Document No.) | |
| 5. CONTRACT REFERENCE | |
| 6. REQUIRING OFFICE | |
| 7. DD 250 REQ | |
| 8. APP CODE | |
| 9. DIST STATEMENT REQUIRED | |
| 10. FREQUENCY | |
| 11. AS OF DATE | |
| 12. DATE OF FIRST SUBMISSION | |
| 13. DATE OF SUBSEQUENT SUBMISSION | |
| 17. PRICE | |
| 18. ESTIMATED TOTAL | |

16. REMARKS
Intentionally left blank.

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| 15. TOTAL ⟶ | | | |

| G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE |
|---|---|---|---|
| | | | |

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST (2 Data Items)

Form Approved
OMB N[illegible] [illegible]704-0188

Public repo[illegible] burden for this collection of information is estimated to average 110 hours per response, including the time [illegible]ing instructions, searching existing [illegible]urces gathering and maintaining the data needed, and completing and reviewing the collection of inform[illegible] comments regarding this burden [illegible] or any other aspect of this collection of information, including suggestions for reducing this burden, to [illegible] of Defense, Washington Headq[illegible] [illegible]vices, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlin[illegible] 2202-4302, and to the Office [illegible]ment and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETU[illegible] form to either of these address[illegible] [illegible]d completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AV
C. CATEGORY: TDP TM OTHER TRAINING
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

---

1. DATA ITEM NO.: F003
2. TITLE OF DATA ITEM: Trainee Guide
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-ILSS-81100 of 5 Dec 90 8768
5. CONTRACT REFERENCE: S.O.W. 3.7.1 - 3.7.5
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: AN
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

16. REMARKS
Block 12: Submit 90 days prior to start of first scheduled course.
Block 13: Government will review and comment or approve NLT 30 DAR. Revisions due NLT 30 DARC.
*Block 14: Provide one copy per student plus two master copies at each site.

17. PRICE: 151.00
18. TOTAL: 151.00

---

1. DATA ITEM NO.: F004
2. TITLE OF DATA ITEM: On-the-Job Training Handbook
3. SUBTITLE:
4. AUTHORITY (Data Acquisition Document No.): DI-ILSS-81101 of 5 Dec 90
5. CONTRACT REFERENCE: S.O.W. 3.7.2 - 3.7.5
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: A
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 12 Mos ADC
13. DATE OF SUBSEQUENT SUBMISSION: 30 DARC

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | 3 | 3 | |
| CNCTC N53 | 1 | 1 | |
| 15. TOTAL → | 4 | 4 | |

16. REMARKS
Government will review and comment or approve NLT 30 DAR.
*Block 14: Provide one copy per student plus two master copies at each site.

17. PRICE: 149.00
18. TOTAL: 149.00

---

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
## (2 Data Items)

*Form Approved*
*OMB No. 0704-0188*

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AX
C. CATEGORY: TDP TM OTHER TESTING
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

1. DATA ITEM NO.: G001
2. TITLE OF DATA ITEM: Cutover Plan (cont.)
3. SUBTITLE:
17. PRICE:
4. AUTHORITY (Data Acquisition Document No.):
5. CONTRACT REFERENCE:
6. REQUIRING OFFICE:
18. TOTAL:
7. DD 250 REQ
9. DIST STATEMENT REQUIRED
10. FREQUENCY
12. DATE OF FIRST SUBMISSION
14. DISTRIBUTION (a. ADDRESSEE; b. COPIES: Draft, Final Reg, Repr)
8. APP CODE
11. AS OF DATE
13. DATE OF SUBSEQUENT SUBMISSION
15. TOTAL →

16. REMARKS

(Tailoring of DI-MGMT-80355)
(2) Precutover phase which begins upon completion of the contractor's installation phase and is completed when cutover begins (major activity during this phase shall be implementation testing), (3) Cutover phase during which the new system is placed into operational service, and (4) Postcutover phase which begins at the completion of and continues until normal operations and maintenance are underway.
10.4 Part III Management: This part shall identify and describe the management structure necessary for the orderly implementation of the plan. It shall include military and contractor representatives; it shall provide for both area cutover management; it shall describe the chain of command and the authority and responsibility of each command element.

1. DATA ITEM NO.: G001
2. TITLE OF DATA ITEM: Cutover Plan (cont.)
3. SUBTITLE:
17. PRICE: 74,619.
4. AUTHORITY (Data Acquisition Document No.):
5. CONTRACT REFERENCE:
6. REQUIRING OFFICE:
18. TOTAL: 74,619.
7. DD 250 REQ
9. DIST STATEMENT REQUIRED
10. FREQUENCY
12. DATE OF FIRST SUBMISSION
14. DISTRIBUTION (a. ADDRESSEE; b. COPIES: Draft, Final Reg, Repr)
8. APP CODE
11. AS OF DATE
13. DATE OF SUBSEQUENT
15. TOTAL →

16. REMARKS

(Tailoring of DI-MGMT-80355 continued)
10.5 Part IV Site Cutover Operation Sheets (COS): This part shall be prepared as separate documents. The COS shall identify and schedule the cutover activities required just prior to cutover. The entries on them shall define all physical work to be performed at all locations. work items shall be time-phased and the contractor and Government responsible for each item shall be shown. (1) each sheet shall represent a work operation at a location where cutover activities must be performed. The site COS shall be arranged into books on a per-site basis. (3) The shall include audio frequency and dc (TTY) circuit to be cutover at each (4) Approval of and changes to this part of the cutover plan shall be coordinated with local military personnel at each site.

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE



00281

1058/183
Attachment 6

*DD Form 1423-2: Contract Data Requirements List (2 Data Items)*

# CONTRACT DATA REQUIREMENTS LIST
(2 Data Items)

Form Approved
OMB No. 0704-0188

Public reporting burden for this collection of information is estimated to average 110 hours per response, including the time for reviewing instructions, searching existing data sources gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0188), Washington, DC 20503. Please DO NOT RETURN your form to either of these addresses. Send completed form to the Government Issuing Contracting Officer for the Contract/PR No. listed in Block E.

A. CONTRACT LINE ITEM NO.: 0006, 0009, 0012, 0015
B. EXHIBIT: AZ
C. CATEGORY: TDP TM OTHER TESTING
D. SYSTEM/ITEM: AUTOMATED TECHNICAL CONTROL
E. CONTRACT/PR NO.: N00600-93-R-2790
F. CONTRACTOR:

**Data Item 1**

1. DATA ITEM NO.: G003
2. TITLE OF DATA ITEM: Test Procedure
3. SUBTITLE: Design Verification Test Procedures
4. AUTHORITY (Data Acquisition Document No.): DI-NDTI-80603 of 1 Jun 88
5. CONTRACT REFERENCE: S.O.W. 3.9.1.2
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE: AN
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: ONE/R
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: See Block 16
13. DATE OF SUBSEQUENT SUBMISSION: See Block 16

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 1 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL → | | 2 | |

16. REMARKS
Block 12: Submit NLT 150 days prior to scheduled start of testing.
Block 13: Government will review and comment or approve NLT 30 DAR. Revisions due NLT 30 DARC.
Block 2: Submit separate procedures for each site.

17. PRICE: 719.C
18. TOTAL: 719.C

**Data Item 2**

1. DATA ITEM NO.: G004
2. TITLE OF DATA ITEM: Test Report
3. SUBTITLE:
4. AUTHORITY (... Acquisition Document No.): DI-NDT... of 1 Jun 88
5. CONTRACT REFERENCE: S.O.W. 3.9
6. REQUIRING OFFICE: PMW 152
7. DD 250 REQ: LT
8. APP CODE:
9. DIST STATEMENT REQUIRED:
10. FREQUENCY: As required
11. AS OF DATE:
12. DATE OF FIRST SUBMISSION: 30 DATC
13. DATE OF SUBSEQUENT SUBMISSION:

14. DISTRIBUTION

| a. ADDRESSEE | b. COPIES Draft | Final Reg | Final Repr |
|---|---|---|---|
| PMW 152-23C | | 1 | |
| CNCTC N53 | | 1 | |
| 15. TOTAL → | | 2 | |

16. REMA...
Block 1... Submit ...arate report for each test conducted.
Block 2: Submit a separate report for each site's tests.

17. PRICE: 1,735.
18. TOTAL: 1,735.

G. PREPARED BY | H. DATE | I. APPROVED BY | J. DATE

*Pages 53 through 68 of Attachment 6 are

deleted and replaced with this new Page 53

Exhibits BA through BP are deleted.

# 3.5 Schedule of Travel

**SCHEDULE OF TRAVEL**
CLIN 0001AA - NTCC HAMPTON ROADS
YEAR 1

| | | | |
|---|---|---|---|
| Monthly 3 BR Apt. Rent: | $1,200.00 | Monthly Car Rental: | $760.00 |
| Daily Hotel Accomodation: | $75.00 | Daily Car Rental: | $35.00 |

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR ALLOW. | GAS ALLOW ($10 per day) | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | | | Refer below | | | | | | | | $996.00 | | $1,101.08 | | $1,189.17 |
| 1 car, hotel | Sys. Eng. ** | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $137.70 | N/A | $1,206.70 | $127.31 | $1,334.01 | $106.72 | $1,440.73 |
| 2 cars, hotel | Site Survey *** | 5 | N/A | 12 | N/A | $0.00 | $5,025.00 | $34.00 | $2,278.00 | $209.10 | N/A | $7,512.10 | $792.53 | $8,304.63 | $664.37 | $8,969.00 |
| 1 car, hotel | Pre-Instal *** | 1 | N/A | 7 | N/A | $0.00 | $525.00 | $34.00 | $238.00 | $147.90 | N/A | $910.90 | $96.10 | $1,007.00 | $80.56 | $1,087.56 |
| 1 car, 2 apt. | Installation**** | 4 | N/A | 21 | N/A | $0.00 | $2,400.00 | $17.00 | $1,428.00 | $219.30 | N/A | $4,047.30 | $426.99 | $4,474.29 | $357.94 | $4,832.23 |
| | Training**** | 2 | N/A | 14 | N/A | $0.00 | $0.00 | $17.00 | $476.00 | $183.60 | N/A | $659.60 | $69.59 | $729.19 | $58.34 | $787.53 |
| 1 car, 1 apt. | Cutover**** | 3 | N/A | 182 | N/A | $0.00 | $7,280.00 | $17.00 | $9,282.00 | $1,040.40 | N/A | $17,602.40 | $1,857.05 | $19,459.45 | $1,556.76 | $21,016.21 |
| 1 car, 1 apt. | Testing | 3 | N/A | 5 | N/A | $0.00 | $200.00 | $17.00 | $255.00 | $137.70 | N/A | $592.70 | $62.53 | $655.23 | $52.42 | $707.65 |
| 1 car, 1 apt. | Acceptance**** | 2 | N/A | 30 | N/A | $0.00 | $1,200.00 | $17.00 | $1,020.00 | $265.20 | N/A | $2,485.20 | $262.19 | $2,747.39 | $219.79 | $2,967.18 |
| TOTALS | | | | 276 | | $514.00 | $17,015.00 | | $15,147.00 | $2,340.90 | $0.00 | $36,012.90 | $3,694.29 | $39,812.27 | $3,096.90 | $42,997.26 |

**NOTES**

Car rentals, air fares, and gas allowance amounts have been removed, as ISN personnel will drive down to Hampton Roads.

* Travel is required for system engineering test bed development purposes. It is anticipated that 3 ISN personnel will travel to DMS (Norwalk). These travel costs are pro-rated equally (1/3 rd)among Hampton Roads, Camp Smith, and Makalapa.

| | No. of Persons | No. of Days/trip | No. of Trips | Fare | Fare Amount | Per Diem ($111/day) | Car Rental Amt. ($35/day) | Gas Allow. ($10/day) | Subtotal | G&A 0.1055 | Total Cost | Fee 0.0800 | Total Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Task Leader | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Engineer | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Analyst | 1 | 5 | 1 | $514.00 | $514.00 | $555.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| TOTAL | | 11 | | | $1,542.00 | $1,221.00 | $175.00 | $50.00 | $2,988.00 | $315.24 | $3,303.24 | $264.26 | $3,567.50 |

** 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

*** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

**** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts.

*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

**SCHEDULE OF TRAVEL**
CLIN 0001AC - NTCC MAKALAPA
YEAR 1

Monthly 3 BR Apt. Rent: $2,800.00
Daily Hotel Accomodation: $105.00
Monthly Car Rental: $760.00
Daily Car Rental: $35.00

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR RENTAL | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | | | Refer below | | | | | | | | $996.00 | | $1,101.08 | | $1,189.17 |
| 1 car, hotel | Sys. Eng.** | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey*** | 3 | 3 | 5 | $1,180.00 | $3,540.00 | $1,575.00 | $62.00 | $930.00 | $175.00 | $50.00 | $6,270.00 | $661.49 | $6,931.49 | $554.52 | $7,486.01 |
| 1 car, hotel | Pre-Instal*** | 1 | 1 | 7 | $1,180.00 | $1,180.00 | $735.00 | $62.00 | $434.00 | $245.00 | $70.00 | $2,664.00 | $281.05 | $2,945.05 | $235.60 | $3,180.65 |
| 1 car, 1 apt. | Installation**** | 4 | 3 | 21 | $1,180.00 | $3,540.00 | $2,800.00 | $31.00 | $2,604.00 | $760.00 | $210.00 | $9,914.00 | $1,045.93 | $10,959.93 | $876.79 | $11,836.72 |
| | Training**** | 2 | 2 | 14 | $1,180.00 | $2,360.00 | $0.00 | $31.00 | $868.00 | $354.67 | $0.00 | $3,582.67 | $377.97 | $3,960.64 | $316.85 | $4,277.49 |
| 1 car, 1 apt. | Cutover**** | 2 | 0 | 98 | $1,180.00 | $0.00 | $9,146.67 | $31.00 | $6,076.00 | $2,482.67 | $980.00 | $18,685.34 | $1,971.30 | $20,656.64 | $1,652.53 | $22,309.17 |
| 1 car, 1 apt. | Testing & | 3 | 1 | 5 | $1,180.00 | $1,180.00 | $466.67 | $31.00 | $465.00 | $126.67 | $50.00 | $2,288.34 | $241.42 | $2,529.76 | $202.38 | $2,732.14 |
| 1 car, 1 apt. | Acceptance**** | 2 | 0 | 30 | $1,180.00 | $0.00 | $2,800.00 | $31.00 | $1,860.00 | $760.00 | $300.00 | $5,720.00 | $603.46 | $6,323.46 | $505.88 | $6,829.34 |
| TOTALS | | | | 155 | | $12,314.00 | $17,908.34 | | $13,407.00 | $5,079.01 | $1,710.00 | $51,414.35 | $5,319.14 | $56,838.57 | $4,458.99 | $61,385.65 |

**NOTES**

*Travel is required for system engineering test bed development purposes. It is anticipated that 3 ISN personnel will travel to DMS (Norwalk). These travel costs are pro-rated equally (1/3 rd)among Hampton Roads, Camp Smith, and Makalapa.

| | No. of Persons | No. of Days/trip | No. of Trips | Fare | Fare Amount | Per Diem ($111/day) | Car Rental Amt. ($35/day) | Gas Allow. ($10/day) | Subtotal | G&A 0.1055 | Total Cost | Fee 0.0800 | Total Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Task Leader | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Engineer | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Analyst | 1 | 5 | 1 | $514.00 | $514.00 | $555.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| TOTAL | | 11 | | | $1,542.00 | $1,221.00 | $175.00 | $50.00 | $2,988.00 | $315.24 | $3,303.24 | $264.26 | $3,567.50 |

** 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

*** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

**** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts.

*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

**SCHEDULE OF TRAVEL**
CLIN 0001AC - NTCC MAKALAPA
YEAR 1

Monthly 3 BR Apt. Rent: $2,800.00
Daily Hotel Accomodation: $105.00
Monthly Car Rental: $760.00
Daily Car Rental: $35.00

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR RENTAL | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | | | Refer below | | | | | | | | $996.00 | | $1,101.08 | | $1,189.17 |
| 1 car, hotel | Sys. Eng.** | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey*** | 3 | 3 | 5 | $1,180.00 | $3,540.00 | $1,575.00 | $62.00 | $930.00 | $175.00 | $50.00 | $6,270.00 | $661.49 | $6,931.49 | $554.52 | $7,486.01 |
| 1 car, hotel | Pre-Instal*** | 1 | 1 | 7 | $1,180.00 | $1,180.00 | $735.00 | $62.00 | $434.00 | $245.00 | $70.00 | $2,664.00 | $281.05 | $2,945.05 | $235.60 | $3,180.65 |
| 1 car, 1 apt. | Installation**** | 4 | 3 | 21 | $1,180.00 | $3,540.00 | $2,800.00 | $31.00 | $2,604.00 | $760.00 | $210.00 | $9,914.00 | $1,045.93 | $10,959.93 | $876.79 | $11,836.72 |
| | Training**** | 2 | 2 | 14 | $1,180.00 | $2,360.00 | $0.00 | $31.00 | $868.00 | $354.67 | $0.00 | $3,582.67 | $377.97 | $3,960.64 | $316.85 | $4,277.49 |
| 1 car, 1 apt. | Cutover**** | 2 | 0 | 98 | $1,180.00 | $0.00 | $9,146.67 | $31.00 | $6,076.00 | $2,482.67 | $980.00 | $18,685.34 | $1,971.30 | $20,656.64 | $1,652.53 | $22,309.17 |
| 1 car, 1 apt. | Testing & | 3 | 1 | 5 | $1,180.00 | $1,180.00 | $466.67 | $31.00 | $465.00 | $126.67 | $50.00 | $2,288.34 | $241.42 | $2,529.76 | $202.38 | $2,732.14 |
| 1 car, 1 apt. | Acceptance**** | 2 | 0 | 30 | $1,180.00 | $0.00 | $2,800.00 | $31.00 | $1,860.00 | $760.00 | $300.00 | $5,720.00 | $603.46 | $6,323.46 | $505.88 | $6,829.34 |
| TOTALS | | | | 155 | | $12,314.00 | $17,908.34 | | $13,407.00 | $5,079.01 | $1,710.00 | $51,414.35 | $5,319.14 | $56,838.57 | $4,458.99 | $61,385.65 |

**NOTES**

*Travel is required for system engineering test bed development purposes. It is anticipated that 3 ISN personnel will travel to DMS (Norwalk).
These travel costs are pro-rated equally (1/3 rd)among Hampton Roads, Camp Smith, and Makalapa.

| | No. of Persons | No. of Days/trip | No. of Trips | Fare | Fare Amount | Per Diem ($111/day) | Car Rental Amt. ($35/day) | Gas Allow. ($10/day) | Subtotal | G&A 0.1055 | Total Cost | Fee 0.0800 | Total Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Task Leader | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Engineer | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Analyst | 1 | 5 | 1 | $514.00 | $514.00 | $555.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| TOTAL | | 11 | | | $1,542.00 | $1,221.00 | $175.00 | $50.00 | $2,988.00 | $315.24 | $3,303.24 | $264.26 | $3,567.50 |

** 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

*** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

**** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts.

*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*
00287

**SCHEDULE OF TRAVEL**
CLIN 0001AB - NTCC CAMP SMITH
YEAR 1

Monthly 3 BR Apt. Rent: $2,800.00
Daily Hotel Accomodation: $105.00
Monthly Car Rental: $760.00
Daily Car Rental: $35.00

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR RENTAL | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | | | Refer below | | | | | | | | $996.00 | | $1,101.08 | | $1,189.17 |
| 1 car, hotel | Sys. Eng.** | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey*** | 3 | 3 | 5 | $1,180.00 | $3,540.00 | $1,575.00 | $62.00 | $930.00 | $175.00 | $50.00 | $6,270.00 | $661.49 | $6,931.49 | $554.52 | $7,486.01 |
| 1 car, hotel | Pre-Instal*** | 1 | 1 | 7 | $1,180.00 | $1,180.00 | $735.00 | $62.00 | $434.00 | $245.00 | $70.00 | $2,664.00 | $281.05 | $2,945.05 | $235.60 | $3,180.65 |
| 1 car, 1 apt. | Installation**** | 4 | 3 | 23 | $1,180.00 | $3,540.00 | $2,800.00 | $31.00 | $2,852.00 | $760.00 | $230.00 | $10,182.00 | $1,074.20 | $11,256.20 | $900.50 | $12,156.70 |
| | Training**** | 2 | 2 | 14 | $1,180.00 | $2,360.00 | $0.00 | $31.00 | $868.00 | $354.67 | $0.00 | $3,582.67 | $377.97 | $3,960.64 | $316.85 | $4,277.49 |
| 1 car, 1 apt. | Cutover**** | 2 | 0 | 70 | $1,180.00 | $0.00 | $6,533.33 | $31.00 | $4,340.00 | $1,773.33 | $700.00 | $13,346.66 | $1,408.07 | $14,754.73 | $1,180.38 | $15,935.11 |
| 1 car, 1 apt. | Testing**** | 3 | 1 | 5 | $1,180.00 | $1,180.00 | $466.67 | $31.00 | $465.00 | $126.67 | $50.00 | $2,288.34 | $241.42 | $2,529.76 | $202.38 | $2,732.14 |
| 1 car, 1 apt. | Acceptance**** | 2 | 0 | 30 | $1,180.00 | $0.00 | $2,800.00 | $31.00 | $1,860.00 | $760.00 | $300.00 | $5,720.00 | $603.46 | $6,323.46 | $505.88 | $6,829.34 |
| TOTALS | | | | 159 | | $12,314.00 | $15,295.00 | | $11,919.00 | $4,369.67 | $1,450.00 | $46,343.67 | $4,784.18 | $51,232.93 | $4,010.55 | $55,331.57 |

**NOTES**

*Travel is required for system engineering test bed development purposes. It is anticipated that 3 ISN personnel will travel to DMS (Norwalk). These travel costs are pro-rated equally (1/3 rd)among Hampton Roads, Camp Smith, and Makalapa.

| | No. of Persons | No. of Days/trip | No. of Trips | Fare | Fare Amount | Per Diem ($111/day) | Car Rental Amt. ($35/day) | Gas Allow. ($10/day) | Subtotal | G&A 0.1055 | Total Cost | Fee 0.0800 | Total Price |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Task Leader | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Engineer | 1 | 3 | 1 | $514.00 | $514.00 | $333.00 | $0.00 | $0.00 | $847.00 | $89.36 | $936.36 | $74.91 | $1,011.27 |
| Sys. Analyst | 1 | 5 | 1 | $514.00 | $514.00 | $555.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| TOTAL | | 11 | | | $1,542.00 | $1,221.00 | $175.00 | $50.00 | $2,988.00 | $315.24 | $3,303.24 | $264.26 | $3,567.50 |

* 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

*** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts.



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00288

**SCHEDULE OF TRAVEL**
CLIN 0004 - NCTS JAPAN
YEAR 2

Monthly 3 BR Apt. Rent: $2,850.00
Daily Hotel Accomodation: $157.00
Daily Transportation Allow. $15.00 (per person)
Daily Car Rental: $85.00

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR ALLOW. | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey** | 3 | 3 | 5 | $960.00 | $2,880.00 | $2,355.00 | $107.00 | $1,605.00 | $425.00 | $50.00 | $7,315.00 | $771.73 | $8,086.73 | $646.94 | $8,733.67 |
| 1 car, hotel | Pre-Instal** | 1 | 1 | 7 | $960.00 | $960.00 | $1,099.00 | $107.00 | $749.00 | $595.00 | $70.00 | $3,473.00 | $366.40 | $3,839.40 | $307.15 | $4,146.55 |
| 2 cars, 3 apt | Installation*** | 4 | 3 | 21 | $960.00 | $2,880.00 | $5,985.00 | $53.50 | $4,494.00 | $1,260.00 | N/A | $14,619.00 | $1,542.30 | $16,161.30 | $1,292.90 | $17,454.20 |
| | Training*** | 2 | 2 | 14 | $960.00 | $1,920.00 | $0.00 | $53.50 | $1,498.00 | $420.00 | N/A | $3,838.00 | $404.91 | $4,242.91 | $339.43 | $4,582.34 |
| 2 cars, 3 apt | Cutover*** | 8 | 4 | 91 | $960.00 | $3,840.00 | $25,935.00 | $53.50 | $38,948.00 | $10,920.00 | N/A | $79,643.00 | $8,402.34 | $88,045.34 | $7,043.63 | $95,088.97 |
| 2 cars, 2 apt | Testing*** | 3 | 1 | 5 | $960.00 | $960.00 | $950.00 | $53.50 | $802.50 | $225.00 | N/A | $2,937.50 | $309.91 | $3,247.41 | $259.79 | $3,507.20 |
| 2 cars, 2 apt | Acceptance*** | 2 | 0 | 30 | $960.00 | $0.00 | $5,700.00 | $53.50 | $3,210.00 | $900.00 | N/A | $9,810.00 | $1,034.96 | $10,844.96 | $867.60 | $11,712.56 |
| TOTALS | | | | 178 | | $13,954.00 | $42,409.00 | | $51,476.50 | $14,920.00 | $170.00 | $122,929.50 | $12,969.07 | $135,898.57 | $10,871.88 | $146,770.45 |

**NOTES**

* 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

*** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts.





*USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL*

ISN

**SCHEDULE OF TRAVEL**
CLIN 0004 - NCTS JAPAN
YEAR 2

| | | | |
|---|---|---|---|
| Monthly 3 BR Apt. Rent: | $2,850.00 | Daily Transportation Allow. | $15.00 (per person) |
| Daily Hotel Accomodation: | $157.00 | Daily Car Rental: | $85.00 |

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR ALLOW. | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey** | 3 | 3 | 5 | $960.00 | $2,880.00 | $2,355.00 | $107.00 | $1,605.00 | $425.00 | $50.00 | $7,315.00 | $771.73 | $8,086.73 | $646.94 | $8,733.67 |
| 1 car, hotel | Pre-Instal** | 1 | 1 | 7 | $960.00 | $960.00 | $1,099.00 | $107.00 | $749.00 | $595.00 | $70.00 | $3,473.00 | $366.40 | $3,839.40 | $307.15 | $4,146.55 |
| 2 cars, 3 apt | Installation*** | 4 | 3 | 21 | $960.00 | $2,880.00 | $5,985.00 | $53.50 | $4,494.00 | $1,260.00 | N/A | $14,619.00 | $1,542.30 | $16,161.30 | $1,292.90 | $17,454.20 |
| | Training*** | 2 | 2 | 14 | $960.00 | $1,920.00 | $0.00 | $53.50 | $1,498.00 | $420.00 | N/A | $3,838.00 | $404.91 | $4,242.91 | $339.43 | $4,582.34 |
| 2 cars, 3 apt | Cutover*** | 8 | 4 | 91 | $960.00 | $3,840.00 | $25,935.00 | $53.50 | $38,948.00 | $10,920.00 | N/A | $79,643.00 | $8,402.34 | $88,045.34 | $7,043.63 | $95,088.97 |
| 2 cars, 2 apt | Testing*** | 3 | 1 | 5 | $960.00 | $960.00 | $950.00 | $53.50 | $802.50 | $225.00 | N/A | $2,937.50 | $309.91 | $3,247.41 | $259.79 | $3,507.20 |
| 2 cars, 2 apt | Acceptance*** | 2 | 0 | 30 | $960.00 | $0.00 | $5,700.00 | $53.50 | $3,210.00 | $900.00 | N/A | $9,810.00 | $1,034.96 | $10,844.96 | $867.60 | $11,712.56 |
| TOTALS | | | | 178 | | $13,954.00 | $42,409.00 | | $51,476.50 | $14,920.00 | $170.00 | $122,929.50 | $12,969.07 | $135,898.57 | $10,871.88 | $146,770.45 |

**NOTES**

* 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

*** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts.



00290

"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

**SCHEDULE OF TRAVEL**
CLIN 0007 - NCTS SICILY
YEAR 2

Monthly 3 BR Apt. Rent: $1,500.00
Daily Hotel Accomodation: $82.00

Monthly Car Rental: $1,804.00
Daily Car Rental: $65.00
Estimated price of used car $3,500.00

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR RENTAL | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey** | 3 | 3 | 5 | $780.00 | $2,340.00 | $1,230.00 | $64.00 | $960.00 | $325.00 | $50.00 | $4,905.00 | $517.48 | $5,422.48 | $433.80 | $5,856.28 |
| 1 car, hotel | Pre-Instal** | 1 | 1 | 7 | $780.00 | $780.00 | $574.00 | $64.00 | $448.00 | $455.00 | $70.00 | $2,327.00 | $245.50 | $2,572.50 | $205.80 | $2,778.30 |
| 2 cars, 3 apt | Installation*** | 4 | 3 | 21 | $780.00 | $2,340.00 | $4,500.00 | $32.00 | $2,688.00 | $7,000.00 | $420.00 | $16,948.00 | $1,788.01 | $18,736.01 | $1,498.88 | $20,234.89 |
| | Training*** | 2 | 2 | 14 | $780.00 | $1,560.00 | $0.00 | $32.00 | $896.00 | $0.00 | $0.00 | $2,456.00 | $259.11 | $2,715.11 | $217.21 | $2,932.32 |
| 2 cars, 3 apt | Cutover*** | 6 | 2 | 105 | $780.00 | $1,560.00 | $15,750.00 | $32.00 | $20,160.00 | $0.00 | $2,100.00 | $39,570.00 | $4,174.64 | $43,744.64 | $3,499.57 | $47,244.21 |
| 2 cars, 2 apt | Testing & | 3 | 1 | 5 | $780.00 | $780.00 | $500.00 | $32.00 | $480.00 | $0.00 | $100.00 | $1,860.00 | $196.23 | $2,056.23 | $164.50 | $2,220.73 |
| 2 cars, 2 apt | Acceptance*** | 2 | 0 | 30 | $780.00 | $0.00 | $3,000.00 | $32.00 | $1,920.00 | $0.00 | $600.00 | $5,520.00 | $582.36 | $6,102.36 | $488.19 | $6,590.55 |
| TOTALS | | | | 192 | | $9,874.00 | $25,939.00 | | $27,722.00 | $7,955.00 | $3,390.00 | $74,880.00 | $7,899.85 | $82,779.85 | $6,622.39 | $89,402.24 |

**NOTES**

* 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

*** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts. It is anticipated that two used cars would be purchased for economic reasons.

00291

"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

**SCHEDULE OF TRAVEL**
CLIN 0010 - NCTS PUERTO RICO
YEAR 2

Monthly 3 BR Apt. Rent: $2,000.00
Daily Hotel Accomodation: $116.00
Monthly Car Rental: $830.00
Daily Car Rental: $35.00
Estimated price of used car $3,000.00

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR RENTAL | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey** | 3 | 3 | 5 | $435.00 | $1,305.00 | $1,740.00 | $76.00 | $1,140.00 | $175.00 | $50.00 | $4,410.00 | $465.26 | $4,875.26 | $390.02 | $5,265.28 |
| 1 car, hotel | Pre-Instal** | 1 | 1 | 7 | $435.00 | $435.00 | $812.00 | $76.00 | $532.00 | $245.00 | $70.00 | $2,094.00 | $220.92 | $2,314.92 | $185.19 | $2,500.11 |
| 2 cars, 2 apt | Installation*** | 4 | 3 | 21 | $435.00 | $1,305.00 | $4,000.00 | $38.00 | $3,192.00 | $6,000.00 | $420.00 | $14,917.00 | $1,573.74 | $16,490.74 | $1,319.26 | $17,810.00 |
| | Training*** | 2 | 2 | 14 | $435.00 | $870.00 | $0.00 | $38.00 | $1,064.00 | $0.00 | $0.00 | $1,934.00 | $204.04 | $2,138.04 | $171.04 | $2,309.08 |
| 2 cars, 2 apt | Cutover*** | 5 | 1 | 77 | $435.00 | $435.00 | $10,266.67 | $38.00 | $14,630.00 | $0.00 | $1,540.00 | $26,871.67 | $2,834.96 | $29,706.63 | $2,376.53 | $32,083.16 |
| 2 cars, 2 apt | Testing & | 3 | 1 | 5 | $435.00 | $435.00 | $666.67 | $38.00 | $570.00 | $0.00 | $100.00 | $1,771.67 | $186.91 | $1,958.58 | $156.69 | $2,115.27 |
| 2 cars, 2 apt | Acceptance*** | 2 | 0 | 30 | $435.00 | $0.00 | $4,000.00 | $38.00 | $2,280.00 | $0.00 | $600.00 | $6,880.00 | $725.84 | $7,605.84 | $608.47 | $8,214.31 |
| TOTALS | | | | 164 | | $5,299.00 | $21,870.34 | | $23,578.00 | $6,595.00 | $2,830.00 | $60,172.34 | $6,348.19 | $66,520.53 | $5,321.64 | $71,842.17 |

**NOTES**

* 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

*** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings in lodging and meals amounts. It is anticipated that two used cars would be purchased for economic reasons.



00292
"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

SCHEDULE OF TRAVEL
CLIN 0013 - NCTS LONDON
YEAR 2

Monthly 3 BR Apt. Rent: $3,100.00
Daily Hotel Accomodation: $132.00
Daily Transportation allow. $12.00 (per person)
Daily Car Rental: $50.00

| COMMENTS | PURPOSE | NO. OF PERSONS | NO. OF AIR TRIP | DAYS | AIR FARE | FARE AMOUNT | TOTAL LODGING | DAILY MEAL ALLOWANCE | MEAL AMOUNT | CAR ALLOW. | GAS ALLOWANC | SUB TOTAL | G&A 10.55% | TOTAL COST | FEE 8.00% | TOTAL PRICE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 car, hotel | Sys. Eng.* | 1 | 1 | 5 | $514.00 | $514.00 | $385.00 | $34.00 | $170.00 | $175.00 | $50.00 | $1,294.00 | $136.52 | $1,430.52 | $114.44 | $1,544.96 |
| 1 car, hotel | Site Survey** | 3 | 3 | 5 | $885.00 | $2,655.00 | $1,980.00 | $80.00 | $1,200.00 | $250.00 | $50.00 | $6,135.00 | $647.24 | $6,782.24 | $542.58 | $7,324.82 |
| 1 car, hotel | Pre-Instal** | 1 | 1 | 7 | $885.00 | $885.00 | $924.00 | $80.00 | $560.00 | $350.00 | $70.00 | $2,789.00 | $294.24 | $3,083.24 | $246.66 | $3,329.90 |
| 2 cars, 3 apt | Installation*** | 4 | 3 | 21 | $885.00 | $2,655.00 | $9,300.00 | $40.00 | $3,360.00 | $1,008.00 | N/A | $16,323.00 | $1,722.08 | $18,045.08 | $1,443.61 | $19,488.69 |
| | Training*** | 2 | 2 | 14 | $885.00 | $1,770.00 | $0.00 | $40.00 | $1,120.00 | $336.00 | N/A | $3,226.00 | $340.34 | $3,566.34 | $285.31 | $3,851.65 |
| 2 cars, 3 apt | Cutover*** | 6 | 2 | 110 | $885.00 | $1,770.00 | $34,100.00 | $40.00 | $26,400.00 | $7,920.00 | N/A | $70,190.00 | $7,405.05 | $77,595.05 | $6,207.60 | $83,802.65 |
| 1 car, 2 apt | Testing & | 3 | 1 | 5 | $885.00 | $885.00 | $1,033.33 | $40.00 | $600.00 | $180.00 | N/A | $2,698.33 | $284.67 | $2,983.00 | $238.64 | $3,221.64 |
| 1 car, 2 apt | Acceptance*** | 2 | 0 | 30 | $885.00 | $0.00 | $6,200.00 | $40.00 | $2,400.00 | $720.00 | N/A | $9,320.00 | $983.26 | $10,303.26 | $824.26 | $11,127.52 |
| TOTALS | | | | 197 | | $11,134.00 | $53,922.33 | | $35,810.00 | $10,939.00 | $170.00 | $111,975.33 | $11,813.40 | $123,788.73 | $9,903.10 | $133,691.83 |

**NOTES**

* 1 ISN Systems Engineer will travel to DMS (Norwalk) for staging purposes. Per diem rates at Norwalk (meals - $34/day & accom. - $77/day) are used.

** For site survey and pre-installation phases, full per diem rates at ATCS sites are used.

*** For installation, training, cutover, testing & acceptance phases, it is assumed that personnel will be accomodated in apartments at ATCS sites, and therefore there will be certain savings *in lodging and meals* amounts.

"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00203

# 3.6 Cost of Turnkey ATCS at Sites

**COST SCHEDULE OF TURNKEY ATCS INSTALLED AND ACCEPTED AT SITES**

| COST ELEMENTS | | YEAR 1<br>CLIN 0001AA<br>NTCC HAMPTON ROADS | YEAR 2<br>CLIN 0004<br>NCTS JAPAN | YEAR 1<br>CLIN 0001AC<br>NTCC MAKALAP | YEAR 1<br>CLIN 0001AB<br>NTCC CAMP SMITH | YEAR 2<br>CLIN 0007<br>NCTS SICILY | YEAR 2<br>CLIN 0010<br>NCTS PUERTO RICO | YEAR 2<br>CLIN 0013<br>NCTS LONDON |
|---|---|---|---|---|---|---|---|---|
| EQUIPMENT: | | | | | | | | |
| HARDWARE | | $1,639,789.67 | $436,920.12 | $514,391.92 | $416,283.93 | $486,277.00 | $387,461.43 | $611,561.28 |
| SOFTWARE | | $10,077.00 | $8,793.90 | $9,771.00 | $9,771.00 | $8,793.90 | $8,793.90 | $8,793.90 |
| SUB TOTAL | | $1,649,866.67 | $445,714.02 | $524,162.92 | $426,054.93 | $495,070.90 | $396,255.33 | $620,355.18 |
| G&A | 3.46% | $57,085.39 | $15,421.71 | $18,136.04 | $14,741.50 | $17,129.45 | $13,710.43 | $21,464.29 |
| TOTAL COST | | $1,706,952.06 | $461,135.73 | $542,298.96 | $440,796.43 | $512,200.35 | $409,965.76 | $641,819.47 |
| FEES | 0.00% | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| TOTAL PRICE | | $1,706,952.06 | $461,135.73 | $542,298.96 | $440,796.43 | $512,200.35 | $409,965.76 | $641,819.47 |
| OTHER DIRECT COSTS: | | | | | | | | |
| TRAVEL | | $36,012.90 | $122,929.50 | $51,414.35 | $46,343.67 | $74,880.00 | $60,172.34 | $111,975.33 |
| LAND/SEA SHIPPING | | $0.00 | $0.00 | $6,004.00 | $6,004.00 | $0.00 | $0.00 | $0.00 |
| U.S. INLAND | | $925.00 | $925.00 | $495.00 | $495.00 | $925.00 | $925.00 | $925.00 |
| INSURANCE | | $2,999.73 | $591.43 | $748.33 | $552.11 | $690.14 | $492.51 | $940.71 |
| SUBCONTRACTOR | | $13,000.00 | $10,000.00 | $13,000.00 | $13,000.00 | $10,000.00 | $10,000.00 | $10,000.00 |
| | | $52,937.63 | $134,445.93 | $71,661.68 | $66,394.78 | $86,495.14 | $71,589.85 | $123,841.04 |
| OTHER ODCs (Excld. Travel): | | | | | | | | |
| SUB TOTAL | | $16,924.73 | $11,516.43 | $20,247.33 | $20,051.11 | $11,615.14 | $11,417.51 | $11,865.71 |
| G&A | 10.55% | $1,785.56 | $1,214.98 | $2,136.09 | $2,115.39 | $1,225.40 | $1,204.55 | $1,251.83 |
| TOTAL COST | | $18,710.29 | $12,731.41 | $22,383.42 | $22,166.50 | $12,840.54 | $12,622.06 | $13,117.54 |
| FEES | 8.00% | $1,496.82 | $1,018.51 | $1,790.67 | $1,773.32 | $1,027.24 | $1,009.76 | $1,049.40 |
| TOTAL PRICE | | $20,207.11 | $13,749.92 | $24,174.09 | $23,939.82 | $13,867.78 | $13,631.82 | $14,166.94 |
| TRAVEL ODCs: | | | | | | | | |
| SUB TOTAL | | $36,012.90 | $122,929.50 | $51,414.35 | $46,343.67 | $74,880.00 | $60,172.34 | $111,975.33 |
| G&A | 10.55% | $3,799.36 | $12,969.06 | $5,424.21 | $4,889.26 | $7,899.84 | $6,348.18 | $11,813.40 |
| TOTAL COST | | $39,812.26 | $135,898.56 | $56,838.56 | $51,232.93 | $82,779.84 | $66,520.52 | $123,788.73 |
| FEES | 8.00% | $3,184.98 | $10,871.88 | $4,547.08 | $4,098.63 | $6,622.39 | $5,321.64 | $9,903.10 |
| TOTAL PRICE | | $42,997.24 | $146,770.44 | $61,385.64 | $55,331.56 | $89,402.23 | $71,842.16 | $133,691.83 |
| PERSONNEL SUPPORT: | | | | | | | | |
| OFF-SITE | | $127,093.52 | $83,486.10 | $127,093.52 | $127,093.52 | $83,486.10 | $83,486.10 | $83,486.10 |
| ON-SITE | | $351,208.00 | $121,909.60 | $129,202.00 | $102,077.20 | $135,526.01 | $108,347.20 | $149,034.40 |
| SUB TOTAL | | $478,301.52 | $205,395.70 | $256,295.52 | $229,170.72 | $219,012.11 | $191,833.30 | $232,520.50 |
| G&A | 10.55% | $50,460.81 | $21,669.25 | $27,039.18 | $24,177.51 | $23,105.78 | $20,238.41 | $24,530.91 |
| TOTAL COST | | $528,762.33 | $227,064.95 | $283,334.70 | $253,348.23 | $242,117.89 | $212,071.71 | $257,051.41 |
| FEES | 8.00% | $42,300.99 | $18,165.20 | $22,666.78 | $20,267.86 | $19,369.43 | $16,965.74 | $20,564.11 |
| TOTAL PRICE (PERSONNEL) | | $571,063.32 | $245,230.14 | $306,001.47 | $273,616.09 | $261,487.32 | $229,037.45 | $277,615.53 |
| TOTAL PRICE | | $2,341,219.73 | $866,886.23 | $933,860.16 | $793,683.90 | $876,957.68 | $724,477.20 | $1,067,293.77 |

-793673.16-



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00295

# 3.7 Maintenance Costs of ATCS

INFORMATION S[...]TEMS & NETWORK CORP. - N00600-93-R-2790

ISN

MAINTENANCE COSTS OF ATCS

NTCC HAMPTON ROADS
CLINS 0016, 0031, 0046 & 0061

| | | | | CLIN 0016 | | | CLIN 0031 | | | CLIN 0046 | | | CLIN 0061 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 0 | $0.00 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $0.00 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $0.00 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $0.00 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $0.00 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 0 | 0.00 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $281,114.64

17.66



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790

ISN

**MAINTENANCE COSTS OF ATCS**

**NCTS JAPAN**
**CLINS 0018, 0033, 0048 & 0063**

| | | | | CLIN 0018 | | | CLIN 0033 | | |
|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 0 | $0.00 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $0.00 | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $0.00 | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $0.00 | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $0.00 | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 0 | 0.00 | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

| | CLIN 0048 | | | CLIN 0063 | | |
|---|---|---|---|---|---|---|
| | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $281,114.64



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00298

MAINTENANCE COSTS OF ATCS

NTCC MAKALAPA
CLINS 0020, 0035, 0050 & 0065

| | | | | CLIN 0020 | | | CLIN 0035 | | | CLIN 0050 | | | CLIN 0065 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL COST | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 0 | $0.00 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $0.00 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $0.00 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $0.00 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $0.00 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 0 | 0.00 | | 1880 | $70,278.65 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $281,114.63



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790

**MAINTENANCE COSTS OF ATCS**

**NTCC CAMP SMITH**
**CLINS 0022, 0037, 0052 & 0067**

| | | | | CLIN 0022 | | | CLIN 0037 | | | CLIN 0052 | | | CLIN 0067 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL COST | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 0 | $0.00 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $0.00 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $0.00 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $0.00 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $0.00 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 0 | 0.00 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $281,114.64



00300

ISN

**MAINTENANCE COSTS OF ATCS**

**NCTS SICILY**
**CLINS 0024, 0039, 0054 & 0069**

| | | | | CLIN 0024 | | | CLIN 0039 | | | CLIN 0054 | | | CLIN 0069 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL COST | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 0 | $0.00 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $0.00 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $0.00 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $0.00 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $0.00 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 0 | 0.00 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $281,114.64

00301



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790

ISN

**MAINTENANCE COSTS OF ATCS**

**NCTS PUERTO RICO**
**CLINS 0026, 0041, 0056 & 0071**

| | | | | CLIN 0026 | | | CLIN 0041 | | | CLIN 0056 | | | CLIN 0071 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 0 | $0.00 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $0.00 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $0.00 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $0.00 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $0.00 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 0 | 0.00 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $281,114.64

00302



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS & NETWORK CORP. - N00600-93-R-2790

**MAINTENANCE COSTS OF ATCS**

**NCTS LONDON**
**CLINS 0028, 0043, 0058 & 0073**

| | | | | CLIN 0028 | | | CLIN 0043 | | | CLIN 0058 | | | CLIN 0073 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT | UNIT RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE SUPERVISOR | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 | $32.89 | 0 | $0.00 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 | $23.86 | 0 | $0.00 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINTENANCE TECH. | $31.31 | 0 | $0.00 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 | $31.31 | 1880 | $58,862.80 |
| SUBTOTAL | | | $0.00 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 | | | $58,862.80 |
| G&A 10.55% | | | $0.00 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 | | | $6,210.03 |
| TOTAL COST | | | $0.00 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 | | | $65,072.83 |
| FEE 8.00% | | | $0.00 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 | | | $5,205.83 |
| TOTAL PRICE | | 0 | 0.00 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 | | 1880 | $70,278.66 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $281,114.64



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00303

# 3.8 Additional Training Classes

INFORMATION SYSTEMS NETWORK CORP. - N00600-93-R-2790

ISN

**ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15**

**LOCATION : NTCC HAMPTON ROADS**

| | | | | | CLIN 0030 | | | CLIN 0045 | | | CLIN 0060 | | | CLIN 0075 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE MANAGER | | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINT. TECHNICIAN | | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | | $0.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 |
| G&A | 10.55% | | | $0.00 | | | $478.97 | | | $478.97 | | | $478.97 | | | $478.97 |
| TOTAL COST | | | | $0.00 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 |
| FEE | 8.00% | | | $0.00 | | | $401.52 | | | $401.52 | | | $401.52 | | | $401.52 |
| TOTAL LABOR | | | | $0.00 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 |
| ODC: | | | | | | | | | | | | | | | | |
| PER DIEM COSTS | | | | $0.00 | | | $3,052.00 | | | $3,052.00 | | | $3,052.00 | | | $3,052.00 |
| CAR RENTAL COSTS | | | | $0.00 | | | $490.00 | | | $490.00 | | | $490.00 | | | $490.00 |
| GAS ALLOWANCE | | | | $0.00 | | | $140.00 | | | $140.00 | | | $140.00 | | | $140.00 |
| TRAVEL/AIR FARES | | | | $0.00 | | | $183.60 | | | $183.60 | | | $183.60 | | | $183.60 |
| SUB TOTAL | | | | $0.00 | | | $3,865.60 | | | $3,865.60 | | | $3,865.60 | | | $3,865.60 |
| G&A | 10.55% | | | $0.00 | | | $407.82 | | | $407.82 | | | $407.82 | | | $407.82 |
| TOTAL COST | | | | $0.00 | | | $4,273.42 | | | $4,273.42 | | | $4,273.42 | | | $4,273.42 |
| FEE | 8.00% | | | $0.00 | | | $341.87 | | | $341.87 | | | $341.87 | | | $341.87 |
| TOTAL ODC | | | | $0.00 | | | $4,615.29 | | | $4,615.29 | | | $4,615.29 | | | $4,615.29 |
| TOTAL PRICE | | | | $0.00 | | | $10,035.78 | | | $10,035.78 | | | $10,035.78 | | | $10,035.78 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $40,143.12

00305



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS NETWORK CORP. - N00600-93-R-2790

ISN

ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15

LOCATION : NCTS JAPAN

| | | | | CLIN 0030 | | | CLIN 0045 | | | CLIN 0060 | | | CLIN 0075 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINT. TECHNICIAN | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | $0.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 |
| G&A 10.55% | | | $0.00 | | | $478.97 | | | $478.97 | | | $478.97 | | | $478.97 |
| TOTAL COST | | | $0.00 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 |
| FEE 8.00% | | | $0.00 | | | $401.52 | | | $401.52 | | | $401.52 | | | $401.52 |
| TOTAL LABOR | | | $0.00 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 |
| ODC: | | | | | | | | | | | | | | | |
| PER DIEM COSTS | | | $0.00 | | | $7,392.00 | | | $7,392.00 | | | $7,392.00 | | | $7,392.00 |
| CAR RENTAL COSTS | | | $0.00 | | | $1,190.00 | | | $1,190.00 | | | $1,190.00 | | | $1,190.00 |
| GAS ALLOWANCE | | | $0.00 | | | $140.00 | | | $140.00 | | | $140.00 | | | $140.00 |
| TRAVEL/AIR FARES | | | $0.00 | | | $1,920.00 | | | $1,920.00 | | | $1,920.00 | | | $1,920.00 |
| SUB TOTAL | | | $0.00 | | | $10,642.00 | | | $10,642.00 | | | $10,642.00 | | | $10,642.00 |
| G&A 10.55% | | | $0.00 | | | $1,122.73 | | | $1,122.73 | | | $1,122.73 | | | $1,122.73 |
| TOTAL COST | | | $0.00 | | | $11,764.73 | | | $11,764.73 | | | $11,764.73 | | | $11,764.73 |
| FEE 8.00% | | | $0.00 | | | $941.18 | | | $941.18 | | | $941.18 | | | $941.18 |
| TOTAL ODC | | | $0.00 | | | $12,705.91 | | | $12,705.91 | | | $12,705.91 | | | $12,705.91 |
| TOTAL PRICE | | | $0.00 | | | $18,126.40 | | | $18,126.40 | | | $18,126.40 | | | $18,126.40 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $72,505.60

00300



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15

LOCATION : NTCC MAKALAPA

| | | | | CLIN 0030 | | | CLIN 0045 | | | CLIN 0060 | | | CLIN 0075 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | | |
| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL COST | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE MANAGER | | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINT. TECHNICIAN | | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | | $0.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 |
| G&A | 10.55% | | | $0.00 | | | $478.97 | | | $478.97 | | | $478.97 | | | $478.97 |
| TOTAL COST | | | | $0.00 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 |
| FEE | 8.00% | | | $0.00 | | | $401.52 | | | $401.52 | | | $401.52 | | | $401.52 |
| TOTAL LABOR | | | | $0.00 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 |
| ODC: | | | | | | | | | | | | | | | | |
| PER DIEM COSTS | | | | $0.00 | | | $4,676.00 | | | $4,676.00 | | | $4,676.00 | | | $4,676.00 |
| CAR RENTAL COSTS | | | | $0.00 | | | $490.00 | | | $490.00 | | | $490.00 | | | $490.00 |
| GAS ALLOWANCE | | | | $0.00 | | | $140.00 | | | $140.00 | | | $140.00 | | | $140.00 |
| TRAVEL/AIR FARES | | | | $0.00 | | | $2,360.00 | | | $2,360.00 | | | $2,360.00 | | | $2,360.00 |
| SUB TOTAL | | | | $0.00 | | | $7,666.00 | | | $7,666.00 | | | $7,666.00 | | | $7,666.00 |
| G&A | 10.55% | | | $0.00 | | | $808.76 | | | $808.76 | | | $808.76 | | | $808.76 |
| TOTAL COST | | | | $0.00 | | | $8,474.76 | | | $8,474.76 | | | $8,474.76 | | | $8,474.76 |
| FEE | 8.00% | | | $0.00 | | | $677.98 | | | $677.98 | | | $677.98 | | | $677.98 |
| TOTAL ODC | | | | $0.00 | | | $9,152.74 | | | $9,152.74 | | | $9,152.74 | | | $9,152.74 |
| TOTAL PRICE | | | | $0.00 | | | $14,573.23 | | | $14,573.23 | | | $14,573.23 | | | $14,573.23 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $58,292.92



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 5.0 Assumptions

INFORMATION SYSTEMS NETWORK CORP. - N00600-93-R-2790

ISN

**ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15**

**LOCATION : NTCC CAMP SMITH**

| | | | | | CLIN 0030 | | | CLIN 0045 | | | CLIN 0060 | | | CLIN 0075 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | | LABOR RATES* | TOTAL HOURS | TOTAL COST | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE MANAGER | | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | | $32.89 | 0 | $0.00 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | | $23.86 | 0 | $0.00 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 |
| ADMINISTRATIVE ASST | | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINT. TECHNICIAN | | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | | $0.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 |
| G&A | 10.55% | | | $0.00 | | | $478.97 | | | $478.97 | | | $478.97 | | | $478.97 |
| TOTAL COST | | | | $0.00 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 |
| FEE | 8.00% | | | $0.00 | | | $401.52 | | | $401.52 | | | $401.52 | | | $401.52 |
| TOTAL LABOR | | | | $0.00 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 |
| ODC: | | | | | | | | | | | | | | | | |
| PER DIEM COSTS | | | | $0.00 | | | $4,676.00 | | | $4,676.00 | | | $4,676.00 | | | $4,676.00 |
| CAR RENTAL COSTS | | | | $0.00 | | | $490.00 | | | $490.00 | | | $490.00 | | | $490.00 |
| GAS ALLOWANCE | | | | $0.00 | | | $140.00 | | | $140.00 | | | $140.00 | | | $140.00 |
| TRAVEL/AIR FARES | | | | $0.00 | | | $2,360.00 | | | $2,360.00 | | | $2,360.00 | | | $2,360.00 |
| SUB TOTAL | | | | $0.00 | | | $7,666.00 | | | $7,666.00 | | | $7,666.00 | | | $7,666.00 |
| G&A | 10.55% | | | $0.00 | | | $808.76 | | | $808.76 | | | $808.76 | | | $808.76 |
| TOTAL COST | | | | $0.00 | | | $8,474.76 | | | $8,474.76 | | | $8,474.76 | | | $8,474.76 |
| FEE | 8.00% | | | $0.00 | | | $677.98 | | | $677.98 | | | $677.98 | | | $677.98 |
| TOTAL ODC | | | | $0.00 | | | $9,152.74 | | | $9,152.74 | | | $9,152.74 | | | $9,152.74 |
| TOTAL PRICE | | | | $0.00 | | | $14,573.23 | | | $14,573.23 | | | $14,573.23 | | | $14,573.23 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $58,292.92



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00308

INFORMATION SYSTEMS NETWORK CORP. - N00600-93-R-2790

ISN

ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.16

LOCATION : NCTS SICILY

| | | | | CLIN 0030 | | | CLIN 0045 | | | CLIN 0060 | | | CLIN 0075 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | LABOR RATES* | TOTAL HOURS | TOTAL COST | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINT. TECHNICIAN | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | $0.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 |
| G&A 10.55% | | | $0.00 | | | $478.97 | | | $478.97 | | | $478.97 | | | $478.97 |
| TOTAL COST | | | $0.00 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 |
| FEE 8.00% | | | $0.00 | | | $401.52 | | | $401.52 | | | $401.52 | | | $401.52 |
| TOTAL LABOR | | | $0.00 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 |
| ODC: | | | | | | | | | | | | | | | |
| PER DIEM COSTS | | | $0.00 | | | $4,088.00 | | | $4,088.00 | | | $4,088.00 | | | $4,088.00 |
| CAR RENTAL COSTS | | | $0.00 | | | $910.00 | | | $910.00 | | | $910.00 | | | $910.00 |
| GAS ALLOWANCE | | | $0.00 | | | $140.00 | | | $140.00 | | | $140.00 | | | $140.00 |
| TRAVEL/AIR FARES | | | $0.00 | | | $1,560.00 | | | $1,560.00 | | | $1,560.00 | | | $1,560.00 |
| SUB TOTAL | | | $0.00 | | | $6,698.00 | | | $6,698.00 | | | $6,698.00 | | | $6,698.00 |
| G&A 10.55% | | | $0.00 | | | $706.64 | | | $706.64 | | | $706.64 | | | $706.64 |
| TOTAL COST | | | $0.00 | | | $7,404.64 | | | $7,404.64 | | | $7,404.64 | | | $7,404.64 |
| FEE 8.00% | | | $0.00 | | | $592.37 | | | $592.37 | | | $592.37 | | | $592.37 |
| TOTAL ODC | | | $0.00 | | | $7,997.01 | | | $7,997.01 | | | $7,997.01 | | | $7,997.01 |
| TOTAL PRICE | | | $0.00 | | | $13,417.50 | | | $13,417.50 | | | $13,417.50 | | | $13,417.50 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $53,670.00



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

003305

**ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15**

**LOCATION : NCTS PUERTO RICO**

| | | | | CLIN 0030 | | | CLIN 0045 | | | CLIN 0060 | | | CLIN 0075 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ESCALATION RATE: 0 | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | | ESCALATION RATE: 0 | | |
| | | YEAR 1 | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | LABOR RATES* | TOTAL HOURS | TOTAL COST | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINT. TECHNICIAN | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | $0.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 |
| G&A 10.55% | | | $0.00 | | | $478.97 | | | $478.97 | | | $478.97 | | | $478.97 |
| TOTAL COST | | | $0.00 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 |
| FEE 8.00% | | | $0.00 | | | $401.52 | | | $401.52 | | | $401.52 | | | $401.52 |
| TOTAL LABOR | | | $0.00 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 |
| ODC: | | | | | | | | | | | | | | | |
| PER DIEM COSTS | | | $0.00 | | | $5,376.00 | | | $5,376.00 | | | $5,376.00 | | | $5,376.00 |
| CAR RENTAL COSTS | | | $0.00 | | | $490.00 | | | $490.00 | | | $490.00 | | | $490.00 |
| GAS ALLOWANCE | | | $0.00 | | | $140.00 | | | $140.00 | | | $140.00 | | | $140.00 |
| TRAVEL/AIR FARES | | | $0.00 | | | $870.00 | | | $870.00 | | | $870.00 | | | $870.00 |
| SUB TOTAL | | | $0.00 | | | $6,876.00 | | | $6,876.00 | | | $6,876.00 | | | $6,876.00 |
| G&A 10.55% | | | $0.00 | | | $725.42 | | | $725.42 | | | $725.42 | | | $725.42 |
| TOTAL COST | | | $0.00 | | | $7,601.42 | | | $7,601.42 | | | $7,601.42 | | | $7,601.42 |
| FEE 8.00% | | | $0.00 | | | $608.11 | | | $608.11 | | | $608.11 | | | $608.11 |
| TOTAL ODC | | | $0.00 | | | $8,209.53 | | | $8,209.53 | | | $8,209.53 | | | $8,209.53 |
| TOTAL PRICE | | | $0.00 | | | $13,630.02 | | | $13,630.02 | | | $13,630.02 | | | $13,630.02 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $54,520.08



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

INFORMATION SYSTEMS NETWORK CORP. - N00600-93-R-2790

**ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.16**

**LOCATION : NCTS LONDON**

| | | | | CLIN 0030 | | | CLIN 0045 | | | CLIN 0060 | | | CLIN 0075 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 | ESCALATION RATE: | | 0 |
| | YEAR 1 | | | YEAR 2 | | | YEAR 3 | | | YEAR 4 | | | YEAR 5 | | |
| LABOR CATEGORIES | LABOR RATES* | TOTAL HOURS | TOTAL COST | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT | LABOR RATES* | TOTAL HOURS | TOTAL AMOUNT |
| PROGRAM MANAGER | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 | $54.88 | 0 | $0.00 |
| TASK LEADER - SYSTEMS | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 | $30.57 | 0 | $0.00 |
| SYSTEMS ENGINEER | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 | $37.26 | 0 | $0.00 |
| SITE MANAGER | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 | $38.33 | 0 | $0.00 |
| SENIOR TECHNICIAN | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 | $29.00 | 0 | $0.00 |
| TECHNICIAN | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 | $25.55 | 0 | $0.00 |
| SYSTEMS ANALYST | $32.89 | 0 | $0.00 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 | $32.89 | 80 | $2,631.20 |
| SR SYSTEMS ANALYST | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 | $33.20 | 0 | $0.00 |
| QA ENGINEER | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 | $38.32 | 0 | $0.00 |
| TRAINING INSTRUCTOR | $23.86 | 0 | $0.00 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 | $23.86 | 80 | $1,908.80 |
| ADMINISTRATIVE ASST | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 | $18.70 | 0 | $0.00 |
| ENGR DRAFT | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 | $22.70 | 0 | $0.00 |
| ON-SITE MAINT. TECHNICIAN | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 | $31.31 | 0 | $0.00 |
| SUB TOTAL | | | $0.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 | | | $4,540.00 |
| G&A 10.55% | | | $0.00 | | | $478.97 | | | $478.97 | | | $478.97 | | | $478.97 |
| TOTAL COST | | | $0.00 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 | | | $5,018.97 |
| FEE 8.00% | | | $0.00 | | | $401.52 | | | $401.52 | | | $401.52 | | | $401.52 |
| TOTAL LABOR | | | $0.00 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 | | | $5,420.49 |
| ODC: | | | | | | | | | | | | | | | |
| PER DIEM COSTS | | | $0.00 | | | $5,936.00 | | | $5,936.00 | | | $5,936.00 | | | $5,936.00 |
| CAR RENTAL COSTS | | | $0.00 | | | $700.00 | | | $700.00 | | | $700.00 | | | $700.00 |
| GAS ALLOWANCE | | | $0.00 | | | $140.00 | | | $140.00 | | | $140.00 | | | $140.00 |
| TRAVEL/AIR FARES | | | $0.00 | | | $1,770.00 | | | $1,770.00 | | | $1,770.00 | | | $1,770.00 |
| SUB TOTAL | | | $0.00 | | | $8,546.00 | | | $8,546.00 | | | $8,546.00 | | | $8,546.00 |
| G&A 10.55% | | | $0.00 | | | $901.60 | | | $901.60 | | | $901.60 | | | $901.60 |
| TOTAL COST | | | $0.00 | | | $9,447.60 | | | $9,447.60 | | | $9,447.60 | | | $9,447.60 |
| FEE 8.00% | | | $0.00 | | | $755.81 | | | $755.81 | | | $755.81 | | | $755.81 |
| TOTAL ODC | | | $0.00 | | | $10,203.41 | | | $10,203.41 | | | $10,203.41 | | | $10,203.41 |
| TOTAL PRICE | | | $0.00 | | | $15,623.90 | | | $15,623.90 | | | $15,623.90 | | | $15,623.90 |

*LABOR RATES INCLUDE FRINGE, OVERHEAD, AND ESCALATION FACTORS

TOTAL ALL YEARS $62,495.60



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

00310

SUBCONTRACTOR (DMS) COSTS

| | | CLIN 0001AA NTCC HAMPTON | | CLIN 0001AB NTCC CAMP | | CLIN 0001AC NTCC | | CLIN 0004 NCTS JAPAN | | CLIN 0007 NCTS SICILY | | CLIN 0010 NCTS PUERTO | | CLIN 0013 NCTS LONDON |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FUNCTIONAL TASKS | Days | ROADS | Days | SMITH | Days | MAKALAPA | | | Days | | Days | RICO | Days | |
| Site Survey* | 2 | $1,000.00 | 2 | $1,000.00 | 2 | $1,000.00 | 2 | $1,000.00 | 2 | $1,000.00 | 2 | $1,000.00 | 2 | $1,000.00 |
| Systems Engineering* | 6 | $3,000.00 | 6 | $3,000.00 | 6 | $3,000.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 | 0 | $0.00 |
| Assembly & Staging* | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 |
| Install & Chkout* | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 | 5 | $2,500.00 |
| Acceptance Test* | 3 | $1,500.00 | 3 | $1,500.00 | 3 | $1,500.00 | 3 | $1,500.00 | 3 | $1,500.00 | 3 | $1,500.00 | 3 | $1,500.00 |
| Training** | 10 | $2,500.00 | 10 | $2,500.00 | 10 | $2,500.00 | 10 | $2,500.00 | 10 | $2,500.00 | 10 | $2,500.00 | 10 | $2,500.00 |
| TOTAL | 31 | $13,000.00 | 31 | $13,000.00 | 31 | $13,000.00 | 25 | $10,000.00 | 25 | $10,000.00 | 25 | $10,000.00 | 25 | $10,000.00 |

Note:
*DMS1rate @ $500 per day is used.
**DMS2 rate @ $250 per day is used.



"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

# 3.9 Subcontractor Costs

# 4.0 Supplemental Price Information

ISN

ISN SHE 2.66
G-UNIT 1.875

# 4.0 SUPPLEMENTAL PRICE INFORMATION

## A. INTRODUCTION

ISN's accounting system has been developed to comply with the cost principles and applicable provisions of the Federal Acquisition Regulations (FARs), the Federal Procurement Regulations (FPRs) and the Defense Acquisition Regulations (DARs). The following paragraphs provide cost and pricing data required by the Request for Proposal.

## B. DIRECT LABOR RATES

Unburdened direct labor hourly rates are determined by dividing the proposed person's salary by 2,080 hours.

## C. FRINGE RATE

The actual fringe statutory rate incurred till February 28, i.e. 35.52% is applied to the direct labor costs.

## D. OVERHEAD RATES

1. **ON-SITE.** An ISN Services overhead rate of 16.16% is applied to direct labor and fringe for work that is performed at the Navy ATCS sites.

2. **OFF-SITE.** An overhead rate of 64.63% is applied to direct labor and fringe for work that is performed off-site, i.e. at ISN's provided facilities.

## E. G&A RATES

The G&A rate has been modified to reflect a material handling pool. A G&A rate of 10.55% has been applied to direct labor, fringe, overhead, and other direct costs (ODCs), and a G&A (material handling) rate of 3.46% has been applied to materials.





"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

ISN

## F. PROFIT/FEE

A proposed fee of 8% has been applied to labor and other direct costs. No fee, i.e. 0% has been applied to material costs.

## G. ESCALATION RATES

ISN has removed the annual escalation rates from Years 2 through 5.





"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT
TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

## 5.0 ASSUMPTIONS

### 1. TELECOMMUNICATION SYSTEM FACILITIES

It is assumed that on-site personnel will be provided FTS (Federal Telecommunication Systems) or equivalent.

### 2. STORAGE & OFFICE FACILITIES

Storage and staging area will be provided on-site for all materials and equipment to be used in the ATC installation. Office space will also be provided for the on-site maintenance technician.

### 3. SHIPPING COSTS

For foreign-shipped items, it is assumed that these will be transported to the sites at Government's expense from Portsmouth. We are responsible for delivering materials and equipment f.o.b. to Portsmouth.





"USE OR DISCLOSURE OF PROPOSAL DATA IS SUBJECT TO THE RESTRICTION OF THE FIRST PAGE OF THIS PROPOSAL"

SOLICITATION, OFFER AND AWARD

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) ► | RATING DO-A7 | PAGE OF 1 | 119 PAGES

| 2. CONTRACT NO. | 3. SOLICITATION NO. | 4. TYPE OF SOLICITATION | 5. DATE ISSUED | 6. REQUISITION/PURCHASE NO. |
|---|---|---|---|---|
| N00600-94-C-0389 | N00600-93-R-2790 | SEALED BID (IFB) / XX NEGOTIATED (RFP) | JUN 22, 1993 | N00039-94-RC-DL300 |

7. ISSUED BY CODE N00600
Naval Regional Contracting Center
Washington Navy Yard, Bldg 200, 901 M street SE,
Washington, D.C. 20374-5014

8. ADMINISTERED BY (If other than Item 7)
SEE BLOCK 24

EXHIBIT 46

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid " and "bidder"

SOLICITATION

9. Sealed offers in origional and One (1) copies for furnishing the supplies or services in the schedule will be received at the place specified in item 8, or if handcarried, in the depository located in The Bid Room, Naval Regional Contracting Center, Washington Navy Yard, Bldg 200, 901 M Street SE., Washington DC 20374-5014 until 2:00 PM EASTERN local time (Hour) AUGUST 31, 1993. (Date)

CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provosion No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation

10. FOR INFORMATION CALL: ► A. NAME: WILLIAM THOREEN | B. TELEPHONE NO. (202) 433-5389 NO COLLECT CALLS

11. TABLE OF CONTENTS


| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I-THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 94 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III-LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 8 | X | J | LIST OF ATTACHMENTS | 119 |
| X | D | PACKAGING AND MARKING | 71 | | | PART IV-REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPRANCE | 73 | | K | REPRESENTATIONS, CERTIFICATES AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 78 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 83 | | L | INSTRS., COND., AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | 93 | | M | EVALUATION FACTORS FOR AWARD | |


OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period.

12. In compliance with the above, the undersigned agrees, if this offer is accepted within ______ calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT ► (See Section I, Clause52.232-8 ► | 10 CALENDAR DAYS % | 20 CALENDER DAYS % | 30 CALENDAR DAYS - % | CALENDAR DAYS % |
|---|---|---|---|---|

| 14. ACKNOWLEDGEMENT OF AMENDMENTS (The offeror acknowledges receipt of ammendments to the SOLICITATION for offerors and related documents numbered and dated: | AMENDMENT NO. | DATE | AMENDMENT NO. | DATE |
|---|---|---|---|---|
| | 0001 | 8/19/93 | 0004 | 10/5/93 |
| | 0002 | 9/13/93 | 0005 | 10/13/93 |
| | 0003 | 10/1/93 | 0006 | 10/27/93 |

15A. NAME AND ADDRESS OF OFFEROR CODE 80179 FACILITY
INFORMATION SYSTEMS & NETWORKS CORP.
10411 MOTOR CITY DRIVE, BETHESDA, MD 20817

16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER
ROMA MALKANI, PRESIDENT

15B. TELEPHONE NO.(INCLUDE AREA CODE)
(301) 469-0400

15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE - ENTER SUCH ADDRESS IN SCHEDULE

17. SIGNATURE Roma Malkani

18. OFFER DATE 11/1/93

AWARD (To be completed by Government)

19. ACCEPTED AS TO ITEMS NUMBERED 0001 through 0003 | 20. AMOUNT $4416645.54 | 21. ACCOUNTING AND APPROPRIATION DATA SEE CLAUSE G.12

22. AUTHORITY FOR USING OTHER THAN FULL AND COMPETATION ( ) 10 U.S.C. 2304(c)( ) or ( ) 41 U.S.C. 253(c)( )

23. SUBMIT INVOICES TO ADDRESS SHOWN IN ITEM (4 copies unless otherwise specified) ► SEE CLAUSE G.20

24. ADMINISTRATED BY (If other than Item 7) CODE S2102A
DCMAO Baltimore
200 Towsontown Blvd., West
Towson, MD 21204-5299

25. PAYMENT WILL BE MADE BY CODE S3910A
DFAS-Columbus Center
DFAS-CO/Capitol Division, PO Box 182263
Columbus, OH 43218-2263

26. NAME OF CONTRACTING OFFICER (Type or print)
ROSCOE W. CRAWFORD

27. UNITED STATES OF AMERICA BY Roscoe W. Crawford (Signature of Contracting Officer)

28. AWARD DATE 15 JUL 1994

IMPORTANT-Award will be made on this form, or on Standard Form 26, or by other authorized offical written notice

NSN 7540-01-152-8064 COMPUTER GENERATED STANDARD FORM 33 (REV.4-85) Prescribed by GSA

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED N00600-94-C-0389 | PAGE 2 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT I | | | | |
| 0001 | TURNKEY AUTOMATED TECHNICAL CONTROL SYSTEM (ATC) | | | | |
| 0001AA | TURNKEY ATC INSTALLED AND ACCEPTED AT NTCC HAMPTON ROADS | 1 | EA | $2,341,219.73 | $2,341,219.73 |
| 0001AB | TURNKEY ATC INSTALLED AND ACCEPTED AT NTCC CAMP SMITH | 1 | EA | $793,683.90 | $793,683.90 |
| 0001AC | TURNKEY ATC INSTALLED AND ACCEPTED AT NTCC MAKALAPA | 1 | EA | $933,860.16 | $933,860.16 |
| 0002 | FORMAL CLASSROOM TRAINING | | | | |
| 0002AA | FORMAL CLASSROOM TRAINING FOR NTCC HAMPTON ROADS | 1 | LOT | $3,141.49 | $3,141.49 |
| 0002AB | FORMAL CLASSROOM TRAINING FOR NTCC CAMP SMITH | 1 | LOT | $3,141.49 | $3,141.49 |
| 0002AC | FORMAL CLASSROOM TRAINING FOR NTCC MAKALAPA | 1 | LOT | $3,141.49 | $3,141.49 |
| 0003 | CONTRACT DATA REQUIREMENTS FOR CLINS 0001 AND 0002. SEE ATTACHMENT 6 (EXHIBITS A-R) | 1 | LOT | $338,457.28 | $338,457.28 |
| | TOTAL FOR LOT I | | | | $4,416,645.54 |
| | LOT II - OPTION I PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0004 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS JAPAN | 1 | EA | $866,886.23 | $866,886.23 |
| 0005 | FORMAL CLASSROOM TRAINING FOR NCTS JAPAN | 1 | LOT | $3,141.49 | $3,141.49 |
| 0006 | CONTRACT DATA REQUIREMENTS FOR CLINS 0004 AND 0005. SEE ATTACHMENT 6 (EXHIBITS AI-AZ) | 1 | LOT | $78,984.26 | $78,984.26 |
| | TOTAL FOR LOT II | | | | $949,011.98 |

STANDARD FORM 36 (REV 10-83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>3 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT III – OPTION II<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0007 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS SICILY | 1 | EA | $876,957.68 | $876,957.68 |
| 0008 | FORMAL CLASSROOM TRAINING FOR NCTS SICILY | 1 | LOT | $3,141.49 | $3,141.49 |
| 0009 | CONTRACT DATA REQUIREMENTS FOR CLINS 0007 AND 0008<br>SEE ATTACHMENT 6 (EXHIBITS AI–AZ) | 1 | LOT | $78,984.26 | $78,984.26 |
| | TOTAL FOR LOT III | | | | $959,083.43 |
| | LOT IV – OPTION III<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0010 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS PUERTO RICO | 1 | EA | $724,477.20 | $724,477.20 |
| 0011 | FORMAL CLASSROOM TRAINING FOR NCTS PUERTO RICO | 1 | LOT | $3,141.49 | $3,141.49 |
| 0012 | CONTRACT DATA REQUIREMENTS FOR CLINS 0010 AND 0011<br>SEE ATTACHMENT 6 (EXHIBITS AI–AZ) | 1 | LOT | $61,700.78 | $61,700.78 |
| | TOTAL FOR LOT IV | | | | $789,319.47 |
| | LOT V – OPTION IV<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0013 | TURNKEY ATC INSTALLED AND ACCEPTED AT NCTS LONDON | 1 | EA | $1,067,293.77 | $1,067,293.77 |
| 0014 | FORMAL CLASSROOM TRAINING FOR NCTS LONDON | 1 | LOT | $3,141.49 | $3,141.49 |
| 0015 | CONTRACT DATA REQUIREMENTS FOR CLINS 0013 AND 0014<br>SEE ATTACHMENT 6 (EXHIBITS AI–AZ) | 1 | LOT | $100,398.76 | $100,398.76 |
| | TOTAL FOR LOT V | | | | $1,170,834.02 |

STANDARD FORM 36 (REV 10–83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>4 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT VI – OPTION V<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0016 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0017 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0018 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0019 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0020 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.55 | $70,278.60 |
| 0021 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0022 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| 0023 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0024 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0025 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0026 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0027 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0028 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0029 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0030 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT VI | | | | $605,930.98 |

STANDARD FORM 36 (REV 10-83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>5 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT VII – OPTION VI<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0031 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0032 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0033 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0034 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0035 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.56 | $70,278.72 |
| 0036 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0037 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| 0038 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0039 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0040 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0041 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0042 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0043 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0044 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0045 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT VII | | | | $605,931.10 |

STANDARD FORM 36 (REV 10-83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED<br>N00600-94-C-0389 | PAGE<br>6 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT VIII – OPTION IX<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0046 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0047 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0048 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0049 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0050 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.56 | $70,278.72 |
| 0051 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0052 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| 0053 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0054 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0055 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0056 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0057 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0058 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0059 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0060 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT VIII | | | | $605,931.10 |

STANDARD FORM 36 (REV 10–83) COMPUTER GENERATED

| CONTINUATION SHEET | NO. OF DOCUMENT BEING CONTINUED N00600-94-C-0389 | PAGE 7 | OF PAGES |
|---|---|---|---|

NAME OF OFFEROR/CONTRACTOR: Information Systems and Networks Corporation

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | LOT IX – OPTION X<br>PERIOD OF PERFORMANCE (SEE CLAUSE F.7) | | | | |
| 0061 | MAINTENANCE OF THE ATC LOCATED AT NTCC HAMPTON ROADS | 12 | MO | $5,856.56 | $70,278.72 |
| 0062 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC HAMPTON ROADS | 1 | LOT | NTE | $2,000.00 |
| 0063 | MAINTENANCE OF THE ATC LOCATED AT NCTS JAPAN | 12 | MO | $5,856.56 | $70,278.72 |
| 0064 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS JAPAN | 1 | LOT | NTE | $2,000.00 |
| 0065 | MAINTENANCE OF THE ATC LOCATED AT NTCC MAKALAPA | 12 | MO | $5,856.56 | $70,278.72 |
| 0066 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC MAKALAPA | 1 | LOT | NTE | $2,000.00 |
| 0067 | MAINTENANCE OF THE ATC LOCATED AT NTCC CAMP SMITH | 12 | MO | $5,856.56 | $70,278.72 |
| 0068 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NTCC CAMP SMITH | 1 | LOT | NTE | $2,000.00 |
| 0069 | MAINTENANCE OF THE ATC LOCATED AT NCTS SICILY | 12 | MO | $5,856.56 | $70,278.72 |
| 0070 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS SICILY | 1 | LOT | NTE | $2,000.00 |
| 0071 | MAINTENANCE OF THE ATC LOCATED AT NCTS PUERTO RICO | 12 | MO | $5,856.56 | $70,278.72 |
| 0072 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS PUERTO RICO | 1 | LOT | NTE | $2,000.00 |
| 0073 | MAINTENANCE OF THE ATC LOCATED AT NCTS LONDON | 12 | MO | $5,856.56 | $70,278.72 |
| 0074 | MAINTENANCE OUTSIDE THE PPM FOR THE ATC LOCATED AT NCTS LONDON | 1 | LOT | NTE | $2,000.00 |
| 0075 | ADDITIONAL TRAINING CLASSES IN ACCORDANCE WITH CLAUSE C.15 | 1 | LOT | $99,980.06 | $99,980.06 |
| | TOTAL FOR LOT IX | | | | $605,931.10 |

STANDARD FORM 36 (REV 10-83) COMPUTER GENERATED

SECTION C - DESCRIPTION/SPECIFICATION/WORK STATEMENT

STATEMENT OF WORK

**SECTION 1 - SCOPE**

1.1 INTRODUCTION

The United States Navy operates and maintains numerous multi-vendor Technical Control Facilities (TCFs) which provide tactical and strategic communications support for the fleet and other DOD components. Current technical control operations, such as network monitoring, patching, and testing of circuits and trunks for network reconfiguration require constant operator intervention with manually operated test equipment and patch cords.

The objective of this Statement of Work (SOW) is to seek a solution to this manpower intensive operation by upgrading all manual technical control facilities with Automated Technical Controls (ATCs). This SOW outlines the desired objectives of the project and associated technical, systems integration, and implementation requirements.

1.2 CONTRACTOR CONTACT WITH NAVY SITES

Prospective contractors shall not have direct contact with any Navy site with regards to this acquisition. All questions or Requests for Assistance will be directed to Naval Regional Contracting Center (NRCC) for resolution.

1.3 SCOPE OF WORK

This SOW defines communications service requirements and is not intended to be a design specification. This SOW, in conjunction with the ATC Functional Specification, establishes the requirements for the provision of an ATC to replace the manual technical control facilities in the Naval shore communications stations. The ATC shall automate the major functional areas in the technical control facilities of Naval Telecommunications Center (NTCC) Hampton Roads, Naval Computer and Telecommunications Station (NCTS) Sicily, NCTS Puerto Rico, NCTS Japan, NCTS London, NTCC Pearl Harbor and NTCC Camp Smith. These functional areas include service establishment and restoration, system performance assessment, fault isolation, coordination of operations, report generation and recordkeeping. The ATC contract shall be the primary vehicle for engineering, installation, training, operation, and maintenance services for these seven sites.

1.4 GEOGRAPHIC SCOPE

Automated Technical Control facilities, operational, and maintenance services shall be required for systems at each of the following Commander, Naval Computer and Telecommunications Command (COMNAVCOMTELCOM) facilities under the ATC contract:

a. NTCC Camp Smith

b. NTCC Hampton Roads

c. NCTS Sicily

d. NCTS Puerto Rico

e. NCTS Japan

f. NCTS London

g. NTCC Pearl Harbor

1.5 LIVE TEST DEMONSTRATION REQUIREMENTS

Each technically compliant offeror shall provide the Government a Live Test Demonstration (LTD) prior to contract award. This LTD shall be held in the continental United States (CONUS) in a fully functional and operational Automated Technical Control site. The offeror's LTD shall consist of the equipments proposed for the offeror's ATC solution and shall demonstrate that the system and its operation are compliant with Government's requirements as stated in the Functional Specification. Bidders will be asked to certify that they have a minimum of two (2) operational ATC sites in CONUS representing the design proposed. The LTD shall be conducted at one of these two operational sites.

**SECTION 2 - APPLICABLE DOCUMENTS**

2.1 MILITARY STANDARDS

MIL-STD-973 Configuration Management

2.2 OTHER

AUTOMATED TECHNICAL CONTROL (ATC), FUNCTIONAL CHARACTERISTIC SPECIFICATION dated 1 November 1992

**SECTION 3 - REQUIREMENTS**

3.1 GENERAL

The Contractor shall provide all material, labor, and services to engineer, provide, install, test, provide operational assistance for seven ATC turnkey facilities at NTCC Camp Smith, NTCC Hampton Roads, NCTS Sicily, NCTS Puerto Rico, NCTS Japan, NCTS London, and NTCC Pearl Harbor. The Contractor shall identify and develop life-cycle maintenance on the ATC and its peripheral equipment in accordance with this SOW. The Contractor shall operate the ATC, 24 hours per day, during the 30-day Acceptance period and during this time, provide in-depth training to Government personnel. This training shall include a minimum of 50% hands-on training. Following the formal Acceptance by the Government, the Government will operate and maintain the ATC with support of one (1) on-site Contractor representative. Government maintenance includes replacement of defective modules down to the Lowest Replaceable Unit (LRU) for emergent requirements and routine preventive maintenance. The Contractor shall certify that he shall provide parts support, repair, maintenance, and replacement of defective modules for the fifteen (15) year life of the system to the extent and for so long as the Government contracts for such support. The Contractor shall provide one (1) maintenance person who will remain on-site for a period of one (1) year from time of formal acceptance. The responsibilities of the Contractor include, but are not limited to: further training of Government personnel, maintenance of the ATC equipment, and assisting in operating the ATC. The Contractor shall respond within a maximum 2 hour timeframe (after notification) to assist the Government with ATC system problems outside the Government's capabilities. The Contractor must have a Program Liaison Office within 2 hours of Washington, D.C.. The contract will have options to continue contractor operations and maintenance support beyond the one year after acceptance. The Government, without penalty, may cancel this on-site support with 30 days written notice to the Contractor. Throughout this SOW, "provide" refers to <u>each</u> ATC facility.

3.2 HARDWARE

The contractor shall develop, implement, operate, maintain, and support an Electronic Cross-connect Switch (ECS) and subsystems. Hardware elements of this system may include, but are not necessarily limited to, the following:

3.2.1 Switch Sizing

The ECS shall allow for easy expansion in modular increments to accommodate evolutionary growth anticipated to be 30% or more. The ECS Matrix must be sized to accommodate a 30% or more increase in port count above current communication baseline requirements. Circuits identified will be a combination of DC loop, analog, and digital. Requirements for specific sizing of each candidate technical control are contained in the Site Specific Appendices to this specification.

3.2.2 State of the Art

The Contractor shall provide commercially available, field-proven equipment, components, and parts. The equipment shall use state-of-the-art, solid state technology of currently designed communications systems and equipment. To be considered field-proven, the equipment shall have been operated successfully for a minimum of twelve (12) months as a fully integrated system carrying real (not simulated) traffic in either a commercial or military application. Equipment operated in a lab environment, or operated to further its design, or to validate or test its design, is not acceptable.

3.2.3 Work Stations

The Contractor shall provide Network Management System (NMS) work stations, each identical in function and capable of controlling all ECS and NMS functions, and any stand-alone administrative functions as identified in the Functional Specification.

3.2.4 Test Equipment (Automated)

The Contractor shall provide all test equipment, technical literature, and other items necessary to test, maintain, and repair the ATC system in accordance with the contractor proposed Logistics and Maintenance Plan.

3.2.5 Spare Parts

The Contractor shall be responsible for furnishing all spare parts and equipment required in performance of the contract. The term "spare parts" includes all assemblies, subassemblies, components, parts, repair kits, and raw materials required or anticipated to be required as replacements of like items during installation, maintenance, repair, or overhaul of the ATC or any other equipment identified as part of the contract. Such spare parts shall be obtained by acquisition of

off-the-shelf contractor, subcontractor, or vendor items. The Contractor will provide complete spare parts support for the life of the contract. Storage space will be furnished by the Government. The Contractor shall provide the cabinet for the storage of on-site spare parts and the means by which to secure it. The contractor will provide a list of "Recommended" spare parts within the Contractor's technical proposal.

3.2.6 Cabling

The Contractor shall conduct a site survey to determine cabling requirements for equipment that will interface to the ATC switch.

3.3 SOFTWARE

3.3.1 Network Management Software

The NMS software shall provide administrative and status monitoring functions via any, or all, of the required user consoles. All administrative functions shall be done in a non-disruptive manner so as not to interfere with normal switch operations. These functions include service establishment and restoration, performance assessment, coordination, fault isolation, and reporting and recordkeeping as identified and expanded on in the ATC specification.

3.3.1.1 Alarms

The ECS and/or NMS shall be capable of error identification between interface connections and provide both audible and visual hardware alarms.

3.3.1.2 Network Database

The database shall be accessible by all workstations of the NMS. Status and event data generated by the switch shall automatically update the database.

3.4 ENGINEERING SUPPORT

3.4.1 Configuration Management (CM)

The Contractor shall maintain the responsibilities and procedures of configuration management as specified herein. The Contractor shall identify a single authority with responsibility for configuration management. That authority shall serve as the focal point within the Contractor's organization for all communications between the Government and the Contractor on all

configuration management related matters. The Contractor shall maintain a configuration management program in accordance with MIL-STD-973 to include, but not be limited to:

- Review of hardware and software change proposals in accordance with the guidelines of the approved CM Plan.

- Provide Engineering Change Proposals (ECPs) and related documents with checklists to the members of the ATC Configuration Control Board (CCB) for review.

- Track implementing actions and provide periodic status reports as required to the Government ATC Program Manager (PM).

- Maintain a complete library of the most current version of all technical documentation and system software.

- Update Product Baseline and maintain updated site configurations.

- Monitor all warranties as new equipment is added to the system.

- Provide monthly CM reports - similar to current program reports - in content and format as required by the PM.

3.4.2 Configuration Identification

The Contractor shall select Configuration Items (CIs) in accordance with MIL-STD-973, as reviewed and approved by the Government.

3.4.3 Baseline Control

The Contractor shall identify the configuration of the ATC system baseline and, once approved by the Government, maintain currency of those baselines and assure consistency between all of the documentation, hardware, software, and firmware data associated with the baseline.

3.4.4 Configuration Change Control

Designated baseline documents and configuration items shall be changed only as a result of an approved ECP, Request for Deviation, or Request for Waiver. The Contractor shall prepare all such changes in accordance with MIL-STD-973.

3.4.5 Logistics Support

The Contractor shall establish and maintain a logistics support program. As a minimum, the support program shall provide an adequate range and level of spares and support equipment to achieve operational availability, as defined in the ATC Functional Specification. The Contractor shall be sensitive to the fact that no two sites are identical in composition, mission requirements, nor equipment inventory. Additionally, the Contractor shall incorporate the projected future growth factor of 30% or more in the logistics support program.

The Contractor shall prepare and submit for approval a Logistics and Maintenance Plan. The logistics and maintenance concept upon which this plan shall be developed is that of Contractor-provided maintenance for the life of the equipment. This concept is further detailed in this SOW.

3.4.6 Operational Site Installation

The site facilities provided by the Government shall include the building, heating, ventilation, air conditioning, electrical power (breakers within the power panels), and lighting. The Contractor shall be responsible for assisting the Government in insuring that the facility meets the requirements of the ATC system equipment to be installed.

3.4.7 Contractor Site Technical Support

The Contractor shall include in the Installation Plan, a Site Preparation Manual for the ATC installation. Site planning shall address all required facility support which must be available to operate the ATC. Examples of topics to be addressed are: power, air conditioning, grounding, equipment maintenance clearances, data cable length limitations between equipment components, equipment locations, etc.

3.4.8 Site Installation, System Assembly, and Check-out

Before activation of the operational ATC, the Contractor shall:

- Prepare the facility and provide all materials and equipment necessary for system assembly, installation, and on-site check-out;

- Provide all special cross-connection ground wiring and power stabilization equipment required for the ATC equipment;

- Provide all materials and labor required to connect the ATC power center to the power feeder specified by the

Government and to connect the ATC power center to the individual ATC equipment components;

- Open, protect, and close all means of access to the Government facility during the installation of ATC equipment and sub-systems;

- Provide protection of exposed Government property and equipment at all times during the ATC system assembly, installation, and check-out;

3.4.9 Site Survey

The Contractor shall perform site surveys in conjunction with the Government, to gather information about site conditions such as available electrical power, air conditioning, space, equipment placement, etc., which will enable the Contractor to determine the specific communication equipment to satisfy the contract requirements. The Contractor shall also make recommendations to the Government on actions required to successfully install the equipment. The report shall show all tasks associated with the installation of Contractor equipment. This shall include equipment locations, power interconnects, conduits, cable trays or underdeck cabling runs, signal cables, grounds, and other information necessary for the successful completion of the proposed system. Upon completion of required site surveys and network configuration design efforts, the Contractor shall provide a written report, to the Government, outlining the Contractor recommendations for site preparation, the type and quantities of communication equipment required and an explanation of the proposed network configuration design that will satisfy the functional and operational requirement of the ATC. The final site survey report in conjunction with the proposed ATC Installation Plan shall also include detailed drawings of the proposed network configuration, equipment placement, rack elevations, and cabling. The report shall describe in detail the proposed installation schedule and describe tasks to be accomplished in order to install the ATC system. This report shall be reviewed by the Government and approved before any communication equipment is installed. Critical points which require Navy assistance shall be highlighted.

The site surveys shall be conducted in a manner which will not disrupt any existing Government functions or system. The site surveys shall be conducted and completed by contract award plus 30 days. Site surveys for the optional ATC sites will be conducted and completed by date of option exercise plus 30 days (in accordance with the option provisions contained herein).

3.5 MAINTENANCE

3.5.1 Contractor Maintenance

The Contractor shall provide the necessary services and facilities to accomplish repair, modifications, overhaul, and acceptance testing as required for all ATC end items, spares, and equipment included as part of the contract. The term "maintenance" includes, but is not limited to that effort required to perform day-to-day maintenance and repair of unserviceable equipment and spares, retest, calibration, corrosion control, preventive maintenance, and refurbishment actions required to maintain the equipment and items comprising the ATC system in an operational condition.

The Contractor shall provide on-site maintenance support five (5) days per week, eight (8) hours per day during the peak period of system usage at each site. At all other times, the Contractor shall provide on-call support, responding to notice for assistance within two (2) hours of notification.

3.6 LABOR

3.6.1 Management Approach

The Contractor shall establish and maintain a program management function to plan and control the execution of tasks required by this contract. The Contractor shall be responsible for the selection and effective management of subcontractors required in the performance of work. In all cases, the contractor shall serve as the focal point for resolution of all problems or questions concerning the ATC network. Within 30 days of contract award, the Contractor shall hold a post-award conference with ATC program management. This conference shall identify key Government and Contractor personnel and their responsibilities, preliminary ATC technical, logistical, and management approach, and potential problem areas.

All engineering, installation, training, operation, and maintenance services under this contract shall be performed by competent personnel, fully trained to perform the required functions identified herein in accordance with the best commercial practices without unnecessary delays or interference with Government functions. Primary engineering (i.e. Program Manager and Site Managers), training, operation and maintenance

personnel and on-site installation supervisors shall have completed applicable installation and maintenance training courses specified by the Original Equipment Manufacturer (OEM) or certified equivalent, and one year of actual hands-on experience applicable for equipment similar to that being installed and/or maintained.

The Contractor shall provide written evidence of a proper level of resources to perform engineering, installation, training, operation, and maintenance tasks under this contract to include ownership or licensing of spare parts, diagnostic and repair tools, documentation, and employed personnel.

The Contractor shall have adequate resources (equipment, labor, and dollars) to support the requirements of this contract. The support infrastructure shall be such as to meet the response time requirements of this contract.

The Contractor shall provide references, in addition to the two operational **ATC** sites, in written form of similar engineering, installation, training, and maintenance services performed by the contractor in the last five years.

The Contractor shall ensure that there will be no interruption of contract services due to labor disruptions.

The Contractor shall keep the Government completely apprised of all facets of the **ATC** program through periodic meetings. These meetings shall be held frequently enough to ensure current and comprehensive knowledge of program status is resident with key Government personnel. The contractor shall include the planned schedule for meetings and reviews in the Management Plan. The meetings shall be held at a site recommended by the Contractor and approved by the Government.

3.6.2 Program Manager (PM)

The Contractor PM shall develop procedures and policies related to the overall management of project activities. The PM is responsible for formulating, disseminating and implementing project management standards, developing requirements and making written recommendations for solving management, technical, and business problems by use of sound management principles and practices. Qualified individual shall possess excellent verbal and written communications skills and must be capable of liaison with program specialists and cognizant officials within NRCC, CNCTC, and SPAWAR. Individual shall be capable of understanding and responding to their concerns in a timely and effect manner. The PM must possess a Bachelor of Science degree in Management,

Engineering or Applied Physical Sciences. The PM must also possess at least eight (8) years of commercial and/or government telecommunications management experience, three (3) years of which must be with large-scale telecommunications projects. As an alternative the PM may possess an Associates Degree in Management, Engineering or Applied Physical sciences with at least twelve (12) years of commercial and/or government telecommunications management experience, three (3) years of which must be with large scale telecommunications projects. He/she must show experience in the following areas:

- Management of engineers, communications, and installation specialists involved in implementation, installation, and maintenance of communications systems/networks.

- Previous experience in the implementation and installation of automated technical control facilities.

The PM shall be responsible for total system implementation. The PM shall be easily accessible to the Acquisition Engineer, Government Program Manager, and the Contracting Officer.

3.6.3 On-Site Maintenance Technician

The On-Site Maintenance Technician is responsible for maintaining the systems installed under this contract. This individual must have at least one year experience in maintaining systems similar to those proposed/installed under this contract. In addition, this individual must possess at least two years experience maintaining telecommunication systems in an operational environment.

3.7 TRAINING

3.7.1 Formal Training

Operator, maintenance, and System Administrator training shall produce graduates with skills and abilities necessary to perform their respective functions. System Administrator training is considered critical and will require a comprehensive curriculum, separate from operator and maintenance and tailored toward a limited number of individuals.

3.7.2 On-the-Job Training (OJT) During Acceptance Period

In addition to formal classroom instruction, the Contractor shall provide OJT with the emphasis on in-depth, "hands-on," interactive training provided for those Government

personnel who have completed the formal classroom course of instruction. The Acceptance Period is considered to be an opportune time to familiarize Government maintenance and operator personnel with the myriad potential problems that could be encountered after acceptance.

3.7.3 Continuing On-the-Job Training

The On-Site Maintenance Technician shall continue to provide OJT to on-site Government operator and maintenance personnel during the period that he/she remains on site following formal acceptance. This period is contingent on the continuing requirement and the exercising of contract option years, both contingencies at the sole discretion of the Government.

3.7.4 Training Materials

A Course Outline and required training materials will be included as part of the Training Plan.

3.7.5 Scheduling and Location of Classes

The starting dates and location of the classes for the formal training courses shall be proposed by the Contractor as part of the Training Plan and coordinated and agreed upon by the Government.

The Contractor shall be sensitive to the requirement to schedule in-depth OJT sufficiently close to the completion of formal training to maximize the benefits of both training evolutions.

3.8 DOCUMENTATION

3.8.1 Software

The Contractor shall develop system user, operator, and maintenance manuals to ensure complete and comprehensive documentation is available.

3.8.2 Hardware

At a minimum, the Contractor shall provide four (4) copies for each site of all Operator, Maintenance, and Fault Isolation Manuals. In addition, one copy each will be provided to the Acquisition Engineer and the Government PM.

3.9 TEST, EVALUATION, AND CUTOVER

3.9.1 Testing Methodology

The Contractor shall be responsible for the development of a Cutover Plan and a System Test Plan. The Contractor shall be responsible for ensuring all ATC associated equipment is tested in accordance with the Test Plan and demonstrates that the equipment satisfies the system requirements of the Functional Specification. The Contractor shall be familiar with the contents and requirements of the **ATC** *Test and Evaluation Master* Plan (TEMP) when formulating the System Test Plan. All testing shall be performed by the Contractor and monitored by the Government and/or its representative(s). At a minimum, the Contractor shall perform the testing described below.

3.9.1.1 Acceptance Testing

The Contractor shall perform acceptance testing of all equipment components which they provide as the **ATC** solution. The testing shall certify that all components shall remain operational without failure for 30 contiguous 24-hour periods. If any components fail during this time period, testing will restart after corrections have *been* made.

3.9.1.2 System Test Plan

The System Test Plan shall clearly define those tests and procedures which shall be utilized to test and demonstrate that system performance satisfies the system requirements as stated in the **ATC** Functional Specification, to verify the integrity of the installation, and to meet the test requirements of the Acceptance Testing. Failure to meet the requirements of any portion of the Test Plan shall be deemed a failure of the test and it must be rescheduled after appropriate corrections have been made to resolve the cause of the failure. If, after installation or prior to Government acceptance, the Contractor and/or Government tests show the **ATC** communication equipment is not functioning properly, then the Contractor shall be responsible for isolating and resolving the problem.

AUTOMATED TECHNICAL CONTROL

(ATC)

FUNCTIONAL SPECIFICATION

EXECUTIVE SUMMARY

The program consists of one overriding goal: to develop an acquisition strategy that insures industry will bring their experience, design expertise, implementation capabilities, maintenance, operation, and warranty skills for the development of an Automated Technical Control (ATC) for Navy Technical Control Facility automation, thereby minimizing the risk to the Government and providing a warranted, turnkey facility, life-time maintained by the contractor.

It is the Government's intention that the design of this system will reduce the technical control workload through the reduction of manual tasks, thereby reducing the manpower required.

With this procurement, the Government will select the best Non-Developmental Item (NDI) Commercial, Off-the-Shelf (COTS) design that is capable of being customized to satisfy the designated requirements in accordance with the Statement-of-Work (SOW) and this Functional Specification, meets the 99.998 percent (or greater) availability functional criteria, and is judged to achieve the best combination of stated goals at the lowest total life-cycle cost. Vendors shall propose their solution on how to meet the requirements outlined in the SOW and to provide the best combination (based on trade-offs) of requirements for meeting technical, performance, and scheduled goals at the most reasonable cost.

Only vendors who have at least two systems now in operation that meet the requirements stated in Section 3 need apply. Vendors must be able to demonstrate current ATCs in operation and be capable of delivering the ATC system hardware, firmware, and software within six (6) months of contract award.

Qualifications of potential vendors are listed below:

- Design and manufacture system(s) currently in operation which meet the 99.998% (or greater) reliability goal

- Possess in-house hardware, software development, and support staff
- Manufacture automated system(s) within the continental United States
- Submit a depot-level, maintenance-support scheme
- Arrange for Government visit(s) to view working system(s)
- Demonstrate delivery capability within six months of contract award
- Provide up to two years on-site system maintenance
- Demonstrate on-site Administrator, operator, maintenance training performance
- Detail vendor's Government Open Systems Interconnection Profile (GOSIP) network management migration plan
- Provide Defense Industrial Security Clearance Office (DISCO) Facility Clearances and sufficient installation personnel currently cleared for Top Secret access at time of award.

This Functional Characteristic Specification identifies the performance, design, quality control, and operational requirements for the ATC. It consists of three sections. Section 1 provides a brief explanation and introduction to the ATC. Section 2 lists applicable standards and documents which govern technical control operation and installation. Section 3 provides a description of the ATC system requirements explaining all aspects of the concept. Site specific characteristic appendices are also included.

## 1.0 INTRODUCTION

### 1.1 Scope

This specification identifies the functional characteristics and minimum requirements of the Automated Technical Control (ATC).

1.1.1 Current Operations

Navy Technical Control Facilities (TCFs) are central telecommunications hubs for the Naval Telecommunications System (NTS), many Defense Information System Network (DISN) circuits, and other Government agencies' circuits. TCFs support resources for afloat and ashore users, both tactical and non-tactical. In order to accomplish this mission, a broad range of communications networks including microwave, satellite, fiber optics, HF, and other transmission media are employed. The TCFs are the focal points for the management of these networks including configuration, reconfiguration, trouble-shooting, circuit restoration, quality control, and reporting. Currently, patch panels are used to access the signals traversing these networks. These patch panels support the basic functions of patching (looping, sparing, etc.), testing and monitoring, and are configured so that signals going into and out of an equipment or system are electrically accessible at all points. See Figure 1-01 for a functional block diagram of a typical circuit configuration in an existing Navy TCF.

1.1.2 ATC System Goals

The ATC shall automate the major functional areas of a Navy shore-based technical control, i.e., service establishment and restoration, performance assessment, coordination, fault isolation, and reporting and recordkeeping utilizing a modular, computer-driven system currently available in NDI/COTS configurations. The ATC system shall:

- Automate real-time circuit, link, trunk performance monitoring and fault isolation
- Significantly reduce the time required to establish or change circuit configuration
- Eliminate the possibility of establishing circuits which violate communications security doctrine
- Reduce the possibility of human error associated with current patching techniques through programmed functions which prohibit illogical actions




FIGURE 1-01
TYPICAL CIRCUIT CONFIGURATION

FIGURE 1-01
TYPICAL CIRCUIT CONFIGURATION

- Through standardization, reduce site uniqueness and time required to station qualify technical control personnel
- Automate updating of equipment, multiplex (mux), and cable records
- Automate incident logging and report generation
- Automate updating Circuit Layout Record (CLR) cards
- Significantly reduce in-house wiring
- Permit remote site operational control
- Eliminate manual patch panels and intermediate distribution frames (IDFs).

1.1.3 Open Architecture

The ATC must support a variety of attached devices, networks, and protocols to meet both current and future connectivity requirements. The ATC system architecture shall support several protocol environments including asynchronous, synchronous, bisynchronous, and the GOSIP standards. It shall also support external interfaces and networks such as Ethernet.

**2.0 APPLICABLE DOCUMENTS**

2.1 Government Documents

2.1.1 Standards

The following standards are currently listed in the Department of Defense Index of Specification and Standards (DODISS). References to the various standards are specifically cited where applicable; however, reference of the standards in this section does not bind the vendor to all parts of the standard, but only to the extent specified herein.

MILITARY DOCUMENTS:

STANDARDS:

MIL-STD-188-100 Common Long Haul and Tactical Communications Systems Technical Standards

| | |
|---|---|
| MIL-STD-188-114A | Electrical Characteristics of Digital Interface Circuits |
| MIL-STD-188-124B | Grounding, Bonding and Shielding for Common Long Haul/Tactical Communication Systems including Ground Based Communications-Electronics Facilities and Equipments |
| MIL-STD-454M | Standard General Requirements for Electronic Equipment |
| MIL-STD-461C | Electromagnetic Emission and Susceptibility Requirements for the Control of Electromagnetic Interference |

HANDBOOKS:

| | |
|---|---|
| MIL-HDBK-232A | RED/BLACK Engineering - Installation Guidelines |
| MIL-HDBK-419 | Grounding, Bonding, and Shielding For Electronic Equipment and Facilities |

2.1.2 Other Government Publications

The following Government publications form a part of this Functional Characteristic Specification to the extent specified herein.

PUBLICATIONS:

NSA

| | |
|---|---|
| NACSIM 5100 | Compromising Emanations - Laboratory Test Standards - Electromagnetic |
| NACSIM 5203 | Guidelines for Facility Design and RED/BLACK Installation |

DCA

| | |
|---|---|
| DCAC 310-70-1 | DCS Technical Control (Vols I-III and Supplements) |

NAVY

| | |
|---|---|
| OPNAVINST 5239.1A | Department of the Navy Automatic Data Processing Security Program |

DOD

| | |
|---|---|
| DOD 5200.28-STD | Department of Defense Trusted Computer System Evaluation Criteria |

2.1.3 Other Publications

CCITT

| | |
|---|---|
| Rec. G.106 | Concepts, Terms, and Definitions Related to Availability and Reliability Studies |
| Rec. G.821 | Error Performance of a Digital Connection Forming Part of an Integrated Services Network |
| Rec. G.822 | Controlled Slip Rate Objectives on a Digital Connection |
| Rec. G.824 | The Control of Jitter and Wander Within Digital Networks Which are Based on the 1544 Kbps Hierarchy |

## 3.0 REQUIREMENTS

### 3.1 System Description

The ATC shall consist of: an Electronic Cross-connect Switch (ECS), Network Management System (NMS), and all necessary ancillary items, equipment, sub-assemblies, connecting hardware, and cabling. A single point of failure is unacceptable. Redundancy of key elements shall be built into the system to maintain continuity of operations should a key component fail. These redundant, key elements shall come on-line automatically, immediately upon the failure of the primary element and with no loss of capabilities or data.

The ATC shall automate manual technical control functions such as service establishment and restoration, circuit and network performance assessment, coordination, fault-isolation, and reporting and recordkeeping necessary for effective control of circuits, trunks, equipment, transmission systems, and facilities. These functions are explained below.

The ATC shall be an interactive, real-time computer-based circuit-control and switching system designed to automate functions that are now performed manually in a Navy TCF. The ATC shall be modular in design to accommodate evolutionary growth. The ATC shall consist of NDI/COTS hardware, firmware, and customized NDI software maintained, operated, and warranted by the vendor to the extent defined in the Statement of Work (SOW).

3.1.1 Operational Goals

The operational goal of the ATC is to automate the five functional areas of a TCF, as delineated in DCAC 310-70-1, and as stated below.

3.1.1.1 Service Establishment and Restoration

Establishment of service is defined as the process of configuring necessary equipments within the network required to support the circuit, link, or trunk and establishing service for the user.

Restoration of service is the process of repairing or replacing faulty equipment or rerouting around disrupted segments.

3.1.1.2 Performance Assessment

Performance assessment, or quality control, involves the gathering and analysis of circuit-parameter data to determine the quality of communications service. Typical performance assessment actions are:

- in-service and out-of-service testing of analog and digital circuits
- measurement of transmission link parameter values for comparison with pre-defined parameters
- monitoring equipment and system alarms

3.1.1.3 Coordination

Coordination is the ability to establish, arrange, or organize troubleshooting and network fault isolation procedures with users and other appropriate facilities.

3.1.1.4 Fault Isolation

Fault isolation, or troubleshooting, is the process of testing and analyzing the resulting data to determine the specific location of a fault within a circuit, system, or link or trunk network. The basic purpose of fault isolation is to locate the source of a problem and to correct it in a timely manner.

3.1.1.5 Reporting and Recordkeeping

Reporting and recordkeeping are the procedures taken to advise interested parties of equipment, circuit, and system status and to maintain historical records as required. These procedures provide near-real-time and long-term historical information. Several logs and forms are required to record the information necessary to maintain a continuing knowledge of the status and condition of circuits, equipments, and facilities.

3.1.2 Architectural Goals

The Government intends to replace the manual patch panels, ancillary equipment, intermediate distribution frames (IDFs), and associated copper cabling currently installed in Navy TCFs. The Data Terminal Equipment (DTE), Data Communications Equipment (DCE), crypto devices, test equipment, and software packages currently in use shall be integrated into the ATC environment where technologically feasible.

3.1.3 Proposed Functional Block Diagram

Figure 3-01 is a functional block diagram depicting the ATC concept.




FIGURE 3-01

PROPOSED FUNCTIONAL BLOCK DIAGRAM OF THE AUTOMATED TECHNICAL CONTROL (ATC)

3.2 System Characteristics

The ATC shall consist of: an Electronic Cross-connect Switch (ECS), Network Management System (NMS), and all necessary ancillary items, equipment, sub-assemblies, connecting hardware, and cabling. These components shall have the ability to implement all minimum-required functions described below.

3.2.1 Electronic Cross-Connect Switch (ECS) Requirements

3.2.1.1 General

The ATC ECS shall provide automated circuit access and route control. The ECS requirements are detailed in the following paragraphs.

3.2.1.2 Interface Requirements

The ATC ECS shall serve as the hub for circuits passing through or terminating at a shore-based Naval Computer and Telecommunications Station (NCTS). The ECS shall interface with various Command, Control, Computer, Communications, and Intelligence ($C^4I$) systems that are part of the NTS, DISN, and with commercial and military systems of other agencies and foreign governments. The ECS shall connect with, provide switching for, and have the ability to test and monitor each circuit. These circuits shall include 2-, 4-, and 6-wire 4 kHz voice circuits, and circuits operating from 50 baud direct current (DC) loop teletype to 2.048 Mbps Conference of European Postal and Telephone (CEPT) digital trunks. The ECS shall support common industry and military equipment/circuit interface standards to include:

Electronic Industries Association (EIA)

| | |
|---|---|
| RS-232-D | Interface between Data Terminal Equipment and Data Communication Equipment Employing Serial Binary Interchange. |
| RS-422-A | Electrical Characteristics of Balanced Voltage Digital Interface Circuits. |
| RS-423-A | Electrical Characteristics of Unbalanced Voltage Digital Interface Circuits. |
| RS-449 | General Purpose 37 Position Interface for Data Terminal Equipment and Data Circuit Terminating Equipment Employing Serial-Binary Data Interchange. |
| RS-530 | High Speed 25-Position Interface for Data Terminal Equipment and Data Circuit Terminating Equipment. |

| | |
|---|---|
| V.35 | Data Transmission at 48,000 bps using 60-108 kHz Group Band Circuits. |
| X.21 | Interface between DTE and DCE Equipment for Synchronous Operation on Public Data Networks |
| X.400 | Message Handling - System Model - Service Elements. |
| FIPS PUB 446 | GOSIP |

Military Standards

| | |
|---|---|
| MIL-STD-188-100 | Common Long Haul and Tactical Communications System Technical Standards |
| MIL-STD-188-114A | Electrical Characteristics of Digital Interface Circuits |

3.2.1.2.1 Protocol Transparency

The ECS shall be transparent to all data formats and protocols contained within signals passing through the switch.

3.2.1.2.2 Special Interface Requirements

The ATC ECS shall interface with various Command, Control, Computer, Communications, and Intelligence (C4I) systems that are part of the Naval Telecommunications Systems (NTS). These systems utilize UHF SATCOM as its primary source for satellite interfaces from shore to ship. These systems, for simplistic terms to be categorized as Information Exchange Subsystems (IXS), are as follows:

(a) CUDIXS - Common User Digital Information Exchange Subsystem

- AN/UYK-20 to ON-143(V)4
- ON-143(V)3 to KG-36
- KG-36 to ON-143(V)4
- ON-143(V)4 to AN/WSC-3
- ON-143(V)4 to AN/WSC-5
- ON-143(V)4 to TD-1271(B)U

(b) CUDIXS II - Common User Digital Information Exchange Subsystem

- VME CHASSIS to ON-143(V)4
- VME CHASSIS to KG-84A
- KG-84A to AN/WSC-3
- KG-84A to AN/WSC-5
- KG-84A to TD-1271(B)U

(c) TACINTEL - Tactical Intelligence Information Exchange Subsystem

- LSI-9600 to LSI-9600
- LSI-9600 to AN/WSC-3
- LSI-9600 to AN/WSC-5
- LSI-9600 to TD-1271(B)U

(d) SSIXS - Satellite Submarine Information Exchange Subsystem

- ON-143(V)4 to LSI-4800
- LSI-4800 to LSI-4800
- LSI-4800 to AN/WSC-3

(e) TADIXS - Tactical Data Information Exchange Subsystem

- AN/UYK-44 to ON-143(V)6
- ON-143(V)6 to KG-84A
- ON-143(V)6 to LSI-9600
- LSI-9600 to DSD
- DSD to TD-1271(B)U
- TADIXS GATEWAY
- PROCESSOR to ON-143(V)6
- ON-143(V)6 to AN/WSC-3
- ON-143(V)6 to AN/WSC-5
- ON-143(V)6 to TD-1271(B)

(f) OCTIXS - Officer in Tactical Command Information Exchange Subsystem

- LSI-9600 to LSI-9600
- LSI-9600 to AN/WSC-3
- LSI-9600 to AN/WSC-5
- AN/UYK-44 to ON-143(V)6
- ON-143(V)6 to KG-84A
- KG-84A to ON-143(V)6
- ON-143(V)6 to LSI-9600
- LSI-9600 to DSD to TD-1271(B)U
- ON-143(V)6 to KG-36
- KG-36 to ON-143(V)6
- ON-143(V)6 to AN/WSC-3

- ON-143(V)6 to AN/WSC-5
- ON-143(V)6 to TD-1271(B)

The IXS interface employs MIL-STD-188-114A as its primary standard interface specification with the following exceptions:

(a) Transmit and Receive Clock delays (start/stop) up to 115ms.

(b) Control functions requiring ground contact closure circuits with a reference voltage from +6 VDC to 0 V.

(c) Lamp indicator circuits with a reference voltage of 28 VDC.

(d) Low Level Converter +/- 6 VDC (currently an external device interfacing transceivers).

3.2.1.3 Switch Sizing

The ECS shall allow for easy expansion in modular increments to accommodate evolutionary growth anticipated at 30% or more. Circuits identified will be a combination of DC loop, analog, and digital. Requirements for specific sizing of each candidate technical control are contained in the Site Specific Appendices to this specification.

3.2.1.4 Non-Blocking Architecture

The ECS shall utilize a non-blocking architecture. There shall be no distinction between inputs and outputs. Any port must be capable of interconnection with any other port, regardless of loading. Blocking of improper or illogical connections will be a function of the switch control software and network management software.

3.2.1.5 Connectivity Capability

The ECS shall support the following port connectivity modes:

(a) Standard (one DCE to one DTE)

(b) Broadcast (one port to many ports)

(c) "Null-Modem" (DCE to DCE or DTE to DTE)

(d) Loopback (loop toward signal source)

3.2.1.6 Redundant Capability

A single point of failure is unacceptable. Redundancy of key elements shall be built into the system to maintain continuity of operations should a key component fail. At a minimum, redundant key elements of the ECS shall include:

(a) Power supply

(b) All control logic

(c) Timing source

(d) Memory units

These redundant, key elements shall come on-line automatically, immediately upon the failure of the primary element and with no loss of capabilities or data. There shall be a visual, audible, and printed-report alarm at the control console. In addition, there shall be a visual indication at the equipment cabinet to alert maintenance personnel of the failure.

3.2.1.7 Power Loss Recovery

The ECS shall automatically return to the last configuration held prior to loss of power or reboot. The ECS shall maintain this ability for a minimum of eight (8) hours after a power failure.

3.2.1.8 Test and Monitor

The ECS shall provide intrusive and non-intrusive access for testing and monitoring circuits. The system shall be capable of testing circuits utilizing recognized and accepted industry and military standard test procedures, performed from designated test positions.

3.2.1.9 Performance Standards

There are three major categories of performance standards for digital systems. They are (1) error performance measurements; (2) jitter; and, (3) slip. Subparagraphs 3.2.1.9.1 through 3.2.1.9.3 identify the criteria on which these parameters are based.

3.2.1.9.1 Error Performance Measurements

Error measurement is the most important criteria on which a digital system is judged. Commercial error performance indicators include Bit Error Rate (BER), Errored Seconds (ES), Block Errors, and average BER. BER and ES are the most widely used indicators.

3.2.1.9.1.1 Bit Error Rate (BER)

The ATC ECS shall not exceed bit-error-rate performance objectives as set forth in CCITT Recommendation G.821, Paragraph 2, Table 1/G.821.

3.2.1.9.1.2 Errored Seconds (ES)

The ATC ECS shall not exceed ES performance objectives as set forth in CCITT Recommendation G.821, Paragraph 2, Table 1/G.821.

3.2.1.9.2 Jitter

The ATC ECS shall not exceed jitter and wander performance objectives as set forth in CCITT Recommendation G.824, Paragraph 4.2.

3.2.1.9.3 Slip

The ATC ECS shall not exceed slip performance objectives as set forth in CCITT Recommendation G.822, Paragraph 3, Table 1/G.822.

3.2.1.10 RED/BLACK Engineering Criteria

The ATC must satisfy the RED/BLACK installation requirements established in NACSIM 5203 and MIL-HDBK 232A.

3.2.1.11 TEMPEST Criteria

(Deleted in accordance with Amendment 1 Paragraph 3).

3.2.1.12 Timing and Synchronization

The ATC ECS shall incorporate an internal clock to synchronize switch operations. The switch shall be capable of being triggered by an external clock system, i.e., LORAN C, NAVSTAR Global Positioning System (GPS), or any other precision unit. The ATC ECS shall be capable of military and commercial connections (DCE/DCE, DCE/DTE, DTE/DTE, Null Modem); providing timing internally through any switch port(s) without loss of timing accuracy at the selected port rate (i.e. without use of

additional external port clock timing distribution equipment, cabling, or IDF).

3.2.1.13 Availability

The ATC ECS shall meet service availability standards set forth in CCITT Recommendations G.821, Annex A and G.106, Definition 2.6. Availability for the ATC ECS shall be 99.998 percent or greater.

3.3 Installation and Workmanship

The ECS installation shall conform to accepted industry standards for installation of electronic equipment, cabinets, and cabling. Workmanship shall conform to standards set forth in MIL-STD-454M and MIL-STD-188-124B. Vendor shall define intended installation technique criteria in proposal submission. Any specific Government requirements shall be negotiated.

3.3.1 Interchangeability

All "like" units, assemblies, subassemblies, and replacement parts of the ECS shall be physically, electrically, and functionally interchangeable.

3.3.2 Safety

The ATC ECS shall meet all Occupational Safety Health Administration (OSHA) and Original Equipment Manufacturer (OEM) standards, as well as applicable Government safety regulations.

3.4 Network Management System (NMS)

ATC network management requirements are defined in the following paragraphs.

3.4.1 System Description

The NMS is that portion of the ATC which will contain the hardware and software required to allow centralized control and monitoring of the network through software-definable commands.

3.4.1.1 Redundancy

A single point of failure is unacceptable. Redundancy of key elements shall be built into the system to maintain continuity of operations should a key component fail. These

redundant, key elements shall come on-line automatically upon the failure of the primary element and with no loss of capabilities or data.

3.4.2 NMS Applications

The NMS shall be the hub of the ATC and shall oversee and manage all system management and network restoration functions within the ATC. Such operations shall include, but are not limited to, the following:

(a) Alarm surveillance

(b) Real-time Network Status and Control

(c) Network Performance Monitoring

(d) Fault Isolation and Service Restoral

(e) Network/Equipment Operation and Administrative Recordkeeping

The NMS shall provide operator password protection, partition control, and access for remote workstations.

3.4.2.1 Interface with External NMS Programs

The vendor shall provide the Government with necessary interface data giving the Navy access to the system database in order to use the information to run existing external network management programs through the provided ATC NMS.

3.4.3 NMS Security

NMS security is discussed in the following paragraphs.

3.4.3.1 Authorized Access

A comprehensive security system based on user ID and password shall be provided. The system shall include multiple levels of security to prevent unauthorized access to the system. Statistics on operator access shall be maintained in the form of ID, time, date, and duration of use.

3.4.3.2 Databases

The NMS shall include databases which shall support all required functions of the ATC as listed in Appendix I, and shall contain, at a minimum, the following:

- An Alarm and Performance Database that shall contain the capability to log and store alarms corresponding to identified faults and their diagnostic results.

- A Trouble Database that shall contain the pertinent referred trouble reports and trouble ticket administrative data.

- An Equipment Database that shall contain equipment configuration data, parameter settings, maintenance status, testing thresholds, hardware configurations, and appropriate administrative data.

3.4.3.2.1 Load/Update Capability

The NMS workstation shall have the capacity for initial loading and subsequent reloading of the NMS database. The NMS workstation shall also have a near-real-time update capability when operating on-line.

3.4.3.2.2 Minimum Required Capabilities

The NMS shall provide a menu-driven, user-friendly, command interpreter, including the following features for each workstation:

(a) Command prompts and menus

(b) Plain English text error messages

(c) No requirement for operator to memorize codes or complex commands

(d) An on-line, context-sensitive HELP command to display usage and meaning of available commands

(e) The ability to bypass the menu and provide the use of shorthand commands.

3.4.3.3 System Control

The NMS shall keep operators apprised of all current system operating conditions, enabling him/her to react to changing circuit conditions, dynamic, user requirements, natural

or manmade transmission path interruptions, and equipment failures.

3.4.3.3.1 System Control Functions

For the NMS to successfully accomplish the system control requirements, it shall provide certain control functions discussed in the following paragraphs. Additionally, the NMS shall automatically disseminate announcements of events to all concerned operators and record the event in the appropriate system database log.

3.4.3.3.2 System Administrator/Operator Capability

Operators shall be able to invoke commands allowing the controller to implement several commands with a single command (macros). The ability to exercise these control capabilities shall be restricted and locally administered by the system administrator with a modifiable password hierarchy program that may limit individual operators to specific capabilities.

3.4.3.3.3 Surveillance Functions

The NMS shall monitor the operational status of the ATC, providing operators with the ability to select circuits and equipment to be monitored.

The surveillance function shall result in the collection of circuit, system, and equipment status data that will allow the ATC operator to perform those control and circuit management functions previously discussed in paragraphs 3.1.1.1 through 3.1.1.5. Data requirements for the ATC are driven by:

(a) The operational responsibility to maintain circuit continuity

(b) The need to assign alternate route paths to circuits

(c) The requirement to flag high priority circuits and systems for management purposes

A database detailing the configuration and inter-relationships between all circuits entering or exiting the ATC shall be maintained in the NMS. Equipment configuration and operational status data must be collected to provide operators:

(a) An indication that there is an existing or impending problem with the network

(b) The information to intelligently implement manual override procedures or modify programmed configurations

3.4.3.3.4 Service Restoration Information

To effectively restore and/or reroute critical circuits and trunks, NMS operators must possess current, accurate knowledge of the configuration and operational status of all in-house circuits and equipment. In addition to the logical trunk, circuit, or link outage indications, NMS operators shall be provided detailed information about any outage. For example, the system shall provide, at a minimum, the following:

(a) The location of the circuit, link, or trunk fault

(b) The time of a circuit, link, or trunk fault

(c) The user and restoration priority (RP) of the faulty service

(d) The reason the circuit, link, or trunk is down

(e) The status of equipment available for restoring service

(f) The status of station level efforts to reroute circuits, links, and trunks

All information concerning an outage shall be displayed on a single screen to facilitate operator comprehension and reaction.

3.4.4 Alarms

3.4.4.1 Alarm and On-Occurrence Data

The requirement for ATC alarm data is driven by the requirement to remain aware of the operational condition of the network and to ensure service to users. The NMS shall continuously monitor the operational status of the network at all times. Current connected equipment status information shall be available upon request. When a change of status is recognized in the network, the status change should be reflected in real-time with a new entry in the NMS system operations database. All alarms must be acknowledged before they can be removed from the alarm display screen.

3.4.4.2 Port Alarm Monitoring

The NMS shall generate notification to the operator if any of the following circuit fault conditions occur:

(a) Any fault that affects the status of a connected port

(b) The loss of a locally-defined threshold of the ECS's connectivity capability

The NMS shall have the ability to monitor, store, and display external alarm sources that indicate failures or Hazardous Conditions (HAZCONs). Failures could be events such as commercial power failures, transmission path failures, etc. HAZCONs include, but are not limited to the following:

- The failure of any combination of primary, backup, or spare hardware where failure of another like component would cause a reportable outage (e.g., primary or auxiliary AC power source failure, Central Processing Unit (CPU) failures, external timing source, main memory failures) and failure of environmental equipment where rapid restoration is necessary for ATC operations to continue (e.g., heating or air conditioning system failures).

3.4.4.3 Alarm Prioritization

Each alarm shall be assigned a level of criticality. There shall be a minimum of two definable levels of station alarms, appropriately color coded, for which the operator shall respond to. These are:

(a) Level 1: Alarm of a station-defined major condition requiring immediate acknowledgement or corrective action. This alarm indicator shall be color coded RED. An example of a major (RED) alarm might be:

- Loss of one of two memories
- Loss of one of two power supplies
- Loss of a transmission path
- Loss of station timing source
- Loss of the commercial power source.

(b) Level 2: Alarm of a station-defined minor condition requiring expeditious handling, but not to the degree of a major alarm. This alarm indicator shall be color coded AMBER. An example of a minor (AMBER) alarm might be:

- Individual circuit exceeding pre-determined thresholds
- Group pilot alarms
- Housekeeping alarms

The operator shall be made aware of Level 1 alarms first. If two alarms occur simultaneously, or an alarm occurs during another, the operator shall be clearly apprised of the level of each alarm. If the operator needs to leave the alarm screen (e.g., to go to a trouble-shooting menu), then other alarms of lesser priority should be queued, but additional Level 1 alarms must be displayed immediately. The data that the operator was working with before the alarm shall also be saved for later retrieval.

3.4.4.4 Alarm Selection and Display

The NMS shall provide flexibility, through password controls, in selecting which alarms and status indications (visual and audible) will be presented to the operator and what priority will be assigned to each incoming message type.

3.4.5 Operations and Maintenance

This section describes ATC requirements for the following Operations and Maintenance (O&M) functions:

(a) Operations Support

(b) Maintenance

(c) Trouble Ticket Processing

3.4.5.1 Operations Support

The following type of operations support shall be required:

(a) The NMS shall have the capability, under local control, to input new or modified ATC ECS routing information. This capability is intended to support the development and maintenance of accurate configuration records for the ATC.

(b) The NMS shall have application software to assign ATC resources based on circuit requirements. Examples of the functions performed by this software are:

(1) Assign line or circuit identifiers with a minimum of 16 alpha-numeric characters and flag special circuits. The flags will indicate conditions such as Special Interest circuits, Commercial Carrier circuits, G and H Route circuits, 55-1 reportable circuits, etc. The flag field shall be a minimum of two alpha-numeric characters

(2) Assign cable and pair, multiplex channel, etc., designators with a minimum of a 16 alpha-numeric character location identification numbers

(3) Assign equipment designators with a minimum of 16 alpha-numeric characters

(4) Assign a local service order alpha-numeric identifier.

(c) The NMS shall provide the capability to update the database with new, service-oriented configuration data in advance of actual system changes. The NMS shall be capable of flagging this data as pending (i.e., not yet operational), and then change its status to operational when a completion notice is received.

(d) The NMS shall possess the capability to query the database for pending service orders. These queries should allow the selection of other parameters such as projected date of activation and service features.

3.4.5.2 Maintenance

The NMS shall support both Corrective and Preventive Maintenance (PM) functions. The NMS should also be capable of creating and modifying trouble tickets and other maintenance records utilizing the databases described in paragraph 3.4.3.2. Examples of currently-used Navy forms are included in Appendix H. These forms are intended to be informative only, and do not bind the vendor to their use. However, if vendor generated forms are

used, the format must retain the informational integrity of the data required on the provided Navy forms.

3.4.5.2.1 Corrective Maintenance

Corrective maintenance activities include the identification, isolation, and analysis of network and user service problems; correction of the problems; verification that the corrective actions have restored service to the appropriate levels; and logging of activities for maintenance records and trend analysis. NMS support of these functions shall be user-friendly.

3.4.5.2.2 Preventive Maintenance (PM)

The NMS shall support PM of the ATC in order to prevent non-critical equipment faults from degrading into critical faults. The NMS shall provide the following capabilities:

(a) Allow the operator to schedule PM downtime

(b) Store preventive maintenance test and service guidelines

(c) Maintain records of preventive maintenance actions and test results in a database with the ability to interface with external systems

(d) Generate follow-up maintenance work orders

3.4.5.2.3 Trouble Ticket Processing

The NMS shall provide trouble ticket processing support. The NMS shall provide, as a minimum, the following capabilities:

(a) Create and modify trouble tickets that provide the circuit and/or system involved, the date and time of the fault, the reported fault, space to record agencies coordinated with, and space to record remarks and other information related to the outage. An example of a currently used trouble ticket is included in Appendix H.

(b) Close-out trouble tickets

(c) Generate trouble ticket status reports as required

(d) Maintain on-line, all trouble tickets for the past thirty days

(e) Query trouble ticket files by time period, port, operator, etc

(f) Store completed trouble tickets in an historical data file

3.4.6 Administration

The NMS shall support the planning, report generating, data collecting, and general record keeping functions that are necessary to provide user services and fulfill circuit reporting requirements. Planning and report generating activities require large amounts of accurate, easily accessible data. Data collecting and record keeping activities required for planning, report generating, system control, and O&M functions are discussed in the following paragraphs.

3.4.6.1 Record Keeping

The following sections describe "files" and "records" of various data that shall be kept by the NMS databases. These files and records represent data that should be kept but does not mandate the specific database structure required to record keeping data:

(a) Record keeping is a "global" function in that it encompasses all pertinent data stored. This ranges from volatile data, such as alarms, to relatively non-volatile data like equipment inventories and operating procedures. All data shall be available for access, interrogation, or file transfer to any NMS workstation, subject to security and procedural constraints.

(b) The NMS shall maintain configuration control for all equipment, circuits, trunks, lines, etc., utilized to support efficient and reliable circuit switching. The NMS shall contain a complete set of data for the network elements under its control.

3.4.6.1.1 General Inventory

The NMS shall be capable of maintaining a general equipment inventory by type, number on hand, and status.

3.4.6.1.2 Unassigned Equipment Inventory

The NMS shall provide information of spare switch ports and interface equipment. The operator shall be able to call up a screen showing him/her what spare equipment and transmission assets he/she has to work with, including, but not limited to, name, type, service, location, and quantity.

3.4.6.1.3 Switch Configuration Files

Information in these files shall include all port configurations for the ECS.

3.4.6.1.4 Circuit Records

The NMS should contain information related to each circuit. This should include the name and location of the users, type of service, restoration priority, and any special requirements of subscribers. The circuit record shall contain, as a minimum, information required on the Circuit Layout Record (CLR) Card found in Appendix H.

3.4.6.1.5 ECS Maintenance Records

The NMS shall store records of all ECS maintenance activities. These records shall be accessible as both active maintenance and historical maintenance files.

3.4.6.1.5.1 Active Maintenance Files

The active maintenance file shall contain information concerning ECS hardware and software service problems for which the maintenance activities have not been completed. The initiation of the appropriate command to transfer the individual records in the active maintenance file should only be switched upon completion of the action which clears the equipment fault and returns the equipment for service.

3.4.6.1.5.2 Historical Maintenance Files

The historical maintenance file shall include complete historical data for all completed maintenance activities in an off-line, permanent storage database.

3.4.6.1.6 General Historical Records

The NMS shall provide the capability to store, archive, and retrieve data from alarm logs, trouble reports, repair reports, O&M data, inventory control, etc.

3.4.6.2 Report Generation

Reports shall be available through simple operator initiated commands. The NMS shall be capable of storing, displaying, editing, and printing reports. Reports that are printed out must fit on 8 1/2" X 11" or 14 1/2" X 11" size paper. These reports shall provide near-real-time and long-term historical status information on communications facilities, links, trunks, circuits, and equipment to assist management personnel in maintaining required records. Examples of such reports are listed below and are not all-inclusive.

- Listing all circuits for a location
- Listing all circuits flagged as Special Interest
- Listing all trouble tickets for a given date or period between two given dates
- Listing all trouble tickets for a given circuit
- Listing all open trouble tickets
- Listing all commercial carrier trouble tickets.

The primary purpose of ATC is to support real-time operations. Therefore, non-real-time administrative report processing shall not interfere with real-time processing.

3.4.6.3 Event Reporting

Event reports detail the results of all ATC system operations. The event report should provide the operator with a chronological list of events to include operator log-on/log-off, time, date, commands, configuration changes, subsystem failures, port alarms, and any other pertinent information necessary to support overall network management. The NMS event database shall be able to produce a report via the system event logging printer and shall be available to the operator via the control console.

3.4.7 Dedicated Functions

The NMS shall have the capability to support a dedicated edit/word processing function for extended report generation.

3.4.7.1 Training Mode

The NMS shall allow the operator to have a training mode that simulates administration, operating, and maintenance functions.

3.4.8 NMS Workstation Characteristics

3.4.8.1 RED/BLACK Engineering Criteria

The ATC must satisfy the RED/BLACK installation requirements established in NACSIM 5203 and MIL-HDBK 232A.

3.4.8.2 TEMPEST Criteria

(Deleted in accordance with Amendment 1 Paragraph 3).

3.4.8.3 Human Engineering

Human engineering criteria and principles shall be in accordance with MIL-STD 454M, Requirement 62.

3.4.8.4 Network Status Display

The NMS workstation shall be equipped with a color graphics monitor so that the current network alarm or alert status can be determined by color at a glance.

3.4.8.5 Display and Control Concepts

The NMS shall provide the capability to display the functional status of the ATC at each workstation. The status shall include all circuits, equipment, and current alarms. Displays shall be "user friendly" with a minimum of two means of access:

(a) Pre-defined structured (menu driven)

(b) Direct (an expert code to bypass the menu and provide the use of shorthand commands)

The NMS shall have a windowing capability that allows dynamic selection, placement, and sizing of various windows and displays.

3.4.8.6 Modularity and Flexibility

The NMS design shall facilitate future display modification, particularly as the various NMS subsystems grow, as

new subsystems are added, as technology refreshments dictate, as mission requirements demand, and as new displays are defined through NMS usage.

3.4.8.7 Multi-Tasking Sessions

Each NMS workstation shall be capable of supporting simultaneous sessions to perform all NMS system requirements.

3.4.9 NMS Workstation Communications

The NMS workstation shall have the capability to communicate with other workstations associated with the ATC.

3.5 Quality Factors

3.5.1 Availability

The demonstrated availability of the ATC shall be 99.998 percent or greater.

3.5.2 Reliability

The ATC shall meet the reliability standards set forth in CCITT Recommendation G.106, Paragraph 2.5 and shall function continuously 24 hours per day. ATC reliability is defined in terms of critical system failure. A critical system failure is defined as those failures which deny user access to information, computations, reports generation, or other functions that could adversely affect mission accomplishment. The following specific failures are applicable:

(a) A loss at any one time of 5% or more of system ports

(b) A loss of the system controller

(c) A failure of the system due to software

(d) A failure of a workstation

(e) A loss of internal system clock

(f) A loss of internal system power.

3.5.3 ATC Interoperability

The ATC shall be interoperable with a variety of DTE, DCE, crypto devices, and test equipments. Specific equipment and

corresponding interface requirements for candidate sites are found in Appendices A through G.

3.5.4 ATC System Recovery

Following an ATC system failure, one of the two following types of system restarts shall be provided. A "cold" start shall be required when all queues and temporary files are empty and all initializing data must be re-entered. The time required to perform a "cold" start shall not exceed five minutes. A "warm" start shall be required when an error has occurred which has caused minimal system degradation. The time required to perform a "warm" start shall not exceed five minutes.

3.5.5 ATC Diagnostic Tests

Diagnostic and Built-in-Test (BIT) programs shall provide isolation to a Lowest Replaceable Unit (LRU). Test programs shall be available prior to program loading and during operations to verify system malfunctions or to check the operational status of a specific system component or program.

3.5.6 Safety

The ATC shall comply with the Occupational Safety and Health Administration (OSHA) and Navy Occupational Safety and Health (NOSH) safety requirements established by the Government for industry.

3.6 Logistics

3.6.1 Maintenance Support

The vendor shall provide maintenance support for the life of the contract for all system hardware, firmware, and software.

3.6.1.1 Technology Refreshment

The design of the ATC NMS shall permit incorporation of future technology refreshments, as they occur. Updates to equipment hardware, firmware, and software shall be made available for implementation throughout the ATC life cycle and shall be installed at the option of the Government. Examples of

expected future technological advances include, but are not limited to:

(a) Expert systems using artificial intelligence

(b) Integrated Services Digital Network (ISDN)

3.6.1.2 Technical Support

On-site technical support shall be available in accordance with the SOW.

3.7 Personnel

Navy and civilian personnel in a wide range of fields shall be able to operate the ATC with minimal on-site training.

3.8 Training and Training Plan

In accordance with the SOW, the vendor shall prepare a comprehensive training plan to include the preparation, support, and implementation of the training program. It shall provide for scheduling, development, and management of training activities. The vendor shall propose the most efficient and practical personnel training methods for the ATC operation.

3.8.1 Software Maintenance Training

The vendor shall provide a software maintenance course. This course shall enhance instruction provided by the system software documentation and shall include hardware features affecting operating system functions. The vendor shall provide the following items:

(a) Training Courses/Curriculum Outline

(b) Instruction/Lesson Guides

(c) Student's Training Course Guide

(d) Measurement of Student Achievement Test.

3.8.2 Operator Training

The vendor shall provide a training course which will instruct ATC operators in use of the ATC. The course shall consist of both formal training and OJT in hardware and software system concepts, use of the system manual to aid in problem solving, and in hardware use and functional configuration.

The training, to be conducted during the installation/acceptance testing phase, shall provide personnel with a working knowledge of the ATC system that will allow them to maintain reliable communications. The vendor shall provide the following training items:

(a) Training Course/Curriculum Outline

(b) Instructor Lesson Guides

(c) Student's Training Course Guide

(d) Measurement of Student Achievement Test

Formal operator training shall consist of, at a minimum:

(a) Overview of system operations

(b) System start-up/shut-down procedures

(c) System log-on/log-off procedures

(d) Network Management System (NMS) operations

(e) Creation and management of operator-defined files and reports

(f) Alarm monitoring and response

(g) System/circuit monitoring and testing procedures

3.8.3 Government Review and Comments

Draft and preliminary training materials shall be available for review by Government personnel. The Government shall review materials for both technical and editorial completeness and forward the comments to the Contractor for the next submission.

3.9 Documentation

3.9.1 Software Documentation

3.9.1.1 Vendor Developed Software

The vendor shall provide the Government a copy of the source code in hardcopy and machine readable form for the

software and firmware used in the ATC. The source code must be provided to the Government for the purpose of computer security inspection and verification.

3.9.1.2 Vendor Purchased Software - Copyrights Available

The vendor shall provide the Government a copy of the source code in hardcopy and machine readable form for all purchased software and firmware used in the ATC to which the vendor has the rights. This source code must be given to the Government for purposes of computer security inspection and verification.

3.9.1.3 Vendor Purchased Software - Copyrights Not Available

For those software/firmware packages for which the vendor can not obtain the copyrights to the source code, the vendor shall arrange to have those copyrights passed directly to the Government from the software vendor. The Government reserves the rights to use the source code for security inspection and verification.

3.9.1.4 Software Manuals

The vendor shall provide the Government the necessary documentation for maintenance and use of the software/firmware specified by this document. This includes, at a minimum, four sets per site of the following manuals:

(a) Operator Manual(s)

(b) Maintenance Manual(s)

3.9.2 Systems Administration

The vendor shall provide systems-level documentation necessary to utilize all the features of the proposed ATC system equipment, firmware, and software. This shall include, but not be limited to:

(a) A complete description of ATC system functions and documentation

(b) Audit trails

(c) Security features

(d) Local equipment preventive maintenance procedures

(e) Local equipment actions that can be performed by an operator

(f) Start-up of the system

(g) Recovery from any system failure(s)

(h) Data backup procedures

(i) System backup procedures.

3.9.3 Diagnostics Guide

The vendor shall provide a diagnostics trouble-shooting guide.

3.9.4 Technical Manuals and Publications

A minimum of four sets per site of all technical manuals prepared specifically for the ATC, and any commercial equipment manuals involving the ATC shall be provided.

3.10 Hardware Documentation

Hardware documentation shall provide technical data on the ATC system components. For the duration of the contract, documentation for future changes to equipment shall be provided as they occur (minimum of four sets per site).

3.11 Licenses and Permits

The ATC system hardware, firmware, and software must be in current production. The vendor shall be responsible for obtaining all requisite and necessary licenses and permits for complying with any or all applicable National and/or municipal laws, codes, and regulations of the geographical area(s) in which the equipment will be installed in connection with the performance of the contract.

When the vendor firm is offering equipment that is manufactured entirely or in part from assemblies produced by another contractor, or is manufacturing the equipment under license, this shall be stated in the bid. Details of the original designer/manufacturer and contractual relationship with the bidder shall be provided so the precise origin of the hardware, firmware, and software can be established.

3.12 Modifications

The vendor shall be entirely responsible for all modifications found necessary to correct unsatisfactory operation of the ATC within the terms of the contract, including the supply of all modification kits, special test equipment and tools required to implement and test modifications, and the update of handbooks and drawings. All modifications subsequent to ATC equipment acceptance shall be fully documented and include:

(a) Modification number

(b) List of materials required and those rendered surplus following the modification

(c) Detailed modification instructions, and modification verification test procedures

(d) Appropriate instructions to correct documentation delivered within the terms of the contract.

**OTHER INFORMATION:**

Additional information as well as specifications for each site are located in Section J as follows:

| | |
|---|---|
| APPENDIX (A) | NTCC HAMPTON ROADS |
| APPENDIX (B) | NCTS JAPAN |
| APPENDIX (C) | NTCC MAKALAPA |
| APPENDIX (D) | NTCC CAMP SMITH |
| APPENDIX (E) | NCTS SICILY |
| APPENDIX (F) | NCTS PUERTO RICO |
| APPENDIX (G) | NCTS LONDON |
| APPENDIX (H) | EXAMPLES OF CURRENTLY USED TCF FORMS |
| APPENDIX (I) | ATC NMS FUNCTIONAL REQUIREMENTS |
| APPENDIX (J) | LIST OF ACRONYMS AND ABBREVIATIONS |

Note: Site specific tables reflect actual equipments, circuit counts, land line counts, but do not reflect actual port counts required to be cutover to the ATC. All multiplexers will be wired to their maximum capability with the exception of Integrated Digital Network Exchange (IDNX) and TIMEPLEX multiplexers.

## C.1 SCOPE OF CONTRACT

(a) The Naval Regional Contracting Center is procuring turnkey Automated Technical Control systems for the Space and Naval Warfare Systems Command.

(b) The Contractor shall furnish, as required, the hardware/software/systems/maintenance and other Contractor support services required for the support of all items under this contract. Such equipment, software, maintenance, and other Contractor support services shall be supplied in conformance with the terms and conditions of this contract.

## C.3 FEDERAL INFORMATION PROCESSING STANDARDS (FIPS)

(a) The standards identified as an Attachment to this solicitation (Attachment 2) apply to this acquisition. FIPS Publications themselves may be obtained from the National Institute of Standards and Technology (NIST), Department of Commerce, Washington, D.C.

(b) Terminology for specifying standards can be found in the Federal ADP and Telecommunications Standards Index, which may be obtained from the Superintendent of Documents, Government Printing Office, Washington, D.C. 20402.

## C.6 USED EQUIPMENT

When used/refurbished equipment is proposed, equipment must be identified as such and be warranted the same as new equipment.

## C.7 REFURBISHED EQUIPMENT, SUP 5252.239-9412 (JAN 1992)

Refurbished or remanufactured equipment may be offered. If refurbished or remanufactured equipment is proposed, it shall be completely renovated, thoroughly inspected, repaired as necessary, and subject to the same product performance specifications and testing for serviceability prescribed by the manufacturer for newly manufactured equipment. All such refurbished or remanufactured equipment shall be so identified and must be warranted as new.

## C.8 CERTIFICATE OF MAINTAINABILITY

(a) At such time as the services of the contractor are terminated, expire contractually or are otherwise not extended, the contractor shall within five (5) working days, issue a "Certificate

of Maintainability" for all equipment maintained by the Contractor under this contract.

(b) The certificate shall state that preventive maintenance in accordance with the specifications of the original equipment manufacturer (OEM) has been performed and that the equipment is performing in accordance with the OEM's specifications such that the OEM (or the OEM's successor in interest) commits that it would assume maintenance of the equipment without any one-time charges (including but not limited to repair or inspection charges) if such maintenance were assumed effective the day after the contractor's performance ceases. The contractor is responsible for bearing all costs associated with obtaining such certification and at no separate charge to the Government.

(c) Should the contractor fail to issue the required Certificate of Maintainability in accordance with this clause, or should any equipment fail to perform in accordance with the certification, the contractor shall be liable to the Government for any reasonable costs incurred by the Government in bringing the equipment up to maintainable level(s).

## C.9 INTERCHANGEABILITY OF PARTS IS REQUIRED

All replacement/spare parts shall be guaranteed to be equal in all respects (including performance, interchangeability, durability and quality), to parts specified for use by the Original Equipment Manufacturer (OEM).

## C.10 REPLACEMENT PARTS AVAILABILITY, SUP 5252.239-9403 (JAN 1992)

The Contractor guarantees that replacement parts for each machine in this contract will be available for a minimum of 15 years from the date of this contract. Subsequent to this period, if parts are not available from the Contractor, it shall, if requested by the government, furnish data to enable the government to have such parts manufactured elsewhere.

## C.11 OPERATING SOFTWARE, SUP 5252.239-9402 (JAN 1992)

The operating software required to make use of equipment acquired under this contract shall be provided, and supported, by the Contractor. Operating software refers to those routines that interface directly with hardware peripheral devices, the computer operations, and applications and utility programs.

## C.12 SOFTWARE

(a) Software Furnished. The Contractor shall furnish the software listed in Sections B and/or C as well as all supporting evaluated optional features proposed by the Contractor and accepted by the Government. The Contractor shall support such software, including any Contractor-sponsored modification(s) or revision(s) thereof, at no additional cost to the Government for the duration of this contract, including any renewals and extensions thereof. The software support provided shall, at a minimum, consist of error correction, and providing Contractor-sponsored (and Government-accepted) modifications, improvements and revisions.

(b) Software Modifications and Revisions. The Government shall be provided with full documentation of all Contractor changes and/or modification to the software provided to meet the Government's requirements. The software is listed in Section B of this contract. In the event there are new software releases, the Government may elect to accept any later version(s) of the software and, if accepted, software support shall be provided at no additional cost to the Government for the duration of this contract, including any renewals and extensions thereof (any additional equipment required to accommodate such later version(s) will be provided at the Government's expense). In the event the Government elects to not accept later version(s) of the software, the Contractor shall continue to correct any latent defects in the software supplied under this contract. However, the Contractor's obligation to correct latent defects shall be limited to those services necessary to permit the government to process the workload identified in the contract.

## C.13 MANUALS AND PUBLICATIONS

(a) General. The Contractor shall furnish, in accordance with Schedule B and the DD Form(s) 1423, user manuals and publications for all Contractor software and equipment provided under this contract, if any.

(b) Other Manuals. In addition to the above specified agency documentation requirements, the offeror may include in its proposal any other manuals and program descriptions which it would consider helpful to the user.

(c) Updated Versions. The Contractor shall notify the Government as soon as updated versions of the above documentation items become available. The Government will specify its requirements, if any, for such updates in numbers not to exceed the initial requirements

stated above. Requirements for such updates shall be satisfied promptly.

## C.14 SUPPLIES

Rental and maintenance charges do not include consumable operational supplies, e.g., paper, tape, carbon. Supplies used by the Government shall conform to the equipment Contractor's technical specifications or equivalent.

## C.15 TRAINING

(a) Schedule for Training. The Contractor shall provide training in accordance with the schedule below. All instructors shall be experienced in the fields for which they are providing training and should gear the training to the Contractor's specific equipment, and not to basic concepts. The Contractor shall provide the students/attenders with all necessary and appropriate materials, manuals and course outlines necessary to accomplish the Government's training goals in accordance with Functional Specification paragraphs 3.8 through 3.8.3.

| Type of Training | Location of Training | Maximum Number Students* | Course Dates | Duration of Course |
|---|---|---|---|---|
| Operator Training | On-Station and on the Job Training | 15 persons per site | TBN | TBN |
| Maintenance Training | " | 15 persons per site | TBN | TBN |
| Software Training | " | 15 persons per site | TBN | TBN |

TBN=To be negotiated

*Training will be conducted at individual sites. Training for Lots II through V will be based on the above (with a maximum of 10 students per site) and will be in accordance with option provisions contained herein. Training in Lots VI through IX will include the above classes with a maximum of 8 students per class per site and will be in accordance with option provisions contained herein.

(b) Review and Approval. The training course curriculum shall be subject to the Government's approval prior to award. The training schedule and number of people to be trained may vary, subject to the Government's requirements. In no event shall the maximum number of students be greater than that indicated above. Scheduling and duration of courses will be subject to mutual agreement between the contractor and government.

(c) In the event the Government intends to reschedule course date(s), the Government shall provide the Contractor with at least thirty (30) days' written notice. Any change in the course scheduling shall not be cause for the Government's incurrence of additional costs, nor be the subject of a claim unless the thirty day notification is not given by the Government.

**C.18 SUBSTITUTION OR ADDITION OF PERSONNEL, SUP 5252.237-9400 (JAN 1992)**

(a) The offeror agrees to assign to the contract those persons whose resumes, personnel data forms or personnel qualification statements were submitted as required by Section L to fill the requirements of the contract. No substitution or addition of personnel shall be made except in accordance with this clause.

(b) The Offeror agrees that:

[ ] during the contract performance period
[X] during the first 180 days of the contract period

no personnel substitutions will be permitted unless such substitutions are necessitated by an individual's sudden illness, death or termination of employment. In any of these events, the Contractor shall promptly notify the Contracting Officer and provide the information required by paragraph (d) herein.

(c) If personnel for whatever reason become unavailable for work under the contract for a continuous period exceeding thirty (30) working days, or are expected to devote substantially less effort to the work than indicated in the proposal, the Contractor shall propose a substitution of such person(nel), in accordance with paragraph (d) herein.

(d) All proposed substitutions shall be submitted, in writing, to the Contracting Officer at least fifteen (15) days (thirty (30) days if a security clearance must be obtained) prior to the proposed substitution. Each request shall provide a detailed explanation of the circumstances necessitating the proposed substitution(s) and any other information required by the

Contracting Officer to approve or disapprove the proposed substitution(s). All proposed substitutions (no matter when proposed during the performance period) must have qualifications equal to or greater than the qualifications of the person(s) to be replaced.

(e) In the event a requirement to increase the specified level of effort for a designated labor category, but not the overall level of effort of the contract occurs, the Contractor shall submit to the Contracting Officer a written request for approval to add personnel to the designated labor category. The information required is the same as that required in paragraph (d) herein. The additional personnel shall have qualifications greater than or equal to at least one (1) if the individuals proposed for the designated labor category.

(f) The Contracting Officer shall evaluate requests for substitution and addition of personnel and promptly notify the Offeror, in writing, of whether the request is approved or disapproved.

(g) If the Contracting Officer determines that suitable and timely replacement of personnel who have been reassigned, terminated, or have otherwise become unavailable to perform under the contract is not reasonably forthcoming or that the resultant reduction of productive effort would impair the successful completion of the contract or the delivery order, the contract may be terminated by the Contracting Officer for default or for the convenience of the government, as appropriate. Alternatively, at the Contracting Officer's discretion, if the Contracting Officer finds the Contractor to be at fault for the condition, s/he may equitably adjust (downward) the contract price or fixed fee to compensate the government for any delay, loss or damage as a result of the Contractor's action.

**C.19 PERSONNEL QUALIFICATIONS (MINIMUM), SUP 5252.237-9401 (JAN 1992)**

(a) Personnel assigned to or utilized by the Contractor in the performance of this contract shall, at a minimum, meet the experience, education, or other background requirements set forth below and shall be fully capable of performing in an efficient, reliable and professional manner. If the offeror does not identify the labor categories listed below by the same specific title, then a cross-referencing list should be provided in the offeror's proposal identifying the difference.

(b) The government will review resumes of Contractor personnel to be assigned, and if personnel not currently in the employ of the Contractor, a written agreement from the potential employee to work shall be presented as part of the technical proposal.

(c) If the Contractong Officer questions the qualifications or competence of any person performing under the contract, the burden of proof to sustain that the person is qualified as prescribed herein shall be upon the Contractor.

(d) The Contractor must have the personnel, organization, and administrative control necessary to ensure that the services performed meet all requirements specified in the Contract. The work history of each Contractor employee shall contain experience directly related to the tasks and functions to be assigned. The Contracting Officer reserves the right to determine whether a given work history contains necessary and sufficiently detailed related experience to reasonably ensure the ability for effective and efficient performance.

| LABOR CATEGORY | MINIMUM REQUIREMENTS |
|---|---|
| Program Manager | Ref: SOW 3.6.2 |
| On-Site Maintenance Technician | Ref: SOW 3.6.1 and 3.6.3 |
| Installation Supervisor | Ref: SOW 3.6.1 |
| Training Personnel | Ref: SOW 3.6.1 |

**C.20 MAINTENANCE**

(a) Responsibilities of the Contractor. When ordered, the Contractor shall provide maintenance (labor and parts) at the prices shown in Section B of contract, and shall keep the equipment in good operating condition. The system (or machine) shall be considered to be in good operating condition when it operates within the permissible consecutive and non-consecutive hours specified in the contract. Maintenance service shall not include electrical work external to the equipment, the furnishing of supplies, nor adding or removing accessories, attachments, or other devices. It shall not include repair of damage resulting from accident, transportation between Government sites, neglect, misuse, failure of electrical power or air-conditioning or humidity control, or cause other than ordinary use. All parts, including those required for maintenance outside the Principal Period of Maintenance (PPM), if applicable, are included in the fixed monthly charge.

(b) Responsibilities of the Government.

(1) Government personnel shall not perform maintenance or attempt repairs to

equipment while such equipment is under the purview of this contract unless agreed to by the Contractor.

(2) Subject to security regulations, the Government shall permit access to the equipment which is to be maintained.

(3) The Government shall provide adequate storage space for spare parts and adequate working space (including heat, light, ventilation, electric current and outlets) and telephones (for local calls only) for the use of maintenance personnel. These facilities shall be within the reasonable distance of the equipment to be serviced and shall be provided at no charge to the Contractor.

(4) The Government shall provide time for Contractor-sponsored modifications within a reasonable time after being notified by the Contractor that a modification is ready to be made. The time required to make the modification shall be outside the normal preventive maintenance hours.

(5) The Government shall maintain site requirements in accordance with the equipment environmental specifications furnished by the Contractor, if any.

**C.21 ON-SITE MAINTENANCE**

(a) On-site maintenance is defined as that method of providing Federal Information Processing (FIP) equipment maintenance in which the Contractor stations personnel permanently at the Government's location(s). On-site preventive maintenance shall be performed in accordance with the Contractor-proposed (and Government-approved) maintenance plan(s) during the Principle Period of Performance (PPM) as stipulated in paragraph (c) and in accordance with the fixed monthly charges shown in Section B of this contract. In the event equipment under this contract requires remedial maintenance during the PPM, regardless of how many times the equipment requires said maintenance, the government may require the Contractor to respond and have the equipment functioning within the timeframes listed within this contract. Remedial maintenance is defined as determining why FIP equipment is malfunctioning, and effecting either repair or replacement of said malfunctioning equipment. For the purposes of this contract, Contractor response under On-Site maintenance is 15 minutes.

(b) In addition to providing on-site preventive and remedial maintenance services during the stated PPM, remedial maintenance services shall be provided Outside the Principal Period of

Maintenance (OPPM) when ordered by the Government. A response time of two (2) hours is required for this per-call remedial maintenance. Hourly per-call rates shall be in accordance with Attachment 3 (Table B-6) of this contract.

(c) The PPM for this contract is 7:00 A.M. to 4:00 P.M. Monday through Friday. This period includes one (1) hour for lunch.

## C.24 PREVENTIVE MAINTENANCE

(a) Preventive maintenance shall be performed during the Principle Period of Maintenance as specified within this contract and in accordance with the Contractor's proposed (and Government-approved) preventive maintenance plan(s). The Contractor shall identify the frequency and duration of the preventive maintenance required for the equipment listed in Section B in its proposal (see Section L).

(b) If a mutually agreeable preventive maintenance plan cannot be established between the Government and the Contractor, the Government reserves the right to specify the hours and days during which preventive maintenance shall take place (within the PPM).

## C.25 NON-CHARGEABLE MAINTENANCE ITEMS

There shall be no additional charges for:

(a) Replacement parts, unless such parts are required due to the fault or negligence of the Government;

(b) Preventive maintenance, regardless of when performed;

(c) Remedial maintenance which was requested during the PPM specified in the contract, regardless of when the maintenance is performed;

(d) Time spent by maintenance personnel after arrival at the site awaiting the arrival of additional maintenance personnel and/or delivery of parts, etc., after a service call has commenced;

(e) Remedial maintenance required on any machine (including periods which would otherwise be OPPM) when the scheduled preventive maintenance for that machine

preceding the malfunction had not been performed unless preventive maintenance was omitted at the Government's request or the Contractor was denied access to the equipment;

(f) Remedial maintenance required within a 48-hour period due to a recurrence of the same malfunction (including periods during what would otherwise be OPPM);

(g) Chargeable time spent for repair;

(h) Description(s) of malfunction(s).

## C.26 MAINTENANCE OF INSTALLED SYSTEM CONFIGURATION, SUP 5252.239-9401 (JAN 1992)

The equipment contained in Section B is subject to change as a result of upgrades, deletions or substitutions of equipment, or through requirements for additional hardware due to resource expansion. To provide for these changes in maintenance during the life of the contract, this contract contains provisions for the addition and deletion of equipment which, in the aggregate, may increase the contract value for each base or option period by up to 25% of the contract value for that period. Clause SUP 5252.239-9404, System Configuration: FIP Maintenance Contracts, provides terms and conditions relative to this clause.

## C.27 SYSTEM CONFIGURATION: FIP MAINTENANCE CONTRACTS, SUP 5252.239-9404 (JAN 1992)

The government reserves the right, throughout the performance period, to substitute items of equipment contained in Section B without price revision. Maintenance of the substitute equipment shall be performed at the same price set forth in Section B for comparable equipment.

(b) The government reserves the right to delete equipment at any time during the period of performance. The government may unilaterally reduce the price of the contract based on the prices set forth in Section B for the deleted equipment.

(c) The government reserves the right to require maintenance on additional equipment whether or not comparable items are already priced in the contract. however, the contract's

value for the base period and each option period may not be increased by more than 25% to provide for maintenance of additional equipment.

(d) Maintenance of an additional item of equipment that is comparable to an existing contract line item shall be performed at the price established for the existing line item. When there is no existing line item comparable to the additional item of equipment, a price shall be negotiated and agreed upon between the government and Contractor, and a bilateral modification shall be executed to incorporate the change.

**C.28 ALTERATIONS AND ATTACHMENTS, SUP 5252.239-9413 (JAN 1992)**

(a) Government Alterations. Upon 30 days written notice, the Government may make alterations or install attachments to the Contractor's equipment, provided that such action will not create a safety hazard. The Government shall assume full liability for any damages and/or degradation in equipment performance attributable directly to such alteration or attachment.

(b) Removal of Alterations or Attachments. Before discontinuance of rental, the Government shall remove alterations or attachments which are not the property of the Contractor, and the equipment shall be restored to the prior configuration at Government expense.

(c) Maintenance Charges. If alterations made by the Government increase the cost of maintenance, mutually agreeable arrangements for additional maintenance under this contract, as applicable, shall be made for each installation.

(d) Reprogramming. Any reprogramming agreed to by the Contractor which is required to accommodate additions attachments shall be accomplished at the Government's expense.

**C.29 USE OF HARDWARE AND/OR SOFTWARE MONITORS**

(a) The Contractor shall permit inclusion or attachment of such devices as the Government may choose for the purpose of examining or measuring the activity within the computer system.

(b) Devices such as hardware monitors (which may require physical connection to the computer system), or software monitors (which may require portions of the computer

system's control software to be displaced) are specifically included in this category.

(c) The Contractor may not prohibit the installation of such devices unless the particular device will cause significant or permanent damage to the computer system. The Contractor shall assist the Government in identifying and locating device connections when requested by the Government if the Contractor provides such service to other customers. Cost for this service, if any, is stated in Section B of this contract.

(d) Hardware and software monitors fall within the purview of the Alterations and Attachments clause, if this clause is included herein.

## C.31 SPECIAL PROVISIONS FOR MAINTENANCE OF GOVERNMENT-OWNED ADPE

(a) General. The maintenance prices listed in this contract include the cost of labor and parts and such other expenses necessary to keep the equipment in good operating condition.

(b) Maintenance Coverage

(1) The Contractor shall honor orders for maintenance under any of the maintenance options set forth in Sections B and C for periods of one (1) year or less at the prices shown in Section B. All equipment which is a part of the system delivered under this contract, if this contract calls for equipment delivery, shall be covered by the same maintenance provisions.

(2) The effective date of maintenance services, the type and model number(s) of the equipment and applicable charges shall be specified on the order (or contract).

(3) The effective date of maintenance services shall not be prior to the expiration of the warranty period, if any.

(4) Discontinuance Notice. When discontinuing maintenance pursuant to this clause, the Government will give the Contractor 30 days' prior written notice of its intent to discontinue maintenance services, or a shorter notice when agreed to by the Contractor. However, no discontinuance notice is required if the Government elects not to exercise an option.

(c) Responsibilities of Contractor

(1) Only new standard parts, or parts equal in performance to new parts, shall be used in making repairs. Parts which have been replaced shall become the property of the Contractor.

(2) Should the Government make alterations or install attachments which affect the maintenance of this equipment, the continuation of maintenance service on this equipment shall be subject to mutual agreement. Should the alterations or attachments increase the maintenance costs to the Contractor, additional maintenance charges shall be made on an individual installation basis. If such alterations or attachments create a safety hazard, the Contractor may discontinue maintenance service on the hazardous equipment. In addition, should such be the cause of malfunction or downtime, such downtime shall not be creditable against the Contractor under clause G.15, Government Downtime Credits.

(d) Contractor-sponsored alterations or attachments to equipment shall be made with the consent of the Government. Appropriate modification of the contract shall be negotiated for each such alteration which either enhances the value of the system to the Government or decreases the overall maintenance costs.

(e) Movement of Equipment

(1) In the event the system(s) being maintained under the terms and conditions of this contract is/are moved to another location within the same geographical service area, as designated by the Contractor, the terms and conditions of this contract shall continue to apply. If the system(s) must be moved outside the Contractor's designated service area, then the continued applicability of this contract shall be subject to mutual agreement.

(2) The Government shall give at least thirty (30) days written notice to the Contractor of its intention to move the equipment, except in emergencies.

(3) Maintenance charges shall be suspended on the day dismantling of the equipment in preparation for shipment is begun. Maintenance charges shall be reinstated on the day the equipment is reassembled. In the event the Contractor performs said functions, the Government shall be charged for disassembly and reassembly at the applicable OPPM rates shown in Table B-6.

(4) Shipment to the new installation(s) shall be at the Government's expense by military or commercial carrier(s) or, at the Government's option, provide the

Contractor with an authorization to ship by commercial carrier, in which case the Government shall be invoiced for transportation, rigging and drayage costs.

## C.32 REPORTING REQUIREMENTS

The contractor shall furnish a signed malfunction report to the COTR upon completion of each maintenance call. The report shall include as a minimum, the following:

(a) Contract Number
(b) Contractor's Name
(c) Date and time notified
(d) Date and time of arrival
(e) Type and description of machine
(f) Chargeable time spent for repair (for OPPM calls)
(g) Description of malfunction

## C.34 DATA ITEMS (NOT-SEPARATELY PRICED (NSP))

The Contractor shall furnish the Data identified in Section B as "Not Separately Priced (NSP)" in accordance with the DD Form(s) 1423, Attachment 6 of Section J.

## SECTION D - PACKAGING AND MARKING

### D.1 PACKAGING

(a) The supplies shall be packaged in accordance with commercial practices and in a manner that will afford protection against corrosion, deterioration and physical damage during direct shipment.

(b) The supplies shall be packed in a manner conforming to the requirements of Uniform Freight Classification for rail shipment; National Motor Freight Classification for truck shipment; Parcel Post Regulations; and the regulations of other carriers as applicable to the mode of transportation employed.

### D.4 PROHIBITED PACKING MATERIALS

The use of asbestos, excelsior, newspaper or shredded paper (all types including waxed paper, computer paper and similar hygroscopic or non-neutral material) is prohibited. In addition, loose-fill polystyrene is prohibited for shipboard use.

### D.6 MARKINGS OF WARRANTED ITEMS, (NAVSUP)(JAN 1992)

(a) Each item covered by a warranty shall be stamped or marked in accordance with MIL-STD-129, "Marking for Shipment and Storage". Where this is impracticable, written notice shall be attached to, or furnished with, the warranted item.

(b) Markings will state

(1) existence and substance of warranty;
(2) its duration;
(3) whom to notify if supplies are found to be defective;
(4) manufacturer (or entity) providing the warranty; and
(5) an indication whether attempted on-site repair by government personnel shall void the warranty.

## D.7 LABELING OF ASBESTOS MATERIALS

(a) Hazardous Chemicals and Materials. All unit and intermediate-pack chemicals and materials (including aerosol propellants) shall have affixed thereto the applicable warning labels in accordance with applicable laws, statutes, regulations, or ordinances. Such laws include the Federal Food, Drug, and Cosmetic Act and similar state and municipal legislation, the Federal Insecticide, Fungicide, and Rodenticide Act. In addition, interior-, unit- and intermediate packs including unit containers that serve as shipping containers such as palls and drums shall be marked with the applicable precautionary information in accordance with the American National Standard for Labeling of Hazardous Industrial Chemicals (ANSI Z129.1-1976).

(b) Specific Hazards: Asbestos unit- and intermediate packs, including containers that serve as shipping containers of asbestos and products containing asbestos shall be marked:

> "Caution, Contains Asbestos Fibers. Avoid Creating Dust. Breathing Asbestos Dust May Cause Serious Bodily Harm."

in accordance with the OSHA Compliance Label for Asbestos.

## D.8 PACKING AND UNPACKING

The Contractor shall furnish such labor as may be necessary for packing, unpacking, placement and installation of equipment. Said packing, unpacking, placement and installation of equipment shall be furnished by the Contractor without additional charge to the Government.

## SECTION E - INSPECTION AND ACCEPTANCE

### E.1 CONTRACT CLAUSES INCORPORATED BY REFERENCE

**I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES**
**II. DOD FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES**

| | | |
|---|---|---|
| **52.246-2** | **INSPECTION OF SUPPLIES -- FIXED PRICE** | **JUL 1985** |
| **52.246-4** | **INSPECTION OF SERVICES -- FIXED PRICE** | **APR 1984** |
| **52.246-16** | **RESPONSIBILITY FOR SUPPLIES** | **APR 1984** |

### E.2 STANDARD OF PERFORMANCE AND ACCEPTANCE OF EQUIPMENT (ADP SYSTEMS)

(a) General. This provision establishes a standard of performance which must be met before any equipment listed in Section B is accepted by the Government. This provision also pertains to replacement and substitute machines, and machines which are added or field modified (modification of a machine from one model to another) after a successful performance period.

(b) Performance Period. The performance period shall begin on the installation date (unless delayed in accordance with E.2(b)(3) herein) and shall end when the equipment has met the standard of performance for a period of thirty (30) consecutive days by operating in conformance with the Contractor's technical specifications and functional descriptions, or as quoted in the Contractor's proposal, which must satisfy the requirements of Section C, at an effectiveness level of 99.998% or more.

(1) Continuance of Performance Period. If the equipment does not meet the standard of performance during the initial 30 consecutive days, the performance period shall continue on a day-by-day basis until the standard of performance is met for a total of 30 consecutive days.

(2) Failure to Meet Standard of Performance. If the equipment fails to meet the standard of performance after 90 calendar days from the installation date or start of the performance period, whichever is later, the Government may at Its option request a replacement or terminate the contract and request the immediate removal of the equipment and the restoration of the site to pre-installation condition.

(3) Delay of Start of Performance Period. If necessary, the Government may delay the start of the performance period, but such a delay shall not exceed 30 consecutive days; therefore, the performance period must start not later than the 31st day after the installation date. Should the Government delay the start of the performance period, rental charges, or maintenance charges as applicable, shall accrue for that period of time between the installation date and the start of the performance period and shall be paid only upon completion of the successful performance period.

(c) Effectiveness Level Computations.

(1) General. The effectiveness level for a system is computed by dividing the operational use time by the sum of the operational use time plus system failure downtime.

(2) Changes in Equipment. The effectiveness level for machines added, field-modified, or substituted, or for a replacement machine is a percentage figure determined by dividing the operational use time of the machine by the sum of that time plus downtime resulting from equipment failure of the machine being tested.

(d) Operational Use Time.

(1) For System. Operational use time for performance testing for a system is the accumulated time during which the Central Processing Unit is in actual operation, including any intervals of time between the start and stop of the processing of the programs.

(2) For Equipment. Operational use time for performance testing for a machine added, field-modified, or substituted, or for a replacement machine, is defined as the accumulated time during which the machine is in actual use.

(3) Minimum Use Time. During the performance period for a system/machine, a minimum of 100 hours of operational use time with scheduled productive or simulated work will be required as a basis for computing the effectiveness level. However, in computing the effectiveness level, the actual number of operational use hours shall be used when that number exceeds the minimum of 100 hours. Added machines, field-modified machines, and substitute machines are subject to the 100 hour minimum use time requirement. However, the Government shall accept such machine(s) without the addition of simulated work solely to achieve the minimum of 100 hours use time, provided the average effectiveness for the 30 day acceptance period is equal to or better

than the level specified in E.2(b) herein.

(4) Measure of Operational Use Time. Operational use time and downtime shall be measured in hours and whole minutes.

(e) Downtime.

(1) System Failure Downtime. System failure downtime is that period of time during which the scheduled productive workload, or simulated workload, being used for acceptance testing cannot be continued on the system due to machine(s) failure. If simulated workload is being used for acceptance testing, it must be consistent with the data processing requirements set forth elsewhere in this contract.

(2) Start of Downtime. Downtime for each incident shall start from the time the Government contacts the Contractor's designated representative at the prearranged contact point until the system(s) or machine(s) is returned to the Government in proper operating condition, exclusive of actual travel time required by the Contractor's maintenance personnel but not in excess of one hour on each day such services were requested. However, at the request of the Contractor, the Government shall make available not only the failed equipment, but also those machines which the Contractor must use to accomplish such repairs. The Contractor shall provide an answering service or other continuous telephone coverage to permit the Government to make such contact.

(3) Equipment Use During System Downtime. During a period of system failure downtime, the Government may use operable equipment when such action does not interfere with maintenance of the inoperable equipment. The entire system will be considered down during such periods of use. Whenever the operable equipment is not released to the Contractor upon request, all such usage periods shall be considered system operational use time in computing the effectiveness level.

(4) Machine Failure Downtime. Machine failure downtime for a machine added, field-modified, or substituted, or for a replacement machine after the system has completed a successful performance period is that period of time when such machine is inoperable due to its failure.

(f) Daily Records. The Government shall maintain appropriate daily records to satisfy the requirements of paragraph E.2(b) herein and shall notify the Contractor in writing of the date of successful completion of the performance period.

(g) Remote Devices. For remote devices the standard of performance shall be determined in accordance with paragraph E.2(d)(3) herein. A remote device is defined as any Contractor-supplied device which is connected to the Central Processing Unit by way of data transmission lines rather than Contractor-supplied direct cable connection. The effectiveness level for equipment supplied by the Contractor shall be computed in accordance with paragraph E.2(d)(2) herein and shall exclude downtime attributable to related equipment, cables, transmission lines, wires, etc. not supplied by the Contractor.

(h) Date of Acceptance. The Government shall not accept equipment and shall not pay charges until after the standard of performance is met. The date of acceptance shall be the first day following the completion of the successful performance period.

## E.3 GUARANTEED RERUN OF THE BENCHMARK TEST

(a) Agreement. The Contractor agrees to rerun the benchmark test and/or operational capability demonstration set forth in the solicitation document on the initial proposed ADP system and any proposed augmentations installed under this contract, provided a separate preaward benchmark test was required for the augmented configuration. This rerun shall be completed prior to the start of the acceptance test period.

(b) Required Performance. If the initial installation includes all of the hardware and software used by the Contractor to perform the preaward benchmark test, the time to perform the benchmark rerun(s) shall not exceed the maximum benchmark time(s) specified for the preaward benchmark test for that configuration. If the initial hardware/software configuration installed at the Government's site must be augmented under the terms of the contract, the benchmark rerun(s) shall not exceed the maximum benchmark time(s) specified for the preaward benchmark test for the specific augmented configuration involved.

(c) Files, Data, and Procedures. The benchmark program files, input data, and processing procedures must be the same as those used in the original timed benchmark test. The Contractor agrees to retain all necessary files, programs, and information used in the original benchmark test for the guaranteed rerun benchmark test.

(d) Additional Hardware and Software. If the required performance is not attained on rerun of the benchmark tests, through no fault of the Government, the Contractor shall provide whatever hardware and/or software is necessary to meet the specified benchmark test time(s). Such additional hardware and/or software shall be provided at no cost to the Government for the duration of the system life specified in the solicitation.

(e) Waiver of Test. The Government reserves the right to waive the requirement for Benchmark and Operational Capability Tests if technical compliance can be adequately determined through review of technical proposals.

**E.7 INSPECTION AND ACCEPTANCE (DESTINATION), (NRCC WASH)(OCT 1992)**

(a) Final inspection and acceptance of the supplies to be furnished hereunder shall be made at destination by the COTR.

(b) The COTR shall execute acceptance on the applicable inspection and receiving report (DD Form 250, and forward to the paying office cited on the award page of the contract. One executed copy of the final DD Form 250 shall be forwarded to the contract administration office cited in the contract.

## SECTION F - DELIVERIES OR PERFORMANCE

### F.1 CONTRACT CLAUSES INCORPORATED BY REFERENCE

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CONTRACT CLAUSES
II. DOD FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES

| | | |
|---|---|---|
| 52.212-10 | DELIVERY OF EXCESS QUANTITIES OF $100 OR LESS | SEP 1989 |
| 52.212-13 | STOP-WORK ORDER | AUG 1989 |
| 52.212-15 | GOVERNMENT DELAY OF WORK | APR 1984 |
| 52.247-34 | F.O.B. DESTINATION | DEC 1991 |
| 52.247-54 | DIVERSION OF SHIPMENT UNDER F.O.B. DESTINATION CONTRACTS | MAR 1989 |

### F.2 DELIVERY REQUIREMENTS AND OPTIONS

(a) The Government reserves the right to delay the installation by up to 30 days, at no additional cost to the Government, provided that:

(1) The Contractor shall receive written notice from the Contracting Officer 30 days prior to the scheduled installation date.

(2) Any installation delays beyond 30 days shall be mutually agreed to by the Contractor and the Government.

(b) If the equipment is certified to be ready for use prior to the installation date, the Government, at its option, may elect to use the equipment and change the installation date accordingly. In this event, the contract shall be so amended by the Government.

(c) The Government agrees to have the site prepared in accordance with the Contractor's written site specifications by thirty (30) days prior to the scheduled installation date, unless a shorter period of time is agreed to in writing.

(d) The Government shall provide the Contractor with access to the site for the purpose of installing the equipment prior to the scheduled installation date. The Contractor shall specify

in writing the time required to install the equipment.

**F.3 DELIVERY OF DATA**

The place and time of delivery of data shall be as specified on the DD Form 1423 (Contract Data Requirements List) which is an exhibit to this contract, unless delivery is deferred at the Government's option by written order of the Contracting Officer.

Exhibits A through R apply to Lot I of the contract. Exhibits AI through AZ are required for each optional ATC site (in accordance with option provisions contained herein).

## F.7 TIME AND PLACE OF DELIVERY – F.O.B. DESTINATION

The contractor shall furnish the items hereunder at the following locations and within the following timeframes and without additional expense to the Government.

| CLIN | DESTINATION | QTY/ UNIT | DELIVERY SCHEDULE PERIOD OF PERFORMANCE |
|---|---|---|---|
| 0001AA | NTCC HAMPTON ROADS | 1/EA | 12 MONTHS AFTER CONTRACT AWARD |
| 0001AB | NTCC CAMP SMITH | 1/EA | 09 MONTHS AFTER CONTRACT AWARD |
| 0001AC | NTCC MAKALAPA | 1/EA | 10 MONTHS AFTER CONTRACT AWARD |
| 0002AA | NTCC HAMPTON ROADS | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0002AB | NTCC CAMP SMITH | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0002AC | NTCC MAKALAPA | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0003 | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0004* | NCTS JAPAN | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0005* | NCTS JAPAN | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0006* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0007* | NCTS SICILY | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0008* | NTCS SICILY | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0009* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0010* | NCTS PUERTO RICO | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0011* | NCTS PUERTO RICO | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0012* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |

| CLIN | DESTINATION | QTY/ UNIT | DELIVERY SCHEDULE PERIOD OF PERFORMANCE |
|---|---|---|---|
| 0013* | NCTS LONDON | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0014* | NCTS LONDON | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0015* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0016- THROUGH 0030* | AS SPECIFIED IN SECT B | N/A | 01 OCT 1994 THROUGH 30 SEPT 1995 |
| 0031- THROUGH 0045* | AS SPECIFIED IN SECT B | N/A | 01 OCT 1995 THROUGH 30 SEPT 1996 |
| 0046- THROUGH 0060* | AS SPECIFIED IN SCET B | N/A | 01 OCT 1996 THROUGH 30 SEPT 1997 |
| 0061- THROUGH 0075* | AS SPECIFIED IN SECT B | N/A | 01 OCT 1997 THROUGH 30 SEPT 1998 |

*IN ACCORDANCE WITH OPTION PROVISIONS CONTAINED HEREIN.

## F.16 NO WAIVER OF DELIVERY SCHEDULE

None of the following shall be regarded as an extension, waiver, or abandonment of the delivery schedule or a waiver of the Government's right to terminate for default:

(a) Delay by the Government in terminating for default;

(b) Acceptance of delinquent deliveries; and

(c) Acceptance or approval of samples submitted either after default in delivery or in sufficient time for the contractor to meet the delivery schedule. Any assistance rendered to the contractor on this contract or acceptance by the Government of delinquent goods or services hereunder will be solely for the purpose of mitigating damages and is not to be construed as an intention on the part of the Government to condone any delinquency, nor as a waiver of any rights the Government may have under subject contract.

## SECTION G - CONTRACT ADMINISTRATION DATA

### G.1 POINT-OF-CONTACT

The point-of-contact regarding this document is William Thoreen, who can be reached at 202-433-5389.

### G.2 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER, SUP 5252.243-9000 (JAN 1992)

(a) Except as specified in paragraph (b) herein, no order, statement, or conduct of Government personnel who visit the Contractor's facilities, or in any other manner communicate with Contractor personnel during the performance of this contract, shall constitute a change under the "Changes" clause of this contract.

(b) The Contractor shall not comply with any order, direction, or request of Government personnel unless issued in writing and signed by the Contracting Officer, or pursuant to specific authority otherwise included in this contract.

(c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and, notwithstanding provisions contained elsewhere in this contract, said authority remains solely with the Contracting Officer. In the event the Contractor effects any change (s) at the direction of any person other than the Contracting Officer, that change shall be considered to have been made without authority and no adjustment in price shall be made in the contract (or Delivery Order) to cover any increase in charges incurred as a result thereof. The name and address of the Principle Contracting Officer (PCO) is:

ROSCOE W. CRAWFORD
NAVAL REGIONAL CONTRACTING CENTER
BLDG 200, 901 M ST
WASHINGTON NAVY YARD
WASHINGTON, DC 20374-5014

**G.4 DESIGNATION OF COTR, (NRCC WASH)(OCT 1992)**

(a) (1) The Contracting Officer's Technical Representative (COTR) for this contract is:

NAME: MR. PERCY TOLBERT
MAIL ADDRESS: Space and Naval Warfare Systems Command
Code PMW-152-21F
2451 Crystal Drive
Arlington, VA 22245-5200

TELEPHONE NUMBER: (703) 602-8332 Ext. 548

(2) The above-named individual is hereby delegated as the authorized COTR for this contract/order. As such, this individual is responsible for monitoring, progressing and overall technical surveillance of services to be performed under this contract/order and should be contacted regarding questions or problems of a technical nature. In no event will any understanding or agreement, modification, change order, or other matter deviating from the terms of the basic contract between the contractor and any person other than the Procuring Contracting Officer (PCO) or the Administering Contracting Officer (ACO) be effective or binding upon the Government.

(3) When, in the opinion of the contractor, the COTR requests effort outside the existing scope of the contract, the contractor will promptly notify the PCO in writing.

(4) No action will be taken by the contractor under such technical instruction unless the PCO or ACO has issued a contractual change.

(b) List of duties to be performed by COTR in the administration of Contract:

(1) Serve as the point-of-contact through which the contractor can relay questions or problems of a technical nature to the contracting Officer.

(2) Monitor services being performed to ensure the contractor uses personnel meeting the requisite qualifications cited in the contract/order and require contractor's justification when using categories of personnel that are not in proportion to approved estimates.

(3) Review and evaluate contractor's estimates to furnish comments and recommendations to the PCO or ACO as appropriate.

(4) Alert the ACO, as appropriate, to any potential problems which may affect cost or performance schedules. Determine if percentage of work performed reasonably corresponds to the percentage of funds expended.

(5) Ensure that a copy of trip reports of Government personnel visiting contractor's plant, and a copy of all pertinent Government technical correspondence is retained in the COTR contract file.

(6) Review and certify invoices in accordance with invoicing instructions of the contract. Maintain a file with copies of these documents.

(7) Determine causative factors for any slippage in the performance schedule and report to the PCO or ACO making recommendations for corrective action to eliminate the cause of the slippage. In addition, the contractor's performance should be monitored to ensure that corrective action is being taken.

(8) Furnish the PCO with any requests for change, deviation, or waiver (whether generated by Government personnel or contractor personnel), including all supporting paperwork in connection with such change, deviation, or waiver.

(9) Be responsible for the inspection and acceptance of the services performed. Ensure compliance with the clause at FAR 52.246-5 or -6 which provide the Government the right to require the contractor to perform the services again, in conformance with the contract requirements, without payment of additional profit/fee.

(10) Submit to the PCO (with a copy to the ACO), a written evaluation of

(A) the performance of the contractor and

(B) a statement as to the uses made of any deliverables furnished by the contractor.

This report shall be made within 60 days of contract completion or annually on the anniversary date for contracts which include options. The written performance should address the cost effectiveness, quality, and timeliness of contractor performance.

## G.6 SECURITY COGNIZANCE

The highest level of security required under this contract is Top Secret as designated on the DD Form 254, Attachment 8 to this contract. Responsibility for security requirements under this contract is assigned to Director Industrial Security, Defense Investigative Service, Capital Region.

## G.7 COST ACCOUNTING STANDARDS ADMINISTRATION

A copy of this contract has been furnished to the cognizant Contract Administration Office for administration of the Cost Accounting Standards provisions contained herein.

## G.8 AUTHORITY FOR DEOBLIGATION OF UNEXPENDED AND EXCESS DOLLAR BALANCES

The Administrative Contracting Officer (ACO) is authorized to execute contract modifications deobligating unexpended Navy dollar balances considered excess to known contract requirements.

## G.9 ADDITIONAL FUNCTIONS ASSIGNED

In addition to the Contract Administration functions authorized by FAR 42.302, the Administrative Contracting Officer (ACO) is authorized to perform the following administrative functions as checked below:

[X] Negotiate, or negotiate and execute, supplemental agreements issued under the Changes clause.

NOTE: Prior to completion of negotiations and issuance of the supplemental agreement, any delivery schedule change shall be coordinated with the Principle Contracting Officer (PCO).

[X] Negotiate, or negotiate and execute, supplemental agreements changing contract delivery schedules.

[X] Negotiate, or negotiate and execute, supplemental agreements providing for the deobligation of unexpended dollar balances excess to known contract requirements.

[ ] Negotiate changes to interim billing prices.

[X] Issue amended shipping instructions and, when necessary, negotiate and execute supplemental agreements incorporating contractor proposals resulting from the amended shipping instructions.

## G.10 NOTE TO PAYING OFFICE: ADDRESS OF PAYEE

The Contractor shall identify the address to which payments shall be made, if different from that identified on the SF26. Payments are to be mailed to the following address:

________________________________________

________________________________________

________________________________________

## G.12 APPROPRIATION DATA

Accounting and Appropriation Data for this contract is as follows:

| ACRN | ACCOUNTING AND APPROPRIATION DATA | DOLLARS OBLIGATED |
|---|---|---|
| AA | 1741810 52D6 000 EA152 0 068342 2D 000000 D60010000000 | $4,416,645.54 |

## G.14 EXTENDED MAINTENANCE FUNDING

(a) This contract specifies a not-to-exceed amount for per-call maintenance services (labor and travel) outside the Principal Period of Maintenance (OPPM). The Government may unilaterally modify the contract to increase the not-to-exceed amount for these services. However, the Contractor is not obligated to perform, and the Government is not obligated to pay for, services in excess of the dollars specified in Section B.

(b) However, the Contractor is not obligated to perform, and the Government is not obligated to pay, for services that will cause the total maximum value of the contract to be exceeded.

(c) Charges for per-call services shall be invoiced separately and on a calendar month basis

listing the date(s) performed, the service(s) performed, the number of hours, and the reasons for the services.

## G.15 GOVERNMENT DOWNTIME CREDIT

The amount of creditable hours (for failure to arrive within the response time designated in Clause C.21 ("On-Site Maintenance") shall be accumulated for the month and adjusted to the nearest hour. The amount of credit for each hour in excess of the specified response time shall be computed at the applicable OPPM rate specified in the Schedule. The total credit during any month shall not exceed the Total Monthly Maintenance Charge.

## G.16 CALCULATION OF DOWNTIME CREDIT

(a) Definition. System downtime is that period of time when the system is inoperative and no scheduled workload can be accomplished due to a malfunction in the Contractor-supplied/maintained equipment or operating software or the system is inoperative and no scheduled workload can be accomplished because the system is released to the Contractor for remedial services.

(b) Period of Downtime. Downtime shall commence at the time of the actual contact (or bona-fide attempt as defined in the glossary) with the Contractor's maintenance representative at the designated point of contact or with the Contractor's answering service or other continuous telephone coverage provided to permit the Government to make such contact. Downtime shall end when the system and/or machine is returned to the Government in operable condition, including operating software regeneration, if required, ready to perform the scheduled workload. The Contractor shall not be responsible for input of lost workload data.

(c) Maintenance Credit for System Downtime. If the system remains inoperative and cannot perform the scheduled workload due to an equipment or operating software malfunction through no fault or negligence of the Government for a period of _5_ consecutive minutes, or more than _10_ non-consecutive minutes during a twenty-four (24) hour period, the Contractor shall grant a credit to the Government for each minute of downtime in the amount of one-half (1/2) of one percent of the Total Monthly Charges due under this contract, as defined in Section J, Attachment 1, Glossary. However, no credit shall be due the Government for operating software malfunctions when

> (1) the malfunction is not attributable solely to the Contractor-supplied/maintained software, and/or
>
> (2) the Government has made any additions or alterations or otherwise modified the operating software.

The credit for system downtime shall be computed to the nearest half or whole minute. No credit shall accrue to the Government during those periods when the Contractor is denied access to the equipment and the amount of credit granted shall not exceed 1/30th of the Total Monthly Charges for any calendar day.

(d) Maintenance Credit for Equipment Downtime. If a machine remains unusable due to an equipment and/or operating software malfunction through no fault or negligence of the Government, for a period of _2_ consecutive hours or more than _4_ non-consecutive hours during a twenty four (24) hour period, the Contractor shall grant a credit to the Government for each hour of downtime in the amount of one-half (1/2) of one percent of Total Monthly Charges due under this contract, as defined in Section J, Attachment J.1, Glossary, plus similar credits for any other machine(s) supplied under this contract not usable as a result of the malfunction. No credit shall accrue to the Government during those periods when the Contractor is denied access to the equipment and the amount of credit granted under this paragraph for each machine shall not exceed 1/30th of the Total Monthly Charge for the machine for any calendar day. Credit for equipment or software malfunctions shall be computed to the nearest half or whole hour. However, no credit shall be due the Government for operating software or equipment malfunctions when

(1) the malfunction is not attributed solely to the Contractor supplied/maintained software or equipment and/or

(2) the Government has made any additions or alterations or otherwise modified the operating software or equipment.

During a period of downtime, the Government may use operable equipment when such action does not interfere with remedial maintenance. The credit provisions of this paragraph do not apply when paragraph (c) herein is invoked.

(e) Purchased System and/or Equipment. For purchased system/equipment, maintenance downtime credits apply only during the period in which the Contractor has maintenance responsibility.

**G.18 SUBMISSION OF INVOICES IN CONTRACTS FOR ACQUISITION OF FEDERAL INFORMATION PROCESSING (FIP) RESOURCES INCLUDING LEASE, MAINTENANCE, RENTAL AND/OR SUPPORT SERVICES, SUP 5252.232-9003 (JUN 1992)**

(a) The Contractor shall submit original DD-250s with _3_ copies to the address identified on the solicitation/contract award form (SF33 - Block 23), for certification prior to payment.

(b) In addition to the information identified in the clause entitled "Prompt Payment" herein, in, DD-250s shall include the following information:

(1) Contract Line Item Number (CLIN):
(2) Contract Subline Item Number (SLIN), if applicable;
(3) Accounting Classification Reference Number (ACRN);
(4) Payment terms;
(5) Name and serial number of equipment provided or serviced;
(6) Total charges and, if applicable, the Prompt Payment discount.

(c) The Contractor shall submit DD-205s for basic monthly charges in the month following the month for which the charges accrue and not more than on a monthly basis. Payment for rental or services of less than one month's duration shall be prorated at 1/30th of the basic monthly charges for each calendar day.

(d) If maintenance credits apply, the procedures indicated below are applicable:

[ X ] The Government will request, in writing, that the applicable credits for the month be applied against other charges, The request will list the following information:

Type and model number(s) of machine(s);
Date of Occurrence;
Period of downtime; and Credit due.

Invoices for remedial (on-call) maintenance will be accompanied by copies of the applicable malfunction reports regarding the on-call maintenance furnished.

[ ] The government will deduct the credits from the monthly invoice and inform the contractor in writing of the reason.

## G.20 INVOICING ADDRESS

Invoices shall be sent to the following address(es):

NAME: MR. PERCY TOLBERT
MAIL ADDRESS: Space and Naval Warfare Systems Command
Code PMW-152-21F
2451 Crystal Drive
Arlington, VA 22245-5200

TELEPHONE NUMBER: (703) 602-8332 Ext. 548

## G.23 SERVICE CONTRACT GUIDELINES

All Naval personnel involved in inspection or surveillance of Contractor services or liaison with contractor personnel shall conform to the guidelines for using contractor services set forth in the latest version to SECNAVINST 4200.27A.

## G.24 SUBCONTRACTING PLAN

The Contractor's subcontracting plan number *__________, dated ____________ is determined to be acceptable and is hereby incorporated as Attachment ____. A copy of the plan shall be provided to the ACO.

*Not required.

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H.2 ADVERTISING OF AWARD

The Contractor agrees not to refer to awards in commercial advertising in such a manner as to state or imply that the product or service provided is endorsed or preferred by the Federal Government or is considered by the Government to be superior to other products or services.

### H.4 POST-AWARD CONFERENCE, (NAVSUP)(JAN 1992)

(a) A post-award conference shall be conducted within 30 days after contract award with representatives of the Contractor, the cognizant Contract Administration Office, and the Contracting Officer at _______to be determined_________. The Contracting Officer, or designated representative, initiating the conference will designate, or act as, the chairperson. At the request of the Procuring Contracting Officer, conference arrangements will be made by the Contract Administration Office, including notification to the Contractor and the Contracting Officer.

(b) The requirement for a post-award conference shall in no event constitute grounds for excusable delay by the Contractor in performance of any provisions in the contract.

## SECTION I - CONTRACT CLAUSES

### I.1 CLAUSES INCORPORATED BY REFERENCE

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER I) CLAUSES
II. DOD FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES

CAUTION TO OFFERORS: THE OFFEROR IS CAUTIONED NOT TO DELETE CLAUSES FROM NOR ADD CLAUSES TO THE FOLLOWING CONTRACT CLAUSE LIST. SUCH AN ACTION MAY CAUSE THE OFFER TO BE REJECTED. NOTE THE AVAILABILITY OF TEXT OF CLAUSES: THE COMPLETE TEXT OF SPECIFIC CLAUSES IS CONTAINED IN TITLES 48 AND 41 OF THE CODE OF FEDERAL REGULATIONS (CFR) AND IS AVAILABLE AT MOST COMPLETE LAW LIBRARIES.

| CLAUSE | TITLE | DATE |
|---|---|---|
| 252.201-7000 | CONTRACTING OFFICER'S REPRESENTATIVE | DEC 1991 |
| 52.202-1 | DEFINITIONS | APR 1984 |
| 52.203-1 | OFFICIALS NOT TO BENEFIT | APR 1984 |
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES | APR 1984 |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | JUL 1985 |
| 52.203-7 | ANTI-KICKBACK PROCEDURES | OCT 1988 |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | SEP 1990 |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | JAN 1990 |
| 252.203-7000 | STATUTORY PROHIBITIONS ON COMPENSATION TO FORMER DoD EMPLOYEES | DEC 1991 |
| 252.203-7001 | SPECIAL PROHIBITION ON EMPLOYMENT | DEC 1991 |
| 252.203-7002 | DISPLAY OF DoD HOTLINE POSTER | DEC 1991 |
| 52.204-2 | SECURITY REQUIREMENTS | APR 1984 |
| 252.204-7000 | DISCLOSURE OF INFORMATION | DEC 1991 |
| 252.204-7002 | PAYMENT FOR SUBLINE ITEMS NOT SEPARATELY PRICED | DEC 1991 |
| 252.205-7000 | PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS | DEC 1991 |

| | | |
|---|---|---|
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | NOV 1992 |
| 52.210-5 | NEW MATERIAL | APR 1984 |
| 52.210-7 | USED OR RECONDITIONED MATERIAL, RESIDUAL INVENTORY, AND FORMER GOVERNMENT SURPLUS PROPERTY | APR 1984 |
| 52.212-8 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS | SEP 1990 |
| 52.215-1 | EXAMINATION OF RECORDS BY COMPTROLLER GENERAL | APR 1984 |
| 52.215-2 | AUDIT-NEGOTIATION | DEC 1989 |
| 52.215-22 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA | DEC 1991 |
| 52.215-24 | SUBCONTRACTOR COST OR PRICING DATA | DEC 1991 |
| 52.215-25 | SUBCONTRACTOR COST OR PRICING DATA - MODIFICATIONS | DEC 1991 |
| 52.215-26 | INTEGRITY OF UNIT PRICES | APR 1991 |
| 52.215-27 | TERMINATION OF DEFINED BENEFIT PENSION PLANS | SEP 1989 |
| 52.215-33 | ORDER OF PRECEDENCE | JAN 1986 |
| 52.215-39 | REVERSION OR ADJUSTMENT OF PLANS FOR POST-RETIREMENT BENEFITS OTHER THAN PENSIONS (PRB) | JUL 1991 |
| 252.215-7000 | PRICING ADJUSTMENTS | DEC 1991 |
| 252.215-7002 | COST ESTIMATING SYSTEM REQUIREMENTS | DEC 1991 |
| 252.215-7003 | INDUSTRIAL MODERNIZATION INCENTIVE PROGRAM (IMIP) PRODUCTIVITY SAVINGS REWARDS | DEC 1991 |
| 52.219-8 | UTILIZATION OF SMALL-BUSINESS CONCERNS AND SMALL DISADVANTAGED BUSINESS CONCERNS | FEB 1990 |
| 52.219-9 | SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN | JAN 1991 |
| 52.219-13 | UTILIZATION OF WOMEN-OWNED SMALL BUSINESSES | AUG 1986 |
| 52.219-16 | LIQUIDATED DAMAGES-SMALL BUSINESS SUBCONTRACTING PLAN | AUG 1989 |

| | | |
|---|---|---|
| 252.219-7003 | SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN (DoD CONTRACTS) | DEC 1991 |
| 252.219-7005 | INCENTIVE FOR SUBCONTRACTING WITH SMALL BUSINESSES, SMALL DISADVANTAGED BUSINESSES, HISTORICALLY BLACK COLLEGES AND UNIVERSITIES, AND MINORITY INSTITUTIONS | DEC 1991 |
| 52.220-3 | UTILIZATION OF LABOR-SURPLUS AREA CONCERNS | APR 1984 |
| 52.220-4 | LABOR SURPLUS AREA SUBCONTRACTING PROGRAM | APR 1984 |
| 52.222-18 | NOTIFICATION OF EMPLOYEE RIGHTS CONCERNING PAYMENT OF UNION DUES OR FEES | MAY 1992 |
| 52.222-20 | WALSH-HEALEY PUBLIC CONTRACTS ACT | APR 1984 |
| 52.222-26 | EQUAL OPPORTUNITY | APR 1984 |
| 52.222-28 | EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS | APR 1984 |
| 52.222-35 | AFFIRMATIVE ACTION FOR SPECIAL DISABLED AND VIETNAM ERA VETERANS | APR 1984 |
| 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS | APR 1984 |
| 52.222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA | JAN 1988 |
| 252.222-7000 | RESTRICTIONS ON EMPLOYMENT OF PERSONNEL | DEC 1991 |
| 52.223-2 | CLEAN AIR AND WATER | APR 1984 |
| 52.223-6 | DRUG-FREE WORKPLACE | JUL 1990 |
| 252.223-7004 | DRUG-FREE WORK FORCE | SEP 1988 |
| 52.225-10 | DUTY-FREE ENTRY | APR 1984 |
| 52.225-11 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES | APR 1984 |
| 252.225-7001 | BUY-AMERICAN ACT AND BALANCE OF PAYMENTS PROGRAM | DEC 1991 |
| 252.225-7002 | QUALIFYING COUNTRY SOURCES AS SUBCONTRACTORS | DEC 1991 |
| 252.225-7007 | TRADE AGREEMENTS ACT | DEC 1991 |
| 252.225-7009 | DUTY-FREE ENTRY - QUALIFYING COUNTRY END-PRODUCTS AND SUPPLIES | DEC 1991 |

| | | |
|---|---|---|
| 252.225-7010 | DUTY-FREE ENTRY - ADDITIONAL PROVISIONS | DEC 1991 |
| 252.225-7012 | PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES | DEC 1991 |
| 252.225-7031 | SECONDARY ARAB BOYCOTT OF ISRAEL | JUN 1992 |
| 52.226-1 | UTILIZATION OF INDIAN ORGANIZATIONS AND INDIAN-OWNED ECONOMIC ENTERPRISES | AUG 1991 |
| 52.227-1 | AUTHORIZATION AND CONSENT | APR 1984 |
| 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT | APR 1984 |
| 52.227-3 | PATENT INDEMNITY | APR 1984 |
| 52.227-14 | RIGHTS IN DATA - GENERAL | JUN 1987 |
| 252.227-7000 | NON-ESTOPPEL | OCT 1966 |
| 252.227-7013 | RIGHTS IN TECHNICAL DATA AND COMPUTER SOFTWARE | OCT 1988 |
| 252.227-7018 | RESTRICTIVE MARKINGS ON TECHNICAL DATA | OCT 1988 |
| 252.227-7029 | IDENTIFICATION OF TECHNICAL DATA | APR 1988 |
| 252.227-7030 | TECHNICAL DATA - WITHHOLDING OF PAYMENTS | OCT 1988 |
| 252.227-7031 | DATA REQUIREMENTS | OCT 1988 |
| 252.227-7036 | CERTIFICATION OF TECHNICAL DATA CONFORMITY | MAY 1987 |
| 252.227-7037 | VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA | APR 1988 |
| 52.228-5 | INSURANCE - WORK ON A GOVERNMENT INSTALLATION | SEP 1989 |
| 52.229-3 | FEDERAL, STATE AND LOCAL TAXES | JAN 1991 |
| 52.229-5 | TAXES - CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO | APR 1984 |
| 52.230-2 | COST ACCOUNTING STANDARDS | AUG 1992 |
| 52.230-3 | DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES | AUG 1992 |
| 52.230-5 | ADMINISTRATION OF COST ACCOUNTING STANDARDS | AUG 1992 |
| 252.231-7000 | SUPPLEMENTAL COST PRINCIPLES | DEC 1991 |
| 52.232-1 | PAYMENTS | APR 1984 |
| 52.232-8 | DISCOUNTS FOR PROMPT PAYMENT | APR 1989 |
| 52.232-9 | LIMITATION ON WITHHOLDING OF PAYMENTS | APR 1984 |
| 52.232-11 | EXTRAS | APR 1984 |
| 52.232-16 | PROGRESS PAYMENTS | JUL 1991 |
| 52.232-17 | INTEREST | JAN 1991 |

| | | |
|---|---|---|
| 52.232-18 | AVAILABILITY OF FUNDS | APR 1984 |
| 52.232-23 | ASSIGNMENT OF CLAIMS | JAN 1986 |
| 52.232-25 | PROMPT PAYMENT | SEP 1992 |
| 252.232-7004 | DOD PROGRESS PAYMENT RATES | DEC 1991 |
| 252.232-7006 | REDUCTION OR SUSPENSION OF CONTRACT PAYMENTS UPON FINDING OF FRAUD | AUG 1992 |
| 52.233-1 | DISPUTES | DEC 1991 |
| | Alternate I | DEC 1991 |
| 52.233-3 | PROTEST AFTER AWARD | AUG 1989 |
| 252.233-7000 | CERTIFICATION OF CLAIMS AND REQUESTS FOR ADJUSTMENT OR RELIEF | DEC 1991 |
| 52.237-2 | PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT AND VEGETATION | APR 1984 |
| 252.239-7000 | PROTECTION AGAINST COMPROMISING EMANATIONS | DEC 1991 |
| 52.242-13 | BANKRUPTCY | APR 1991 |
| 252.242-7000 | POSTAWARD CONFERENCE | DEC 1991 |
| 252.242-7004 | MATERIAL MANAGEMENT AND ACCOUNTING SYSTEM | DEC 1991 |
| 52.243-1 | CHANGES - FIXED PRICE | AUG 1987 |
| 52.243-6 | CHANGE ORDER ACCOUNTING | APR 1984 |
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS | DEC 1991 |
| 52.244-1 | SUBCONTRACTS (FIXED-PRICE CONTRACTS) | APR 1991 |
| 52.245-2 | GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS) | DEC 1989 |
| 52.245-19 | SPECIAL TEST EQUIPMENT | AUG 1988 |
| 52.246-23 | LIMITATION OF LIABILITY | |
| 52.246-24 | LIMITATION OF LIABILITY - HIGH-VALUE ITEMS | APR 1984 |
| | Alternate I | APR 1984 |
| 52.246-25 | LIMITATION OF LIABILITY - SERVICES | APR 1984 |
| 252.246-7000 | MATERIAL INSPECTION AND RECEIVING REPORT | DEC 1991 |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA | DEC 1991 |
| 252.247-7024 | NOTIFICATION OF TRANSPORTATION OF SUPPLIES BY SEA | DEC 1991 |
| 52.248-1 | VALUE ENGINEERING | MAR 1989 |
| 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED PRICE) | APR 1984 |

| | | |
|---|---|---|
| **52.249-8** | **DEFAULT (FIXED-PRICE SUPPLY AND SERVICE)** | **APR 1984** |
| **252.249-7001** | **NOTICE OF SUBSTANTIAL IMPACT ON EMPLOYMENT** | **DEC 1991** |
| **52.253-1** | **COMPUTER GENERATION OF FORMS BY THE PUBLIC** | **JAN 1991** |

## I.2 REQUIREMENT FOR PROCUREMENT INTEGRITY - MODIFICATION, FAR 52.203-9 (NOV 1990)

(a) Definitions. The definitions at FAR 3.104-4 are hereby incorporated in this clause.

(b) The Contractor agrees that it will execute the certification set forth in paragraph (c) of this clause when requested by the Contracting Officer in connection with the execution of any modification of this contract.

(c) Certification. As required in paragraph (b) of this clause, the officer or employee responsible for this offer shall execute the following certification:

CERTIFICATE OF PROCUREMENT INTEGRITY - MODIFICATION

(1) I, ________________________________ [Name of certifier], am the officer or employee responsible for the preparation of this modification proposal and hereby certify that, to the best of my knowledge and belief, with the exception of any information described in this certificate, I have no information concerning a violation or possible violation of subsection 27(a), (b), (d), or (f) of the Office of Federal Procurement Policy Act, as amended* (41 U.S.C. 423), (hereinafter referred to as "the Act"), as implemented in the FAR, occurring during the conduct of this procurement N00600-9 - - (contract and modification number).

(2) As required by subsection 27(e)(1)(8) of the Act, I further certify that, to the best of my knowledge and belief, each officer, employee, agent, representative, and consultant of ______________________________ [Name of offeror] who has participated personally and substantially in the preparation or submission of this proposal has certified that he or she is familiar with, and will comply with, the requirements of subsection 27(a) of the Act, as implemented in the FAR, and will report immediately to me any information concerning a violation or possible violation of the Act, as implemented in the FAR, pertaining to this procurement.

(3) Violations or possible violations (Continue on plain bond paper if necessary and label Certificate of Procurement Integrity (Continuation Sheet), ENTER NONE IF NONE EXISTS):

[Signature of the officer or employee responsible for the modification proposal and date]

[Typed Name of the officer or employee responsible for the modification proposal]

*Subsections 27(a), (b), and (d) are effective on December 1, 1990. Subsection 27(f) is effective on June 1, 1991.

THIS CERTIFICATION CONCERNS A MATTER WITHIN THE JURISDICTION OF AN AGENCY OF THE UNITED STATES AND THE MAKING OF A FALSE, FICTITIOUS, OR FRAUDULENT CERTIFICATION MAY RENDER THE MAKER SUBJECT TO PROSECUTION UNDER TITLE 18, UNITED STATES CODE, SECTION 1001.

(d) In making the certification in paragraph (2) of the certificate, the officer or employee of the competing Contractor responsible for the offer or bid may rely upon a one-time certification from each individual required to submit a certification to the competing Contractor, supplemented by periodic training. These certifications shall be obtained at the earliest possible date after an individual required to certify begins employment or association with the Contractor. If a Contractor decides to rely on a certification executed prior to the suspension of section 27, the Contractor shall ensure that an individual who has so certified is notified that section 27 has been reinstated. These certifications shall be maintained by the Contractor for a period of 6 years from the date a certifying employee's employment with the company ends or, for an agency, representative, or consultant, 6 years from the date such individual ceases to act on behalf of the Contractor.

(e) The certification required by paragraph (c) of this clause is a material representation of fact upon which reliance will be placed in executing this modification.

---

**I.3 CERTIFICATION OF COMMERCIAL PRICING FOR PARTS OR COMPONENTS, FAR 52.215-32 - Alternate I (JUL 1990)**

The requirements of this clause shall become operative only for any modification to this contract involving the furnishing of parts or components, as defined in paragraph (a) of this clause, if awarded as a result of other than full and open competition.

(a) Definitions.

"Lowest commercial price," as used in this clause, means the lowest price at which a sale was made to the general public of a particular part or component. The terms does not include a price at which a sale was made to -

(1) Any agency of the united States;

(2) Customers located outside the United States; or

(3) A subsidiary, affiliate, or parent business organization of the Contractor, or any other branch of the same business entity. "Part or component," as used in this clause, means any individual part, component, subassembly, assembly or subsystem integral to a major system, and other property which may be replaced during the life of the system, and includes spare parts and replenishment spare parts, but does not include packaging or labeling associated with shipment or identification of a part or component.

(b) Submission requirements. The Offeror/Contractor shall execute and submit to the Contracting Officer the following certificate with any offer/proposal as required by FAR 15.813-4 when requested by the Contracting Officer:

CERTIFICATE OF COMMERCIAL PRICING FOR PARTS OR COMPONENTS

(1) Unless justified in subparagraph (b)(2) of this clause, by submission this offer/proposal, the Offeror/Contractor certifies that, to the best of its knowledge and belief, the prices offered for those parts or components (whether or not separately identified) that the Contractor offers for sale are no higher than the lowest commercial price at which such items were sold to the public during the most recent regular monthly, quarterly, or other period for which sales data are reasonably available, provided that in no event shall this period be less than 1-month in duration.

(2) All parts or components for which prices offered are higher than the lowest commercial price referred to in subparagraph (b)(1) of this certificate are identified below (including the amounts by which such offered prices are higher) and a written justification for the differences is attached (list as necessary):

| Part or Component | Price Differences |
| --- | --- |
| None | |
| | |
| | |
| | |

Offer/Proposal Number ______________________

Time period for sales data ______________________________
Firm ______________________________

Typed name and signature ______________________________

Title ______________________________

Date ______________________________

(c) Audit. The Contracting Officer or representatives of the Contracting Officer who are employees of the Government shall have the right to examine and audit all directly pertinent records of sales and related documents, including contract terms and conditions necessary to verify the validity of any certificate executed in accordance with paragraph (b) of this clause. The Contractor shall make those records, books, data, and documents available for examination, audit, or reproduction until 3 years after the date the certificate set forth in paragraph (b) of this clause is executed. Nothing contained in this clause shall require the submission of cost or pricing data not otherwise required by law or regulation.

(d) Price reduction. If any price, including profit or fee negotiated in connection with this contract, or any cost reimbursable under this contract, has increased because the certification paragraph (b)(1) of the certificate or the information provided as justification in subparagraph (b)(2) of the certificate was inaccurate, incomplete, or misleading, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.

## I.8 OPTION FOR INCREASED QUANTITY - SEPARATELY PRICED LINE-ITEM (MAR 1989) FAR 52.217-7

The Government may require the delivery of the numbered line item, identified in the Schedule as an option item, in the quantity and at the price stated in the Schedule. The Contracting Officer may exercise the option by written notice to the Contractor 90 days before exercise. Delivery of added items shall continue at the same rate that like items are called for under the contract, unless the parties otherwise agree.*

*The Government reserves the right to exercise any of the following options at any time between date of contract award (plus applicable notice period) and 31 Jan 1996: Lot II - Option I, Lot III - Option II, Lot IV - Option III, and Lot V - Option IV,

## I.9 OPTION TO EXTEND THE TERM OF THE CONTRACT, (MAR 1989) FAR 52.217-9

(a) The Government may extend the term of this contract by written notice to the contractor within 30 days of contract expiration; provided that the Government shall give the Contractor preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.*

(b) If the Government exercises this option, the extended contract shall be considered to include this option provision consideration.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 60 months.

*The Government reserves the right to decrease the quantity of a line item within the option based upon an ATC system not yet being ready for maintenance and training (i.e. installation and acceptance have not been completed).

## I.16 NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS, DFARS 252.219-7006 (DEC 1991)

(Deleted in accordance with Amendment 1 Paragraph 5).

## I.17 PRIOR WRITTEN PERMISSION REQUIRED FOR SUBCONTRACTS

None of the services required by this contract shall be subcontracted to, nor performed by, persons other than the Contractor's employees without the prior written consent of the Procuring Contracting Officer (PCO).

**I.18 SUBCONTRACTING PLAN - INCORPORATED**

(Not applicable; ISN is a small business).

**I.21 PREFERENCE FOR LABOR - SURPLUS AREA CONCERNS, FAR 52.220-1 (APR 1984)**

(a) This acquisition is not a set-aside for labor-surplus area (LSA) concerns. However, the Offeror's status as such a concern may affect

(1) entitlement to award in case of tie offers;

(2) offer evaluation in accordance with the Buy American Act clause of this solicitation.

In order to determine whether the Offeror is entitled to a preference under (1) or (2) above, the Offeror must identify, below, the LSA in which the costs to be incurred on account of manufacturing or production (by the manufacturer or the first-tier subcontractors) amount to more than 50% of the contract price.

______Not Applicable__________ ________________________________

(b) Failure to identify the locations as specified above will preclude consideration of the Offeror as an LSA concern. If the Offeror is awarded a contract as an LSA concern and would not have otherwise qualified for award, the Offeror shall perform the contract or cause the contract to be performed in accordance with the obligations of an LSA concern.

**I.22 EXEMPTION FROM APPLICATION OF SERVICE CONTRACT ACT PROVISIONS, (MAY 1989) FAR 52.222-48**

(a) The following certification shall be checked:

CERTIFICATION

The offeror certifies (X) does not certify ( ) that:

(i) The items of equipment to be serviced under this contract are commercial items which are used regularly for other than Government purposes, and are sold or traded by the Contractor in substantial quantities to the general public in the course of normal business operations;

(ii) The contract services are furnished at prices which are, or are based on, established catalog or market prices for the maintenance, calibration, and/or repair of certain ADP, scientific and medical, and/or office and business equipment. An "established catalog price" is a price included in a catalog, price list schedule, or other form that is regularly maintained by the manufacturer or the Contractor, is either published or otherwise available for inspection by customers, and states prices at which sales are currently, or were last, made to a significant number of buyers constituting the general public. An "established market price" is a current price, established in the usual course of trade between buyers and sellers free to bargain, which can be substantiated from sources independent of the manufacturer or Contractor; and

(iii) The Contractor utilizes the same compensation (wage and fringe benefits) plan for all service employees performing work under the contract as the Contractor uses for equivalent employees servicing the same equipment of commercial customers.

(b) If a negative certification is made and a Service Contract Act wage determination is not attached to the solicitation, the Contractor shall notify the Contracting Officer as soon as possible.

(c) Failure to execute the certification in paragraph (a) of this clause or to contact the Contracting Officer as required in paragraph (b) of this clause may render the bid or offer nonresponsive.

**I.23 SUPPLIES TO BE ACCORDED DUTY - FREE ENTRY, DFARS 252.225-7008 (DEC 1991)**

In accordance with paragraph (a) of the Duty-Free Entry clause and/or paragraph (b) of the Duty-Free Entry -- Qualifying Country End-Products and Supplies clause of this contract, the following supplies are accorded duty-free entry:

______________

____ Not Applicable ___

______________

## I.26 RIGHTS TO PROPOSAL DATA (TECHNICAL) FAR 52.227-23 (JUN 1987)

Except for data contained on pages __________, it is agreed that as a condition of award of this contract, and notwithstanding the conditions of any notice appearing thereon, the government shall have unlimited rights (as defined in the "Rights in Data -- General" clause contained in this contract) in and to the technical data contained in the proposal dated __11/01/93__, upon which this contract is based.

## I.30 FIRMR APPLICABILITY, FIRMR 201-39.5202-1 (OCT 1990)

This solicitation/contract requires the use or delivery of Federal Information Processing resources, but the Agency has determined that FIRMR Part 201-39 does not apply based on the exception set for in Section 201-39.101-3(b)(ii).

## I.32 PRIVACY OR SECURITY SAFEGUARDS, FIRMR 201-39.5202-5 (OCT 1990)

(a) The details of any safeguards the Contractor may design or develop under this contract are the property of the Government and shall not be published or disclosed in any way without the consent of the Contracting Officer's express written consent.

(b) The details of any safeguards that may be revealed to the Contractor by the Government in the course of performance under this contract shall not be published or disclosed in any manner without the Contracting Officer's express written consent.

(c) The Government shall be accorded full, free, and uninhibited access to all installations, technical capabilities, operations, documentation, records, and databases for the purpose of carrying out a program of inspection to ensure continued efficacy and efficiency of safeguards against threats and hazards to data security, integrity and confidentiality.

(d) If new or unanticipated threats or hazards are discovered by either the Government or the Contractor, or if existing safeguards have ceased to function, the discoverer shall immediately bring the situation to the attention of the other party. Mutual agreement shall then be reached

on changes or corrections to existing safeguards or institution of new safeguards, with final determination of appropriateness being made by the government. The government's liability is limited to an equitable adjustment of cost for such corrections, and the government shall not be liable for claims of loss of business, damage to reputation, or damages of any other kind arising from discovery of new or unanticipated threats or hazards, or any public or private disclosure thereof.

**I.33 WARRANTY EXCLUSION AND LIMITATION OF DAMAGES FIRMR 201-39.5202-6 (OCT 1990)**

Except as expressly set forth in writing in this agreement, and except for the warranty of merchantability, there are no warranties expressed or implied. In no event will the Contractor be liable to the Government for consequential damages as defined in the Uniform Commercial Code, Section 2-715, in effect in the District of Columbia as of January 1, 1983, i.e., consequential damages resulting from the seller's breach include --

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could have been reasonably prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty.

**I.34 REFURBISHED EQUIPMENT CERTIFICATION, SUP 5252.239-9406 (JAN 1992)**

All refurbished or remanufactured equipment supplied to the government must be accompanied by a "Certificate of Maintainability" from the applicable original equipment manufacturer. This certificate must indicate, at the minimum, the following:

(a) Model and serial number of the equipment certified;
(b) Expiration date, if any, of the certification;
(c) Release level of the equipment;
(d) Certification that the manufacturer will accept the equipment for maintenance.

This certification must be received prior to the government commencing evaluation against the acceptance criteria described in Section E. The Contractor shall have the responsibility for contacting the original equipment manufacturer and arranging for equipment certification, which is inclusive of any or all repair/refurbishment. All costs associated with equipment certification will be borne by the Contractor.

**I.35 ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO PURCHASE OF FIP RESOURCES SYSTEMS LIFE CONTRACTS, SUP 5252.239-9409 (JAN 1992)**

(a) Warranty. The following warranty is in addition to the clause at FAR 52.246-18 (if incorporated into Section I), and shall not limit the right of the Government under that clause.

(1) Warranty Period. The Contractor shall furnish, at no cost to the Government, all maintenance (labor and parts), as specified in this contract, both during and outside the Principal Period of Maintenance, for a period of one (1) year beginning on the first day of the successful performance period.

(2) Replaced Parts. All replaced parts during the warranty period shall become the property of the Contractor.

(3) Cost of Movement. Prior to the expiration of the warranty period, whenever equipment is shipped for mechanical replacement purposes, the Contractor shall bear all costs, including but not limited to, costs of packing, transportation, rigging, drayage, and insurance.

(4) Fault of Government. The warranty shall not apply to maintenance required due to the fault or negligence of the Government.

(b) Title (Under Purchase). Title of each machine, including special features installed thereon, will pass to the government when the purchase price is paid.

(c) Purchase of Installed Rental Equipment. N/A. Installed rental equipment acquired under the provisions of paragraph N/A may be purchased at any time. The purchase allowance shall be in accordance with paragraph N/A. All applicable provisions of paragraphs N/A shall apply. Provided that the Contractor clearly demonstrates that the equipment is in good operating condition, the effective date of purchase shall be either

(1) The day following receipt by the Contractor of a funded contract amendment, or funded purchase order; or

(2) A later date if so specified in the order; or

(3) An earlier date when mutually agreed to, and a confirming order is received within thirty (30) day after the effective date of purchase.

## I.36 ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO SOFTWARE ACQUISITION, SUP 5252.239-9410 (JAN 1992)

(a) Warranty. All software furnished pursuant to the terms and conditions of this contract shall be unconditionally guaranteed for a period of one (1) year beginning on the first day of acceptance.

(b) Title. Title to software systems acquired under this contract and any reproductions or versions thereof shall remain with the Contractor.

(c) Risk of Loss or Damage. The government shall be relieved from all risks of loss or damage to the software.

(d) Liability for Injury or Damage. The Contractor shall not be liable for any injury to government personnel or damage to government property arising from use of software provided by the Contractor unless such injury or damage is due to the fault or negligence of the Contractor.

## I.37 COMMITMENTS, WARRANTIES, AND REPRESENTATIONS, SUP 5252.239-9413 (JAN 1992)

Any written commitment by the Contractor within the scope of this contact shall be binding upon the Contractor. Failure of the Contractor to fulfill any such commitment shall render the Contractor liable for liquidated, or other such damages due to the government under the terms of this contract. For the purpose of this contract, a written commitment by the Contractor is limited to the proposals submitted by the Contractor, and to specific written modifications to the proposal. Written commitments by the Contractor are further defined as including

(1) any warranty or representation made by the Contractor in a proposal as to hardware or software performance; total systems performance; other physical, design, or functional characteristics of a machine, software package, or system, or installation date;

(2) any warranty or representation made by the Contractor concerning the characteristics or items described in paragraph (1) herein made in any publications, drawings, or specifications accompanying or referred to in a proposal; and

(3) any modification of or affirmation or representation as to the above which is made by the Contractor in or during the course of the Live Test Demonstration or negotiations,

whether or not incorporated into a formal amendment to the proposal in question.

## I.38 CONTRACTOR REPRESENTATION, SUP 5252.239-9415 (JAN 1992)

Unless the Contractor expressly states otherwise in the Contractor's proposal, where functional requirements are expressly stated as part of the requirement of the solicitation, the Contractor, by responding, represents that, in its opinion, the system(s)/item(s) proposed is/are capable of meeting those requirements. However, once the system(s)/item(s) is/are accepted by the government, Contractor responsibility under this clause ceases. In the event of any inconsistency between the detailed specification and the functional specification contained in the solicitation, the former shall control.

## I.39 ACQUISITION OF ADPE BY THE CONTRACTOR FOR CONTRACT PERFORMANCE

(a) This clause applies to Contractor-acquired ADPE, except for components as end-items delivered to the government, if the ADPE is for the account of the government, or if title will pass to the government. The Contractor shall comply with the provisions of DFARS 270.6 and receive ACO and PCO approval prior to acquiring ADPE required for the performance of the contract. If approved, the Contractor shall acquire ADPE on a competitive basis unless otherwise specifically approved. Acquisition shall not be made until funding is provided on the contract and the contract is modified to include specifics of the approval.

(b) Nothing herein shall be construed as permission to incur costs in excess of those obligated to the contract, nor does it authorize reimbursement to be made contrary to the payment provisions of the contract.

(c) The Contractor shall not:

(1) acquire ADPE under the contract which is unnecessary for execution of the contract;

(2) acquire ADPE or commercial software for Navy use; or

(3) place commercial software subcontracts for the account of the government under this contract prior to obtaining ACO approval, if required, under the "Subcontracts" clause of this contract.

(d) Under any circumstance, the Contractor shall acquire commercial software competitively to the maximum extent practicable.

(e) The Contractor shall comply with the Government Property clause of the contract and FAR Part 45.

(f) For Labor-Hour and Time-and-Materials contracts, the term contract as used in this clause is understood to mean Delivery Order. The term ADPE is defined in FAR 31.001.

**I.40 CERTIFICATION OF INDIRECT COSTS, (APR 1986) DFARS 252.242-7001**

(a) The Contractor shall --

(1) Certify any proposal to establish or modify billing rates or to establish final indirect-cost rates;

(2) Use the form set forth in paragraph (c) of this clause; and

(3) Have the certificate signed by an individual of the Contractor's organization at a level no lower than a vice president or chief financial officer of the business segment of the Contractor that submits the proposal.

(b) Failure to submit a signed certificate, as described in this clause, shall result in payment of indirect costs at rates unilaterally established by the Government.

(c) The certificate of indirect costs shall read as follows:

CERTIFICATE OF INDIRECT COSTS

This is to certify that to the best of my knowledge and belief:

1. I have reviewed the indirect-cost proposal submitted herewith.

2. All costs included in this proposal N00600-93-R-2790 dated 11/01/93 (identify, date) to establish billing or final indirect cost rates for length of contract (identify period covered by rate) are allowable in accordance with the requirements of contracts to which they apply and with the cost principles of the Department of Defense applicable to those contracts;

3. This proposal does not include any costs which are unallowable under applicable cost principles of the Department of Defense, such as (without limitation): advertising and

public relations costs, contributors and donations, entertainment costs, fines and penalties, lobbying costs, defense of fraud proceedings, and good will; and

4. All costs included in this proposal are properly allocable to Defense contracts on the basis of a beneficial or causal relationship between the expenses incurred and the contracts to which they are allocated in accordance with applicable acquisition regulations.

I declare under penalty of perjury that the foregoing is true and correct.

Firm: ______________________________
Signature: ____________________________
Name of Corporate Official: _______________
Title: ______________________________
Date of Execution: ______________________

## I.42 STANDARD COMMERCIAL WARRANTY, SUP 5252.246-9401 (JAN 1992)

(a) The Offeror shall extend to the government the full coverage of any standard commercial warranty normally offered in a similar commercial sale, provide such warranty is available at no additional cost to the government. Acceptance of the Standard commercial warranty does not waive the government's rights with regard to other terms and conditions of this contract. In the event of a conflict, the terms and conditions of the contract shall take precedence over the standard commercial warranty. The standard commercial warranty period shall begin upon final acceptance of the applicable material and/or services listed in the Schedule.

(b) The Contractor shall provide a copy of its standard commercial warranty (if applicable) with its offer. The /warranty shall cover a period of __5 years__ [Offeror to insert number].

## I.43 LIABILITY, AUTOMOBILE AND WORKMAN'S COMPENSATION INSURANCE

The following types of insurance are required in accordance with the clause entitled "INSURANCE - WORK ON A GOVERNMENT INSTALLATION" (FAR 52.228-5) and shall be maintained in the minimum amounts shown:

(a) Comprehensive General Liability: $200,000 per person and $500,000 per accident for bodily injury.

(b) Automobile Insurance: $200,000 per person and $500,000 per accident for bodily injury and $20,000 per accident for property damage.

(c) Standard Workmen's compensation and Employer's Liability Insurance (or, where maritime employment is involved, Longshoremen's and Harbor Worker's Compensation Insurance) in the minimum amount of $100,000.

## I.44 RISK OF LOSS OR DAMAGE

(a) *Risk of Loss or Damage* - Leased Equipment.

(1) The Government is relieved of all risk of loss or damage to the equipment during periods of transportation and installation, and during the entire time the equipment is in the possession of the Government, except for

(i) loss or damage caused by nuclear reaction, nuclear radiation, radioactive contamination, war, insurrection, civil strife, rebellion, weapons of war; or

(ii) negligence on the part of the Government or its agents, provided however, that the Government shall be relieved of the liability for such risks of loss or damage due to negligence if any commercial customer of the Contractor is relieved of such liability under like circumstances.

(2) If the Government is liable for loss or damage of a machine, the Contractor shall have the option to restore the machine to its previous condition, in which event the Government shall pay the Contractor to perform such restoration at the Contractor's then-current prices, terms and conditions.

(3) If the Contractor elects not to restore the machine, the Government may, at its own expense, restore the machine to its previous condition. If, however, the machine is lost or damaged beyond repair, the Government shall pay to the Contractor the same price for the machine as the Government would have paid had it purchased the machine on the day prior to the loss or damage under the provisions of this contract. This clause shall govern risk of loss or damage, notwithstanding any other provisions of this contract relating to title, payment, or ownership.

(b) Risk of Loss or Damage - Purchased Equipment

(1) The Government is relieved of all risk of loss or damage to the equipment, up to and including the day prior to the first day of a successful performance period, except for

(i) loss or damage caused by nuclear reaction, nuclear radiation, radioactive contamination, war, insurrection, civil strife, rebellion, weapons of war; or

(ii) negligence on the part of the Government or its agents, provided, however, that the Government shall be relieved of the liability for such risks of loss-or damage due to negligence if any commercial customer of the Contractor is relieved of such liability under like circumstances.

(2) If the Government is liable for loss or damage of a machine, the Contractor shall have the option to restore the machine to its previous condition, in which event the Government shall pay the Contractor to perform such restoration at the Contractor's then-current prices, terms and conditions. If the Contractor elects not to restore the machine, the Government may, at its own expense, restore the machine to its previous condition. If, however, the machine is lost or damaged beyond repair, the Government shall pay the Contractor the same price for the machine as the Government would have paid if it had purchased the machine on the day prior to the loss or damage under the provisions of this contract. This clause shall govern risk of loss or damage, notwithstanding any other provisions of this contract relating to title, payment, or ownership.

**I.45 PREPARATION OF VALUE ENGINEERING CHANGE PROPOSALS, DFARS 252.248-7000 (DEC 1991)**

Prepare Value Engineering change proposals, for submission pursuant to the value engineering clause of this contract, in the format prescribed by the version of MIL-STD-973 in effect on the date of contract award.

**I.46 CHANGE PROPOSALS**

(a) After contract award, the Government may solicit, and the Contractor is encouraged to independently propose, changes to the equipment, software specifications, or other requirements of this contract. These changes may be proposed to save money, to improve performance, to save energy, or to satisfy increased data processing requirements. However, if proposed

changes relating to improved performance are necessary to meet increased data processing requirements of the user, those requirements shall not exceed the contract requirements by more than 25%. If the proposed changes are acceptable to both parties, the Contractor shall submit a price proposal to the Government for evaluation. Those proposed changes that are acceptable to the Government will be processed as modifications to the contract.

(b) This clause applies only to those proposed changes identified by the Contractor under a proposal submitted pursuant to the provisions of this clause. At a minimum, the following information shall be submitted by the Contractor with each proposal:

(1) A description of the difference(s) between the existing contract requirement and the proposed change(s), and the comparative advantages and disadvantages of each;

(2) Itemized requirements of the contract which must be changed if the proposal is adopted, and the proposed revision to the contract for each such change;

(3) An estimate of the changes in performance and cost, if any, that will result from adoption of the proposal;

(4) An evaluation of the effects the proposed change would have on collateral costs to the Government, such as Government-furnished property costs, costs of related items, and costs of maintenance and operation; and

(5) A statement of the time by which the change order adopting the proposal must be issued so as to obtain the maximum benefits of the changes during the remainder of this contract. Also, any effect on the contract completion time or delivery schedule shall be identified.

(c) Change proposals submitted to the Contracting Officer shall be processed expeditiously. The Government shall not be liable for proposal preparation costs or any delay in acting upon any proposal submitted pursuant to this clause. The Contractor has the right to withdraw, in whole or in part, any change proposal not accepted by the Government within the period specified in the change proposal. The decision of the Contracting Officer as to the acceptance of any such proposal under this contract shall be final and shall not be subject to the "Disputes" clause of this contract.

(d) The Contracting Officer may accept any change proposal submitted pursuant to this clause by giving the Contractor written notice thereof. This written notice may be given by issuance of a modification to this contract. Unless and until a modification is executed to incorporate a

change proposal under this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract.

(e) If a change proposal submitted pursuant to this clause is accepted and applied to this contract, an equitable adjustment in the contract price and in any other affected provisions of this contract shall be made in accordance with this clause and other applicable clauses of this contract.

(f) The Contractor is requested to identify specifically any information contained in the change proposal which the Contractor considers confidential and/or proprietary. Identification of information as confidential and/or proprietary is for information purposes only shall not be binding on the Government to prevent disclosure of such information. Offerors are advised that such information may be subject to release upon request pursuant to the Freedom of Information Act (5 U.S.C. 552).

(g) Nothing in this clause shall be construed to authorize change proposals which are properly changes under the "Changes" clause or new work which require justification and approval in accordance with FAR Part 6. All matters should be coordinated with the Contracting Officer.

**I.49 CLAUSES INCORPORATED BY REFERENCE, FAR 52.252-2 (JUN 1988)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

**I.50 ALTERATIONS IN CONTRACT, FAR 52.252-4 (APR 1984)**

Portions of this contract are altered as follows:

| | | | | |
|---|---|---|---|---|
| G.4 | G.6 | | G.12 | G.20 |
| G.24 | H.4 | I.18 | I.26 | |

**I.51 AUTHORIZED DEVIATIONS IN CLAUSES, FAR 52.252-6 (APR 1984)**

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR

Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation of any Defense Federal Acquisition Supplement (48 CFR Chapter 2) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

## SECTION J - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

ATTACHMENTS:

1. Glossary (2 pages)
2.* Federal Information Processsing Standards (FIPS) Checklist (8 pages)
3.* Cost/Price Tables for Provision L.21. (6 pages)
4.* Certificate of Performance (1 page)
5.* Live Test Demonstration Evaluation Standards (15 pages)
6. DD Forms 1423 (Exhibits A through AZ)(36 pages)
7.* DD Forms 1664 (95 pages)
8.**DD Form 254 (2 pages)
9. Appendices to the Specification:
   - (A) - NTCC HAMPTON ROADS, (35 pages)
   - (B) - NCTS JAPAN (26 pages)
   - (C) - NTCC MAKALAPA (29 pages)
   - (D) - NTCC CAMP SMITH (23 pages)
   - (E) - NCTS SICILY (37 pages)
   - (F) - NCTS PUERTO RICO (23 pages)
   - (G) - NCTS LONDON (31 pages)
   - (H) - Examples of currently used TCF forms (10 pages)
   - *(I) - ATC NMC Functional Requirements (2 pages)
   - *(J) - List of Acronyms and Abbreviations (2 pages)
   - *(K) - Information Exchange Subsystems (IFS) Descriptions and Signal Flow diagrams(EE130-PL-OMI-020/W142-UHFSATCOM Manual)
10. Contract Administration Plan (2 pages)
11. *Amendments to the RFP (Note: all replacement pages and Pen & Ink changes identified in amendments have been inserted into award document.)
    *Amendment 0001, *Amendment 0002, *Amendment 0003
    *Amendment 0004, *Amendment 0005, *Amendment 0006
    *Amendment 0007, *Amendment 0008, *Amendment 0009
    *Amendment 0010, *Amendment 0011, *Amendment 0012
    *Amendment 0013

Solicitation sections K, L and M have been removed from award document for distribution purposes only.

* Deleted from award document for distribution purposes only.
**DD form 254 will be provided in a subsequent modification to the contract.

ISN proposal dated 11/1/93, revised proposal dated 2/15/94 and BAFO dated 5/18/94 are incorporated into award document by reference.

ORIGINAL

EXHIBIT 47

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORK CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 98-178C (Judge Turner) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION, AND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 26, 33, and 34 of the Rules of the United States Court of Federal Claims, the United States hereby responds to plaintiff's first set of interrogatories, requests for admission, and request for production of documents.

General Statements And Objections

1. Vague, Ambiguous, Irrelevant And Unclear: The United States objects to plaintiff's discovery because it contains interrogatories and requests which are vague, ambiguous, irrelevant or unclear, often because the terms used in the interrogatories are undefined and are not otherwise susceptible to a single meaning. The objectionable requests are specifically identified in the United States' responses set forth below. Nevertheless, the United States has attempted to respond to plaintiff's discovery requests, to the extent possible, by providing the information which appears to have been sought by plaintiff or by providing information responsive to a reasonable interpretation of the individual request.

2. Privileged/Protected Material: The United States objects to the plaintiff's discovery requests to the extent that

Interrogatory No. 8:

State any additional reason, other than those specified in the TCO's December 9, 1997 Letter ISN's Robert Cozzie, a true and correct copy of which is attached hereto a Exhibit "B," why the Gross Settlement for ISN's termination claim was set at $4,049,532 and for each such reason, identify the reason and state the factual basis for you answer, including identifying all persons with knowledge relating thereto and all documents supporting that answer.

RESPONSE: There are no additional reasons.

Interrogatory No. 13:

Pursuant to Paragraph 13 in your Answer, state the percentage of completion by ISN for ATC equipment installation, and the factual basis for computing those percentages, including identifying all persons with knowledge thereof and documents supporting that computation.

RESPONSE: Defendant objects to interrogatory number 13 to the extent that it requires disclosure of communications that are protected from disclosure by the attorney client and/or attorney work product privileges. Defendant further objects to the interrogatory upon the grounds that the manner in which it is worded, when read with its definitions and general instructions, is so vague, broad, general, and all inclusive that it does not permit a proper or reasonable response and is, therefore, unduly burdensome and oppressive. Defendant further objects to interrogatory number 13 upon the ground that it is unduly burdensome because the information sought by plaintiff can be as easily derived or ascertained by plaintiff from its own business records. See RCFC 33(c). Without waiving these objections, defendant responds that the percentage of completion for ATC installation was 95% for CLIN 0001AA. The percentage was computed based on the amount of equipment plaintiff had installed.

Interrogatory No. 14:

Pursuant to Paragraph 13 in your Answer, state the percentage of completion by ISN for the-pair cable fabrication and the cut-over and testing, and the factual basis for computing those percentages, including identifying all persons with knowledge thereof and documents supporting that computation.

RESPONSE: Defendant objects to interrogatory number 13 to the extent that it requires disclosure of communications that are protected from disclosure by the attorney client and/or attorney work product privileges. Defendant further objects to the interrogatory upon the grounds that the manner in which it is worded, when read with its definitions and general instructions, is so vague, broad, general, and all inclusive that it does not permit a proper or reasonable response and is, therefore, unduly burdensome and oppressive. Defendant further objects to interrogatory number 13 upon the ground that it is unduly burdensome because the information sought by plaintiff can be as easily derived or ascertained by plaintiff from its own business records. See RCFC 33(c). Without waiving these objections, defendant responds that the percentage of completion for the-pair cable fabrication and the cut-over and testing for ATC installation was 5% for CLIN 0001AA. Plaintiff had fabricated a significant number of cables, but had not begun the cutover and testing of operational circuits.

EXHIBIT
48

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION<br><br>Plaintiff.<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant | ) | Case No. 02-796C<br>(Judge Allegra) |

PLAINTIFF'S MOTION *IN LIMINE* TO ESTABLISH AS ADMITTED ALL COSTS INCURRED BY PLAINTIFF AS VERIFIED IN DEFENDANT'S AUDIT REPORT OF SUCH COSTS

Plaintiff, Information Systems & Networks Corporation ("plaintiff" or "ISN"), by its undersigned attorneys, hereby moves this Honorable Court *in limine* pursuant to Rules 301, 402, and 403 of the Federal Rules of Evidence to establish as admitted as a conclusive, irrebuttable presumption that ISN has proven its claimed and unpaid costs incurred on the subject contract of $460,708. ISN must still prove entitlement to such costs based on the allegations of the Complaint as well as its loss of profit claim. ISN is entitled to this ruling as a result of the binding evidentiary admissions of the United States ("defendant" or "the Government"). In two of the three depositions taken regarding the audit of the costs performed by the defendant, each deponent independently confirmed that the audit performed verified that the costs incurred on the subject contract above the original contract amount of $460,708 were incurred by ISN on the performance of the subject contract and met all requirements of the Federal Acquisition Regulations ("FAR"), Generally Accepted Government Auditing Standards ("GAGAS") and the DOD FAR Supplement ("DFARS") governing audits for reimbursement except for entitlement. These admissions were made by Mark Moser who authorized the Audit

Report and headed-up the Columbia, Maryland branch office of the Defense Contract Audit Agency ("DCAA"); Benjamin Monastero, the DCAA Auditor who actually performed the audit; and are set forth in the Audit Report. Defendant has therefore conceded, as a result of its Audit Report, and testimony at deposition, that all increased costs in excess of the original contract amount were actually incurred by ISN in connection with the performance of the subject contract and met the auditing standards for verification. ISN, therefore, is not required to prove any of these costs.

ISN is entitled to the presumption of the accuracy of every portion of the Audit Report that is against the Government's interest, and should not be required to present evidence establishing any cost which exceeds the original contract amount and is being claimed in this case. The DCAA has examined all of the relevant evidence in coming to this conclusion, and is the Agency in the Government charged with auditing Contract claims. ISN should not be required to prove costs which have been verified by the DCAA and the Government should not be permitted to introduce evidence to contradict its admission or to now question costs it previously verified. Such evidence is unnecessary, would render the case not suspectible to summary disposition, and would cause confusion in resolving those aspects of ISN's claim for which there remains a material dispute. The material disputes to be resolved at trial primarily regard ISN's entitlement to the admitted costs and loss of profit. The parties should not prolong and complicate the trial by proving or disputing damages already analyzed and verified by the Government's own audit.

## STATEMENT OF RELEVANT FACTS

This Court, in its Opinion of April 12, 2005, set forth in detail the overall background of this case in connection with deciding cross-motions for summary

judgment on Count I of the Complaint for breach of contract. Accordingly, ISN will not repeating such facts but will limit its statement to facts surrounding the Audit Report.

After termination of the contract for convenience, ISN submitted what is generally referred to as a Termination Settlement Proposal ("TSP") consisting of a Settlement Proposal and Schedule of Accounting Information. The TSP claimed total costs incurred and profit $5,060,578. At that time, ISN had been paid $2,507,015. After its submission, the Defense Contract Management Agency ("DCMA") in Atlanta, Georgia requested that DCAA perform an audit of the TSP. The audit responsibility fell on the DCAA Columbia branch office, that had cognizant DCAA authority over ISN. The audit was required to be performed in accordance with GAGAS, as well as requirements in the FAR and DFARS. The Audit Report was issued on December 19, 1996. See Exhibit 1.

The audit was subject to three qualifications, none of which have any relevance to the establishment or auditing of ISN's costs: First, the defendant had not provided DCAA technical reports at the time of the audit.[1] Second, the defendant had not prepared an inventory verification report at the time of the audit.[2] Third, no opinion was expressed on ISN's legal entitlement to the costs. In performing the audit, because the DCAA viewed ISN as a high risk audit candidate, it increased its testing of accounts to satisfy the risk. In addition, the DCAA determined that there were no material or significant inadequacies or noncompliances in the TSP.

The audit investigated six elements of the ISN TSP: (1) Direct Materials; (2) Direct Labor; (3) Indirect Expenses; (4) Other Direct Costs; (5) G&A Expense; and (6)

[1] These reports were required from the defendant and apparently submitted later.
[2] This report was subsequently provided by the defendant. Neither Report caused any alteration in the results of the Report.

Settlement Expenses. For each of these categories, the DCAA found as follows:

1. Direct Materials. Total claimed of $2,401,080 was found accurate and supportable.

2. Direct Labor: DCAA made an upward adjustment to direct labor of $22,147 or increased the amount of ISN's claim by this amount. DCAA verified that the labor cost reconciled with ISN's Jamis job cost reports and employee timesheets and was incurred prior to the termination notice. Total amount was found to be accurate and supportable of $626,804.

3. Indirect Expenses: DCAA again made an upward adjustment of $17,079 because of the increase in direct labor. These expenses were based on Fringe Benefits and Overhead rates that DCAA approved and accepted. Total amount found accurate and supportable was $483,409.

4. Other Direct Costs: The DCAA found $427,831 to be accurate and supportable.

5. G&A Expense: DCAA again made an upward adjustment of $5,370. The G&A rate was verified to the current provisional billing rates being used by ISN as well as prior termination audits and totaled $539,431.

6. Settlement Expenses: The DCAA allowed $31,685 of the $183,224 claimed by ISN.[3]

Thus, all of the costs set forth and claimed by ISN in the TSP were audited and tested by DCAA, which than made the following overall findings: First, all documentation supporting all costs was reviewed for allowability and allocabiltiy to the terminated contract and found to be proper. Second, all costs were tested and found to

[3] For the purposes of this Motion, ISN is accepting the $31,685.

have been properly incurred on the terminated contract. Third, the DCAA confirmed the defendant's acknowledgement during the audit process that ISN was due some form of equitable adjustment on the contract due to various changes to the statement of work.

Therefore, the Audit Report concluded that based on total costs incurred of $4,510,240, ISN should be paid an additional $1,542,517. Along with what had been paid before the TSP was filed, this left unpaid incurred costs of $460,708.[4]

In describing the audit procedures, Moser said:

> ...You want to make sure that the findings, or the results of the audits are based upon sound logic, that there is some basis in FAR, that they have-- it seems that they have performed adequate auditing steps to prove the things that they have done by, you know, saying to me that they had verified the cost incurred back to whatever documents that they identify....
> (Dep.at 32)

Regarding the purpose of the Report, Moser confirmed the audit was to verify ISN's TSP costs:

> Q. So is it correct to say that the only purpose of this audit report...was...verifying the elements of ISN's settlement proposal.
> A. Yes
> (Dep.T.at 84)

The actual auditor, Monastero, wrote the statement in the Report that "...we consider the proposal (TSP) to be acceptable as a basis for negotiating a fair and reasonable price"

(Dep.at 42).

> Q. What was your purpose in stating that?
> A. When you craft the auditor's opinion, when the proposal and your audit is--generally everything checks out okay for the most part— I'm trying to put it in layman's terms, that it was okay that you can use this as a basis to negotiate. There wasn't any super serious

[4] The defendant accepted the findings of the Report as the basis to pay an additional $1,542,517. The only reason the remaining $460,708 was not paid was because it exceeded the Contract amount.

flaws that would be, you know, big showstopper kind of things so to speak, you know?

Q. Did you audit whether the contents of ISN's proposal were supportable and accurate?

A. We did.

Q. Okay, and your conclusion was with the exceptions that you point out, that the data was accurate.

A. Yes.

(Dep. 44-45).

LEGAL ARGUMENT

The admissions in the Audit Report, the conduct of defendant in paying $1,542,517 based on the Report, and the accompanying testimony of the two DCAA witnesses who cannot now contradict or otherwise explain away the Audit Report findings constitute "evidentiary admissions." An evidentiary admission is a statement made by a party's agent which the trier of fact may evaluate as it deems fit. See Weyerhaeuser Co. and Subsidiaries v. United States, 32 Fed. Cl. 80, 118(1994). The trier of fact shall ascribe whatever evidentiary weight that is appropriate for the evidentiary admission. Id. (citing Budden v. United States, 748 F. Supp. 1374 (D.Neb. 1990), vacated on other grounds, 963 F.2d 188(8th Cir. 1991).

In this instance, this Court is the trier of fact. In narrowing the issues for trial, this Court should give substantial weight to the admissions made by the Government after it audited the extensive evidence supporting ISN's claim. The DCAA "has the primary responsibility for providing accounting and financial advice on Department of Defense contracts governed by Defense Acquisition Regulations, 32 C.F.R. Sec. 357.2(a)." Marquardt Co. v. United States, 822 F.2d 1573(Fed Cir. 1987); see also, FAR § 42101(b)("the [DCAA] is the responsible Government audit agency" regarding audits). Federal courts have observed, "[T]he auditors of the DCAA are highly expert in their field and have special knowledge which no other personnel in any of the other agencies

of the[Department of Defense] possess...." See United States v. Westinghouse Elec. Corp., 615 F.Supp. 1163,1191(W.D. Pa. 1985). The Government relies heavily upon the DCAA's expertise in auditing claims from government contractors.

As a result of the admission made by the Government through the Agency that specializes in analyzing the proof of contract claims, the Court should proceed with the legal presumption that ISN has proven the costs incurred under the Contract that exceed the original Contract amount. A presumption has been defined as "a rule of law, statutory or judicial, by which finding a basic fact gives rise to[the] existence of [a] presumed fact, until [the] presumption is rebutted." Black's Law Dictionary 1185(6th Ed. 1990). Although not evidence, a presumption can be a "substitute" for evidence if it is not rebutted. Dunn v. Simmons, 877 F.2d 1275, 1278(6th Cir. 1989), cert. Den., 494U.S. 1061(1990). "[P]resumptions, whether created by statute or by judicial ruling, 'arise out of considerations of fairness, public policy and probability.'" See A.C.Aukerman Co. v. R.L. Chaides Contr Co., 960 F.2d 1020,1034 (Fed. Cir. 1992)(citing Cornetta v. United States, 851 F.2d 1372,1380(Fed. Cir. 1988); see also, Panduit Corp. v. All States Plastic Mfg. Co., 744 F.2d 1564,1581(Fed. Cir. 1984).

Conclusive, or "irrebuttable" presumptions are binding, while presumptions which are rebuttable are nonbinding. See Universal Restoration, Inc. v. United States, 798 F.2d 1400, 1406(Fed. Cir. 1986). "A conclusive presumption is one in which proof of[a] basic fact renders the existence of the presumed fact conclusive and irrebuttable." Black's Law Dictionary 1186. Here, there is no Government witness who can now

provide any testimony about the Audit Report in light of their respective deposition testimony disclaiming any different knowledge of the Report's content.[5]

Accordingly, as a result of the defendant's conduct alone, the Court should apply an irrebutable presumption to the accuracy of the Government's admissions in the Audit Report thereby precluding the Government from offering evidence rebutting its own Report. ISN, as a result, would not have to offer evidence other than the Audit Report itself to prove any of the incurred costs claimed. Any other result would moot the purpose and the effect of the Audit Report.

Even if the Court determines that ISN is entitled to only a rebuttable presumption as to the proof of the costs not questioned in the Audit Report, the Government has no ability to offer evidence to refute or explain the contents of the Audit Report because it refused to provide such deposition testimony claiming lack of any knowledge.

This Court should determine that ISN is entitled to a conclusive, irrebuttable presumption that the Government's admissions are accurate and binding. The findings by the DCAA must be viewed as reliable since they were the result of an independent audit performed under the applicable DCAA standards. Certainly DCAA would not err against the interests of the Government. To the contrary, the Audit Report discloses that because ISN was a high risk audit candidate, DCAA would be especially careful in its audit investigation. This Court should therefore presume that the costs claimed by ISN in this case have been properly verified.

The United States Court of Federal Claims has previously held that the United States is estopped from protesting the findings of one of its own audits of a claim by

[5] ISN claims that because the defendant failed to comply with RCFC 30(b)(6), it is precluded from offering any testimony on which the designee was unprepared and unknowledgeable as well as precluding defendant from contradicting or modifying their responses on specified issues, from the deposition testimony offered.

offering subsequent audit of the same claim containing a different calculation as to the determination of costs. See Elastic Stop Nut Corp. v. United States, 132 F.Supp. 466, 468(Ct. Cl. 1955). The Elastic case dealt with multiple contracts between the Government and a contractor, and the attempt by the Government to contradict its previous audit of the contractor's claim that the parties had relied on in settling a previous claim. Id. The Government's rationale for questioning the previous audit in that case was to reallocate costs from a different claim to the claim that had already settled, thereby reducing the amount available as damages in the subsequent suit. Id. The Court held that even "[I]f, at this stage of the proceedings, there were unanimity of opinion among expert accountants that the [latter] audit was more scientifically accurate, it would not affect our conclusion in this case." Id. The Court noted that the "Government made its [initial] audit," and the Court rejected the Government's attempt to revise the results of that audit because "[I]t is too late to do that, merely for the purpose of preserving the niceties of scientific accounting." Id.

The application of a conclusive presumption would allow the Court to save time and move more quickly to the entitlement issues. The Federal Circuit has held that the Court should reject litigation positions which waste resources and time or needlessly encumber the dispute resolution process." See Anderson Consulting v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992). In addition, even if the Court denies ISN's accompanying motion on the discovery conduct, any evidence offered by the Government rebutting its previous admissions would be irrelevant, and therefore inadmissible under Rule 402 of the Federal Rules of Evidence. To the extent that evidence regarding the costs verified in the Audit Report could be considered relevant, its "probative value is substantially outweighed" by "considerations of undue delay, waste of

time, or needless presentation of cumulative evidence"-and therefore must be excluded pursuant to Rule 403 of the Federal Rules of Evidence.

Regardless of the type of presumption the Court may find applicable here, ISN should not be required to present evidence of the verified costs from the Audit Report. Forcing ISN to produce the raw data underlying the admissions in the Audit Report would only prolong the trial of this matter unnecessarily, and would not serve any public purpose. The Government has already examined all of this evidence. If the Court decides that the Government may have the opportunity to revisit its findings, even in the face of its discovery tactics, ISN should not be required to reproduce documents and testimony that substantiate the Government's admissions. The trial should proceed with the admission that ISN as satisfactorily proven the costs verified in the Audit Report by virtue of the Government's admissions therein.

CONCLUSION

For the foregoing reasons, plaintiff, Information Systems & Networks Corporation, respectfully requests this Court to establish as admitted all costs incurred by ISN under the Contract as verified in the Audit Report.

December 11, 2006

Respectfully Submitted,

SINGER & ASSOCIATES, P.C.

s/Norman H. Singer
NORMAN H. SINGER, ESQ
Singer & Associates, P.C.
10411 Motor City Drive
Suite 725
Bethesda, MD 20817
Phone: (301) 469-0400
Fax: (301) 469-0403

CERTIFICATE OF FILING

I hereby certify that on December 11, 2006, a copy of the foregoing Plaintiff's Motion *In Limine* to Establish as Admitted all Costs Incurred by Plaintiff as Verified in Defendant's Audit Report of such Costs was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing systems. Parties may access this filing through the Court's system.

s/Norman H. Singer
NORMAN H. SINGER, ESQ

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT

19 December 1996

**PREPARED FOR:** Termination Contracting Officer
ATTN: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

**PREPARED BY:** Columbia Branch Office
One Mall North, Suite 200
10025 Governor Warfield Parkway
Columbia, MD 21004
Telephone No. (410) 964-2060
FAX No. (410) 997-3237
e-Mail Address fao6311@rma.dcaa.mil

**SUBJECT:** Termination Settlement Proposal

**REFERENCES:** TCO: Contract No. N00600-94-C-0389
DCAA: Audit Report No. 6311-97B17100001

**CONTRACTOR:** Information Systems and Networks Corporation
10411 Motor City Drive
Bethesda, MD 20817

**REPORT RELEASE RESTRICTIONS:** See Page 9

**CONTENTS:**

| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 3 |
| DCAA Personnel and Report Authorization | 8 |
| Audit Report Distribution and Restrictions | 9 |

## SUBJECT OF AUDIT

As requested by DCMC-Atlanta, we audited the 4 June 1996 termination settlement proposal submitted by Information Systems and Networks Corporation (ISN). Contract N00600-94-C-0389 was terminated for the convenience of the government with an effective termination date of 15 March 1996. Prior to the termination notice, a Stop-Work Order had been issued on 20 February 1996. The termination settlement proposal for $5,060,578 was submitted on the total cost basis.

The termination settlement proposal is the responsibility of ISN. Our responsibility is to express an opinion on the settlement proposal based on our audit.

## EXECUTIVE SUMMARY

Our audit of the $5.06 million proposal disclosed $1.01 million of questioned costs. The questioned costs are summarized below:

| | |
|---|---|
| Direct Labor | ($22,147) |
| Indirect Expenses | (17,079) |
| G&A Expense | (5,370) |
| Profit | 443,396 |
| Settlement Expenses | 151,539 |
| Cost in Excess of Contract | 460,708 |
| Total | $1,011,047 |

The termination settlement proposal is acceptable for arriving at a fair and reasonable price; however, the significant issues described below should be considered in establishing the government's position.

SIGNIFICANT ISSUES:

1. The results are qualified because we have not yet received a copy of the current technical report regarding the estimate to complete/estimate at completion, and the inventory verification report. We do not express an opinion regarding the contractor's legal entitlement.

2. ISN overstated settlement expenses by proposing settlement labor and ODCs which it did not incur and prompt payment act interest which is unallowable since ISN received progress payments.

3. ISN overstated the entire settlement proposal by proposing costs in excess of the contract limitations (FAR 49.207).

4. Profit is questioned in total. ISN could not support the proposed 10% profit factor with any Estimates to Complete (ETCs). Further, ISN acknowledged that they under bid this contract and were starting out in a loss from the beginning.

## SCOPE OF AUDIT

Except for the qualifications noted below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance that the proposal is free of material misstatement. An audit includes:

a. reviewing the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment:
b. examining, on a test basis, evidence supporting the amounts and disclosures in the termination settlement proposal;
c. assessing the accounting principles used and significant estimates made by the contractor;
d. evaluating the overall proposal presentation, and
e. determining the need for technical specialist assistance and (if applicable) quantifying the results of a government technical evaluation.

We evaluated the proposed costs using the applicable requirements contained in the:

a. Federal Acquisition Regulation (FAR), Part 49, and
b. DOD FAR Supplement (DFARS).

In CY 1996, ISN has brought three previous termination settlement proposals to the Armed Services Board of Contract Appeals (ASBCA) for settlement. Our prior audits have resulted in significant questioned costs. Based on our prior audits and current ASBCA experience with ISN's termination settlement proposals, we have assessed control risk as high. Our audit reflects this assessment and provides a reasonable basis for our opinion.

QUALIFICATIONS:

1. We were informed by Mr. Jeff Bergdahl, COTR that the updated technical reports will not be available for incorporation into our report. Therefore, the results of audit are qualified.

2. We made our recommendations without the benefit of the inventory verification report (SF 1423), which was not available as of the date of this report. Therefore, the audit report is qualified accordingly.

3. Our audit results do not consider the contractor's legal entitlement. We express no opinion regarding legal entitlement.

## RESULTS OF AUDIT

### AUDITOR'S OPINION

In our opinion, the cost or pricing data submitted by the offeror are inadequate in some respects. The proposal was not prepared in all respects in accordance with appropriate provisions of FAR and DFARS (see Notes 5, 6 and 7, pages 5, 6 and 7 for a further discussion). However, the impact of the inadequacies and noncompliances described is considered to be relatively insignificant. Therefore, we consider the proposal to be acceptable as a basis for negotiating a fair and reasonable price. This statement should not be interpreted to mean that the data are necessarily accurate, complete and current in accordance with 10 U.S.C. 2306a, since a postaward review may disclose evidence not now discernible.

| Elements of ISN's Proposal | ISN's Proposal | Questioned Costs | Difference (Note 1) | Note | Page |
|---|---|---|---|---|---|
| Direct Materials | $ 2,401,080 | $ 0 | $ 2,401,080 | | |
| Direct Labor | 604,657 | (22,147) | 626,804 | 2 | 4 |
| Indirect Expenses | 466,330 | (17,079) | 483,409 | 3 | 4 |
| Other Direct Costs | 427,831 | 0 | 427,831 | | |
| G&A Expense | 534,061 | (5,370) | 539,431 | 4 | 5 |
| Subtotal | 4,433,959 | (44,596) | 4,478,555 | | |
| Profit | 443,396 | 443,396 | 0 | 5 | 5 |
| Settlement Expenses | 183,224 | 151,539 | 31,685 | 6 | 6 |
| Cost in Excess of Cont. | 0 | 460,708 | (460,708) | 7 | 6 |
| Total | 5,060,579 | $ 1,011,047 | $ 4,049,532 | | |
| Payments Received | (2,507,015) | | | 8 | 7 |
| Net Requested | $ 2,553,564 | | | | |

4,049,532

() Denotes upward adjustment

1,542,517.00
2,507,015.00

### Explanatory Notes

1. The amounts in this column are presented solely for the convenience of the TCO in developing the government's negotiation objective. They represent only the arithmetic difference between the amounts proposed and the related questioned costs. You should not consider the amounts to be audit approved or recommended amounts. DCAA does not approve or recommend prospective costs because the amounts depend partly on factors outside the realm of accounting expertise, such as opinions on technical and production matters. Any portion of the questioned costs accepted by the TCO must have the appropriate indirect rates applied.



FOR OFFICIAL USE ONLY

2. Direct Labor

a. Summary of Conclusions:

We have reclassified $22,332 of stop work labor from settlement costs to direct costs and questioned $185 due to a difference between the settlement proposal and its supporting documentation. The net effect of these adjustments is an upward adjustment to direct labor of $22,147.

b. Basis of Claimed Cost:

Direct labor is based on the actual incurred labor cost as recorded in the books and records.

c. Audit Evaluation:

We verified that the direct labor cost: (1) reconciled with ISN's Jamis job cost reports and employee timesheets; and (2) was incurred prior to the termination notice.

3. Indirect Expenses

a. Summary of Conclusions:

We have increased the indirect expenses by $17,079 due to the increase in Direct Labor shown above.

b. Basis of Claimed Cost:

The indirect expenses are based on a Fringe Benefits rate of 29.68% and an Overhead rate of 36.58%. ISN's overhead allocation base includes fringe benefits.

c. Audit Evaluation:

We verified the proposed Fringe Benefits and Overhead rates to the current provisional billing rates and prior termination audits. The upward adjustment applicable to Fringe Benefits is calculated by applying the proposed and accepted Fringe Benefits rate to the stop work labor reclassified from settlement expenses to direct labor. The resulting sum is then multiplied by the proposed and accepted Overhead rate to arrive at the upward adjustment applicable to overhead.

4. G&A Expense

a. Summary of Conclusions:

We have increased the G&A expenses by $5.370 due to the increases in Direct Labor, Fringe Benefits and associated Overhead expenses.

b. Basis of Proposed Cost:

The G&A expenses are based on a G&A rate of 13.69% applied to Direct labor, Indirect expenses, Direct materials and ODCs.

c. Audit Evaluation:

We verified the proposed G&A expense rate to the current provisional billing rate and prior termination audits. The upward adjustment is the result of applying the proposed and accepted G&A rate to the increase in Direct labor and related Fringe Benefits and Overhead expense

5. Profit

a. Summary of Conclusions:

We have questioned the entire $443.396 of claimed profit in accordance with FAR 49.203 due to the following: (1) ISN did not provide us with any Estimate to Complete (ETC) or Percentage of Completion: (2) ISN significantly under bid this contract by approximately $900,000; and (3) DCAA audit report No. 6221-96G17500001 disclosed that ISN was in a loss position on this contract.

A loss calculation was not applied since the Government acknowledged that ISN was due some form of equitable adjustment on this contract due to various changes to the statement of work. It is our understanding that the only hold-up in the equitable adjustment negotiations was a delivery schedule. Since the contract was terminated prior to the conclusion of the equitable adjustment negotiations, we are unable to determine the impact that the equitable adjustment would have on the anticipated loss.

b. Basis of Claimed Cost:

ISN has claimed a profit factor of 10% applied to all costs

c. Audit Evaluation:

We requested ISN to provide us with an ETC and a Percentage of Completion. We also requested technical specialist assistance regarding the ETC and Percentage of Completion.

6. Settlement Expenses

a. Summary of Conclusions:

We have questioned $151,539 of the $183,224 proposed settlement expenses as shown below:

| Description | Questioned | Ref. |
|---|---|---|
| Reclassified to D/L | $28,960 | (1) |
| Cost Not Incurred | 64,355 | (2) |
| Prompt Pmt. Int. | 58,224 | (3) |
| Total | $151,539 | |

(1) We have reclassified the stop work period labor and associated fringe benefits to direct labor and indirect expenses respectively as discussed in notes 2. and 3. Stop work period labor is not a settlement cost but a direct expense.

(2) ISN is proposing settlement labor and ODCs which are estimates of possible future costs. Consequently, these costs have not been incurred and are questioned in total.

(3) We have questioned the entire $58,224 of proposed Prompt Payment Interest in accordance with FAR 32.907-2 which states "no interest penalty shall be paid to the contractor as a result of delayed contract financing payments". Since ISN received progress payments, and the interest is calculated on these progress payments, the interest is unallowable.

b. Basis of Claimed Cost:

The claimed settlement costs are based on costs recorded in ISN's Jamis Job Cost and estimated future labor and ODCs. The claimed prompt payment interest is a mathematical calculation not recorded in the accounting records.

c. Audit Evaluation:

We verified that the claimed settlement expenses were recorded in the Jamis Job Cost and supported by vendor invoices and employee timesheets. We reviewed the supporting documentation for allowability and allocability to the terminated contract. We also verified that the costs were incurred after the Termination notice.

7. Cost in Excess of Contract Limitations

a. Summary of Conclusions:

We have questioned $460,708 which is the total proposed costs and profit of $4,877,354 less the contract price of $4,416,646 in accordance with FAR 49.207.

b. Basis of Claimed Cost

ISN did not indicate in its termination settlement proposal any costs claimed in excess of the contract limitations.

c. Audit Evaluation

We compared the proposed costs plus profit to the contract price.

8. Payments Received

a. Summary of Conclusions:

The $2,507,015 proposed by ISN agrees with their accounting records.

We discussed factual matters concerning audit findings with Mr. Daniel Dowling, Corporate Counsel. We did not disclose the dollar impact of our conclusions and recommendations to the contractor. Mr. Dowling reserved comment on our findings.

## DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contact regarding this audit | |
| Benjamin Monastero, Senior Auditor | (410) 964-2060 |
| Other contacts regarding this audit: | |
| Mark S. Moser, Branch Manager | (410) 964-2060 |
| William C. Erdman, Supervisory Auditor | (410) 964-2060 |
| Office Administrative Personnel | |

| | FAX No. |
|---|---|
| | (410) 997-3237 |

AUDIT REPORT AUTHORIZED BY:

for William C. Erdman

Mark S. Moser
Branch Manager
DCAA Columbia Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

Termination Contracting Officer
ATTN.: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Proprietary determinations should be made in the event of an external request for access. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

3. The information contained in this audit report should not be used for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

EXHIBIT 49





IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - x

INFORMATION SYSTEMS & :

NETWORK CORPORATION, : ORIGINAL

Plaintiff, :

-vs- : Case No. 1:02-ever-796

THE UNITED STATES, : Judge Allegra

Defendant. :

- - - - - - - - - - - - - x

Bethesda, Maryland

Wednesday, January 24, 2007

Deposition of:

ELLEN E. ERDELSKY

the witness, was called for examination by counsel for the Plaintiff, at the offices of Singer & Associates, the ISN Building, 10411 Motor City Drive, Suite 725, Bethesda, Maryland 20814, commencing at 10:00 a.m., before Marcia G. Blau, Shorthand Reporter and Notary Public for the State of Maryland, and were present on behalf of the respective parties:

00462

audit included profit?

A. I don't know that.

Q. Do you know how the Government calculated any additional payment to ISN after submission of this audit report?

A. I do not know.

Q. Is it correct to say in reviewing this audit report and going back to page 4 of the Auditor's Opinion, and with the exception of profit and the majority of the settlement expenses, that all of ISN's costs incurred on this contract were verified by DCAA in this audit?

A. Yes.

Q. On what is stamped page 159 and 99 -- it has actually two stamps on it -- under the page Payments Received Number 8 --

A. Right.

Q. It says, "The $2,507,015 proposed by ISN agrees with their accounting records."

A. Right.

Q. And that comes from line 18 of the settlement proposal on advanced progress and partial payments that

00406

CONDENSED TRANSCRIPT

EXHIBIT
50

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, Plaintiff, | ) | |
| v. | ) | No. 02-796C (Judge Allegra) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules for the United States Court of Federal Claims, defendant proposes its findings of uncontroverted fact.

Contracts

1. On July 15, 1994, the Government, through the Department of the Navy, awarded Contract No. N00600-94-C-0389 ("contract 0389"), to plaintiff Information Systems And Networks Corporation ("ISN"). Def. App. 1.[1] The ultimate customer was the Navy's Space and Naval Warfare Systems Command ("SPAWAR"). Id. The contract required ISN to provide all material, labor, and services to engineer, install, and test an automated technical control system ("ATC") for three Naval turnkey facilities located at the switching centers at Hampton Roads, Virginia, Pearl Harbor, Hawaii, and Camp Smith, Hawaii. Def. App. 9. The contract was for a firm fixed price of $4,416,645.54. Def. App. 3. The contract also contained four options to provide the same system at several other installations around the world. Def. App. 3-7.

[1] Def. App. ___ refers to pages from the appendix attached to this filing.

2. Section G.4(a) of contract 0389 states, in relevant part:

> (3) When in the opinion of the contractor, the COTR requests effort outside the existing scope of the contract, the contractor will promptly notify the PCO in writing.
>
> (4) No action will be taken by the contractor under such technical instruction unless the PCO or ACO has issued a contractual change.

Def. App. 23.

3. On March 28, 1995, ISN formally executed a subcontract agreement with Datacomm Management Sciences ("Datacomm"). Def. App. 35. In accordance with the agreement Datacomm was to provide ISN with the supplies and software ISN required for completion of the contract. Def. App. 36. ISN agreed to pay Datacomm a firm fixed price for each item ISN ordered. Id.

The Engineering Change Proposal

4. Almost from the beginning of contract performance, ISN was behind schedule. ISN was late in delivering contract data requirements lists ("CDRL"), as well as behind the overall installation for all three sites. Def. App. 49-53. While there were many reasons for ISN falling behind schedule, chief among them was the fact that ISN had initially understaffed the contract with temporary hires and that ISN did not understand the magnitude of the project. Id. Indeed, the problems required ISN to replace its program manager just a few months into the start of the project. Id.

5. The contract called for ISN to modernize the existing switching equipment in the turnkey facilities. The communications configuration at the Hampton Roads facility however,

was continually changing. Complaint ¶ 6. On June 20, 1995 to address ISN's performance problems and the changing configuration, ISN submitted an Engineering Change Proposal ("ECP"). Complaint ¶ 7.

6. In a June 26, 1995 letter, The Navy contract specialist, Lisa Murtha, wrote to ISN that: "[a] formal modification to the contract will be issued for the combination of both the formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." Def. App. 54; Pl. Ex. 6. That letter further indicated that the ECP "will be reviewed by SPAWAR with comments" to be provided. Id. In addition, the letter indicated that ISN was required to provide a delivery schedule for all sites in Lot I. Id.

7. On July 20, 1995, Jeff Bergdahl, the contracting officer's technical representative sent a facsimile to Roscoe Crawford, the contracting officer, that included a memorandum from SPAWAR to FISC. The memorandum indicated in paragraph 1 that SPAWAR reviewed the ECP and "technically approves ISN's proposed engineering changes," but recommended that all terms be negotiated. Pl. Ex. 7. In paragraph 2, the memorandum addressed ISN's cost analysis, recommending, among other things, a further cost breakdown of the additional charges. Id.

8. Contracting officer Roscoe Crawford testified that discussions that he had with Mr. Bergdahl indicated that SPAWAR viewed the ECP's costs as unreasonably priced. Def. App. 122. In addition, Mr. Crawford testified that ISN never provided a revised installation cutover schedule as requested by Ms. Murtha's June 26, 1995 letter. Def. App. 123.

9. On August 23, 1995, an ISN employee, in an internal ISN memorandum, explained to Mr. Robertson that:

PER FONCON WITH LISA MURTHA, 22 Aug 95:

1) She has not looked at the ECP, to date.

2) Due to end of year procurements(8a-2 each) She will not be able to work on our ECP until Mid-Sept 95.

* * *

5) I talked with Don Tabasco about contract and FAR requirements for Timely ECP processing by the government. He recommends that we take a more forceful approach with the contracting officer. You might want to touch base with him personally.

* * *

If you decide to talk with Roscoe, please give me a heads up so I can do the same to Lisa?

Def. App. 55. Additionally, ISN included in its submitted progress reports for September through December 1995, that the June ECP had <u>not</u> been approved. Def. App. 56-70. On January 26, 1996, Mr. Don Tabasco, ISN's manager of contracts, wrote to the Government to complain about the fact that ISN had not received approval of the June 20, 1995 ECP. Def. App. 71.

<u>Funding</u>

10. On August, 31, 1995, Jeffery Bergdahl, the contracting officer's technical representative informed ISN that the ECP was "technically" approved. Pl. Ex. 7. Further, Mr. Bergdahl acknowledged that additional funds would have to be added to the contract to accommodate the ECP. <u>Id.</u>

11. On August 23, 1995, just one week prior to the writing of the above memorandum, SPAWAR, had reprogrammed $789,319 from another contract to partially fund the ECP. Def. App. 74. On November 27, 1995, the reprogrammed funds were withdrawn from

contract 0389 due to an emergent requirement. Def. App. 75. The reprogrammed funds represent the only monies added to contract 0389. As of November 27, 1995, there was no money added to contract 0389 to fund the ECP.

12. In addition, Mr. Bergdahl also specifically stated that the "agreed configuration" that had been proposed by ISN and technically approved by SPAWAR, "*obviously was never set forth in the contract.*" Def. App. 131.

13. Meeting notes from a December 6, 1995 meeting between Roscoe Crawford and SPAWAR representatives indicate that Mr. Crawford "never modified the contract to re-establish the deliv. schedule on any of the sites because he could never get a good idea of what a realistic new deliv. schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo." Def. App. 116; compare Pl. Ex. 11.

14. ISN's program manager testified that ISN was aware that without a formal modification of the contract, ISN could not start work on the ECP. Def. App. 119. Mr. Robertson also testified that ISN was aware that the Government did not possess funding for the ECP, and that without such funding, the ECP could not be approved. Def. App. 120.

Not Correct Rep.

Termination

15. On February 20, 1996, the Government issued a stop work order to ISN. Def. App. 76. This was preliminary to the Government terminating ISN's contract for the convenience of the Government. On February 23, 1996, the Government took possession of all of the Government inventory retained by ISN. Id. The contract was formally terminated for the convenience of the Government on March 15, 1996. Def. App. 77. At the time of the termination, ISN had partially completed only the installation at the Hampton Roads Virginia

site. ISN did not even start the installation at the two Hawaii sites. Id.

16. Pursuant to Part 49 of the Federal Acquisition Regulations (FAR), ISN, on June 6, 1996, submitted a termination settlement proposal ("proposal"). Def. App. 82-90. ISN sought payment of $5,060,578 on a $4,416,646 contract in which ISN had only performed work on a third of the contract requirements. The proposed amount included $443,396 in profit. Id. ISN also stated that it had spent $2,401,080 for materials. Id. There was no discussion about any outstanding payments due to ISN's subcontractor, Datacomm. In fact, according to a request letter from Datacomm, ISN still owes Datacomm $196,688.68 plus interest for materials Datacomm furnished to ISN pursuant to their subcontract agreement. Def. App. 91.

17. On December 19, 1996, the Defense Contract Audit Agency ("DCAA") issued audit Report No. 6311-97B17100001. Def. App. 92. At the request of the termination contracting officer, DCAA had conducted an audit of ISN's settlement proposal. Id. The auditor concluded that he could support a $4,049,532 settlement with ISN. Def. App. 95. The auditor questioned $1,011,047 of ISN's $5,060,578 proposal. In particular, all of the claimed profit was questioned. Def. App. 93. The disallowance was due in part to a previous audit of ISN's request for progress payments 3-5. Def. App. 102-109. The earlier audit had concluded that ISN was in loss position on contract 0389. Def. App. 103.

Previous Proceeding

18. On October 3, 2001, this Court, Judge James Turner presiding, issued a bench ruling to the effect that there was no settlement agreement between ISN and the Government. Def. App. 110-114. That ruling was subsequently affirmed by the United States Court of Appeals for the Federal Circuit on October 16, 2002. Def. App. 115.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

s/ Brent M. McBurney

BRENT M. McBURNEY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, Room 12074
Washington, D.C. 20530
Tele: (202) 307-0277

April 29, 2004

Attorneys for Defendant

CERTFICATE OF SERVICE

I HEREBY CERTIFY that the Appendix of Exhibits Supporting Plaintiff's Opposition to Defendant's Motion for Summary Judgment was filed electronically with the Court on this 11th day of May, 2007 pursuant to the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the system. The parties may access the filing through the system.

/s/Norman H. Singer
NORMAN H. SINGER, ESQ.