Contracting Officer to approve or disapprove the proposed substitution(s). All proposed substitutions (no matter when proposed during the performance period) must have qualifications equal to or greater than the qualifications of the person(s) to be replaced.

(e) In the event a requirement to increase the specified level of effort for a designated labor category, but not the overall level of effort of the contract occurs, the Contractor shall submit to the Contracting Officer a written request for approval to add personnel to the designated labor category. The information required is the same as that required in paragraph (d) herein. The additional personnel shall have qualifications greater than or equal to at least one (1) if the individuals proposed for the designated labor category.

(f) The Contracting Officer shall evaluate requests for substitution and addition of personnel and promptly notify the Offeror, in writing, of whether the request is approved or disapproved.

(g) If the Contracting Officer determines that suitable and timely replacement of personnel who have been reassigned, terminated, or have otherwise become unavailable to perform under the contract is not reasonably forthcoming or that the resultant reduction of productive effort would impair the successful completion of the contract or the delivery order, the contract may be terminated by the Contracting Officer for default or for the convenience of the government, as appropriate. Alternatively, at the Contracting Officer's discretion, if the Contracting Officer finds the Contractor to be at fault for the condition, s/he may equitably adjust (downward) the contract price or fixed fee to compensate the government for any delay, loss or damage as a result of the Contractor's action.

**C.19 PERSONNEL QUALIFICATIONS (MINIMUM), SUP 5252.237-9401 (JAN 1992)**

(a) Personnel assigned to or utilized by the Contractor in the performance of this contract shall, at a minimum, meet the experience, education, or other background requirements set forth below and shall be fully capable of performing in an efficient, reliable and professional manner. If the offeror does not identify the labor categories listed below by the same specific title, then a cross-referencing list should be provided in the offeror's proposal identifying the difference.

(b) The government will review resumes of Contractor personnel to be assigned, and if personnel not currently in the employ of the Contractor, a written agreement from the potential employee to work shall be presented as part of the technical proposal.

(c) If the Contractong Officer questions the qualifications or competence of any person performing under the contract, the burden of proof to sustain that the person is qualified as prescribed herein shall be upon the Contractor.

(d) The Contractor must have the personnel, organization, and administrative control necessary to ensure that the services performed meet all requirements specified in the Contract. The work history of each Contractor employee shall contain experience directly related to the tasks and functions to be assigned. The Contracting Officer reserves the right to determine whether a given work history contains necessary and sufficiently detailed related experience to reasonably ensure the ability for effective and efficient performance.

| LABOR CATEGORY | MINIMUM REQUIREMENTS |
|---|---|
| Program Manager | Ref: SOW 3.6.2 |
| On-Site Maintenance Technician | Ref: SOW 3.6.1 and 3.6.3 |
| Installation Supervisor | Ref: SOW 3.6.1 |
| Training Personnel | Ref: SOW 3.6.1 |

**C.20 MAINTENANCE**

(a) Responsibilities of the Contractor. When ordered, the Contractor shall provide maintenance (labor and parts) at the prices shown in Section B of contract, and shall keep the equipment in good operating condition. The system (or machine) shall be considered to be in good operating condition when it operates within the permissible consecutive and non-consecutive hours specified in the contract. Maintenance service shall not include electrical work external to the equipment, the furnishing of supplies, nor adding or removing accessories, attachments, or other devices. It shall not include repair of damage resulting from accident, transportation between Government sites, neglect, misuse, failure of electrical power or air-conditioning or humidity control, or cause other than ordinary use. All parts, including those required for maintenance outside the Principal Period of Maintenance (PPM), if applicable, are included in the fixed monthly charge.

(b) Responsibilities of the Government.

(1) Government personnel shall not perform maintenance or attempt repairs to

equipment while such equipment is under the purview of this contract unless agreed to by the Contractor.

(2) Subject to security regulations, the Government shall permit access to the equipment which is to be maintained.

(3) The Government shall provide adequate storage space for spare parts and adequate working space (including heat, light, ventilation, electric current and outlets) and telephones (for local calls only) for the use of maintenance personnel. These facilities shall be within the reasonable distance of the equipment to be serviced and shall be provided at no charge to the Contractor.

(4) The Government shall provide time for Contractor-sponsored modifications within a reasonable time after being notified by the Contractor that a modification is ready to be made. The time required to make the modification shall be outside the normal preventive maintenance hours.

(5) The Government shall maintain site requirements in accordance with the equipment environmental specifications furnished by the Contractor, if any.

## C.21 ON-SITE MAINTENANCE

(a) On-site maintenance is defined as that method of providing Federal Information Processing (FIP) equipment maintenance in which the Contractor stations personnel permanently at the Government's location(s). On-site preventive maintenance shall be performed in accordance with the Contractor-proposed (and Government-approved) maintenance plan(s) during the Principle Period of Performance (PPM) as stipulated in paragraph (c) and in accordance with the fixed monthly charges shown in Section B of this contract. In the event equipment under this contract requires remedial maintenance during the PPM, regardless of how many times the equipment requires said maintenance, the government may require the Contractor to respond and have the equipment functioning within the timeframes listed within this contract. Remedial maintenance is defined as determining why FIP equipment is malfunctioning, and effecting either repair or replacement of said malfunctioning equipment. For the purposes of this contract, Contractor response under On-Site maintenance is 15 minutes.

(b) In addition to providing on-site preventive and remedial maintenance services during the stated PPM, remedial maintenance services shall be provided Outside the Principal Period of

Maintenance (OPPM) when ordered by the Government. A response time of two (2) hours is required for this per-call remedial maintenance. Hourly per-call rates shall be in accordance with Attachment 3 (Table B-6) of this contract.

(c) The PPM for this contract is 7:00 A.M. to 4:00 P.M. Monday through Friday. This period includes one (1) hour for lunch.

## C.24 PREVENTIVE MAINTENANCE

(a) Preventive maintenance shall be performed during the Principle Period of Maintenance as specified within this contract and in accordance with the Contractor's proposed (and Government-approved) preventive maintenance plan(s). The Contractor shall identify the frequency and duration of the preventive maintenance required for the equipment listed in Section B in its proposal (see Section L).

(b) If a mutually agreeable preventive maintenance plan cannot be established between the Government and the Contractor, the Government reserves the right to specify the hours and days during which preventive maintenance shall take place (within the PPM).

## C.25 NON-CHARGEABLE MAINTENANCE ITEMS

There shall be no additional charges for:

(a) Replacement parts, unless such parts are required due to the fault or negligence of the Government;

(b) Preventive maintenance, regardless of when performed;

(c) Remedial maintenance which was requested during the PPM specified in the contract, regardless of when the maintenance is performed;

(d) Time spent by maintenance personnel after arrival at the site awaiting the arrival of additional maintenance personnel and/or delivery of parts, etc., after a service call has commenced;

(e) Remedial maintenance required on any machine (including periods which would otherwise be OPPM) when the scheduled preventive maintenance for that machine

preceding the malfunction had not been performed unless preventive maintenance was omitted at the Government's request or the Contractor was denied access to the equipment;

(f) Remedial maintenance required within a 48-hour period due to a recurrence of the same malfunction (including periods during what would otherwise be OPPM);

(g) Chargeable time spent for repair;

(h) Description(s) of malfunction(s).

## C.26 MAINTENANCE OF INSTALLED SYSTEM CONFIGURATION, SUP 5252.239-9401 (JAN 1992)

The equipment contained in Section B is subject to change as a result of upgrades, deletions or substitutions of equipment, or through requirements for additional hardware due to resource expansion. To provide for these changes in maintenance during the life of the contract, this contract contains provisions for the addition and deletion of equipment which, in the aggregate, may increase the contract value for each base or option period by up to 25% of the contract value for that period. Clause SUP 5252.239-9404, System Configuration: FIP Maintenance Contracts, provides terms and conditions relative to this clause.

## C.27 SYSTEM CONFIGURATION: FIP MAINTENANCE CONTRACTS, SUP 5252.239-9404 (JAN 1992)

The government reserves the right, throughout the performance period, to substitute items of equipment contained in Section B without price revision. Maintenance of the substitute equipment shall be performed at the same price set forth in Section B for comparable equipment.

(b) The government reserves the right to delete equipment at any time during the period of performance. The government may unilaterally reduce the price of the contract based on the prices set forth in Section B for the deleted equipment.

(c) The government reserves the right to require maintenance on additional equipment whether or not comparable items are already priced in the contract. however, the contract's

value for the base period and each option period may not be increased by more than 25% to provide for maintenance of additional equipment.

(d) Maintenance of an additional item of equipment that is comparable to an existing contract line item shall be performed at the price established for the existing line item. When there is no existing line item comparable to the additional item of equipment, a price shall be negotiated and agreed upon between the government and Contractor, and a bilateral modification shall be executed to incorporate the change.

**C.28 ALTERATIONS AND ATTACHMENTS, SUP 5252.239-9413 (JAN 1992)**

(a) Government Alterations. Upon 30 days written notice, the Government may make alterations or install attachments to the Contractor's equipment, provided that such action will not create a safety hazard. The Government shall assume full liability for any damages and/or degradation in equipment performance attributable directly to such alteration or attachment.

(b) Removal of Alterations or Attachments. Before discontinuance of rental, the Government shall remove alterations or attachments which are not the property of the Contractor, and the equipment shall be restored to the prior configuration at Government expense.

(c) Maintenance Charges. If alterations made by the Government increase the cost of maintenance, mutually agreeable arrangements for additional maintenance under this contract, as applicable, shall be made for each installation.

(d) Reprogramming. Any reprogramming agreed to by the Contractor which is required to accommodate additions attachments shall be accomplished at the Government's expense.

**C.29 USE OF HARDWARE AND/OR SOFTWARE MONITORS**

(a) The Contractor shall permit inclusion or attachment of such devices as the Government may choose for the purpose of examining or measuring the activity within the computer system.

(b) Devices such as hardware monitors (which may require physical connection to the computer system), or software monitors (which may require portions of the computer

system's control software to be displaced) are specifically included in this category.

(c) The Contractor may not prohibit the installation of such devices unless the particular device will cause significant or permanent damage to the computer system. The Contractor shall assist the Government in identifying and locating device connections when requested by the Government if the Contractor provides such service to other customers. Cost for this service, if any, is stated in Section B of this contract.

(d) Hardware and software monitors fall within the purview of the Alterations and Attachments clause, if this clause is included herein.

## C.31 SPECIAL PROVISIONS FOR MAINTENANCE OF GOVERNMENT-OWNED ADPE

(a) General. The maintenance prices listed in this contract include the cost of labor and parts and such other expenses necessary to keep the equipment in good operating condition.

(b) Maintenance Coverage

(1) The Contractor shall honor orders for maintenance under any of the maintenance options set forth in Sections B and C for periods of one (1) year or less at the prices shown in Section B. All equipment which is a part of the system delivered under this contract, if this contract calls for equipment delivery, shall be covered by the same maintenance provisions.

(2) The effective date of maintenance services, the type and model number(s) of the equipment and applicable charges shall be specified on the order (or contract).

(3) The effective date of maintenance services shall not be prior to the expiration of the warranty period, if any.

(4) Discontinuance Notice. When discontinuing maintenance pursuant to this clause, the Government will give the Contractor 30 days' prior written notice of its intent to discontinue maintenance services, or a shorter notice when agreed to by the Contractor. However, no discontinuance notice is required if the Government elects not to exercise an option.

(c) Responsibilities of Contractor

(1) Only new standard parts, or parts equal in performance to new parts, shall be used in making repairs. Parts which have been replaced shall become the property of the Contractor.

(2) Should the Government make alterations or install attachments which affect the maintenance of this equipment, the continuation of maintenance service on this equipment shall be subject to mutual agreement. Should the alterations or attachments increase the maintenance costs to the Contractor, additional maintenance charges shall be made on an individual installation basis. If such alterations or attachments create a safety hazard, the Contractor may discontinue maintenance service on the hazardous equipment. In addition, should such be the cause of malfunction or downtime, such downtime shall not be creditable against the Contractor under clause G.15, Government Downtime Credits.

(d) Contractor-sponsored alterations or attachments to equipment shall be made with the consent of the Government. Appropriate modification of the contract shall be negotiated for each such alteration which either enhances the value of the system to the Government or decreases the overall maintenance costs.

(e) Movement of Equipment

(1) In the event the system(s) being maintained under the terms and conditions of this contract is/are moved to another location within the same geographical service area, as designated by the Contractor, the terms and conditions of this contract shall continue to apply. If the system(s) must be moved outside the Contractor's designated service area, then the continued applicability of this contract shall be subject to mutual agreement.

(2) The Government shall give at least thirty (30) days written notice to the Contractor of its intention to move the equipment, except in emergencies.

(3) Maintenance charges shall be suspended on the day dismantling of the equipment in preparation for shipment is begun. Maintenance charges shall be reinstated on the day the equipment is reassembled. In the event the Contractor performs said functions, the Government shall be charged for disassembly and reassembly at the applicable OPPM rates shown in Table B-6.

(4) Shipment to the new installation(s) shall be at the Government's expense by military or commercial carrier(s) or, at the Government's option, provide the

Contractor with an authorization to ship by commercial carrier, in which case the Government shall be invoiced for transportation, rigging and drayage costs.

## C.32 REPORTING REQUIREMENTS

The contractor shall furnish a signed malfunction report to the COTR upon completion of each maintenance call. The report shall include as a minimum, the following:

(a) Contract Number
(b) Contractor's Name
(c) Date and time notified
(d) Date and time of arrival
(e) Type and description of machine
(f) Chargeable time spent for repair (for OPPM calls)
(g) Description of malfunction

## C.34 DATA ITEMS (NOT-SEPARATELY PRICED (NSP))

The Contractor shall furnish the Data identified in Section B as "Not Separately Priced (NSP)" in accordance with the DD Form(s) 1423, Attachment 6 of Section J.

## SECTION D - PACKAGING AND MARKING

### D.1 PACKAGING

(a) The supplies shall be packaged in accordance with commercial practices and in a manner that will afford protection against corrosion, deterioration and physical damage during direct shipment.

(b) The supplies shall be packed in a manner conforming to the requirements of Uniform Freight Classification for rail shipment; National Motor Freight Classification for truck shipment; Parcel Post Regulations; and the regulations of other carriers as applicable to the mode of transportation employed.

### D.4 PROHIBITED PACKING MATERIALS

The use of asbestos, excelsior, newspaper or shredded paper (all types including waxed paper, computer paper and similar hygroscopic or non-neutral material) is prohibited. In addition, loose-fill polystyrene is prohibited for shipboard use.

### D.6 MARKINGS OF WARRANTED ITEMS, (NAVSUP)(JAN 1992)

(a) Each item covered by a warranty shall be stamped or marked in accordance with MIL-STD-129, "Marking for Shipment and Storage". Where this is impracticable, written notice shall be attached to, or furnished with, the warranted item.

(b) Markings will state

(1) existence and substance of warranty;
(2) its duration;
(3) whom to notify if supplies are found to be defective;
(4) manufacturer (or entity) providing the warranty; and
(5) an indication whether attempted on-site repair by government personnel shall void the warranty.

## D.7 LABELING OF ASBESTOS MATERIALS

(a) Hazardous Chemicals and Materials. All unit and intermediate-pack chemicals and materials (including aerosol propellants) shall have affixed thereto the applicable warning labels in accordance with applicable laws, statutes, regulations, or ordinances. Such laws include the Federal Food, Drug, and Cosmetic Act and similar state and municipal legislation, the Federal Insecticide, Fungicide, and Rodenticide Act. In addition, interior-, unit- and intermediate packs including unit containers that serve as shipping containers such as palls and drums shall be marked with the applicable precautionary information in accordance with the American National Standard for Labeling of Hazardous Industrial Chemicals (ANSI Z129.1-1976).

(b) Specific Hazards: Asbestos unit- and intermediate packs, including containers that serve as shipping containers of asbestos and products containing asbestos shall be marked:

> "Caution, Contains Asbestos Fibers. Avoid Creating Dust. Breathing Asbestos Dust May Cause Serious Bodily Harm."

in accordance with the OSHA Compliance Label for Asbestos.

## D.8 PACKING AND UNPACKING

The Contractor shall furnish such labor as may be necessary for packing, unpacking, placement and installation of equipment. Said packing, unpacking, placement and installation of equipment shall be furnished by the Contractor without additional charge to the Government.

## SECTION E - INSPECTION AND ACCEPTANCE

**E.1 CONTRACT CLAUSES INCORPORATED BY REFERENCE**

**I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES**
**II. DOD FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES**

| | | |
|---|---|---|
| **52.246-2** | **INSPECTION OF SUPPLIES -- FIXED PRICE** | **JUL 1985** |
| **52.246-4** | **INSPECTION OF SERVICES -- FIXED PRICE** | **APR 1984** |
| **52.246-16** | **RESPONSIBILITY FOR SUPPLIES** | **APR 1984** |

**E.2 STANDARD OF PERFORMANCE AND ACCEPTANCE OF EQUIPMENT (ADP SYSTEMS)**

(a) General. This provision establishes a standard of performance which must be met before any equipment listed in Section B is accepted by the Government. This provision also pertains to replacement and substitute machines, and machines which are added or field modified (modification of a machine from one model to another) after a successful performance period.

(b) Performance Period. The performance period shall begin on the installation date (unless delayed in accordance with E.2(b)(3) herein) and shall end when the equipment has met the standard of performance for a period of thirty (30) consecutive days by operating in conformance with the Contractor's technical specifications and functional descriptions, or as quoted in the Contractor's proposal, which must satisfy the requirements of Section C, at an effectiveness level of 99.998% or more.

(1) Continuance of Performance Period. If the equipment does not meet the standard of performance during the initial 30 consecutive days, the performance period shall continue on a day-by-day basis until the standard of performance is met for a total of 30 consecutive days.

(2) Failure to Meet Standard of Performance. If the equipment fails to meet the standard of performance after 90 calendar days from the installation date or start of the performance period, whichever is later, the Government may at Its option request a replacement or terminate the contract and request the immediate removal of the equipment and the restoration of the site to pre-installation condition.

(3) Delay of Start of Performance Period. If necessary, the Government may delay the start of the performance period, but such a delay shall not exceed 30 consecutive days; therefore, the performance period must start not later than the 31st day after the installation date. Should the Government delay the start of the performance period, rental charges, or maintenance charges as applicable, shall accrue for that period of time between the installation date and the start of the performance period and shall be paid only upon completion of the successful performance period.

(c) Effectiveness Level Computations.

(1) General. The effectiveness level for a system is computed by dividing the operational use time by the sum of the operational use time plus system failure downtime.

(2) Changes in Equipment. The effectiveness level for machines added, field-modified, or substituted, or for a replacement machine is a percentage figure determined by dividing the operational use time of the machine by the sum of that time plus downtime resulting from equipment failure of the machine being tested.

(d) Operational Use Time.

(1) For System. Operational use time for performance testing for a system is the accumulated time during which the Central Processing Unit is in actual operation, including any intervals of time between the start and stop of the processing of the programs.

(2) For Equipment. Operational use time for performance testing for a machine added, field-modified, or substituted, or for a replacement machine, is defined as the accumulated time during which the machine is in actual use.

(3) Minimum Use Time. During the performance period for a system/machine, a minimum of 100 hours of operational use time with scheduled productive or simulated work will be required as a basis for computing the effectiveness level. However, in computing the effectiveness level, the actual number of operational use hours shall be used when that number exceeds the minimum of 100 hours. Added machines, field-modified machines, and substitute machines are subject to the 100 hour minimum use time requirement. However, the Government shall accept such machine(s) without the addition of simulated work solely to achieve the minimum of 100 hours use time, provided the average effectiveness for the 30 day acceptance period is equal to or better

than the level specified in E.2(b) herein.

(4) Measure of Operational Use Time. Operational use time and downtime shall be measured in hours and whole minutes.

(e) Downtime.

(1) System Failure Downtime. System failure downtime is that period of time during which the scheduled productive workload, or simulated workload, being used for acceptance testing cannot be continued on the system due to machine(s) failure. If simulated workload is being used for acceptance testing, it must be consistent with the data processing requirements set forth elsewhere in this contract.

(2) Start of Downtime. Downtime for each incident shall start from the time the Government contacts the Contractor's designated representative at the prearranged contact point until the system(s) or machine(s) is returned to the Government in proper operating condition, exclusive of actual travel time required by the Contractor's maintenance personnel but not in excess of one hour on each day such services were requested. However, at the request of the Contractor, the Government shall make available not only the failed equipment, but also those machines which the Contractor must use to accomplish such repairs. The Contractor shall provide an answering service or other continuous telephone coverage to permit the Government to make such contact.

(3) Equipment Use During System Downtime. During a period of system failure downtime, the Government may use operable equipment when such action does not interfere with maintenance of the inoperable equipment. The entire system will be considered down during such periods of use. Whenever the operable equipment is not released to the Contractor upon request, all such usage periods shall be considered system operational use time in computing the effectiveness level.

(4) Machine Failure Downtime. Machine failure downtime for a machine added, field-modified, or substituted, or for a replacement machine after the system has completed a successful performance period is that period of time when such machine is inoperable due to its failure.

(f) Daily Records. The Government shall maintain appropriate daily records to satisfy the requirements of paragraph E.2(b) herein and shall notify the Contractor in writing of the date of successful completion of the performance period.

(g) Remote Devices. For remote devices the standard of performance shall be determined in accordance with paragraph E.2(d)(3) herein. A remote device is defined as any Contractor-supplied device which is connected to the Central Processing Unit by way of data transmission lines rather than Contractor-supplied direct cable connection. The effectiveness level for equipment supplied by the Contractor shall be computed in accordance with paragraph E.2(d)(2) herein and shall exclude downtime attributable to related equipment, cables, transmission lines, wires, etc. not supplied by the Contractor.

(h) Date of Acceptance. The Government shall not accept equipment and shall not pay charges until after the standard of performance is met. The date of acceptance shall be the first day following the completion of the successful performance period.

## E.3 GUARANTEED RERUN OF THE BENCHMARK TEST

(a) Agreement. The Contractor agrees to rerun the benchmark test and/or operational capability demonstration set forth in the solicitation document on the initial proposed ADP system and any proposed augmentations installed under this contract, provided a separate preaward benchmark test was required for the augmented configuration. This rerun shall be completed prior to the start of the acceptance test period.

(b) Required Performance. If the initial installation includes all of the hardware and software used by the Contractor to perform the preaward benchmark test, the time to perform the benchmark rerun(s) shall not exceed the maximum benchmark time(s) specified for the preaward benchmark test for that configuration. If the initial hardware/software configuration installed at the Government's site must be augmented under the terms of the contract, the benchmark rerun(s) shall not exceed the maximum benchmark time(s) specified for the preaward benchmark test for the specific augmented configuration involved.

(c) Files, Data, and Procedures. The benchmark program files, input data, and processing procedures must be the same as those used in the original timed benchmark test. The Contractor agrees to retain all necessary files, programs, and information used in the original benchmark test for the guaranteed rerun benchmark test.

(d) Additional Hardware and Software. If the required performance is not attained on rerun of the benchmark tests, through no fault of the Government, the Contractor shall provide whatever hardware and/or software is necessary to meet the specified benchmark test time(s). Such additional hardware and/or software shall be provided at no cost to the Government for the duration of the system life specified in the solicitation.

(e) Waiver of Test. The Government reserves the right to waive the requirement for Benchmark and Operational Capability Tests if technical compliance can be adequately determined through review of technical proposals.

**E.7 INSPECTION AND ACCEPTANCE (DESTINATION), (NRCC WASH)(OCT 1992)**

(a) Final inspection and acceptance of the supplies to be furnished hereunder shall be made at destination by the COTR.

(b) The COTR shall execute acceptance on the applicable inspection and receiving report (DD Form 250, and forward to the paying office cited on the award page of the contract. One executed copy of the final DD Form 250 shall be forwarded to the contract administration office cited in the contract.

## SECTION F - DELIVERIES OR PERFORMANCE

### F.1 CONTRACT CLAUSES INCORPORATED BY REFERENCE

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CONTRACT CLAUSES
II. DOD FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES

| | | |
|---|---|---|
| 52.212-10 | DELIVERY OF EXCESS QUANTITIES OF $100 OR LESS | SEP 1989 |
| 52.212-13 | STOP-WORK ORDER | AUG 1989 |
| 52.212-15 | GOVERNMENT DELAY OF WORK | APR 1984 |
| 52.247-34 | F.O.B. DESTINATION | DEC 1991 |
| 52.247-54 | DIVERSION OF SHIPMENT UNDER F.O.B. DESTINATION CONTRACTS | MAR 1989 |

### F.2 DELIVERY REQUIREMENTS AND OPTIONS

(a) The Government reserves the right to delay the installation by up to 30 days, at no additional cost to the Government, provided that:

(1) The Contractor shall receive written notice from the Contracting Officer 30 days prior to the scheduled installation date.

(2) Any installation delays beyond 30 days shall be mutually agreed to by the Contractor and the Government.

(b) If the equipment is certified to be ready for use prior to the installation date, the Government, at its option, may elect to use the equipment and change the installation date accordingly. In this event, the contract shall be so amended by the Government.

(c) The Government agrees to have the site prepared in accordance with the Contractor's written site specifications by thirty (30) days prior to the scheduled installation date, unless a shorter period of time is agreed to in writing.

(d) The Government shall provide the Contractor with access to the site for the purpose of installing the equipment prior to the scheduled installation date. The Contractor shall specify

in writing the time required to install the equipment.

## F.3 DELIVERY OF DATA

The place and time of delivery of data shall be as specified on the DD Form 1423 (Contract Data Requirements List) which is an exhibit to this contract, unless delivery is deferred at the Government's option by written order of the Contracting Officer.

Exhibits A through R apply to Lot I of the contract. Exhibits AI through AZ are required for each optional ATC site (in accordance with option provisions contained herein).

## F.7 TIME AND PLACE OF DELIVERY – F.O.B. DESTINATION

The contractor shall furnish the items hereunder at the following locations and within the following timeframes and without additional expense to the Government.

| CLIN | DESTINATION | QTY/ UNIT | DELIVERY SCHEDULE PERIOD OF PERFORMANCE |
|---|---|---|---|
| 0001AA | NTCC HAMPTON ROADS | 1/EA | 12 MONTHS AFTER CONTRACT AWARD |
| 0001AB | NTCC CAMP SMITH | 1/EA | 09 MONTHS AFTER CONTRACT AWARD |
| 0001AC | NTCC MAKALAPA | 1/EA | 10 MONTHS AFTER CONTRACT AWARD |
| 0002AA | NTCC HAMPTON ROADS | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0002AB | NTCC CAMP SMITH | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0002AC | NTCC MAKALAPA | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0003 | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0004* | NCTS JAPAN | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0005* | NCTS JAPAN | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0006* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0007* | NCTS SICILY | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0008* | NTCS SICILY | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0009* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0010* | NCTS PUERTO RICO | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0011* | NCTS PUERTO RICO | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0012* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |

| CLIN | DESTINATION | QTY/ UNIT | DELIVERY SCHEDULE PERIOD OF PERFORMANCE |
|---|---|---|---|
| 0013* | NCTS LONDON | 1/EA | 9 MONTHS AFTER OPTION EXERCISE |
| 0014* | NCTS LONDON | 1/LT | IN ACCORDANCE WITH CLAUSE C.15 |
| 0015* | SEE CLAUSE F.3 | 1/LT | SEE CLAUSE F.3 |
| 0016- THROUGH 0030* | AS SPECIFIED IN SECT B | N/A | 01 OCT 1994 THROUGH 30 SEPT 1995 |
| 0031- THROUGH 0045* | AS SPECIFIED IN SECT B | N/A | 01 OCT 1995 THROUGH 30 SEPT 1996 |
| 0046- THROUGH 0060* | AS SPECIFIED IN SCET B | N/A | 01 OCT 1996 THROUGH 30 SEPT 1997 |
| 0061- THROUGH 0075* | AS SPECIFIED IN SECT B | N/A | 01 OCT 1997 THROUGH 30 SEPT 1998 |

*IN ACCORDANCE WITH OPTION PROVISIONS CONTAINED HEREIN.

## F.16 NO WAIVER OF DELIVERY SCHEDULE

None of the following shall be regarded as an extension, waiver, or abandonment of the delivery schedule or a waiver of the Government's right to terminate for default:

(a) Delay by the Government in terminating for default;

(b) Acceptance of delinquent deliveries; and

(c) Acceptance or approval of samples submitted either after default in delivery or in sufficient time for the contractor to meet the delivery schedule. Any assistance rendered to the contractor on this contract or acceptance by the Government of delinquent goods or services hereunder will be solely for the purpose of mitigating damages and is not to be construed as an intention on the part of the Government to condone any delinquency, nor as a waiver of any rights the Government may have under subject contract.

## SECTION G - CONTRACT ADMINISTRATION DATA

### G.1 POINT-OF-CONTACT

The point-of-contact regarding this document is William Thoreen, who can be reached at 202-433-5389.

### G.2 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER, SUP 5252.243-9000 (JAN 1992)

(a) Except as specified in paragraph (b) herein, no order, statement, or conduct of Government personnel who visit the Contractor's facilities, or in any other manner communicate with Contractor personnel during the performance of this contract, shall constitute a change under the "Changes" clause of this contract.

(b) The Contractor shall not comply with any order, direction, or request of Government personnel unless issued in writing and signed by the Contracting Officer, or pursuant to specific authority otherwise included in this contract.

(c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and, notwithstanding provisions contained elsewhere in this contract, said authority remains solely with the Contracting Officer. In the event the Contractor effects any change (s) at the direction of any person other than the Contracting Officer, that change shall be considered to have been made without authority and no adjustment in price shall be made in the contract (or Delivery Order) to cover any increase in charges incurred as a result thereof. The name and address of the Principle Contracting Officer (PCO) is:

ROSCOE W. CRAWFORD
NAVAL REGIONAL CONTRACTING CENTER
BLDG 200, 901 M ST
WASHINGTON NAVY YARD
WASHINGTON, DC 20374-5014

## G.4 DESIGNATION OF COTR, (NRCC WASH)(OCT 1992)

(a) (1) The Contracting Officer's Technical Representative (COTR) for this contract is:

NAME: MR. PERCY TOLBERT
MAIL ADDRESS: Space and Naval Warfare Systems Command
Code PMW-152-21F
2451 Crystal Drive
Arlington, VA 22245-5200

TELEPHONE NUMBER: (703) 602-8332 Ext. 548

(2) The above-named individual is hereby delegated as the authorized COTR for this contract/order. As such, this individual is responsible for monitoring, progressing and overall technical surveillance of services to be performed under this contract/order and should be contacted regarding questions or problems of a technical nature. In no event will any understanding or agreement, modification, change order, or other matter deviating from the terms of the basic contract between the contractor and any person other than the Procuring Contracting Officer (PCO) or the Administering Contracting Officer (ACO) be effective or binding upon the Government.

(3) When, in the opinion of the contractor, the COTR requests effort outside the existing scope of the contract, the contractor will promptly notify the PCO in writing.

(4) No action will be taken by the contractor under such technical instruction unless the PCO or ACO has issued a contractual change.

(b) List of duties to be performed by COTR in the administration of Contract:

(1) Serve as the point-of-contact through which the contractor can relay questions or problems of a technical nature to the contracting Officer.

(2) Monitor services being performed to ensure the contractor uses personnel meeting the requisite qualifications cited in the contract/order and require contractor's justification when using categories of personnel that are not in proportion to approved estimates.

(3) Review and evaluate contractor's estimates to furnish comments and recommendations to the PCO or ACO as appropriate.

(4) Alert the ACO, as appropriate, to any potential problems which may affect cost or performance schedules. Determine if percentage of work performed reasonably corresponds to the percentage of funds expended.

(5) Ensure that a copy of trip reports of Government personnel visiting contractor's plant, and a copy of all pertinent Government technical correspondence is retained in the COTR contract file.

(6) Review and certify invoices in accordance with invoicing instructions of the contract. Maintain a file with copies of these documents.

(7) Determine causative factors for any slippage in the performance schedule and report to the PCO or ACO making recommendations for corrective action to eliminate the cause of the slippage. In addition, the contractor's performance should be monitored to ensure that corrective action is being taken.

(8) Furnish the PCO with any requests for change, deviation, or waiver (whether generated by Government personnel or contractor personnel), including all supporting paperwork in connection with such change, deviation, or waiver.

(9) Be responsible for the inspection and acceptance of the services performed. Ensure compliance with the clause at FAR 52.246-5 or -6 which provide the Government the right to require the contractor to perform the services again, in conformance with the contract requirements, without payment of additional profit/fee.

(10) Submit to the PCO (with a copy to the ACO), a written evaluation of

(A) the performance of the contractor and

(B) a statement as to the uses made of any deliverables furnished by the contractor.

This report shall be made within 60 days of contract completion or annually on the anniversary date for contracts which include options. The written performance should address the cost effectiveness, quality, and timeliness of contractor performance.

## G.6 SECURITY COGNIZANCE

The highest level of security required under this contract is Top Secret as designated on the DD Form 254, Attachment 8 to this contract. Responsibility for security requirements under this contract is assigned to Director Industrial Security, Defense Investigative Service, Capital Region.

## G.7 COST ACCOUNTING STANDARDS ADMINISTRATION

A copy of this contract has been furnished to the cognizant Contract Administration Office for administration of the Cost Accounting Standards provisions contained herein.

## G.8 AUTHORITY FOR DEOBLIGATION OF UNEXPENDED AND EXCESS DOLLAR BALANCES

The Administrative Contracting Officer (ACO) is authorized to execute contract modifications deobligating unexpended Navy dollar balances considered excess to known contract requirements.

## G.9 ADDITIONAL FUNCTIONS ASSIGNED

In addition to the Contract Administration functions authorized by FAR 42.302, the Administrative Contracting Officer (ACO) is authorized to perform the following administrative functions as checked below:

[X] Negotiate, or negotiate and execute, supplemental agreements issued under the Changes clause.

NOTE: Prior to completion of negotiations and issuance of the supplemental agreement, any delivery schedule change shall be coordinated with the Principle Contracting Officer (PCO).

[X] Negotiate, or negotiate and execute, supplemental agreements changing contract delivery schedules.

[X] Negotiate, or negotiate and execute, supplemental agreements providing for the deobligation of unexpended dollar balances excess to known contract requirements.

[ ] Negotiate changes to interim billing prices.

[X] Issue amended shipping instructions and, when necessary, negotiate and execute supplemental agreements incorporating contractor proposals resulting from the amended shipping instructions.

## G.10 NOTE TO PAYING OFFICE: ADDRESS OF PAYEE

The Contractor shall identify the address to which payments shall be made, if different from that identified on the SF26. Payments are to be mailed to the following address:

______________________________________________

______________________________________________

______________________________________________

## G.12 APPROPRIATION DATA

Accounting and Appropriation Data for this contract is as follows:

| ACRN | ACCOUNTING AND APPROPRIATION DATA | DOLLARS OBLIGATED |
|---|---|---|

AA 1741810 52D6 000 EA152 0 068342 2D 000000 D60010000000 $4,416,645.54

## G.14 EXTENDED MAINTENANCE FUNDING

(a) This contract specifies a not-to-exceed amount for per-call maintenance services (labor and travel) outside the Principal Period of Maintenance (OPPM). The Government may unilaterally modify the contract to increase the not-to-exceed amount for these services. However, the Contractor is not obligated to perform, and the Government is not obligated to pay for, services in excess of the dollars specified in Section B.

(b) However, the Contractor is not obligated to perform, and the Government is not obligated to pay, for services that will cause the total maximum value of the contract to be exceeded.

(c) Charges for per-call services shall be invoiced separately and on a calendar month basis

listing the date(s) performed, the service(s) performed, the number of hours, and the reasons for the services.

## G.15 GOVERNMENT DOWNTIME CREDIT

The amount of creditable hours (for failure to arrive within the response time designated in Clause C.21 ("On-Site Maintenance") shall be accumulated for the month and adjusted to the nearest hour. The amount of credit for each hour in excess of the specified response time shall be computed at the applicable OPPM rate specified in the Schedule. The total credit during any month shall not exceed the Total Monthly Maintenance Charge.

## G.16 CALCULATION OF DOWNTIME CREDIT

(a) Definition. System downtime is that period of time when the system is inoperative and no scheduled workload can be accomplished due to a malfunction in the Contractor-supplied/maintained equipment or operating software or the system is inoperative and no scheduled workload can be accomplished because the system is released to the Contractor for remedial services.

(b) Period of Downtime. Downtime shall commence at the time of the actual contact (or bona-fide attempt as defined in the glossary) with the Contractor's maintenance representative at the designated point of contact or with the Contractor's answering service or other continuous telephone coverage provided to permit the Government to make such contact. Downtime shall end when the system and/or machine is returned to the Government in operable condition, including operating software regeneration, if required, ready to perform the scheduled workload. The Contractor shall not be responsible for input of lost workload data.

(c) Maintenance Credit for System Downtime. If the system remains inoperative and cannot perform the scheduled workload due to an equipment or operating software malfunction through no fault or negligence of the Government for a period of 5 consecutive minutes, or more than 10 non-consecutive minutes during a twenty-four (24) hour period, the Contractor shall grant a credit to the Government for each minute of downtime in the amount of one-half (1/2) of one percent of the Total Monthly Charges due under this contract, as defined in Section J, Attachment 1, Glossary. However, no credit shall be due the Government for operating software malfunctions when

(1) the malfunction is not attributable solely to the Contractor-supplied/maintained software, and/or

(2) the Government has made any additions or alterations or otherwise modified the operating software.

The credit for system downtime shall be computed to the nearest half or whole minute. No credit shall accrue to the Government during those periods when the Contractor is denied access to the equipment and the amount of credit granted shall not exceed 1/30th of the Total Monthly Charges for any calendar day.

(d) Maintenance Credit for Equipment Downtime. If a machine remains unusable due to an equipment and/or operating software malfunction through no fault or negligence of the Government, for a period of _2_ consecutive hours or more than _4_ non-consecutive hours during a twenty four (24) hour period, the Contractor shall grant a credit to the Government for each hour of downtime in the amount of one-half (1/2) of one percent of Total Monthly Charges due under this contract, as defined in Section J, Attachment J.1, Glossary, plus similar credits for any other machine(s) supplied under this contract not usable as a result of the malfunction. No credit shall accrue to the Government during those periods when the Contractor is denied access to the equipment and the amount of credit granted under this paragraph for each machine shall not exceed 1/30th of the Total Monthly Charge for the machine for any calendar day. Credit for equipment or software malfunctions shall be computed to the nearest half or whole hour. However, no credit shall be due the Government for operating software or equipment malfunctions when

(1) the malfunction is not attributed solely to the Contractor supplied/maintained software or equipment and/or

(2) the Government has made any additions or alterations or otherwise modified the operating software or equipment.

During a period of downtime, the Government may use operable equipment when such action does not interfere with remedial maintenance. The credit provisions of this paragraph do not apply when paragraph (c) herein is invoked.

(e) Purchased System and/or Equipment. For purchased system/equipment, maintenance downtime credits apply only during the period in which the Contractor has maintenance responsibility.

**G.18 SUBMISSION OF INVOICES IN CONTRACTS FOR ACQUISITION OF FEDERAL INFORMATION PROCESSING (FIP) RESOURCES INCLUDING LEASE, MAINTENANCE, RENTAL AND/OR SUPPORT SERVICES, SUP 5252.232-9003 (JUN 1992)**

(a) The Contractor shall submit original DD-250s with 3 copies to the address identified on the solicitation/contract award form (SF33 - Block 23), for certification prior to payment.

(b) In addition to the information identified in the clause entitled "Prompt Payment" herein, in, DD-250s shall include the following information:

(1) Contract Line Item Number (CLIN):
(2) Contract Subline Item Number (SLIN), if applicable;
(3) Accounting Classification Reference Number (ACRN);
(4) Payment terms;
(5) Name and serial number of equipment provided or serviced;
(6) Total charges and, if applicable, the Prompt Payment discount.

(c) The Contractor shall submit DD-205s for basic monthly charges in the month following the month for which the charges accrue and not more than on a monthly basis. Payment for rental or services of less than one month's duration shall be prorated at 1/30th of the basic monthly charges for each calendar day.

(d) If maintenance credits apply, the procedures indicated below are applicable:

[ X ] The Government will request, in writing, that the applicable credits for the month be applied against other charges, The request will list the following information:

Type and model number(s) of machine(s);
Date of Occurrence;
Period of downtime; and Credit due.

Invoices for remedial (on-call) maintenance will be accompanied by copies of the applicable malfunction reports regarding the on-call maintenance furnished.

[ ] The government will deduct the credits from the monthly invoice and inform the contractor in writing of the reason.

## G.20 INVOICING ADDRESS

Invoices shall be sent to the following address(es):

NAME: MR. PERCY TOLBERT
MAIL ADDRESS: Space and Naval Warfare Systems Command
Code PMW-152-21F
2451 Crystal Drive
Arlington, VA 22245-5200

TELEPHONE NUMBER: (703) 602-8332 Ext. 548

## G.23 SERVICE CONTRACT GUIDELINES

All Naval personnel involved in inspection or surveillance of Contractor services or liaison with contractor personnel shall conform to the guidelines for using contractor services set forth in the latest version to SECNAVINST 4200.27A.

## G.24 SUBCONTRACTING PLAN

The Contractor's subcontracting plan number *__________, dated ____________ is determined to be acceptable and is hereby incorporated as Attachment ____. A copy of the plan shall be provided to the ACO.

*Not required.

## SECTION H - SPECIAL CONTRACT REQUIREMENTS

### H.2 ADVERTISING OF AWARD

The Contractor agrees not to refer to awards in commercial advertising in such a manner as to state or imply that the product or service provided is endorsed or preferred by the Federal Government or is considered by the Government to be superior to other products or services.

### H.4 POST-AWARD CONFERENCE, (NAVSUP)(JAN 1992)

(a) A post-award conference shall be conducted within 30 days after contract award with representatives of the Contractor, the cognizant Contract Administration Office, and the Contracting Officer at _______to be determined_________. The Contracting Officer, or designated representative, initiating the conference will designate, or act as, the chairperson. At the request of the Procuring Contracting Officer, conference arrangements will be made by the Contract Administration Office, including notification to the Contractor and the Contracting Officer.

(b) The requirement for a post-award conference shall in no event constitute grounds for excusable delay by the Contractor in performance of any provisions in the contract.

## SECTION I - CONTRACT CLAUSES

### I.1 CLAUSES INCORPORATED BY REFERENCE

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER I) CLAUSES
II. DOD FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES

CAUTION TO OFFERORS: THE OFFEROR IS CAUTIONED NOT TO DELETE CLAUSES FROM NOR ADD CLAUSES TO THE FOLLOWING CONTRACT CLAUSE LIST. SUCH AN ACTION MAY CAUSE THE OFFER TO BE REJECTED. NOTE THE AVAILABILITY OF TEXT OF CLAUSES: THE COMPLETE TEXT OF SPECIFIC CLAUSES IS CONTAINED IN TITLES 48 AND 41 OF THE CODE OF FEDERAL REGULATIONS (CFR) AND IS AVAILABLE AT MOST COMPLETE LAW LIBRARIES.

| CLAUSE | TITLE | DATE |
|---|---|---|
| 252.201-7000 | CONTRACTING OFFICER'S REPRESENTATIVE | DEC 1991 |
| 52.202-1 | DEFINITIONS | APR 1984 |
| 52.203-1 | OFFICIALS NOT TO BENEFIT | APR 1984 |
| 52.203-3 | GRATUITIES | APR 1984 |
| 52.203-5 | COVENANT AGAINST CONTINGENT FEES | APR 1984 |
| 52.203-6 | RESTRICTIONS ON SUBCONTRACTOR SALES TO THE GOVERNMENT | JUL 1985 |
| 52.203-7 | ANTI-KICKBACK PROCEDURES | OCT 1988 |
| 52.203-10 | PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY | SEP 1990 |
| 52.203-12 | LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS | JAN 1990 |
| 252.203-7000 | STATUTORY PROHIBITIONS ON COMPENSATION TO FORMER DoD EMPLOYEES | DEC 1991 |
| 252.203-7001 | SPECIAL PROHIBITION ON EMPLOYMENT | DEC 1991 |
| 252.203-7002 | DISPLAY OF DoD HOTLINE POSTER | DEC 1991 |
| 52.204-2 | SECURITY REQUIREMENTS | APR 1984 |
| 252.204-7000 | DISCLOSURE OF INFORMATION | DEC 1991 |
| 252.204-7002 | PAYMENT FOR SUBLINE ITEMS NOT SEPARATELY PRICED | DEC 1991 |
| 252.205-7000 | PROVISION OF INFORMATION TO COOPERATIVE AGREEMENT HOLDERS | DEC 1991 |

| | | |
|---|---|---|
| 52.209-6 | PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED, OR PROPOSED FOR DEBARMENT | NOV 1992 |
| 52.210-5 | NEW MATERIAL | APR 1984 |
| 52.210-7 | USED OR RECONDITIONED MATERIAL, RESIDUAL INVENTORY, AND FORMER GOVERNMENT SURPLUS PROPERTY | APR 1984 |
| 52.212-8 | DEFENSE PRIORITY AND ALLOCATION REQUIREMENTS | SEP 1990 |
| 52.215-1 | EXAMINATION OF RECORDS BY COMPTROLLER GENERAL | APR 1984 |
| 52.215-2 | AUDIT-NEGOTIATION | DEC 1989 |
| 52.215-22 | PRICE REDUCTION FOR DEFECTIVE COST OR PRICING DATA | DEC 1991 |
| 52.215-24 | SUBCONTRACTOR COST OR PRICING DATA | DEC 1991 |
| 52.215-25 | SUBCONTRACTOR COST OR PRICING DATA - MODIFICATIONS | DEC 1991 |
| 52.215-26 | INTEGRITY OF UNIT PRICES | APR 1991 |
| 52.215-27 | TERMINATION OF DEFINED BENEFIT PENSION PLANS | SEP 1989 |
| 52.215-33 | ORDER OF PRECEDENCE | JAN 1986 |
| 52.215-39 | REVERSION OR ADJUSTMENT OF PLANS FOR POST-RETIREMENT BENEFITS OTHER THAN PENSIONS (PRB) | JUL 1991 |
| 252.215-7000 | PRICING ADJUSTMENTS | DEC 1991 |
| 252.215-7002 | COST ESTIMATING SYSTEM REQUIREMENTS | DEC 1991 |
| 252.215-7003 | INDUSTRIAL MODERNIZATION INCENTIVE PROGRAM (IMIP) PRODUCTIVITY SAVINGS REWARDS | DEC 1991 |
| 52.219-8 | UTILIZATION OF SMALL-BUSINESS CONCERNS AND SMALL DISADVANTAGED BUSINESS CONCERNS | FEB 1990 |
| 52.219-9 | SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN | JAN 1991 |
| 52.219-13 | UTILIZATION OF WOMEN-OWNED SMALL BUSINESSES | AUG 1986 |
| 52.219-16 | LIQUIDATED DAMAGES-SMALL BUSINESS SUBCONTRACTING PLAN | AUG 1989 |

| | | |
|---|---|---|
| 252.219-7003 | SMALL BUSINESS AND SMALL DISADVANTAGED BUSINESS SUBCONTRACTING PLAN (DoD CONTRACTS) | DEC 1991 |
| 252.219-7005 | INCENTIVE FOR SUBCONTRACTING WITH SMALL BUSINESSES, SMALL DISADVANTAGED BUSINESSES, HISTORICALLY BLACK COLLEGES AND UNIVERSITIES, AND MINORITY INSTITUTIONS | DEC 1991 |
| 52.220-3 | UTILIZATION OF LABOR-SURPLUS AREA CONCERNS | APR 1984 |
| 52.220-4 | LABOR SURPLUS AREA SUBCONTRACTING PROGRAM | APR 1984 |
| 52.222-18 | NOTIFICATION OF EMPLOYEE RIGHTS CONCERNING PAYMENT OF UNION DUES OR FEES | MAY 1992 |
| 52.222-20 | WALSH-HEALEY PUBLIC CONTRACTS ACT | APR 1984 |
| 52.222-26 | EQUAL OPPORTUNITY | APR 1984 |
| 52.222-28 | EQUAL OPPORTUNITY PREAWARD CLEARANCE OF SUBCONTRACTS | APR 1984 |
| 52.222-35 | AFFIRMATIVE ACTION FOR SPECIAL DISABLED AND VIETNAM ERA VETERANS | APR 1984 |
| 52.222-36 | AFFIRMATIVE ACTION FOR HANDICAPPED WORKERS | APR 1984 |
| 52.222-37 | EMPLOYMENT REPORTS ON SPECIAL DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA | JAN 1988 |
| 252.222-7000 | RESTRICTIONS ON EMPLOYMENT OF PERSONNEL | DEC 1991 |
| 52.223-2 | CLEAN AIR AND WATER | APR 1984 |
| 52.223-6 | DRUG-FREE WORKPLACE | JUL 1990 |
| 252.223-7004 | DRUG-FREE WORK FORCE | SEP 1988 |
| 52.225-10 | DUTY-FREE ENTRY | APR 1984 |
| 52.225-11 | RESTRICTIONS ON CERTAIN FOREIGN PURCHASES | APR 1984 |
| 252.225-7001 | BUY-AMERICAN ACT AND BALANCE OF PAYMENTS PROGRAM | DEC 1991 |
| 252.225-7002 | QUALIFYING COUNTRY SOURCES AS SUBCONTRACTORS | DEC 1991 |
| 252.225-7007 | TRADE AGREEMENTS ACT | DEC 1991 |
| 252.225-7009 | DUTY-FREE ENTRY - QUALIFYING COUNTRY END-PRODUCTS AND SUPPLIES | DEC 1991 |

| | | |
|---|---|---|
| 252.225-7010 | DUTY-FREE ENTRY - ADDITIONAL PROVISIONS | DEC 1991 |
| 252.225-7012 | PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES | DEC 1991 |
| 252.225-7031 | SECONDARY ARAB BOYCOTT OF ISRAEL | JUN 1992 |
| 52.226-1 | UTILIZATION OF INDIAN ORGANIZATIONS AND INDIAN-OWNED ECONOMIC ENTERPRISES | AUG 1991 |
| 52.227-1 | AUTHORIZATION AND CONSENT | APR 1984 |
| 52.227-2 | NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT | APR 1984 |
| 52.227-3 | PATENT INDEMNITY | APR 1984 |
| 52.227-14 | RIGHTS IN DATA - GENERAL | JUN 1987 |
| 252.227-7000 | NON-ESTOPPEL | OCT 1966 |
| 252.227-7013 | RIGHTS IN TECHNICAL DATA AND COMPUTER SOFTWARE | OCT 1988 |
| 252.227-7018 | RESTRICTIVE MARKINGS ON TECHNICAL DATA | OCT 1988 |
| 252.227-7029 | IDENTIFICATION OF TECHNICAL DATA | APR 1988 |
| 252.227-7030 | TECHNICAL DATA - WITHHOLDING OF PAYMENTS | OCT 1988 |
| 252.227-7031 | DATA REQUIREMENTS | OCT 1988 |
| 252.227-7036 | CERTIFICATION OF TECHNICAL DATA CONFORMITY | MAY 1987 |
| 252.227-7037 | VALIDATION OF RESTRICTIVE MARKINGS ON TECHNICAL DATA | APR 1988 |
| 52.228-5 | INSURANCE - WORK ON A GOVERNMENT INSTALLATION | SEP 1989 |
| 52.229-3 | FEDERAL, STATE AND LOCAL TAXES | JAN 1991 |
| 52.229-5 | TAXES - CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO | APR 1984 |
| 52.230-2 | COST ACCOUNTING STANDARDS | AUG 1992 |
| 52.230-3 | DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES | AUG 1992 |
| 52.230-5 | ADMINISTRATION OF COST ACCOUNTING STANDARDS | AUG 1992 |
| 252.231-7000 | SUPPLEMENTAL COST PRINCIPLES | DEC 1991 |
| 52.232-1 | PAYMENTS | APR 1984 |
| 52.232-8 | DISCOUNTS FOR PROMPT PAYMENT | APR 1989 |
| 52.232-9 | LIMITATION ON WITHHOLDING OF PAYMENTS | APR 1984 |
| 52.232-11 | EXTRAS | APR 1984 |
| 52.232-16 | PROGRESS PAYMENTS | JUL 1991 |
| 52.232-17 | INTEREST | JAN 1991 |

| | | |
|---|---|---|
| 52.232-18 | AVAILABILITY OF FUNDS | APR 1984 |
| 52.232-23 | ASSIGNMENT OF CLAIMS | JAN 1986 |
| 52.232-25 | PROMPT PAYMENT | SEP 1992 |
| 252.232-7004 | DOD PROGRESS PAYMENT RATES | DEC 1991 |
| 252.232-7006 | REDUCTION OR SUSPENSION OF CONTRACT PAYMENTS UPON FINDING OF FRAUD | AUG 1992 |
| 52.233-1 | DISPUTES | DEC 1991 |
| | Alternate I | DEC 1991 |
| 52.233-3 | PROTEST AFTER AWARD | AUG 1989 |
| 252.233-7000 | CERTIFICATION OF CLAIMS AND REQUESTS FOR ADJUSTMENT OR RELIEF | DEC 1991 |
| 52.237-2 | PROTECTION OF GOVERNMENT BUILDINGS, EQUIPMENT AND VEGETATION | APR 1984 |
| 252.239-7000 | PROTECTION AGAINST COMPROMISING EMANATIONS | DEC 1991 |
| 52.242-13 | BANKRUPTCY | APR 1991 |
| 252.242-7000 | POSTAWARD CONFERENCE | DEC 1991 |
| 252.242-7004 | MATERIAL MANAGEMENT AND ACCOUNTING SYSTEM | DEC 1991 |
| 52.243-1 | CHANGES - FIXED PRICE | AUG 1987 |
| 52.243-6 | CHANGE ORDER ACCOUNTING | APR 1984 |
| 252.243-7001 | PRICING OF CONTRACT MODIFICATIONS | DEC 1991 |
| 52.244-1 | SUBCONTRACTS (FIXED-PRICE CONTRACTS) | APR 1991 |
| 52.245-2 | GOVERNMENT PROPERTY (FIXED-PRICE CONTRACTS) | DEC 1989 |
| 52.245-19 | SPECIAL TEST EQUIPMENT | AUG 1988 |
| 52.246-23 | LIMITATION OF LIABILITY | |
| 52.246-24 | LIMITATION OF LIABILITY - HIGH-VALUE ITEMS | APR 1984 |
| | Alternate I | APR 1984 |
| 52.246-25 | LIMITATION OF LIABILITY - SERVICES | APR 1984 |
| 252.246-7000 | MATERIAL INSPECTION AND RECEIVING REPORT | DEC 1991 |
| 252.247-7023 | TRANSPORTATION OF SUPPLIES BY SEA | DEC 1991 |
| 252.247-7024 | NOTIFICATION OF TRANSPORTATION OF SUPPLIES BY SEA | DEC 1991 |
| 52.248-1 | VALUE ENGINEERING | MAR 1989 |
| 52.249-2 | TERMINATION FOR CONVENIENCE OF THE GOVERNMENT (FIXED PRICE) | APR 1984 |

| | | |
|---|---|---|
| **52.249-8** | **DEFAULT (FIXED-PRICE SUPPLY AND SERVICE)** | **APR 1984** |
| **252.249-7001** | **NOTICE OF SUBSTANTIAL IMPACT ON EMPLOYMENT** | **DEC 1991** |
| **52.253-1** | **COMPUTER GENERATION OF FORMS BY THE PUBLIC** | **JAN 1991** |

## I.2 REQUIREMENT FOR PROCUREMENT INTEGRITY - MODIFICATION, FAR 52.203-9 (NOV 1990)

(a) Definitions. The definitions at FAR 3.104-4 are hereby incorporated in this clause.

(b) The Contractor agrees that it will execute the certification set forth in paragraph (c) of this clause when requested by the Contracting Officer in connection with the execution of any modification of this contract.

(c) Certification. As required in paragraph (b) of this clause, the officer or employee responsible for this offer shall execute the following certification:

CERTIFICATE OF PROCUREMENT INTEGRITY - MODIFICATION

(1) I, ______________________________ [Name of certifier], am the officer or employee responsible for the preparation of this modification proposal and hereby certify that, to the best of my knowledge and belief, with the exception of any information described in this certificate, I have no information concerning a violation or possible violation of subsection 27(a), (b), (d), or (f) of the Office of Federal Procurement Policy Act, as amended* (41 U.S.C. 423), (hereinafter referred to as "the Act"), as implemented in the FAR, occurring during the conduct of this procurement N00600-9 - - (contract and modification number).

(2) As required by subsection 27(e)(1)(8) of the Act, I further certify that, to the best of my knowledge and belief, each officer, employee, agent, representative, and consultant of ______________________________ [Name of offeror] who has participated personally and substantially in the preparation or submission of this proposal has certified that he or she is familiar with, and will comply with, the requirements of subsection 27(a) of the Act, as implemented in the FAR, and will report immediately to me any information concerning a violation or possible violation of the Act, as implemented in the FAR, pertaining to this procurement.

(3) Violations or possible violations (Continue on plain bond paper if necessary and label Certificate of Procurement Integrity (Continuation Sheet), ENTER NONE IF NONE EXISTS):

[Signature of the officer or employee responsible for the modification proposal and date]

[Typed Name of the officer or employee responsible for the modification proposal]

*Subsections 27(a), (b), and (d) are effective on December 1, 1990. Subsection 27(f) is effective on June 1, 1991.

THIS CERTIFICATION CONCERNS A MATTER WITHIN THE JURISDICTION OF AN AGENCY OF THE UNITED STATES AND THE MAKING OF A FALSE, FICTITIOUS, OR FRAUDULENT CERTIFICATION MAY RENDER THE MAKER SUBJECT TO PROSECUTION UNDER TITLE 18, UNITED STATES CODE, SECTION 1001.

(d) In making the certification in paragraph (2) of the certificate, the officer or employee of the competing Contractor responsible for the offer or bid may rely upon a one-time certification from each individual required to submit a certification to the competing Contractor, supplemented by periodic training. These certifications shall be obtained at the earliest possible date after an individual required to certify begins employment or association with the Contractor. If a Contractor decides to rely on a certification executed prior to the suspension of section 27, the Contractor shall ensure that an individual who has so certified is notified that section 27 has been reinstated. These certifications shall be maintained by the Contractor for a period of 6 years from the date a certifying employee's employment with the company ends or, for an agency, representative, or consultant, 6 years from the date such individual ceases to act on behalf of the Contractor.

(e) The certification required by paragraph (c) of this clause is a material representation of fact upon which reliance will be placed in executing this modification.

---

**I.3 CERTIFICATION OF COMMERCIAL PRICING FOR PARTS OR COMPONENTS, FAR 52.215-32 - Alternate I (JUL 1990)**

The requirements of this clause shall become operative only for any modification to this contract involving the furnishing of parts or components, as defined in paragraph (a) of this clause, if awarded as a result of other than full and open competition.

(a) Definitions.

"Lowest commercial price," as used in this clause, means the lowest price at which a sale was made to the general public of a particular part or component. The terms does not include a price at which a sale was made to -

(1) Any agency of the united States;

(2) Customers located outside the United States; or

(3) A subsidiary, affiliate, or parent business organization of the Contractor, or any other branch of the same business entity. "Part or component," as used in this clause, means any individual part, component, subassembly, assembly or subsystem integral to a major system, and other property which may be replaced during the life of the system, and includes spare parts and replenishment spare parts, but does not include packaging or labeling associated with shipment or identification of a part or component.

(b) Submission requirements. The Offeror/Contractor shall execute and submit to the Contracting Officer the following certificate with any offer/proposal as required by FAR 15.813-4 when requested by the Contracting Officer:

CERTIFICATE OF COMMERCIAL PRICING FOR PARTS OR COMPONENTS

(1) Unless justified in subparagraph (b)(2) of this clause, by submission this offer/proposal, the Offeror/Contractor certifies that, to the best of its knowledge and belief, the prices offered for those parts or components (whether or not separately identified) that the Contractor offers for sale are no higher than the lowest commercial price at which such items were sold to the public during the most recent regular monthly, quarterly, or other period for which sales data are reasonably available, provided that in no event shall this period be less than 1-month in duration.

(2) All parts or components for which prices offered are higher than the lowest commercial price referred to in subparagraph (b)(1) of this certificate are identified below (including the amounts by which such offered prices are higher) and a written justification for the differences is attached (list as necessary):

| Part or Component | Price Differences |
| --- | --- |
| None | |
| | |
| | |
| | |

Offer/Proposal Number ______________________________

Time period for sales data ______________________________
Firm ______________________________

Typed name and signature ______________________________

Title ______________________________

Date ______________________________

(c) Audit. The Contracting Officer or representatives of the Contracting Officer who are employees of the Government shall have the right to examine and audit all directly pertinent records of sales and related documents, including contract terms and conditions necessary to verify the validity of any certificate executed in accordance with paragraph (b) of this clause. The Contractor shall make those records, books, data, and documents available for examination, audit, or reproduction until 3 years after the date the certificate set forth in paragraph (b) of this clause is executed. Nothing contained in this clause shall require the submission of cost or pricing data not otherwise required by law or regulation.

(d) Price reduction. If any price, including profit or fee negotiated in connection with this contract, or any cost reimbursable under this contract, has increased because the certification paragraph (b)(1) of the certificate or the information provided as justification in subparagraph (b)(2) of the certificate was inaccurate, incomplete, or misleading, the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.

## I.8 OPTION FOR INCREASED QUANTITY - SEPARATELY PRICED LINE-ITEM (MAR 1989) FAR 52.217-7

The Government may require the delivery of the numbered line item, identified in the Schedule as an option item, in the quantity and at the price stated in the Schedule. The Contracting Officer may exercise the option by written notice to the Contractor 90 days before exercise. Delivery of added items shall continue at the same rate that like items are called for under the contract, unless the parties otherwise agree.*

*The Government reserves the right to exercise any of the following options at any time between date of contract award (plus applicable notice period) and 31 Jan 1996: Lot II - Option I, Lot III - Option II, Lot IV - Option III, and Lot V - Option IV,

## I.9 OPTION TO EXTEND THE TERM OF THE CONTRACT, (MAR 1989) FAR 52.217-9

(a) The Government may extend the term of this contract by written notice to the contractor within 30 days of contract expiration; provided that the Government shall give the Contractor preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.*

(b) If the Government exercises this option, the extended contract shall be considered to include this option provision consideration.

(c) The total duration of this contract, including the exercise of any options under this clause, shall not exceed 60 months.

*The Government reserves the right to decrease the quantity of a line item within the option based upon an ATC system not yet being ready for maintenance and training (i.e. installation and acceptance have not been completed).

## I.16 NOTICE OF EVALUATION PREFERENCE FOR SMALL DISADVANTAGED BUSINESS CONCERNS, DFARS 252.219-7006 (DEC 1991)

(Deleted in accordance with Amendment 1 Paragraph 5).

## I.17 PRIOR WRITTEN PERMISSION REQUIRED FOR SUBCONTRACTS

None of the services required by this contract shall be subcontracted to, nor performed by, persons other than the Contractor's employees without the prior written consent of the Procuring Contracting Officer (PCO).

**I.18 SUBCONTRACTING PLAN - INCORPORATED**

(Not applicable; ISN is a small business).

**I.21 PREFERENCE FOR LABOR - SURPLUS AREA CONCERNS, FAR 52.220-1 (APR 1984)**

(a) This acquisition is not a set-aside for labor-surplus area (LSA) concerns. However, the Offeror's status as such a concern may affect

(1) entitlement to award in case of tie offers;

(2) offer evaluation in accordance with the Buy American Act clause of this solicitation.

In order to determine whether the Offeror is entitled to a preference under (1) or (2) above, the Offeror must identify, below, the LSA in which the costs to be incurred on account of manufacturing or production (by the manufacturer or the first-tier subcontractors) amount to more than 50% of the contract price.

______Not Applicable__________ _________________________________

(b) Failure to identify the locations as specified above will preclude consideration of the Offeror as an LSA concern. If the Offeror is awarded a contract as an LSA concern and would not have otherwise qualified for award, the Offeror shall perform the contract or cause the contract to be performed in accordance with the obligations of an LSA concern.

**I.22 EXEMPTION FROM APPLICATION OF SERVICE CONTRACT ACT PROVISIONS, (MAY 1989) FAR 52.222-48**

(a) The following certification shall be checked:

CERTIFICATION

The offeror certifies (X) does not certify ( ) that:

(i) The items of equipment to be serviced under this contract are commercial items which are used regularly for other than Government purposes, and are sold or traded by the Contractor in substantial quantities to the general public in the course of normal business operations;

(ii) The contract services are furnished at prices which are, or are based on, established catalog or market prices for the maintenance, calibration, and/or repair of certain ADP, scientific and medical, and/or office and business equipment. An "established catalog price" is a price included in a catalog, price list schedule, or other form that is regularly maintained by the manufacturer or the Contractor, is either published or otherwise available for inspection by customers, and states prices at which sales are currently, or were last, made to a significant number of buyers constituting the general public. An "established market price" is a current price, established in the usual course of trade between buyers and sellers free to bargain, which can be substantiated from sources independent of the manufacturer or Contractor; and

(iii) The Contractor utilizes the same compensation (wage and fringe benefits) plan for all service employees performing work under the contract as the Contractor uses for equivalent employees servicing the same equipment of commercial customers.

(b) If a negative certification is made and a Service Contract Act wage determination is not attached to the solicitation, the Contractor shall notify the Contracting Officer as soon as possible.

(c) Failure to execute the certification in paragraph (a) of this clause or to contact the Contracting Officer as required in paragraph (b) of this clause may render the bid or offer nonresponsive.

**I.23 SUPPLIES TO BE ACCORDED DUTY - FREE ENTRY, DFARS 252.225-7008 (DEC 1991)**

In accordance with paragraph (a) of the Duty-Free Entry clause and/or paragraph (b) of the Duty-Free Entry -- Qualifying Country End-Products and Supplies clause of this contract, the following supplies are accorded duty-free entry:

Not Applicable

**I.26 RIGHTS TO PROPOSAL DATA (TECHNICAL)**
**FAR 52.227-23 (JUN 1987)**

Except for data contained on pages _________, it is agreed that as a condition of award of this contract, and notwithstanding the conditions of any notice appearing thereon, the government shall have unlimited rights (as defined in the "Rights in Data -- General" clause contained in this contract) in and to the technical data contained in the proposal dated __11/01/93__, upon which this contract is based.

**I.30 FIRMR APPLICABILITY, FIRMR 201-39.5202-1 (OCT 1990)**

This solicitation/contract requires the use or delivery of Federal Information Processing resources, but the Agency has determined that FIRMR Part 201-39 does not apply based on the exception set for in Section 201-39.101-3(b)(ii).

**I.32 PRIVACY OR SECURITY SAFEGUARDS,**
**FIRMR 201-39.5202-5 (OCT 1990)**

(a) The details of any safeguards the Contractor may design or develop under this contract are the property of the Government and shall not be published or disclosed in any way without the consent of the Contracting Officer's express written consent.

(b) The details of any safeguards that may be revealed to the Contractor by the Government in the course of performance under this contract shall not be published or disclosed in any manner without the Contracting Officer's express written consent.

(c) The Government shall be accorded full, free, and uninhibited access to all installations, technical capabilities, operations, documentation, records, and databases for the purpose of carrying out a program of inspection to ensure continued efficacy and efficiency of safeguards against threats and hazards to data security, integrity and confidentiality.

(d) If new or unanticipated threats or hazards are discovered by either the Government or the Contractor, or if existing safeguards have ceased to function, the discoverer shall immediately bring the situation to the attention of the other party. Mutual agreement shall then be reached

on changes or corrections to existing safeguards or institution of new safeguards, with final determination of appropriateness being made by the government. The government's liability is limited to an equitable adjustment of cost for such corrections, and the government shall not be liable for claims of loss of business, damage to reputation, or damages of any other kind arising from discovery of new or unanticipated threats or hazards, or any public or private disclosure thereof.

**I.33 WARRANTY EXCLUSION AND LIMITATION OF DAMAGES FIRMR 201-39.5202-6 (OCT 1990)**

Except as expressly set forth in writing in this agreement, and except for the warranty of merchantability, there are no warranties expressed or implied. In no event will the Contractor be liable to the Government for consequential damages as defined in the Uniform Commercial Code, Section 2-715, in effect in the District of Columbia as of January 1, 1983, i.e., consequential damages resulting from the seller's breach include --

(a) Any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could have been reasonably prevented by cover or otherwise; and

(b) Injury to person or property proximately resulting from any breach of warranty.

**I.34 REFURBISHED EQUIPMENT CERTIFICATION, SUP 5252.239-9406 (JAN 1992)**

All refurbished or remanufactured equipment supplied to the government must be accompanied by a "Certificate of Maintainability" from the applicable original equipment manufacturer. This certificate must indicate, at the minimum, the following:

(a) Model and serial number of the equipment certified;
(b) Expiration date, if any, of the certification;
(c) Release level of the equipment;
(d) Certification that the manufacturer will accept the equipment for maintenance.

This certification must be received prior to the government commencing evaluation against the acceptance criteria described in Section E. The Contractor shall have the responsibility for contacting the original equipment manufacturer and arranging for equipment certification, which is inclusive of any or all repair/refurbishment. All costs associated with equipment certification will be borne by the Contractor.

**I.35 ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO PURCHASE OF FIP RESOURCES SYSTEMS LIFE CONTRACTS, SUP 5252.239-9409 (JAN 1992)**

(a) Warranty. The following warranty is in addition to the clause at FAR 52.246-18 (if incorporated into Section I), and shall not limit the right of the Government under that clause.

(1) Warranty Period. The Contractor shall furnish, at no cost to the Government, all maintenance (labor and parts), as specified in this contract, both during and outside the Principal Period of Maintenance, for a period of one (1) year beginning on the first day of the successful performance period.

(2) Replaced Parts. All replaced parts during the warranty period shall become the property of the Contractor.

(3) Cost of Movement. Prior to the expiration of the warranty period, whenever equipment is shipped for mechanical replacement purposes, the Contractor shall bear all costs, including but not limited to, costs of packing, transportation, rigging, drayage, and insurance.

(4) Fault of Government. The warranty shall not apply to maintenance required due to the fault or negligence of the Government.

(b) Title (Under Purchase). Title of each machine, including special features installed thereon, will pass to the government when the purchase price is paid.

(c) Purchase of Installed Rental Equipment. N/A. Installed rental equipment acquired under the provisions of paragraph N/A may be purchased at any time. The purchase allowance shall be in accordance with paragraph N/A. All applicable provisions of paragraphs N/A shall apply. Provided that the Contractor clearly demonstrates that the equipment is in good operating condition, the effective date of purchase shall be either

(1) The day following receipt by the Contractor of a funded contract amendment, or funded purchase order; or

(2) A later date if so specified in the order; or

(3) An earlier date when mutually agreed to, and a confirming order is received within thirty (30) day after the effective date of purchase.

## I.36 ADDITIONAL TERMS AND CONDITIONS APPLICABLE TO SOFTWARE ACQUISITION, SUP 5252.239-9410 (JAN 1992)

(a) Warranty. All software furnished pursuant to the terms and conditions of this contract shall be unconditionally guaranteed for a period of one (1) year beginning on the first day of acceptance.

(b) Title. Title to software systems acquired under this contract and any reproductions or versions thereof shall remain with the Contractor.

(c) Risk of Loss or Damage. The government shall be relieved from all risks of loss or damage to the software.

(d) Liability for Injury or Damage. The Contractor shall not be liable for any injury to government personnel or damage to government property arising from use of software provided by the Contractor unless such injury or damage is due to the fault or negligence of the Contractor.

## I.37 COMMITMENTS, WARRANTIES, AND REPRESENTATIONS, SUP 5252.239-9413 (JAN 1992)

Any written commitment by the Contractor within the scope of this contact shall be binding upon the Contractor. Failure of the Contractor to fulfill any such commitment shall render the Contractor liable for liquidated, or other such damages due to the government under the terms of this contract. For the purpose of this contract, a written commitment by the Contractor is limited to the proposals submitted by the Contractor, and to specific written modifications to the proposal. Written commitments by the Contractor are further defined as including

(1) any warranty or representation made by the Contractor in a proposal as to hardware or software performance; total systems performance; other physical, design, or functional characteristics of a machine, software package, or system, or installation date;

(2) any warranty or representation made by the Contractor concerning the characteristics or items described in paragraph (1) herein made in any publications, drawings, or specifications accompanying or referred to in a proposal; and

(3) any modification of or affirmation or representation as to the above which is made by the Contractor in or during the course of the Live Test Demonstration or negotiations,

whether or not incorporated into a formal amendment to the proposal in question.

**I.38 CONTRACTOR REPRESENTATION, SUP 5252.239-9415 (JAN 1992)**

Unless the Contractor expressly states otherwise in the Contractor's proposal, where functional requirements are expressly stated as part of the requirement of the solicitation, the Contractor, by responding, represents that, in its opinion, the system(s)/item(s) proposed is/are capable of meeting those requirements. However, once the system(s)/item(s) is/are accepted by the government, Contractor responsibility under this clause ceases. In the event of any inconsistency between the detailed specification and the functional specification contained in the solicitation, the former shall control.

**I.39 ACQUISITION OF ADPE BY THE CONTRACTOR FOR CONTRACT PERFORMANCE**

(a) This clause applies to Contractor-acquired ADPE, except for components as end-items delivered to the government, if the ADPE is for the account of the government, or if title will pass to the government. The Contractor shall comply with the provisions of DFARS 270.6 and receive ACO and PCO approval prior to acquiring ADPE required for the performance of the contract. If approved, the Contractor shall acquire ADPE on a competitive basis unless otherwise specifically approved. Acquisition shall not be made until funding is provided on the contract and the contract is modified to include specifics of the approval.

(b) Nothing herein shall be construed as permission to incur costs in excess of those obligated to the contract, nor does it authorize reimbursement to be made contrary to the payment provisions of the contract.

(c) The Contractor shall not:

(1) acquire ADPE under the contract which is unnecessary for execution of the contract;

(2) acquire ADPE or commercial software for Navy use; or

(3) place commercial software subcontracts for the account of the government under this contract prior to obtaining ACO approval, if required, under the "Subcontracts" clause of this contract.

(d) Under any circumstance, the Contractor shall acquire commercial software competitively to the maximum extent practicable.

(e) The Contractor shall comply with the Government Property clause of the contract and FAR Part 45.

(f) For Labor-Hour and Time-and-Materials contracts, the term contract as used in this clause is understood to mean Delivery Order. The term ADPE is defined in FAR 31.001.

**I.40 CERTIFICATION OF INDIRECT COSTS, (APR 1986) DFARS 252.242-7001**

(a) The Contractor shall --

(1) Certify any proposal to establish or modify billing rates or to establish final indirect-cost rates;

(2) Use the form set forth in paragraph (c) of this clause; and

(3) Have the certificate signed by an individual of the Contractor's organization at a level no lower than a vice president or chief financial officer of the business segment of the Contractor that submits the proposal.

(b) Failure to submit a signed certificate, as described in this clause, shall result in payment of indirect costs at rates unilaterally established by the Government.

(c) The certificate of indirect costs shall read as follows:

CERTIFICATE OF INDIRECT COSTS

This is to certify that to the best of my knowledge and belief:

1. I have reviewed the indirect-cost proposal submitted herewith.

2. All costs included in this proposal N00600-93-R-2790 dated 11/01/93 (identify, date) to establish billing or final indirect cost rates for length of contract (identify period covered by rate) are allowable in accordance with the requirements of contracts to which they apply and with the cost principles of the Department of Defense applicable to those contracts;

3. This proposal does not include any costs which are unallowable under applicable cost principles of the Department of Defense, such as (without limitation): advertising and

public relations costs, contributors and donations, entertainment costs, fines and penalties, lobbying costs, defense of fraud proceedings, and good will; and

4. All costs included in this proposal are properly allocable to Defense contracts on the basis of a beneficial or causal relationship between the expenses incurred and the contracts to which they are allocated in accordance with applicable acquisition regulations.

I declare under penalty of perjury that the foregoing is true and correct.

Firm: ______________________________
Signature: ___________________________
Name of Corporate Official: _______________
Title: ______________________________
Date of Execution: _____________________

## I.42 STANDARD COMMERCIAL WARRANTY, SUP 5252.246-9401 (JAN 1992)

(a) The Offeror shall extend to the government the full coverage of any standard commercial warranty normally offered in a similar commercial sale, provide such warranty is available at no additional cost to the government. Acceptance of the Standard commercial warranty does not waive the government's rights with regard to other terms and conditions of this contract. In the event of a conflict, the terms and conditions of the contract shall take precedence over the standard commercial warranty. The standard commercial warranty period shall begin upon final acceptance of the applicable material and/or services listed in the Schedule.

(b) The Contractor shall provide a copy of its standard commercial warranty (if applicable) with its offer. The /warranty shall cover a period of __5 years__ [Offeror to insert number].

## I.43 LIABILITY, AUTOMOBILE AND WORKMAN'S COMPENSATION INSURANCE

The following types of insurance are required in accordance with the clause entitled "INSURANCE - WORK ON A GOVERNMENT INSTALLATION" (FAR 52.228-5) and shall be maintained in the minimum amounts shown:

(a) Comprehensive General Liability: $200,000 per person and $500,000 per accident for bodily injury.

(b) Automobile Insurance: $200,000 per person and $500,000 per accident for bodily injury and $20,000 per accident for property damage.

(c) Standard Workmen's compensation and Employer's Liability Insurance (or, where maritime employment is involved, Longshoremen's and Harbor Worker's Compensation Insurance) in the minimum amount of $100,000.

## I.44 RISK OF LOSS OR DAMAGE

(a) *Risk of Loss or Damage* - Leased Equipment.

(1) The Government is relieved of all risk of loss or damage to the equipment during periods of transportation and installation, and during the entire time the equipment is in the possession of the Government, except for

(i) loss or damage caused by nuclear reaction, nuclear radiation, radioactive contamination, war, insurrection, civil strife, rebellion, weapons of war; or

(ii) negligence on the part of the Government or its agents, provided however, that the Government shall be relieved of the liability for such risks of loss or damage due to negligence if any commercial customer of the Contractor is relieved of such liability under like circumstances.

(2) If the Government is liable for loss or damage of a machine, the Contractor shall have the option to restore the machine to its previous condition, in which event the Government shall pay the Contractor to perform such restoration at the Contractor's then-current prices, terms and conditions.

(3) If the Contractor elects not to restore the machine, the Government may, at its own expense, restore the machine to its previous condition. If, however, the machine is lost or damaged beyond repair, the Government shall pay to the Contractor the same price for the machine as the Government would have paid had it purchased the machine on the day prior to the loss or damage under the provisions of this contract. This clause shall govern risk of loss or damage, notwithstanding any other provisions of this contract relating to title, payment, or ownership.

(b) Risk of Loss or Damage - Purchased Equipment

(1) The Government is relieved of all risk of loss or damage to the equipment, up to and including the day prior to the first day of a successful performance period, except for

(i) loss or damage caused by nuclear reaction, nuclear radiation, radioactive contamination, war, insurrection, civil strife, rebellion, weapons of war; or

(ii) negligence on the part of the Government or its agents, provided, however, that the Government shall be relieved of the liability for such risks of loss-or damage due to negligence if any commercial customer of the Contractor is relieved of such liability under like circumstances.

(2) If the Government is liable for loss or damage of a machine, the Contractor shall have the option to restore the machine to its previous condition, in which event the Government shall pay the Contractor to perform such restoration at the Contractor's then-current prices, terms and conditions. If the Contractor elects not to restore the machine, the Government may, at its own expense, restore the machine to its previous condition. If, however, the machine is lost or damaged beyond repair, the Government shall pay the Contractor the same price for the machine as the Government would have paid if it had purchased the machine on the day prior to the loss or damage under the provisions of this contract. This clause shall govern risk of loss or damage, notwithstanding any other provisions of this contract relating to title, payment, or ownership.

**I.45 PREPARATION OF VALUE ENGINEERING CHANGE PROPOSALS, DFARS 252.248-7000 (DEC 1991)**

Prepare Value Engineering change proposals, for submission pursuant to the value engineering clause of this contract, in the format prescribed by the version of MIL-STD-973 in effect on the date of contract award.

**I.46 CHANGE PROPOSALS**

(a) After contract award, the Government may solicit, and the Contractor is encouraged to independently propose, changes to the equipment, software specifications, or other requirements of this contract. These changes may be proposed to save money, to improve performance, to save energy, or to satisfy increased data processing requirements. However, if proposed

changes relating to improved performance are necessary to meet increased data processing requirements of the user, those requirements shall not exceed the contract requirements by more than 25%. If the proposed changes are acceptable to both parties, the Contractor shall submit a price proposal to the Government for evaluation. Those proposed changes that are acceptable to the Government will be processed as modifications to the contract.

(b) This clause applies only to those proposed changes identified by the Contractor under a proposal submitted pursuant to the provisions of this clause. At a minimum, the following information shall be submitted by the Contractor with each proposal:

(1) A description of the difference(s) between the existing contract requirement and the proposed change(s), and the comparative advantages and disadvantages of each;

(2) Itemized requirements of the contract which must be changed if the proposal is adopted, and the proposed revision to the contract for each such change;

(3) An estimate of the changes in performance and cost, if any, that will result from adoption of the proposal;

(4) An evaluation of the effects the proposed change would have on collateral costs to the Government, such as Government-furnished property costs, costs of related items, and costs of maintenance and operation; and

(5) A statement of the time by which the change order adopting the proposal must be issued so as to obtain the maximum benefits of the changes during the remainder of this contract. Also, any effect on the contract completion time or delivery schedule shall be identified.

(c) Change proposals submitted to the Contracting Officer shall be processed expeditiously. The Government shall not be liable for proposal preparation costs or any delay in acting upon any proposal submitted pursuant to this clause. The Contractor has the right to withdraw, in whole or in part, any change proposal not accepted by the Government within the period specified in the change proposal. The decision of the Contracting Officer as to the acceptance of any such proposal under this contract shall be final and shall not be subject to the "Disputes" clause of this contract.

(d) The Contracting Officer may accept any change proposal submitted pursuant to this clause by giving the Contractor written notice thereof. This written notice may be given by issuance of a modification to this contract. Unless and until a modification is executed to incorporate a

change proposal under this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract.

(e) If a change proposal submitted pursuant to this clause is accepted and applied to this contract, an equitable adjustment in the contract price and in any other affected provisions of this contract shall be made in accordance with this clause and other applicable clauses of this contract.

(f) The Contractor is requested to identify specifically any information contained in the change proposal which the Contractor considers confidential and/or proprietary. Identification of information as confidential and/or proprietary is for information purposes only shall not be binding on the Government to prevent disclosure of such information. Offerors are advised that such information may be subject to release upon request pursuant to the Freedom of Information Act (5 U.S.C. 552).

(g) Nothing in this clause shall be construed to authorize change proposals which are properly changes under the "Changes" clause or new work which require justification and approval in accordance with FAR Part 6. All matters should be coordinated with the Contracting Officer.

**I.49 CLAUSES INCORPORATED BY REFERENCE, FAR 52.252-2 (JUN 1988)**

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

**I.50 ALTERATIONS IN CONTRACT, FAR 52.252-4 (APR 1984)**

Portions of this contract are altered as follows:

| | | | | |
|---|---|---|---|---|
| G.4 | G.6 | | G.12 | G.20 |
| G.24 | H.4 | I.18 | I.26 | |

**I.51 AUTHORIZED DEVIATIONS IN CLAUSES, FAR 52.252-6 (APR 1984)**

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR

Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation of any Defense Federal Acquisition Supplement (48 CFR Chapter 2) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

## SECTION J - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS

ATTACHMENTS:
1. Glossary (2 pages)
2.* Federal Information Processsing Standards (FIPS) Checklist (8 pages)
3.* Cost/Price Tables for Provision L.21. (6 pages)
4.* Certificate of Performance (1 page)
5.* Live Test Demonstration Evaluation Standards (15 pages)
6. DD Forms 1423 (Exhibits A through AZ)(36 pages)
7.* DD Forms 1664 (95 pages)
8.**DD Form 254 (2 pages)
9. Appendices to the Specification:
   (A) - NTCC HAMPTON ROADS, (35 pages)
   (B) - NCTS JAPAN (26 pages)
   (C) - NTCC MAKALAPA (29 pages)
   (D) - NTCC CAMP SMITH (23 pages)
   (E) - NCTS SICILY (37 pages)
   (F) - NCTS PUERTO RICO (23 pages)
   (G) - NCTS LONDON (31 pages)
   (H) - Examples of currently used TCF forms (10 pages)
   *(I) - ATC NMC Functional Requirements (2 pages)
   *(J) - List of Acronyms and Abbreviations (2 pages)
   *(K) - Information Exchange Subsystems (IFS) Descriptions and Signal Flow diagrams(EE130-PL-OMI-020/W142-UHFSATCOM Manual)
10. Contract Administration Plan (2 pages)
11. *Amendments to the RFP (Note: all replacement pages and Pen & Ink changes identified in amendments have been inserted into award document.)
   *Amendment 0001, *Amendment 0002, *Amendment 0003
   *Amendment 0004, *Amendment 0005, *Amendment 0006
   *Amendment 0007, *Amendment 0008, *Amendment 0009
   *Amendment 0010, *Amendment 0011, *Amendment 0012
   *Amendment 0013

Solicitation sections K, L and M have been removed from award document for distribution purposes only.

* Deleted from award document for distribution purposes only.
**DD form 254 will be provided in a subsequent modification to the contract.

ISN proposal dated 11/1/93, revised proposal dated 2/15/94 and BAFO dated 5/18/94 are incorporated into award document by reference.

ORIGINAL

EXHIBIT 47

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

INFORMATION SYSTEMS & NETWORK CORPORATION, Plaintiff,

v.

THE UNITED STATES, Defendant.

No. 98-178C (Judge Turner)

DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION, AND REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 26, 33, and 34 of the Rules of the United States Court of Federal Claims, the United States hereby responds to plaintiff's first set of interrogatories, requests for admission, and request for production of documents.

General Statements And Objections

1. Vague, Ambiguous, Irrelevant And Unclear: The United States objects to plaintiff's discovery because it contains interrogatories and requests which are vague, ambiguous, irrelevant or unclear, often because the terms used in the interrogatories are undefined and are not otherwise susceptible to a single meaning. The objectionable requests are specifically identified in the United States' responses set forth below. Nevertheless, the United States has attempted to respond to plaintiff's discovery requests, to the extent possible, by providing the information which appears to have been sought by plaintiff or by providing information responsive to a reasonable interpretation of the individual request.

2. Privileged/Protected Material: The United States objects to the plaintiff's discovery requests to the extent that

Interrogatory No. 8:

State any additional reason, other than those specified in the TCO's December 9, 1997 Letter ISN's Robert Cozzie, a true and correct copy of which is attached hereto a Exhibit "B," why the Gross Settlement for ISN's termination claim was set at $4,049,532 and for each such reason, identify the reason and state the factual basis for you answer, including identifying all persons with knowledge relating thereto and all documents supporting that answer.

RESPONSE: There are no additional reasons.

Interrogatory No. 13:

Pursuant to Paragraph 13 in your Answer, state the percentage of completion by ISN for ATC equipment installation, and the factual basis for computing those percentages, including identifying all persons with knowledge thereof and documents supporting that computation.

RESPONSE: Defendant objects to interrogatory number 13 to the extent that it requires disclosure of communications that are protected from disclosure by the attorney client and/or attorney work product privileges. Defendant further objects to the interrogatory upon the grounds that the manner in which it is worded, when read with its definitions and general instructions, is so vague, broad, general, and all inclusive that it does not permit a proper or reasonable response and is, therefore, unduly burdensome and oppressive. Defendant further objects to interrogatory number 13 upon the ground that it is unduly burdensome because the information sought by plaintiff can be as easily derived or ascertained by plaintiff from its own business records. See RCFC 33(c). Without waiving these objections, defendant responds that the percentage of completion for ATC installation was 95% for CLIN 0001AA. The percentage was computed based on the amount of equipment plaintiff had installed.

Interrogatory No. 14:

Pursuant to Paragraph 13 in your Answer, state the percentage of completion by ISN for the-pair cable fabrication and the cut-over and testing, and the factual basis for computing those percentages, including identifying all persons with knowledge thereof and documents supporting that computation.

RESPONSE: Defendant objects to interrogatory number 13 to the extent that it requires disclosure of communications that are protected from disclosure by the attorney client and/or attorney work product privileges. Defendant further objects to the interrogatory upon the grounds that the manner in which it is worded, when read with its definitions and general instructions, is so vague, broad, general, and all inclusive that it does not permit a proper or reasonable response and is, therefore, unduly burdensome and oppressive. Defendant further objects to interrogatory number 13 upon the ground that it is unduly burdensome because the information sought by plaintiff can be as easily derived or ascertained by plaintiff from its own business records. See RCFC 33(c). Without waiving these objections, defendant responds that the percentage of completion for the-pair cable fabrication and the cut-over and testing for ATC installation was 5% for CLIN 0001AA. Plaintiff had fabricated a significant number of cables, but had not begun the cutover and testing of operational circuits.

EXHIBIT
48

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION<br><br>Plaintiff.<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant | ) | Case No. 02-796C<br>(Judge Allegra) |

PLAINTIFF'S MOTION *IN LIMINE* TO ESTABLISH AS ADMITTED ALL COSTS INCURRED BY PLAINTIFF AS VERIFIED IN DEFENDANT'S AUDIT REPORT OF SUCH COSTS

Plaintiff, Information Systems & Networks Corporation ("plaintiff" or "ISN"), by its undersigned attorneys, hereby moves this Honorable Court *in limine* pursuant to Rules 301, 402, and 403 of the Federal Rules of Evidence to establish as admitted as a conclusive, irrebuttable presumption that ISN has proven its claimed and unpaid costs incurred on the subject contract of $460,708. ISN must still prove entitlement to such costs based on the allegations of the Complaint as well as its loss of profit claim. ISN is entitled to this ruling as a result of the binding evidentiary admissions of the United States ("defendant" or "the Government"). In two of the three depositions taken regarding the audit of the costs performed by the defendant, each deponent independently confirmed that the audit performed verified that the costs incurred on the subject contract above the original contract amount of $460,708 were incurred by ISN on the performance of the subject contract and met all requirements of the Federal Acquisition Regulations ("FAR"), Generally Accepted Government Auditing Standards ("GAGAS") and the DOD FAR Supplement ("DFARS") governing audits for reimbursement except for entitlement. These admissions were made by Mark Moser who authorized the Audit



00441

Report and headed-up the Columbia, Maryland branch office of the Defense Contract Audit Agency ("DCAA"); Benjamin Monastero, the DCAA Auditor who actually performed the audit; and are set forth in the Audit Report. Defendant has therefore conceded, as a result of its Audit Report, and testimony at deposition, that all increased costs in excess of the original contract amount were actually incurred by ISN in connection with the performance of the subject contract and met the auditing standards for verification. ISN, therefore, is not required to prove any of these costs.

ISN is entitled to the presumption of the accuracy of every portion of the Audit Report that is against the Government's interest, and should not be required to present evidence establishing any cost which exceeds the original contract amount and is being claimed in this case. The DCAA has examined all of the relevant evidence in coming to this conclusion, and is the Agency in the Government charged with auditing Contract claims. ISN should not be required to prove costs which have been verified by the DCAA and the Government should not be permitted to introduce evidence to contradict its admission or to now question costs it previously verified. Such evidence is unnecessary, would render the case not suspectible to summary disposition, and would cause confusion in resolving those aspects of ISN's claim for which there remains a material dispute. The material disputes to be resolved at trial primarily regard ISN's entitlement to the admitted costs and loss of profit. The parties should not prolong and complicate the trial by proving or disputing damages already analyzed and verified by the Government's own audit.

STATEMENT OF RELEVANT FACTS

This Court, in its Opinion of April 12, 2005, set forth in detail the overall background of this case in connection with deciding cross-motions for summary

judgment on Count I of the Complaint for breach of contract. Accordingly, ISN will not repeating such facts but will limit its statement to facts surrounding the Audit Report.

After termination of the contract for convenience, ISN submitted what is generally referred to as a Termination Settlement Proposal ("TSP") consisting of a Settlement Proposal and Schedule of Accounting Information. The TSP claimed total costs incurred and profit $5,060,578. At that time, ISN had been paid $2,507,015. After its submission, the Defense Contract Management Agency ("DCMA") in Atlanta, Georgia requested that DCAA perform an audit of the TSP. The audit responsibility fell on the DCAA Columbia branch office, that had cognizant DCAA authority over ISN. The audit was required to be performed in accordance with GAGAS, as well as requirements in the FAR and DFARS. The Audit Report was issued on December 19, 1996. See Exhibit 1.

The audit was subject to three qualifications, none of which have any relevance to the establishment or auditing of ISN's costs: First, the defendant had not provided DCAA technical reports at the time of the audit.[1] Second, the defendant had not prepared an inventory verification report at the time of the audit.[2] Third, no opinion was expressed on ISN's legal entitlement to the costs. In performing the audit, because the DCAA viewed ISN as a high risk audit candidate, it increased its testing of accounts to satisfy the risk. In addition, the DCAA determined that there were no material or significant inadequacies or noncompliances in the TSP.

The audit investigated six elements of the ISN TSP: (1) Direct Materials; (2) Direct Labor; (3) Indirect Expenses; (4) Other Direct Costs; (5) G&A Expense; and (6)

[1] These reports were required from the defendant and apparently submitted later.

[2] This report was subsequently provided by the defendant. Neither Report caused any alteration in the results of the Report.

Settlement Expenses. For each of these categories, the DCAA found as follows:

1. Direct Materials. Total claimed of $2,401,080 was found accurate and supportable.

2. Direct Labor: DCAA made an upward adjustment to direct labor of $22,147 or increased the amount of ISN's claim by this amount. DCAA verified that the labor cost reconciled with ISN's Jamis job cost reports and employee timesheets and was incurred prior to the termination notice. Total amount was found to be accurate and supportable of $626,804.

3. Indirect Expenses: DCAA again made an upward adjustment of $17,079 because of the increase in direct labor. These expenses were based on Fringe Benefits and Overhead rates that DCAA approved and accepted. Total amount found accurate and supportable was $483,409.

4. Other Direct Costs: The DCAA found $427,831 to be accurate and supportable.

5. G&A Expense: DCAA again made an upward adjustment of $5,370. The G&A rate was verified to the current provisional billing rates being used by ISN as well as prior termination audits and totaled $539,431.

6. Settlement Expenses: The DCAA allowed $31,685 of the $183,224 claimed by ISN.[3]

Thus, all of the costs set forth and claimed by ISN in the TSP were audited and tested by DCAA, which than made the following overall findings: First, all documentation supporting all costs was reviewed for allowability and allocabiltiy to the terminated contract and found to be proper. Second, all costs were tested and found to

[3] For the purposes of this Motion, ISN is accepting the $31,685.

have been properly incurred on the terminated contract. Third, the DCAA confirmed the defendant's acknowledgement during the audit process that ISN was due some form of equitable adjustment on the contract due to various changes to the statement of work.

Therefore, the Audit Report concluded that based on total costs incurred of $4,510,240, ISN should be paid an additional $1,542,517. Along with what had been paid before the TSP was filed, this left unpaid incurred costs of $460,708.[4]

In describing the audit procedures, Moser said:

> ...You want to make sure that the findings, or the results of the audits are based upon sound logic, that there is some basis in FAR, that they have-- it seems that they have performed adequate auditing steps to prove the things that they have done by, you know, saying to me that they had verified the cost incurred back to whatever documents that they identify....
> (Dep.at 32)

Regarding the purpose of the Report, Moser confirmed the audit was to verify ISN's TSP costs:

> Q. So is it correct to say that the only purpose of this audit report...was...verifying the elements of ISN's settlement proposal.
> A. Yes
> (Dep.T.at 84)

The actual auditor, Monastero, wrote the statement in the Report that "...we consider the proposal (TSP) to be acceptable as a basis for negotiating a fair and reasonable price"

(Dep.at 42).

> Q. What was your purpose in stating that?
> A. When you craft the auditor's opinion, when the proposal and your audit is--generally everything checks out okay for the most part— I'm trying to put it in layman's terms, that it was okay that you can use this as a basis to negotiate. There wasn't any super serious

[4] The defendant accepted the findings of the Report as the basis to pay an additional $1,542,517. The only reason the remaining $460,708 was not paid was because it exceeded the Contract amount.

flaws that would be, you know, big showstopper kind of things so to speak, you know?

Q. Did you audit whether the contents of ISN's proposal were supportable and accurate?

A. We did.

Q. Okay, and your conclusion was with the exceptions that you point out, that the data was accurate.

A. Yes.

(Dep. 44-45).

## LEGAL ARGUMENT

The admissions in the Audit Report, the conduct of defendant in paying $1,542,517 based on the Report, and the accompanying testimony of the two DCAA witnesses who cannot now contradict or otherwise explain away the Audit Report findings constitute "evidentiary admissions." An evidentiary admission is a statement made by a party's agent which the trier of fact may evaluate as it deems fit. See Weyerhaeuser Co. and Subsidiaries v. United States, 32 Fed. Cl. 80, 118(1994). The trier of fact shall ascribe whatever evidentiary weight that is appropriate for the evidentiary admission. Id. (citing Budden v. United States, 748 F. Supp. 1374 (D.Neb. 1990), vacated on other grounds, 963 F.2d 188(8th Cir. 1991).

In this instance, this Court is the trier of fact. In narrowing the issues for trial, this Court should give substantial weight to the admissions made by the Government after it audited the extensive evidence supporting ISN's claim. The DCAA "has the primary responsibility for providing accounting and financial advice on Department of Defense contracts governed by Defense Acquisition Regulations, 32 C.F.R. Sec. 357.2(a)." Marquardt Co. v. United States, 822 F.2d 1573(Fed Cir. 1987); see also, FAR § 42101(b)("the [DCAA] is the responsible Government audit agency" regarding audits). Federal courts have observed, "[T]he auditors of the DCAA are highly expert in their field and have special knowledge which no other personnel in any of the other agencies

of the[Department of Defense] possess...." See United States v. Westinghouse Elec. Corp., 615 F.Supp. 1163,1191(W.D. Pa. 1985). The Government relies heavily upon the DCAA's expertise in auditing claims from government contractors.

As a result of the admission made by the Government through the Agency that specializes in analyzing the proof of contract claims, the Court should proceed with the legal presumption that ISN has proven the costs incurred under the Contract that exceed the original Contract amount. A presumption has been defined as "a rule of law, statutory or judicial, by which finding a basic fact gives rise to[the] existence of [a] presumed fact, until [the] presumption is rebutted." Black's Law Dictionary 1185(6th Ed. 1990). Although not evidence, a presumption can be a "substitute" for evidence if it is not rebutted. Dunn v. Simmons, 877 F.2d 1275, 1278(6th Cir. 1989), cert. Den.; 494U.S. 1061(1990). "[P]resumptions, whether created by statute or by judicial ruling, 'arise out of considerations of fairness, public policy and probability.'" See A.C.Aukerman Co. v. R.L. Chaides Contr Co., 960 F.2d 1020,1034 (Fed. Cir. 1992)(citing Cornetta v. United States, 851 F.2d 1372,1380(Fed. Cir. 1988); see also, Panduit Corp. v. All States Plastic Mfg. Co., 744 F.2d 1564,1581(Fed. Cir. 1984).

Conclusive, or "irrebuttable" presumptions are binding, while presumptions which are rebuttable are nonbinding. See Universal Restoration, Inc. v. United States, 798 F.2d 1400, 1406(Fed. Cir. 1986). "A conclusive presumption is one in which proof of[a] basic fact renders the existence of the presumed fact conclusive and irrebuttable." Black's Law Dictionary 1186. Here, there is no Government witness who can now

provide any testimony about the Audit Report in light of their respective deposition testimony disclaiming any different knowledge of the Report's content.[5]

Accordingly, as a result of the defendant's conduct alone, the Court should apply an irrebutable presumption to the accuracy of the Government's admissions in the Audit Report thereby precluding the Government from offering evidence rebutting its own Report. ISN, as a result, would not have to offer evidence other than the Audit Report itself to prove any of the incurred costs claimed. Any other result would moot the purpose and the effect of the Audit Report.

Even if the Court determines that ISN is entitled to only a rebuttable presumption as to the proof of the costs not questioned in the Audit Report, the Government has no ability to offer evidence to refute or explain the contents of the Audit Report because it refused to provide such deposition testimony claiming lack of any knowledge.

This Court should determine that ISN is entitled to a conclusive, irrebuttable presumption that the Government's admissions are accurate and binding. The findings by the DCAA must be viewed as reliable since they were the result of an independent audit performed under the applicable DCAA standards. Certainly DCAA would not err against the interests of the Government. To the contrary, the Audit Report discloses that because ISN was a high risk audit candidate, DCAA would be especially careful in its audit investigation. This Court should therefore presume that the costs claimed by ISN in this case have been properly verified.

The United States Court of Federal Claims has previously held that the United States is estopped from protesting the findings of one of its own audits of a claim by

[5] ISN claims that because the defendant failed to comply with RCFC 30(b)(6), it is precluded from offering any testimony on which the designee was unprepared and unknowledgeable as well as precluding defendant from contradicting or modifying their responses on specified issues, from the deposition testimony offered.

offering subsequent audit of the same claim containing a different calculation as to the determination of costs. See Elastic Stop Nut Corp. v. United States, 132 F.Supp. 466, 468(Ct. Cl. 1955). The Elastic case dealt with multiple contracts between the Government and a contractor, and the attempt by the Government to contradict its previous audit of the contractor's claim that the parties had relied on in settling a previous claim. Id. The Government's rationale for questioning the previous audit in that case was to reallocate costs from a different claim to the claim that had already settled, thereby reducing the amount available as damages in the subsequent suit. Id. The Court held that even "[I]f, at this stage of the proceedings, there were unanimity of opinion among expert accountants that the [latter] audit was more scientifically accurate, it would not affect our conclusion in this case." Id. The Court noted that the "Government made its [initial] audit," and the Court rejected the Government's attempt to revise the results of that audit because "[I]t is too late to do that, merely for the purpose of preserving the niceties of scientific accounting." Id.

The application of a conclusive presumption would allow the Court to save time and move more quickly to the entitlement issues. The Federal Circuit has held that the Court should reject litigation positions which waste resources and time or needlessly encumber the dispute resolution process." See Anderson Consulting v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992). In addition, even if the Court denies ISN's accompanying motion on the discovery conduct, any evidence offered by the Government rebutting its previous admissions would be irrelevant, and therefore inadmissible under Rule 402 of the Federal Rules of Evidence. To the extent that evidence regarding the costs verified in the Audit Report could be considered relevant, its "probative value is substantially outweighed" by "considerations of undue delay, waste of

time, or needless presentation of cumulative evidence"-and therefore must be excluded pursuant to Rule 403 of the Federal Rules of Evidence.

Regardless of the type of presumption the Court may find applicable here, ISN should not be required to present evidence of the verified costs from the Audit Report. Forcing ISN to produce the raw data underlying the admissions in the Audit Report would only prolong the trial of this matter unnecessarily, and would not serve any public purpose. The Government has already examined all of this evidence. If the Court decides that the Government may have the opportunity to revisit its findings, even in the face of its discovery tactics, ISN should not be required to reproduce documents and testimony that substantiate the Government's admissions. The trial should proceed with the admission that ISN as satisfactorily proven the costs verified in the Audit Report by virtue of the Government's admissions therein.

CONCLUSION

For the foregoing reasons, plaintiff, Information Systems & Networks Corporation, respectfully requests this Court to establish as admitted all costs incurred by ISN under the Contract as verified in the Audit Report.

December 11, 2006

Respectfully Submitted,

SINGER & ASSOCIATES, P.C.

s/Norman H. Singer

NORMAN H. SINGER, ESQ
Singer & Associates, P.C.
10411 Motor City Drive
Suite 725
Bethesda, MD 20817
Phone: (301) 469-0400
Fax: (301) 469-0403

CERTIFICATE OF FILING

I hereby certify that on December 11, 2006, a copy of the foregoing Plaintiff's Motion *In Limine* to Establish as Admitted all Costs Incurred by Plaintiff as Verified in Defendant's Audit Report of such Costs was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing systems. Parties may access this filing through the Court's system.

s/Norman H. Singer
NORMAN H. SINGER, ESQ

# DEFENSE CONTRACT AUDIT AGENCY

## AUDIT REPORT

19 December 1996

**PREPARED FOR:** Termination Contracting Officer
ATTN: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

**PREPARED BY:** Columbia Branch Office
One Mall North, Suite 200
10025 Governor Warfield Parkway
Columbia, MD 21004

| | |
|---|---|
| Telephone No. | (410) 964-2060 |
| FAX No. | (410) 997-3237 |
| e-Mail Address | fao6311@rma.dcaa.mil |

**SUBJECT:** Termination Settlement Proposal

**REFERENCES:** TCO: Contract No. N00600-94-C-0389
DCAA: Audit Report No. 6311-97B17100001

**CONTRACTOR:** Information Systems and Networks Corporation
10411 Motor City Drive
Bethesda, MD 20817

**REPORT RELEASE RESTRICTIONS:** See Page 9

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 3 |
| DCAA Personnel and Report Authorization | 8 |
| Audit Report Distribution and Restrictions | 9 |

## SUBJECT OF AUDIT

As requested by DCMC-Atlanta, we audited the 4 June 1996 termination settlement proposal submitted by Information Systems and Networks Corporation (ISN). Contract N00600-94-C-0389 was terminated for the convenience of the government with an effective termination date of 15 March 1996. Prior to the termination notice, a Stop-Work Order had been issued on 20 February 1996. The termination settlement proposal for $5,060,578 was submitted on the total cost basis.

The termination settlement proposal is the responsibility of ISN. Our responsibility is to express an opinion on the settlement proposal based on our audit.

## EXECUTIVE SUMMARY

Our audit of the $5.06 million proposal disclosed $1.01 million of questioned costs. The questioned costs are summarized below:

| | |
|---|---|
| Direct Labor | ($22,147) |
| Indirect Expenses | (17,079) |
| G&A Expense | (5,370) |
| Profit | 443,396 |
| Settlement Expenses | 151,539 |
| Cost in Excess of Contract | 460,708 |
| Total | $1,011,047 |

The termination settlement proposal is acceptable for arriving at a fair and reasonable price; however, the significant issues described below should be considered in establishing the government's position.

SIGNIFICANT ISSUES:

1. The results are qualified because we have not yet received a copy of the current technical report regarding the estimate to complete/estimate at completion, and the inventory verification report. We do not express an opinion regarding the contractor's legal entitlement.

2. ISN overstated settlement expenses by proposing settlement labor and ODCs which it did not incur and prompt payment act interest which is unallowable since ISN received progress payments.

3. ISN overstated the entire settlement proposal by proposing costs in excess of the contract limitations (FAR 49.207).

4. Profit is questioned in total. ISN could not support the proposed 10% profit factor with any Estimates to Complete (ETCs). Further, ISN acknowledged that they under bid this contract and were starting out in a loss from the beginning.

## SCOPE OF AUDIT

Except for the qualifications noted below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance that the proposal is free of material misstatement. An audit includes:

a. reviewing the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment:
b. examining, on a test basis, evidence supporting the amounts and disclosures in the termination settlement proposal;
c. assessing the accounting principles used and significant estimates made by the contractor;
d. evaluating the overall proposal presentation, and
e. determining the need for technical specialist assistance and (if applicable) quantifying the results of a government technical evaluation.

We evaluated the proposed costs using the applicable requirements contained in the:

a. Federal Acquisition Regulation (FAR), Part 49, and
b. DOD FAR Supplement (DFARS).

In CY 1996, ISN has brought three previous termination settlement proposals to the Armed Services Board of Contract Appeals (ASBCA) for settlement. Our prior audits have resulted in significant questioned costs. Based on our prior audits and current ASBCA experience with ISN's termination settlement proposals, we have assessed control risk as high. Our audit reflects this assessment and provides a reasonable basis for our opinion.

QUALIFICATIONS:

1. We were informed by Mr. Jeff Bergdahl, COTR that the updated technical reports will not be available for incorporation into our report. Therefore, the results of audit are qualified.

2. We made our recommendations without the benefit of the inventory verification report (SF 1423), which was not available as of the date of this report. Therefore, the audit report is qualified accordingly.

3. Our audit results do not consider the contractor's legal entitlement. We express no opinion regarding legal entitlement.

## RESULTS OF AUDIT

### AUDITOR'S OPINION

In our opinion, the cost or pricing data submitted by the offeror are inadequate in some respects. The proposal was not prepared in all respects in accordance with appropriate provisions of FAR and DFARS (see Notes 5, 6 and 7, pages 5, 6 and 7 for a further discussion). However, the impact of the inadequacies and noncompliances described is considered to be relatively insignificant. Therefore, we consider the proposal to be acceptable as a basis for negotiating a fair and reasonable price. This statement should not be interpreted to mean that the data are necessarily accurate, complete and current in accordance with 10 U.S.C. 2306a, since a postaward review may disclose evidence not now discernible.

| Elements of ISN's Proposal | ISN's Proposal | Questioned Costs | Difference (Note 1) | Note | Page |
|---|---|---|---|---|---|
| Direct Materials | $ 2,401,080 | $ 0 | $ 2,401,080 | | |
| Direct Labor | 604,657 | (22,147) | 626,804 | 2 | 4 |
| Indirect Expenses | 466,330 | (17,079) | 483,409 | 3 | 4 |
| Other Direct Costs | 427,831 | 0 | 427,831 | | |
| G&A Expense | 534,061 | (5,370) | 539,431 | 4 | 5 |
| Subtotal | 4,433,959 | (44,596) | 4,478,555 actual profit | | |
| Profit | 443,396 | 443,396 | 0 | 5 | 5 |
| Settlement Expenses | 183,224 | 151,539 | 31,685 | 6 | 6 |
| Cost in Excess of Cont. | 0 | 460,708 | (460,708) | 7 | 6 |
| Total | 5,060,579 | $ 1,011,047 | $ 4,049,532 | | |
| Payments Received | (2,507,015) | | | 8 | 7 |
| Net Requested | $ 2,553,564 | | | | |

4,049,532

() Denotes upward adjustment

1,542,517.00
2,507,015.00

### Explanatory Notes

1. The amounts in this column are presented solely for the convenience of the TCO in developing the government's negotiation objective. They represent only the arithmetic difference between the amounts proposed and the related questioned costs. You should not consider the amounts to be audit approved or recommended amounts. DCAA does not approve or recommend prospective costs because the amounts depend partly on factors outside the realm of accounting expertise, such as opinions on technical and production matters. Any portion of the questioned costs accepted by the TCO must have the appropriate indirect rates applied.

2. Direct Labor

a. Summary of Conclusions:

We have reclassified $22,332 of stop work labor from settlement costs to direct costs and questioned $185 due to a difference between the settlement proposal and its supporting documentation. The net effect of these adjustments is an upward adjustment to direct labor of $22,147.

b. Basis of Claimed Cost:

Direct labor is based on the actual incurred labor cost as recorded in the books and records.

c. Audit Evaluation:

We verified that the direct labor cost: (1) reconciled with ISN's Jamis job cost reports and employee timesheets; and (2) was incurred prior to the termination notice.

3. Indirect Expenses

a. Summary of Conclusions:

We have increased the indirect expenses by $17,079 due to the increase in Direct Labor shown above.

b. Basis of Claimed Cost:

The indirect expenses are based on a Fringe Benefits rate of 29.68% and an Overhead rate of 36.58%. ISN's overhead allocation base includes fringe benefits.

c. Audit Evaluation:

We verified the proposed Fringe Benefits and Overhead rates to the current provisional billing rates and prior termination audits. The upward adjustment applicable to Fringe Benefits is calculated by applying the proposed and accepted Fringe Benefits rate to the stop work labor reclassified from settlement expenses to direct labor. The resulting sum is then multiplied by the proposed and accepted Overhead rate to arrive at the upward adjustment applicable to overhead.

4. G&A Expense

a. Summary of Conclusions:

We have increased the G&A expenses by $5.370 due to the increases in Direct Labor, Fringe Benefits and associated Overhead expenses.

b. Basis of Proposed Cost:

The G&A expenses are based on a G&A rate of 13.69% applied to Direct labor, Indirect expenses, Direct materials and ODCs.

c. Audit Evaluation:

We verified the proposed G&A expense rate to the current provisional billing rate and prior termination audits. The upward adjustment is the result of applying the proposed and accepted G&A rate to the increase in Direct labor and related Fringe Benefits and Overhead expense

5. Profit

a. Summary of Conclusions:

We have questioned the entire $443.396 of claimed profit in accordance with FAR 49.203 due to the following: (1) ISN did not provide us with any Estimate to Complete (ETC) or Percentage of Completion: (2) ISN significantly under bid this contract by approximately $900,000; and (3) DCAA audit report No. 6221-96G17500001 disclosed that ISN was in a loss position on this contract.

A loss calculation was not applied since the Government acknowledged that ISN was due some form of equitable adjustment on this contract due to various changes to the statement of work. It is our understanding that the only hold-up in the equitable adjustment negotiations was a delivery schedule. Since the contract was terminated prior to the conclusion of the equitable adjustment negotiations, we are unable to determine the impact that the equitable adjustment would have on the anticipated loss.

b. Basis of Claimed Cost:

ISN has claimed a profit factor of 10% applied to all costs

c. Audit Evaluation:

We requested ISN to provide us with an ETC and a Percentage of Completion. We also requested technical specialist assistance regarding the ETC and Percentage of Completion.

6. Settlement Expenses

a. Summary of Conclusions:

We have questioned $151,539 of the $183,224 proposed settlement expenses as shown below:

| Description | Questioned | Ref. |
|---|---|---|
| Reclassified to D/L | $28,960 | (1) |
| Cost Not Incurred | 64,355 | (2) |
| Prompt Pmt. Int. | 58,224 | (3) |
| Total | $151,539 | |

(1) We have reclassified the stop work period labor and associated fringe benefits to direct labor and indirect expenses respectively as discussed in notes 2. and 3. Stop work period labor is not a settlement cost but a direct expense.

(2) ISN is proposing settlement labor and ODCs which are estimates of possible future costs. Consequently, these costs have not been incurred and are questioned in total.

(3) We have questioned the entire $58,224 of proposed Prompt Payment Interest in accordance with FAR 32.907-2 which states "no interest penalty shall be paid to the contractor as a result of delayed contract financing payments". Since ISN received progress payments, and the interest is calculated on these progress payments, the interest is unallowable.

b. Basis of Claimed Cost:

The claimed settlement costs are based on costs recorded in ISN's Jamis Job Cost and estimated future labor and ODCs. The claimed prompt payment interest is a mathematical calculation not recorded in the accounting records.

c. Audit Evaluation:

We verified that the claimed settlement expenses were recorded in the Jamis Job Cost and supported by vendor invoices and employee timesheets. We reviewed the supporting documentation for allowability and allocability to the terminated contract. We also verified that the costs were incurred after the Termination notice.

7. Cost in Excess of Contract Limitations

a. Summary of Conclusions:

We have questioned $460,708 which is the total proposed costs and profit of $4,877,354 less the contract price of $4,416,646 in accordance with FAR 49.207.

b. Basis of Claimed Cost

ISN did not indicate in its termination settlement proposal any costs claimed in excess of the contract limitations.

c. Audit Evaluation

We compared the proposed costs plus profit to the contract price.

8. Payments Received

a. Summary of Conclusions:

The $2,507,015 proposed by ISN agrees with their accounting records.

We discussed factual matters concerning audit findings with Mr. Daniel Dowling, Corporate Counsel. We did not disclose the dollar impact of our conclusions and recommendations to the contractor. Mr. Dowling reserved comment on our findings.

## DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contact regarding this audit | |
| Benjamin Monastero, Senior Auditor | (410) 964-2060 |
| Other contacts regarding this audit: | |
| Mark S. Moser, Branch Manager | (410) 964-2060 |
| William C. Erdman, Supervisory Auditor | (410) 964-2060 |
| Office Administrative Personnel | |
| | FAX No. |
| | (410) 997-3237 |

AUDIT REPORT AUTHORIZED BY:

for William C. Erdman
Mark S. Moser
Branch Manager
DCAA Columbia Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

Termination Contracting Officer
ATTN.: DCMDS-GATC (Ms. Mildred Jacobs)
Defense Logistics Agency
Defense Contract Management Command Atlanta
508 Walker Street
Atlanta, GA 30060-2789

RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Proprietary determinations should be made in the event of an external request for access. The restrictions of 18 U.S.C. 1905 should be considered before this information is released to the public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), any Freedom of Information Act requests for audit reports received by DCAA will be referred to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

3. The information contained in this audit report should not be used for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

EXHIBIT 49





IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - x

INFORMATION SYSTEMS & :

NETWORK CORPORATION, :

Plaintiff, :

-vs- : Case No. 1:02-ever-796

THE UNITED STATES, : Judge Allegra

Defendant. :

- - - - - - - - - - - - - x

ORIGINAL

Bethesda, Maryland

Wednesday, January 24, 2007

Deposition of:

ELLEN E. ERDELSKY

the witness, was called for examination by counsel for the Plaintiff, at the offices of Singer & Associates, the ISN Building, 10411 Motor City Drive, Suite 725, Bethesda, Maryland 20814, commencing at 10:00 a.m., before Marcia G. Blau, Shorthand Reporter and Notary Public for the State of Maryland, and were present on behalf of the respective parties:

00462

audit included profit?

A. I don't know that.

Q. Do you know how the Government calculated any additional payment to ISN after submission of this audit report?

A. I do not know.

Q. Is it correct to say in reviewing this audit report and going back to page 4 of the Auditor's Opinion, and with the exception of profit and the majority of the settlement expenses, that all of ISN's costs incurred on this contract were verified by DCAA in this audit?

A. Yes.

Q. On what is stamped page 159 and 99 -- it has actually two stamps on it -- under the page Payments Received Number 8 --

A. Right.

Q. It says, "The $2,507,015 proposed by ISN agrees with their accounting records."

A. Right.

Q. And that comes from line 18 of the settlement proposal on advanced progress and partial payments that

00406

CONDENSED TRANSCRIPT

EXHIBIT

50

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-796C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules for the United States Court of Federal Claims, defendant proposes its findings of uncontroverted fact.

Contracts

1. On July 15, 1994, the Government, through the Department of the Navy, awarded Contract No. N00600-94-C-0389 ("contract 0389"), to plaintiff Information Systems And Networks Corporation ("ISN"). Def. App. 1.[1] The ultimate customer was the Navy's Space and Naval Warfare Systems Command ("SPAWAR"). Id. The contract required ISN to provide all material, labor, and services to engineer, install, and test an automated technical control system ("ATC") for three Naval turnkey facilities located at the switching centers at Hampton Roads, Virginia, Pearl Harbor, Hawaii, and Camp Smith, Hawaii. Def. App. 9. The contract was for a firm fixed price of $4,416,645.54. Def. App. 3. The contract also contained four options to provide the same system at several other installations around the world. Def. App. 3-7.

[1] Def. App. ___ refers to pages from the appendix attached to this filing.

2. Section G.4(a) of contract 0389 states, in relevant part:

> (3) When in the opinion of the contractor, the COTR requests effort outside the existing scope of the contract, the contractor will promptly notify the PCO in writing.
>
> (4) No action will be taken by the contractor under such technical instruction unless the PCO or ACO has issued a contractual change.

Def. App. 23.

3. On March 28, 1995, ISN formally executed a subcontract agreement with Datacomm Management Sciences ("Datacomm"). Def. App. 35. In accordance with the agreement Datacomm was to provide ISN with the supplies and software ISN required for completion of the contract. Def. App. 36. ISN agreed to pay Datacomm a firm fixed price for each item ISN ordered. Id.

The Engineering Change Proposal

4. Almost from the beginning of contract performance, ISN was behind schedule. ISN was late in delivering contract data requirements lists ("CDRL"), as well as behind the overall installation for all three sites. Def. App. 49-53. While there were many reasons for ISN falling behind schedule, chief among them was the fact that ISN had initially understaffed the contract with temporary hires and that ISN did not understand the magnitude of the project. Id. Indeed, the problems required ISN to replace its program manager just a few months into the start of the project. Id.

5. The contract called for ISN to modernize the existing switching equipment in the turnkey facilities. The communications configuration at the Hampton Roads facility however,

was continually changing. Complaint ¶ 6. On June 20, 1995 to address ISN's performance problems and the changing configuration, ISN submitted an Engineering Change Proposal ("ECP"). Complaint ¶ 7.

6. In a June 26, 1995 letter, The Navy contract specialist, Lisa Murtha, wrote to ISN that: "[a] formal modification to the contract will be issued for the combination of both the formal acceptance of an ECP for implementation of all sites in Lot I and the revised delivery schedule for all sites in Lot I." Def. App. 54; Pl. Ex. 6. That letter further indicated that the ECP "will be reviewed by SPAWAR with comments" to be provided. Id. In addition, the letter indicated that ISN was required to provide a delivery schedule for all sites in Lot I. Id.

7. On July 20, 1995, Jeff Bergdahl, the contracting officer's technical representative sent a facsimile to Roscoe Crawford, the contracting officer, that included a memorandum from SPAWAR to FISC. The memorandum indicated in paragraph 1 that SPAWAR reviewed the ECP and "technically approves ISN's proposed engineering changes," but recommended that all terms be negotiated. Pl. Ex. 7. In paragraph 2, the memorandum addressed ISN's cost analysis, recommending, among other things, a further cost breakdown of the additional charges. Id.

8. Contracting officer Roscoe Crawford testified that discussions that he had with Mr. Bergdahl indicated that SPAWAR viewed the ECP's costs as unreasonably priced. Def. App. 122. In addition, Mr. Crawford testified that ISN never provided a revised installation cutover schedule as requested by Ms. Murtha's June 26, 1995 letter. Def. App. 123.

9. On August 23, 1995, an ISN employee, in an internal ISN memorandum, explained to Mr. Robertson that:

PER FONCON WITH LISA MURTHA, 22 Aug 95:

1) She has not looked at the ECP, to date.

2) Due to end of year procurements(8a-2 each) She will not be able to work on our ECP until Mid-Sept 95.

* * *

5) I talked with Don Tabasco about contract and FAR requirements for Timely ECP processing by the government. He recommends that we take a more forceful approach with the contracting officer. You might want to touch base with him personally.

* * *

If you decide to talk with Roscoe, please give me a heads up so I can do the same to Lisa?

Def. App. 55. Additionally, ISN included in its submitted progress reports for September through December 1995, that the June ECP had not been approved. Def. App. 56-70. On January 26, 1996, Mr. Don Tabasco, ISN's manager of contracts, wrote to the Government to complain about the fact that ISN had not received approval of the June 20, 1995 ECP. Def. App. 71.

Funding

10. On August, 31, 1995, Jeffery Bergdahl, the contracting officer's technical representative informed ISN that the ECP was "technically" approved. Pl. Ex. 7. Further, Mr. Bergdahl acknowledged that additional funds would have to be added to the contract to accommodate the ECP. Id.

11. On August 23, 1995, just one week prior to the writing of the above *memorandum*, SPAWAR, had reprogrammed $789,319 from another contract to partially fund the ECP. Def. App. 74. On November 27, 1995, the reprogrammed funds were withdrawn from

contract 0389 due to an emergent requirement. Def. App. 75. The reprogrammed funds represent the only monies added to contract 0389. As of November 27, 1995, there was no money added to contract 0389 to fund the ECP.

12. In addition, Mr. Bergdahl also specifically stated that the "agreed configuration" that had been proposed by ISN and technically approved by SPAWAR, "*obviously was never set* forth in the contract." Def. App. 131.

13. Meeting notes from a December 6, 1995 meeting between Roscoe Crawford and SPAWAR representatives indicate that Mr. Crawford "never modified the contract to re-establish the deliv. schedule on any of the sites because he could never get a good idea of what a realistic new deliv. schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo." Def. App. 116; compare Pl. Ex. 11.

14. ISN's program manager testified that ISN was aware that without a formal modification of the contract, ISN could not start work on the ECP. Def. App. 119. Mr. Robertson also testified that ISN was aware that the Government did not possess funding for the ECP, and that without such funding, the ECP could not be approved. Def. App. 120.

Not correct rep.

Termination

15. On February 20, 1996, the Government issued a stop work order to ISN. Def. App. 76. This was preliminary to the Government terminating ISN's contract for the convenience of the Government. On February 23, 1996, the Government took possession of all of the Government inventory retained by ISN. Id. The contract was formally terminated for the convenience of the Government on March 15, 1996. Def. App. 77. At the time of the termination, ISN had partially completed only the installation at the Hampton Roads Virginia

site. ISN did not even start the installation at the two Hawaii sites. Id.

16. Pursuant to Part 49 of the Federal Acquisition Regulations (FAR), ISN, on June 6, 1996, submitted a termination settlement proposal ("proposal"). Def. App. 82-90. ISN sought payment of $5,060,578 on a $4,416,646 contract in which ISN had only performed work on a third of the contract requirements. The proposed amount included $443,396 in profit. Id. ISN also stated that it had spent $2,401,080 for materials. Id. There was no discussion about any outstanding payments due to ISN's subcontractor, Datacomm. In fact, according to a request letter from Datacomm, ISN still owes Datacomm $196,688.68 plus interest for materials Datacomm furnished to ISN pursuant to their subcontract agreement. Def. App. 91.

17. On December 19, 1996, the Defense Contract Audit Agency ("DCAA") issued audit Report No. 6311-97B17100001. Def. App. 92. At the request of the termination contracting officer, DCAA had conducted an audit of ISN's settlement proposal. Id. The auditor concluded that he could support a $4,049,532 settlement with ISN. Def. App. 95. The auditor questioned $1,011,047 of ISN's $5,060,578 proposal. In particular, all of the claimed profit was questioned. Def. App. 93. The disallowance was due in part to a previous audit of ISN's request for progress payments 3-5. Def. App. 102-109. The earlier audit had concluded that ISN was in loss position on contract 0389. Def. App. 103.

Previous Proceeding

18. On October 3, 2001, this Court, Judge James Turner presiding, issued a bench ruling to the effect that there was no settlement agreement between ISN and the Government. Def. App. 110-114. That ruling was subsequently affirmed by the United States Court of Appeals for the Federal Circuit on October 16, 2002. Def. App. 115.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

s/ Brent M. McBurney

BRENT M. McBURNEY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, Room 12074
Washington, D.C. 20530
Tele: (202) 307-0277

April 29, 2004

Attorneys for Defendant

CERTFICATE OF SERVICE

I HEREBY CERTIFY that the Appendix of Exhibits Supporting Plaintiff's Opposition to Defendant's Motion for Summary Judgment was filed electronically with the Court on this 11th day of May, 2007 pursuant to the Court's electronic filing system. Notice of this filing will be sent to all parties by operation of the system. The parties may access the filing through the system.

/s/Norman H. Singer
NORMAN H. SINGER, ESQ.