No. 02-796C
(Judge Allegra)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

INFORMATION SYSTEMS & NETWORKS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, Room 12074
Washington, D.C. 20530
Tele: (202) 616-2377
Steven.Mager@usdoj.gov

June 12, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. ISN Misconstrues The Standard For Summary Judgment . . . . . . . . . . . . . . . . . . . 2

II. ISN Improperly Raises New Claims In Its Response . . . . . . . . . . . . . . . . . . . . . . . 4

III. ISN Cannot Demonstrate That There Is A Genuine Issue of Material Fact That The Contracting Officer Ordered The Alleged Changes To The Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV. ISN Fails To Demonstrate That There Is A Genuine Issue of Material Fact With Regard To Bad Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V. ISN's Motion In Limine Is Premature, And Not Relevant To Its Response To The Government's Motion For Summary Judgment . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

### CASES

**PAGE(S)**

Al Johnson Constr. Co. v. United States,
20 Cl. Ct. 184 (1990) . . . . . . . . . . 9

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 3

Asco-Falcon II Shipping Co. v. United States,
32 Fed. Cl. 595 (1994) . . . . . . . . . . 12

Baskett v. United States,
2 Cl. Ct. 356 (1983) . . . . . . . . . . 17

Car Carriers, Inc. v. Ford Motor Co.,
745 F.2d 1101 (7th Cir. 1984) . . . . . . . . . . 6

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . 2, 3, 4

Crest A Apartments, Ltd. II v. United States,
52 Fed. Cl. 607 (2002) . . . . . . . . . . 6

Dairyland Power Coop. v. United States,
16 F.3d 1197 (Fed. Cir. 1994) . . . . . . . . . . 3

Giesler v. United States,
232 F.3d 864 (Fed. Cir. 2000) . . . . . . . . . . 10

International Paper Co. v. United States,
39 Fed. Cl. 478 (1997) . . . . . . . . . . 18

Michels v. United States,
72 Fed. Cl. 426 (2006) . . . . . . . . . . 6

Miller Elevator Co., Inc. v. United States,
30 Fed. Cl. 662 (1994) . . . . . . . . . . 9, 18

North Star Alaska Housing Corp. v. United States,
76 Fed. Cl. 158 (2007) . . . . . . . . . . 16

**PAGE(S)**

Rice Systems, Inc. v. United States,
62 Fed. Cl. 608 (2004) . . . . . . . . . . 2

SMS Data Products Group v. United States,
19 Cl. Ct. 612 (1990) . . . . . . . . . . 6

Snoqualmie Tribe of Indians v. United States,
178 Ct. Cl. 570, 372 F.2d 951 (1967) . . . . . . . . . . 8

Stockton East Water Dist. v. United States,
62 Fed. Cl. 379 (2004) . . . . . . . . . . 7-8

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 2, 3

Torncello v. United States,
231 Ct. Cl. 20; 681 F.2d 756 (1982) . . . . . . . . . . 13

UMC Electronics Co. v. United States,
43 Fed. Cl. 776 (1999) . . . . . . . . . . 18

White Mountain Apache Tribe v. United States,
10 Cl. Ct. 115 (1986) . . . . . . . . . . 17

**STATUTES AND REGULATIONS**

41 U.S.C. § 609(a)(3) . . . . . . . . . . 7

28 U.S.C. § 2501 . . . . . . . . . . 7

**MISCELLANEOUS**

FRE 801(d)(2) . . . . . . . . . . 18

RCFC 7.1 . . . . . . . . . . 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-796C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE**
**<u>TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Rules 7.1(c) of the Rules of United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits its reply to plaintiff Information Systems & Networks Corporation's ("ISN") response to defendant's motion for summary judgment.

In our opening brief, we demonstrated that the Government is entitled to summary judgment upon ISN's constructive change/equitable adjustment claim, because plaintiff could not show that it had received an order to proceed with work despite the lack of a final approved Engineering Change Proposal ("ECP") and because ISN chose to proceed pursuant to a bi-lateral modification process, rather than presenting a change proposal or claim to the contracting officer. Further, we demonstrated that there is no evidence that the Government acted in bad faith, as alleged in plaintiff's complaint. ISN's response fails to successfully rebut these arguments.

Accordingly, we respectfully request that this Court grant our motion to for summary judgment.

## ARGUMENT

### I. ISN Misconstrues The Standard For Summary Judgment

In its response, ISN attempts to shift the burden of producing evidence of non-existent conditions to the Government by misapplying the standard for summary judgment. In our motion for summary judgment, we provide that ISN cannot demonstrate that it received an order from an authorized Government agent or that the Government acted in bad faith. ISN, however, argues that such a showing is not enough to meet the Government's burden for summary judgment, and that the Government must produce some affirmative evidence that there was no order and that the Government acted in good faith.[1] See Pl. Resp. 8-14, 16. Such an argument, however, is contrary to both the law and logic.

As a matter of law, the United States Supreme Court and United States Court of Appeals for the Federal Circuit have detailed the standard that a movant must meet in order to succeed on a motion for summary judgment. In Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986), the Supreme Court held that a party's burden on summary judgment is discharged by "showing" that there is an absence of evidence to support the non-moving party's case. This "showing" merely requires that the moving party point out the absence of evidence to support the other party's case. Id. Consistent with this case law, the United States Court of Appeals for the Federal Circuit held in Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) that "the burden is not on the movant to produce evidence showing the absence

---

[1] In its response to our arguments for summary judgment upon ISN's bad faith claim, ISN goes even further, asserting that " summary judgment cannot be used in disposing of the [bad faith] claim unless the facts are stipulated." Pl. Resp. at 16. As demonstrated below, this is incorrect and this Court has granted summary judgment on bad faith absent stipulated facts. See, e.g., Rice Systems, Inc. v. United States, 62 Fed. Cl. 608, 630-31 (2004).

of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "'the burden on the moving party may be discharged by "showing" — that is, pointing out to the [Court of Federal Claims] — that there is an absence of evidence to support the non-moving party's case.'" Id. (emphasis in original) (quoting Celotex Corp. v. Catrett, 477 U.S. at 325). The Government has met this standard.

After the non-moving party has pointed out the absence of evidence to support the nonmoving party's case, the burden then shifts to the nonmoving party to demonstrate an issue of material fact with regard to such matters. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Sweats Fashions, 833 F.2d at 1562-63. Further, "a nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994). As we demonstrated in our opening brief and explain in further detail below, ISN has not met its burden, and the Government is entitled to summary judgment upon the remaining counts of ISN's complaint.

This procedure for disposing of claims upon summary judgment also is more logical than ISN's proposed procedure. Pursuant to ISN's construction of the summary judgment standard, a movant would have the nearly impossible task of producing affirmative evidence of non-existence of a condition, even where the burden of proof at trial is on the movant. In other words, in order to demonstrate that there was no order by an authorized Government official, the Government would have to demonstrate a non-existent order. Similarly, to demonstrate a lack of bad faith, the Government would be required to produce affirmative demonstrate that Government agents were not acting in bad faith (despite the strong presumptions to the

contrary). This standard would effectively preclude summary judgment in almost all such circumstances. However, the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole," Celotex, 477 U.S. at 327, which allows for the efficient elimination of factually insufficient claims without the need for a trial.

Accordingly, the Government respectfully requests that the Court reject the ISN's attempt to redefine the standards for summary judgment. The proper issue before the Court is whether plaintiff has met its burden of demonstrating in its response that there is a genuine issue of material fact with regard to constructive change/equitable adjustment and bad faith. As demonstrated in our opening brief and below, the Government is entitled to summary judgment as a matter of law.

## II. ISN Improperly Raises New Claims In Its Response

In its response to our motion for summary judgment, ISN asserts new claims regarding constructive change/equitable adjustment and bad faith, that are distinct from the claims set forth in the complaint. These new claims, not found in the complaint, and asserted after the close of discovery and years of litigation (and raised well after the expiration of the relevant statute of limitations), are not properly before this Court.

In its complaint, ISN alleges the Government made a constructive change to the contract because "[t]he services and work performed on the ECP were not contemplated by the original scope of services set forth in the Contract." Compl. ¶ 26. According to ISN, "[t]he ECP, at the least, constituted out-of-scope work approved by defendant and is a constructive change to the contract." Id. See also Compl. ¶¶ 30-31, 33 (equable adjustment). In its response to our opening brief, however, ISN criticizes the Government's focus upon facts relevant to the

unapproved ECP, and the similarity between the facts alleged in connection with our previously filed motion for summary judgment on Count I (breach of contract) of the complaint. Pl. Resp. 10-14. The Government's focus, however, is necessarily a product of ISN's claims. ISN's breach claim and its changes/equitable adjustment claim both are premised on the existence of an approved ECP. Indeed, in its response, ISN continues to link much of its changes/equitable adjustment claim to the ECP, even though this Court previously held that there was no approved ECP. See Def. App. 146-52. Yet, to the extent that ISN is making new changes claim, divorced from the ECP, that claim would not be properly before this Court. Indeed, as noted in our opening brief, such an independent changes claim was not presented to the contracting officer or the termination contracting officer ("TCO") for a final decision, and the Court would lack jurisdiction over such a claim.

Similarly, in its complaint, ISN alleges that the Government acted in bad faith: (1) by advising ISN that its ECP proposal was approved and that it would be paid costs for its services; (2) by representing that the ECP had been approved and that the formal paperwork would "eventually catch up;" (3) by directing, authorizing, and approving the services performed by ISN pursuant to the ECP and then failing to pay for such services; and (4) by recognizing, through the TCO, that ISN was entitled to costs incurred pursuant to the ECP, and then disavowing the authority of the TCO to make such a conclusion. Compl. ¶ 22. In its response to our motion, however, ISN alleges that the Government acted in bad faith by: (1) requesting and demanding multiple ECPs and changes within the scope of the contract, and then refusing to memorialize the changes and pay for such changes; (2) orchestrating ISN's termination; and (3) failing to participate in the termination settlement process. Pl. Resp. at 17. At best, only the

first of these new claims bears any resemblance to the bad faith claim contained in the complaint. The remaining two claims, however, fall outside the scope of the complaint.

ISN should not be permitted to amend its complaint by response to the Government's opening brief. Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss."); Michels v. United States, 72 Fed. Cl. 426 (2006) (refusing to consider new allegations raised on motion to dismiss but not in complaint); Crest A Apartments, Ltd. II v. United States, 52 Fed. Cl. 607, 613 (2002) (refusing to consider claim asserted in summary judgment motion but not in complaint). See also SMS Data Products Group v. United States, 19 Cl. Ct. 612, 616 (1990) (plaintiff barred from raising claim that is fundamentally different from the claim presented to the contracting officer). ISN's changes/equitable adjustment claim is premised upon an approved ECP; and the litigation and discovery have proceeded upon this understanding of ISN's claim. Further, ISN's complaint does not provide any direct or inferential reference to bad faith in connection with the decision to terminate ISN's contract for the convenience of the Government, nor to the contracting officer's alleged lack of participation in the settlement. ISN does not even challenge its termination in its complaint. Instead, ISN's bad faith claim also focused upon the Government's purported failure to pay ISN for an approved ECP. ISN should not be permitted to change its claims only after the Government has moved for summary judgment.

Nor would these new claims be the proper subject of a motion to amend the complaint, even had ISN raised such claims on a motion to amend, rather than a response brief. ISN would be raising such claims in an untimely manner, well outside of the one year statute of limitations

contained in the Contract Disputes Act ("CDA"), 41 U.S.C. § 609(a)(3), or this Court's general six-year statute of limitations for non-CDA claims. 28 U.S.C. § 2501.

ISN's ECP claim was based upon ISN's proposal dated June 20, 1995, and the Government's alleged approval on August 31, 1995. ISN alleges that it was terminated for the convenience of the Government on March 15, 1996. On December 9, 1997, the TCO made a determination that the gross settlement for the termination was $4,049,532, and the net amount due ISN was $0. Upon ISN's request, a final decision was issued on December 24, 1997. Accordingly, ISN should have been aware of any additional changes/equitable adjustment claims it might have, distinct from its claim of an approved ECP, more than a decade prior to filing its response brief.

Further, ISN alleges that the agency formulated a plan to terminate ISN in December 1995, and ISN was terminated for the convenience of the Government on March 15, 1996. Even if ISN was not fully aware that it might have a bad faith claim for improper termination on March 15, 1996, by October 18, 1999, ISN had deposed the contracting officer, Roscoe Crawford, and specifically questioned him about the document upon which its assertion of bad faith is based. See Def. Supp. App. 15-21; Pl. App. 154-55. Thus, it is clear that well over seven years prior to the filing of its response, ISN was aware of such facts as would have required it to raise its new bad faith claim with this Court.

Nor can this claim be said to relate back to the original filing of the complaint, as the complaint did not bring an action based upon any change/equitable adjustment distinct from the unapproved ECP, or a bad faith claim arising from the termination or the conduct of the termination settlement process. See Stockton East Water Dist. v. United States, 62 Fed. Cl. 379,

392 (2004) (quoting Snoqualmie Tribe of Indians v. United States, 178 Ct. Cl. 570, 587, 372 F.2d 951, 960 (1967)).

The contract at issue in this case was awarded in 1994 and terminated in 1996. The acts at issue and the relevant documents are over a decade old. Upon information and belief, many of the Government's and ISN's employees associated with this matter have retired or moved on to other matters. During the course of discovery, and in filing its motion for summary judgment, the Government reasonably focused upon the claims actually asserted by ISN in its complaint. It cannot be said that we had fair notice of these new claims, and we are, thus, entitled to the protections of the statute of limitations. Having failed to previously raise such claims, ISN cannot now raise new claims in response to the Government's motion to dismiss.

## III. ISN Cannot Demonstrate That There Is A Genuine Issue of Material Fact That The Contracting Officer Ordered The Alleged Changes To The Contract

As noted in our opening brief, the contracting officer did not issue any change order or other order to proceed with the ECP work. The contract expressly provides that the contracting officer is the only person with the authority to issue a change to the contract, and further provides that "The Contractor shall not comply with any order, direction, or request of Government personnel unless issued in writing and signed by the Contracting Officer, or pursuant to specific authority otherwise included in this contract." Def. App. 24. Accordingly, because ISN still fails to demonstrate that the contracting officer issued any order or direction to proceed with the ECP work despite the lack of an approved ECP, ISN cannot recover pursuant its constructive change/equitable adjustment theory.

While ISN contends that the contracting officer approved the ECP and work performed pursuant to the ECP, this contention is not supported by any evidence. To the contrary, the

record demonstrates that the ECP remained unapproved, and that ISN was aware that the ECP was unapproved. While the Space and Naval Warfare Systems Command ("SPAWAR") technically approved the ECP on July 20, 1995, it recommended that the contracting officer negotiate "all terms and conditions" with ISN. Def. App. 66. On August 23, 1995, an ISN internal memorandum provides that Lisa Murtha, the contract specialist for the contract had not looked at the ECP to date, and would not be able to work on the ECP until September 1995, due to "too much 'end of year' work and too few people to accomplish it." Def. App. 69. ISN's October 1995, November 1995, December 1995, and January 1996 progress reports details that ISN is "[w]aiting response from the Government" on the ECP. Def. App. 72, 76, 79, 83. On January 26, 1996, ISN wrote to the contracting officer, stating that "the approval of the latest ECP dated June 20, 1995 in the amount of $930,527 for Hampton Roads has not been received by ISN." Def. App. 85. Less than one month later, ISN was issued a stop work order, and the contract was terminated. Def. App. 90.

ISN argument that it did not need a formal change order in order to bring a constructive change claim misses the point. ISN still needs to demonstrate that it can meet the "order/fault" component of a constructive change claim. Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. 662, 678 (1994) (citing Al Johnson Constr. Co. v. United States, 20 Cl. Ct. 184, 204 (1990)). ISN, however, presents no evidence that the contracting officer, the only party with the authority to make a change, required that ISN work on the ECP despite his lack of approval. Indeed, the contracting officer has testified that he believes that ISN did not perform any work on the ECP. Def. Supp. App. 4-7.

Nor can ISN assert that it was unaware of the express contract provisions requiring the contracting officer's approval prior to performing any work on a proposed change. It is

axiomatic that the "[p]arties to a contract are generally bound by its terms," and a contractor is responsible for knowing and compiling with the express terms of the contract. Giesler v. United States, 232 F.3d 864, 869 (Fed. Cir. 2000). Further, on May 25, 1995, ISN stated to the Government that "ISN will insure that all changes are approved by contractually authorized Government Representatives and documented." Pl. App. 138. Even assuming for the sake of argument that ISN performed work on the ECP, a matter not placed at issue in this motion for summary judgment, while such changes remained unapproved by the contracting officer, ISN cannot recover for such work.

Recognizing it cannot demonstrate that the contracting officer issued a change order or required ISN to begin work on the ECP, ISN asserts that the changes were approved by the contracting officer's technical representative ("COTR"), in accordance with section G.4 of the contract. Pl. Resp. 26-27. Section G.4 of the contract, however, does not permit the COTR to approve ECP requests, or to make any changes to the contract. Rather, the COTR was responsible for "monitoring, progressing, and overall surveillance of services to be performed" pursuant to the contract. Def. App. 25. Indeed, this section expressly states that the COTR does not possess authority to make a change to the contract:

> In no event will any understanding or agreement, modification, change order, or other matter deviating from the terms of the basic contract between the contractor and any other person other than the Procuring Contracting Officer (PCO) or the Administering Contracting Officer (ACO) be effective or binding upon the Government.

Id. (emphasis added). While ISN is correct that the contract provides that the COTR shall notify the contracting officer of any requests by the contractor to engage in efforts outside of the scope of the existing contract, this section also provides that "[n]o action shall be taken by the

contractor under such technical instruction unless the PCO or ACO has issued a contractual change." Id. See also Def. Supp. App. 2-3 (deposition of Roscoe Crawford) ("[t]he COR is not authorized to make changes to the terms or conditions of the contract.")

As noted in the March 21, 1995 program meeting minutes, the contracting officer merely "want[ed] ISN to put in the equipment that ISN bid to install." Pl. App. 34. There is no evidence that he approved the ECP or ordered ISN to work on the ECP without approval. Accordingly, we respectfully request that the Court grant the Government's motion for summary judgment upon ISN's constructive change/equitable adjustment claims.

## IV. ISN Fails To Demonstrate That There Is A Genuine Issue of Material Fact With Regard To Bad Faith

In its response, ISN first asserts that it was bad faith for the Government not to respond to its "multiple" ECP requests. At the outset, there is some confusion regarding dates of ISN's ECP requests. According to the citations in ISN's response, the initial configuration change ECP request was prepared on April 18, 1995 (not April 7, 1995), Pl. App. 93-104, and its initial cable ECP was prepared on April 21, 1995 (not April 18, 1995), Pl. App. 130-137. On May 25, 1995, ISN provided a summary of its previous ECP requests in its submittal of contract data requirement list item B002. Pl. App. 138-39.[2] ISN ultimately brought these ECP requests together into one document on June 20, 1995, not June 20, 1996. Pl. App. 52-61. Accordingly, it is this request that was the proper focus of the Government's subsequent consideration and our motion for summary judgment.

Further, to say that the Government failed to respond to the previous ECPs is highly disingenuous, since the June 20, 1995 ECP expressly provides that it is the product of

---

[2] ISN's citations for this document are incorrect.

"[g]uidance provided by the Government" in a May 1, 1995 letter. Our opening brief did not focus upon these initial ECP requests because the Government had responded, and had attempted to assist ISN in preparing the June 20, 1995 ECP request. The Government did not approve this ECP request, but, as we demonstrated in our opening brief, it was not bad faith for the Government to not approve a requested change to the terms of the contract.

The most serious allegation of bad faith by ISN is that the contracting officer contemplated a plan to improperly terminate ISN for default.[3] As ISN acknowledges, however, it was not terminated for default, but rather was terminated for the convenience of the Government. Pl. Resp. 6. See also Def. Supp. App. 19-20. Accordingly, although the presumption that Government officials act in bad faith can only be overcome with clear and convincing proof of "specific acts of bad faith on the part of the government," Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 604 (1994) (emphasis added), ISN bases its claim upon the mere contemplation of an act that it alleges was improper, rather than an act itself. This is incorrect.

Moreover, although the Government considered terminating ISN for default and observed that termination for default is "cheaper" than a termination for convenience, it is uncontested that here, the Government choose the more expensive route and terminated ISN for the convenience of the Government. See Pl. App. 154. As ISN acknowledges, ISN was paid an additional $1,542,517 after termination. Pl. Resp. at 7. Accordingly, it is difficult to argue that the Government's decision to terminate was in bad faith, since the Government choose to terminate the contract in a manner that provided a greater benefit for the contractor, even though

[3] For the purposes of this section, we will assume that the Court has determined that ISN is permitted to raise this new allegation.

believed it might be possible to re-establish its rights under the contract and terminate for default.

Further, assuming that the mere consideration of termination for default and ISN's ultimate termination for convenience could be improper, there is absolutely no evidence anywhere in any documents that these actions (or any other actions) were motivated by "some specific intent to injure the plaintiff," Torncello v. United States, 231 Ct. Cl. 20, 681 F.2d 756, 770 (1982) (emphasis omitted), rather than legitimate concerns regarding ISN's performance of the contract. The document cited by ISN as evidence of an improper plan to terminate ISN for default provides that:

> [t]he contractor has had all kinds of performance problems from the beginning. We and SPAWAR have tried to work with them as much as possible but now realize that he will probably never perform satisfactorily. We are still in the first lot, made up of three sites. The contractor is at least five months late on delivery/installation completion on all three sites.
>
> Roscoe [Crawford, the contracting officer,] never modified the contract to re-establish deliv. schedule on any of the sites because he could not get a good idea of what a relaistic new deliv. schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo.
>
> The first site (Hampton Rds.) is 80% complete. ISN is having trouble completing it. We have paid over $2 million so far in progress payments towrds all three sites in Lot I, which covers the cost of the equipment. We haven't taken title to any of it yet.

Pl. App. 152. See also Def. Supp. App. 16 (deposition of Roscoe Crawford) (stating that the Government considered terminating for default because ISN was "more than eight months late . . . almost a whole year late in installation and cutoff" and providing that "[i]t was just one problem after another that the company ran into.") Only after the discussion of these alleged

performance problems does the Government consider its options of how to resolve problems with ISN, including the possibility of unilaterally re-establishing a delivery schedule that it was likely that ISN could not meet. The Government, however, planned to first attempt to prepare a new delivery schedule with ISN's input, and viewed these acts as merely "reestablishing [the Government's] rights under the existing contract." Pl. App. 150. Further, there is no evidence that the contracting officer intended to set a generally unreasonable delivery schedule, but rather he has testified that he believed that ISN would not meet any new delivery schedule "[b]ased on their track record for delivering other stuff." Def. Supp. App. 17.

ISN argues that there were no actual performance problems on the contract, but this claim is contradicted by the very documents relied upon by ISN. Throughout ISN's performance, the Government continually expressed its concern to the plaintiff of its ability to perform. On September 28, 1994, the Government noted that "[t]he ISN schedule showed that the installation plan to slip from the contract schedule . . . Current manpower is level is a little below needed level." Pl. App. 6. At the time, it was believed that "this slip should not affect the installation schedule," and ISN represented that these difficulties it would be "back on schedule by beginning of next year" Id. Problems remained, however, and on November 30, 1994, "Ron Zell [of SPAWAR] stated a concern about the ISN management structure and the ability to actually accomplish the task." Pl. App. 26. On March 21, 1995, the contracting officer, Roscoe Crawford, provided ISN with a long list of overdue contract data requirements, and requested that ISN provide him with a plan to "get back on track and in compliance with the original contract." Pl. App. 31-37.

ISN also attempts to rebut the Government's concerns about its progress by noting its subsequent progress at the Hampton Roads, Virginia facility. Pl. Resp. 13. Even assuming the

truth of this allegation, the contract at issue also involved switching centers at Pearl Harbor, Hawaii, and Camp Smith, Hawaii (as well as four options to provide the same system at several other installations around the world). Compare Def. App. 3-8 (contract line items) with Pl. App. 439 (acknowledging that ISN was 95% complete with one contract line item [CLIN 0001AA]). See also Pl. App. 154 ("This is FFP [fix fixed price] services with numerous sites and lots."). The Hampton Roads facility only represented a portion of the contract requirements. Further, having made progress on the contract is not the same thing as having timely performed or having performed to the Government's satisfaction, and ISN presents no evidence of such performance.[4]

Finally, ISN claims that the Government acted in bad faith when the contracting officer failed to participate in the termination settlement process.[5] Pl. Resp. 22-24. At the outset, it is unclear how this would be bad faith, especially if the contracting officer was the alleged source of animus toward ISN.[6] In any event, the contracting officer and the TCO both testified that the TCO possessed the authority to negotiate a settlement with ISN, and it is unclear how the contracting officer's involvement was integral to this process at this stage of the agency's action. Def. Supp. App. 8-9, 13-14, 23. While ISN asserts that the contracting officer did not promptly respond to the TCO's inquires regarding a proposed change to ISN's settlement, the contracting officer testified that he was on travel when the TCO attempted to get his feedback on this matter. Id. at 11. ISN has offered no evidence to rebut this sworn testimony.

---

[4] ISN also cites to an affidavit filed by Roma Malkani. This affidavit, however, has no value, as Ms. Malkani previously testified at her 30(b)(6) deposition that she had almost no knowledge of the contract or ECP at issue in this case. Def. Supp. App. 36-49.

[5] For the purposes of this section, we will assume that the Court has determined that ISN is permitted to raise this new allegation.

[6] ISN has not alleged that the TCO acted in bad faith.

After the TCO sent a termination settlement proposal to ISN, Def. Supp. App. 27, the contracting officer did respond, by informing the TCO that the ECP that ISN sought costs for was never approved. Def. Supp. App. 11-12, 24, 25-26, 28. The contracting officer also informed the TCO that SPAWAR would not be funding any additional settlement. Id. at 28. Accordingly, it is unclear what prejudice ISN suffered by the contracting officer's alleged lack of involvement in the process. Indeed, the Government, not ISN, might have been prejudiced by such acts, had the TCO and ISN agreed to a final settlement without the contracting officer's input.

While ISN can demonstrate that its ECP was not approved, that it was terminated, and that it only received a portion of the amount it sought in the termination settlement process, these acts do not establish bad faith. ISN can produce no evidence of bad faith, and this case stands in stark contrast to those cases in which this Court has held that the Government has acted in bad faith. See, e.g., North Star Alaska Housing Corp. v. United States, 76 Fed. Cl. 158 (2007). Accordingly, the Court should grant the Government's motion for summary judgment upon plaintiff's bad faith claims.

## V. ISN's Motion In Limine Is Premature, And Not Relevant To Its Response To The Government's Motion For Summary Judgment

In its response, ISN appears to have renewed a previously filed motion in limine. While the caption of ISN's response does not reflect the inclusion of this motion, we briefly respond and respectfully request that the Court deny this premature motion at this time, without prejudice. To the extent that the Court denies our current motion for summary judgment and sets a schedule for trial, ISN's motion may be renewed at the appropriate time.

The purpose of a motion in limine is to "prevent a party before trial from encumbering a record with irrelevant, immaterial, or cumulative matters. Such a motion enables a Court to rule in advance on the admissibility of documentary or testimonial evidence, and thus to expedite and render efficient a subsequent trial." Baskett v. United States, 2 Cl. Ct. 356 (1983). "A motion in limine is a recognized method under [RCFC] 16 and Fed. R. Civ. P. 16 for obtaining a pretrial order simplifying issues for trial." White Mountain Apache Tribe v. United States, 10 Cl. Ct. 115, 116 (1986).

This Court previously deferred ruling on ISN's motion in limine because it was premature. It remains premature at this time, however, for several reasons. First, the Court presently has before it the Government's motion for summary judgment. A motion in limine, however, is a pre-trial device. If the motion is successful there will be no need for trial, and the parties have not yet set a schedule for the filing of pre-trial motions and filings. Second, the alleged admissions are not relevant to any of the issues raised in our motion for summary judgment, as they relate more to questions of damages or performance, rather than the issues addressed in our opening brief. Indeed, ISN failed to file any cross-motion for summary judgment in response to our opening brief. Third, even if ISN could demonstrate that the underlying information is relevant to its response to the Government's motion, in order to respond to our motion, ISN need only demonstrate a genuine issue of material fact with regard to the Government's motion, and need not establish that there was some alleged admission.

Indeed, in presenting such information, ISN confuses the question of whether ISN performed work outside of the contract requirements (and the nature and extent of such work) with the separate question of order/fault. As noted in our opening brief, there are two prongs to a "constructive change" claim: a "change" component, which focuses upon whether the work

done by the contractor was outside of the scope of the contract; and an "order/fault" component, which focuses upon whether the Government is responsible for the contractor's additional work. Miller Elevator Co., Inc. v. United States, 30 Fed. Cl. 662, 678 (1994) (citations omitted). Our motion for summary judgment does not focus upon the question of whether or not there has been a "change," which we acknowledge would be a highly contested material fact, but rather has focused upon "order/fault" component. Accordingly, the extent to which ISN can demonstrate that there is a contested issue of material fact with regard to its performance of work outside of the contract requirements is irrelevant to the motion before this Court, especially because ISN did not file a cross-motion for summary judgment on this point.

Further, ISN's motion appears to confuse a judicial admission with evidentiary admission. A judicial admission is a "formal act, done in the course of judicial proceeding, which waives or dispenses with the production of evidence, by conceding for purposes of litigation that the proposition of fact alleged by the opponent is true." International Paper Co. v. United States, 39 Fed. Cl. 478, 482 (1997). Statements not made in pleadings or in response to a request for admissions, however, are ordinary evidentiary admissions that may be controverted or explained by the party. See UMC Electronics Co. v. United States, 43 Fed. Cl. 776, 808 (1999). The claim that a statement is an evidentiary admission is often used to respond to the allegation that certain evidence is hearsay. FRE 801(d)(2).

Indeed, the Government would be able to controvert or explain the statements offered by ISN at trial. For example, ISN first argues that the portions of the December 19, 1996 Defense

Contract Audit Agency's ("DCAA") audit[7] are admissions.[8] DCAA's audit, however, was based primarily upon the ISN contract administration files, not any of the Navy's files, and accordingly was expressly a "qualified" report. Def. App. 107-109. DCAA expressly noted that it lacked possessed no information on several points relating to the amount to be paid ISN. Id. Further, DCAA's role is merely advisory, as Ms. Ellen Erdelsky made clear at her 30(b)(6) depositions:

> Q. Okay, and, in fact, the purpose of these reports is to provide a recommendation to an agency or terminating contract officer; is that correct?
> A. Yes.
> Q. Okay, these audit reports are in no way mandatory.
> A. That's correct, they are advisory to them.
> Q. You're advisory?
> A. And they are the ones that make the decision and they don't always agree with us.
> Q. And a terminating contracting officer isn't limited to the information provided in an audit report in terms of negotiating a settlement with the contractor, is he?
> A. That's true, he is not limited.
> Q. There is other information that he can consider?
> A. Yes.

Def. Supp. App. 33-34.

ISN also asserts that statements made by the TCO are admissions. ISN, however, does not identify which statements it is referring to in its brief. In any event, the TCO was charged with settlement negotiations in connection with the termination and any statement attributed to the TCO must be viewed in that light. Further, as ISN itself alleges, the TCO did not always

---

[7] ISN incorrectly lists the date of this report as December 16, 1996 in its brief. Compare Pl Resp. 30 with Def. App. 106.

[8] While ISN encourages the Court to adopt certain portions of the DCAA audit as admissions, it does not encourage the Court to adopt the report's conclusion that ISN is only entitled to $4,049,532, which is the amount that ISN was paid under the contract. Def. App. 109.

possess all the information known to the contracting officer, and her statements therefore must be viewed in that context.

Accordingly, we respectfully request that the Court deny ISN's motion in limine without prejudice.

## CONCLUSION

For the reasons stated in our motion for summary judgment and this reply, we respectfully request that the Court grant the Government's motion for summary judgment and dismiss Counts II (bad faith), III (constructive change), IV (equitable adjustment) and V (attorney fees) of ISN's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin by Deborah A. Bynum
BRIAN M. SIMKIN
Assistant Director

/s/ Steven M. Mager
STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification United
8th Floor
1100 L Street, NW
Washington, D.C.
Tel: (202) 616-2377
Fax: (202) 305-7643
Steven.mager@usdoj.gov
Attorneys for Defendant

June 12, 2007

**CERTIFICATE OF FILING**

I hereby certify that on this 12th day of June 2007, a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Steven M. Mager
Steven M. Mager
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| INFORMATION SYSTEMS & NETWORKS CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 02-796C (Judge Allegra) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

## SUPPLEMENTAL APPENDIX TO DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

STEVEN M. MAGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification United
8th Floor
1100 L Street, NW
Washington, D.C.
Tel: (202) 616-2377
Fax: (202) 305-7643
Steven.mager@usdoj.gov

June 12, 2007

Attorneys for Defendant

## INDEX TO SUPPLEMENTAL APPENDIX


| EXHIBITS | PAGE(S) |
|---|---|
| Excerpts from Deposition of Roscoe W. Crawford | 1-21 |
| Excerpts from Deposition of Denise Jones | 22-26 |
| Letter from Denise M. Jones to ISN, dated November 13, 1997 | 27 |
| Letter from Roscoe W. Crawford to Denise M. Jones, dated December 1, 1997 | 28 |
| Letter from Denise M. Jones to ISN, dated December 9, 1997 | 29-30 |
| Letter from Denise M. Jones to ISN, dated December 19, 1997 | 31 |
| Excerpts from 30(b)(6) Deposition of Ellen E. Erdelsky | 32-34 |
| Excerpt from 30(b)(6) Deposition of Roma Malkani | 35-49 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------:

INFORMATION SYSTEMS & :
NETWORKS CORPORATION :
Plaintiff :
vs. : Case No. 98-178C
THE UNITED STATES :
Defendant :

------------------------------:

Monday, October 18, 1999
Washington, D.C.

Deposition of

ROSCOE W. CRAWFORD

a witness, was called for examination by counsel for the plaintiff, at the offices of United States Department of Justice, 1100 L Street, N.W., 12th Floor Conference Room, Washington, D.C. 20530, commencing at 10:00 a.m. before Doris L. Gude, Shorthand Court Reporter and Notary Public for the District of Columbia, and were present on behalf of the respective parties:

MGB REPORTING, INC.
9805 Korman Court
Potomac, Maryland 20854
(301) 983-9315

Navy for these contracts?

A. I am a supervisor.

Q. Would it be fair to say that you are the supervisor and everybody else that works on the contract on behalf of the Navy reports to you?

A. For a particular contract, yes.

Q. It's my understanding that for certain contracts that the Navy enters into there are positions called, "contracting officer representatives." Is that correct?

A. Yes, it's a COR.

Q. What is a COR?

A. Well, a COR is responsible for actually monitoring the contractor's performance when we award a contract. Any problems that the contractor encounters in performing that contract will be reported back to me through the COR. In certain instances, the CORs are authorized to give technical direction to the contractor, but the COR is not authorized to make any changes to the terms or

conditions of the contract. That comes through the designated contract specialist and myself as the contracting officer.

Q. Since we are on the subject, how are changes to a contract made? Tell me the process for modifying and/or amending a contract to add services?

A. To add services?

Q. Yes. Or to modify services just in general. We're not talking about any specific contract just in general. How does that work?

A. First of all, someone would have to initiate a request for a change. It could be the end user who determines that something needs to be changed. They might need an extension in the period of performance. It might be a change in the actual statement of work or the specification.

Anyway, they would make the request, and then, I would go out to -- with a letter to the contractor telling the contractor that I intend to modify the contract and specify the

SPAWAR could tell me sometime in September, prior to 1 October, that they intended to exercise that option. I wouldn't receive the money probably until sometime in January. So if I exercised the option, it would have been exercised subject to availability of funds because I wouldn't have had the money.

Q. You don't recall approving the ECP, do you?

A. No, I didn't. It would have been a formal modification to the contract if it had been approved.

Q. What is a formal modification to the contract?

A. It's a written document.

Q. Is there a form document?

A. Yes. It's a standard Form 30.

Q. Was a standard Form 30 drafted for the ECP?

A. No.

Q. Do you know whether any of the work encompassed by the ECP was ever performed by

ISN at Hampton Roads?

A. No.

Q. Are you saying you don't know because you don't personally know or you do personally know that no work was performed by ISN under the terms of the ECP?

A. That I personally know.

Q. So work could have been performed by ISN pursuant to the ECP, but you may not know about it. Is that correct?

A. It's highly unlikely.

Q. That's why I said, "may not know." I didn't say, "Do not know." Is it possible, though, that work was performed by ISN under the ECP and you don't know about that work?

A. No. I would say, no, because my COR would have informed me. My COR was at the site periodically three or four times a month, and I would have been informed if they were working or performing work under the so called ECP.

Q. That COR was Jeff Bergdahl?

A. Yes.

Q. Mr. Bergdahl gave you periodic reports on the work?
A. Yes.
Q. Do you recall any documentation from Jeff Bergdahl saying, "Mr. Crawford, ISN has not performed any ECP work"?
A. No.
Q. How would Mr. Bergdahl inform you that no work was performed by ISN pursuant to the ECP?
A. He would call me on the telephone, and he would confirm it in writing or e-mail me.
Q. He would confirm, e-mail, or in writing the substance of your conversation that you had with him?
A. Yes.
Q. That's regarding the work that was being performed at Hampton Roads. Correct?
A. Correct.
Q. During the conversation, he would have told you whether work was being performed by ISN pursuant to the ECP? Is that correct?

A. He would have, yes.

Q. That would have been reflected in some type of documentation including e-mail to you? Is that correct?

A. It would have been.

Q. Did there come a time when ISN was terminated for convenience?

A. Yes.

MR. AUSTIN: Can we take a break, please?

MR. CRAIG: Sure. Anytime.

(Brief Recess)

BY MR. CRAIG:

Q. Before I get into issue of termination for convenience, I just wanted to clarify something. Is it your understanding that SPAWAR has an annual appropriated budget?

A. Yes.

Q. With that annual budget they fund certain projects during the course of a year. Is that how it works?

A. Yes.

wanted to settle ISN's claims pursuant to the termination for convenience?

A. I really don't know.

Q. Let me ask you this. Did ISN give the Navy a settlement proposal after the termination for convenience was issued?

A. ISN submitted a settlement proposal to DCMC, Defense Contract Management Committee, termination contracting officer.

Q. Why did they submit this settlement proposal to this entity?

A. Because I, as the contracting officer, had delegated authority to the TCO to settle the termination for convenience.

Q. What are the duties of the TCO aside from some authority to settle the termination for convenience?

A. She had sole authority to make an offer, enter into negotiations, and actually come up with a final price if there was one to be paid.

Q. Who was the first TCO assigned to the

ISN termination for convenience?

A. We only had one TCO and that person has been on the case ever since we delegated it to her. I'm bad with names.

Q. Denise Jones?

A. Yes, Denise.

Q. Ms. Jones negotiated with ISN for a settlement?

A. I don't know whether she actually negotiated or whether she just made an offer. I don't know.

Q. Do you recall whether Ms. Jones made an offer of settlement to ISN?

A. Yes, she did.

Q. Do you recall what that offer of settlement was?

A. $891,000 plus.

Q. Let me ask you this. Did you review any documents in preparation for your deposition today?

A. No.

Q. Aside from speaking to your

attorney -- I don't want to know anything about that -- did you speak to anybody else about your deposition today?

A. No.

Q. Do you know when Ms. Jones made this $891,000 offer to ISN?

A. No. I looked at the letter. I don't even recall the date on the letter.

Q. Do you recall what happened after Ms. Jones made the $891,000 offer to ISN?

A. She rescinded the offer.

Q. Do you recall how she rescinded the offer?

A. I believe with a letter.

Q. Did you see the letter before she sent it to ISN?

A. No. I saw a copy of the letter. I think I was cc'd a copy of the letter.

Q. Do you recall when she sent the rescission letter to ISN?

A. No, I don't recall the actual date.

Q. Do you recall the contention of the

rescission letter?
A. That she was basically rescinding the offer, and that was based on new information that I had provided to her.
Q. Had ISN accepted the offer prior to Ms. Jones rescinding the offer?
A. Yes.
Q. After the offer was accepted and before the rescission letter was issued, what, as you put it, new information did you provide Ms. Jones?
A. Ms. Jones had been trying for sometime to have a conversation or a conference with me in regards to the termination and the settlement proposal, but I was on travel and I never really was able to have the conference. When I finally got back to the office and had reviewed all of her correspondence to me, that's when I was able to talk with her about my opinions on the settlement proposal.
Q. What did you tell Ms. Jones?
A. Basically, I told her we had agreed to

pay ISN for work that they didn't accomplish for the two sites in Hawaii, so we paid them the entire amount of Lot I when they didn't perform any services at the two sites in Hawaii.

Q. Was it your understanding that the $891,000 was totally made up of monies that ISN said it was due for work it performed?

A. Yes, that's my understanding.

Q. Do you know whether approximately $400,000 to $450,000 of ISN's $891,000 claim had to do with a profit over the entire contract that the DCCA audit disallowed?

A. I really don't know. I don't recall the details of that audit report.

Q. Do you recall reviewing a September 1997 letter by ISN to Ms. Jones setting forth its reasoning for its claim of $891,000?

A. I would say, yes, but I couldn't tell you the details of that letter.

Q. Sitting here today you can't tell me the details?

A. No.
Q. Also sitting here today you don't know what the $891,000 claim is made up of, do you?
A. I have an idea. If I recall, I think it was basically labor. There were some material costs in there. I can't tell you what the actual dollar figures were for labor and for material costs. I can't give you a break down on that.
Q. You don't know one way or another whether approximately $400,000 to $450,000 of the $891,000 was a profit claimed by ISN?
A. No, I don't. I know there were questioned costs, but I can't recall.
Q. In addition to providing this new information to Ms. Jones, is there anything else you spoke with Ms. Jones about?
A. No, nothing else.
Q. Did you tell her to rescind the agreement that she just entered into with ISN?
A. No, I didn't tell her that.
Q. Ms. Jones had the authority to enter

into the agreement with ISN?

A. She did.

Q. Does Ms. Jones hold a warrant?

A. She would, yes.

Q. Do you know what type of warrant she would hold?

A. I don't know. You mean dollar value?

Q. Approximately.

A. I wouldn't know.

Q. You described the first warrant that you held was up to $3 million. Is that a baseline warrant or are there lower warrants than that?

A. They have lower warrants. You can have them anywhere from $250,000 up to an unlimited dollar amount.

Q. But you have no idea what Ms. Jones' warrant was?

A. I have no idea.

Q. After this conversation with Ms. Jones regarding the new information that you supplied, then what happened with regard to

government enters into a contract with another government entity?

A. Right.

Q. Once you've had a moment to take a look at it, I'll ask you a few questions.

A. (Reviewing.) What's your question?

Q. Have you seen this document before?

A. I probably have. I really can't say, but I remember the contents of it. So it's safe to say that I have seen it before.

(Documentation referred to above was marked as Crawford Exhibit Number 8 for identification, copy of which is attached.)

BY MR. CRAIG:

Q. Do you know who drafted Exhibit 8?

A. No. That's my question. No, I can't say. I think Lisa Scott might have drafted this.

Q. Do you know why you remember the contents of this document?

A. Because at the time we had brought in

the ACO and the ACO was hell-bent on us doing a termination for default as opposed to doing a termination for convenience.

Q. Who was the ACO?

A. Tish Proctor.

Q. Do you know why she wanted --

A. Based on the facts that they were over -- at this particular time they were more than eight months late, but they were almost a whole year late in installation and cutoff. It was just one problem after another that the company ran into.

Q. I want to refer you down to the fifth paragraph that says, "Roscoe wants to reestablish the delivery schedule." Referring you to that paragraph, what does the first sentence mean, "Roscoe wants to reestablish the delivery schedule for all three sites in Lot I, knowing full well ISN won't meet the dates"? What does that mean.

A. Like I told you before, I had been trying, I guess, almost from the time that we

awarded the contract to reestablish the delivery schedules for not only the performance of the work, but for some of the documentation that was required to be submitted under the contract. They came out of the blocks late. They were procedurals that they had to provide within 30 days of contact award, which they never delivered. They were late. They finally delivered them, but they were so late in doing it.

Q. What does the phrase, "knowing full well ISN won't meet the dates," mean?

A. Based on their track record for delivering other stuff, that's what they were referring to there.

Q. Is it fair to say that what this paragraph means is that new dates will be given to ISN. You assume they are going to miss the dates, and then, you'll T for D them after they miss the dates?

A. That's the only way I could effectively do a termination for default and

make it stick.

Q. It says, "The activity prefers to T for C them." What does that mean?

A. What that really means is that there was a lot of forbearance on the government's part. We should have T for D them immediately once we determined that they couldn't perform, but the requiring activity allowed ISN to continue to string them along, and we didn't take any actions to protect the government's interest.

Q. What does the phrase, "the activity," refer to?

A. SPAWAR.

Q. Is it your understanding that SPAWAR preferred to T for C ISN as opposed to T for D ISN. Is that correct?

A. Run that by me again.

Q. Is it your understanding that SPAWAR preferred to T for C ISN as opposed to T for D ISN?

A. Yes, that's correct.

Q. I want to drop you down to where it says, "Roscoe's Action Items," and we're going to look at the fourth paragraph, "When contractor does not meet the delivery dates, Roscoe needs to T for D the contractor. If it turns out there is evidence of fraud by ISN re: the progress payments, this could also contribute to our basis for T for D'ing." Did that provision become inapplicable once the decision was made to T for C ISN?
A. (Reviewing.) No, it didn't become inapplicable.
Q. Did you set forth new delivery dates for ISN after this meeting?
A. No.
Q. There wasn't any new delivery dates to meet on behalf of ISN, was there?
A. No.
Q. So you didn't T for D ISN, did you?
A. No, I didn't.
Q. So nothing in that paragraph happened?
A. Well -- (pause) --

Q. I'm not trying to trick you.
A. I understand you're not trying to trick me. No, nothing in this paragraph did happen. I didn't T for D them.
Q. Let's go down to the next paragraph, "If we T for C, we will only reestablish a delivery date for Hampton Roads, since this is 80% done." What does that sentence mean?
A. Well, they were talking about partial T for C. We were going to T for C the other two sites in Lot I, and we had no intentions of exercising any future lots.
Q. What does the term, "we will only reestablish the delivery date for Hampton Roads," mean?
A. That we were going to T for C the other two sites in Lot I.
Q. I got you. The next sentence, "We will T for C the other two sites in Lot I. Then we will have to negotiate the equitable adjustment." What does the sentence "then we will have to negotiate the equitable

adjustment" mean?

A. Whenever you do for T for C, you have to give the contractor an opportunity to submit you a settlement proposal.

MR. CRAIG: Exhibit Number 9, please.

THE WITNESS: (Reviewing.) What's your question?

BY MR. CRAIG:

Q. Have you seen this document before?

A. Yes, I believe so.

(Documentation referred to above was marked as Crawford Exhibit Number 9 for identification, copy of which is attached.)

BY MR. CRAIG:

Q. Did you see this document on or about December 7, 1995 with regard to the first e-mail, and on or about December 8, 1995 in regard to the top e-mail?

A. Yes.

Q. What does the term, "source selection information-see FAR 3.104," mean?

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

INFORMATION SYSTEMS AND NETWORKS CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

COPY

CASE NO: 98-178C
JUDGE: James T. Turner

**DEPOSITION OF DENISE JONES**

The deposition of **DENISE JONES**, taken at the instance of the Plaintiff, pursuant to stipulations contained herein; the reading and signing of the deposition reserved, before Certified Court Reporter, Allison Garrison, at 10:30 a.m., October 22, 1999, at 1201 West Peachtree Street, Suite 5050, Atlanta, Georgia.

**SOUTHERN PEACH REPORTING SERVICE, LLC**
**Certified Court Reporters**
**383 Wesley Park Drive**
**Jonesboro, Georgia 30238**
**(770) 477-0336**

Q The next sentence says (reading), It is asked of your office to reply to this letter as to whether you agree or disagree.

Why do you ask the PCO to agree or disagree?

A Because I need the information from them as far as what's going on with the contract as well as the funding.

Q If you received a disagreement what would happen?

A I would have to review the information.

Q But you could still make the offer even if the PCO disagreed?

A Based on the information. That would be the determining factor.

Q So it's not what the PCO tells you, it's based upon your independent analysis of all the information that you receive, correct?

A Yes.

Q And that information is information you receive from the contractor, information you receive from the audit, and information you receive from the PCO, correct?

A Yes.

Q And that system we talked about,

Q Do you know why you didn't receive an SF30 in this case?
A No.
Q Did you make any inquiries as to why you didn't receive an SF30?
A I can't recall, but I think there was a final explanation.
Q From who?
A The PCO office.
Q From Mr. Crawford?
A Yes.
Q Do you know what Mr. Crawford told you?
A Basically, the ECP had never been approved.
Q Did he provide you documentation supporting his contention that the ECP had not been approved?
A Yes.
Q Do you know what documentation he provided to you?
A I think his December 11th letter, he had some documentation.
Q Do you know what the documentation was?
A It was several things.
Q Do you recall what the several things

office is what they do.

Q So if Mr. Crawford refused to provide funding for this settlement, then that would be the end of the settlement; is that the way it works?

A Yes.

Q And he can refuse to provide funding for any reason; is that correct?

A Whatever reason he has.

Q Or no reason?

A I don't know.

Q What if he gave you no reason and he just said I'm not going to provide funding, is that enough?

A Then I would have sent it back to -- returned it back to his office.

Q Did you return this back to his office?

A No.

Q Does that mean he gave you a reason for not providing --

A He provided me information, yes.

Q Do you know what information he provided you?

A Repeat that.

Q Do you know what information he

provided to you?

A Yes. He provided letters.

Q And what did those letters say?

A Basically the ECP had never been approved.

Q That's what those letters said?

A Basically.

Q You independently determined that the information contained in those letters was true?

A To the best of my knowledge.

Q Did you assume that the information contained in the letters was true?

A Yes.

Q I may have already asked you this, but I just want to be clear. Did you return authority back to Mr. Crawford's office for completion of the termination?

A I can't recall. There was something that happened, but I can't recall exactly what happened.

(Whereupon, Plaintiff's Exhibit Number 16 was marked for identification)

BY MR. CRAIG (resuming):

Q (Presenting) Ms. Jones, I'm showing you what's been marked as Plaintiff's Exhibit Number

NOV. 13 97 (THU) 15:59 DCMC-GAT TEL:770 590 2081 P. 002

DEFENSE LOGISTICS AGENCY
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

EXHIBIT
Crawford #28
10-8-09

IN REPLY REFER TO: DCMDS- GATC

November 13, 1997

SUBJECT: Terminated Contract N00600-94-C-0389
Docket N961443SA

Mr. Robert M. Cozzie
ISN
10411 Motor City Drive
Bethesda, MD

Dear Mr. Cozzie:

The cost principal in FAR Part 31, the DOD FAR Supplement (DFARS), and the cost or pricing data requirement contained in FAR Part 49 were used in reviewing your proposal.

Contingent upon funding from The Department of the Navy, Fleet and Industrial Supply Center Norfolk, Washington, DC the TCO makes the following offer to ISN for the settlement on subject contract:

| | |
|---|---|
| Actual Costs and Profit | $4,909,211.00 |
| Total Previous Payment to ISN | (4,049,532.00) |
| Settlement Expense | 31,685.00 |
| Net Settlement | 891,364.00 |

Once again this is contingent on funding from the Department of the Navy. If you are in agreement with the settlement please sign at the bottom of this letter and return to this office. If you are not in agreement you have 15 days from the date of this letter to substantiate the cost proposed. If no response is received from your office within 15 days I will in accordance with FAR 49 issue a unilateral determination of the amount due you on the subject termination.

Should you have any questions or desire any further information, please contact the undersigned at (404) 590-6389, FAX (404) 590-2081.

Sincerely,

Denise M. Jones

DENISE M. JONES
Termination Contracting Officer

DEPARTMENT OF THE NAVY
FLEET AND INDUSTRIAL SUPPLY CENTER NORFOLK
DETACHMENT WASHINGTON
WASHINGTON NAVY YARD BLDG 200
901 M STREET SE
WASHINGTON DC 20374-5014

DEC 01 1997
4200
02W1.4A:CS:94C-0389

From: 02W1.4 (Mr. Roscoe Crawford)
To: Defense Contract Management Command, Atlanta
Attn: Ms. Denise M. Jones, Termination Contracting Officer
805 Walker Street
Marietta, GA 30060-2789

Subj: TERMINATED CONTRACT – N00600-94-C-0389 DOCKET N961443SA

Ref: (a) DCMDS-GATC ltr November 18, 1997
(b) DCMDS-GATC ltr November 5, 1997
(c) DCMDS-GATC ltr October 9, 1997

Encl: (1) ISN ltr January 26, 1996
(2) ISN ltr 25 May 1995

1. This office is in agreement with the original DCAA Audit Report No. 6311-97B17100001 and your August 8, 1997 letter determination that the net amount of $0 was due to ISN. ISN has provided your office with volumes of supposed justification for additional compensation based on supposed approval of an ECP. This ECP was not approved and no services/supplies were received as stated by ISN. The ISN request for payment is unwarranted and as a Contracting Officer, not approved by myself.

2. ISN was not issued this ECP because the costs associated with its implementation were exorbitant. ISN letter of January 26, 1996 (Encl. 1) states clearly that the approved ECP had not been received. ISN letter dated 25 May 1995 (Encl. 2) states "ISN will insure all changes are approved by contractually authorized Government Representatives and document." No matter what case ISN is trying to build, it is clear that ISN knew and knows the modification of the contract by myself as the Contracting Officer was the only way the ECP could be added to the contract and the only manner in which contracted reimbursable work could be performed.

3. In summary, additional funding will not be provided. The ECP referred to by ISN was not approved. No further funding is approved.

Roscoe W. Crawford
ROSCOE W. CRAWFORD
Contracting Officer

EXHIBIT
Crawford
#31
10-12-99

# DEFENSE LOGISTICS AGENCY
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

N REPLY
REFER TO: DCMDS-GATC

December 9, 1997

SUBJECT: Settlement on Terminated Contract N00600-94-C0389

Robert Cozzie
ISN
10411 Motor City Dr.
Bethesda, MD 20817

Dear Mr. Cozzie:

Reference DCMC-GATC letter dated November 13, 1997
Reference FAR 49.114 Unsettled Contract Changes

In our referenced letter to your office you were advised that the offer was contingent on funding from The Department of the Navy, Fleet and Industrial Supply Center Norfolk, Washington, DC.

Our office has been advised by FISC that "additional funding will not be provided. The ECP referred to by ISN was not approved. No further funding is approved." FAR 49.114 requires I solicit the opinion of the Contracting Officer on all unadjusted changes. FISC's determination is that no amount is due and no funding will be provided. Accordingly, it is my determination that the Gross Settlement for this termination will be $4,049,532.00. The net amount due ISN is $0. If ISN is not in agreement with this I will, within 15 days, in accordance with FAR 52.249-2, issue a Unilateral Determination. You may also request a final decision be issued by FISC, which is then appealable to the Board of Contract Appeals or the US Claims Court.

EXHIBIT
CRAWford
#33
10-18-99 cg

PENGAD-Bayonne, N. J.



Federal Recycling Program Printed on Recycled Paper

Should you have any question or desire further assistance please contact the undersign at (770)590-6389 or Fax (770)590-2081.

Sincerely

DENISE M. JONES
Termination Contracting Officer

cc:
Roscoe Crawford/Fleet Industrial Supply
DCMC Baltimore.

CERTIFIED LETTER-RETURN RECEIPT REQUESTED

**DEFENSE LOGISTICS AGENCY**
DEFENSE CONTRACT MANAGEMENT COMMAND
ATLANTA
805 WALKER STREET
MARIETTA, GA 30060-2789

N REPLY REFER TO: DCMDS-GATC

December 19, 1997

SUBJECT: Unilateral Determination on Terminated Contract N00600-94-C0389
Docket N961443SA

Robert Cozzie
ISN
10411 Motor City Dr.
Bethesda, MD 20817

Dear Mr. Cozzie:

This letter is to reiterate my position of December 9, 1997. In as much as we are unable to reach a negotiated settlement for the termination cost on the subject termination, I am issuing a Unilateral Determination pursuant to FAR49.107(d). I hereby determine that the amount Due ISN by reason of the Termination for Convenience to be $0, consisting of $4,049,532.00 previously paid for work and services performed . As explained in our letter dated December 9, 1997, and per the attached letter from FISC, FISC has stated that "additional funding will not be provided. The ECP referred to by ISN was not approved. No further funding is approved." FAR 49.114 requires I solicit the opinion of the Contracting Officer on all unadjusted changes. FISC's determination is that no amount is due and no funding will be provided. You may also request a final decision be issued by FISC, which is then appealable to the Board of Contract Appeals or the US Claims Court. If no dispute is filed within twelve (12) months of the date you receive this Unilateral Decision the contract file will be administratively closed.

Should you have any question or desire further assistance please contact the undersign at (770)590-6389 or Fax (770)590-2081.

Sincerely

DENISE M. JONES
Termination Contracting Officer

cc:
Roscoe Crawford/Fleet Industrial Supply
DCMC Baltimore.

EXHIBIT
Crawford
#34
101849 9
PENGAD-Bayonne, N. J.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

INFORMATION SYSTEMS & :

NETWORKS CORPORATION, :

Plaintiff, :

Vs. : Case No.:

THE UNITED STATES, : 1:02-cv-796

Defendant. :

- - - - - - - - - - - - - - - - x

Tuesday, October 31, 2006

Washington, D.C.

30(b)(6) Deposition of:

ELLEN E. ERDELSKY,

the Witness, called for examination by counsel for the Plaintiff, pursuant to notice, commencing at 10:05 a.m., at the offices of U.S. Department of Justice, 1100 L Street, N.W., Washington, D.C., before Curtis R. Cloward, CSR, a Notary Public in and for the District of Columbia when were present on behalf of the respective parties:



aeb02a9a-5aca-45cd-9826-08e05598e644

identified later on in the audit report and my first part was at paragraph 5.

A. Yes, they were both identified. Yes.

Q. And paragraph 7 we have identified?

A. Yes.

Q. So both are identified?

A. Yes, both of them are identified.

Q. Okay.

Finally I wanted to ask you, you said there were no errors in this report. Mr. Singer had asked you the significance of the audit report being qualified.

Now, is it commonplace for DCAA to issue qualified audit reports?

A. It is very common practice.

Q. Okay, and, in fact, the purpose of these reports is to provide a recommendation to an agency or terminating contract officer; is that correct?

A. Yes.

Q. Okay, these audit reports are in no way mandatory.



aeb02a9a-5aca-45cd-9826-08e05598e644

A. That's correct, they are advisory to them.

Q. You're advisory?

A. And they are the ones that make the decision and they don't always agree with us.

Q. And a terminating contracting officer isn't limited to the information provided in an audit report in terms of negotiating a settlement with the contractor, is he?

A. That's true, he is not limited.

Q. There is other information that he can consider?

A. Yes.

Q. And he doesn't have to consider this at all if he chooses not to?

A. Yes. They usually do not choose to ignore it entirely.

Q. All right, but again, they can.

A. Yes.

MR. VOHRA: Okay, I have nothing further.

MR. SINGER: Okay, good.



aeb02a9a-5aca-45cd-9826-08e05598e644

(CERTIFIED TAPE TRANSCRIPT)

DEPOSITION OF

MRS. ROMA MALKANI

CASE NAME: ISN, DJ154-98-178

WEDNESDAY, NOVEMBER 17, 1999
1:35 P.M.
At
Information Systems & Networks Corporation
7th Floor
10411 Motor City Dr.
Bethesda, MD 20817

Attorney for the Defendant:
Mr. Michael D. Austin
U.S. Department of Justice
Commercial Litigation Div.

Attorney for the Plaintiff:
Mr. Norman H. Singer
General Council
Information Systems
Networks Corporation

form.

MR. AUSTIN: I'll restate it.

MRS. MALKANI: Yes.

MR. AUSTIN: The contract that is at issue, earlier you had stated that you were aware of the nature of the lawsuit. Are you familiar with this particular contract?

MR. SINGER: Object to the form.

MR. AUSTIN: Are you familiar with the contract that your company entered into with the Navy on July 15, 1994?

MR. SINGER: Object to the form.

MRS. MALKANI: By familiar do you mean do I know what it was about?

MR. AUSTIN: Correct. Let's start there.

MRS. MALKANI: Not really.

MR. AUSTIN: Not really? So you didn't have any involvement with the contract?

MRS. MALKANI: No.

MR. AUSTIN: Mr. Singer, this is 30B6 deposition and ISN was noticed to put forth an individual knowledgeable about the issues that were

specified in the 30B6 notice. Is there such an individual available?

MR. SINGER: No. We are only obliged to put forth those individuals who are currently employed, who have the knowledge, if those individuals are not employed, then we can't obviously put forth them.

MR. AUSTIN: So there is no one currently involved, currently employed by Information Systems Network that has any knowledge of the contract at issue.

MR. SINGER: Other than Mrs. Malkani whom we have produced, the answer is no.

MR. AUSTIN: Mrs. Malkani, you do have some familiarity with the contract at issue? The one that your company entered into on July 15, 1994 for the procurement of certain technical switching equipment at Hampton Roads, Virginia and two sites in Hawaii, you are familiar with that?

MRS. MALKANI: Yes, to some extent.

MR. AUSTIN: Okay, let's start -- what was your personal involvement with that contract?

MR. SINGER: She testified that she had no

involvement. She just said that she had some familiarity.

MR. AUSTIN: Okay.

MR. SINGER: Not involvement, so --

MR. AUSTIN: When did you first become familiar with the contract?

MR. MALKANI: To the best of my recollection, I have to say I cannot remember exactly when and I also cannot remember if I signed on July 15, 1994 as you have said. But I know we have had this contract within the company. I kind of remember the faces of some people that worked on it and I don't really know much about the work that was done on it, you know the reports that were submitted.

I do know that we achieved a settlement for payment of a certain amount. And that's about all I know.

MR. AUSTIN: Okay, well, let's start with, you understand and correct me if I'm wrong, that when your company proposes a bid, that they use certain rates. Rates for overhead, fringe rates and then profit margins, so you are familiar with those?

MRS. MALKANI: No.

MR. AUSTIN: Okay, go ahead. Continue your explaining.

MRS. MALKANI: First of all the overhead rate gets affected everyday. It's not a -- these are estimated rates before the year begins and at the end of the year, you have your actual rate.

MR. AUSTIN: Right.

MRS. MALKANI: An overhead rate changes every day in any company.

MR. AUSTIN: I understand that. But let's get back to the rates for the labor pool for on-site, meaning at ISN, and off-site meaning at the contract site. Unless I tell you otherwise, we are talking about the contract your company entered into, that's at issue in this case. Okay.

MR. SINGER: Which this witness has no specific recollection of.

MR. AUSTIN: But she has also been put forth as 30B6 witness.

MR. SINGER: Wait a minute, wait a minute. I don't care how and why she has been put forth. We are

not obligated to conjure up testimony. This witness has told you that she has no specific recollection of this contract. And I have represented to you there is nobody in this company currently that has such knowledge. Sorry, that we can't get a witness. We are not obligated to do so. And therefore, this witness can only tell you generically answers to questions but not specifically.

To the extent that you want to take a generic answer, and argue that and applies, you can argue anything you want. But this is a factual deposition and Mrs. Malkani is not going to conjecture, she is not going to give you possibilities. She is going to give you the facts that she knows to the extent she knows them and that is all.

MR. AUSTIN: That's fine. And that is what I'm trying to do.

MR. SINGER: No, you're not.

MR. AUSTIN: And I testing the extent of her --

MR. SINGER: No, you are not. Then why don't

you ask her questions about her knowledge about the specific contract so we can get on with this.

MR. AUSTIN: I think I was doing that.

MR. SINGER: No, I don't think you were.

MR. AUSTIN: I think I was. And I think I -- you know, we can read it back what I said --

MR. SINGER: Okay, go ahead.

MR. AUSTIN: -- I said otherwise directed, this is -- we are talking about the contract at issue.

MR. SINGER: But that's my point. She can't talk about the contract at issue. We are not going to have that stipulation. Her question -- her answers are going to be your specific question and that is all. We are not agreeing to any thing else.

MR. AUSTIN: That's fine.

MR. SINGER: You just ask the questions and we'll try to answer.

MR. AUSTIN: And I think I have an obligation to find out the limits --

MR. SINGER: Go ahead and ask your questions. We are here to answer them.

MR. AUSTIN: Thank you.

MRS. MALKANI: I don't remember anything in the letter or in the offer.

MR. AUSTIN: Prior to your signing that document did you have any involvement with the preparation or the negotiations to that?

MRS. MALKANI: No.

MR. AUSTIN: Do you have any familiarity at all?

MRS. MALKANI: I just knew something was going on, but I didn't know what.

(Exhibit No. 3 was marked for identification.)

MR. AUSTIN: Let's show you what's been marked as Exhibit 3, (Exhibit No. 3, previously marked for identification, was received in evidence). Now, Exhibit 3, the cover letter --

MRS. MALKANI: Yes.

MR. SINGER: Have you read it? Take your time.

MRS. MALKANI: Yes.

MR. AUSTIN: Now, Exhibit 3, the subject is the "Settlement Proposal Termination," and it is dated

June 6, 1996, is that correct?

MRS. MALKANI: Yes.

MR. AUSTIN: And your signature is on the cover, is that correct?

MRS. MALKANI: Yes.

MR. AUSTIN: And did you prepare this letter?

MRS. MALKANI: No.

MR. AUSTIN: And do you know who did?

MRS. MALKANI: No.

MR. AUSTIN: So, even though you signed it, you have no knowledge of what is contained in the letter?

MRS. MALKANI: That's right.

MR. AUSTIN: Or the proposal?

MRS. MALKANI: That's right.

MR. AUSTIN: So, when it says, "Our proposal is based on a total cost basis," you don't know if that's correct or not?

MRS. MALKANI: Right.

MR. AUSTIN: And you have no -- okay, so terms of the proposal, let's flip to the first of the Settlement Proposal. And you see down near the bottom

where it says, "ISN believes that it is entitled to the amount of $891,364 because it performed additional work as required and directed by the Government." Now, are you aware of what additional work was required and directed by the Government?

MRS. MALKANI: No.

MR. AUSTIN: And so you are not -- the next sentence where it says, "The work describe in ISN's September 5, 1997 letter was performed pursuant to the ECP requested by the Government, and constitutes a constructive change to the contract." You have no knowledge of what is being talked about?

MRS. MALKANI: No.

MR. AUSTIN: And so you don't know if the ECP, ECP meaning Engineering Change Proposal was ever approved by the Government?

MRS. MALKANI: I don't know.

MR. AUSTIN: Now, as president of the company and you have extensive experience with Federal contract, do you know how an Engineering Change Proposal is approved?

MR. SINGER: Object to the form. Approved by

MRS. MALKANI: I was just generally speaking, saying the many ways. And if you want me to continue on a generally speaking manner, I can answer that too. How does the COTR has the authority is that the question?

MR. AUSTIN: Yes.

MRS. MALKANI: The COTR has the authority if the CO has given him the authority. Now, it is up to the COTR how he dispenses with the authority and that too is done in many ways.

MR. AUSTIN: Now, in this particular contract at issue that we are talking about, you don't know if the contracting officer gave the COTR, the Contracting Officer Technical Representative the authority?

MRS. MALKANI: Negative.

MR. AUSTIN: And we don't know if there was every an amendment approving the Engineering Change Proposal.

MRS. MALKANI: That I don't know.

MR. AUSTIN: And you don't know if the contracting officer ever gave the go ahead to approve that?

MRS. MALKANI: I don't have the details on what happened on this contract.

MR. AUSTIN: Were you ever briefed on the contract as it was ongoing?

MRS. MALKANI: I just remember things to the extent that there was no risk in what they were doing. We would get paid and when it finished we were in fact told the invoices would be approved and paid in a few weeks. And then for some reason it didn't get paid which I don't know and then later on there was a settlement. Even that was supposed to be paid in a few weeks. Again, that didn't get paid which I don't know why. So it has got a lot of "I don't knows in it."

MR. AUSTIN: Who told you that the invoices would get paid in a few weeks?

MRS. MALKANI: This was when we got terminated or it was a "stop work" or something. They assured us continuously all the payments would be made.

MR. AUSTIN: Who assured you? Do you know?

MRS. MALKANI: I think the -- if I remember

MRS. MALKANI: I think so, yeah.

MR. AUSTIN: So he could have told you that there is no risk?

MR. SINGER: Object to the form.

MRS. MALKANI: I don't know who told me. He could have told me. Sure, he could be one of the ones. But I didn't get it from one person. I got it from quite a few.

MR. AUSTIN: Since you brought it up, let's talk a little bit about the termination. What was your involvement at the termination?

MRS. MALKANI: All that I know is that when there was a "stop work" I was informed that there is a "stop work" and that was my involvement; to just get the news. I wasn't involved with the Navy or other.

MR. AUSTIN: And what did you do at that point?

MRS. MALKANI: There is nothing I can do.

MR. AUSTIN: So where you aware that there was an issue regarding inventory?

MRS. MALKANI: No, I don't know anything about that.

MR. AUSTIN: And so, and do you know, were you aware that the Navy took if you will, reacquired if you will, property that was on ISN's property?

MR. SINGER: Object to the form.

MRS. MALKANI: Oh, I didn't know that at all.

MR. AUSTIN: And were you -- so you don't know, and you are not aware that your company prepared an inventory of the equipment that the Navy ceased?

MRS. MALKANI: No, I don't know.

MR. AUSTIN: You are not aware that the Navy performed an inventory of the equipment that was taken?

MRS. MALKANI: No.

MR. AUSTIN: And you are not aware that your company was given an opportunity to participate or to view that inventory?

MRS. MALKANI: To participate in performing the inventory?

MR. AUSTIN: Correct.

MRS. MALKANI: I have no knowledge about that.

MR. AUSTIN: Would you have known that if the Navy had given your company an opportunity to participate in the inventory, would you have been aware of that?

MR. SINGER: Object to the form.

MRS. MALKANI: No. Sorry.

MR. SINGER: Go ahead.

MRS. MALKANI: No.

(Exhibit No. 8 was marked for identification.)

MR. AUSTIN: Mrs. Malkani, were you aware that DCAA meaning the Defense Contracting Audit Agency, conducted two audits of this particular contract?

MRS. MALKANI: No.

MR. AUSTIN: You are not aware of that

MRS. MALKANI: No.

MR. AUSTIN: Shown what's been marked as Exhibit 8, (Exhibit No. 8, previously marked for identification, was received in evidence.) Exhibit 8 is a contract -- I mean an audit that the DCAA conducted of progress payments of number 3, 4, and 5.