IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------:
INFORMATION SYSTEMS & :
NETWORKS CORPORATION :
Plaintiff :
vs. : Case No. 98-178C
THE UNITED STATES :
Defendant :
----------------------------:

Monday, October 18, 1999
Washington, D.C.

Deposition of

ROSCOE W. CRAWFORD

a witness, was called for examination by counsel for the plaintiff, at the offices of United States Department of Justice, 1100 L Street, N.W., 12th Floor Conference Room, Washington, D.C. 20530, commencing at 10:00 a.m. before Doris L. Gude, Shorthand Court Reporter and Notary Public for the District of Columbia, and were present on behalf of the respective parties:

MGB REPORTING, INC.
9805 Korman Court
Potomac, Maryland 20854
(301) 983-9315

Navy for these contracts?

A. I am a supervisor.

Q. Would it be fair to say that you are the supervisor and everybody else that works on the contract on behalf of the Navy reports to you?

A. For a particular contract, yes.

Q. It's my understanding that for certain contracts that the Navy enters into there are positions called, "contracting officer representatives." Is that correct?

A. Yes, it's a COR.

Q. What is a COR?

A. Well, a COR is responsible for actually monitoring the contractor's performance when we award a contract. Any problems that the contractor encounters in performing that contract will be reported back to me through the COR. In certain instances, the CORs are authorized to give technical direction to the contractor, but the COR is not authorized to make any changes to the terms or

conditions of the contract. That comes through the designated contract specialist and myself as the contracting officer.

Q. Since we are on the subject, how are changes to a contract made? Tell me the process for modifying and/or amending a contract to add services?

A. To add services?

Q. Yes. Or to modify services just in general. We're not talking about any specific contract just in general. How does that work?

A. First of all, someone would have to initiate a request for a change. It could be the end user who determines that something needs to be changed. They might need an extension in the period of performance. It might be a change in the actual statement of work or the specification.

Anyway, they would make the request, and then, I would go out to -- with a letter to the contractor telling the contractor that I intend to modify the contract and specify the

SPAWAR could tell me sometime in September, prior to 1 October, that they intended to exercise that option. I wouldn't receive the money probably until sometime in January. So if I exercised the option, it would have been exercised subject to availability of funds because I wouldn't have had the money.

Q. You don't recall approving the ECP, do you?

A. No, I didn't. It would have been a formal modification to the contract if it had been approved.

Q. What is a formal modification to the contract?

A. It's a written document.

Q. Is there a form document?

A. Yes. It's a standard Form 30.

Q. Was a standard Form 30 drafted for the ECP?

A. No.

Q. Do you know whether any of the work encompassed by the ECP was ever performed by

ISN at Hampton Roads?

A. No.

Q. Are you saying you don't know because you don't personally know or you do personally know that no work was performed by ISN under the terms of the ECP?

A. That I personally know.

Q. So work could have been performed by ISN pursuant to the ECP, but you may not know about it. Is that correct?

A. It's highly unlikely.

Q. That's why I said, "may not know." I didn't say, "Do not know." Is it possible, though, that work was performed by ISN under the ECP and you don't know about that work?

A. No. I would say, no, because my COR would have informed me. My COR was at the site periodically three or four times a month, and I would have been informed if they were working or performing work under the so called ECP.

Q. That COR was Jeff Bergdahl?

A. Yes.

Q. Mr. Bergdahl gave you periodic reports on the work?
A. Yes.
Q. Do you recall any documentation from Jeff Bergdahl saying, "Mr. Crawford, ISN has not performed any ECP work"?
A. No.
Q. How would Mr. Bergdahl inform you that no work was performed by ISN pursuant to the ECP?
A. He would call me on the telephone, and he would confirm it in writing or e-mail me.
Q. He would confirm, e-mail, or in writing the substance of your conversation that you had with him?
A. Yes.
Q. That's regarding the work that was being performed at Hampton Roads. Correct?
A. Correct.
Q. During the conversation, he would have told you whether work was being performed by ISN pursuant to the ECP? Is that correct?

A. He would have, yes.

Q. That would have been reflected in some type of documentation including e-mail to you? Is that correct?

A. It would have been.

Q. Did there come a time when ISN was terminated for convenience?

A. Yes.

MR. AUSTIN: Can we take a break, please?

MR. CRAIG: Sure. Anytime.

(Brief Recess)

BY MR. CRAIG:

Q. Before I get into issue of termination for convenience, I just wanted to clarify something. Is it your understanding that SPAWAR has an annual appropriated budget?

A. Yes.

Q. With that annual budget they fund certain projects during the course of a year. Is that how it works?

A. Yes.

wanted to settle ISN's claims pursuant to the termination for convenience?

A. I really don't know.

Q. Let me ask you this. Did ISN give the Navy a settlement proposal after the termination for convenience was issued?

A. ISN submitted a settlement proposal to DCMC, Defense Contract Management Committee, termination contracting officer.

Q. Why did they submit this settlement proposal to this entity?

A. Because I, as the contracting officer, had delegated authority to the TCO to settle the termination for convenience.

Q. What are the duties of the TCO aside from some authority to settle the termination for convenience?

A. She had sole authority to make an offer, enter into negotiations, and actually come up with a final price if there was one to be paid.

Q. Who was the first TCO assigned to the

ISN termination for convenience?

A. We only had one TCO and that person has been on the case ever since we delegated it to her. I'm bad with names.

Q. Denise Jones?

A. Yes, Denise.

Q. Ms. Jones negotiated with ISN for a settlement?

A. I don't know whether she actually negotiated or whether she just made an offer. I don't know.

Q. Do you recall whether Ms. Jones made an offer of settlement to ISN?

A. Yes, she did.

Q. Do you recall what that offer of settlement was?

A. $891,000 plus.

Q. Let me ask you this. Did you review any documents in preparation for your deposition today?

A. No.

Q. Aside from speaking to your

attorney -- I don't want to know anything about that -- did you speak to anybody else about your deposition today?

A. No.

Q. Do you know when Ms. Jones made this $891,000 offer to ISN?

A. No. I looked at the letter. I don't even recall the date on the letter.

Q. Do you recall what happened after Ms. Jones made the $891,000 offer to ISN?

A. She rescinded the offer.

Q. Do you recall how she rescinded the offer?

A. I believe with a letter.

Q. Did you see the letter before she sent it to ISN?

A. No. I saw a copy of the letter. I think I was cc'd a copy of the letter.

Q. Do you recall when she sent the rescission letter to ISN?

A. No, I don't recall the actual date.

Q. Do you recall the contention of the

rescission letter?

A. That she was basically rescinding the offer, and that was based on new information that I had provided to her.

Q. Had ISN accepted the offer prior to Ms. Jones rescinding the offer?

A. Yes.

Q. After the offer was accepted and before the rescission letter was issued, what, as you put it, new information did you provide Ms. Jones?

A. Ms. Jones had been trying for sometime to have a conversation or a conference with me in regards to the termination and the settlement proposal, but I was on travel and I never really was able to have the conference. When I finally got back to the office and had reviewed all of her correspondence to me, that's when I was able to talk with her about my opinions on the settlement proposal.

Q. What did you tell Ms. Jones?

A. Basically, I told her we had agreed to

pay ISN for work that they didn't accomplish for the two sites in Hawaii, so we paid them the entire amount of Lot I when they didn't perform any services at the two sites in Hawaii.

Q. Was it your understanding that the $891,000 was totally made up of monies that ISN said it was due for work it performed?

A. Yes, that's my understanding.

Q. Do you know whether approximately $400,000 to $450,000 of ISN's $891,000 claim had to do with a profit over the entire contract that the DCCA audit disallowed?

A. I really don't know. I don't recall the details of that audit report.

Q. Do you recall reviewing a September 1997 letter by ISN to Ms. Jones setting forth its reasoning for its claim of $891,000?

A. I would say, yes, but I couldn't tell you the details of that letter.

Q. Sitting here today you can't tell me the details?

A. No.

Q. Also sitting here today you don't know what the $891,000 claim is made up of, do you?

A. I have an idea. If I recall, I think it was basically labor. There were some material costs in there. I can't tell you what the actual dollar figures were for labor and for material costs. I can't give you a break down on that.

Q. You don't know one way or another whether approximately $400,000 to $450,000 of the $891,000 was a profit claimed by ISN?

A. No, I don't. I know there were questioned costs, but I can't recall.

Q. In addition to providing this new information to Ms. Jones, is there anything else you spoke with Ms. Jones about?

A. No, nothing else.

Q. Did you tell her to rescind the agreement that she just entered into with ISN?

A. No, I didn't tell her that.

Q. Ms. Jones had the authority to enter

into the agreement with ISN?

A. She did.

Q. Does Ms. Jones hold a warrant?

A. She would, yes.

Q. Do you know what type of warrant she would hold?

A. I don't know. You mean dollar value?

Q. Approximately.

A. I wouldn't know.

Q. You described the first warrant that you held was up to $3 million. Is that a baseline warrant or are there lower warrants than that?

A. They have lower warrants. You can have them anywhere from $250,000 up to an unlimited dollar amount.

Q. But you have no idea what Ms. Jones' warrant was?

A. I have no idea.

Q. After this conversation with Ms. Jones regarding the new information that you supplied, then what happened with regard to

government enters into a contract with another government entity?

A. Right.

Q. Once you've had a moment to take a look at it, I'll ask you a few questions.

A. (Reviewing.) What's your question?

Q. Have you seen this document before?

A. I probably have. I really can't say, but I remember the contents of it. So it's safe to say that I have seen it before.

(Documentation referred to above was marked as Crawford Exhibit Number 8 for identification, copy of which is attached.)

BY MR. CRAIG:

Q. Do you know who drafted Exhibit 8?

A. No. That's my question. No, I can't say. I think Lisa Scott might have drafted this.

Q. Do you know why you remember the contents of this document?

A. Because at the time we had brought in

the ACO and the ACO was hell-bent on us doing a termination for default as opposed to doing a termination for convenience.

Q. Who was the ACO?

A. Tish Proctor.

Q. Do you know why she wanted --

A. Based on the facts that they were over -- at this particular time they were more than eight months late, but they were almost a whole year late in installation and cutoff. It was just one problem after another that the company ran into.

Q. I want to refer you down to the fifth paragraph that says, "Roscoe wants to reestablish the delivery schedule." Referring you to that paragraph, what does the first sentence mean, "Roscoe wants to reestablish the delivery schedule for all three sites in Lot I, knowing full well ISN won't meet the dates"? What does that mean.

A. Like I told you before, I had been trying, I guess, almost from the time that we

awarded the contract to reestablish the delivery schedules for not only the performance of the work, but for some of the documentation that was required to be submitted under the contract. They came out of the blocks late. They were procedurals that they had to provide within 30 days of contact award, which they never delivered. They were late. They finally delivered them, but they were so late in doing it.

Q. What does the phrase, "knowing full well ISN won't meet the dates," mean?

A. Based on their track record for delivering other stuff, that's what they were referring to there.

Q. Is it fair to say that what this paragraph means is that new dates will be given to ISN. You assume they are going to miss the dates, and then, you'll T for D them after they miss the dates?

A. That's the only way I could effectively do a termination for default and

make it stick.

Q. It says, "The activity prefers to T for C them." What does that mean?

A. What that really means is that there was a lot of forbearance on the government's part. We should have T for D them immediately once we determined that they couldn't perform, but the requiring activity allowed ISN to continue to string them along, and we didn't take any actions to protect the government's interest.

Q. What does the phrase, "the activity," refer to?

A. SPAWAR.

Q. Is it your understanding that SPAWAR preferred to T for C ISN as opposed to T for D ISN. Is that correct?

A. Run that by me again.

Q. Is it your understanding that SPAWAR preferred to T for C ISN as opposed to T for D ISN?

A. Yes, that's correct.

Q. I want to drop you down to where it says, "Roscoe's Action Items," and we're going to look at the fourth paragraph, "When contractor does not meet the delivery dates, Roscoe needs to T for D the contractor. If it turns out there is evidence of fraud by ISN re: the progress payments, this could also contribute to our basis for T for D'ing." Did that provision become inapplicable once the decision was made to T for C ISN?

A. (Reviewing.) No, it didn't become inapplicable.

Q. Did you set forth new delivery dates for ISN after this meeting?

A. No.

Q. There wasn't any new delivery dates to meet on behalf of ISN, was there?

A. No.

Q. So you didn't T for D ISN, did you?

A. No, I didn't.

Q. So nothing in that paragraph happened?

A. Well -- (pause) --

Q. I'm not trying to trick you.
A. I understand you're not trying to trick me. No, nothing in this paragraph did happen. I didn't T for D them.
Q. Let's go down to the next paragraph, "If we T for C, we will only reestablish a delivery date for Hampton Roads, since this is 80% done." What does that sentence mean?
A. Well, they were talking about partial T for C. We were going to T for C the other two sites in Lot I, and we had no intentions of exercising any future lots.
Q. What does the term, "we will only reestablish the delivery date for Hampton Roads," mean?
A. That we were going to T for C the other two sites in Lot I.
Q. I got you. The next sentence, "We will T for C the other two sites in Lot I. Then we will have to negotiate the equitable adjustment." What does the sentence "then we will have to negotiate the equitable

adjustment" mean?

A. Whenever you do for T for C, you have to give the contractor an opportunity to submit you a settlement proposal.

MR. CRAIG: Exhibit Number 9, please.

THE WITNESS: (Reviewing.) What's your question?

BY MR. CRAIG:

Q. Have you seen this document before?

A. Yes, I believe so.

(Documentation referred to above was marked as Crawford Exhibit Number 9 for identification, copy of which is attached.)

BY MR. CRAIG:

Q. Did you see this document on or about December 7, 1995 with regard to the first e-mail, and on or about December 8, 1995 in regard to the top e-mail?

A. Yes.

Q. What does the term, "source selection information-see FAR 3.104," mean?