(CERTIFIED TAPE TRANSCRIPT)

DEPOSITION OF

MRS. ROMA MALKANI

CASE NAME: ISN, DJ154-98-178

WEDNESDAY, NOVEMBER 17, 1999
1:35 P.M.
At
Information Systems & Networks Corporation
7th Floor
10411 Motor City Dr.
Bethesda, MD 20817

Attorney for the Defendant:
Mr. Michael D. Austin
U.S. Department of Justice
Commercial Litigation Div.

Attorney for the Plaintiff:
Mr. Norman H. Singer
General Council
Information Systems
Networks Corporation

form.

MR. AUSTIN: I'll restate it.

MRS. MALKANI: Yes.

MR. AUSTIN: The contract that is at issue, earlier you had stated that you were aware of the nature of the lawsuit. Are you familiar with this particular contract?

MR. SINGER: Object to the form.

MR. AUSTIN: Are you familiar with the contract that your company entered into with the Navy on July 15, 1994?

MR. SINGER: Object to the form.

MRS. MALKANI: By familiar do you mean do I know what it was about?

MR. AUSTIN: Correct. Let's start there.

MRS. MALKANI: Not really.

MR. AUSTIN: Not really? So you didn't have any involvement with the contract?

MRS. MALKANI: No.

MR. AUSTIN: Mr. Singer, this is 30B6 deposition and ISN was noticed to put forth an individual knowledgeable about the issues that were

specified in the 30B6 notice. Is there such an individual available?

MR. SINGER: No. We are only obliged to put forth those individuals who are currently employed, who have the knowledge, if those individuals are not employed, then we can't obviously put forth them.

MR. AUSTIN: So there is no one currently involved, currently employed by Information Systems Network that has any knowledge of the contract at issue.

MR. SINGER: Other than Mrs. Malkani whom we have produced, the answer is no.

MR. AUSTIN: Mrs. Malkani, you do have some familiarity with the contract at issue? The one that your company entered into on July 15, 1994 for the procurement of certain technical switching equipment at Hampton Roads, Virginia and two sites in Hawaii, you are familiar with that?

MRS. MALKANI: Yes, to some extent.

MR. AUSTIN: Okay, let's start -- what was your personal involvement with that contract?

MR. SINGER: She testified that she had no

involvement. She just said that she had some familiarity.

MR. AUSTIN: Okay.

MR. SINGER: Not involvement, so --

MR. AUSTIN: When did you first become familiar with the contract?

MR. MALKANI: To the best of my recollection, I have to say I cannot remember exactly when and I also cannot remember if I signed on July 15, 1994 as you have said. But I know we have had this contract within the company. I kind of remember the faces of some people that worked on it and I don't really know much about the work that was done on it, you know the reports that were submitted.

I do know that we achieved a settlement for payment of a certain amount. And that's about all I know.

MR. AUSTIN: Okay, well, let's start with, you understand and correct me if I'm wrong, that when your company proposes a bid, that they use certain rates. Rates for overhead, fringe rates and then profit margins, so you are familiar with those?

MRS. MALKANI: No.

MR. AUSTIN: Okay, go ahead. Continue your explaining.

MRS. MALKANI: First of all the overhead rate gets affected everyday. It's not a -- these are estimated rates before the year begins and at the end of the year, you have your actual rate.

MR. AUSTIN: Right.

MRS. MALKANI: An overhead rate changes every day in any company.

MR. AUSTIN: I understand that. But let's get back to the rates for the labor pool for on-site, meaning at ISN, and off-site meaning at the contract site. Unless I tell you otherwise, we are talking about the contract your company entered into, that's at issue in this case. Okay.

MR. SINGER: Which this witness has no specific recollection of.

MR. AUSTIN: But she has also been put forth as 30B6 witness.

MR. SINGER: Wait a minute, wait a minute. I don't care how and why she has been put forth. We are

not obligated to conjure up testimony. This witness has told you that she has no specific recollection of this contract. And I have represented to you there is nobody in this company currently that has such knowledge. Sorry, that we can't get a witness. We are not obligated to do so. And therefore, this witness can only tell you generically answers to questions but not specifically.

To the extent that you want to take a generic answer, and argue that and applies, you can argue anything you want. But this is a factual deposition and Mrs. Malkani is not going to conjecture, she is not going to give you possibilities. She is going to give you the facts that she knows to the extent she knows them and that is all.

MR. AUSTIN: That's fine. And that is what I'm trying to do.

MR. SINGER: No, you're not.

MR. AUSTIN: And I testing the extent of her --

MR. SINGER: No, you are not. Then why don't

you ask her questions about her knowledge about the specific contract so we can get on with this.

MR. AUSTIN: I think I was doing that.

MR. SINGER: No, I don't think you were.

MR. AUSTIN: I think I was. And I think I -- you know, we can read it back what I said --

MR. SINGER: Okay, go ahead.

MR. AUSTIN: -- I said otherwise directed, this is -- we are talking about the contract at issue.

MR. SINGER: But that's my point. She can't talk about the contract at issue. We are not going to have that stipulation. Her question -- her answers are going to be your specific question and that is all. We are not agreeing to any thing else.

MR. AUSTIN: That's fine.

MR. SINGER: You just ask the questions and we'll try to answer.

MR. AUSTIN: And I think I have an obligation to find out the limits --

MR. SINGER: Go ahead and ask your questions. We are here to answer them.

MR. AUSTIN: Thank you.

MRS. MALKANI: I don't remember anything in the letter or in the offer.

MR. AUSTIN: Prior to your signing that document did you have any involvement with the preparation or the negotiations to that?

MRS. MALKANI: No.

MR. AUSTIN: Do you have any familiarity at all?

MRS. MALKANI: I just knew something was going on, but I didn't know what.

(Exhibit No. 3 was marked for identification.)

MR. AUSTIN: Let's show you what's been marked as Exhibit 3, (Exhibit No. 3, previously marked for identification, was received in evidence). Now, Exhibit 3, the cover letter --

MRS. MALKANI: Yes.

MR. SINGER: Have you read it? Take your time.

MRS. MALKANI: Yes.

MR. AUSTIN: Now, Exhibit 3, the subject is the "Settlement Proposal Termination," and it is dated

June 6, 1996, is that correct?

MRS. MALKANI: Yes.

MR. AUSTIN: And your signature is on the cover, is that correct?

MRS. MALKANI: Yes.

MR. AUSTIN: And did you prepare this letter?

MRS. MALKANI: No.

MR. AUSTIN: And do you know who did?

MRS. MALKANI: No.

MR. AUSTIN: So, even though you signed it, you have no knowledge of what is contained in the letter?

MRS. MALKANI: That's right.

MR. AUSTIN: Or the proposal?

MRS. MALKANI: That's right.

MR. AUSTIN: So, when it says, "Our proposal is based on a total cost basis," you don't know if that's correct or not?

MRS. MALKANI: Right.

MR. AUSTIN: And you have no -- okay, so terms of the proposal, let's flip to the first of the Settlement Proposal. And you see down near the bottom

where it says, "ISN believes that it is entitled to the amount of $891,364 because it performed additional work as required and directed by the Government." Now, are you aware of what additional work was required and directed by the Government?

MRS. MALKANI: No.

MR. AUSTIN: And so you are not -- the next sentence where it says, "The work describe in ISN's September 5, 1997 letter was performed pursuant to the ECP requested by the Government, and constitutes a constructive change to the contract." You have no knowledge of what is being talked about?

MRS. MALKANI: No.

MR. AUSTIN: And so you don't know if the ECP, ECP meaning Engineering Change Proposal was ever approved by the Government?

MRS. MALKANI: I don't know.

MR. AUSTIN: Now, as president of the company and you have extensive experience with Federal contract, do you know how an Engineering Change Proposal is approved?

MR. SINGER: Object to the form. Approved by

MRS. MALKANI: I was just generally speaking, saying the many ways. And if you want me to continue on a generally speaking manner, I can answer that too. How does the COTR has the authority is that the question?

MR. AUSTIN: Yes.

MRS. MALKANI: The COTR has the authority if the CO has given him the authority. Now, it is up to the COTR how he dispenses with the authority and that too is done in many ways.

MR. AUSTIN: Now, in this particular contract at issue that we are talking about, you don't know if the contracting officer gave the COTR, the Contracting Officer Technical Representative the authority?

MRS. MALKANI: Negative.

MR. AUSTIN: And we don't know if there was every an amendment approving the Engineering Change Proposal.

MRS. MALKANI: That I don't know.

MR. AUSTIN: And you don't know if the contracting officer ever gave the go ahead to approve that?

MRS. MALKANI: I don't have the details on what happened on this contract.

MR. AUSTIN: Were you ever briefed on the contract as it was ongoing?

MRS. MALKANI: I just remember things to the extent that there was no risk in what they were doing. We would get paid and when it finished we were in fact told the invoices would be approved and paid in a few weeks. And then for some reason it didn't get paid which I don't know and then later on there was a settlement. Even that was supposed to be paid in a few weeks. Again, that didn't get paid which I don't know why. So it has got a lot of "I don't knows in it."

MR. AUSTIN: Who told you that the invoices would get paid in a few weeks?

MRS. MALKANI: This was when we got terminated or it was a "stop work" or something. They assured us continuously all the payments would be made.

MR. AUSTIN: Who assured you? Do you know?

MRS. MALKANI: I think the -- if I remember

MRS. MALKANI: I think so, yeah.

MR. AUSTIN: So he could have told you that there is no risk?

MR. SINGER: Object to the form.

MRS. MALKANI: I don't know who told me. He could have told me. Sure, he could be one of the ones. But I didn't get it from one person. I got it from quite a few.

MR. AUSTIN: Since you brought it up, let's talk a little bit about the termination. What was your involvement at the termination?

MRS. MALKANI: All that I know is that when there was a "stop work" I was informed that there is a "stop work" and that was my involvement; to just get the news. I wasn't involved with the Navy or other.

MR. AUSTIN: And what did you do at that point?

MRS. MALKANI: There is nothing I can do.

MR. AUSTIN: So where you aware that there was an issue regarding inventory?

MRS. MALKANI: No, I don't know anything about that.

MR. AUSTIN: And so, and do you know, were you aware that the Navy took if you will, reacquired if you will, property that was on ISN's property?

MR. SINGER: Object to the form.

MRS. MALKANI: Oh, I didn't know that at all.

MR. AUSTIN: And were you -- so you don't know, and you are not aware that your company prepared an inventory of the equipment that the Navy ceased?

MRS. MALKANI: No, I don't know.

MR. AUSTIN: You are not aware that the Navy performed an inventory of the equipment that was taken?

MRS. MALKANI: No.

MR. AUSTIN: And you are not aware that your company was given an opportunity to participate or to view that inventory?

MRS. MALKANI: To participate in performing the inventory?

MR. AUSTIN: Correct.

MRS. MALKANI: I have no knowledge about that.

MR. AUSTIN: Would you have known that if the Navy had given your company an opportunity to participate in the inventory, would you have been aware of that?

MR. SINGER: Object to the form.

MRS. MALKANI: No. Sorry.

MR. SINGER: Go ahead.

MRS. MALKANI: No.

(Exhibit No. 8 was marked for identification.)

MR. AUSTIN: Mrs. Malkani, were you aware that DCAA meaning the Defense Contracting Audit Agency, conducted two audits of this particular contract?

MRS. MALKANI: No.

MR. AUSTIN: You are not aware of that

MRS. MALKANI: No.

MR. AUSTIN: Shown what's been marked as Exhibit 8, (Exhibit No. 8, previously marked for identification, was received in evidence.) Exhibit 8 is a contract -- I mean an audit that the DCAA conducted of progress payments of number 3, 4, and 5.