# In The United States Court of Federal Claims

No. 02-796C

(Filed: May 6, 2008)

---

| | |
|---|---|
| INFORMATION SYSTEMS & NETWORKS, CORP., Plaintiff, v. THE UNITED STATES, Defendant. | * Motion for summary judgment; Contract claim – Contract Disputes Act; Constructive change doctrine; Limitations of the doctrine – *Len Co. Assocs.*; Failure to create genuine issue of material fact as to whether additional, uncompensated work was ordered by an official with the authority to do so; Covenant of good faith and fair dealing; Failure to create genuine issue of material fact as to whether termination of contract and other conduct was animated by bad faith; Defendant's motion granted. |

---

**OPINION**

---

*Norman H. Singer,* Singer & Associates, P.C., Bethesda, MD, for plaintiff.

*Steven M. Mager*, United States Department of Justice, Washington, D.C., with whom was *Peter D. Keisler*, Assistant Attorney General, for defendant.

**ALLEGRA, Judge:**

This contract case arises under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613. It is before the court on defendant's motion for summary judgment. Having fully considered the briefs and oral argument on this motion, the court **GRANTS** this motion for the reasons that follow.

## I. BACKGROUND[1]

On or about July 15, 1994, defendant, acting through the Department of the Navy's Fleet and Industrial Supply Center, Norfolk, Virginia (FISC), awarded plaintiff, Information Systems &

---

[1] Many of these background facts first appeared in the court's unpublished opinion in this case, issued April 12, 2005.

Networks Corp (Information Systems or ISN), a contract (No. 00600-94-C0389) to provide various material, labor, and services for naval telecommunications centers at Hampton Roads, Camp H.M. Smith, and Pearl Harbor. The objective of the contract was to lessen the manpower needs associated with the Technical Control Facilities that provide tactical and strategic communications support for the U.S. Navy's fleet and other Department of Defense components. The Space and Naval Warfare Systems Command (SPAWAR) was the primary beneficiary of the contract. The contract indicated that plaintiff was to "provide all material, labor, and services to engineer, provide, install, test, [and] provide operational assistance to seven ATC turnkey facilities." It further anticipated that Information Systems would perform site surveys "to gather information about site conditions such as available electrical power, air conditioning, space, equipment placement, etc., which will enable the Contractor to determine the specific communications equipment to satisfy the contract requirements." Plaintiff was to formulate the survey results into a report that was to be reviewed and approved by defendant. Any new equipment, software or specification changes identified in that report were then to be processed as a formal modification to the contract.[2]

The contract specified, in great detail, who had the authority to issue a written modification and repeatedly warned Information Systems not to perform additional work without a properly signed modification. For example, one section provided that "[t]he Contracting Officer may accept any change proposal submitted pursuant to this clause by giving the Contractor written notice thereof. This written notice may be given by issuance of a modification to this contract." Another section detailed:

---

[2] Clause I.46 in the contract dealing with "Change Proposals," specified that –

> After contract award, the Government may solicit, and the Contractor is encouraged to independently propose, changes to the equipment, software specifications, or other requirements of this contract. These changes may be proposed to save money, to improve performance, to save energy, or to satisfy increased data processing requirements. However, if proposed changes relating to improved performance are necessary to meet increased data processing requirements of the user, those requirements shall not exceed the contract requirements by more than 25%. If the proposed changes are acceptable to both parties, the contractor shall submit a price proposal to the Government for evaluation. Those proposed changes that are acceptable to the Government will be processed as modifications to the contract.

This clause also provided that "[u]nless and until a modification is executed to incorporate a change proposal under this contract, the Contractor shall remain obligated to perform in accordance with the terms of the existing contract," adding that if a change proposal was accepted, "an equitable adjustment in the contract price" would be made.

**G.2 AUTHORIZED CHANGES ONLY BY THE CONTRACTING OFFICER, SUP 5252.243-9000 (JAN. 1992)**

> (a) Except as specified in paragraph (b) herein, no order, statement or conduct of Government personnel who visit the Contractor's facilities, or in any other manner communicate with Contractor personnel during the performance of this contract, shall constitute a change under the "Changes" clause of this contract.
>
> (b) The Contractor shall not comply with any order, direction or request of Government personnel unless issued in writing and signed by the Contracting Officer, or pursuant to specific authority otherwise included in this contract.
>
> (c) The Contracting Officer is the only person authorized to approve changes in any of the requirements of this contract and, notwithstanding provisions contained elsewhere in this contract, said authority remains solely with the Contracting Officer. In the event the contractor effects any change(s) at the direction of any person other than the Contracting Officer, that change shall be considered to have been made without authority and no adjustment in price shall be made in the contract (or Delivery Order) to cover any increase in charges incurred as a result thereof.

Yet another section of the contract, in explaining the duties of the contracting officer's technical representative (COTR), reemphasized that only the contracting officer could approve a modification to the contract, adding that "[n]o action should be taken by the contractor" upon the technical instructions of the COTR absent the written issuance of a contractual change. Finally, the contract incorporated various FAR (48 C.F.R.) clauses, among them that at FAR § 43.301, which provides that supplemental agreements must be in writing and, in particular, "shall" be on a Standard Form 30 (SF 30). Under the contract, Roscoe Crawford, Jeffery Berghdal and Lisa Murtha served, respectively, as the contracting officer, contracting officer's technical representative, and contract specialist.

Defendant asserts that Information Systems lagged behind schedule, almost from the start of its performance. On March 21, 1995, the contracting officer provided Information Systems with a lengthy list of supposedly overdue contract data requirements and asked plaintiff to provide him with a plan to "get back on track and in compliance with the original contract." In June of 1995, SPAWAR identified changes it felt needed to be made to the contract, particularly as to the Hampton Roads site, and requested that plaintiff submit an engineering change proposal (ECP) that would effectuate those changes. On June 20, 1995, plaintiff submitted that ECP, accompanied by: (i) a cost breakdown differentiated by total cost, contract cost, and ECP cost; (ii) an equipment list for Hampton Roads; and (iii) a revised schedule with a set of specific delivery dates for Hampton Roads. On June 26, 1995, Ms. Murtha wrote plaintiff, indicating that "[a] modification to the contract will be issued for . . . the formal acceptance of an ECP," and that the "ECP submitted . . . will be reviewed by SPAWAR with comments to be provided" on June 26 or 27, 1995. The letter also requested Information Systems to provide a revised installation schedule.

On July 21, 1995, Mr. Berghdal sent Mr. Crawford and Ms. Murtha a copy of a July 20, 1995, memorandum from SPAWAR providing the latter's comments on the ECP. This memorandum began by stating –

> SPAWAR has reviewed reference (a) ECP and technically approves [Information Systems'] proposed engineering change. Recommend negotiate all terms and conditions listed in reference (a) with [Information Systems].

It went on to provide detailed comments on various aspects of Information Systems' cost analysis sheet. On August 23, 1995, SPAWAR, in a document signed by the contracting officer, reallocated $789,319 to the contract in question, allegedly to fund the ECP. (However, on November 27, 1995, these funds were reallocated to another purpose.).

Also on August 23, 1995, one of plaintiff's employees, Mr. Tobin, wrote Mr. Robertson, plaintiff's program manager, to "update him on the status of our ECP at FISC." This internal memorandum stated that Lisa Murtha "has not looked at the ECP, to date," and would be unable to do so until mid-September of 1995. The memorandum reflects that Mr. Tobin informed Ms. Murtha that he "did not think that ISN (my VP) would wait that long." Referring, by section number, to the "change proposals" clause in the contract, Mr. Tobin further stated –

> I talked with Don Tabasco about contract and FAR requirements for timely ECP processing by the government. He recommends that we take a more forceful approach with the contracting officer. You might want to touch base with him personally.

On August 31, 1995, Mr. Berghdal sent a memorandum to plaintiff, indicating that "we have technically approved the ECP" and asking "are you still going to submit a no-cost ECP to use in negotiation of consideration with FISC."

Despite this preliminary activity, the contracting officer never signed a SF 30 Form formally approving the ECP. Information Systems alleges that it orally was told to proceed with the work – or, at least, never told not to perform the work. Between September and December 1995, plaintiff submitted progress reports in which it repeatedly recognized that the ECP had not been approved. On September 27, 1995, Mr. Berghdal noted that "ISN is slightly behind the proposed schedule in their ECP, but still performing satisfactorily compared against that schedule." Notes from a December 6, 1995, meeting between Mr. Crawford and SPAWAR representatives reflect that Mr. Crawford –

> never modified the contract to re-establish the [delivery] schedule on any of the sites because he could never get a good idea of what a realistic new [delivery] schedule would be. Also the contractor would not agree to pay consideration to extend the schedule. So right now we are in limbo.

These same notes reflect that Mr. Crawford and others were contemplating terminating the contract.[3] On January 26, 1996, Mr. Tabasco, plaintiff's manager of contracts, wrote to the government complaining that "the approval of the latest ECP dated June 20, 1995, in the amount of $930,527 for Hampton Roads has not been received by ISN."

In February of 1996, after Information Systems had failed to meet its proposed delivery schedules, the Navy issued a stop work order. On March 15, 1996, defendant terminated the contract for convenience. From June of 1996 to November of 1997, plaintiff's representatives and Ms. Jones, the terminating contracting officer, attempted to settle on the proposed termination costs. As part of this process, on December 19, 1996, the Defense Contract Audit Agency (DCAA) audited plaintiff's termination proposal and concluded that a settlement of $ 4,049,532 was appropriate. By letter dated August 8, 1997, Ms. Jones issued a unilateral determination that found that Information Systems was entitled to $ 4,049,532; however, since plaintiff had already been paid this amount, Ms. Jones concluded that it was entitled to no further compensation. She left open, however, the possibility that plaintiff might receive additional compensation if it could further document its claim.

By letter dated September 5, 1997, Information Systems provided Ms. Jones with further information, seeking an additional $891,364, for work performed pursuant to the ECP. Thereafter, Ms. Jones attempted to contact Mr. Crawford to determine whether the ECP had been approved. After Mr. Crawford did not respond to her, by letter dated November 13, 1997, she offered Information Systems the sum of $891,364.00 in full and final settlement of its claims, "contingent on funding from the Department of Navy." On November 14, 1997, Information Systems purported to accept the offer by signing the November 13 letter and returning it to Ms. Jones. On November 18, 1997, Ms. Jones wrote Mr. Crawford advising him of the "offer" to Information Systems and requesting that he provide the additional funding needed. On December 1, 1997, Mr. Crawford responded that his office agreed with the original audit findings, that is, that nothing further was due Information Systems. By way of explanation, his letter stated –

> ISN has provided your office with volumes of supposed justification for additional compensation based on supposed approval of an ECP. This ECP was not approved and no services/supplies were received as stated by ISN. The ISN request for payment is unwarranted and as a Contracting Officer, not approved by myself.

His letter continued –

> ISN was not issued this ECP because the costs associated with its implementation were exorbitant . . . No matter what case ISN is trying to build, it is clear that ISN knew and knows the modification of the contract by myself as the Contracting

---

[3] According to the minutes, the contracting officer "want[ed] to reestablish the delivery schedule for all three sites in Lot I, knowing full well ISN won't meet the dates." Discussion also centered on whether any termination should be for default or for convenience.

> Officer was the only way the ECP could be added to the contract and the only manner in which contracted reimbursable work could be performed.

This letter concluded, "[i]n summary, additional funding will not be provided." On December 9, 1997, Ms. Jones informed plaintiff that the funding for her prior offer had not been approved and that plaintiff was due nothing for the ECP.

Initially, Information Systems brought suit in this court seeking, *inter alia*, damages for the breach of a settlement agreement covering the ECP. In that case (No. 98-178C), this court held that the settlement which Ms. Jones had attempted to process had not been finalized and dismissed the relevant count of the complaint. Plaintiff then voluntarily dismissed its other counts, without prejudice, while pursuing an appeal; on October 16, 2002, the Federal Circuit affirmed. *See Information Sys. & Networks Corp. v. United States*, 48 Fed. Appx. 334 (Fed. Cir. 2002). Then, on July 16, 2002, plaintiff filed a new complaint, this one containing five counts and seeking to recover in excess of $890,000, plus interest. On April 12, 2005, the court granted defendant summary judgment on the first count of that complaint, in which plaintiff sought damages for the costs incurred on the ECP, as a result of the defendant's breach of the allegedly modified contract. Discovery was then conducted on the remaining counts of the complaint. On March 16, 2007, defendant filed a motion seeking summary judgment seeking the dismissal of counts concerning: (i) the alleged breach of the covenant of good faith and fair dealing; (ii) an alleged constructive change; and (iii) plaintiff's entitlement to an equitable adjustment. Briefing, oral argument, and supplemental briefing on this motion have now been completed.

## II. DISCUSSION

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Arko Executive Servs. v. United States*, 78 Fed. Cl. 420, 423 (2007). Disputes over facts that are not outcome-determinative will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Becho, Inc. v. United States*, 47 Fed. Cl. 595, 599 (2000).

When reaching a summary judgment determination, the court's function is not to weigh the evidence, but to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *see also Agosto v. INS*, 436 U.S. 748, 756 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented."); *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 154 (2004). Rather, the court must determine whether the evidence reflects a disagreement sufficient to require fact finding or is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250-52; *Lockheed Martin Corp. v. United States*, 70 Fed. Cl. 745, 748-49 (2006). All facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in

the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587-88 (citing *United States v. Diebold*, 369 U.S. 654, 655 (1962)); *see also Lockheed Martin*, 70 Fed. Cl. at 749; *L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 240 (2005).

Twice, this court has rejected claims predicated upon the notion that defendant agreed to compensate plaintiff for modifications made to the contract at issue. In the earlier suit, this court held that these parties had not agreed to any settlement providing for additional compensation based upon the termination for convenience that occurred here. More recently in this case, this court found that there was no evidence that an authorized agent of the United States had approved an engineering change proposal that would have modified the contract. It found that "it is plain that a binding modification did not arise here, as the alleged modification was not reduced to a written agreement . . ." Slip Op. at 5. Finding its most direct path to recovery blocked, plaintiff now mounts a rearguard action asserting claims based upon implied agreements and covenants. Specifically, it avers that defendant's conduct in administering the contract effectuated a constructive change for which plaintiff is entitled to an equitable adjustment and that plaintiff was injured when defendant breached the covenant of good faith and fair dealing here. The court will consider these claims *seriatim*.

**A. Constructive Change/Equitable Adjustment**

In count III of the complaint, Information Systems alleges that the work it performed under the ECP was not contemplated by the original contract and that defendant, by approving that work, albeit without the formal adoption of an ECP, effectuated a constructive change to the contract. It further alleges that defendant breached the contract by failing to pay for the costs incurred by Information Systems on this constructive change. Count IV of the complaint makes similar claims and asserts that defendant approved a change in the scope of the work under the ECP, causing Information Systems to incur costs of which defendant was aware. This count concludes that "an equitable adjustment is required to be made to the contract for the ECP change which was approved, authorized, and directed by the defendant." On brief, both parties agree that counts III and IV represent successive prongs of the same, essential claim – a proposition that, as will be seen, is borne out by the decisional law.

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994)); *see also Praecomm, Inc. v. United States*, 78 Fed. Cl. 5, 11 (2007). "Equitable adjustments are corrective measures that make a contractor whole when the government modifies a contract." *Int'l Data Prods. Corp.*, 492 F.3d at 1325; *see also Ets-Hokin Corp. v. United States*, 420 F.2d 716, 720 (Ct. Cl. 1970); *Praecomm*, 78 Fed. Cl. at 11. A contractor is entitled to an equitable adjustment for a constructive change when it is required to perform more or different work not called for under the terms of its contract. *See Aydin Corp. v. Widnall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995) ("Where it requires a constructive change in a contract, the Government must fairly compensate the contractor for the costs of the change."); *Conner Bros. Const. Co. v. United States*, 65 Fed. Cl. 657, 679 (2005).

This scenario can arise in variety of ways. As this court summarized in *Metric Constr. Co., Inc. v. United* States, 80 Fed. Cl. 178 (2008), "[s]everal categories of constructive change have been identified: (i) disputes over contract interpretation during performance; (ii) Government interference or failure to cooperate; (iii) defective specifications; (iv) misrepresentation and nondisclosure of superior knowledge; and (v) acceleration.'" *Id*. at 185 (quoting *Miller Elevator*, 30 Fed. Cl. at 678); *see also* John Cibinic, Jr, Ralph C. Nash, Jr. & James F. Nagle, Administration of Contracts 428 (4th ed. 2006) (hereinafter "Cibinic, Nash & Nagle").[4]

Despite the wide variations in these fact patterns, there are several core principles that serve to map the contours of the constructive change doctrine. First, for there to be a constructive change, the contractor must truly be ***required*** by the government to perform work beyond the contract requirements – the contractor cannot recover if it unilaterally determines that a particular course of performance is preferable. *See Singer Co., Librascope Div. v. United States*, 568 F.2d 695, 701 (Ct. Cl. 1977) (no constructive change where, despite indications that government disapproved of equipment, no proof that "the Government directed plaintiff to take the step it did"); *Flink/Vulcan v. United States*, 63 Fed. Cl. 292, 309 (2004), *aff'd*, 163 Fed. Appx. 890 (Fed. Cir. 2006) (no constructive change when contractor could have declined extra work or proceeded under protest, but elected to proceed without reservation, for business reasons). To put it bluntly, "[t]he work must not have been volunteered." *Conner Bros. Constr. Co.*, 65 Fed. Cl. at 679.[5] Second, for a constructive change to occur, the informal order or the other conduct that causes the contractor to exceed the scope of the contract must originate from someone who is authorized to

[4] For examples of these variations, *see, e.g.*, *Ace Constrs., Inc. v. United States*, 70 Fed. Cl. 253, 280 (2006) ("Constructive acceleration is recognized as a form of constructive change."); *Dan Rice Constr. Co.*, 04-1 B.C.A. ¶ 32595 (2004); *A & D Fire Prot., Inc.*, 02-2 B.C.A. ¶ 32,053 at 158,448 (2002) ("A contractor is entitled to an equitable adjustment [for] a constructive change when required to perform more or different work not called for under the terms of its contract as a result of a Government inspector's misinterpretation of specifications."); *Const. Foresite, Inc.*, 93-1 B.C.A. ¶ 25,515 at 127,073 (1993) (contractor entitled to a monetary adjustment for an inspector's direction to install additional strapping beyond electrical code requirements and an additional electrical receptacle not shown on a contract drawing); *Allstate Leisure Prods., Inc.*, 89-3 BCA ¶ 22,003 at 110,623 ([Quality assurance representative's] erroneous interpretation of inspection standards was a constructive change); *see also* Ralph C. Nash & John Cibinic, "Contracting Authority of Government Inspectors: Now You See it, Now You Don't," 18 No. 12 Nash & Cibinic Rep. ¶ 52 (2004).

[5] *See also Len Co. & Assoc. v. United States*, 385 F.2d 438, 443 (Ct. Cl. 1967) (authorized officer must "compel" the contractor to perform the additional work); *Calfon Constr., Inc. v. United States*, 17 Cl. Ct. 171, 177 (1989); *Honeywell, Int'l, Inc.*, 07-2 B.C.A. ¶ 33612 (2007) (no constructive change where there is "volition to perform"); *Lovering-Johnson, Inc.*, 05-2 B.C.A.¶ 33126 (2005); Cibinic, Nash & Nagle, *supra*, at 434.

bind the Government.[6] It would be startling, indeed, if the law were otherwise on this point, as this limitation seemingly reflects the basic notion that the United States cannot be subjected to liability based upon the conduct of those not authorized to act in a particular regard. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380 (1947) ("Anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority."); *see also Miller Elevator*, 30 Fed. Cl. at 693; *Sam Gray Enters., Inc. v. United States*, 43 Fed. Cl. 596, 602 (1999), *aff'd*, 250 F.3d 755 (Fed. Cir. 2000).

There may be a third limitation on this doctrine. This case thus begs the question whether the doctrine can apply in the face of contract provisions that not only indicate that all changes are to be approved in writing by the contracting officer, but also repeatedly warn that the contractor should not perform additional work without such a written order and that it proceeds at financial risk, if it does so. Early decisions applying the constructive change doctrine reflect a willingness to relax the formal writing requirement in the then-existing changes clause, at least where the contracting officer orally ordered the changes. *See, e.g.*, *Turnbull, Inc. v. United States*, 389 F.2d 1007, 1012 (Ct. Cl. 1967) (and cases cited therein). Those rulings were viewed as reasonably effectuating the purpose of the changes clause, particularly where there was debate among the parties regarding whether an oral order effectuated a change or merely enforced an existing contract requirement. *See, e.g., J.B. Williams Co.*, 450 F.2d at 1394; *Ets-Hokin Corp. v. United States*, 420 F.2d 716, 720 (Ct. Cl. 1970); *Fleisher Eng'r & Constr. Co. v. United States*, 98 Ct. Cl. 139, 158 (1942); *Fox Valley Eng'r, Inc. v. United States*, 151 Ct. Cl. 228, 238 (1960). The situation presented in this case arguably is different. In contrast to the cases described above, applying the doctrine here would defenestrate several contract provisions that explicitly direct the contractor ***not*** to perform without a written modification order and ***not*** to expect compensation if it does so perform. But, is this a distinction with a difference?

At least one case – *Len Co. & Assocs*., 385 F. 2d at 442-44 – suggests "yes." In that case, the Court of Claims examined a housing contract arising under the Capehart Act of 1955, §§ 801-09, 69 Stat. 635 – a contract that had change provisions which were more specific than the then-standard clause insofar as the former required work modifications to be approved in writing by designated officials. Rejecting claims that the plaintiff's requests for compensation could be viewed as demands for equitable adjustments for constructive changes, Judge Davis, writing on behalf of the court, observed that "[t]he flaw in this argument is that it overlooks the special provisions of the plaintiff's Capehart Act contract and divorces the 'constructive change' doctrine from the type of contractual 'Changes' clause to which it has always been wedded." *Id*. at 442. His opinion noted that the court had "never indicated that the doctrine inheres in or is applicable to every 'Changes' clause, regardless of its terms or coverage," adding that "[f]rom the beginning,

---

[6] *See Harbert/ Lummus v. United States*, 142 F.3d 1429, 1432-33 (Fed. Cir. 1998); *Len Co. & Assoc.*, 385 F.2d at 442; *Conner Bros. Const. Co.*, 65 Fed. Cl. at 679 ("A government officer with the requisite authority must have directed the contractor to perform the additional work."); *CEMS, Inc.*, 59 Fed. Cl. at 202 (same); *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994) ("As a general matter, the Government remains bound only by the words or actions of those possessed with authority to bind the Government.").

regard has been had for the individual provision." *Id*. at 442. Emphasizing the relatively narrow rationale for the doctrine, he further opined that "this rationale . . . does not point to [the doctrine's] applicability in every instance in which a contracting officer requires the contractor to perform work not called for by the contract, regardless of the nature of the terms of the 'Changes' clause inserted by the contracting parties into their agreement." *Id*. at 443. The court then found that the specific provisions of the Capehart Act contract were controlling and could not support the general invocation of the constructive changes doctrine. "It goes without saying," the opinion concluded, "that we cannot rewrite, by an undiscriminating use of the constructive-change doctrine, the parties' own contract," *Id*. at 443-44.

Cases regularly cite *Len* as recognizing the constructive change doctrine, but do so without mentioning the contract-specific limitations on that doctrine enunciated by that case. There are several possible reasons for the latter omission. One possibility is that as the doctrine has broadened over time – encompassing conduct other than oral orders to perform work and clauses other than the once-typical "Changes" clause – the limitations discussed in *Len,* though not overruled, have become less confining. Indeed, many of the recent cases applying the doctrine reflect nothing more than a straightforward application of the most recent iteration of the standard changes clause, which now, unlike prior to 1968, recognizes that changes may be accomplished via "oral orders" from the contracting officer. *See, e.g.*, FAR § 52.243-4; *see also* Cibinic and Nash, *supra*, at 428. Another possibility is that that the limitations described in *Len* have taken a different form, effectuated, *sub silentio*, by a host of decisions refusing to give effect to oral change orders where the contract required such modifications to be in writing. *See, e.g.*, *Axion Corp. v. United States*, 75 Fed. Cl. 99, 116-17 (2007); *Design Prod., Inc. v. United States*, 18 Cl. Ct. 168, 205-07 (1989). Nevertheless, it cannot be denied that some cases continue to apply the doctrine to actions taken by officials not authorized to effectuate changes under the contract, as well as to oral orders given in apparent contravention of explicit contract provisions requiring changes to be in writing. *See* Cibinic & Nash, *supra*, at 405-08 (citing and comparing these cases). Surveying the decisional landscape, the court thus is left to question whether the doctrine ought to apply ***at all*** where a contract has very detailed provisions regarding modifications, particularly, where those provisions are atypical, and, especially, where the contract envisions, *ab initio*, that there will be significant modifications in contract performance. Fortunately, the court need not approach this case in such absolute terms, for assuming *arguendo* that the constructive change doctrine could apply theoretically in this contractual context, defendant has shown, as a matter of law, that it should not apply here.

Plaintiff, in fact, has failed to offer enough evidence to raise genuine issues of fact as to any of the subsidiary findings that are needed to trigger the doctrine. It has, first, made no real showing that any work it performed was above and beyond that envisioned by the original contract, which anticipated that the contractor would provide turnkey sites, as well as conduct site surveys and propose equipment purchases as part of the contract. *See Int'l Data Prods. Corp.*, 492 F.3d at 1325 ("These theories require record evidence that the Air Force demanded work above and beyond that in the contract."); *Lathan Co. Inc. v. United States*, 20 Cl. Ct. 122, 128 (1990). Second, it has made no showing that it was not paid for the work that it performed which was supposedly outside the scope of the contract. *See Morrison-Knudsen Co. v. United States*, 397 F.2d 826, 829 (Ct. Cl. 1968) (amount of equitable adjustment reduced by "compensation plaintiff

has already received"); *Flink/Vulcan*, 63 Fed. Cl. at 308. Third, it has failed to identify any informal order or other wrongful conduct on behalf of the United States that caused it to perform the additional work. Contrary to plaintiff's claims, nothing in the minutes of the various meetings it held with the contracting officer and COTR suggests that it was ever ordered to perform additional work or threatened with termination if it did not accelerate the existing work.[7] Rather, every indication is that plaintiff decided on its own accord to perform this work in anticipation of the ECP being approved, despite knowing full well the contractual risks of performing without that approval.[8] *See id*. at 308 ("The contractor must be directed, ordered, required or compelled to perform additional work."). Having acted contrary to the contract it signed, plaintiff should not be heard now to complain. Finally, even though plaintiff asserts that it was ordered to perform the work, it has not provided any evidence suggesting that the alleged additional work it performed was based upon the informal order or faulty conduct of someone who had the authority to bind the United States. *See Len Co. & Assocs*., 385 F.2d at 444.

Plaintiff's constructive change claim thus fails not on one, or even two or three, but ***four*** separate factual planes – it has not presented evidence to raise questions of fact that it performed additional work, that whatever work it performed was left uncompensated, that any such work was performed pursuant to an informal order or other faulty conduct, and that any supposed direction came from someone authorized to bind the United States.[9] Of course, any one of these deficiencies

---

[7] Various cases hold that a threat to terminate for default is akin to an order requiring acceleration of performance and can give rise to a constructive change. *See* Cibinic, Nash & Nagle, *supra*, at 451 (citing cases). Other cases, however, have refused to apply this rule where the government's right to terminate for default was merely mentioned. *See Donald R. Stewart & Assocs*., 92-1 B.C.A. ¶ 24,705 (1992).

[8] Clear indication of this may be found in a letter sent by Information Systems to the Navy on January 26, 1996. That letter cites two "very serious" concerns regarding the "lack of progress payments and approval of the ECP." It does not suggest that plaintiff was ordered to perform, but rather states "[w]e proceeded on the basis that the contract modification would be issued expeditiously in accordance with Clause I.46 of the contract implementing the ECP and that we wanted to continue with the progress on the contract to avoid default and receive progress payments." This letter continues, stating that "[w]ithout an expeditious resolution of these issues, our only recourse will be to submit a constructive change for equitable adjustment pursuant to the Changes Clause FAR 52.243-1." Of course, as this court previously noted, the record is replete with indications that plaintiff's officers knew that it was critical to have the ECP formally adopted.

[9] To be sure, in his declaration, Roma Malkani, the President and CEO of Information Systems, asserts that "[a]s soon as ISN completed its site surveys as required by the ATC Contract, the defendant began requesting changes in the Contract equipment and labor." Mr. Malkani further states that the changes were "reduced to writing" in the form of "Project Meeting Minutes" and "confirmatory documents" prepared by Information Systems. Notably, however, the declaration indicates that Mr. Malkani "make[s] this declaration upon personal knowledge,

would be enough to sink its claim. Nor, contrary to plaintiff's assertions, is its claim resurrected by the audits conducted by the DCAA. Plaintiff, indeed, wholly mischaracterizes these audits in suggesting that they concluded that it was entitled to "equitable adjustments" for work performed. In fact, the first of those audits, dated November 13, 1995, merely related to the status of progress payments, while the second, dated December 19, 1996, examined the termination settlement proposal that was submitted by Information Systems on June 4, 1996. It is the second of these audits upon which plaintiff principally relies. But, that audit explicitly caveats that its "results do not consider the contractor's legal entitlement," adding that the DCAA "express no opinion regarding legal entitlement." Rather, it purports only to opine on the acceptability of the settlement proposal in view of what was a "fair and reasonable price." In this regard, the audits rejected $1,011,047 of the $5,060,578 claimed by plaintiff, concluding that the settlement proposal was acceptable only to the extent that plaintiffs would receive $4,049,532. Notably, the latter figure appears to cover all of the material costs claimed by plaintiff ($2,401,080), thereby seeming to account for the cost of the equipment that plaintiff continues to seek in this matter. (Plaintiff has not shown otherwise.) Ultimately, the Navy, relying upon the latter DCAA audit, found that plaintiff has received all the funds to which it is entitled. Plaintiff has not shown that finding to be faulty, leading the court to conclude that the DCAA audits, if anything, support defendant's claim that plaintiff is not entitled to a further equitable adjustment owing to the equipment it installed.

In sum, the arguments that plaintiff makes here are all too reminiscent of those that it made unsuccessfully in asserting that the ECP here had been adopted. In its earlier summary judgment opinion in this case, the court thoroughly rejected those claims, holding that "no agency official with authority to bind the defendant assented to the ECP, either in writing or by conduct." Slip Op. at 6. In addition, the court found that "[t]he only person with the authority to bind defendant here was Mr. Crawford, the contracting officer, who neither engaged in any conduct assenting to the amendment nor signed any written document to that effect." *Id.* As was the case earlier, all of

---

except as to matters stated to be upon information and belief, which I believe to be true." The latter caveat appears to modify the entire declaration, rather than any particular statements therein, thereby depriving the entire declaration of any real evidentiary value. Such a result, indeed, is dictated by RCFC 56(e), which, like its Federal Rules counterpart, requires affidavits made in support of motions for summary judgment to be "made on personal knowledge." Under this rule, an affidavit that is based, in relevant part, on "information or belief" cannot raise genuine issues of fact. *See, e.g.*, *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("The Rule's requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'"); *Pace v. Copobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002) ("Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, "upon information and belief" – instead of only knowledge – from raising genuine issues of fact sufficient to defeat summary judgment."); *Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) ("[Rule 56(e)'s] requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented. An affidavit based merely on information and belief is unacceptable."). Of course, it does not help that the meeting minutes in question reflect that Mr. Malkani did not attend any the relevant meetings and that plaintiff has failed to produce any of the supposed "confirmatory documents" referenced in the affidavit.

plaintiff's evidence appears consistent with the notion that the only officials here that might have ordered the work performed were anticipating the adoption of the ECP and neither ordered nor otherwise caused plaintiff to perform any additional work. In these circumstances, the court concludes, as a matter of law, that no constructive change occurred here and that, as a result, plaintiff is not entitled to an equitable adjustment.

**B. Covenant of Good Faith and Fair Dealing**

In count II of the complaint, Information Systems alleges that defendant breached its covenant of good faith and fair dealing, essentially by misleading plaintiff into performing services despite the fact that the ECP had not been adopted. Effectively, plaintiff asserts that, at the time defendant requested it to complete work it had no intentions of formally executing the ECP or otherwise agreeing to pay for this work.

"Because it is an implied term of every contract that each party will act in good faith towards the other," the Federal Circuit has stated, "a party may breach a contract by acting in bad faith." *Link v. Dept. of the Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). As an aspect of these duties, "[e]very contract . . . imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'" *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (quoting *Luria Bros. v. United States*, 369 F.2d 701, 708 (Ct. Cl. 1966)); *see also H & S Mfg., Inc. v. United States*, 66 Fed. Cl. 301, 310 (2005), *aff'd*, 192 Fed. Appx. 965 (Fed. Cir. 2006). Such covenants require each party "not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Centex Corp.*, 395 F.3d at 1304; *see also Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988), *modified on other grounds by*, 857 F.2d 787 (Fed. Cir. 1988). A breach of the covenant occurs when, in the words of Judge Posner, there has been "sharp dealing," defined as taking "deliberate advantage of an oversight by your contract partner concerning his rights under the contract." *Mkt. St. Assocs. L.P. v. Frey*, 941 F.2d 588, 594 (7th Cir. 1991); *see also Centex Corp.*, 395 F.3d at 1304; *Moreland Corp. v. United States*, 76 Fed. Cl. 268, 291 (2007); *North Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 187 (2007). In short, "the covenant may be breached if, in ways unenvisioned by the contract, a party proceeds in a fashion calculated to frustrate or hinder performance by its contracting partner." *North Star*, 76 Fed. Cl. at 188; *see also Centex Corp.*, 395 F.3d at 1306.

When a contractor alleges bad faith, in order "to overcome the presumption of good faith [on behalf of the government], the proof must be almost irrefragable." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003). Translated into more common parlance, "well nigh irrefragable proof" has been described as "clear and convincing evidence." *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002). "In the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some specific intent to injure the plaintiff." *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982); *see also Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004); *Librach v. United States*, 147 Ct. Cl. 605, 614 (1959); *cf. Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 757-72 (2005). Courts have found bad faith when

confronted by a course of government conduct that was "designedly oppressive," *Struck Const. Co v. United States*, 96 Ct. Cl. 186, 222 (1942), or that "initiated a conspiracy" to "get rid" of a contractor, *Knotts v. United States*, 121 F. Supp. 630, 636 (Ct. Cl. 1954). *See also C. Sanchez & Son, Inc.*, 6 F.3d at 1542; *North Star*, 76 Fed. Cl. at 291. As these cases illustrate, the "irrefragable proof" standard, though daunting, "is not intended to be impenetrable, that is, it does not 'insulate government action from any review by courts'." *Id*. at 291 (quoting *The Libertatia Assocs., Inc. v. United States*, 46 Fed. Cl. 702, 707 (2000)); *see also L.P. Consulting Group, Inc. v. United States*, 66 Fed. Cl. 238, 243 (2005); *Manson Const. Co. v. United States*, 64 Fed. Cl. 746, 753 n.11 (2005).

That said, plaintiff has failed to produce evidence creating a genuine issue of fact as to a critical element of its claim – that defendant's actions in either failing to approve the ECP, terminating the contract, or otherwise administering the contract, were prompted by some specific intent to injure plaintiff. Plaintiff's banner claim in this regard – that there was a scheme to terminate it for default – relies heavily on the minutes of an internal meeting held on December 6, 1995, which it claims reflect a plan to "orchestrate" that termination, without approval of the ECP. The passage of these minutes upon which plaintiff principally relies states –

> Roscoe [Crawford – the CO] wants to reestablish the deliv[ery] schedule for all three sites in Lot I, knowing full well ISN won't meet the dates. If he can't negotiate consideration he will determine it unilaterally. When the contractor misses the dates, Roscoe wants to [terminate for default] them. The activity prefers to [terminate for convenience] them. This will have to be resolved and we discussed this at length. However, both Roscoe and the DCMAO ACO feel we have a good case for [termination for default]ing them and it will be a lot cheaper than [terminating them for convenience]. The downside is it will mean the contract will have to go on for about 6 more months (the soonest new realistic delivery date 1would be about 6 mo. from now).

Any notion, however, that these comments reflect a sinister plan to snatch benefits from plaintiff sans compensation is dispelled by reading them in context. The full minutes reveal that the termination for default was being contemplated not to take advantage of plaintiff, but rather because "[t]he contractor has had all kinds of performance problems from the beginning" and "is at least five months late on delivery/installation completion of all three sites." Moreover, those minutes note that the Government had already paid over $2 million in progress payments "which covers the cost of the equipment" – thus directly contradicting plaintiff's unsupported claim that the purpose of the termination was to allow defendant to seize its equipment without compensation. In context, then, the cited passage reflects that, while the reestablishment of deadlines was viewed as a precursor to terminating the contract, that termination was anticipated based neither upon the unreasonableness of the new schedule nor any animus-driven desire to "get rid" of the contractor, but rather based upon plaintiff's failed performance to that date.[10]

---

[10] That view is confirmed by the deposition testimony of Mr. Crawford and is not controverted by any other evidence supplied by plaintiff.

Leaving aside the absence here of any proof of animus or even sharp dealing, there is at least one other significant factual kink in plaintiff's assertion that defendant hatched a scheme to terminate it for default and seize its equipment – namely, it was not terminated for default, but rather for convenience. Of course, under the latter termination scenario, plaintiff was entitled to compensation for properly incurred expenses. *See* FAR § 52.249-6; *Maxima Corp. v. United States*, 847 F.2d 1549, 1552 (Fed. Cir. 1988). But, even if plaintiff had been terminated for default, this would not be a close case. Plaintiff has had ample opportunity to conduct discovery on whether defendant took any actions in bad faith (or, at least in the absence of good faith) here and, apart from the minutes discussed above, has come forth with no shred of evidence in support of its claim. *Cf. North Star*, 76 Fed. Cl. at 190-208 (bad faith demonstrated by "statements made by key government official exhibiting animus" and by dishonest conduct.). This litigation has far passed the stage where plaintiff may support its covenant-breach claim based solely upon bald allegations. Its failure to provide any real factual support for these allegations means that defendant is entitled to judgment on this claim as a matter of law.[11]

## III. CONCLUSION

This court need go no further. While plaintiff has struggled mightily to create the slightest glimmer of a material factual question here, in the end, its efforts have proven futile. The court is left with the firm conviction that no such questions exist and that defendant, therefore, is entitled to judgment as a matter of law. Based on the foregoing, the court **GRANTS** defendant's motion for summary judgment. The Clerk is instructed to dismiss plaintiff's complaint.[12]

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[11] Indeed, it should not be overlooked that without some proof that it performed additional work for which it was not compensated, plaintiff is unable to claim that it was harmed here.

[12] Count V of plaintiff's complaint seeks attorney fees for this litigation. But, obviously, this claim cannot stand if all the substantive claims in the complaint are dismissed.